**KESSLER TOPAZ MELTZER
    & CHECK, LLP**
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:    (415) 400-3000
Fax:    (415) 400-3001


**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:    (310) 819-3470

*Counsel for Plaintiff Electrical Workers Pension Fund, Local 103, I.B.E.W.*

[Additional counsel appear on signature page.]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELECTRICAL WORKERS PENSION FUND, LOCAL 103, I.B.E.W., on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HP INC., DION J. WEISLER, CATHERINE A. LESJAK, and STEVEN J. FIELER,<br><br>Defendants. | Case No. 3:20-cv-01260<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>DEMAND FOR JURY TRIAL |

Plaintiff Electrical Workers Pension Fund, Local 103, I.B.E.W. ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (i) regulatory filings made by HP Inc. ("HP" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, presentations, and media reports issued by and disseminated by the Company; (iii) analyst and media reports concerning HP; and (iv) other public information regarding the Company.

## I.   INTRODUCTION

1.   This securities class action is brought on behalf of all persons or entities that purchased shares of HP's common stock between February 23, 2017 and October 3, 2019, inclusive (the "Class Period"). The claims asserted herein are alleged against HP and certain of the Company's current and former senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.   Based in Palo Alto, California, HP is a global provider of personal computers, printers and related supplies, solutions, and services. The Company conducts its business primarily through two segments: Personal Systems and Printing. The Personal Systems segment offers commercial and consumer computers and related software, support, and services. The Printing segment provides consumer and commercial printer hardware, supplies, solutions, and services.

3.   The Company's Printing segment includes the Supplies business unit which comprises consumable products, including ink and laser cartridges, for recurring use in consumer and commercial printing hardware. The Supplies business has been a significant revenue driver for the Company. Prior to the Class Period, on June 21, 2016, HP reported that its Supplies business was facing challenges from price variability among Supplies products available to customers in an omnichannel world as well as a decreasing impact from the Company's promotional pricing of its supplies. As a result, the Company announced a one-time investment

1  of $450 million to buy back supplies from its channel partners to better align supplies inventory
2  levels with demand, with the goal of stabilizing supplies revenue in constant currency by the end
3  of fiscal 2017.  HP also announced the fundamental shift in its supplies business from a push
4  strategy to a pull strategy, which involves aligning channel supplies inventory levels with current
5  demand and marketing efforts to drive print relevancy and strengthen HP's Supplies brand value.

6         4.      Accordingly, at the start of the Class Period, HP assured investors that its new
7  approach to managing and aligning demand and inventory in its Supplies business would avert the
8  types of problems that necessitated the $450 million buy-back.  The centerpiece of this new
9  approach was focused on what the Company called its "four-box model."  For several years, the
10 Company measured its Supplies business through this model, which focuses on the four key drivers
11 of revenue growth: in-store base, usage, market share, and price.

12        5.      With the shift to the pull strategy to manage its Supplies business, the Company's
13 four-box model became the primary focus of the Company and its investors because HP assured
14 investors that its use of the four-box model enabled it to accurately assess demand for products in
15 its Supplies business and manage the inventory placed in its sales and distribution channels.

16        6.      Throughout the Class Period, the Company emphasized the four-box model as an
17 accurate, reliable tool to determine demand and revenue in the Supplies business, and reassured
18 investors that, based on the four-box model, HP had a "clear line of sight to supply stabilization."
19 Defendants repeatedly highlighted the reliability of the Company's four-box model and the
20 revenue growth of the Supplies business, touting their "continued confidence in the predictive
21 value of the four box model" and stating that the Company's "Supplies revenue is in line with the
22 expectations that we set, and that our 4-box model continues to drive predictability."  These
23 statements were false.  In truth, Defendants knew HP lacked reliable, automated data for the four-
24 box model and, as a result, the four-box model was not a reliable tool and provided HP with only
25 a partial, outdated indicator of the demand for Supplies products.  As a result of Defendants'
26 misrepresentations, shares of HP's common stock traded at artificially inflated prices during the
27 Class Period.

28        7.      The truth began to emerge on February 27, 2019, after the market closed, when the

Company reported disappointing total Supplies revenue for the first quarter of fiscal 2019 due to weaker than predicted demand from commercial customers in HP's Europe, the Middle East, and Africa ("EMEA") market. The Company blamed these results on an increase in online sales, where the Company had a lower market share and faced more competition from cheaper third-party alternatives than with traditional commercial resellers and in-store retailers, in addition to price sensitivity due to increased macro uncertainty. Significantly, in reporting these results, the Company admitted that its four-box model had been based upon incorrect data concerning inventory, market share, and pricing assumptions. Accordingly, due to its limited "visibility into the downstream channel ecosystem," the Company "did not see clearly enough that we had an issue." The Company also revealed that it lacked telemetry data to determine reliable market share assumptions for its Supplies business.[1] The Company revised its market share and pricing assumptions and announced a plan to lower channel inventory levels once again—as it had done in the second half of 2016—which created a $100 million headwind to the Company's Supplies revenue for the remainder of fiscal 2019. As a result, the Company revised its previous estimate of Supplies revenue for fiscal 2019 to a decline of 3%, versus prior guidance of flat to slightly up revenue year over year. These disclosures caused the Company's stock price to decline from $23.85 per share to $19.73 per share, or over 17%, on high trading volume.

8.      On May 30, 2019, at the Sanford C. Bernstein Strategic Decisions Conference, Weisler disclosed additional detail on HP's lack of telemetry data, admitting that the consumer segment of the Supplies business had had telemetry data for years, meaning that management had known all along the importance of telemetry data for an accurate model and that the commercial Supplies business lacked this key input. This was because the Company "started that effort much later" for its commercial customers and faced "problems . . . getting through commercial firewalls" to obtain telemetry data. The lack of sufficient telemetry data for the commercial Supplies business, in contrast to its availability in the consumer segment, meant that management knew or

---

[1] Telemetry data is data provided automatically by remote units, such as printers that have been sold to customers, which apprise HP about the level of usage and need for new toner.

recklessly disregarded that the use of the four-box model was critically impaired. As a result of these disclosures, by the end of the following day, the Company's stock price dropped over 2%, from $19.14 per share to $18.68 per share, on high trading volume, wiping out $690 million in shareholder value.

9. On August 22, 2019, after the market closed, HP announced that Defendant Weisler would step down at the end of October 2019 due to a family health matter. HP also announced mixed earnings results for the third quarter of fiscal 2019, with Supplies revenue down 7% year-over-year. On this news, the price of HP stock dropped nearly 6%, from $18.93 per share to $17.81 per share, on high trading volume.

10. Then, on October 3, 2019, after the market closed, HP announced that it was "departing from the purely transactional Supplies-centric business model" and moving away from using the four-box model, transitioning instead to a hardware-driven business model. The major change to the Company's business model would give customers the choice between a discounted HP printer that can only function with HP supplies or a higher-priced HP printer with the option to choose third-party supplies. Under the new business model, the Company would de-emphasize Supplies revenue as "the singular metric to determine our progress" and instead focus on "the key metrics [of] service growth and operating profit dollars, which better reflect[] the system profitability." The Company also announced mass layoffs as part of a major restructuring, in which it expects to cut between 7,000 to 9,000 positions, or up to 16% of its global workforce, over three years. As a result of these disclosures, the price of HP's stock dropped from $18.40 per share to $16.64 per share, or nearly 10%, on unusually high trading volume.

## II.   JURISDICTION AND VENUE

11. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). HP maintains its headquarters in Palo Alto, California,

1  which is situated in this District, conducts substantial business in this District, and many of the
2  acts and conduct that constitute the violations of law complained of herein, including
3  dissemination to the public of materially false and misleading information, occurred in and/or were
4  issued from this District.  In connection with the acts alleged in this Complaint, Defendants,
5  directly or indirectly, used the means and instrumentalities of interstate commerce, including, but
6  not limited to, the mails, interstate telephone communications, and the facilities of the national
7  securities markets.

## III. PARTIES

13. Plaintiff is a pension fund based in Boston, Massachusetts that provides retirement benefits to active and retired Boston electrical workers.  As indicated on the certification submitted herewith, Plaintiff purchased HP common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

14. Defendant HP is a global provider of personal computers, printers and related supplies, solutions, and services.  Incorporated in Delaware, the Company maintains its corporate headquarters at 1501 Page Mill Road, Palo Alto, California.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under ticker symbol "HPQ."  As of November 30, 2019, HP had over 1.4 billion shares of common stock outstanding, owned by hundreds or thousands of investors.

15. Defendant Dion J. Weisler ("Weisler") served as President and Chief Executive Officer of HP from November 2015 until November 1, 2019.

16. Defendant Catherine A. Lesjak ("Lesjak") served as HP's Chief Financial Officer from November 2015 until July 1, 2018 and served as HP's interim Chief Operating Officer from July 1, 2018 until February 2019.

17. Defendant Steven J. Fieler ("Fieler") has served as HP's Chief Financial Officer since July 1, 2018.  Previously, Defendant Fieler served as HP's Head of Global Treasury since January 2017.

18. Defendants Weisler, Lesjak, and Fieler are collectively referred to hereinafter as

the "Individual Defendants." The Individual Defendants, because of their positions with HP, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports, presentations, and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV. BACKGROUND

19. HP is a global provider of personal computers, printers and related supplies, solutions, and services. HP's two primary segments are Personal Systems and Printing. The Personal Systems segment offers commercial and consumer computers and related software, support, and services. The Printing segment provides consumer and commercial printer hardware, supplies, solutions, and services. HP was formerly a part of Hewlett-Packard Co., which on November 1, 2015, split into two separate companies: HP and Hewlett-Packard Enterprise.

20. HP's Printing segment includes the Supplies business unit which consists of consumable products, such as ink and laser cartridges, for use in consumer and commercial printing hardware. HP's Supplies business is a significant revenue driver for the Company. For example, Supplies accounted for 66% of the Company's total Printing revenue in the third quarter of fiscal 2017. At an analyst conference in New York on September 6, 2017, HP's then-Chief Financial Officer ("CFO") Catherine A. Lesjak stressed the importance of Supplies for the Company, stating that "a big portion of the [Company's] profits is really coming from Supplies because we typically have a business model, where you place the units at very low margins or negative margins and you basically then get the Supplies annuity to give you a positive [net present value]."

21. Following the 2015 split from Hewlett-Packard Co., HP experienced ongoing

difficulties in its Supplies revenue, with the Company experiencing declining market share due to competition from third-party ink suppliers, remanufacturers (vendors who refill HP ink cartridges), and counterfeiters.

22. On June 21, 2016, following a large decline year-over-year in Supplies revenue, HP announced that it would be making a one-time "investment" of $225 million in each of the next two quarters (a total of $450 million) to reduce the level of Supplies inventory across the channels by buying back product from its channel partners to right-size inventory levels. HP stated that this step would enable a fundamental shift in its Supplies business from a "push" strategy, which relied on promotions to sell supplies into the broad channel network at the end of each quarter in anticipation of future demand and then leveraging additional funds to push the inventory through to end users, to a "pull" strategy, which aligns channel supplies inventory levels with current demand followed by investment in marketing to drive print relevancy and strengthen HP's supplies brand value.

23. To assure investors that HP could accurately manage demand and inventory, and avoid a recurrence of the excess inventory problem that resulted in the $450 million repurchase of inventory, HP stressed its reliance on its four-box model. That model, which had been in use for several years, focuses on four key drivers of revenue growth: in-store base, usage, share, and price. Specifically, the first driver is to place positive net present value ("NPV") units, while the second driver is to ensure higher usage of printer hardware units. The third driver is market share supply, which focuses on driving customers toward HP-branded supplies. Lastly, the fourth driver is product pricing, in which HP sets a price point for its supplies products to maximize profit without impacting demand. The four-box model relies on "big data," according to Defendant Lesjak, who on November 24, 2015, told investors, "We have found that our four-box model is, in fact, very good. And as we have collected more big data – and every week we collect new data, we update [] the model."

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

24. The Class Period begins on February 23, 2017, the next trading day after HP issued a press release after the close of market on February 22, 2017, which it also filed with the SEC on Form 8-K, announcing its financial results for the first quarter of fiscal 2017. The Company reported total revenue of $12.7 billion for the quarter, well above Wall Street consensus estimates, as both its Personal Systems and Printing segments outperformed estimates. Later that day, the Company held an earnings conference call with analysts and investors to discuss its financial results for the first quarter of fiscal 2017. During the call, Defendant Weisler stated that "total Supplies revenue was down just 2% year-over-year in constant currency. As we always say, it's all about Supplies, and we continue to drive a number of initiatives within the four-box model to return this revenue stream to growth." He also stated that "[a]ctual performance continues to meet, and sometimes beat the four-box model forecast, which means we firmly believe the strategy that we're executing to is the right strategy, and that you've seen those metrics play out inside the business results."

25. On May 24, 2017, after the market closed, HP held a conference call with analysts and investors to discuss the Company's financial results for the second quarter of fiscal 2017. The Company reported an improvement in its Supplies business, with Supplies net revenue up 2% in constant currency, after adjusting for the changes to the Company's Supplies sales model that HP made in 2016, which materially outperformed Wall Street estimates. During the conference call, Defendant Lesjak stated that, based on the four-box model, "[w]e have clear line of sight to supply stabilization."

26. On August 23, 2017, after the market closed, HP held a conference call with analysts and investors to discuss the Company's financial results for the third quarter of fiscal 2017. The Company reported that Supplies net revenue was again up 2%, after adjusting for constant currency and the changes to the Company's Supplies sales model that HP made in 2016. During the call, Defendant Weisler reported that the Company's Supplies revenue had stabilized in the third quarter of 2017, a quarter earlier than expected, which he touted as an "important

milestone" for the Company. During the call, Defendant Lesjak also touted "better than anticipated" supplies revenue growth which was "driven by improving four-box model drivers." She also reported that, for the third quarter; supplies channel inventory levels were below the ceiling HP had set and stated that the Company "expect[s] to consistently operate with supplies channel inventory levels remaining at or below our ceiling."

27. On November 21, 2017, after the market closed, HP held a conference call with analysts and investors to discuss the Company's financial results for the fourth quarter of fiscal 2017. During the call, Defendant Weisler touted that the Company's "[q]uarter 4 Supplies revenue grew again, demonstrating the huge progress we've made with this business during the year." Additionally, in response to an analyst's question regarding the Company's four-box model, Defendant Lesjak stated, "We have really proven to ourselves and hopefully to you that you should have confidence in our four-box model."

28. On February 22, 2018, after the market closed, HP held a conference call with analysts and investors to discuss the Company's financial results for the first quarter of fiscal 2018. During the call, Defendant Weisler again touted that the Company's "Supplies revenue grew 10% year-over-year, marking another quarter of substantial progress and supporting our confidence in the four-box model to drive health in the Print business for the long term." After adjusting for HP's acquisition of Samsung's printer business, which closed on November 1, 2017, Supplies revenue grew 4% year-over-year. Defendant Weisler also stated that "the four-box model has been the strong predictor of outcomes for us" and "as a result of that, we believe that Supplies in '19 will be flat to slightly up." Similarly, on the call, Defendant Lesjak stated that "[w]e believe that the four-box model remains a good predictor of our Supplies performance, and we continue to operate below our channel inventory ceiling." Defendant Weisler assured investors that "we have really high confidence in the four-box model."

29. On February 27, 2018, Defendant Lesjak represented HP at the Morgan Stanley Technology, Media & Telecom Conference in San Francisco. During the conference, in response to an analyst's question regarding the Company's confidence about Supplies stability as informed by the four-box model, Defendant Lesjak stated, "[W]e have a lot of confidence in the predictive

capabilities of our four-box model. We have seen that it has been very reliable."

30. On May 29, 2018, after the market closed, HP held a conference call with analysts and investors to discuss the Company's financial results for the second quarter of fiscal 2018. The Company reported that Supplies revenue for the second quarter was up 6% in constant currency with the Company "continu[ing] to operate below our ceiling for Supplies channel inventory." During the call, Defendant Weisler touted the Company's "continued confidence in the predictive value of the four-box model."

31. On May 31, 2018, Defendant Weisler represented HP at the Sanford C. Bernstein Strategic Decisions Conference in New York. During the conference, Defendant Weisler stated that "the four-box driver model has been a good predictive tool for us" and "when we retrospectively go back and look at what actually happened versus what the model told us would happen, it is pretty consistent. So we feel good about the guidance that we're giving."

32. On June 6, 2018, Defendants Lesjak and Fieler represented HP at the Bank of America Merrill Lynch Global Technology Conference in San Francisco. During the conference, Defendant Fieler stated that "what's really important about the [four-box] model is the predictability around it," touting the model as "highly predictive." Defendant Fieler also stated that "we have increasing confidence as we get more data and insight into the four-box model."

33. On August 23, 2018, after the market closed, HP held a conference call with analysts and investors to discuss the Company's financial results for the third quarter of fiscal 2018. The Company reported that Supplies revenue for the third quarter was again up 6% in constant currency with the Company "continu[ing] to operate below our ceiling for Supplies channel inventory." During the call, Defendant Fieler stated that "we have been pretty predictive with what we call the four-box model" and "we reflect on the four-box model and what it's predicting" and "[w]e have confidence that [Supplies revenue] will be flat to slightly up next year." During the call, Defendant Weisler stated that "I, like Steve [Fieler], also have a lot of confidence in the predictive value of our four-box model, which is the basis for what we guided for the rest of FY '18 and '19."

34. On October 3, 2018, the Company held its annual Securities Analyst Meeting in

New York. During the conference, Defendant Weisler stated that "I'm … pleased that our Supplies revenue is in line with the expectations that we set, and that our four-box model continues to drive predictability."

35.  The statements set forth above in ¶¶24-34 were materially false and misleading. In truth, Defendants knew that the four-box model was severely deficient and not a strong predictor of Supplies demand and outcomes, because HP lacked telemetry data from its commercial printers and had to use unreliable and stagnant market share data to develop assumptions for the four-box model. Defendants knew the lack of telemetry data for commercial printing was a critical shortcoming of the four-box model because HP possessed telemetry data on its personal printing side and knew it was a necessary element for an accurate understanding of the Supplies channel. As a result, the Supplies inventory in the Company's channel exceeded demand by at least $100 million and HP's Supplies revenue growth was grossly inflated.

## VI.  THE TRUTH EMERGES

36.  After the close of trading on February 27, 2019, HP reported that total Supplies revenue was down 3%, with a 9% decline in EMEA, for the first quarter of fiscal 2019. On an earnings call held that day, HP management attributed the shortfall to weaker than predicted demand from commercial customers in EMEA driven by an increase in online sales, where HP had a lower market share and faced more competition from cheaper third-party alternatives than in the US. HP admitted to a larger problem with its four-box model: it had been using incorrect Supplies market share assumptions and, contrary to its previous statements, in fact had limited "visibility into the downstream channel ecosystem" and had failed to accurately predict "a decline in share and, to a lesser extent, pricing," most significantly for Supplies in HP's commercial channels. As a result, the Company had too much inventory in its Supplies channel network that was not selling through. When an analyst from Morgan Stanley asked why the four-box model was not flagging these problems ahead of time, Defendant Weisler responded by explaining that HP "did not have a statistically significant sample from the system telemetry" and that the Company used "periodic third-party survey data and market research aggregators to estimate" commercial Supplies market share. These "lagging and incomplete market share surveys" failed

1  to indicate that HP's commercial Supplies market share "was significantly lower than what we had
2  assumed." Thus, HP announced a plan to lower channel inventory levels, which would create a
3  $100 million headwind to the Company's Supplies revenue for the remainder of fiscal 2019. As a
4  result, the Company stated that it "no longer expect[ed] Supplies to be flat to slightly up in fiscal
5  '19" and expected Supplies revenue to decline 3% for fiscal 2019. These disclosures caused the
6  Company's stock price to decline from $23.85 per share to $19.73 per share, or over 17%, on high
7  trading volume.

8        37.    Despite these revelations, HP misled investors on the call as to how fundamental
9  the problems were with the four-box model's ability to provide visibility into the Supplies channel,
10 characterizing the revenue shortfall for the first quarter of fiscal 2019 as the result of "an
11 unexpected challenge in Supplies." But on May 30, 2019, at the Sanford C. Bernstein Strategic
12 Decisions Conference, Defendant Weisler disclosed additional detail on the lack of telemetry data,
13 admitting that the consumer segment of the Supplies business had had telemetry data for years,
14 meaning that management had known all along the importance of telemetry data for an accurate
15 model and that the commercial Supplies business lacked this key input. This was because the
16 Company "started that effort much later" for its commercial customers and faced "problems . . .
17 getting through commercial firewalls" to obtain telemetry data. The lack of sufficient telemetry
18 data for the commercial Supplies business, in contrast to its availability in the consumer segment,
19 meant that management should have known that the use of the four-box model was critically
20 impaired. As a result of these disclosures, by the end of the following day, the Company's stock
21 price dropped over 2%, from $19.14 per share to $18.68 per share, on high trading volume.

22       38.    On August 22, 2019, after the market closed, HP announced in a press release, also
23 filed on Form 8-K with the SEC, that Defendant Weisler would step down at the end of October
24 2019 due to a family health matter. HP also announced disappointing earnings results for the third
25 quarter of fiscal 2019, with Supplies revenue down 7% year-over-year. Management also revised
26 Supplies revenue guidance even further down, to 4% or 5% down for fiscal 2019 from previous
27 guidance of 3%. On this news, the price of HP stock dropped nearly 6%, from $18.93 per share
28 to $17.81 per share, on unusually high trading volume.

39. Then, on October 3, 2019, after the market closed, HP announced that it was "departing from the purely transactional Supplies-centric business model" and transitioning to a hardware-driven business. The new business model gives customers the choice between a discounted HP printer that can only function with HP Supplies or a higher-priced HP printer with the option to choose third-party cartridges. Under the new business model, HP would abandon its use of the four-box model as the Company de-emphasized Supplies revenue and instead would focus on "the key metrics [of] service growth and operating profit dollars, which better reflect[] the system profitability." The Company also announced mass layoffs as part of a major company restructuring, in which it expects to cut between 7,000 to 9,000 positions, or up to 16% of its global workforce, over three years. As a result of these disclosures, the price of HP's stock dropped from $18.40 per share to $16.64 per share, or nearly 10%, on unusually high trading volume.

40. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## VII. LOSS CAUSATION

41. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of HP's common stock and operated as a fraud or deceit on the Class (as defined below). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of HP's stock fell precipitously as the prior artificial inflation came out of the price over time. As a result of their purchases of HP's stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VIII. CLASS ACTION ALLEGATIONS

42. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the publicly traded common stock of HP during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of HP and their families and affiliates.

43. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of November 30, 2019, HP had over 1.4 billion shares of common stock outstanding, owned by hundreds or thousands of investors.

44. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    (a) Whether Defendants violated the Exchange Act;

    (b) Whether Defendants omitted and/or misrepresented material facts;

    (c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    (d) Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

    (e) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

    (f) Whether Defendants' conduct impacted the price of HP common stock;

    (g) Whether Defendants' conduct caused the members of the Class to sustain damages; and

    (h) The extent of damage sustained by Class members and the appropriate measure of damages.

45. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

46. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

47. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR

48. HP's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

49. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of HP who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X. PRESUMPTION OF RELIANCE

50. At all relevant times, the market for HP's common stock was an efficient market for the following reasons, among others:

   (a) HP common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

   (b) As a regulated issuer, HP filed periodic public reports with the SEC and the NYSE;

   (c) HP regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

   (d) HP was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

51. As a result of the foregoing, the market for HP common stock promptly digested

current information regarding HP from all publicly available sources and reflected such information in the price of HP common stock. Under these circumstances, all purchasers of HP common stock during the Class Period suffered similar injury through their purchase of HP common stock at artificially inflated prices and the presumption of reliance applies.

52. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the availability of reliable data to predict future demand for the Company's supplies which artificially inflated revenue—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Company's ability to reliably predict demand for its supplies and place the appropriate amount of inventory into its channel network, that requirement is satisfied here.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

53. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase HP common stock at artificially inflated prices.

55. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for HP common stock in violation of Section 10(b) of

the Exchange Act and Rule 10b-5, promulgated thereunder.

56. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

57. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

58. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal HP's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

59. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for HP's common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for HP's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

60. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

61. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

62. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

63. The Individual Defendants acted as controlling persons of HP within the meaning

of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about HP, the Individual Defendants had the power and ability to control the actions of HP and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XI.   PRAYER FOR RELIEF

64. WHEREFORE, Plaintiff prays for judgment as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XII.   JURY DEMAND

65. Plaintiff demands a trial by jury.

DATED: February 19, 2020

Respectfully submitted,

**KESSLER TOPAZ MELTZER & CHECK, LLP**

/s/ Jennifer Joost
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:     (415) 400-3000
Fax:    (415) 400-3001


**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

/s/ Jonathan D. Uslaner
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:     (310) 819-3470

-and-

HANNAH ROSS
(hannah@blbglaw.com)
AVI JOSEFSON
(avi@blbglaw.com)
MICHAEL D. BLATCHLEY
(michaelb@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:     (212) 554-1400
Fax:    (212) 554-1444

*Counsel for Plaintiff Electrical Workers Pension Fund, Local 103, I.B.E.W.*