**KESSLER TOPAZ MELTZER**
    **& CHECK, LLP**
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
ELI R. GREENSTEIN (Bar No. 217945)
(egreenstein@ktmc.com)
STACEY M. KAPLAN (Bar No. 241989)
(skaplan@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:     (415) 400-3000
Fax:     (415) 400-3001

*Counsel for Lead Plaintiff the State of Rhode
Island, Office of the General Treasurer, on behalf of
the Employees' Retirement System of Rhode Island
and Co-Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER**
    **& GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:     (310) 819-3470

*Counsel for Lead Plaintiff Iron Workers Local 580
Joint Funds and Co-Lead Counsel for the Class*

[Additional counsel appear on signature page.]

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE HP INC. SECURITIES LITIGATION | Case No. 3:20-cv-01260-SI |
| | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | <u>CLASS ACTION</u> |
| | DEMAND FOR JURY TRIAL |
| | Dept.:  Courtroom 1, 17th Floor<br>Judge:  Hon. Susan Illston |

1

## TABLE OF CONTENTS

2

**Page**

3  I.   INTRODUCTION ...................................................................................................1

4  II.  JURISDICTION AND VENUE .............................................................................9

5  III. PARTIES ..............................................................................................................10

6       A.   Lead Plaintiffs .........................................................................................10

7       B.   Corporate Defendant ................................................................................10

8       C.   Individual Defendants ..............................................................................11

9  IV.  OVERVIEW OF DEFENDANTS' FRAUD ........................................................13

10      A.   HP's Success Depended on Its Printing Supplies Business.....................14

11      B.   Prior to the Class Period, HP's Supplies Revenue Had Been Declining for Years
             As Consumers Printed Less and Competition Increased In the Supplies
12           Aftermarket ..............................................................................................16

13           1.   HP Was Losing Supplies Market Share To Third-Party Aftermarket
                  Suppliers, Leading to Lower Supplies Revenues and Profits ...............17

14
             2.   HP Was Selling Fewer Printers, Leading to Less Supplies Revenue ...................18
15
             3.   Consumers Were Printing Less, Leading to Lower Supplies Sales.....................19
16
17      C.   Defendants Assured Investors That HP's Four Box Model Could Accurately
             Assess Supplies Revenue .........................................................................20

18      D.   In 2016, HP Disclosed a $450 Million Supplies Inventory Write-Off and Then
             Doubled Down On Its Razor/Razor Blade Model ............................................24
19
        E.   During the Class Period, Defendants Misleadingly Told Investors that the "Four
20           Box Model" Showed HP's Supplies Revenue Had Stabilized, its Market Share
             Was Growing, and its Inventory Was Based on "True Demand"....................26
21
             1.   Defendants Misled Investors to Believe that the Four Box Model Was
22                Based on "Big Data" and, As a Result, Accurate and Reliable ...........26

23           2.   Defendants' Statements Regarding HP's Market Share Growth Were
                  Materially False and Misleading—As Defendants Eventually
24                Acknowledged ........................................................................................29

25           3.   Defendants Also Misleadingly Represented That, Based on the Four Box
                  Model, the Supplies Business Would Return to Stability and Growth.................32
26
             4.   Defendants Misleadingly Told Investors that the Four Box Model Allowed
27                Them to Keep Inventories In Line With "True Demand"—Only to Later
                  Admit a $100 Million Overstatement in Inventory................................37
28
        F.   The Relevant Truth is Revealed Through a Series of Partial Disclosures .......................39

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ..................47

        A.      Defendants' Materially False and Misleading Statements in 2017 ..................48

                1.      February 22, 2017 1Q17 Earnings Call ..................48

                2.      March 1, 2017 Morgan Stanley Technology, Media & Telecom Conference.......51

                3.      April 2017 Analyst Meetings..................54

                4.      May 24, 2017 2Q17 Earnings Call ..................56

                5.      August 23, 2017 3Q17 Earnings Call ..................60

                6.      September 6, 2017 Citi Global Technology Conference ..................63

                7.      October 12, 2017 Securities Analyst Meeting ..................65

                8.      November 21, 2017 4Q17 Earnings Call ..................71

        B.      Defendants' Materially False and Misleading Statements in 2018 ..................72

                1.      February 22, 2018 1Q18 Earnings Call ..................72

                2.      February 27, 2018 Morgan Stanley Technology Conference..................75

                3.      May 29, 2018 2Q18 Earnings Call ..................77

                4.      May 31, 2018 Sanford C. Bernstein Strategic Decisions Conference ..................80

                5.      June 6, 2018 Bank of America Merrill Lynch Global Technology Conference..................83

                6.      August 23, 2018 3Q18 Earnings Call ..................87

                7.      September 7, 2018 Citi Global Technology Conference ..................90

                8.      September 12, 2018 Deutsche Bank Technology Conference..................92

                9.      October 3, 2018 Securities Analyst Meeting ..................94

                10.     November 29, 2018 4Q18 Earnings Call ..................99

        C.      Defendants' Materially False and Misleading Statements in 2019 ..................101

                1.      January 8, 2019 CES Citigroup TMT West Conference and January 2019 Analyst Meetings ..................101

VI.     ADDITIONAL ALLEGATIONS OF SCIENTER..................102

        A.      Defendants' Repeated Statements and Admissions Reveal that They Had Actual Knowledge of the Falsity of Their Misstatements During the Class Period..................103

        B.      HP's Supplies Business Was Its Core Operation..................108

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

C.   The Individual Defendants Were HP's Most Senior Executives and Controlled the Content of Their Statements During the Class Period .....................................................110

D.   The Close Temporal Proximity Between Defendants' False Assurances and the Partial Revelation of the Relevant Truth ...........................................................112

E.   Weisler's and Lores' Suspicious Insider Trading and Defendants' Motive to Conceal the Relevant Truth About HP's Supplies Business Further Confirm a Strong Inference of Their Scienter.....................................................................112

VII.   LOSS CAUSATION...................................................................................................116

A.   February 27, 2019: The Relevant Truth Regarding HP's Supplies Business and the Flaws in its Four Box Model Begins to Emerge...........................................117

B.   August 22, 2019: Investors Learn New Information Regarding the Instability of HP's Supplies Business.......................................................................................122

C.   October 3, 2019: HP Abandons the Four Box Model and Admits its Supplies Business is Fundamentally Unsound .................................................................125

VIII.   PRESUMPTION OF RELIANCE..............................................................................129

IX.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ...............................130

X.   CLASS ACTION ALLEGATIONS ...........................................................................130

XI.   CONTEMPORANEOUS TRADING.........................................................................132

XII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT........................................132

XIII.   PRAYER FOR RELIEF .............................................................................................137

XIV.   JURY DEMAND ........................................................................................................137

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiffs the State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island ("Rhode Island") and Iron Workers Local 580 Joint Funds ("Iron Workers" and together with Rhode Island, "Lead Plaintiffs"), bring this action individually and on behalf of all others similarly situated who purchased or otherwise acquired the common stock of HP Inc. ("HP" or the "Company") between February 23, 2017 and October 3, 2019 (the "Class Period"), and were damaged thereby.

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief are based on the ongoing independent investigation of their undersigned counsel. This investigation includes review and analysis of, among other things: (i) HP's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of HP's conference calls with analysts and investors; (iv) Company presentations, press releases, and reports; (v) news and media reports concerning HP and other facts related to this action; (vi) price and volume data for HP's securities; and (vii) information provided by former HP employees. Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants (defined below) or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    **INTRODUCTION**

1.    This securities class action arises from Defendants' materially false and misleading statements to investors concerning, *inter alia*, HP's printing supplies business, its "Four Box Model," and the purported stabilization of printing supplies revenue and growth in market share during the Class Period. After years of poor performance, Defendants pointed to HP's purportedly reliable and accurate Four Box Model to reassure investors that, during the Class Period, they had stabilized HP's printing supplies business, the Company's printing supplies market share was growing, and printing supplies inventories were in line with market demand. Defendants' assurances were materially false and misleading. When the relevant truth was eventually revealed through a series of corrective disclosures, Defendants had to abandon HP's Four Box Model, acknowledging that HP had never had the basic data inputs Defendants

repeatedly touted and had, unbeknownst to investors, used instead lagging and incomplete third-party survey data. HP also admitted that, contrary to its Class Period representations to investors, it had not stabilized its printing supplies revenue and its supplies market share was not growing, but actually was shrinking. Further, HP stated that its printing supplies inventory was overstated by approximately $100 million. In connection with these disclosures, HP's CEO also announced that he would be stepping down. Ultimately, HP admitted that it had "gone too far" and had to overhaul HP's entire supplies-based printing business model. These revelations shocked the market, and collectively wiped out more than ***$10.5 billion in shareholder value***, causing HP investors to suffer enormous damages.

2.      HP sells personal computers ("PCs"), printers for both home and business consumers, as well as printing supplies like ink and toner for its printers ("Supplies"). During the Class Period, nearly all of HP's profits came from sales of Supplies. In fact, analysts estimated that the Company's Supplies business accounted for anywhere from 80% to 110% of its profits. This was due to HP's "razor/razor blade" business model, which involved selling its printers at a loss (i.e., for less money than it cost to make and sell them) in order to create a steady stream of once-profitable Supplies revenue. HP was willing to lose money on printer sales because it would more than recoup those losses by selling high-margin ink and toner supplies for those printers. As Defendant Enrique Lores ("Lores") summarized: "We lose money on printers. We make money on supplies."

3.      HP's business model only worked, however, if its printer customers (i.e., its "installed base") actually bought their printing supplies from HP instead of third parties. Otherwise, HP would be selling printers at a loss without profitable Supplies revenue streams to make up for those losses. As a result, the Company's mantra—both before and during the Class Period—was "it's all about supplies" and the Supplies business was by far the most important driver of HP's business and stock price.

4.      But in the years leading up to the Class Period, HP faced serious competition in the Supplies market (or "aftermarket"). Remanufacturers (or "remans") were refilling and then reselling used HP ink cartridges. Additionally, both legitimate third-party cartridge manufacturers and illegal counterfeiters were manufacturing their own ink and toner cartridges for use in HP printers. These aftermarket competitors sold cartridges for HP's printers at prices that were significantly lower than the price of HP original supplies. As a result, prior to the Class Period, HP was losing critical Supplies market share, and its all-

important Supplies revenues had been declining for five straight years—posing a grave threat to the Company's business model.

5.    Heading into the Class period, therefore, HP's profitability—and ultimately its stock price—were highly contingent on its ability to stabilize its Supplies revenues. Moreover, analysts recognized that stemming aftermarket share losses was essential to this undertaking. As Maxim Group wrote, "*[k]ey to stock appreciation will be stabilization of after market printer supply share*."[1]

6.    Throughout the Class Period, Defendants repeatedly reassured investors that they were turning HP's Supplies business around—more specifically, that Supplies market share was growing, Supplies inventory matched "true demand," and Supplies revenue was stable. As support for these statements, Defendants pointed to HP's Four Box Model, which purportedly allowed HP to accurately assess Supplies revenue by analyzing the four "key levers" that "drive supplies revenue growth": (i) the number of HP printers in use ("installed base"); (ii) how much HP's installed base was printing ("usage"); (iii) HP's market shares in the Supplies aftermarket ("market share"); and (iv) the price of HP's supplies ("price").

7.    Defendants repeatedly boasted about the reliability and accuracy of the Four Box Model. They claimed that the Four Box Model was able to accurately and reliably assess Supplies revenues because HP's inputs for the four "boxes" were based on real-time data that HP was receiving directly from its printers. In particular, HP claimed that its printers automatically collected data and measurements relevant to the four boxes, and then automatically "phone[d] home"—i.e., sent that data back to HP. This type of remote data collection is referred to as "telemetry" data. For example, an HP printer would automatically inform HP when it was low on printer ink or toner, so that HP would be able to analyze when printing supplies were needed and gauge both demand and market share. The purported strength of HP's Four Box Model was that HP would constantly update the model with telemetry data it claimed to automatically receive from its printers—allowing HP to understand HP's inventory demand, market share, and other trends in the four boxes in real-time.

---

[1]    Unless otherwise noted, all emphasis is added.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

8.    Defendants repeatedly touted, for example, the Company's "[b]ig data and analytics" based on "the capacity that we have now to connect with millions of printers in our installed base and to capture the data from them." According to Defendants, HP was receiving this "big data" from HP's home and its commercial printers. For example, in November 2016, Defendant Catherine A. Lesjak ("Lesjak") stated, "[s]o we get printers [to] phone home regularly and we had a bigger installed base printers phoning home in the ink space and over the course of 2016 we now are having the commercial side of the house, and *those laser jet printers are phoning home too*, and so, yes, we are constantly refining the model with the data that we get."

9.    Given these purported capabilities, Defendants repeatedly assured investors that the Four Box Model was an accurate, reliable method to determine demand for HP's supplies, as well as revenue and market share for HP's key Supplies business. For example, in February 2018, Lesjak similarly stated "*we have a lot of confidence in the predictive capabilities of our 4-box model*" and that "[w]e have seen that it has been very reliable." In September 2018, Defendant Christoph Schell ("Schell") likewise represented regarding the Four Box Model: "*We are following a clear predictive tool when we give this guidance, when we say it's flat to slightly positive, then that's really what we currently see*."

10.    As such, Defendants claimed that the Four Box Model confirmed that they had stabilized HP's Supplies revenue stream. For example, Lesjak represented that the Company's Supplies revenue trajectory would be stable in the long-term, stating: "[W]e are, at a minimum, maintaining the stabilization in constant currency in supplies over a longer time period." Defendants continued to make similar representations throughout the Class Period, and analysts repeatedly echoed those representations. For example, J.P.Morgan reported that "*[t]he company expects Supplies revenue to continue to be stable going forward*" and that "*[p]rinter supplies growth [was] sustainable*," based on "*higher supplies share*." Argus wrote that "*[t]he issues with supplies that set the company back in 2015-2016 are now largely resolved*." Similarly, Deutsche Bank reported that it had been "*convinced that the days of declining Y/Y printing sales are behind us*."

11.    Defendants also claimed that HP's purported "big data" analysis allowed them to accurately align the Company's Supplies inventory levels with "true demand"—thereby avoiding huge inventory write-offs that had plagued HP in the past. Specifically, in June 2016, HP announced that it needed to

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

reduce the Supplies inventory in its channel by $450 million—creating a massive headwind for the remainder of the year. Following this disclosure, Defendants assured investors that moving forward, they had the "big data" necessary to determine true market demand, and would closely monitor inventory levels to keep them at levels that aligned with that demand. During the Class Period, Defendants repeatedly represented that HP was successfully keeping Supplies inventory levels in line with "true demand." For example, Defendant Dion J. Weisler ("Weisler") stated "we're really on fulfilling when there's true demand," and Lesjak represented that Supplies inventory linearity "mirrors the demand we're seeing." Moreover, on nearly every quarterly conference call during the Class Period, Defendants assured investors that HP's Supplies inventory was being kept under the inventory "ceiling" as determined by true market demand. In response, UBS reported that HP had "solved the problem of excess supplies in channel," "aided by increasing data HP receives on printer use."

12.    Likewise, during the Class Period, Defendants repeatedly told investors that HP's market share was growing for both its home and commercial printing supplies. For example, Lores stated that HP had "increased share," Lesjak boasted of the "progress in our market share," Weisler represented that "we're making improvements in the aftermarket share," and Defendants repeatedly published graphics touting that HP's office (i.e., commercial) Supplies market share was increasing according to the Company's Four Box Model.

13.    None of this was true. Unbeknownst to investors and as Defendants later admitted, the Company **never had** sufficient telemetry data from its laser or toner-based printers to perform an accurate data analysis. As Defendants later explained, HP's commercial printers were not sufficiently "phoning home" due to enterprise firewall and other constraints, such that the Company never had "***statistically relevant***" telemetry data "***for . . . [HP] to rely on.***" As a result, for its laser fleet, HP had limited visibility into the size of its active installed base or their "usage." Moreover, the lack of statistically relevant telemetry data blinded HP to its actual market share for toner-based printer supplies. Indeed, as HP later conceded the model that Defendants repeatedly hailed as the path to stable revenue, market share growth, and demand-based inventory levels in HP's all-important Supplies business "***did not have . . . the capabilities to calculate [market] share*** for toner-based products in the installed base."

14.   Even worse, far from relying on accurate, real-time data—as Defendants had repeatedly misrepresented—HP was instead relying "primarily on *lagging and incomplete market share surveys*" to form the "market share" inputs into its Four Box Model. This third-party market share data "wasn't changing, over time" to reflect true market conditions. Defendants were later forced to admit that, based on actual "big data," HP's actual market share was "significantly lower" than the market share input they had been using the Four Box Model and was, in fact, shrinking. Thus, while HP had represented to investors during the Class Period that its office market share was increasing, in reality it was *decreasing*.

15.   Defendants knew or at least recklessly disregarded the fact that their Four-Box Model-based representations were based on stale and incomplete market survey information—and not the real-time "big data" they promised investors. Indeed, Defendants boasted of being "extensively" familiar with the Four Box model and said it was "*something that we focus on very carefully*" and "*constantly work[ed] to improve and to refine*." As Weisler himself stated, "*we're constantly testing the model*. Every time we close a quarter, *we go back and look at the 4-box drivers, what it predicted and what it returned*."

16.   The relevant truth concealed by Defendants' misrepresentations began to be revealed to the market on February 27, 2019. After the close of market that day, the Company shocked investors when it reported supplies revenue growth of negative 3% for the first quarter of fiscal 2019, and *disclosed that it expected Supplies revenues to decline by 3% for the remainder of 2019*. The Company also announced that it had overstated its channel inventory levels by $100 million, once again creating a massive Supplies headwind.

17.   Defendants blamed its lowered Supplies guidance and inventory write-down squarely on the fundamental—and previously undisclosed—issues with the Four Box Model. In particular, HP finally admitted that, contrary to its prior representations, it "did not have" sufficient telemetry data from its laser printers and so it "ha[d] never been statistically relevant for . . . [HP] to rely on it." As a result, for a huge portion of HP's installed base, the Company *never* had the real-time "big data" necessary to accurately understand "usage" or "market share"—the two most critical inputs in the Four Box Model.

18.   Defendants also conceded that the Company's repeated reassurances to the market about Supplies stabilization and increasing market share were premised not on accurate, real-time data—as they had represented—but instead on "lagging and incomplete market share surveys." As HP finally gained

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

access to real-time data from its printers, it became clear that ***its Supplies market share was actually*** ***decreasing***, and that as a result, its Supplies revenues would also decrease for the remainder of the year. For example, Weisler explained that as a result of using inaccurate survey data, HP "had incorrect Supplies [market] share assumptions in our 4-box model" but that after applying the updated real-time data, "we no longer expect supplies to be flat to slightly up in fiscal '19."

19.    Likewise, Defendants admitted that because HP never had accurate market share data, they "overestimated" Supplies demand and put too much inventory into the channel "over multiple quarters." In fact, once Defendants "compared our old share assumptions with the revised one that have been informed by big data" it became clear that ***at least*** $100 million in excess inventory needed to be removed from the channel. In other words, while repeatedly representing to investors that its inventories were aligned with true demand, in reality HP had never had the "big data" necessary to actually understand what that "demand" was.

20.    As a result of these disclosures, the Company's stock price fell from $23.85 per share to $19.73 per share, or over 17%, on high trading volume. As such, HP lost over $6.34 billion in shareholder value in a single day.

21.    HP's stock price, however, remained artificially inflated because—based on Defendants' repeated Class Period misrepresentations—investors still believed that HP could ultimately return its Supplies business to stability. For example, a Morgan Stanley analyst wrote in May 2019: "Key Debates . . . ***Can HP return to printer supplies growth? Yes, but we believe it will take multiple quarters*** as the company works through bloated channel inventory and takes operational and strategic actions to better defend against remanufacturers." In July 2019, after meeting with an HP representative, Evercore ISI reported that "[a]lthough HPQ lowered its supplies revenue expectations following its F1Q print, the company has since implemented remediation plans which ***we think should stabilize the trajectory*** of the overall printing business going forward." Thus, heading into HP's third quarter 2019 print, Deutsche Bank wrote that "***we expect a continued path towards Supplies stabilization. . . .***"

22.    After market close on August 22, 2019, HP announced another large Supplies revenue decline—down 7% year-over-year. More fundamentally, HP lowered 2019 Supplies revenue guidance even further—to negative 4% to 5%—and ***disclosed that it did not expect supplies revenue to grow in***

*FY2020*. HP blamed the lowered guidance, in large part, on continued market share losses: "[W]e have created a very attractive profit pool of supply but now has attracted many other companies to try to attack it, and capture a portion of it . . . . And because of that, we see an erosion of the overall profit pool that, according to our model, means a reduction in share and a reduction in price." The following month, UBS lowered its estimates for FY20 Supplies growth and wrote that "*[w]e think HP's four-box model is challenged and the company may have to revamp its forecast model*." HP also announced that Defendant Weisler would suddenly be stepping down as CEO.

23.     Following these disclosures, HP's common stock price dropped nearly 6%, from $18.93 per share to $17.81 per share, on high trading volume, which wiped out another $1.66 billion in market capitalization. As a result of Defendants' repeated misleading statements, however, investors still believed that HP's Supplies business was viable, but would simply take longer to stabilize than expected. For example, heading into HP's October 2019 Securities Analyst Meeting, Deutsche Bank wrote that, in its view, "a stabilization in Supplies is also expected eventually, albeit with the time frame pushed out into 2HFY20 or later."

24.     Then, on October 3, 2019, HP finally admitted that it could not stabilize its Supplies business, and the declines were permanent: "*we are not relying on Supplies revenues to grow beyond FY '20.*" In other words, as one analyst summed it up following the disclosure, "*[e]xpect supplies to keep declining*." In fact, going forward, HP told investors they should no longer rely on Supplies revenues or the Four Box Model to gauge the health of the Company's business, causing Wells Fargo to issue a report titled "HPQ: *RIP 4-Box Model* – HP Moves To Systems Based Printing Strategy."

25.     HP also finally conceded that its Supplies business model was not viable and that Defendants had "gone too far." In particular, Defendants admitted that because aftermarket competition was stealing HP's Supplies revenue share, the Company had been unable to recoup losses on negative margin printers: "[W]e don't know specifically if . . . [a printer purchaser] is actually going to be a user of HP original[] [supplies], or candidly, even a user of supplies" and so when HP sold printers at negative margins we "lose money on those customers." As a result, HP disclosed that it was fundamentally altering its "razor/razor blade" business model, and that moving forward any customer who wanted the option to use third-party aftermarket supplies would have to pay a premium for the printer up front to ensure HP a profit.

26.    Market commentators viewed HP's business model change as a "*capitulation*" and a "*tacit admission that the supplies business is no longer growing*." Moreover, analysts overwhelmingly blamed HP's "capitulation" on market share losses to third-party suppliers. For example, Wells Fargo wrote that, "[t]he model is a response to after-market supply producers that have cut into HP's IPG operating profit." Credit Suisse reported that the shift was a "response to the growing threat of aftermarket Supplies that are weighing on the highly-lucrative revenue stream." Morgan Stanley wrote, "HP's print strategy pivot . . . is a direct response to increasing competition from supplies remanufacturers, and even more so the growing market of counterfeits."

27.    As a result of these disclosures, the price of HP's stock dropped from $18.40 per share to $16.64 per share, or nearly 10%, on high trading volume—erasing another $2.6 billion in shareholder value.

28.    This action seeks to recover for the enormous losses suffered by investors due to Defendants' Class Period misrepresentations and omissions.

## II.    JURISDICTION AND VENUE

29.    The claims asserted herein arise under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1(a), respectively, and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

30.    This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa. In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337.

31.    Venue is proper in this District under 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. HP is headquartered and conducts business in this District, and many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

32.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of a national securities exchange.

# III.     PARTIES

## A.     Lead Plaintiffs

33.     Lead Plaintiff the State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island is a public pension fund that provides benefits to public employees of the State of Rhode Island. As set forth in the certification attached hereto as Exhibit A, Rhode Island purchased HP common stock and suffered damages as a result of the securities law violations alleged herein. By order dated May 20, 2020, the Court appointed Rhode Island a Lead Plaintiff in this action.

34.     Lead Plaintiff Iron Workers Local 580 Joint Funds is a provider of pension and health benefits to active and retired participants in the iron working industry. As set forth in the certification attached hereto as Exhibit B, Iron Workers purchased HP common stock and suffered damages as a result of the securities law violations alleged herein. By order dated May 20, 2020, the Court appointed Iron Workers a Lead Plaintiff in this action.

## B.     Corporate Defendant

35.     Defendant HP is a global provider of personal computers, printers, and related supplies, solutions, and services. Incorporated in Delaware, the Company maintains its corporate headquarters at 1501 Page Mill Road, Palo Alto, California. The Company's common stock trades on the New York Stock Exchange ("NYSE") under ticker symbol "HPQ." Over the Class Period, HP had between 1.69 billion shares (as of January 31, 2017) and 1.48 billion shares (as of July 31, 2019) of common stock outstanding, which were owned by hundreds or thousands of investors.

36.     HP's fiscal year ("FY") begins November 1 and ends October 31. As such, HP' fiscal quarters are as follows: November 1 to January 31 ("1Q"); February 1 to April 30 ("2Q"), May 1 to July 31 ("3Q"); and August 1 to October 31 ("4Q"). The Class Period includes statements concerning HP's financial results for three fiscal years: November 1, 2016 to October 31, 2017 ("FY17"); November 1, 2017 to October 31, 2018 ("FY18"); and November 1, 2018 to October 31, 2019 ("FY19"). The Class Period likewise includes statements concerning HP's financial results for twelve fiscal quarters: November 1, 2016 to January 31, 2017 ("1Q17"); February 1, 2017 to April 30, 2017 ("2Q17"); May 1, 2017 to July 31, 2017 ("3Q17"); August 1, 2017 to October 31, 2017 ("4Q17"); November 1, 2017 to January 31, 2018 ("1Q18"); February 1, 2018 to April 30, 2018 ("2Q18"); May 1, 2018 to July 31, 2018 ("3Q18"); August 1, 2018 to October

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

31, 2018 ("4Q18"); November 1, 2018 to January 31, 2019 ("1Q19"); February 1, 2019 to April 30, 2019 ("2Q19"); May 1, 2019 to July 31, 2019 ("3Q19"); and August 1, 2019 to October 31, 2019 ("4Q19").

## C.   **Individual Defendants**

37.   Defendant Dion J. Weisler served as President and Chief Executive Officer ("CEO") of HP from November 2015 until November 1, 2019. HP announced his resignation on August 22, 2019. Upon stepping down as President and CEO, Weisler assumed the role of Senior Executive Advisor, a non-executive officer role, through January 31, 2020. Weisler also served as a member of HP's Board of Directors from November 1, 2015, through the completion of the Company's 2020 Annual Meeting of Stockholders held on May 12, 2020. Previously, Weisler served as Executive Vice President of the Printing and Personal Systems Group of Hewlett-Packard Company from June 2013 to November 2015 and as Senior Vice President and Managing Director, Printing and Personal Systems, Asia Pacific and Japan from January 2012 to June 2013.  Defendant Weisler made materially false and misleading statements during the: February 22, 2017 1Q17 earnings call; March 1, 2017 Morgan Stanley Technology, Media & Telecom Conference; May 24, 2017 2Q17 earnings call; August 23, 2017 3Q17 earnings call; October 12, 2017 Securities Analyst Meeting; February 22, 2018 1Q18 earnings call; May 29, 2018 2Q18 earnings call; May 31, 2018 Sanford C. Bernstein Strategic Decisions Conference; August 23, 2018 3Q18 earnings call; September 7, 2018 Citi Global Technology Conference; and October 3, 2018 Securities Analyst Meeting.

38.   Defendant Catherine A. Lesjak served as HP's Chief Financial Officer ("CFO") from November 2015 until July, 2018 and served as HP's interim Chief Operating Officer from July 1, 2018 until February 2019. Lesjak also served as Executive Vice President and CFO for Hewlett-Packard Company from 2007 until the November 2015 split. Defendant Lesjak made materially false and misleading statements during the: February 22, 2017 1Q17 earnings call; April 2017 analyst meeting; May 24, 2017 2Q17 earnings call; August 23, 2017 3Q17 earnings call; September 6, 2017 Citi Global Technology Conference; October 12, 2017 Securities Analyst Meeting; November 21, 2017 4Q17 earnings call; February 22, 2018 1Q18 earnings call; February 27, 2018 Morgan Stanley Technology, Media & Telecom Conference; May 29, 2018 2Q18 earnings call; and June 6, 2018 Bank of America Merrill Lynch Global Technology Conference.

39.   Defendant Steven J. Fieler ("Fieler") has served as HP's CFO since July 2018. Previously, Defendant Fieler served as HP's Head of Global Treasury from January 2017 to June 2018. Prior to HP's separation from Hewlett-Packard Company, Fieler served in a range of finance and operational roles, including as Vice President, CFO for HP Software, Vice President of Sales Operations, Senior Director of Marketing Operations, Head of Investor Relations, and Director of Strategy and Corporate Development. Defendant Fieler made materially false and misleading statements during the June 6, 2018 Bank of America Merrill Lynch Global Technology Conference; August 23, 2018 3Q18 earnings call; and November 29, 2018 4Q18 earnings call.

40.   During the Class Period, Defendant Enrique Lores served as HP's President of Imaging, Printing and Solutions, a role he held since November 2015. Since November 1, 2019, Lores has served as HP's President and CEO, and also as a member of HP's Board of Directors. Lores began his tenure at Hewlett-Packard Company in 1989, and served in a variety of roles, including as the Hewlett-Packard Company's Separation Leader from 2014 to October 2015. Defendant Lores made materially false and misleading statements during the: October 12, 2017 Securities Analyst Meeting; October 3, 2018 Securities Analyst Meeting; January 8, 2019 Consumer Electronics Show ("CES") Citigroup TMT Conference; and January 2019 analyst meeting.

41.   During the Class Period, Defendant Christoph Schell served in two different roles: (i) President of the Americas region, a role he held from November 2015 to November 2018; and (ii) President of 3D Printing and Digital Manufacturing, a role he held from November 2018 to October 2019. Since, November 2019, Schell has served as the first Chief Commercial Officer ("CCO") of HP. Prior to the split, Schell managed the Americas region for the HP Print and Personal Systems business from August 2014 to November 2015. Defendant Schell made materially false and misleading statements during the September 12, 2018 Deutsche Bank Technology Conference.

42.   Defendants Weisler, Lesjak, Fieler, Lores, and Schell are collectively referred to hereinafter as the "Individual Defendants" (and collectively with HP, the "Defendants"). The Individual Defendants, because of their positions with HP, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the

Company's statements and presentations alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

## IV.   OVERVIEW OF DEFENDANTS' FRAUD

43.   As detailed below, during the Class Period, Defendants misled investors regarding the stability of HP's Supplies business and revenues, the accuracy and reliability of HP's Four Box Model, its purportedly "true demand"-based inventory levels, and its purportedly growing Supplies market share. Defendants' scheme started after years of disappointing results, when they decided to double-down on HP's "razor/razor blade" business model in a desperate effort to salvage HP's once-profitable Supplies business. To assure investors this time would be different, Defendants claimed that their plan to stabilize and grow HP's Supplies business was sound because it was supported by their purportedly reliable and accurate Four Box Model. According to Defendants, the Four Box Model was based on a detailed analysis of real-time data automatically supplied by HP's printers—i.e., telemetry data—that allowed HP to accurately assess its inventory demand, market share, and other key metrics. Armed with the Four Box Model, Defendants claimed during the Class Period that they had "stabilized" HP's Supplies revenues, HP's office market share was growing, and the Company's inventory levels were properly aligned with "true demand."

44.   Defendants' statements were false and misleading. In the end, after the relevant truth was revealed through a series of disclosures, Defendants had abandoned HP's Supplies-based business model and, with it, the Four Box Model, because the latter's lack of telemetry data for commercial printers rendered it incapable of calculating toner market share. Defendants ultimately admitted that HP's market share was shrinking, not growing as Defendants had represented to investors, HP's Supplies inventory was overstated by approximately $100 million, and these issues required a complete overhaul of HP's printing business model. Investors paid the price: the stock price declines resulting from the revelations of the

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

relevant truth concealed by Defendants' knowing (or at minimum grossly reckless) scheme erased many over $10.5 billion in shareholder value.

**A.     HP's Success Depended on Its Printing Supplies Business**

45.     HP's entire business model depended on its printing business. Indeed, HP was created following the November 2015 split of Hewlett Packard Company into Hewlett-Packard Enterprise ("HP Enterprise" or "HPE") and HP—the latter of which was focused entirely on the printer business and legacy computers.[2] As Defendant Weisler, HP's then-CEO, explained after the split: "We wake up every day, we think about Printing and Personal Systems, it's all we do."

46.     HP's Printing segment comprised sales of commercial and consumer printer hardware, printer supplies, and related media, software, and services. Commercial hardware included commercial inkjet printers, large format printers, and laser printers, while consumer hardware included consumer and small/medium-sized business inkjet printers. HP's Printing segment also included its Supplies business, the revenue of which was generated by the sale of consumable products, including ink and toner cartridges, for recurring use in HP's consumer and commercial printers.

47.     All profit in HP's Printing segment came from its Supplies sales. That is because HP's business model was to sell its printers at a loss—in other words, a negative margin—in order to generate revenue over time through the sale of supplies (i.e., ink and toner cartridges) for those printers. As *The New York Times* explained, "[o]ver the years, HP's business model for its desktop consumer and corporate printing business has been to sell printers at no profit or a loss, but make money on selling a steady stream of replacement cartridges, called aftermarket supplies." Weisler similarly explained: "It's a razor/razor blade model. We lose money, generally speaking, when we place a [printer] unit" and "we make back money over time as supplies go into those units." Likewise, Lores summed it up at the Company's October 3, 2018 Securities Analyst Meeting: "We lose money on printers. We make money on supplies."

48.     HP was willing to sell its printers at a loss because historically it was able to more than make up for that loss through the sale of HP original supplies in the years the followed the original hardware purchase. As Deutsche Bank explained prior to the Class Period, "since hardware units require supplies for

---

[2]     HPE, on the other hand, would focus on enterprise and services, including servers, software, and cloud technology.

multiple years, these supplies create a steady stream of income and cash flow for the company." Moreover, printing supplies carried extremely high margins. Another pre-Class Period Deutsche Bank report explained: "Gross margins on supplies are high for printer companies, in the 50-70% range." As a result, by placing printer units at a loss, HP was staking a claim to a profitable stream of future revenue over the life of the printer units.

49.    Not only did HP's Supplies business unit generate most of the Printing segment's profits, it also accounted for most, if not all, of HP's *total* profits. In fact, analysts estimated that the Company's printing Supplies business accounted for anywhere from 80% to 110% of its profits. For example, a Deutsche Bank analyst wrote that "[a]s a percent of the company's operating profit, we estimates [sic] supplies account for 110%, as negative printer hardware profit more than offsets only modest PC profit." In other words, Deutsche Bank estimated that because HP lost more money selling printer hardware than it made selling PCs, Supplies actually accounted for more than 100% of the Company's profits.

50.    As a result, Supplies were ***the*** key driver of HP's success. As an analyst from Morgan Stanley wrote, "the reality is ink drives the majority of the profit." Similarly, Deutsche Bank noted that, "supplies growth is the most important driver of profit growth for HP." Given this, analysts and investors were keenly focused on HP's Supplies business before and throughout the Class Period. For example, a UBS analyst wrote in an August 18, 2016 report that "[p]rinting is about 80% of profit and should be investors' focus." Similarly, during a September 12, 2018 Deutsche Bank Technology Conference, Defendant Schell noted, "I think most of you in the room, you pay very particular attention to how we perform in our supplies business." According to a Class Period survey conducted by UBS, investors ranked "printer margin and supplies growth" as the most important issues to them regarding HP.

51.    Defendants obviously also knew that HP's success was determined by its Supplies business. To be sure, during HP's first annual Securities Analyst Meeting, just before the split was officially finalized, Defendants Weisler and Lores told analysts and investors that HP's "business is all about supplies." According to Lores, HP undertook every action with one objective—to drive Supplies revenue: "I know that this business is all about supplies. Every action that we've -- I have been describing . . . have one common objective. Improve our supplies business." As Lores explained: "In HP, we bleed ink; in HP, we bleed toner; and we like this company so much, we love this business so much that we decided to

change the name of the Company, and this is why we've [sic] called now HP Inc." Summing it up after the meeting, analyst Morningstar wrote: "[t]he clear takeaway from the presentation was that, 'it's all about supplies.'"

52.    Until the end of the Class Period—when HP abandoned its "razor/razor blade" business model, finally admitting to investors that the model was unsustainable, the Company's constant refrain was "i[t']s all about supplies." For example, at the Securities Analyst Meeting the following year, Lores again reiterated: "Everything that we do in this business has one objective, to grow our supplies business because this business, it's all about supplies." Likewise, during the Company's February 22, 2017 1Q17 earnings call, Weisler stated, "[a]s we always say, it's all about supplies . . . ."

**B.    Prior to the Class Period, HP's Supplies Revenue Had Been Declining for Years As Consumers Printed Less and Competition Increased In the Supplies Aftermarket**

53.    Leading up to the Class Period, HP's Supplies revenues had been consistently declining. Indeed, HP's Supplies revenues had declined in each year since at least 2012:

| Year | Y/Y Supplies Revenue Decline (%) | Y/Y Supplies Revenue Decline (millions of $) |
|---|---|---|
| 2012 | -5.9% | -$1,003 |
| 2013 | -2.7% | -$435 |
| 2014 | -5.1% | -$799 |
| 2015 | -6.3% | -$938 |
| 2016 | -15.1% | -$2,104 |

54.    As *The Wall Street Journal* wrote in June 2016, HP's Supplies business "has been in state a slow-but-steady decline for the past three years. And that decline has accelerated. Printing supplies' revenue fell 15% year over year for the six-months ending April 30."

55.    As detailed below, three primary reasons for the Supplies revenue decline were that: (i) HP was losing Supplies market share to third-party aftermarket suppliers; (ii) consumers were purchasing less printer hardware (i.e., consumers were not replacing their printers as often); and (iii) consumers were using their printers less. As *The Wall Street Journal* summarized in February 2016: "In printing, which accounts for about 80% of the company's profits, sales of both hardware and ink have been hurt by changing habits of computer users and competition."

**1.    HP Was Losing Supplies Market Share To Third-Party Aftermarket Suppliers, Leading to Lower Supplies Revenues and Profits**

56.    HP's business model of selling printers at a loss, but making up the difference through the sale of supplies, only worked if its printer customers (i.e., its "installed base") bought supplies from HP, rather than third parties. In the years leading up to the Class Period, however, HP was losing market share in the Supplies aftermarket due to competition from third-party ink suppliers, remanufacturers or "remans" (i.e., vendors who refill and then resell original HP ink cartridges), and illegal counterfeiters. As *The Wall Street Journal* later explained, "the rise of alternative supplies like remanufactured, third-party ink cartridges ma[de] . . . [HP's "razor/razor blade" model] more challenging." Likewise, the *Los Angeles Times* later reported that, HP's "most profitable business model was a razor-and-blade strategy in its printer line . . . . But those riches began to wane as cheap knock-off cartridges infiltrated the market."

57.    These third-party aftermarket suppliers often sold ink and toner cartridges for HP's printers at significantly lower prices than HP's original supplies. For example, S&P Capital IQ explained that, "independent suppliers offer refill and remanufactured alternatives for HPQ original inkjet and toner supplies, which are often available for lower prices." An April 2016 Maxim Group analyst report noted that "large re-mans" often sold HP ink supplies at "50 cents on the dollar," while (albeit less reliable) "mom and pop[]" third-party alternatives could sell for as low as "18 cents on the dollar." As a result, in the years leading up to the Class Period, HP had been forced to discount its HP-brand ink and toner cartridges in an attempt "to combat after-market alternatives," which, in turn, drove down its critical Supplies profits and margins.

58.    Notwithstanding these discounts, HP had been losing significant market share to third-party aftermarket suppliers heading into the Class Period. For example, a Sanford C. Bernstein analyst noted on the Company's February 24, 2016 1Q16 earnings call that, "after-market share actually declined this quarter. And my belief is over the last five years, it's also gone down." The following day, February 25, 2016, Maxim Group reported that, "ongoing share losses to after market re-manufacturer print suppliers are accelerating" and "[k]ey to stock appreciation will be stabilization of after market printer supply share." Argus wrote in a March 1, 2016 analyst report that, "[i]nk used to be the 'jewel in the crown' business for HP Printing. But the company has been losing ground to low-priced competitors." During the June 1, 2016

Sanford C. Bernstein Strategic Decisions Conference, a Sanford C. Bernstein analyst noted that HP had "conceded that, if anything, supplies capture rate has gone down, that the [remans] have gained some share over the last several years" (alteration in original).

59.    Indeed, the impact from third-party competition became so dire that in the fall of 2016, HP tried to prevent is printer customers from using third-party cartridges altogether. As *The Washington Post* reported, HP secretly placed an "authentication" feature into a printer software update so that if a user tried to insert a non-HP cartridge, "[t]he printer would not resume working until an HP brand cartridge was inserted." Following backlash from customers and consumer rights groups, however, HP was forced to quickly walk back the change and ultimately pay fines to compensate certain of its customers.

60.    Moving into the Class Period, therefore, regaining market share in the Supplies was critical to HP's profits and its stock price. As Maxim Group put it, "we believe evidence of re-man share gains being stemmed will be the key to catalyzing HPQ stock price appreciation." Other analysts expressed the same belief that "[s]tabilizing the supplies business and driving further growth in this segment" was HP's "most important strategic priority." For instance, they saw that an "an inflection in supplies will be key to driving earnings" for HP, and that the Supplies business unit was "the most important portion of the company's business" because it was "critical to HP[]'s ability to drive earnings and cash flow."

61.    This was particularly true given, as discussed below, that industry declines—which HP expected to continue unabated—were already driving down HP's Supplies revenues.

### 2.    HP Was Selling Fewer Printers, Leading to Less Supplies Revenue

62.    As discussed above, HP's Supplies revenues stem from sales of its printers; if HP does not sell printers, it does not create the need to purchase ink and toner cartridges. As a result, a decrease in printer sales means a decrease in Supplies revenues. As analyst BMO Capital Markets noted: "Players in the space are doubly punished as [printer] demand decreases, because lower hardware sales are also accompanied by lower consumption of supplies such as inkjet printer ink cartridges and laser printer toner. . . ." *The Wall Street Journal* observed that "HP's printing business has been struggling for a while. Revenue from printing hardware saw double-digit declines for the past four consecutive quarters. That naturally hurts demand for the consumables portion of the business . . . ."

63.    Leading into the Class Period, HP's printer hardware sales had been in decline for years. As BMO Capital Markets summarized: "Total [HP printer] hardware revenues reached a recent peak in FY2011 and have declined by 5% CAGR, with Commercial [hardware] falling by 3% CAGR and Consumer [hardware] dropping by 10%. We believe the decreased demand of consumers is the result of the growth of mobile, with digital content on smartphones and tablets replacing paper across multiple applications." The *Los Angeles Times* likewise reported, "HP has been grappling with shrinking demand for PCs and printers as more people use smartphones and store documents and photos online." Similarly, FBN Securities wrote that: "The key challenge for HPQ is to stabilize its printer supplies business, but supplies is driven by changes in HPQ's printer hardware installed base which is declining."

64.    Likewise, Lores acknowledged during the Company's September 15, 2015 Securities Analyst Meeting: "Hardware units have declined year on year." In fact, by the beginning of the Class Period, HP's printing hardware revenues had been declining since at least 2012:

| Year | Y/Y Hardware Revenue Decline (%) | Y/Y Hardware Revenue Decline (millions of $) |
|---|---|---|
| 2012 | -3.4% | -$293 |
| 2013 | -2.4% | -$198 |
| 2014 | -1.0% | -$76 |
| 2015 | -10.0% | -$809 |
| 2016 | -12% | -$868 |

65.    Moreover, heading into the Class Period, HP expected the printer hardware declines to continue. As Lesjak stated during HP's October 13, 2016 Securities Analyst Meeting: "Our print business assumptions specifically include a market forecasted to decline slightly year-over-year, primarily driven by the consumer segment." Similarly, Credit Suisse wrote: "The printing industry is around $58bn in terms of hardware, excluding supplies. Over the long term, we see the market gradually declining at a rate of 2% per annum."

### 3.    Consumers Were Printing Less, Leading to Lower Supplies Sales

66.    Finally, HP's Supplies revenue also depended on how much people actually used their printers. All else being equal, a decrease in "usage" meant a corresponding decrease in Supplies revenue. This is because, the more HP's installed base printed, the more ink it used, leading to more replacement

cartridges being purchased. As HP noted in a March 2016 presentation, "[d]riving page growth is key to driving supplies growth."

67. In the years leading up to the Class Period, however, printer usage also was declining across the industry. For example, BMO Capital Markets noted that, "[a]s PC shipments have fallen and consumers have moved to consuming content on personal devices like tablets, printing usage has slipped, as well." This decline in usage led to a slowdown in the printing supplies industry. As Wells Fargo wrote in a November 3, 2015 report, "the printing supplies sales face secular pressures from a decline in the amount overall printing by consumers (no longer printing directions, boarding passes, photos, etc. as well as fewer magazines being printed due to eReaders) . . . ."

68. Given the central importance of HP's Supplies business, heading into the Class Period, the key question for analysts and investors was whether HP could stabilize its declining Supplies business or if continued declines were inevitable. For example, Deutsche Bank wrote that "the stabilization and recovery of supplies sales will be a key metric to track over the next two years . . . ." Morgan Stanley wrote that "[i]nvestors are focused on printing supplies stability" and "most investors are still waiting for numbers, in particular supplies Y/Y growth, to stabilize." Wells Fargo reported that "supplies stabilization is the key to HPQ." During a November 2016 Credit Suisse conference, a participant noted that "ultimately supply stabilizing and one day even growing moderately would make this company look very different . . . ." Moreover, a January 16, 2017 Deutsche Bank report noted that meetings with HP's Director of Investor Relations, Chris Lee, the previous week, had "reaffirmed our view that the turnaround in supplies will be key to the stock's performance this year."

C. **Defendants Assured Investors That HP's Four Box Model Could Accurately Assess Supplies Revenue**

69. At HP's 2015 Securities Analyst Meeting—just before the split was finalized—Defendants Weisler and Lesjak first previewed the Company's Four Box Model. The Four Box Model purportedly allowed HP to accurately assess Supplies revenue by analyzing the four "key levers that will drive supplies revenue growth." The first box analyzed the size of HP's "installed based"—i.e., how many hardware printer units were in use. The second box analyzed "usage"—i.e., how much HP's installed base was printing. The third box analyzed HP's printer Supplies market share or supplies "attach"—i.e., the

percentage of aftermarket supplies that HP was capturing compared to third-party supplies. Finally, the fourth box analyzed the price of supplies.

70.   HP claimed that the Four Box Model was able to accurately and reliably predict Supplies revenues because it was based on updated, real-time "big data"—which derived from the "telemetry data" that HP received directly from its printers.

71.   As noted above, "telemetry data" is data that is automatically sent from remote instruments (here, HP's printers) to centralized receiving equipment for monitoring. In other words, HP claimed that its printers automatically collected data and measurements relevant to the four boxes, and then automatically "phone[d] home"—i.e., sent that data back to HP for analysis and processing. For example, during a March 2016 conference Lesjak stated, "[w]e have a lot of printers that . . . phone home and tell us what's going on," which gave HP "a lot of confidence" in each of the four boxes in the model. During a November 2016 Credit Suisse conference, Lesjak represented that HP was collecting telemetry data from both its home and commercial printers: "So we get printers [that] phone home regularly and we had a bigger installed base printers phoning home in the ink space and over the course of 2016 we now are having the commercial side of the house, ***and those laser jet printers are phoning home too*** . . . ." Thus, heading into the Class Period, investors understood that HP was collecting telemetry data from its commercial printers.

72.   Based on its printers "phoning home," HP claimed to have a constant feed of real-time "big data" that allowed HP to analyze and pinpoint trends in the different boxes in the Four Box Model. "Big data" means large data sets that may be analyzed computationally to reveal patterns, trends, and associations. HP claimed that it was constantly updating the Four Box Model with this real-time big data so that it had an accurate and updated view of Supplies demand. For example, in November 2015, Lesjak stated: "We have found that our Four Box Model is, in fact, very good. And as we have collected more big data-and every week we collect new data, we update, basically, the model." Lesjak also represented that, "we are constantly refining the model with the data that we get."

73.   HP's access to a purportedly real-time feed of current and accurate data was critical to the Four Box Model's accuracy and reliability. As Lesjak explained prior to the Class Period, "in the [Four

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Box Model], you got to have accurate assumptions, and you've got to be constantly fine-tuning those assumptions based on what you're seeing in the market and also what big data you are getting back."

74.     Analysts echoed the Company's statements about its "big data" capabilities, and the resulting reliability of the Four Box Model. In October 2015, Credit Suisse reported that the four box model "provides a degree of predictability in the printing market and HP's business by leveraging the data generated from HP[]'s large installed base of printers. Indeed we note that management has noted that for a significant part of its installed base the company receives real-time information on printed pages and usage, and that this big data has been leveraged to effectively predict its supplies business." In June 2016, Morgan Stanley noted that HP "has better visibility compared to the September 2015 analyst day as new printers are networked and give HP insights on print behavior. . . . While installed base units are declining, we think supplies usage and attach will more than make up for it over time (per HP's four Box model)." In a November 2016 report, Credit Suisse wrote that "[m]anagement also revealed that the model is constantly refined, based on data it receives from its printers in the installed base."

75.     Before the Class Period, the majority of HP's Four Box Model levers were moving in the wrong direction. For example, as discussed in Section IV.B.2., *supra*, HP's hardware printer sales—or "installed base" (box one)—had been declining for years and was expected to continue declining. Likewise, as discussed in Section IV.B.3., *supra*, usage of HP's printers (box two) was in secular decline. Finally, HP had just changed its business model to eliminate discounts, effectively raising prices (box four), as discussed in Section IV.D., *infra*.

76.     HP represented that it was relying on two main drivers to turn around its Supplies trajectory. First, although overall usage (box two) was decreasing, HP was attempting to change the "mix" within its installed base by "focusing on placing higher usage units." For example, HP was focused on selling more commercial printers, both because businesses print more than customers at home, and also because commercial units generate supplies for longer (on average, seven years vs. three years for home units). By shifting its "mix" more towards commercial printers HP hoped to increase average usage per printer.

77.     Second, HP was aiming to drive Supplies growth through its critical third box: increasing its Supplies market share. To increase market share, HP told investors that it was undertaking three main initiatives: (i) refreshing printer lines; (ii) shifting to contractual supplies sales; and (iii) marketing the

1   value of HP original supplies. Refreshing printer lines meant that HP released new versions of it printers,

2   which had the potential to increase market share because it took time for third-party sellers to build

3   cartridges to fit the new models, which meant less competition for HP. HP was also trying to shift its

4   customers "from transactional to contractual" because when HP's printer customers contracted to buy all

5   HP ink, HP was guaranteed "100% supplies attach." Finally, HP was also investing in marketing to

6   "explain the benefits of HP supplies to our customers. And the better job we do of that and the more

7   supplies we get."

8       78.   At the Company's October 13, 2016 Securities Analyst Meeting, Defendants made clear that

9   the Company was relying on these two levers to drive Supplies growth. During that meeting, a Bank of

10  America Merrill Lynch analyst asked, "the installed base . . . seems to be a drag. The usage is sort of mixed.

11  The pricing you're saying is sort of flattish. So *the real driver for growth within that 4-box model seems*

12  *to be getting supplies share*. . . . [A]re there other catalysts that I'm not addressing here?" In response,

13  Lores explained that HP would drive Supplies growth through "change of mix" and "*grow[ing] share*."

14  Similarly, Lesjak explained that while HP's "assumptions specifically include a market forecasted to

15  decline slightly year-over-year," the Company believed Supplies revenues would stabilize "driven by both

16  positive NPV unit placements as well as . . . an *increase in supplies after-market share*."

17      79.   The following day, October 14, 2016, J.P.Morgan reported that "[t]he company provided an

18  update on its 4-box model to improve supplies revenue, with the main focus being on placing profitable

19  units in the installed base and *increasing supplies share*." In a same-day report, UBS wrote, "[i]n print,

20  HP hopes to stabilize the core through *increasing aftermarket supplies share* and placing higher quality

21  units." Wells Fargo likewise wrote that "the install base and usage per unit will decrease in the core market

22  but *supplies share will increase*." On October 24, 2016, Morgan Stanley reported that, "[m]anagement

23  meetings provide clarity on printer supplies stabilization, a key investor debate. *We see printer supplies*

24  *share rising, paving a path to stabilization*." Simply put, increasing HP's Supplies market share was

25  critical to HP's ability to grow its Supplies revenue; as a result, both analysts and investors monitored HP's

26  progress closely.

27

28

**D.**    **In 2016, HP Disclosed a $450 Million Supplies Inventory Write-Off and Then Doubled Down On Its Razor/Razor Blade Model**

80.    In addition to the Four Box Model, HP also took drastic steps to shore up its deteriorating printing Supplies business. In particular, on June 21, 2016, following yet another large year-over-year decline in Supplies revenue, HP announced that it needed to reduce the level of Supplies inventory in its channel by $450 million. In particular, the Company disclosed that it would be making an "investment" of $225 million in each of the next two quarters (a total of $450 million) to buy back supplies from its channel partners. This massive buyback created a $450 million dollar headwind to HP's Supplies revenue for 2016.

81.    Then, HP decided to double down on its "razor blade" business model—tweaking it to focus even more on market demand. In that regard, HP claimed that it would only put Supplies inventory into the channel when demand warranted it, shifting from a "push" approach to a demand-driven "pull" approach. Defendants assured investors that HP had "big data" that allowed them to accurately assess market demand to keep the right amount of inventory in HP's sales channel. For example, during HP's June 21, 2016 printing update call, a Bank of America Merrill Lynch analyst asked how HP had determined the "right level of inventory" to have in the channel. In response, Weisler stated: "So we've done a significant amount of analysis through the collection of big data. We've spoken at length to our channel partners. We've analyzed all areas of the business to determine what generates -- both at a Tier 1 level and a Tier 2 level, what generates market demand so that we move from this push model to a pull model. So we're fairly confident that the sums that we've talked about in the prepared remarks are the right amount of inventory to reduce in order to effect that pivoting model."

82.    The inventory write-down plus the shift to a market demand-focused "pull" approach surprised analysts. For example, in a June 21, 2016 report, UBS noted that: "Last earnings call management noted it was satisfied with channel inventory levels, so the sudden shift could be a signal of continued weakness." Likewise, during HP's June 21, 2016 printing update call, a Sanford C. Bernstein analyst registered his consternation with HP's unexpected announcement:

> [W]e had an earnings call less than four weeks ago and you said you were comfortable with supplies inventory levels. Given all the analysis that you have done on this, I'm surprised you said that statement so unequivocally, given that you are now basically coming back to us and saying that's not the right supplies channel inventory level for the new economic reality of what supplies is today. So did you have an inkling, in which case

why didn't you share that with us? Or has the market changed at all in the last four weeks that has changed your perception of where inventory levels need to be?

83.    In response, Defendants Lesjak and Lores attempted to deflect the damage of the inventory writedown by pointing to the shift in focus to market demand. Specifically, Lesjak said that "if we continued to manage our supplies business the way we had been managing it, then the channel inventory levels were the right levels." Lores, continued: "This is why we wanted to share the other changes that we are doing internally because this is really not just a change of the inventory level. We are changing most of the processes that we use to manage the supplies. We are changing the metrics and this will enable us to operate in this different and more efficient way going forward."

84.    Defendants also assured investors that they would closely monitor inventory moving forward, to keep it at a level that aligned with true market demand. For example, during the call Lores stated: "Following these one-time reductions of inventory, we will reduce and tighten the desired ranges for ink and toner in each region. It will be critical, as it is today, for me to hold the sales teams accountable to remain within the ranges going forward. You can expect us to report on this during the quarterly earnings calls, as we have done in the past."

85.    The Company also announced that it would significantly decrease its discounting of printing supplies. "[I]nstead of selling just on price," it would sell on the value of original HP supplies. Following the announcement, however, analysts noted that by removing discounts HP risked losing crucial Supplies market share. For example, during the June 21, 2016 call, a Morgan Stanley analyst stated, "I struggle with the idea that as you raise prices . . . that that's actually going to drive a market share increase rather than an accelerated share shift towards some of those remanufacturers." Likewise, Barclays wrote in June 22, 2016 report that, "fewer periods of increased discounting could result in lost revenue or market share."

86.    Defendant Lores, however, assured the market that HP was confident in its new strategy because "[o]ur big data capabilities give us a very good understanding of the effectiveness of our [discounting and promotional] activities." Similarly, in response to the question from a Bank of America Merrill Lynch analyst: "[H]ow do you see the risk of losing [market] share, at least in the near term, given both lower channel inventory levels, it sounds like also lower promotional activity?," Lores responded: "Actually we have done a little work to understand what the results of these actions will be and we believe

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

that it's going to be helping us to actually grow our [market] share." He further stated, "the fact that we have now big data and that with big data we can track the return on investment of our activities make us very confident in our ability to differentiate actions that will drive good results versus actions that will not drive any payoff."

87.   In sum, heading into the Class Period, analysts and investors were focused on whether HP would be able to keep its Supplies inventory levels in line with actual demand—thus avoiding another massive reduction—and whether it would be able to drive increased Supplies market share, allowing it to stabilize Supplies revenue growth.

### E.   During the Class Period, Defendants Misleadingly Told Investors that the "Four Box Model" Showed HP's Supplies Revenue Had Stabilized, its Market Share Was Growing, and its Inventory Was Based on "True Demand"

#### 1.   Defendants Misled Investors to Believe that the Four Box Model Was Based on "Big Data" and, As a Result, Accurate and Reliable

88.   As noted above, prior to the Class Period, Defendants had boasted that HP's commercial printers were providing telemetry data, which gave them confidence in the reliability and accuracy of the Four Box Model. Throughout the Class Period, Defendants continued to represent to investors that the Four Box Model was reliable and accurate because it was based on real-time "big data" collected directly from HP's printers. Defendants referred to the process of their printers sending this data back to HP as the printer "phoning home." For example, during a March 1, 2017 Morgan Stanley conference, Weisler represented, "we have an incredible amount of data" because "[o]ur printers in many cases *phone home*" and "we put all of that information into this [Four Box] model." At HP's 2017 Securities Analyst Meeting, Lores again touted the Company's "[b]ig data and analytics" based on "the capacity that we have now to connect with millions of printers in our installed base and to capture the data from them."

89.   Moreover, according to Defendants, the "detailed" telemetry data that the Company collected from its printers gave it insight into Supplies demand at a "very granular level." For example, at the June 6, 2018 Bank of America Merrill Lynch Global Technology Conference, Fieler stated:

> [W]hat's really important about the [Four Box] model is the predictability around it. And it's actually rather detailed as you look at geographies and SKUs and things, and it's only getting better with the incremental data and insight we get from our installed base. . . . And so the model, based upon sort of historical trends and other insights that we're gathering,

can predict what we believe the supplies business will look like in the future. And so you take that and get us a very granular level . . . .

90.    During the same conference, Lesjak similarly represented that, "many of your printers phone home to us and tell us what kind of usage we're getting. So we can look at, let's say, the United States, and we can to [sic] this in other countries, but you can look at the United States and you can actually zero in on a ZIP Code and know whether or not these types of SKUs in that ZIP Code tend to buy, on average, a lot of supplies or not. . . . But broadly, we can see inside the ZIP Code level, and we get that data all the time."

91.    Defendants also represented that HP's "big data" provided them with a detailed understanding of the "competitive environment" in the Supplies market. For example, at the May 31, 2018 Sanford C. Bernstein Strategic Decisions Conference, Defendant Weisler stated that HP had the capability to "deeply understand[] again, through big data, what the competitive environment is looking like region by region, country by country," which purportedly allowed them to properly price supplies.

92.    Given these purported capabilities, Defendants repeatedly assured investors that the Four Box Model was an accurate, reliable method to determine demand for HP's Supplies. For example, during a March 1, 2017 Morgan Stanley conference, Weisler stated that the Four Box "model has been very predictive for us, and we have a lot of confidence in it." At the Company's October 12, 2017 Securities Analyst Meeting, Lores represented that the Four Box Model had given HP "confidence in our ability to project and to predict this business in the future but also to manage it for growth."

93.    On February 22, 2018, Weisler again represented that "the Four Box Model has been the strong predictor of outcomes for us," and "the Four Box Model is delivering as predicted." Lesjak similarly stated "we have a lot of confidence in the predictive capabilities of our 4-box model" and further noted, "[w]e have seen that it has been very reliable." Defendant Weisler likewise stated that the Four Box Model has been "a very good predictor of our Supplies trajectory over time" at a September 7, 2018 analyst conference.

94.    In turn, Defendants premised their Supplies revenue targets and statements regarding HP's ability to meet or beat those targets on the purported reliability of the Four Box Model. For instance, at a May 2018 conference, Weisler stated, "the 4-box driver model has been a good predictive tool for us" and

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

"[s]o we feel good about the guidance that we're giving." During the Company's 3Q18 earnings call on August 23, 2018, Defendant Weisler stated that he had, "a lot of confidence in the predictive value of our 4-box model, which is the basis for what we guided for the rest of FY '18 and '19." A few weeks later, at a Deutsche Bank conference, Defendant Schell represented:

> Now if you look at the supplies business and any commitment we make on it, it's actually a very informed messaging that we have because it operates in a predictive tool where as -- we call it the 4-box tool. . . . We are following a clear predictive tool when we give this guidance, when we say it's flat to slightly positive, then that's really what we currently see.

95.     Analysts echoed Defendants' statements. For example, in April 2017, Morgan Stanley reported that "[a]cross HP's printer line-up, improved analytics and 'phone home' capabilities provide management with better visibility into supplies usage trends. On the back of this, we forecast 80bps of Y/Y supplies growth exiting FY17, accelerating to 3.5% in FY18. . . . Price target increase to $22 (from $19) reflective of growth inflection and improving earnings durability." After the Company's October 2017 Securities Analyst Meeting, Morgan Stanley similarly reported that, "[i]mproved data and analytics on customer usage and lower supplies channel inventory increase visibility of supplies revenue, reducing earnings risk, in our view."

96.     Defendants' statements regarding the purported accuracy and reliability of the Four Box Model were materially false and misleading. Indeed, contrary to Defendants' repeated representations that the Four Box Model was being constantly refined based on "big data" sent from HP's printers, Defendants later admitted that they "*did not have*" sufficient telemetry data from the Company's toner-based products (i.e., laser printers). Defendants later explained that HP "had this data for ink-based products, but due to the limited number of machines that were phoning home in commercial due to enterprise firewall constraints and otherwise unconnected devices," it did not have sufficient data for its laser printers and so it "*ha[d] never been statistically relevant for . . . [HP] to rely on it*."

97.     This was a stunning admission by Defendants. Indeed, the lack of statically relevant telemetry data rendered the Four Box Model unreliable and inaccurate—a far cry from the predictive, reliable tool that Defendants' had repeatedly assured the market was informing their Supplies revenue guidance. At its most basic level, without telemetry data from its commercial printers, Defendants had no visibility into the "usage" of those machines (the second "box" in the model). This problem was only exacerbated by HP's

strategy of shifting the mix of its installed base to include more purportedly high usage commercial printers. The fact that HP never had statistically relevant telemetry data for toner-based products (e.g., commercial printers) also meant that the Company was blind as to the success of that strategy. Similarly, although HP knew the total number of printers it had sold, without telemetry data, it did not know how many of the printers were actually being used or still active (box one).

98. Moreover, without statistically relevant telemetry data, HP also was blind to its market share for toner-based printer supplies. Indeed, HP later conceded that it "***did not have . . . the capabilities to calculate share for toner-based products in the installed base***." In this respect, Defendants' statements were all the more egregious given that, far from relying on accurate, real-time data, during the Class Period HP was instead relying "primarily on ***lagging and incomplete market share surveys***" to form the "market share" inputs into its Four Box Model. This third-party market share data "***wasn't changing***, over time" to reflect true market conditions. Finally, without accurate market share data, HP also had no insight into the impact of its marketing efforts or the changes in Supplies pricing (box four). As a result, the Four Box Model could not and did not provide HP or investors with an accurate depiction of the HP's Supplies market share or demand, nor the trajectory of HP's Supplies revenues.

99. Defendants knew that relying on "lagging and incomplete market share surveys" to calculate the "market share" input in its Four Box Model rendered the entire model unreliable and inaccurate. Indeed, as Defendant Fieler himself stated, the "4-box model is only as good as its assumptions." This is particularly striking given that the Four Box Model was highly sensitive to changes in market share assumptions. As Wolfe Research reported on April 15, 2019, following a meeting with Fieler, "[m]isestimating laser supplies share by even a point has a material revenue impact." In the end, Defendants' decision to abandon the Supplies focused business model and, thereby, the Four Box Model, prompted analysts to write in October 2019: "RIP 4-Box Model."

### 2. Defendants' Statements Regarding HP's Market Share Growth Were Materially False and Misleading—As Defendants Eventually Acknowledged

100. Throughout the Class Period, Defendants repeatedly told investors that HP's Supplies market share was growing. For example, at the October 12, 2017 Securities Analyst Meeting, Defendant Lores stated that the Company had stabilized Supplies by, among other things, "increas[ing] share." Moreover,

Lores included in his presentation two charts, showing both that Supplies market share had increased "in line with expectation" in 2017 and that, based on the Four Box Model, HP expected market share to continue to increase in 2018:

 

101.  HP executives also repeatedly represented that HP was improving its Supplies market share. For example, after meetings with Nick Lazaridis, then-President of EMEA (i.e., Europe, the Middle East, and Africa), and Kitt Tanner, HP's Director of Investor Relations, Morgan Stanley reported on June 26, 2017, in a report titled "Meetings Highlight Sustainable Growth," that "HP accelerated printer hardware innovation and refresh cycles *allowing for higher supplies share*" and that "[r]eallocating dollars from contra spend for channel partners to end user education of the benefits of HP branded supplies is *also pushing supplies share higher*." Morgan Stanley concluded that supplies stabilization was "sustainable" in the longer-term. During the September 6, 2017 Citi Global Technology Conference, Lesjak stated that "market share supply, that's obviously pretty important" and "we've done a really good job of managing our discounts, and we're taking that savings and we're putting some of that back into marketing. . . . to drive preference for that HP-branded supplies. *And so you've also seen us have progress in our market share*."

102.  During the May 31, 2018 Sanford C. Bernstein Strategic Decisions Conference, Sanford C. Bernstein analyst A.M. ("Toni") Sacconaghi asked Defendant Weisler whether there were certain boxes in the model that were positives or negatives: "[I]n terms of the levers within 4-box, I don't want to mechanically go through each one, but are there 1 or 2 that are sort of positive pluses and minuses? Meaning

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-- *I know aftermarket capture rates is obviously a very big factor. You move that needle a little bit either way. That can really have a big impact.* Obviously, install base is a big factor. So are there 1 or 2 levers that structurally are getting a little bit better, becoming more of a challenging headwind within that model . . . .?" In response, Weisler again reiterated that "*we're making improvements in the aftermarket share.*"

103. During the Company's October 3, 2018 Securities Analyst Meeting, Lores included in his presentation a chart, showing that, based on the "all the assumptions" in the Four Box Model, HP expected market share to continue to increase in both home and office supplies in 2019:



104. These statements were materially false and misleading. In particular, as discussed in Section V, *infra*, while assuring investors that HP's Supplies market share was improving, Defendants failed to disclose that HP had *never had* the "big data" necessary to reliably and accurately determine supplies market share.  In fact, HP later conceded that it "*did not have . . . the capabilities to calculate [market] share* for toner-based products in the installed base." Nor did Defendants disclose that they were basing their repeated reassurances to investors on "lagging and incomplete" third-party market share data "that wasn't changing over time" to reflect true market conditions.

105. In fact, more than just having zero insight into market share, Defendants repeatedly told investors that HP's Supplies market share was *increasing*, when it was *actually going down*. At the end of the Class Period, Defendants eventually admitted this reality, stating: "[w]hereas we have previously had an arrow going up of gaining share, *given the new data, we'd actually expect share to be down* to a

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

lesser extent on office." Indeed, when HP was finally able to access actual "big data" from its printers and was actually able to calculate its "***real share number***," Defendants found that "HP's Supplies share, and particularly in . . . [its] office business, was ***significantly lower*** than what . . . [it] had assumed in . . . [the] 4-box model." As Wolfe Research wrote in May 2019 after meeting with Defendant Fieler: "The four-box model had incorporated share gain, which no longer is the case." Simply put, because HP used unreliable market survey data, its "***assumptions about share were wrong***." Ultimately, as a result of Defendants' false and misleading statements and omissions of material fact, investors were left with the misleading impression that HP's critical Supplies market share had improved when it had not.

106. Moreover, Defendants conceded that HP's market share assumptions had been incorrect for quite some time: "Where we went wrong is that we had incorrect Supplies share assumptions in our 4-box model regarding the plans for Supplies selling ***in quarter 1 '19 and in prior quarters***." Nor was the error limited in geographic scope. As Fieler admitted, HP was forced to "look at all regions and revised our share" based on insights from the actual "big data."

107. Defendants, who admitted to extensively using and constantly refining the Four Box Model, knew that that it was based on unreliable market share data or at the very least were deliberately reckless in disregarding this reality. For example, Weisler stated that, "the four-box model is a predictive tool, and ***we use it extensively***" and "it is something that ***we focus on very carefully***." Lores explained that HP's management was "constantly work[ing] to improve and to refine" the Four Box Model. Weisler similarly stated, "***we're constantly testing the model***. Every time we close a quarter, we go back and look at the 4-box drivers, what it predicted and what it returned." HP's senior executives also closely scrutinized Supplies market share. For example, during the September 12, 2018 Deutsche Bank Technology Conference, Defendant Schell admitted that because market share was "very important" to "inform the guidance that we give," it was a "key component" that he worked on "in my daily job with my team."

### 3. Defendants Also Misleadingly Represented That, Based on the Four Box Model, the Supplies Business Would Return to Stability and Growth

108. In addition, throughout the Class Period, Defendants repeatedly assured investors that, based on the big data and analytics in the Four Box Model, HP's Supplies business would stabilize and thus remain a viable business model. While making these statements, however, HP failed to disclose that these

predictions were based not in reliable, real-time "big data"—as Defendants had repeatedly represented—but instead on, among other things, unreliable "lagging and incomplete" market share survey data "that wasn't changing over time" to reflect true market conditions.

109.   For example, during the Company's February 22, 2017 1Q17 earnings call, Weisler stated, "*we remain confident that supplies revenue growth in constant currency will stabilize* by the end of 2017, consistent with our Four Box model analytics that we see." Lesjak similarly stated: "The year-over-year decline associated with the Four Box model drivers was better than we expected. And as Dion said, *we remain on track to stabilize supplies revenue* in constant currency by the end of the year."

110.   Analysts repeated Defendants' assurances. For example, on February 22, 2017, Morningstar wrote, "the company indicated that *the revenue trajectory is on track to stabilize* by the end of fiscal 2017" and RBC Capital Markets reported that while "HPQ Supplies' quarterly revenue has declined on a y/y basis for the past 6 quarters[,] [t]he company *expects the trajectory to inflect* on a constant currency y/y basis by the end of FY17." Barclays likewise reported on February 22 that, "[t]he company reiterated its goal for supplies revenue to stabilize at CC by the end of FY17. More important, the company indicated that supplies revenue could actually grow beyond FY17, which we believe longer-term investors will find encouraging." Similarly, in a February 23, 2017 report, UBS stated: "The company believes its four box model is on track for stabilization . . . . We viewed the company as having little momentum a year ago coming out of the split but are now more optimistic and bump up our F18-19 estimates. Printer supplies should stabilize on a flat to up margin." Argus also reported on February 27, 2017 that, "Printing, formerly a jewel in the crown asset for old Hewlett-Packard Corp., struggled in 2016 and has become the company's primary focus for realignment and restructuring. Supplies revenue is on track to stabilize by the end of fiscal 2017; channel inventories are in tighter ranges; and momentum is building in strategic areas."

111.   Over the next few months, HP executives continued to meet with analysts and represent that the Supplies revenue trajectory would stabilize. For example, after attending an event with HP executives in Barcelona, Deutsche Bank reported on March 22, 2017 that "[t]he *stabilization of the supplies business by the end of FY-17 remains on track*." Likewise, after meeting with Lores at the Barcelona event, Wells Fargo reported on March 23, 2017 that HP "seemed *highly confident in its ability to stabilize supplies revenue* in constant currency by the end of 2017 driven by results being seen from actions it has been

taking over the previous quarters." After meeting with Defendant Lesjak, UBS reported on April 12, 2017, that Lesjak was "***very confident in supplies stabilization by year end***." That same day, J.P.Morgan met with HP representative Kitt Tanner, and reported that "***HPQ said that its goal to stabilize supplies revenue in constant currency by the end of FY'17 is on track***."

112.  Then, HP announced on its August 23, 2017 3Q17 earnings call that it had "stabilized" its Supplies business. It also reported Supplies revenue growth for 4Q17. HP's Supplies growth in the second half of 2017, however, was primarily due to easy comparisons created by HP's $450 million Supplies inventory write-downs in the second half of 2016. The following day, August 24, 2017, J.P.Morgan reported that, "***[t]he company expects Supplies revenue to continue to be stable going forward***." In a same-day report, Morgan Stanley wrote "***Printer supplies growth sustainable***," attributing it, in part, to "***higher supplies share***."

113.  Over the months that followed, Defendants continued to assure investors that the stabilization of the Supplies business was sustainable. During the September 6, 2017 Citi Global Technology Conference, for instance, Lesjak stated that by managing the four box levers, the Company was "***set . . . up for kind of sustainability in that from a stabilization perspective***." Likewise, at HP's annual Securities Analyst Meeting on October 12, 2017, Defendants reassured investors that—based on the Four Box Model—the Company was confident that its Supplies business would be stable or even grow moving forward. For example, Weisler stated, "***the pundit said, Printing was destined to decline, but we're proving them wrong. Some of you said we couldn't do it, but we are***. . . . The team did an excellent job managing the transitions in our supply sales model, and our focus on the four-box model drivers is really working for us. ***Stabilizing our core business sets us up for growth opportunities*** . . . ." Likewise, Lores stated, "the combination of both the supply stabilization, the management of the drivers of the model and the change in supplies, this has ***great confidence in our ability to project and to predict this business in the future but also to manage it for growth***."

114. That same day, RBC Capital Markets reported that "[i]n Printing, ***HPQ has stabilized supplies and is focused on driving growth***." The following day, Guggenheim reported, "HPQ at least stabilized supplies in its latest quarter (following inventory/go to market changes as planned) and ***believes it has potential to grow longer term***." On October 17, 2017, Argus wrote that "***[t]he issues with supplies***

*that set the company back in 2015-2016 are now largely resolved*." Similarly, on October 22, 2017, Deutsche Bank reported that, after meeting with Chris Lee, HP's Director of Investor Relations, it was "more *convinced that the days of declining Y/Y printing sales are behind us*."

115.  In late 2017, HP closed its acquisition of Samsung Electric Co., Ltd.'s ("Samsung") printer business, which analysts estimated increased HP's printer segment revenues by approximately 10%. As a result, although HP continued to report Supplies revenue growth throughout 2018, much, if not all, of that growth was driven by the additional Supplies revenues from the new Samsung printer line.

116.  Throughout the rest of 2017 and 2018, analysts repeatedly pressed HP about the growth in HP's organic Supplies business without the boost provided by the Samsung acquisition. But Defendants claimed that they were unable to break out organic growth. For example, during the November 21, 2017 4Q17 earnings call, a Sanford C. Bernstein analyst asked about how much of Samsung's $1.8 billion in printing revenues came from supplies. In response, Lesjak stated "we've never talked about what the percentage was of that, that was supplies. . . . So I can't really talk to that." The analyst followed up: "Okay. It just – if we're ever going to really know what your organic supplies growth rate is next year, we really need to know how much is coming from Samsung. So if you're not going to give it out now, are you going to be giving it out in the future?" Lesjak responded that "it will become increasingly difficult for us to breakout what was -- what is the Samsung business, Samsung's Printing business versus the HP Printing business, so that will be a challenge on a go-forward basis." Defendants repeated this refrain, with Lesjak representing on May 29, 2018, in response to an analyst question that "there isn't really a way to meaningfully separate what is organic growth versus inorganic growth for the Print segment," and Defendant Fieler representing on August 23, 2018, in response to an analyst question that "we do not have the ability to accurately break out what's inorganic versus organic."

117.  As a result, investors were unable to fully assess HP's Supplies revenue results and their impact on the future trajectory. Defendants, however, continued to reassure investors that HP's Supplies business was stabilized and would continue to be flat or slightly up for the foreseeable future. For example, on January 12, 2018, after meeting with Nick Lazaridis (then-President of EMEA (i.e., Europe, the Middle East, and Africa)), Stuart Pann (Chief Supply Chain Officer), and Tuan Tran (Global Head of Office Printing Solutions) at the annual CES, UBS reported that "[w]e walked away *confident in growth for at*

*least the next two years*." Ultimately, UBS wrote that investors had become convinced that HP's business would no longer decline moving forward and "*[t]he debate has shifted from whether HP can stabilize supplies to whether HP can sustainably grow*."

118.  Indeed, throughout the Class Period, Defendants continued to assure investors that, based on the Four Box Model, the Company's Supplies revenues would remain stable. For example, during HP's 1Q18 earnings call on February 22, 2018, Weisler stated that "the Four Box Model has been the strong predictor of outcomes for us. And as a result of that, we believe that *Supplies in '19 will be flat to slightly up*." The following day, Morgan Stanley wrote that it had "increased confidence" in sustainable Supplies growth based, in part, on "increasing supplies share," and UBS reported that HP's "[s]ustainable growth narrative [was] on track."

119.  On HP's May 29, 2018 2Q18 earnings call, Defendant Weisler again assured investors that "we have a *continued confidence in the predictive value of the four box model*. You can expect us to drive continued improvements across all 4 boxes to *maintain supply stabilization in '19*." Several days later in response to an analyst query as to whether the Supplies business was decelerating, Weisler affirmed that "I don't think there is any surprises" and "*[w]e've talked a lot about the 4-box drivers, and the 4-box driver model has been a good predictive tool for us. . . . So we feel good about the guidance that we're giving*." Fieler likewise stated at the June 6, 2018 Bank of America Merrill Lynch Global Technology Conference that "we have *confidence in continued stabilization into next year*" and that his confidence was based on the data in the Four Box Model: "we have increasing confidence as we get more data and insight into the 4-box model." During that same call, an analyst asked whether HP had confidence that "the underlying trends" in its Supplies business were still "on an improving trajectory" even without the added revenue from the Samsung acquisition. In response, Fieler stated, "*it really goes to that -- the 4-box drivers*" and "*factoring it all in, we have confidence in continued stabilization into next year*."

120.  Thereafter, at the September 12, 2018 Deutsche Bank Technology Conference, Defendant Schell represented that based on the Four Box Model, "for fiscal year '19, our current guidance is flattish to slightly positive" and "*[w]e are following a clear predictive tool when we give this guidance, when we say it's flat to slightly positive, then that's really what we currently see*." Moreover, during the Company's October 3, 2018 Securities Analyst Meeting, Lores stated, "we have been using the 4-box model for a

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

while, and *it has been a very good predictor* of the performance that we see. And when we look at '19 and we input all the ins and outs, all the ups and downs and across the different segments, *flat to slightly up is what the model is projecting*, and *it's what we are going to be delivering*." Notably, in an October 4, 2018 report, analyst Maxim Group reported, "HPQ expects printing supplies to be flat to slightly up in FY19" and "[u]nderpinning management's confidence in flat to slightly up supplies growth is HPQ's 4-box model, which the company notes has been very for [sic] predicting supplies growth." The following day, J.P.Morgan wrote, "high margin Supplies has stabilized."

121.  Then, on January 8, 2019, at the CES Citigroup TMT Conference, Lores again assured investors that the Four Box Model was predicting stabilized Supplies revenues moving forward, "we have been very clear since Q1 last year, declaring that as we enter into 2019, our prediction for the supplies business was that it was going to be flat to slightly up." Similarly, after meeting with Lores, Wolfe Research reported on January 22, 2019 that "Lores reiterated guidance of flat-to-up supplies revenue in F19."

122.  These statements, too, were materially misleading. In particular, as discussed in Section V, *infra*, while representing to investors that, based on the big data and analytics in the Four Box Model, HP Supplies business would stabilize and thus remain a viable business model moving forward, Defendants failed to disclose that the Company had never had the "big data" necessary to reliably and accurately predict Supplies revenues—including for the critical "market share" box. Ultimately, when the easy comparisons caused by the 2016 write-down and the Samsung acquisition faded away, Defendants were forced to admit that HP's Supplies business could not be stabilized, and would instead just keep declining. Indeed, at the end of the Class Period, Defendants finally conceded that they could not stem the market share losses caused by third-party aftermarket suppliers, and as a result, HP's "razor blade" Supplies business model was not viable.

> **4.    Defendants Misleadingly Told Investors that the Four Box Model Allowed Them to Keep Inventories In Line With "True Demand"—Only to Later Admit a $100 Million Overstatement in Inventory**

123.  Prior to the Class Period, as discussed in Section IV.C., *supra*, Defendants assured the market that they had "big data" from HP's printers that allowed them to properly align Supplies inventory levels with demand. During the Class Period, Defendants continued to assure investors that HP's Supplies

inventory levels were consistent with the true demand in the marketplace, allowing the Company to avert the types of problems that created the massive $450 million headwind in 2016.

124.  For example, during the March 1, 2017 Morgan Stanley Technology, Media & Telecom Conference, Defendant Weisler stated, "[w]e're seeing unbelievable linearity in our business now, as you would expect, because *we're really on fulfilling when there's true demand*." On the Company's 2Q17 earnings call on May 24, 2017, Lesjak stated, "we did make a change to our supply sales model last year, and that is driving better linearity. Real structural, better linearity. *Linearity in the quarter that mirrors the demand that we're seeing*." Lesjak further stated, "*channel inventory remains below our reduced ceiling*."

125.  Analysts echoed Defendants' statements. On July 24, 2017, UBS reported: "The change in go-to-market seems to have solved the problem of excess supplies in channel. Previously, supplies were sold in based on the channel's forecast, and the bigger the forecast the more discretionary dollars HP provided. Now the approach is sell out to replenish, aided by increasing data HP receives on printer use."

126.  During HP's annual Securities Analyst Meeting on October 12, 2017, Lores stated, "we redefined the supplies model and *we moved to a demand-driven model*. And this is -- we are starting to see the results of that change in our business. *We operate now with lower-channel inventories*." On the Company's February 22, 2018 1Q18 earnings call, Lesjak stated: "We believe that the Four Box Model remains a good predictor of our Supplies performance, *and we continue to operate below our channel inventory ceiling*."

127.  During the May 29, 2018 2Q18 earnings call, Lesjak stated, "we continue to operate below our ceiling for Supplies channel inventory." Defendants made substantially similar statements on the Company's May 24, 2017, November 21, 2017, August 23, 2018, and November 29, 2018 earnings calls.

128.  These statements were materially misleading. As discussed in Section V, *infra*, while representing to investors that HP's inventories were aligned with "true demand" and were within the proper ranges determined by that demand, Defendants failed to disclose that HP *never had* the "big data" actually necessary to determine that demand. Instead HP was using "lagging and incomplete" third-party market share data "that wasn't changing over time" to reflect true market conditions. As a result, investors were

left with the misleading impression that HP Supplies inventory levels were carefully correlated to reflect true demand when, in reality, HP never had the data necessary to do so.

129.   Moreover, Defendants later admitted that because they were relying on inaccurate market share data to determine demand, the Company's channel inventories during the Class Period far exceeded demand: HP "continue[d] to fulfill orders *likely over multiple quarters* based on our original share assumptions, which we now believe were overestimated. This resulted in additional HP supplies in the ecosystem." Once Defendants' demand calculations were actually "informed by big data," Defendants realized Supplies inventory was significantly overstated by at least $100 million. In other words, while repeatedly representing to investors that its inventories were aligned with true demand, in reality HP had at least $100 million dollars in excess Supplies inventory in its channel because of the unreliable market share data it relied upon throughout the Class Period: "$100 million of excess inventory that we didn't have visibility to was flowing into the system with no real readout as to an ongoing issue with demand because the share assumptions were incorrect."

130.   Defendants, who admitted to extensively using and constantly refining the Four Box Model, either knew that that its "demand" calculations were based on unreliable market share data—rather than actual "big data" from HP's installed base—or were deliberately reckless in not knowing. Defendants' knowledge or reckless disregard of the inventory problems is further bolstered by the fact that Defendants meticulously monitored HP's channel inventory. As HP executives explained during the 2015 Securities Analyst Meeting: "we are on it. We're on it every single day by country. We know exactly how much inventory we have in consumer, in commercial and most importantly, we know the quality of that inventory. . . . We're always focused on the channel inventory. And we want to get those into the right position."

F.     **The Relevant Truth is Revealed Through a Series of Partial Disclosures**

131.   Heading into HP's 1Q19 print, analyst J.P.Morgan wrote that "[w]e expect HPQ to post F1Q19 results in line with expectations" and that "[i]nvestors will be focused on Supplies performance."

132.   After the close of market the following day, February 27, 2019, the Company shocked the market when it reported Supplies revenue growth of *negative* 3% for 1Q19, driven mostly by a miss in EMEA. The Company also announced that it had to lower channel inventory levels once again, which

created a $100 million headwind to the Company's Supplies revenue for the remainder of FY19. The Company further disclosed that it expected Supplies revenues to continue to decline by 3% for the remainder of 2019, and declined to discuss the Supplies trajectory beyond that.

133. Analysts were surprised by the miss. For example, Wells Fargo noted that HP's Supplies growth was "*significantly weaker than expected*" and that its "negative commentary around market share lead us to be meaningfully more cautious around our print assumptions." BMO Capital Markets reported that "HPQ delivered results that were *disappointing* on the top line largely due to a Supplies shortfall, where we think a resolution could take a few quarters to iron out." Wolfe Research wrote that "[w]hen we visited HP in Jan, the head of printing said that guidance for supplies of flat-to-up was not conservative. But *we didn't expect a decline of 3% in F1Q*, which is the new annual guidance. Supplies is the lifeblood of HP, which makes the share and price challenges faced in Europe a serious investor concern."

134. During the call, the Company disclosed that contrary to its prior representations, it "did not have" sufficient telemetry data from the Company's toner-based products (i.e., laser printers). Defendants explained that HP "had this data for ink-based products, but due to the limited number of machines that were phoning home in commercial due to enterprise firewall constraints and otherwise unconnected devices," it did not have sufficient data for its entire fleet of laser printers and so it "ha[d] never been statistically relevant for . . . [HP] to rely on it." As a result, HP "did not have . . . the capabilities to calculate [market] share for toner-based products in the installed base."

135. Shockingly, Defendants also admitted that during the Class Period HP "*had relied primarily on lagging and incomplete market share surveys*." As HP finally gained access to real-time data from its printers, however, it became clear that "HP's Supplies share, and particularly in our office business, was *significantly lower than what we had assumed in our 4-box model*." Indeed, the Company admitted that contrary to its prior representations, market share had been declining, not improving: "Whereas we have previously had an arrow going up of gaining share, given the new data, we'd actually expect share to be down to a lesser extent on office."

136. Following the call, Wells Fargo issued a report titled "HPQ: Unexpected Print Supplies Issues Leave 4-Box Model Visibility In Focus," which reported that, "we think investors will now be left to incrementally gauge HP's visibility into its 4-box model." Wolfe Research wrote that the "Four box model

[is] out of kilter." Moreover, Credit Suisse later reported that "we are concerned about HP's lack of visibility into usage trends, particularly in contrast to commentary in recent years about the increasing amount of data from units 'phoning home.'. . ."

137.   Ultimately, Defendants admitted that the Supplies revenue miss, inventory write-down, and lowered guidance all stemmed directly from the incorrect market share data in the Four Box Model. For example, Weisler stated that "[w]here we went wrong is that we had incorrect Supplies share assumptions in our 4-box model regarding the plans for Supplies selling in quarter 1 '19 and in prior quarters" but "now that we understand the trend better, it has driven a change in our expectations for share going forward." Weisler further explained that the after applying the correct, updated market share data, "[i]t also changes our assumptions in the 4-box model for the remainder of the year. As a result, we no longer expect supplies to be flat to slightly up in fiscal '19." In a same-day report, Wells Fargo wrote that "Incremental / more accurate telemetry market share data tracked by HP indicated the company's share (particularly in office) was significantly lower than previously assumed in HP's 4-box model and ***thus resulting in downward revision to forward expectations***." Similarly, Wolfe Research later wrote that "[t]he company blamed [its lowered 2019 guidance on] poor market share intelligence such that it no longer assumes supplies gain share."

138.   With respect to the inventory write-down, Defendants disclosed that HP "continue[d] to fulfill orders likely over multiple quarters based on our original share assumptions, which we now believe were overestimated. ***This resulted in additional HP supplies in the ecosystem***." Moreover, applying the correct, updated market share data made clear that inventories were overstated: "We compared our old share assumptions with the revised one that have been ***informed by big data***, and we also looked at prior selling statistics and CI trends. We then estimated how much additional downstream channel inventory may exist, and we believe $100 million is the right estimate." As a result, HP had to take "actions to lower the level of supplies inventory in the market to be consistent with our new share assumptions." As Wells Fargo noted after the call,  "[t]he company noted that incremental telemetry data led to it significantly decrease its supplies share assumption in its 4-box model and ***as a result it will lower its inventory moving forward creating a $100M headwind to supplies revenue***."

139.  As a result of these disclosures, the Company's stock price declined from $23.85 per share to $19.73 per share, or over 17%, on high trading volume. Analysts attributed the stock decline to the supplies problems. For example, in a February 27, 2019 report, Wells Fargo wrote, "we expect shares to be under pressure following negative printer supplies (attributed mostly to commercial toner) results / guide. HP now expects supplies revenue to decline 3% y/y in F2019 (vs. prior guide of flat to slightly up y/y)." J.P.Morgan likewise reported that: "We expect the lower Printer materials [supplies] outlook to weigh on the stock and expect the stock to trade sideways here with limited catalysts ahead." This precipitous decline erased over $6.34 billion in shareholder value in a single day.

140.  On February 28, 2019, Argus reported that "HPQ was slammed because weakness in printing supplies revenue could persist." In a same-day report, Morgan Stanley wrote that, "HPQ shares are down 12% in the aftermarket after the company disclosed an unexpected printing supplies guide down in FY19 that is reminiscent, though not parallel in our view, of issues the company faced in FY16." UBS likewise noted that "[n]ear-term, the stock would likely trade down because the supplies miss was a surprise to us and many investors." *The Wall Street Journal* later reported: "In the company's fiscal first quarter, a drop in revenue related to printer supplies like ink and cartridges surprised investors, who had been expecting a gain, and caused a selloff in the stock." In May 2019, Wolfe Research reported that "[t]he stock has been under pressure after reporting a supplies decline of 3% and strategic challenges across Europe in F1Q. HP is now down 22% since the print and off 11% year-to-date, underperforming both the S&P 500 (+12%) and the Tech Select Index (+18%)."

141.  Following this disclosure, HP updated the risk disclosures in its Form 10-Q filed with the SEC on March 5, 2019, to add the following language:

> Customers are increasingly using online and omnichannel resellers and distributors to purchase our products. These resellers and distributors often sell our products alongside competing products, including low-cost alternatives, or they may highlight the availability of low-cost alternatives. We expect this competition will continue, and it may negatively impact our financial performance, particularly if large commercial customers purchase competing products instead of HP products.

142.  Even after the February 27, 2019 disclosures, however, HP's stock price remained artificially inflated because, as a result of Defendants' repeated misrepresentations throughout the Class Period, investors still believed that HP could ultimately return its Supplies business to stability. For example, in a

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

May 24, 2019 report, Morgan Stanley wrote: "Key Debates . . . Can HP return to printer supplies growth? Yes, but we believe it will take multiple quarters as the company works through bloated channel inventory and takes operational and strategic actions to better defend against remanufacturers." On July 2, 2019, after meeting with HP management, UBS reported that "HP seems to have printing supplies under control" and "it now believes it has better data sources to track its share" so it can be "more confident in the in-channel results it sees." UBS further reported that based on its "better data," HP "still expects low single digit declines this year, but it should improve." As a result, UBS reiterated its "[b]uy" rating with a "$28 price target." On July 10, 2019, after meeting with HP Director of Investor Relations Tesh Dahya, Evercore ISI reported that a "[k]ey highlight from the meeting[]" was that "[a]lthough HPQ lowered its supplies revenue expectations following its F1Q print, the company has since implemented remediation plans which we think should stabilize the trajectory of the overall printing business going forward." Thus, heading into HP's 3Q19 print, Deutsche Bank wrote that: "We expect an in-line report/guide from HPQ. . . . [I]n Printing, we expect a continued path towards Supplies stabilization."

143.   Then, after market close on August 22, 2019, HP announced disappointing 3Q19 earnings results, with Supplies revenue down 7% year-over-year. Moreover, HP revised Supplies revenue guidance for 2019 down even further—to negative 4% to 5%—and ***disclosed that it did not expect Supplies revenue growth in 2020***. According to HP, the primary driver of the downward guidance revision was its longer-term strategic issues: "[T]hat's the more sustainable impact for us, and it's really the primary driver of why we don't expect Supplies to grow in FY '20. . . ." As Lores explained, the "strategic issues" involved continued market share losses to third-party suppliers: "[W]e have created a very attractive profit pool of supply but now has attracted many other companies to try to attack it, and capture a portion of it without having to have a significant investment that are necessary to create the hardware installed base. And because of that, we see an erosion of the overall profit pool that, according to our model, means a reduction in share and a reduction in price." Lores likewise confirmed that these "strategic issues presumably will have a longer term impact, and we see will be impacting us not only this year but also the years to come."

144.   The Company also announced that Weisler was stepping down, and that Lores would succeed him as CEO. Weisler's exit was publicly attributed to a "family health matter"—but market commentators noted that it was a "sudden departure."

145. The following month, UBS wrote that "[w]e think HP's four-box model is challenged and the company may have to revamp its forecast model. We are changing our F20 supplies revenue estimate from flat to down 1%."

146. As a result of HP's disclosures, the price of HP stock dropped nearly 6%, from $18.93 per share to $17.81 per share, on high trading volume—erasing approximately $1.66 billion in shareholder value. Market commentators attributed the stock price decline to the decreased Supplies revenue guidance. For example, on August 22, 2019, Deutsche Bank wrote that: "Supplies was **guided to decline -4% to -5% in FY19** down from low-single digits prior (implied -1% to +3% q/q in FY4Q19E) and was **guided to decline y/y in FY20E**, which is likely to pressure the stock tomorrow." The same day, *The Wall Street Journal* reported that, "investors watch HP's supplies business closely, given the outsize impact on the bottom line. HP shares slid 17% in February after the first print supply miss. Thursday's report took the stock down an additional 6% after hours."

147. Following this disclosure, HP updated the risk disclosures in its Form 10-Q filed with the SEC on August 29, 2019, to add the following language:

> We also face challenges in Printing due to our multi-tier distribution network, primarily in EMEA, including limiting grey marketing and the potential misuse of pricing programs. A competitive pricing environment, including from non-original supplies (which includes imitation, refill or remanufactured alternatives), and a weakened market in certain geographies with associated pricing sensitivity of our customers also present challenges in Printing.

148. Even after the August 22, 2019 disclosures, however, HP's stock remained artificially inflated because, based on Defendants' misleading statements, investors still believed that HP's Supplies business was viable and would stabilize—albeit later than originally thought. For example, the next day, Wolfe Research wrote that "[m]anagement guided to flat to down F20 Supplies growth; we look to October's investor event for the longer-term plan for stabilizing Printing." Similarly, heading into the October event, Deutsche Bank wrote that, "a stabilization in Supplies is also expected eventually, albeit with the time frame pushed out into 2HFY20 or later." Evercore ISI reported that focus at the event would be on "Supplies trajectory long-term and potential for HPQ to alter that via share gains, new markets, ASPs, etc. . . ."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

149.  On October 3, 2019, HP finally conceded that its Supplies business was not viable after all, announcing during HP's annual Securities Analyst Meeting that the Company would make a fundamental shift to its business model. In particular, moving forward, Defendants announced that HP printer "customers will be able to choose between paying a higher price for hardware and having a more flexible supplies model or buying a subsidized hardware unit that will only work with HP original supplies." In short, HP's customers would have to choose between either: (i) paying less for a printer up front that would not accept anything but HP original supplies; or (ii) paying more for a printer up front (and thus guaranteeing HP a profit) if they wanted the flexibility to use third-party aftermarket supplies. As Credit Suisse reported the following day, "management detailed a fundamental change to their business model going forward, as they look to move away from the traditional 'razor/razor blade' approach to Supplies toward a new focus on 'system' profitability." Evercore ISI similarly wrote, "HPQ intends to shift their business model by ensuring that customers pay a higher price on printing hardware if they want to have flexibility on using competitive supplies solutions, while subsidizing the hardware for customers who commit to only using HPQ hardware and ink."

150.  HP admitted that its business model shift was a direct result of Supplies market share losses: "[W]e made printers more affordable by placing the hardware at a loss and then making profit with supplies over time. . . . But today, I think we've gone too far because this model creates an attractive opportunity for others, thus we're seeing increased competition in the aftermarket. Today, alternatives, supplies, competitors are growing without having to invest in hardware development, production or placement cost." Ultimately, HP's business model was not working, because it was selling printers at a loss, but since it customers were purchasing supplies from third-party suppliers, it never recouped that loss: "[W]e don't know specifically if . . . [a printer purchaser] is actually going to be a user of HP original[] [supplies], or candidly, even a user of supplies. . . .and when we do so . . . we lose money on the hardware placement upfront, we lose money on those customers."

151.  Market commentators likewise attributed the model change to HP's losses in the Supplies aftermarket. For example, Wells Fargo wrote that, "[t]he model is a response to after-market supply producers that have cut into HP's IPG operating profit. . . . The strategy will work to reduce HP's reliance on the Supplies business." Morningstar noted that, "[t]o alleviate concerns about aftermarket ink and toner

vendors affecting supplies sales, HP will now only sell discounted printer hardware to new customers who use genuine HP supplies." Credit Suisse similarly reported that, "HP is looking to systematically raise price on printing HW for targeted segments of the market, in response to the growing threat of aftermarket Supplies that are weighing on the highly-lucrative revenue stream." Morgan Stanley wrote, "HP's print strategy pivot represents the second in 3 years, and is a direct response to increasing competition from supplies remanufacturers, and even more so the growing market of counterfeits."

152.  During the call, Defendants also conceded that the Supplies revenue declines were permanent: "we are not relying on Supplies revenues to grow beyond FY '20." As J.P.Morgan reported the following day: "Printing supplies are not expected to grow beyond FY20." Morgan Stanley wrote, "printing supplies revenue will decline not just in FY20, but over a multi-year period, which we now reflect in our model." *The Wall Street Journal*, in an article titled "HP Has No Easy Way Out of Printer Jam," reported that Defendants' announcement "amounts to a tacit admission that the supplies business is no longer growing." As Evercore ISI aptly summed up, "Expect supplies to keep declining."

153.  Indeed, after reassuring the market the entire Class Period that they could return HP's Supplies revenue to stabilization and growth, Defendants now told the market that they should no longer focus on Supplies revenue growth. For example, during the call an analyst posed the following question: "[L]ast several years, you guys have been talking about the 4-box model in Printing, and this was conspicuously absent in this analyst presentation. Do you think that, that framework is not the right framework anymore?" In response, Defendant "It's all about Supplies" Lores stated, "we didn't cover the 4-box model today because, as we have said several times, we don't think that going forward, supplies is the best metric to measure to understand the health of our business."

154.  Multiple analysts characterized this sudden pivot as a "capitulation." For example, in an October 3, 2019 report titled "HPQ: *RIP 4-Box Model* – HP Moves To Systems Based Printing Strategy," Wells Fargo wrote that, "HP announced that it was moving away from its 4-Box printing model and transitioning to a systems-based strategy that will de-emphasize printing supplies. . . . While we think that this move was largely unavoidable, *we think that investors will view HP's capitulation as net-negative*." The following day, Wolfe Research reported that, "[u]pending of traditional hardware subsidized model

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(new customers will now have to pay for flexibility), coupled with an announced cost savings plan, ***equated to near-term capitulation on efforts to stem existing installed base supplies headwinds***."

155.  Following the call, market commentators also highlighted the significant risks associated with HP's transition—in particular, the risk that by raising prices, HP risked losing even ***more*** critical market share. For example, Credit Suisse wrote that "we see a potentially disruptive transition over the near-term, which brings risk of increased volatility" and "raising price into a mature market will be tough, particularly if competitors choose not to follow. . . ." Morningstar reported that "we have concerns about HP losing market share from customers who do not adopt this sales model." Deutsche Bank noted, "[w]e believe that investors will question how this change impacts HP's market share and profitability long-term." Morgan Stanley wrote that "[w]e also see risk that competitors don't follow suit, which would result in accelerated hardware and supplies share losses." Evercore ISI reported that "this is an interesting idea but implementation of this and what do peers do will be crucial to ensure HPQ doesn't end-up losing market share." Wells Fargo summed it up, "we think investors will be focused on the potential execution risks of this transition. . . ."

156.  As a result of these disclosures, the price of HP's stock dropped from $18.40 per share to $16.64 per share, or nearly 10%, on high trading volume—erasing over $2.6 billion in shareholder value.

## V.     **DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS**

157. During the Class Period, Defendants—through their materially false and misleading statements and omissions of material fact as set forth herein—created the misleading impression that: (i) the Four Box Model could accurately and reliably determine market demand for Supplies and Supplies revenue; (ii) HP's Supplies revenue and market share was, at the very least stable, if not increasing, (iii) its Supplies market share was growing; (iv) its Supplies channel inventory was aligned with market demand; and as a result, (v) HP's Supplies business was stable and its "razor/razor blade" business model was sustainable and a viable revenue stream.

158.  In reality, the Four Box Model was not an accurate and reliable tool, and it was not based on real-time telemetry data, as Defendants had represented. Instead. HP never had sufficient telemetry data for its key commercial Supplies business. Further, the Four Box Model utilized instead out of date and inaccurate third-party market share data that rendered it unreliable and inaccurate. Moreover, as

Defendants later admitted, HP's Supplies market share was actually decreasing, and because HP had no ability to accurately determine its Supplies market share—its Supplies channel inventory was significantly overstated. As a result—and as Defendants later admitted—HP's Supplies business was not on track to stabilize but, instead, would just keep declining. Indeed, at the end of the Class Period, Defendants finally conceded that they could not stem the market share losses caused by third-party aftermarket suppliers, and a result HP's "razor/razor blade" Supplies business model was not viable.

A.   **Defendants' Materially False and Misleading Statements in 2017**

1.   **February 22, 2017 1Q17 Earnings Call**

159.   After the market closed on February 22, 2017, HP held an earnings call to discuss the Company's 1Q17 financial results, in which Defendants Weisler and Lesjak participated. During his prepared remarks, Defendant Weisler stated, "With our continued progress this quarter *we remain confident that supplies revenue in constant currency will stabilize by the end of FY17*. Consistent with that, total supplies revenue was down just 2% year-over-year in constant currency. As we always say, it's all about supplies, and *we continue to drive a number of initiatives within the Four Box model to return this revenue stream to growth*."[3]

160.   During Defendant Lesjak's prepared remarks, she stated: "In Q1, total supplies revenue was down just 2% in constant currency. *The year-over-year decline associated with the Four Box model drivers was better than we expected*. And as Dion said, *we remain on track to stabilize supplies revenue in constant currency by the end of the year*."

161.   During the question-and-answer portion of the call, Defendants responded to a follow-up question from Morgan Stanley analyst Katy Huberty:

> **HUBERTY**: And then, just as a follow-up. The supplies declined 2% constant currency, you said that was better than you expected, and you arguably had a difficult compare, because of the inventory build in the year prior. So as comps ease, why wouldn't you get to that stabilizing supplies growth earlier than the fiscal fourth quarter?
>
> **WEISLER**: Yes, thanks, Katy. Let me tackle it. Listen, as we mentioned in the prepared remarks, *we remain confident that supplies revenue growth in constant currency will*

---

[3]   For ease of reference, Lead Plaintiffs have endeavored to highlight the materially false and misleading aspects of Defendants' Class Period statements in *bold and italics*. Additional text is provided often for context, but that context can also contribute to the false and misleading nature of Defendants' statements.

*stabilize by the end of 2017, consistent with our Four Box model analytics that we see.* Actual performance continues to meet, and at sometimes beat the Four Box model forecast, which means we firmly believe the strategy that we're executing to is the right strategy, and that you've seen those metrics play out inside the business results. So *it gives us increased confidence as we head towards the end of 2017, that we'll stabilize in constant currency*, and that's what we said we would do.

**LESJAK**: And Katy, *that's really what the Four Box model* --

**WEISLER**: *Had predicted*
**LESJAK**: *Had predicted, and is predicting for the rest of the year. And so, that's really the basis on which we feel confident, that we will get there by the end of the year*, and we feel good about the performance in Q1.

162.  Credit Suisse analyst Kulbinder Garcha then asked Defendants "what's your confidence that in the following year, we might see a year in which supplies actually starts growing?," which led to the following exchange:

**GARCHA**: And my second question is just on supplies. We are still talking about stability by year-end. But given the units that you're now [placing], once we move beyond the end of the year, compared to let's say three or six months ago, what's your confidence that in the following year, we might see a year in which supplies actually starts growing? Thanks.

\*       \*       \*

**LESJAK**: And Kulbinder, in terms of longer term view of supplies, we haven't really provided an outlook, out beyond 2017. But what I will say, as we have now a very substantial evidence point of down just 2% in constant currency for supplies year-over-year in Q1 – I'm sorry, yes, in Q1. We are on that march to get it stabilized in constant currency by the end of the year. And then, of course, we are at the same time, focusing on making sure that we're placing the right units, the positive NVP units, and making the right investments across a A3 and graphics, as well as 3D for longer term. So that *over time, we will drive supplies back to growth.*

163.  In response to Bank of America Merrill Lynch analyst Wamsi Mohan's query as to "what drove the upside in the quarter, in that context of the Four Box model specifically," Defendant Lesjak stated:

[W]e will continue to drive all of the different initiatives that we've got going against each of the boxes, because it is -- it continues to be true, and *our fundamental belief that it will continue to be so, that those are the key levers that are going to drive supplies revenue, both just stabilization in constant currency by the end of the year, and then ultimately to growth beyond that.*

164.  Additionally, in response to a question from J.P.Morgan analyst Rod Hall regarding "printing supplies growth," Defendant Weisler responded that HP was "*confident in stabilizing supplies by the end of 2017*."

165.  Following the 1Q17 earnings call, several analysts issued reports reiterating Defendants' statements. For instance, RBC Capital Markets, BMO Capital Markets, Morningstar, FBN Securities, and Wells Fargo each issued reports noting that Defendants expected Supplies revenues to stabilize by the end of FY17.

166.  On February 22, 2017, Barclays issued a report titled "Good Execution, Supplies Improving," which stated: "The company reiterated its goal for supplies revenue to stabilize at CC by the end of FY17. More important, the company indicated that supplies revenue could actually grow beyond FY17, which we believe longer-term investors will find encouraging."

167.  Defendants' statements in ¶¶ 159-64 were materially false and misleading when made because Defendants failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendants' statements gave investors the misleading impression that their statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendants statements in ¶¶ 159-64 were materially false and misleading when made because they lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

168.  In addition, Defendants' statements in ¶¶ 159-64 assuring investors that, based upon the Four Box Model, Supplies revenues would stabilize and even grow, including their assurances that "we remain on track to stabilize supplies revenue in constant currency by the end of the year," that "over time, we will drive supplies back to growth," and that they "continue[d] to drive a number of initiatives within the Four Box model to return this [Supplies] revenue stream to growth," were materially false and misleading when

made because they omitted the highly material facts that Defendants (i) lacked the data necessary to reliably and accurately quantify market demand for HP's Supplies through the Four Box Model, and instead, (ii) based their statements on outputs from the Four Box Model predicated upon "lagging and incomplete" market share survey data "that wasn't changing over time."

169.  Indeed, without statistically sufficient, accurate, or reliable telemetry data for commercial printers, Defendants did not know how many of these printers were still active, how often those printers were being used, the amount of historical, current, or potential toner usage, or the size of HP's Supplies market share. In turn, Defendants had no reasonable basis to assure investors regarding the impact of HP's marketing efforts and changes to Supplies pricing. As a result, Defendants had no reasonable basis to make statements about the historical, current, or potential trajectory and sustainability of HP's Supplies business. As such, Defendants' assurances of Supplies revenue stabilization and growth were materially false and misleading when made and lacked any reasonable basis.

### 2.     March 1, 2017 Morgan Stanley Technology, Media & Telecom Conference

170.  On March 1, 2017, Defendant Weisler participated in the Morgan Stanley Technology, Media & Telecom Conference. During the conference, Morgan Stanley analyst Katy Huberty questioned Defendant Weisler about "the elements" of the Four Box Model that gave HP "confidence" that it would stabilize supplies:

**HUBERTY**: So I want to spend a fair amount of time on printing, because this, as you said, drives the majority of earnings for the Company. And a key part of the HP story right now is getting printer supplies to flat growth versus declines by the end of this fiscal year. So talk about what the elements are of the four-box model that gives you confidence in that path to achieving supply stabilization?

**WEISLER**: We first introduced the concept of the four-box model to the market when we separated the Company. We've been operating in this four-box model for many years. And it's a method that – it's just a model, like all of your models. You've got very complicated models. You have some assumptions. You've got some trailing data. You've got some data that looks forward. ***And we have all that data, as well. We have an incredible amount of data. Our printers in many cases phone home, sending us all sorts of information about usage. We know what the install base is. We know what we plan to put into the market. We know what the analysts are saying the market size is going to be. And we put all of that information into this model, and we call it the four-box model because it has four drivers*** . . . . ***And so that model has been very predictive for us, and we have a lot of confidence in it***. We went back well over a year ago and said, this model is telling us that when we execute the way we plan to execute, that our supplies will stabilize in constant currency by the end of 2017. And granted, I understand not many people believed us back

then. You were actually probably one of the few. And that's okay, because we were a new company. We had to prove ourselves. We had to drop a dollar in the trust bank every quarter. Now, as we get a little closer and we start seeing that supplies is only down to 3%, whether it's as reported or constant currency -- 2% in constant currency -- people are starting to believe that it's actually within sight. And we remain confident that as we do all of the actions that we take in our printing business, we'll affect one of those four levels. *And as we take those actions, supplies will indeed stabilize by the end of 2017 in constant currency*.

171.  Huberty also asked Defendant Weisler about channel Supplies inventory and HP's Supplies target:

**HUBERTY**: Now, comps get easier in supplies as you get into the summer months, because a year ago you chose to move towards this pull away from a push model. You lowered channel supplies inventory. Are you happy with where channel supplies inventory is today, and does that, in fact, increase your confidence in reaching that supplies target, given the comps do get easier?

**WEISLER**: We're seeing unbelievable linearity in our business now, as you would expect, *because we're really on fulfilling when there's true demand. We narrowed the ranges, and we lowered the ranges, and we're operating within those ranges*. They were down significantly year-over-year, and they were also down a bit sequentially, as well. So I'm happy with where they are in the ranges, but I'm even happier with the business outcome. And the business outcome is all about predictability. In a sales channel, it's actually pretty complicated and becoming more complicated. We're frustrating less partners, and we're certainly frustrating less customers. We're able to spend our [contra] money and channel it towards marketing to drive original HP supplies. So all sorts of benefits. And, yes, you're right. Our comps do get easier off the back of that. But we're holding ourselves to a very high standard. *We said that we would stabilize supplies by the end of 2017 in constant currency without those actions. So actually what you should expect [us to do is] we'll grow supplies when you just look at the absolute level. But we're holding to our original standard*.

172.  Analysts reacted favorably to Defendants' remarks. For example, on March 6, 2017, Wells Fargo issued an analyst report titled "HPQ: Upgrade To Outperform On Growth Biz; Raise Ests On Supplies," where it "upgrade[d]" HP's stock because of the "potential upside driven by supplies revenue and improved mix shift toward higher margin growth products," and because "we believe investors are underappreciating the potential for supplies growth on a reported basis."

173.  Additionally, on April 12, 2017, Morgan Stanley issued a report titled "Building Durable Earnings Stream; Increase PT to $22," announcing a price target increase: "Across HP's printer line-up, improved analytics and 'phone home' capabilities provide management with better visibility into supplies usage trends. On the back of this, we forecast 80bps of Y/Y supplies growth exiting FY17, accelerating to

3.5% in FY18 . . . . Price target increase to $22 (from $19) reflective of growth inflection and improving earnings durability." Morgan Stanley further stated: "We expect HP's high margin printer business to at least stabilize exiting FY17."

174. Defendant Weisler's statements set forth above in ¶¶ 170-71 were materially false and misleading when made because he failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendant Weisler's statements gave investors the misleading impression that his statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendant Weisler's statements in ¶¶ 170-71 were materially false and misleading when made because he lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

175. Additionally, Weisler's statements in ¶ 170 assuring investors that the Four Box Model was based on real-time data from HP's printers, including his statements that "[w]e have an incredible amount of data" and that "[o]ur printers in many cases phone home, sending us all sorts of information about usage" were materially false and misleading when made because, as Defendants later admitted, prior to 2019, as a result of enterprise firewall constraints and unconnected units, many toner-based printers *did not* send telemetry data to HP and the Company therefore *never had* statistically significant telemetry data for its toner-based printers, and instead relied on lagging and incomplete third-party market share surveys that was not changing over time to calculate market share for its toner-based printers.

176. Further, Defendant Weisler's statements in ¶¶ 170-71 assuring investors that, based upon the Four Box Model, Supplies revenues would stabilize and even grow, were materially false and misleading when made because they omitted the highly material facts that Defendants (i) lacked the data necessary to reliably and accurately quantify market demand for HP's Supplies through the Four Box Model, and,

instead, (ii) based their statements on outputs from the Four Box Model predicated upon "lagging and incomplete" market share survey data "that wasn't changing over time." Indeed, without statistically sufficient, accurate, or reliable telemetry data for commercial printers, Defendants did not know how many of these printers were still active, how often those printers were being used, the amount of historical, current, or potential toner usage, or the size of HP's Supplies market share. In turn, Defendants had no reasonable basis to assure investors regarding the impact of HP's marketing efforts and changes to Supplies pricing. As a result, Defendants had no reasonable basis to make statements about the historical, current, or potential trajectory and sustainability of HP's Supplies business. As such, Defendants' assurances of Supplies revenue stabilization and growth were materially false and misleading when made and lacked any reasonable basis.

177. Likewise, Defendant Weisler's statements in ¶ 170 assuring investors that the Four Box Model was an accurate and reliable way to assess Supplies demand and revenue, including his statement that the Four Box Model "has been very predictive for us, and we have a lot of confidence in it" were materially false and misleading when made because, as explained in the paragraph directly above, the lack of accurate and reliable telemetry data from HP's toner-based printers and use of inaccurate and unchanging third-party data rendered the Four Box Model's outputs inaccurate and unreliable, such that Defendants' purported confidence in the Four Box Model lacked any reasonable basis.

178. In addition, Defendant Weisler's statements in ¶ 171 assuring investors that HP's Supplies inventory levels were properly aligned with market demand, including his statement that HP was "really on fulfilling when there's true demand" were materially false and misleading when made because Defendants did not know the "true demand" for HP's Supplies business given that they lacked statistically sufficient, accurate, or reliable telemetry data from HP's commercial toner-based printer units necessary to accurately determine the demand for HP-branded supplies and instead relied on "lagging and incomplete" third-party market share data "that wasn't changing over time." Indeed, Defendants eventually admitted that HP had placed at least $100 million in excess inventory into its Supplies channel.

### 3.   April 2017 Analyst Meetings

179. In April 2017, HP executives, including Defendant Lesjak, met with analysts to discuss HP's Supplies business. For instance, in April 2017, Defendant Lesjak, among others, met with UBS analysts.

In an April 12, 2017 report titled "Visit to HP Inc: Supplies Upside in F4Q," UBS confirmed that "*Lesjack [sic] said she has been very confident in supplies stabilization by year end*, even if the Street was not. There is a about a six-month lag between a unit sale and supplies Impact; the upturn in commercial units underpinned our upgrade. A surprise was Lesjack's [sic] definition of flat supplies growth in F4Q. She means flat excluding the $450mn supplies revenue shortfall in F2H/16 as HP reduced channel inventory. In other words, reported supplies in F4Q this year should be up perhaps 7% according to our calculation, not flat." J.P.Morgan likewise met with HP's Director of Investor Relations, Kitt Tanner, in April 2017. In its April 12, 2017 report regarding the meeting titled "Consensus Mis-Modeling Supplies Revenue; Increasing PC forecasts. Reit. Neutral," J.P.Morgan confirmed that "*HPQ said that its goal to stabilize supplies revenue in constant currency by the end of FY'17 is on track*" which led J.P.Morgan to "tweak up our Supplies revenue estimate for FQ3 and FQ4 in line with management commentary."

180.   Defendants' statements in ¶ 179 were materially false and misleading when made because Defendants failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendants' statements gave investors the misleading impression that their statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendants' statements in ¶ 179 were materially false and misleading when made because they lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

181.   In addition, Defendants' statements in ¶ 179 assuring investors that, based upon the Four Box Model, Supplies revenues would stabilize and even grow, including HP's statement (made by Director of Investor Relations, Kitt Tanner) that HP was "on track" to "stabilize supplies revenue . . . by the end of FY'17" and Defendant Lesjak's statement that she was "very confident in supplies stabilization by year end" were materially false and misleading when made because HP omitted the highly material facts that

1  Defendants (i) lacked the data necessary to reliably and accurately quantify market demand for HP's

2  Supplies through the Four Box Model, and, instead, (ii) based their statements on outputs from the Four

3  Box Model predicated upon "lagging and incomplete" market share survey data "that wasn't changing over

4  time." Indeed, without statistically sufficient, accurate, or reliable telemetry data for commercial printers,

5  Defendants did not know how many of these printers were still active, how often those printers were being

6  used, the amount of historical, current, or potential toner usage, or the size of HP's Supplies market share.

7  In turn, Defendants had no reasonable basis to assure investors regarding the impact of HP's marketing

8  efforts and changes to Supplies pricing. As a result, Defendants had no reasonable basis to make statements

9  about the historical, current, or potential trajectory and sustainability of HP's Supplies business. As such,

10  Defendants' assurances of Supplies revenue stabilization and growth were materially false and misleading

11  when made and lacked any reasonable basis.

### 4.    May 24, 2017 2Q17 Earnings Call

13       182.  In anticipation of HP's 2Q17 earnings call, analysts issued reports reflecting Defendants'

14  assertions during the 1Q17 earnings call regarding the stabilization of Supplies revenue at the end of FY17.

15  For example, in a May 1, 2017 report titled "See more upside from current levels, raising PT to $22,"

16  Deutsche Bank wrote: "While the printer business has been a laggard in recent quarters, we think print is

17  poised to begin to see a turn. Supplies challenges have been a key driver of this underperformance, but we

18  expect HPQ to deliver on its goal of stabilizing supplies sales in constant currency by the end of FY17."

19  On May 21, 2017, J.P.Morgan issued a report titled "FQ2'17 Preview: Focus on Supplies Stabilization and

20  NAND/DRAM Impacts – ALERT," which confirmed that its "focus on HPQ's FQ2 earnings call will

21  continue to be on stabilization of printing supplies revenue and the potential trajectory of that revenue post

22  stabilization." The next day, Credit Suisse issued a report titled "Preview - Looking for continued

23  improvement," noting "that supplies remain on track to stabilize by end of CY17," and UBS issued a report

24  titled "Earnings Preview: A Solid Quarter Led by PC Gains and Supplies Improvement," which confirmed

25  that "HP expects supplies to stabilize by F4Q even after adjusting for the channel drawdown in F16,

26  implying supplies revenue will post YoY growth in F4Q."

27       183.  Thereafter, on May 24, 2017, HP hosted an earnings call to discuss its 2Q17 financial results.

28  During Lesjak's prepared remarks she stated:

In Q2, total supplies revenue was up 2% nominally and in constant currency, the first quarter of year-over-year constant currency growth since Q2 2013. The year-over-year increase associated with the Four Box Model drivers was better than we expected. *We have clear line of sight to supply stabilization and expect second half supplies revenue growth to be flat to slightly up year-over-year* in constant currency and adjusted for last year's changes to the supplies sales model. Supplies revenue mix was 67%, flat year-over-year, and *channel inventory remains below our reduced ceiling*.

184.  During the same call, Bank of America Merrill Lynch analyst Wamsi Mohan and Defendant Weisler engaged in the following exchange regarding HP's "supplies attach":

**MOHAN**: Dion, maybe you could talk about what you're seeing in HP original supplies attach? How has that evolved over the past year or so? How much more room do you see over the next few years in driving increased attach, given that's of relatively high significance to your strategy over the past several years?

**WEISLER**: And I think about the entire Four Box Model when I think about our supplies business and its stabilization. And so I'll comment a little bit on each of the levers. *I mean, the Four Box Model continues to predict supplies revenue will stabilize in constant currency and adjusted for the change in the supplies sales model by the end of '17. It's also performed in line with or better than our expectations that we had at the beginning of each of the 4 prior quarters. And recall that we changed the supplies sales model due to the increased impact of the omnichannel environment and believe that this would be a more efficient model. And it's certainly proving to be a more efficient model, our execution of the demand-driven change has seen improved sell-out linearity.*

We're holding less weeks of stock in channel inventory, both year-over-year and quarter-over-quarter, as Cathie mentioned. And we're achieving the cost savings that we previously had put towards discount dollars and that's supporting an increase in the marketing to drive the Print relevance. And that's really at the center of your question, the increase in the marketing dollars and the stable environment out there is enabling us to sell the value of original supplies. And as a result of that, that has an impact on that particular box.

But we're making improvements in all 4 areas. The installed base continues to improve in terms of size and shape. Usage, we have a lot of focus on usage, obviously, in terms of our marketing spend. And also in the change of the different models that we have Managed Print Services and Instant Ink, of course, impact the box that you're talking about, the original supplies and we sell a Managed Print Service contract on Instant Ink. It comes with increased HP original supplies, and so we're happy about that and obviously, maintaining a uniform price environment is helpful. So I think on many dimensions, the results we're starting to see flow through the Printing business are as a result of the work that the team's been doing across all 4 boxes and the one that you mentioned is obviously a big part of that.

185.  During the same call, UBS analyst Steven Milunovich and Defendant Lesjak engaged in the following exchange regarding HP's "longer-term supplies growth rate:"

**MILUNOVICH**: Cathie, on the supply side, just to clarify, again, you talked about flat to up in the second half including the adjustment for last year. So I take that to mean that the reported number will be something up like 5%. I just want to clarify that. And do you have any view on what the longer-term supplies growth rate is likely to be? Or will there be any growth in supplies?

**LESJAK**: So to the first part of your question, the second half. Yes, the reported numbers will be higher from a growth perspective in the second half because we had such a significant adjustment to channel inventories in last year's second half. And in terms of kind of the longer-term view of supplies, I think one of the things that we've been saying pretty consistently is that getting to supply stabilization in constant currency and, again, adjusted for these sales model changes, is the first milestone. It's not that in Q1 we then breathe a sigh of relief and we don't have to do it again. So we recognized that *we are, at a minimum, maintaining the stabilization in constant currency in supplies over a longer time period*. Exactly what that's going to look like, we'll talk more at our Security Analyst Meeting later on in the fall.

186.     Analysts responded favorably to Defendants' remarks. Shortly after the 2Q17 earnings call, BMO Capital Markets issued a report titled "Both Segments Better; Maintain Market Perform," which confirmed that "the company is showing positive momentum on its goal of stabilizing the Supplies business" and "Management now guides for slightly positive adjusted Supplies growth in the second half of the fiscal year." RBC Capital Markets and Wells Fargo issued reports on May 24 and May 25, 2017, respectively, repeating Defendants' assertions regarding Supplies revenue stabilization.

187.     On May 24, 2017 Barclays issued a report titled "Model Stands on Two Pillars," stating, "[w]e think there is staying power to HP's product and channel optimization efforts to underpin continued market share and operating improvements," and "recommend[ed] that long-term investors build, or add to, positions in shares of HP Inc."

188.     UBS likewise issued a report on May 25, 2017, titled "Firing on All Two Cyclinders [sic] as PCs and Printers Put in a Bottom," which explained that "[p]rinting supplies surprisingly increased 2%--remember when few believed supplies could be flat by F4Q?—as the four box model outperforms expectations." UBS further noted that "CFO Cathie Lesjack [sic] repeated that supplies should be flat to up in F2H adjusting for last year's drawdown, meaning reported growth could be 5-7% by our estimate." UBS concluded: "At the time of the split, HPE was considered the growth vehicle and HP Inc the cash flow company. We recently argued that HP has a shot at sustained revenue growth even with a declining core printer business."

189. Defendants' statements in ¶¶ 183-85 were materially false and misleading when made because Defendants failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and, instead unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendants' statements gave investors the misleading impression that their statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendants' statements in ¶¶ 183-85 were materially false and misleading when made because they lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

190. In addition, Defendants' statements in ¶¶ 183-85 assuring investors that, based upon the Four Box Model, Supplies revenues would stabilize and even grow, including Defendant Lesjak's statements that "[w]e have clear line of sight to supply stabilization" and that Defendants were, "at a minimum, maintaining the stabilization in constant currency in supplies over a longer time period," and Defendant Weisler's statement that "the Four Box Model continue[d] to predict supplies revenue w[ould] stabilize" by the end of FY17 were materially false and misleading when made because they omitted the highly material facts that Defendants (i) lacked the data necessary to reliably and accurately quantify market demand for HP's Supplies through the Four Box Model, and, instead, (ii) based their statements on outputs from the Four Box Model predicated upon "lagging and incomplete" market share survey data "that wasn't changing over time." Indeed, without statistically sufficient, accurate, or reliable telemetry data for commercial printers, Defendants did not know how many of these printers were still active, how often those printers were being used, the amount of historical, current, or potential toner usage, or the size of HP's Supplies market share. In turn, Defendants had no reasonable basis to assure investors regarding the impact of HP's marketing efforts and changes to Supplies pricing. As a result, Defendants had no reasonable basis to make statements about the historical, current, or potential trajectory and sustainability

of HP's Supplies business. As such, Defendants' assurances of Supplies revenue stabilization and growth were materially false and misleading when made and lacked any reasonable basis.

191.   Further, Defendants' statements in ¶¶ 183-84 assuring investors that HP's Supplies inventory levels were properly aligned with market demand, including Defendant Weisler's statements in ¶ 184 that HP's purported demand-driven pull model was "certainly proving to be a more efficient model," and that HP's "execution of the demand-driven change has seen improved sell-out linearity" and Defendant Lesjak's statement in ¶ 183 that "channel inventory remains below our reduced ceiling" were materially false and misleading when made because Defendants did not know the demand for HP's Supplies business given that they lacked statistically sufficient, accurate, or reliable telemetry data from HP's own Commercial toner-based printer units necessary to accurately determine the demand for HP-branded supplies and instead relied on "lagging and incomplete" third-party market share data "that wasn't changing over time." Indeed, Defendants later admitted that that HP had placed at least $100 million in excess inventory into its Supplies channel.

### 5.   August 23, 2017 3Q17 Earnings Call

192.   In anticipation of HP's 3Q17 earnings call, analysts reported that the focus going into the call was on HP's Supplies business. For example, on August 10, 2017, J.P.Morgan issued a report titled "FQ3'17 Preview: Focus on supplies and impact of component shortages – ALERT," which provided insight into analyst's expectations prior to HP's third quarter earnings call. Specifically, J.P.Morgan noted: "We believe the focus on HPQ's FQ3 earnings will be on Supplies momentum as the company aims to move toward long-term growth. . . . Focus on Supplies. Printing Supplies materially outperformed our forecast in FQ2 with a 2% Y/Y growth in the quarter vs. our forecast for a 2% decline. We believe that investor focus is increasingly turning to what management believe 2018 growth might look like for Supplies as execution on the turnaround comes through."

193.   Thereafter, on August 23, 2017, HP hosted an earnings call to discuss its 3Q17 financial results, in which Defendants Weisler and Lesjak participated. During her prepared remarks Defendant Lesjak stated that "*supplies growth was better than anticipated, driven by improving 4-box model drivers*." After noting that HP "*achieved supply stabilization a quarter earlier than expected*," Defendant Lesjak further stated, "*We also expect to consistently operate with supplies channel inventory levels*

*remaining at or below our ceiling. And in Q3, channel inventory levels were below the ceiling. As a reminder, as part of making the supplies sales model changes last year, we lowered our channel inventory ceiling to better reflect the more demand-driven sales model.*"

194.  Following Defendants Weisler's and Lesjak's prepared remarks, analysts posed a variety of questions regarding HP's 3Q17 financial results. Specifically, Deutsche Bank analyst Sherri Ann Scribner and Defendant Weisler discussed the Four Box Model:

> **SCRIBNER**: You guys have done a good job of returning supplies to some modest growth when you make the adjustments from last year. We saw 2% growth this quarter, which was the same growth we saw last year. What type of long-term growth would you expect based on the 4-box model? Should we assume that supply is generally flat long term or do you think that growth is modestly single digits? At some way, it would be helpful to learn your long-term perspective.

> **WEISLER**: I think it's important to remind everybody how we define stabilization. We've done that on previous calls, and we've said that supplies revenue and constant currency not declining further is our definition. We also walked you over the last couple of years through the 4-box model drivers and our consistent focus on driving improvement across each of those 4 boxes. Now in quarter 3, *our focus and execution over the last 2 years on all 4 of those drivers saw the supplies revenue mature and stabilize 1 quarter ahead of plan*, and we're very, very encouraged by that. As it relates to quarter 4, *we're on track for supplies revenue to be flat to slightly up in constant currency* as well as being adjusted for last year's supplies sales model change. *Beyond quarter 4, we believe we can drive further improvements across all the 4-box model drivers to impact supplies revenue as we go forward*.

195.  The market reacted positively to these statements. For example, shortly after the call concluded, BMO Capital Markets issued a report titled "Supplies Stabilized; Maintain Market Perform," stating, "Management believes that the [Supplies] business has now been stabilized, one quarter earlier than expected, and anticipates Q4 sales growth of flat to slightly up y/y when similarly adjusted." The next day, J.P.Morgan issued a report titled "FQ3'17 Wrap: Forecasts move up driven by strong PS and continued Supplies stability. Reit. Neutral.," concluding in the "Positives" section of the report that "The company expects Supplies revenue to continue to be stable going forward."

196.  Morgan Stanley likewise issued a report on August 24, 2017, titled "Growing Evidence of Sustainable Growth," finding, "Printer supplies growth sustainable. HP reported two quarters in a row of 2% printer supplies revenue growth (adj. for inventory correction a year ago) and expects flat to growing trends in F4Q. We believe the combination of 1) growing laser printer installed base, 2) higher supplies

share on newly installed printers, and 3) continued growth in graphics and MPS with high ink usage / share are contributors to continued low single-digit supplies revenue growth in 2018."

197. Defendants' statements in ¶¶ 193-94 were materially false and misleading when made because Defendants failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and, instead unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendants' statements gave investors the misleading impression that their statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendants' statements in ¶¶ 193-94 were materially false and misleading when made because they lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

198. In addition, Defendants' statements in ¶¶ 193-94 assuring investors that, based upon the Four Box Model, Supplies revenues would stabilize and even grow, including Defendant Weisler's statements in ¶ 194 that HP was "on track for supplies revenue to be flat to slightly up" in 4Q17 and that "we believe we can drive further improvements across all the 4-box model drivers to impact supplies revenue as we go forward" were materially false and misleading when made because they omitted the highly material facts that Defendants (i) lacked the data necessary to reliably and accurately quantify market demand for HP's Supplies through the Four Box Model, and, instead, (ii) based their statements on outputs from the Four Box Model predicated upon "lagging and incomplete" market share survey data "that wasn't changing over time." Indeed, without statistically sufficient, accurate, or reliable telemetry data for commercial printers, Defendants did not know how many of these printers were still active, how often those printers were being used, the amount of historical, current, or potential toner usage, or the size of HP's Supplies market share. In turn, Defendants had no reasonable basis to assure investors regarding the impact of HP's marketing efforts and changes to Supplies pricing. As a result, Defendants had no reasonable basis to make statements about the historical, current, or potential trajectory and sustainability of HP's Supplies business. As such,

Defendants' assurances of Supplies revenue stabilization and growth were materially false and misleading when made and lacked any reasonable basis.

199. In addition, Defendant Lesjak's statements in ¶ 193 assuring investors that HP's Supplies inventory levels were properly aligned with market demand, including that Defendants "lowered [HP's] channel inventory ceiling to better reflect the more demand-driven [Supplies] sales model" and "expect[ed] to consistently operate with supplies channel inventory levels remaining at or below our ceiling" were materially false and misleading when made because Defendants did not know the demand for HP's Supplies business given that they lacked statistically sufficient, accurate, or reliable telemetry data from HP's own Commercial toner-based printer units necessary to accurately determine the demand for HP-branded supplies and instead relied on "lagging and incomplete" third-party market share data "that wasn't changing over time." Indeed, Defendants later admitted that HP had placed at least $100 million in excess inventory into its Supplies channel.

### 6.  September 6, 2017 Citi Global Technology Conference

200. On September 6, 2017, Defendant Lesjak participated in Citi's Global Technology Conference. In response to Citi analyst Jim Suva's question seeking insight into the steps HP had recently taken to stabilize the Supplies business, Defendant Lesjak stated:

> So not only is a big portion of our profits coming from Print, but when you further drill down, a big portion of the profits is really coming from supplies because we typically have a business model, where you place the units at very low margins or negative margins and you basically then get the supplies annuity to give you a positive NPV. So that means you really have to look at what your supplies business -- how to drive your supplies business. And that's where we talk about kind of the 4 levers that we have to pull, and if we pull all of these levers in the right mix, then that enables us to stabilize supplies in constant currency. We also call them that 4-box model drivers. The first one is units. So it is important to have units. And so we do focus on placing positive NPV units and taking advantage of the opportunities that we see to go ahead and do that. But then you have to focus on almost more importantly, the second driver, which is usage. So giving a bunch of units that actually don't connect a lot or barely make a positive NPV isn't particularly fascinating. It's interesting, but not fascinating, I think is the expression. It's really important to get usage. And so that's where we focus on higher usage printer hardware units. That's where the fact that we have this disruptive technology in the A3 space is so incredibly important, because commercial units and A3 units are workhorse printers. They consume a lot of supplies. So we want to make sure we place the units, but we also want to make sure we got high-quality units. And we're seeing that shift in our portfolio, in our installed base over time. So those are the first 2 drivers: Units, usage. The third one is market share supply, that's obviously pretty important when making investments in go-to

market, specifically around kind of where we go to market, so on the sales side, but also marketing. We are taking – we've done a really good job of managing our discounts, and we're taking that savings and we're putting some of that back into marketing. Marketing that helps people understand and are aware of the value of buying HP-branded supplies and then helping to drive preference for that HP-branded supplies. ***And so you've also seen us have progress in our market share***. And then the fourth driver is really around pricing. We're making sure that we've got exactly the kind of the fine-tune pricing that we need, so that we maximize on kind of what the profit that we can make from printing without hurting the demand. And what we did last year, which was a pretty significant move is that we changed our sales supplies model. We took channel inventories down significantly in Q3 and Q4 last year. And what that has enabled us to do is manage discounts. And like I said, we plow it back, some of it back into marketing. But having that global consistent pricing that we get with the new sales model has been incredibly helpful. ***So again, if you manage all of these levers well, which I believe we have been, you get supply stabilization in constant currency and that helps set us up for kind of sustainability in that from a stabilization perspective***.

201.  Defendant Lesjak's statements in ¶ 200 were materially false and misleading when made for because she failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and, instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendant Lesjak's statements gave investors the misleading impression that her statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendant Lesjak's statements in ¶ 200 were materially false and misleading when made because they lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

202.  Specifically, Lesjak's statements in ¶ 200 regarding the Four Box Model's ability to stabilize Supplies revenues, including that managing all four "levers" "helps set [HP] up for kind of sustainability in that from a stabilization perspective" were materially false and misleading when made because they omitted the highly material facts that Defendants (i) lacked the data necessary to reliably and accurately quantify market demand for HP's Supplies through the Four Box Model, and, instead, (ii) based their statements on outputs from the Four Box Model predicated upon "lagging and incomplete" market share

survey data "that wasn't changing over time." Indeed, without statistically sufficient, accurate, or reliable telemetry data for commercial printers, Defendants did not know how many of these printers were still active, how often those printers were being used, the amount of historical, current, or potential toner usage, or the size of HP's Supplies market share. In turn, Defendants had no reasonable basis to assure investors regarding the impact of HP's marketing efforts and changes to Supplies pricing. As a result, Defendants had no reasonable basis to make statements about the historical, current, or potential trajectory and sustainability of HP's Supplies business. As such, Defendants' assurances of Supplies revenue stabilization and growth were materially false and misleading when made and lacked any reasonable basis.

203.  In addition, Defendant Lesjak's statement in ¶ 200 that "you've also seen us have progress in our market share" was materially false and misleading when made because Defendants failed to disclose that they never had the "big data" necessary to reliably and accurately determine HP's Supplies market share. In fact, HP later conceded that it "did not have . . . the capabilities to calculate share for toner-based products in the installed base." Instead, HP was using "lagging and incomplete" third-party market share data "that wasn't changing over time" to reflect true market conditions. As a result, investors were left with the misleading impression that HP's critical Supplies market share had improved when it had not. Indeed, as Defendants later admitted, HP's true market share was actually "significantly lower" than they previously represented and that although HP "previously had an arrow going up of gaining share, given the new data," Defendants "actually expect[ed] share to be down to a lesser extent on office."

**7.    October 12, 2017 Securities Analyst Meeting**

204.  On October 12, 2017, HP hosted its annual Securities Analyst Meeting, in which Defendants Lores participated. During the meeting, Lores made a presentation concerning the printer business. During his prepared remarks, Lores stated the following with respect to growth in the Supplies business:

> ***You may be asking what did we do to stabilize the supplies business. It was all about rigorous execution of all the actions that influence the 4 drivers of the supplies business. It is about improving the installed base, increasing usage, improving the mix of units that we share, that we ship, increased share and price. This is what we did. On top of that, we redefined the supplies model and we moved to a demand-driven model. And this is -- we are starting to see the results of that change in our business. We operate now with lower-channel inventories. We are able -- we have been able to reduce our channel discounts and increase our marketing investment, and we have increased and improved linearity and predictability within the quarter. And the combination of both the supply stabilization, the management of the drivers of the model and the change in supplies,***

*this has great confidence in our ability to project and to predict this business in the future but also to manage it for growth*.

205.  During his presentation, Defendant Lores also presented a slide titled "Achieved Supplies Stabilization" that included the following graphic :



206.  Lores further emphasized the Four Box Model's predictive power, analytical capability, and quality and quantity of data it used, stating:

Let me talk now about the second capability. Big data and analytics are becoming very important both in how do we manage our business but especially on how do we improve the profitability going forward and therefore, how do we improve shareholder value. ***This is based on the ability that we -- and the capacity that we have now to connect with millions of printers in our installed base and to capture the data from them***. And I thought that rather than explaining it at a very high level, it was better to give 3 clear examples of things that we are doing today to leverage and to use this data. The first chart shows how we are able to monitor and to measure at the country level and what is the usage across different territories. Dion talked before about the heat in the market. This is one way for us to look at the heat in the market, and we can use this data to define specific marketing programs in those areas. The chart in the middle shows how do we use this at a more granular level. We work with some of our partners to understand what is the connect rate between supplies and hardware at the store level. And this enables us to build specific sales programs in those stores to improve that connect rate. And the third chart shows a very different use. In the past, we have talked about looking at the profitability per printer. ***Now we can look at the profitability per printer and per user, and this helps us to identify opportunities to improve our overall profitability by defining new type of products or defining new types of service models. This is really fundamental for us. It's going to be fundamental for us to manage our supplies business in the future***.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

207.  As part of his presentation to analysts, Defendant Lores also stated:

So let me talk now about supplies. First and foremost, we project a stable or slightly positive revenue growth for supplies in fiscal year 2018. ***And this forecast is supported by the predictions of our Four Box Model.*** As we did last year, I wanted to share the assumptions that we used to drive the model. And as you will be going through the details, you will see that the assumptions this year are very consistent to what we discussed a year ago. In fact, there is only one change in the table. Last year, we were projecting a decline in the office installed base. Now we are projecting that the installed base in the office will be flat, and this change is driven by our penetration and our growth in the A3 space. The rest of the assumptions stay consistent.

208.    In connection with his statements in ¶ 207, Defendant Lores also presented the following slide which showed market share increasing for office Supplies:



209.  Following the presentations by HP executives, including Defendants Weisler, Lesjak, and Lores, analysts posed a variety of questions regarding HP's businesses and results. For example, Morgan Stanley analyst Katy Huberty and Defendant Lores had the following colloquy about the Four Box Model:

**HUBERTY**: I'll just throw my follow-up in there for Enrique. You talked about the 4-box model, only one thing changed, which is the laser install base is now flat versus declining. And so why should we think about a suppl[ies] growth that's better than the 2% that you're running at today, given that the 4-box model is moving in your favor?

\*       \*       \*

**LORES**: And in terms of the supplies projection, the comment I was making about the suppl[ies] revenue being flat or slightly positive is really driven by the projections that the 4-box model is therein. ***And given the experience that we have had in the last quarter and how predictable the model is, we really believe it is giving us good guidance on what is going to happen with the supplies business next year***. As you were saying, there is only one change in the assumptions, which is the assumption about the install base in the office growing, but we still have a balance of headwinds and tailwinds that we'll have to manage, and this is driving the overall projection.

210. Following this meeting, analysts echoed these sentiments and credited the Four Box Model. For example, in an October 12, 2017 report titled "Analyst Days Takeaways," BMO Capital Markets wrote: "HP stabilized its supplies business one quarter earlier than expected, lending credence to management's four-box model, which remains largely unchanged for FY18." RBC Capital Markets likewise issued a report on October 12, 2017, titled "HPQ - Live From Analyst Day Part 2 (Printing Supplies & 3D Printing)," providing its "Key Points" from Weisler and Lores remarks: "Impact: Key Points From IPG Segment and 3D Printing Presentation ALL YOU NEED TO KNOW: . . . . 2) HPQ expects supplies will sustain growth in FY18 driven by expectations/results from 4-box model, largest change vs. last year is HPQ expects office install base to be flat in FY18." Similarly, in a report the same day titled "Takeaways from Analyst Day," Deutsche Bank noted that it "came away from the event more confident that HPQ is well positioned to benefit from pockets of growth in the print market."

211. Additionally, Morgan Stanley credited many of Lores' statements in twin reports following the meeting. First, on October 13, 2017, in a report titled "SAM 2017: Stabilization Shifts to Acceleration," Morgan Stanley reported that "President of Imaging, Printing & Solutions, Enrique Lores, highlighted earlier than expected supplies stabilization in FY17 and guided to stable to slightly growing printer supplies revenue in FY18. . . . Improved data and analytics on customer usage and lower supplies channel inventory increase visibility of supplies revenue, reducing earnings risk, in our view." Then in an October 18, 2017 report titled "Management Meeting Reinforces Long-Term Growth Strategy," Morgan Stanley concluded:

> The ability to continuously collect data from the printer installed base means HP can more accurately forecast supplies usage per printer down to a zip code level and understand the elasticity of demand for customers in order to improve pricing and usage in a more targeted fashion. We therefore believe that, with a stabilizing office installed base and the capability to leverage big data to more accurately segment and optimize the market from a share, usage and pricing standpoint, supplies revenue will continue to grow in FY18, despite a declining inkjet installed base.

212. Defendant Lores' statements in ¶¶ 204-09 were materially false and misleading when made because he failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate,

or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendant Lores' statements gave investors the misleading impression that his statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendant Lores' statements in ¶¶ 204-09 were materially false and misleading when made because they lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

213. Specifically, Defendant Lores' statements in ¶ 206 assuring investors that the Four Box Model was based on real-time data from HP's printers, including his statement regarding the "capacity that we have now to connect with millions of printers in our installed base and to capture the data from them," were materially false and misleading when made because, as Defendants later admitted, prior to 2019, as a result of enterprise firewall constraints and unconnected units, many toner-based printers ***did not*** send telemetry data to HP and the Company therefore ***never had*** statistically significant telemetry data for its toner-based printers, and instead relied on lagging and incomplete third-party market share surveys that was not changing over time to calculate market share for its toner-based printers.

214. Moreover, Defendant Lores' statements in ¶¶ 204-05, 207-08 assuring investors that, based upon the Four Box Model, Supplies revenues would stabilize and even grow were materially false and misleading when made because they omitted the highly material facts that Defendants (i) lacked the data necessary to reliably and accurately quantify market demand for HP's Supplies through the Four Box Model, and, instead, (ii) based their statements on outputs from the Four Box Model predicated upon "lagging and incomplete" market share survey data "that wasn't changing over time." Indeed, without statistically sufficient, accurate, or reliable telemetry data for commercial printers, Defendants did not know how many of these printers were still active, how often those printers were being used, the amount of historical, current, or potential toner usage, or the size of HP's Supplies market share. In turn, Defendants had no reasonable basis to assure investors regarding the impact of HP's marketing efforts and changes to Supplies pricing. As a result, Defendants had no reasonable basis to make statements about the historical, current, or potential trajectory and sustainability of HP's Supplies business. As such, Defendants' assurances of Supplies revenue stabilization and growth were materially false and misleading when made

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and lacked any reasonable basis. For the same reasons, his statement in ¶ 207 that HP's forecast of stable or slightly positive revenue growth in FY18 "is supported by the predictions of our Four Box Model" was materially false and misleading when made.

215.  In addition, Defendant Lores' statements in ¶¶ 204, 209 assuring investors that the Four Box Model was an accurate and reliable way to assess Supplies demand and revenue, including that he had "great confidence in our ability to project and to predict this business in the future but also to manage it for growth," and that, based upon "how predictable the model is, we really believe it is giving us good guidance on what is going to happen with the supplies business next year" were materially false and misleading when made because, as explained in the paragraph directly above, the lack of accurate and reliable telemetry data from HP's toner-based printers and use of inaccurate and unchanging third-party data rendered the Four Box Model's outputs inaccurate and unreliable, such that Defendants' purported confidence in the Four Box Model lacked any reasonable basis.

216.  Further, Defendant Lores' statements in ¶ 204 assuring investors that HP's Supplies inventory levels were properly aligned with market demand, including his statements that HP "moved to a demand-driven model" and that, as a result, HP operated "with lower-channel inventories" were materially false and misleading when made because Defendants did not know the demand for HP's Supplies business given that they lacked statistically sufficient, accurate, or reliable telemetry data from HP's own Commercial toner-based printer units necessary to accurately determine the demand for HP-branded supplies and instead relied on "lagging and incomplete" third-party market share data "that wasn't changing over time." Indeed, when Defendants were finally able to access some of the real-time "big data" they claimed to have been using all along, it revealed that HP had placed at least $100 million in excess inventory into its Supplies channel.

217.  Defendant Lores' Defendants' statements and presentation slides set forth in ¶¶ 204-05, 208 assuring investors that HP's Supplies market share was improving were materially false and misleading when made because Defendants failed to disclose that they never had the "big data" necessary to reliably and accurately determine HP's Supplies market share. In fact, HP later conceded that it "did not have . . . the capabilities to calculate share for toner-based products in the installed base." Instead, HP was using "lagging and incomplete" third-party market share data "that wasn't changing over time" to reflect true

market conditions. As a result, investors were left with the misleading impression that HP's critical Supplies market share had improved when it had not. Indeed, as Defendants later admitted, HP's true market share was actually "significantly lower" than they previously represented and that although HP "previously had an arrow going up of gaining share, given the new data," Defendants "actually expect[ed] share to be down to a lesser extent on office."

### 8.   November 21, 2017 4Q17 Earnings Call

218.  On November 21, 2017, Defendants held an earnings conference call to discuss HP's financial results for 4Q17 and FY17. During her prepared remarks, Defendant Lesjak stated, "Now moving to Q4 Supplies performance. Revenue of $3.1 billion was up 10% year-over-year or up 3% after adjusting for currency and last year's negative impact resulting from the Supplies' sales model change. ***We continue to operate below our channel inventory ceiling***."

219.  Defendant Lesjak's statements above in ¶ 218 were materially false and misleading when made because she failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and, instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendant Lesjak's statements gave investors the misleading impression that their statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendant Lesjak's statements in ¶ 218 were materially false and misleading when made because they lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

220.  In addition, Lesjak's statements in ¶ 218 assuring investors that HP's Supplies inventory levels were properly aligned with market demand, including her statement that "[w]e continue to operate below our channel inventory ceiling" were materially false and misleading when made because Defendants had represented that the inventory ceiling was set based on market demand, when in reality they did not know the demand for HP's Supplies business given that they lacked statistically sufficient, accurate, or

reliable telemetry data from HP's toner-based printer units necessary to accurately determine the demand for HP-branded supplies and instead relied on "lagging and incomplete" third-party market share data "that wasn't changing over time." Indeed, Defendants later admitted that HP had placed at least $100 million in excess inventory into its Supplies channel.

### B. Defendants' Materially False and Misleading Statements in 2018

#### 1. February 22, 2018 1Q18 Earnings Call

221. On February 22, 2018, HP held its 1Q18 earnings call. During her prepared remarks, Defendant Lesjak stated, "our Supplies results reflect our sustained efforts around stabilizing supplies and an easier year-over-year compare. *We believe that the Four Box Model remains a good predictor of our Supplies performance, and we continue to operate below our channel inventory ceiling*." She further remarked that, "*Looking forward to FY '19, we expect the overall Supplies business to be flat to slightly up* in constant currency."

222. During the question-and-answer portion of the call, Defendant Weisler said that Defendants "*have really high confidence in the Four Box Model and the team's ability to drive improvements in each element of each of the 4 boxes*. . . . *I have confidence* in the team's ability to deliver a successful integration of the S-Print business going forward so *that our total Supplies business is flat to slightly up next year and the Four Box Model is delivering as predicted*."

223. During the same call, Sanford C. Bernstein analyst Toni Sacconaghi engaged in the following discussion with Defendants Lesjak and Weisler:

**SACCONAGHI**:  I have one for Dion and one for Cathie. Dion, I'm just trying to reconcile maybe qualitatively more than anything sort of the forces at work on Supplies. So Supplies organically have grown better than 2% for each of the last 3 quarters. And all the leading indicators sound good. The graphics business is growing. MPS is growing. You've commented for the last several quarters about placing profitable units. A3 is ramping. All of those would kind of suggest that Supplies actually should improve going forward. And yet, the guidance for fiscal '19 appears that it may be softer than what we've seen in recent quarters. So are there some offsetting takes that we're missing? Or how do we sort of square the circle here?

**LESJAK**: Toni, so maybe I'll take that one. There are some forces outside of the core HP Supplies business in Samsung. Their installed base is continuing to come down pretty significantly, and their installed base is mostly low-end A4 laser and just not pulling the attach. *And so we will, in FY '19, be flat to slightly up in constant currency.* And I think

that that's not inconsistent with what we've been talking about in last year or this year when you look at the easy compare that we had.

**WEISLER**: I mean, it's not a surprise to us, I guess, is what Cathie's saying. We contemplated it. It was fed as an input into the Four Box Model, and ***the Four Box Model has been the strong predictor of outcomes for us***. ***And as a result of that, we believe that Supplies in '19 will be flat to slightly up***.

224.  Analysts reiterated and responded positively to Defendants' statements. For instance, RBC Capital Markets and Wells Fargo issued reports immediately following the 1Q18 earnings call confirming that HP expected 5%-7% year-over-year growth in the Supplies business for the remainder of FY18. Likewise, on February 23, 2018, Deutsche Bank issued a report titled "F1Q-18 results: impressive start to FY-18," confirming that "HPQ's core Supplies still on track to see slight growth." UBS also issued a report that day, titled "The Drumbeat of Growth Continues; Increase Price Target to $28," noting that HP's "[s]ustainable growth narrative" was "on track."

225.  Additionally, in a February 23, 2018 report titled "Estimates Move Higher on Lower Tax and Continued Share Gains," Morgan Stanley confirmed that "Management now sees 5-7% constant currency printer supplies growth in FY18, an uptick from commentary on the previous earnings call." According to Morgan Stanley's report, "[i]ncreased confidence in supplies growth is partly a function of improving printer placements, investments in end customer marketing, and healthy channel inventory levels and played a part in the operational EPS guidance increase of $0.05 for FY18." Further, Morgan Stanley confirmed its "increased confidence" in the sustainability of supplies growth "in light of growing laser installed base, increasing supplies share, growth in high usage segments like Graphics and an entrance into the A3 market."

226. Defendants' statements in ¶¶ 221-23 were materially false and misleading when made because Defendants failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and, instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendants' statements gave investors

1    the misleading impression that their statements that the Supplies business would be stable and viable had

2    a reliable and accurate basis, when in fact they did not. Also, Defendants' statements in ¶¶ 221-23 were

3    materially false and misleading when made because they lacked any reasonable basis, given that the lack

4    of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging

5    third-party survey data made the Four Box Model unreliable and inaccurate.

6         227.  In addition, Defendants' statements in ¶¶ 221-23 assuring investors that, based upon the Four

7    Box Model, Supplies revenues would stabilize and even grow, including Defendants Weisler's and

8    Lesjak's statements that HP's Supplies revenues would be "flat to slightly up" in FY19 were materially

9    false and misleading when made because they omitted the highly material facts that Defendants (i) lacked

10   the data necessary to reliably and accurately quantify market demand for HP's Supplies through the Four

11   Box Model, and, instead, (ii) based their statements on outputs from the Four Box Model predicated upon

12   "lagging and incomplete" market share survey data "that wasn't changing over time." Indeed, without

13   statistically sufficient, accurate, or reliable telemetry data for commercial printers, Defendants did not

14   know how many of these printers were still active, how often those printers were being used, the amount

15   of historical, current, or potential toner usage, or the size of HP's Supplies market share. In turn, Defendants

16   had no reasonable basis to assure investors regarding the impact of HP's marketing efforts and changes to

17   Supplies pricing. As a result, Defendants had no reasonable basis to make statements about the historical,

18   current, or potential trajectory and sustainability of HP's Supplies business. As such, Defendants'

19   assurances of Supplies revenue stabilization and growth were materially false and misleading when made

20   and lacked any reasonable basis.

21        228.  Defendants' statements in ¶¶ 221-23 assuring investors that the Four Box Model was an

22   accurate and reliable way to assess Supplies demand and revenue, including Defendants Weisler's and

23   Lesjak's statements that they "believe that the Four Box Model remains a good predictor of our Supplies

24   performance" and that they had "really high confidence in the Four Box Model" were materially false and

25   misleading when made because, as explained in the paragraph directly above, the lack of accurate and

26   reliable telemetry data from HP's toner-based printers and use of inaccurate and unchanging third-party

27   data rendered the Four Box Model's outputs inaccurate and unreliable, such that Defendants' purported

28   confidence in the Four Box Model lacked any reasonable basis.

229.  Defendant Lesjak's statements in ¶ 221 assuring investors that HP's Supplies inventory levels were properly aligned with market demand, including her statement that "we continue to operate below our channel inventory ceiling" were materially false and misleading when made because Defendants had represented that the inventory ceiling was set based on market demand, when in reality Defendants did not know the demand for HP's Supplies business given that they lacked statistically sufficient, accurate, or reliable telemetry data from HP's toner-based printer units necessary to accurately determine the demand for HP-branded supplies and instead relied on "lagging and incomplete" third-party market share data "that wasn't changing over time." Indeed, Defendants later admitted that HP had placed at least $100 million in excess inventory into its Supplies channel.

### 2.    February 27, 2018 Morgan Stanley Technology Conference

230.  During the February 27, 2018 Morgan Stanley Technology Conference, Defendant Lesjak responded to questions posed by analyst Katy Huberty, and in particular, Huberty's question regarding the Four Box Model:

**HUBERTY**: So let's spend a few minutes on Printing. Last year, the goal was to stabilize and return to printer supplies growth, which you did earlier than expected. For this year, you're talking about 5% to 7% growth in printing supplies but in the core business, ex-Samsung, flat to slightly up. Talk about which elements of that 4-box model give you the confidence that, that supply stability or growth can continue?

**LESJAK**: So the -- *we have a lot of confidence in the predictive capabilities of our 4-box model. We have seen that it has been very reliable*. You look at FY '17, and we were able to be in line with expectations or better than expectations across all of the different elements of the model. *And ultimately, as you said, stabilize supplies a quarter earlier than expected*. But what's important about that model is there isn't a single driver that makes all the difference. You really need to work on all 4 drivers, whether it's kind of installed base, usage, pricing or market share. You need all of them. It's also not a single initiative that addresses all the elements of the 4-box model. It's a number of initiatives, and we're kind of operating on all cylinders in terms of that. *That's what gives us confidence in FY '18, but the core HP business will continue to be flat to slightly up in constant currency*. But we did acquire the Samsung Printing business, and so we do have the impact, kind of the organic/inorganic impact to supplies growth in the year. So what we did was we took the core HP business flat to slightly up, and then we layered on the Samsung-branded supplies business. And what you need to know about that business is that it is in decline, and it's in decline because of the installed base. It's largely low end A4 hardware that is declining. But in the end, we think the year-over-year supplies growth will be 5% to 7% in constant currency for Q2 to Q4. *And we have confidence that with all of the work and the initiatives that we've got targeting the 4-box model, we will continue to improve our performance such that even with the headwinds to the pressure from the Samsung-branded business, that in FY '19 we'll be flat to slightly up in constant currency*.

231.  Defendant Lesjak's statements set forth above in ¶ 230 were materially false and misleading when made because she failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendant Lesjak's statements gave investors the misleading impression that her statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendant Lesjak's statements in ¶ 230 were materially false and misleading when made because they lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

232.  In addition, Defendant Lesjak's statements in ¶ 230 assuring investors that, based upon the Four Box Model, Supplies revenues would stabilize and even grow, including that HP Supplies revenues in FY18 and FY19 would be "flat to slightly up" were materially false and misleading when made because they omitted the highly material facts that Defendants (i) lacked the data necessary to reliably and accurately quantify market demand for HP's Supplies through the Four Box Model, and, instead, (ii) based their statements on outputs from the Four Box Model predicated upon "lagging and incomplete" market share survey data "that wasn't changing over time." Indeed, without statistically sufficient, accurate, or reliable telemetry data for commercial printers, Defendants did not know how many of these printers were still active, how often those printers were being used, the amount of historical, current, or potential toner usage, or the size of HP's Supplies market share. In turn, Defendants had no reasonable basis to assure investors regarding the impact of HP's marketing efforts and changes to Supplies pricing. As a result, Defendants had no reasonable basis to make statements about the historical, current, or potential trajectory and sustainability of HP's Supplies business. As such, Defendants' assurances of Supplies revenue stabilization and growth were materially false and misleading when made and lacked any reasonable basis.

233.  Further, Defendant Lesjak's statements in ¶ 230 assuring investors that the Four Box Model was an accurate and reliable way to assess Supplies demand and revenue, including that Defendants "ha[d]

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

a lot of confidence" in its "predictive capabilities" were materially false and misleading when made because, as explained in the paragraph directly above, the lack of accurate and reliable telemetry data from HP's toner-based printers and use of inaccurate and unchanging third-party data rendered the Four Box Model's outputs inaccurate and unreliable, such that Defendants' purported confidence in the Four Box Model lacked any reasonable basis.

### 3.    May 29, 2018 2Q18 Earnings Call

234.  On May 29, 2018, Defendants held an earnings conference call to discuss HP's financial results for 2Q18.  During her prepared remarks, Defendant Lesjak stated that HP's "Supplies mix of total Print revenue was 65%, and *we continue to operate below our ceiling for Supplies channel inventory*."

235.  Following Defendants Weisler's and Lesjak's prepared remarks, analysts asked questions regarding various aspects of HP's businesses and financial results. For instance, Defendants Weisler and Lesjak responded to questions from Sanford C. Bernstein analyst Toni Sacconaghi about the reasons underlying HP's Supplies results:

> **SACCONAGHI:** Okay. But was the impact from mix greater than the impact from price from DRAM? And I'll ask my follow-up. Just on Supplies, back to printer supplies, I think last quarter, you had said that the contribution from S-Print was about 6 points. And I know it's become more muddied now. But would it be fair to sort of assume that the contribution from S-Print was sort of in that vicinity this quarter? And were there any changes to your channel inventory? I think you said you were under your ceiling, but it's a little bit of a different commentary from prior quarters where I think you said you were within your range, so just a follow-up on the ASPs and then Supplies, please.
>
> **LESJAK**: Sure. The impact of mix on ASPs was material and greater than the pricing impact. In terms of Supplies, I'll go back to what I said earlier. We really have integrated the business here. So it's really not – we're really not able to meaningfully determine what was S-Print's contribution to Supplies versus the core. Because we are rationalizing SKUs, we are now selling more HP SKUs than S-Print SKUs and, therefore, are those Supplies S-Print Supplies or are they HP Supplies? So it's just gotten – it's not just gotten muddy, it's just well integrated, which is exactly what you want us to do because that's what's going to drive the value. ***In terms of the channel inventory, I think we changed our commentary, I want to say, 2 or 3 quarters ago, when we really now are managing below a ceiling. And we have been consistently below the ceiling for Supplies, frankly, since we made the change to our supply sales model***.
>
> **WEISLER**:  And Toni, I think we've consistently said, and you and I have talked about it, we have this relentless focus on execution and we have a continued confidence in the predictive value of the four box model. ***You can expect us to drive continued improvements across all 4 boxes to maintain supply stabilization in '19. We anticipate***

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*the headwinds that Cathie mentioned earlier. We've contemplated them. We've captured them in the expectations, and we've guided that for the rest of '18 as well as '19.*

236. On the call, Deutsche analyst Sherri Ann Scribner asked Defendant Lesjak about growth trends in the Supplies business:

> **SCRIBNER**: Okay, great. And then just looking at the Supplies business, it's trending very strongly, and clearly, you've turned that segment around. How should we think about growth in Supplies? I think we've talked about kind of flat maybe slight growth this year. I know there's some inorganic pieces in there, but it seems like you're trending well ahead of that in Supplies.

> **LESJAK**: So Sherri, what we expect that kind of the sum of Q2, Q3 and Q4 on a year-over-year basis that we would say see 5% to 7% growth in constant currency. That's what we expect for FY '18. *For FY '19, we expect that Supplies will be flat to slightly up* once we have an apples-and-apples comparison with S-Print in both years.

237. Following HP's 2Q18 earnings call, analyst issued reports reiterating Defendants' statements. For instance, Wells Fargo issued a report titled "HPQ: Consistent Execution = Increased F2018 EPS + FCF (+$3.7B) Outlook," on May 29, 2018 stating, "HPQ's supplies channel inventory was noted to be below the ceiling of the company's targeted levels. The company reiterated that it expects supplies revenue could be flat to slight up looking into F2019 w/ like comps post S-Print acquisition. HPQ qualitatively highlighted building growth in A3, graphics, Managed Print Services (MPS), & Instant Ink." The next day, Morgan Stanley issued a report titled "PCs Deliver Another FCF Beat," confirming that "Management reiterated guidance for 5-7% supplies growth in FY18 and flat to slight growth in FY19."

238. Defendants' statements in ¶¶ 234-36 were materially false and misleading when made because Defendants failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and, instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendants' statements gave investors the misleading impression that their statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendants' statements in ¶¶ 234-36 were

materially false and misleading when made because they lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

239.  Specifically, Defendants' statements in ¶¶ 235-36 assuring investors that, based upon the Four Box Model, Supplies revenues would stabilize and even grow, including Defendants Weisler's and Lesjak's statements in ¶¶ 235-36 that HP expected Supplies revenues in FY19 to be "flat to slightly up" based on "driv[ing] continued improvements across all 4 boxes" of the Four Box Model, which also purportedly "contemplated" and "captured" Supplies headwinds, were materially false and misleading when made because they omitted the highly material facts that Defendants (i) lacked the data necessary to reliably and accurately quantify market demand for HP's Supplies through the Four Box Model, and, instead, (ii) based their statements on outputs from the Four Box Model predicated upon "lagging and incomplete" market share survey data "that wasn't changing over time." Indeed, without statistically sufficient, accurate, or reliable telemetry data for commercial printers, Defendants did not know how many of these printers were still active, how often those printers were being used, the amount of historical, current, or potential toner usage, or the size of HP's Supplies market share. In turn, Defendants had no reasonable basis to assure investors regarding the impact of HP's marketing efforts and changes to Supplies pricing. As a result, Defendants had no reasonable basis to make statements about the historical, current, or potential trajectory and sustainability of HP's Supplies business. As such, Defendants' assurances of Supplies revenue stabilization and growth were materially false and misleading when made and lacked any reasonable basis.

240.  In addition, Defendant Lesjak's statements in ¶ 234 assuring investors that HP's Supplies inventory levels were properly aligned with market demand, including her statements that "we continue to operate below our ceiling for Supplies channel inventory" and that Defendants "really now [we]re managing below a ceiling" and that they had "been consistently below the ceiling for Supplies, frankly, since . . . the change to our supply sales model" were materially false and misleading when made because Defendants had represented that the inventory ceiling was set based on market demand, when in reality Defendants did not know the demand for HP's Supplies business given that they lacked statistically sufficient, accurate, or reliable telemetry data from HP's toner-based printer units necessary to accurately

determine the demand for HP-branded supplies and instead relied on "lagging and incomplete" third-party market share data "that wasn't changing over time." Indeed, Defendants later admitted that HP had placed at least $100 million in excess inventory into its Supplies channel.

**4.     May 31, 2018 Sanford C. Bernstein Strategic Decisions Conference**

241.  On May 31, 2018, Defendant Weisler participated in the Sanford C. Bernstein Strategic Decisions Conference. During the conference, Defendant Weisler answered questions posed by Sanford C. Bernstein analyst Toni Sacconaghi regarding HP's supplies business, including the following exchange:

> **SACCONAGHI**: Okay. Maybe we can talk a little bit about just Supplies, and we've talked a lot in the past about this. But it's obviously where the money is. So we'll revisit that topic. So you said Supplies would be 5% to 7% for the remainder of the year. You came in at 6% last quarter, exactly on plan, and you've talked about Supplies next year being kind of flat to slightly up. Now one question that I've gotten is, look, last quarter Q1, 4% Supplies growth at constant currency, and the quarter before that and a couple of quarters, I think you were 2% and 3%. And now it feels like you're more like flat to down. And so -- but your unit placements are pretty good, and you're starting to get some traction in A3. So how do we reconcile that? Was there something unusual about the 3 previous quarters? And -- because otherwise, it sort of feels like it's a deceleration. So how do we reconcile those?
>
> **WEISLER**: *I don't think there is any surprises*. We sat here a year ago, God, time flies, and we said that... So much fun. I'll be back next year. *We said that we would stabilize Supplies. We stabilized Supplies a quarter earlier than we said we would*. We mentioned that the -- on our Q1 earnings call that for the remainder of this year, we'll be on the 5% to 7% range. And we came in at 6%, certainly within that range, and that you could expect that for the rest of the year and that, *next year, we'll be flat to slightly up. We've talked a lot about the 4-box drivers, and the 4-box driver model has been a good predictive tool for us. And it's -- when we retrospectively go back and look at what actually happened versus what the model told us would happen, it is pretty consistent. So we feel good about the guidance that we're giving.* We know that obviously in the first year of Samsung coming in, that, that was going to drive Supplies up in the first year, but a lot of that install base was A4 and low-end A4 that doesn't yield a lot of supplies. And so that rolls off after you lap it, and then *we are back into stabilization*.

242.  Sacconaghi then asked Weisler to discuss the "levers within" the Four Box Model:

> **SACCONAGHI**: And Dion, in terms of the levers within 4-box, I don't want to mechanically go through each one, but are there 1 or 2 that are sort of positive pluses and minuses? Meaning -- I know aftermarket capture rates is obviously a very big factor. You move that needle a little bit either way. That can really have a big impact. Obviously, install base is a big factor. So are there 1 or 2 levers that structurally are getting a little bit better, becoming more of a challenging headwind within that model that you could highlight for people without, again, untangling the whole thing?

**WEISLER**: The whole thing is – it's pretty complicated. You would even be impressed with the spreadsheet.

**SACCONAGHI**:  I go to sleep at night thinking if I could just someday get into that 4-box model.

**WEISLER**: You'll have to join HP.

**SACCONAGHI**: All would be good.

**WEISLER**:  So I would say the install bases is just such a complicated box all by itself Because not all units are created equally. Some units return more supplies than other units, home versus office, different countries, different ZIP codes. *And that's the kind of big data that we have that informs us about where we want to make those investments because every print unit we place, by and large, is an investment that returns supplies over time. So figuring out exactly where you want to place those units and ensuring that they're NPV positive is an entirely big, big data exercise in and of itself*. We've been -- as you noted, been aggressively putting units into the market this quarter, just gone over 15% growth on units. So we do have, as I mentioned in -- with the Samsung business with A4, low-end of A4 coming out of that, because we're not aggressively putting those low-end units in. That becomes a bit of a headwind to the installed base. But you got to think about this huge install base, the M2 subsegments. And so I think we're making progress there in the layers of the more valuable units that we place. *I would say we're making improvements in the aftermarket share, and that is goodness. Usage is running pretty much according to plan, and pricing is just a function of market elasticity and deeply understanding again, through big data, what the competitive environment is looking like region by region, country by country*.

243. Defendant Weisler's statements above in ¶¶ 241-42 were materially false and misleading when made because he failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and, instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendant Weisler's statements gave investors the misleading impression that his statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendant Weisler's statements in ¶¶ 241-42 were materially false and misleading when made because they lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

244. Specifically, Weisler's statements in ¶ 242 assuring investors that the Four Box Model was based on real-time data from HP's printers, including his statements about the "big data that we have that informs us" and the Defendants were able to "understand[]" "through big data, what the competitive environment is looking like region by region, country by country" were materially false and misleading when made because, as Defendants later admitted, prior to 2019, as a result of enterprise firewall constraints and unconnected units, many toner-based printers did not send telemetry data to HP and the Company therefore never had statistically significant telemetry data for its toner-based printers, and instead relied on lagging and incomplete third-party market share surveys that was not changing over time to calculate market share for its toner-based printers.

245. In addition, Defendant Weisler's statements in ¶ 241 assuring investors that the Four Box Model was an accurate and reliable way to assess Supplies demand and revenue, including his statements that "we feel good about the guidance that we're giving" based on "retrospectively go[ing] back and look[ing] at what actually happened versus what the model told us would happen" were materially false and misleading when made because he omitted the highly material facts that Defendants (i) lacked the data necessary to reliably and accurately quantify market demand for HP's Supplies through the Four Box Model, and, instead, (ii) based their statements on outputs from the Four Box Model predicated upon "lagging and incomplete" market share survey data "that wasn't changing over time." Indeed, without statistically sufficient, accurate, or reliable telemetry data for commercial printers, Defendants did not know how many of these printers were still active, how often those printers were being used, the amount of historical, current, or potential toner usage, or the size of HP's Supplies market share. In turn, Defendants had no reasonable basis to assure investors regarding the impact of HP's marketing efforts and changes to Supplies pricing. As a result, Defendants had no reasonable basis to make statements about the historical, current, or potential trajectory and sustainability of HP's Supplies business. As such, Defendants' assurances of Supplies revenue stabilization and growth were materially false and misleading when made and lacked any reasonable basis.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

246. Further, Defendant Weisler's statements in ¶ 242 assuring investors that HP's Supplies market share was improving, including his statement that "we're making improvements in the aftermarket share" was materially false and misleading when made because Defendants failed to disclose that they never had the "big data" necessary to reliably and accurately determine HP's Supplies market share. In fact, HP later conceded that it "did not have . . . the capabilities to calculate share for toner-based products in the installed base." Instead, HP was using "lagging and incomplete" third-party market share data "that wasn't changing over time" to reflect true market conditions. As a result, investors were left with the misleading impression that HP's critical Supplies market share had improved when it had not. Indeed, as Defendants later admitted, HP's true market share was actually "significantly lower" than they previously represented and that although HP "previously had an arrow going up of gaining share, given the new data," Defendants "actually expect[ed] share to be down to a lesser extent on office."

### 5.    June 6, 2018 Bank of America Merrill Lynch Global Technology Conference

247. On June 6, 2018, Defendants Lesjak and Fieler participated in the Bank of America Merrill Lynch Global Technology Conference. During the conference, Bank of America Merrill Lynch analyst Wamsi Mohan asked Defendant Fieler questions regarding the Four Box Model, including the following exchange:

> **MOHAN**: Maybe, Steve, to follow up to placing these positive NPV units, I know also you guys have had a focus on sort of lowering the cost structure within that model so that every model allows you to chase a larger TAM in terms of positive NPV units, and you guys have done an excellent job of that. But can you give us some perspective, looking at this through the 4-box model, can you like maybe distill it down to what those key drivers are that you look at? What are the biggest sort of drivers as we look out over the next couple of years that will influence that supplies growth based on your 4-box model?

> **FIELER**: Sure. Actually, this is an example where I mentioned I left the company and returned, and one of the first things I did is actually looked at the 4-box model. ***And it is a model, at the end of the day, and I think what's really important about the model is the predictability around it. And it's actually rather detailed as you look at geographies and SKUs and things, and it's only getting better with the incremental data and insight we get from our installed base.*** And so the way the model works, we call it a 4-box model because there's really 4 key drivers, I think all of which are rather self-explanatory, but the first is around the installed base. The second is around the usage within the unit and the quality of units that we're actually placing. The third is the aftermarket share. And then the fourth is pricing. ***And so the model, based upon sort of historical trends and other insights that we're gathering, can predict what we believe the supplies business will look like in the future. And so you take that and get us a very granular level***, but when you sort of boil it up at the company level -- and we look at it really in the 3 segments: the home, the

office and graphics business. In the home, the installed base has been in decline. We recognize that and have communicated as such. From a usage perspective, again, per unit has been declining, but we've been placing the higher-quality units, been very focused on share gains and increasing pricing on home. In the office, the installed base has been more flattish, and I think that's been helped by the addition of S-Print and what we're doing in the A3 category and A4, adding the installed base from S-Print. Similar to home, we have sort of the usage decline per unit but also placing higher-quality units, focused on share and roughly flattish pricing on the office side. And last but not least is graphics, where we've been growing that business for some time. So the installed base has been increasing. Usage has been supported by the shift from analog to digital share. We -- sort of consistent with share, and pricing has been a little bit down on the graphic side. ***So you boil all those together, and again, it's a model. It's been a very good predictor. A quarter may have some small delta, but I think in the sort of long term, it's been highly predictive. We did stabilize supplies a quarter earlier than expected last year***. That was a good thing. ***But we have increasing confidence as we get more data and insight into the 4-box model***.

248.   Defendant Fieler likewise answered Mohan's question regarding "growth in supplies in fiscal '19" as follows:

**MOHAN**: So as you look at supplies growth, right, like so, this year, organically, you've got a mid-single-digit supplies growth, and then next year, you guys are talking about sort of slightly up for supplies. Given all the initiatives and all the actions that you have taken to improve all these different categories within the 4-box model, why shouldn't we see an underlying sort of better growth in supplies in fiscal '19?

**FIELER**: So for this year -- so at our Security Analyst Day, we -- before we closed the S-Print acquisition, we had provided an outlook. We thought that our supplies would be flat to slightly up this year. With the addition of S-Print from the Q2 to the Q4 time period in aggregate, our outlook is a 5% to 7% growth in constant currency. So it does include S-Print in there as we've combined SKUs and our go-to-market with a holistic portfolio. We finished Q2 with 6% constant currency growth. And so as we look ahead, it actually -- it follows up on the 4-box. So we look at all the detail, and there's things that certainly are supporting sort of tailwinds to the business, the placing of the units, the growth we've been achieving in graphics, the entry into the A3 category in a more disruptive way. That takes time to play out. But you add up all those tailwinds and you sort of have to map that to the other elements of the 4-box that I mentioned earlier around the home. But more importantly, as expected, with the closure of the S-Print acquisition, that installed base and supply stream had been in decline, particularly on the low-end A4. And so you take some of those growth vectors and you layer on a business that had been in decline and you do the math, ***and next year, we've got confidence in a supplies growth of flat to slightly up in constant currency, and it's taking into account all of the respective variables at play***.

249.  Mohan also asked Defendant Fieler about the underlying trends in the Supplies business as follows:

> **MOHAN**: And would you say like the underlying trends within the sort of ex S-Print installed base is still on an improving trajectory?
>
> **FIELER**: Yes, *we felt comfortable in the supply stabilization last year. Again, it was in Q3 of '17, a quarter earlier than expected*. And yes, *it really goes to that -- the 4-box drivers. There's some puts and takes certainly between home, office and graphics. And each of those areas, when you subsegment further, there's some markets that have more secular challenges than others. But factoring it all in, we have confidence in continued stabilization into next year.*

250.  Following Mohan's question-and-answer session with Defendants Fieler and Lesjak, other analysts posed questions regarding HP's business. For instance, one analyst inquired regarding the Four Box Model:

> **UNIDENTIFIED ANALYST**: So just touching on the 4-box model, how often do you go back and check whether it's actually working? How do you judge the success of that model? For example, if you say that you're placing an NPV -- what do you think is an NPV-positive printer, how often you go back and check whether that customer actually bought the quantity of supplies that you actually thought that they would?
>
> **LESJAK**: So it's pretty difficult for us to go to a specific customer, given privacy and what have you, but your printers, *many of your printers phone home to us and tell us what kind of usage we're getting. So we can look at, let's say, the United States, and we can to this in other countries, but you can look at the United States and you can actually zero in on a ZIP Code and know whether or not these types of SKUs in that ZIP Code tend to buy, on average, a lot of supplies or not*. We can't tell at an individual level. If we could, then there's probably some individuals we wouldn't sell to. *But broadly, we can see inside the ZIP Code level, and we get that data all the time*. *And we are always updating kind of the view of what is an NPV-positive SKU in order to make sure that we're placing those units*. This is the single biggest investment that we make every day, every quarter, every year.

251.  Two days later, CFRA issued a report titled "HP Inc.," that concluded: "We think HPQ's PC and printer end-markets are seeing stable demand, with growth aided by market share gains and focus on growth areas. We see improving printer supplies revenue, which commands higher margins, and envision HPQ gaining share in both ink and laser as well as the A3 copier market." Thereafter, on June 20, 2018, RBC Capital Markets issued a report titled "Revisiting the Long Thesis; Plenty of Upside Levers Ahead," stating: "Share Gains Will Drive Broader Market Outperformance: We think it is worth noting that HPQ's

performance in IPG will likely continue at a flat to slightly positive trajectory organically despite broader market declines. This dynamic is driven by share gains, HP's adherence to its 4-box model, product differentiation (security), and opportunity to capitalize on disruption from some of its peers (XRX, Lexmark)." RBC Capital Markets also remarked in the report that "[w]e believe channel inventory levels have since stabilized and HPQ should see an uptick in its 'sell-in' levels for supplies that will produce a tailwind to IPG and overall HPQ margins."

252. Defendants' statements in ¶¶ 247-50 were materially false and misleading when made because Defendants failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and, instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendants' statements gave investors the misleading impression that their statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendants' statements in ¶¶ 247-50 were materially false and misleading when made because they lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

253. Specifically, Defendants' statements in ¶¶ 247, 250 assuring investors that the Four Box Model was based on real-time data from HP's printers, including Defendant Lesjak's statements in ¶ 250 that "many of your printers phone home to us and tell us what kind of usage we're getting," that "we can see inside the ZIP Code level, and we get that data all the time," and Defendant Fieler's statements in ¶ 247 that HP had "increasing confidence as we get more data and insight into the 4-box model" and that the Four Box Model was "only getting better with the incremental data and insight we get from our installed base" were materially false and misleading when made because, as Defendants later admitted, prior to 2019, as a result of enterprise firewall constraints and unconnected units, many toner-based printers **did not** send telemetry data to HP and the Company therefore **never had** statistically significant telemetry data

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

for its toner-based printers, and instead relied on lagging and incomplete third-party market share surveys that was not changing over time to calculate market share for its toner-based printers.

254.   In addition, Defendants' statements in ¶¶ 247-49 assuring investors that, based upon the Four Box Model, Supplies revenues would stabilize and even grow were materially false and misleading when made because they omitted the highly material facts that Defendants (i) lacked the data necessary to reliably and accurately quantify market demand for HP's Supplies through the Four Box Model, and, instead, (ii) based their statements on outputs from the Four Box Model predicated upon "lagging and incomplete" market share survey data "that wasn't changing over time." Indeed, without statistically sufficient, accurate, or reliable telemetry data for commercial printers, Defendants did not know how many of these printers were still active, how often those printers were being used, the amount of historical, current, or potential toner usage, or the size of HP's Supplies market share. In turn, Defendants had no reasonable basis to assure investors regarding the impact of HP's marketing efforts and changes to Supplies pricing. As a result, Defendants had no reasonable basis to make statements about the historical, current, or potential trajectory and sustainability of HP's Supplies business. As such, Defendants' assurances of Supplies revenue stabilization and growth were materially false and misleading when made and lacked any reasonable basis.

### 6.      August 23, 2018 3Q18 Earnings Call

255.   On August 23, 2018, HP held an earnings call to discuss the financial results for 3Q18. During his prepared remarks, Defendant Fieler stated, "Q3 Supplies revenue of $3.4 billion was up 8% or 6% in constant currency. The Supplies mix of total Print revenue was 66%, down year-over-year and nearly flat sequentially. ***And we continue to operate below our ceilings for Supplies channel inventory***."

256.   Following Defendants Weisler's and Fieler's prepared remarks, analysts posed questions regarding HP's business and 3Q18 financial results. For example, Goldman Sachs analyst Roderick B. Hall asked Defendants Weisler and Fieler about "the Supplies Growth rate" as follows:

> **HALL**: So I had a couple of questions. I guess, one is with regard to the Supplies growth rate. I know that S-Print's in there and driving some of that year-over-year growth, but just curious if you guys would comment on what the underlying kind of organic growth there is. And if you don't want to comment on that, maybe just give us an update on whether you're still thinking flat next year as a possible outcome or a probable outcome. And then I have a follow-up.

**FIELER**: *So we have been pretty predictive with what we call the 4-box model*. And at the beginning of this year, Cathie outlined that we had expected from Q2 to Q4 that our Supplies would grow between 5% to 7% in constant currency, and that's actually exactly what we've been delivering. Within that 5% to 7% growth, that does incorporate legacy S-Print as well as HP Supplies. Given the fact that these businesses are integrated, our sales teams are selling SKUs and making trade-offs in the field, we do not have the ability to accurately break out what's inorganic versus organic, and that's why we put them together in our outlook. So we think forward to FY '19, we do have some headwinds. We do have some tailwinds, *but we reflect on the 4-box model and what it's predicting. We have confidence that we will be flat to slightly up next year*.

**WEISLER**: And I think what you should expect from us is that we will continue to focus on executing against our strategy, both in our core as well as our growth initiatives in this area, which take time to fully play out into the P&L as Steve's alluded to throughout the call. We'll be relentless in our focus on optimizing all levers we have to impact Supplies with the right balance to ensure predictive value over the long term. *I, like Steve, also have a lot of confidence in the predictive value of our 4-box model, which is the basis for what we guided for the rest of FY '18 and '19*.

257. Following HP's 3Q18 earnings call, analysts issued reports reiterating Defendants' statements. For example, Wells Fargo wrote in an August 23, 2018 report titled "HPQ: Profitable Share Gains Con't; Expected Sustained Growth Into F2019," that "F3Q18 Printing results reflect consistent execution to the company's 4-Box operating model strategy." In a report titled "Solid F3Q18 Results: Maintain Overweight," issued the following day, J.P.Morgan likewise stated that "[p]rinter revenues beat our expectations on market share gains" and "[w]e continue to like [HPQ] stock longer term."

258. Defendants' statements in ¶¶ 255-56 were materially false and misleading when made because Defendants failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and, instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendants' statements gave investors the misleading impression that their statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendants' statements in ¶¶ 255-56 were materially false and misleading when made because they lacked any reasonable basis, given that the lack

of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

259.  In addition. Defendants' statements in ¶ 256 assuring investors that, based upon the Four Box Model, Supplies revenues would stabilize and even grow, including that FY19 Supplies revenue would be "flat to slightly up" were materially false and misleading when made because they omitted the highly material facts that Defendants (i) lacked the data necessary to reliably and accurately quantify market demand for HP's Supplies through the Four Box Model, and, instead, (ii) based their statements on outputs from the Four Box Model predicated upon "lagging and incomplete" market share survey data "that wasn't changing over time." Indeed, without statistically sufficient, accurate, or reliable telemetry data for commercial printers, Defendants did not know how many of these printers were still active, how often those printers were being used, the amount of historical, current, or potential toner usage, or the size of HP's Supplies market share. In turn, Defendants had no reasonable basis to assure investors regarding the impact of HP's marketing efforts and changes to Supplies pricing. As a result, Defendants had no reasonable basis to make statements about the historical, current, or potential trajectory and sustainability of HP's Supplies business. As such, Defendants' assurances of Supplies revenue stabilization and growth were materially false and misleading when made and lacked any reasonable basis.

260.  Further, Defendants' statements in ¶ 256 assuring investors that the Four Box Model was an accurate and reliable way to assess Supplies demand and revenue, including Weisler's and Fieler's statements regarding their "confidence" in the Four Box Model and its predictive capabilities were materially false and misleading when made because, as explained in the paragraph directly above, the lack of accurate and reliable telemetry data from HP's toner-based printers and use of inaccurate and unchanging third-party data rendered the Four Box Model's outputs inaccurate and unreliable, such that Defendants' purported confidence in the Four Box Model lacked any reasonable basis.

261.  In addition, Defendant Fieler's statement in ¶ 255 assuring investors that HP's Supplies inventory levels were properly aligned with market demand, including his statement that "we continue to operate below our ceilings for Supplies channel inventory" were materially false and misleading when made because Defendants had represented that the inventory ceiling was set based on market demand, when in reality did not know the demand for HP's Supplies business given that they lacked statistically

sufficient, accurate, or reliable telemetry data from HP's toner-based printer units necessary to accurately determine the demand for HP-branded supplies and instead relied on "lagging and incomplete" third-party market share data "that wasn't changing over time." Indeed, when Defendants were finally able to access some of the real-time "big data" they claimed to have been using all along, it revealed that HP had placed at least $100 million in excess inventory into its Supplies channel.

### 7.    September 7, 2018 Citi Global Technology Conference

262.    On a September 7, 2018, Defendant Weisler participated in the Citi Global Technology Conference. During the conference, Citi analyst Jim Suva posed a number of questions to Defendant Weisler, including questions concerning HP's Supplies business. For example, Suva and Weisler engaged in the following exchange:

> **SUVA**: My last question on printing, before we turn it over to the PC segment, is on printing. You went through a channel change where you had to rightsize your channel and then omni pricing model and working on the supplies. Recently, I think, you gave guidance for supply growth to be about flattish. How can I bridge that flattish growth outlook versus units have been growing. I would think, with units growing, that supplies would be growing also.

> **WEISLER**: Yes, this is a fairly common question that we get asked, particularly when people are looking at our in-quarter results this year where we've been delivering 5%, 6%, but we guided between 5% to 7%, we've delivered sort of in the middle of that range of supplies growth for the last few quarters. And they're trying to understand how do we go from that performance back to flat to slightly up next year. There is no new news here. Most of this is actually math. When we acquired Samsung's printing business last year, that came with both revenue in hardware as well as Supplies that was a business in an investment mode, and it was a business that had declining Supplies revenue and declining install base, much like our business had, had before we stabilized Supplies. So that creates a drag on Supplies after you get through the first initial year of the bump that you get to having that in the first year. So next year, it becomes a drag, which is partially offset by the increased units that we are putting into the business as well as the A3 units that we're putting into the business, the graphics and 3D Printing Supplies offsets that declining install base of the Samsung business going into its second year. The other thing that we said at SAM last year was that we still expect our install base to decline in the home segment, that also being offset by those additional units. ***So when you do the math of that, you put all of that into the 4-box model that we've talked about fairly extensively, which has been a very good predictor of our Supplies trajectory over time, it showed a couple of things, it showed that, this year, we would be 5% to 7% growth in terms of Supplies. And we've been delivering right in the middle of that range. And it also shows that we'll be flat to slightly up next year***.

263.  Defendant Weisler's statements set forth above in ¶ 262 were materially false and misleading when made because he failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and, instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendant Weisler's statements gave investors the misleading impression that his statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendant Weisler's statements in ¶ 262 were materially false and misleading when made because they lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

264.  Specifically, Weisler's statements in ¶ 262 assuring investors that, based upon the Four Box Model, Supplies revenues would stabilize and even grow, including his statements that, based on the Four Box Model, Defendants expected Supplies growth would be up 5% to 7% in FY18 and "flat to slightly up" in FY19 were materially false and misleading when made because they omitted the highly material facts that Defendants (i) lacked the data necessary to reliably and accurately quantify market demand for HP's Supplies through the Four Box Model, and, instead, (ii) based their statements on outputs from the Four Box Model predicated upon "lagging and incomplete" market share survey data "that wasn't changing over time." Indeed, without statistically sufficient, accurate, or reliable telemetry data for commercial printers, Defendants did not know how many of these printers were still active, how often those printers were being used, the amount of historical, current, or potential toner usage, or the size of HP's Supplies market share. In turn, Defendants had no reasonable basis to assure investors regarding the impact of HP's marketing efforts and changes to Supplies pricing. As a result, Defendants had no reasonable basis to make statements about the historical, current, or potential trajectory and sustainability of HP's Supplies business. As such, Defendants' assurances of Supplies revenue stabilization and growth were materially false and misleading when made and lacked any reasonable basis.

### 8.    September 12, 2018 Deutsche Bank Technology Conference

265.  On a September 12, 2018, Defendant Schell participated in the Deutsche Bank Technology Conference. During the conference, Deutsche analyst Sherri Ann Scribner asked Schell about the trajectory of HP's Supplies business as follows:

> **SCRIBNER**: So you want to be selling those supplies, you want to be putting those units in that generate supplies longer term. You guys have been growing nicely in supplies this year. Some of that helped by the acquisition of Samsung I think a little bit. But your guidance for supplies is really only sort of flattish, flat to slightly up in constant currency next year. How do you sort of get that supplies business? And what is your long-term view about how you get that supplies business growing somewhat because that's really the operating profit driver.

> **SCHELL**: Yes. You're right, that supplies business is really key. ***So again, I think on guidance for this fiscal year, fiscal year '18, our guidance was supplies growth of 5% to 7% in constant currency; and for fiscal year '19, our current guidance is flattish to slightly positive, okay***. So that's where we are at.

> ***Now if you look at the supplies business and any commitment we make on it, it's actually a very informed messaging that we have because it operates in a predictive tool where as -- we call it the 4-box tool***. For me, as a German, I like predictive. I don't like surprises. So when you look at this tool right now and you work like me in a region, there are certain things that are really important that inform the guidance that we give.

> Two elements that I want to talk about. One is installed base, the other one is market share. So when we talk in our Q3 about placing -- or selling additional units in, it's very important for this installed base piece of the predictive model. The installed base is key in order to connect supplies. If your installed base shrinks, then you will have challenges growing supplies. Market share on supplies is also very important because if you lose share and somebody else is connecting to your installed base, that is obviously a headwind.

> So in my daily job with my team, those are the 2 key components we're working on. When you look at the forecast that we give on supplies growth, so there are clearly a couple of headwinds, but there are also a couple of tailwinds. . . .

> *        *        *

> So it's a very complex model. Let me, maybe, finish by that. It's a very complex model. ***We are following a clear predictive tool when we give this guidance, when we say it's flat to slightly positive, then that's really what we currently see***. We're obviously investing in all the right boxes in order to make sure that it continues to grow for years to come.

266.  Defendant Schell's statements set forth above in ¶ 265 were materially false and misleading when made because he failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and, instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendant Schell's statements gave investors the misleading impression that his statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendant Schell's statements in ¶ 265 were materially false and misleading when made because they lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

267.   Specifically, Defendant Schell's statements in ¶ 265 assuring investors that, based upon the Four Box Model, Supplies revenues would stabilize and even grow, including his statement that HP's Supplies revenues for FY19 would be "flattish to slightly positive" was materially false and misleading when made because it omitted the highly material facts that Defendants (i) lacked the data necessary to reliably and accurately quantify market demand for HP's Supplies through the Four Box Model, and, instead, (ii) based their statements on outputs from the Four Box Model predicated upon "lagging and incomplete" market share survey data "that wasn't changing over time." Indeed, without statistically sufficient, accurate, or reliable telemetry data for commercial printers, Defendants did not know how many of these printers were still active, how often those printers were being used, the amount of historical, current, or potential toner usage, or the size of HP's Supplies market share. In turn, Defendants had no reasonable basis to assure investors regarding the impact of HP's marketing efforts and changes to Supplies pricing. As a result, Defendants had no reasonable basis to make statements about the historical, current, or potential trajectory and sustainability of HP's Supplies business. As such, Defendants' assurances of Supplies revenue stabilization and growth were materially false and misleading when made and lacked any reasonable basis.

268.   In addition, Defendant Schell's statements in ¶ 265 assuring investors that the Four Box Model was an accurate and reliable way to assess Supplies demand and revenue, including his statements that the Four Box Model was a "clear predictive tool," assuring investors that, based on the Four Box Model, "when we say it's [Supplies revenues] flat to slightly positive, then that's really what we currently

see," and that any commitment HP made regarding the Supplies business was "actually a very informed messaging" because those commitments were made based on the Four Box Model were materially false and misleading when made because, as explained in the paragraph directly above, the lack of accurate and reliable telemetry data from HP's toner-based printers and use of inaccurate and unchanging third-party data rendered the Four Box Model's outputs inaccurate and unreliable, such that Defendants' purported confidence in the Four Box Model lacked any reasonable basis.

### 9.   October 3, 2018 Securities Analyst Meeting

269.   In advance of HP's annual Securities Analyst Meeting, on October 1, 2018, RBC Capital Markets issued a report titled "Thoughts Heading into 10/3 Analyst Day," identifying the key topics for the meeting. For example, with respect to "Growth Drivers" RBC Capital Markets reported that "HPQ should provide a slightly positive outlook for its print business driven by four-box model: installed base (placing NPV positive units), usage (pages printed), aftermarket supplies share, and price (improved post Supplies actions)."

270.   On October 3, 2018, HP held its Securities Analyst Meeting. During the meeting, Defendants Weisler and Lores, among others, made presentations concerning HP's business and financial results. During his prepared remarks, Defendant Weisler stated, "I'm also pleased that our Supplies revenue is in line with the expectations that we set, and that *our 4-box model continues to drive predictability*."

271.   Likewise, during his presentation, Defendant Lores stated:

Let me talk now during -- about the progress we have made. 3 years ago, we faced headwinds and tough market conditions, and you were asking us very good questions. How are you going to be able to grow in a market that is in secular decline? How will you reverse years of unit decline? When will you be able to grow your Supplies business? *We told you that we were well positioned for the long term and that we had clear line of sight of what we needed to do to reverse the situation, and we have delivered on our commitments*. . . . *From revenue to profit to unit placements to Supplies revenue, there is no doubt that Print is growing*.

272.   Defendant Lores further stated:

This chart shows how do we think about the Supplies business. And maintaining supply stability is key for us. I know it's a complex chart, Dion reminds me many times, it's a very ugly chart. But again, showing and sharing to you how do we think about the Supplies business is important. This shows where do we expect headwinds, where do we expect tailwinds and what are all the assumptions that we have built into our model. Don't worry, I'm not going to be going through all of them. I'm going to just highlight those that have

changed from last year because there are actually very few changes from what we discussed a year ago.

273.  Additionally, Defendant Lores stated: "***We input all these assumptions into our 4-box model. And our plan, our expectation is that for fiscal year '19, the Supplies business will be flat or slightly up***, no change from what we communicated to all of you at the end of Q1 when we completed the acquisition of the Samsung business."

274.  In connection with his statements in ¶ 272-73, Defendant Lores presented the following slide which depicted office Supplies market share growing:



275.  Following Defendants' presentations, analysts posed a variety of questions regarding HP's business and financial results. For example, Susquehanna analyst David Ryzhik asked Lores about the Four Box Model:

**RYZHIK**: Enrique, in one of your slides, on the 4-box model, on the Office section, you had pricing going down as a change from last year. Can you just elaborate on what you're seeing on the pricing? Is that A3, A4 pricing? What are you seeing from the remands [sic] and the clones? And in that context, you've made some good progress on A3. You're talking about, maybe, it sounds like a little bit more aggressive on the pricing to take share. Why wouldn't we see more than maybe flat supplies growth? Should we think of that as maybe conservative, like a conservative bar?

**LORES**: So let me explain the arrow in prices in the Office space. I'd remind you that what we are showing in the chart is price of supplies. And actually, in this case, is from a customer perspective, what is the cost per page that they will have to pay. The cost per page in A3 is significantly lower than the cost per page in A4. So as our installed base of A3 printer grows, our cost per page gets down. The cost of A4 will stay stable, the cost per page in A3 will stay, but the mix drives the total price down. This is what we're reflecting

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

in that chart. And this is why I made the comment, that even if the average price will be going down because of this, the higher volumes driven by A3 printers will more than compensate for that because . . . .

**WEISLER**: And increase share.

**LORES**: And increase share. Because this is really going to be, overall, A3, the initiative in A3 is going to help us to grow our supplies business. ***In terms of the forecast for next year, we have been using the 4-box model for a while, and it has been a very good predictor of the performance that we see. And when we look at '19 and we input all the ins and outs, all the ups and downs and across the different segments, flat to slightly up is what the model is projecting, and it's what we are going to be delivering***.

276.  Immediately after this exchange, Goldman Sachs analyst Roderick B. Hall asked a follow-up question concerning the trends in the Four Box Model:

**HALL**: I just wanted to follow-on from that, Enrique, and see if all 3 changes you made to the 4-box model that you highlighted were, I guess, incrementally, a little bit more negative. And what I'm wondering is what could go well there? So could you talk a little bit about what would potentially put you at that top end of that range with the slightly up end or maybe a little better in terms of supplies?. . . .

**LORES**:  So let me address the question on supplies. We were -- with the model we explained, what are the variables for the different segments? As high, in the Office space, especially, the higher growth of A3 is going to help us to increase the overall volume of supplies. But also, the relative mix is going to change. Office will be growing faster than Consumer, and we -- Office print, Office customers print more, and Graphics will also be growing faster. And Graphics customers also print more. So even if in some of the sanctions there are declines, ***when we aggregate the total model, the projection is that supplies will be flat or slightly up in 2019***.

277. Following this meeting, analysts issued reports reiterating Defendants' statements. For instance, immediately following the meeting, RBC Capital Markets issued a report titled "Live From HPQ Analyst Day - Part 2 (Printing, Supplies, 3D)," concluding that the "Supplies business in FY19 should be flat to slightly up." The same day, Wells Fargo issued a report titled "HPQ: SAM Recap - Positive Operating Consistency; Inline F2019 EPS Guide," confirming its understanding that "HP believes it will see flat-to-up supplies growth in F2019" "[b]ased on HP's updated four-box printing model (i.e., profitable unit placement driving future supplies growth)." Wells Fargo further reported that "Mr. Weisler notes that HP remains focused on driving predictable supplies growth, portfolio innovation, and expanded services growth."

278. The following day, Maxim Group issued a report titled "Analyst Day Gives Us Increased Confidence PC & Printing Poised for Low Growth, 3D Printing Remains Exciting - Raising PT," raising its FY19 EPS because of "management's confidence in flat to slightly up supplies growth" from "HPQ's 4-box model, which the company notes has been very for predicting [sic] growth" and the "data points" Defendants shared at the meeting. Then, on October 5, 2018, J.P.Morgan issued a report succinctly stating, "high margin Supplies has stabilized."

279. Defendants' statements in ¶¶ 270-76 were materially false and misleading when made because Defendants failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and, instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendants' statements gave investors the misleading impression that their statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendants' statements in ¶¶ 270-76 were materially false and misleading when made because they lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

280. Additionally, Defendants' statements in ¶¶ 271-76 assuring investors that, based upon the Four Box Model, Supplies revenues would stabilize and even grow, including Lores' statements that "when we look at '19 and we input all the ins and outs, all the ups and downs and across the different segments, flat to slightly up is what the model is projecting, and it's what we are going to be delivering," "[w]e input all these assumptions into our 4-box model. And our plan, our expectation is that for fiscal year '19, the Supplies business will be flat or slightly up," and "[f]rom revenue to profit to unit placements to Supplies revenue, there is no doubt that Print is growing," were materially false and misleading when made because they omitted the highly material facts that Defendants (i) lacked the data necessary to reliably and accurately quantify market demand for HP's Supplies through the Four Box Model, and, instead, (ii) based their statements on outputs from the Four Box Model predicated upon "lagging and incomplete" market

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

share survey data "that wasn't changing over time." Indeed, without statistically sufficient, accurate, or reliable telemetry data for commercial printers, Defendants did not know how many of these printers were still active, how often those printers were being used, the amount of historical, current, or potential toner usage, or the size of HP's Supplies market share. In turn, Defendants had no reasonable basis to assure investors regarding the impact of HP's marketing efforts and changes to Supplies pricing. As a result, Defendants had no reasonable basis to make statements about the historical, current, or potential trajectory and sustainability of HP's Supplies business. As such, Defendants' assurances of Supplies revenue stabilization and growth were materially false and misleading when made and lacked any reasonable basis.

281.  Further, Defendants' statements in ¶¶ 270, 272-75 assuring investors that the Four Box Model was an accurate and reliable way to assess Supplies demand and revenue, including Defendant Lores' statement that the Four Box Model "has been a very good predictor of the performance that we see" and Defendant Weisler's statement that "our 4-box model continues to drive predictability," were materially false and misleading when made because, as explained in the paragraph directly above, the lack of accurate and reliable telemetry data from HP's toner-based printers and use of inaccurate and unchanging third-party data rendered the Four Box Model's outputs inaccurate and unreliable, such that Defendants' purported confidence in the Four Box Model lacked any reasonable basis.

282.  In addition, Defendants' representations in ¶¶ 271-76 assuring investors that HP's Supplies market share was improving, including the slide Defendant Lores presented showing increased Supplies market share in both the Home and Office segments in FY19, were materially false and misleading when made because Defendants failed to disclose that they never had the "big data" necessary to reliably and accurately determine HP's Supplies market share. In fact, HP later conceded that it "did not have . . . the capabilities to calculate share for toner-based products in the installed base." Instead, HP was using "lagging and incomplete" third-party market share data "that wasn't changing over time" to reflect true market conditions. As a result, investors were left with the misleading impression that HP's critical Supplies market share had improved when it had not. Indeed, as Defendants later admitted, HP's true market share was actually "significantly lower" than they previously represented and that although HP "previously had an arrow going up of gaining share, given the new data," Defendants "actually expect[ed] share to be down to a lesser extent on office."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

### 10.   November 29, 2018 4Q18 Earnings Call

283.  On November 29, 2018, HP held its earnings call to discuss its financial results for 4Q18 and FY18. During his prepared remarks, Defendant Fieler stated, "***In Printing, we continue to expect overall Supplies revenue to be flat to slightly up for the full year***."

284.  In addition, during Defendant Fieler's prepared remarks, he stated: "Q4 Supplies revenue of $3.4 billion was up 7%. The Supplies mix of total Print revenue was 64%, down year-over-year and sequentially. ***We continue to operate below our ceilings for Supplies channel inventory***."

285.  During the question-and-answer portion of the call, Defendant Fieler assured investors that "***we'll continue to drive Supplies to flat to slightly up this year***."

286.  Following HP's 4Q18 earnings call, analysts issued reports reiterating Defendants' statements. In particular, in a November 29, 2018 report titled "No Surprises; Maintain Market Perform," BMO Capital Markets stated, "[g]oing forward, Supplies is expected to be only flat to slightly up, especially given tough comps in F1Q (Samsung acquisition)." Additionally, Wells Fargo issued a report on November 29, 2018 titled "HPQ: Solid Execution; Focus On Intel PC CPU Supply Constraints & Macro Risk," in which Wells Fargo wrote, "HP continues to successfully execute on its 4-Box operating model strategy" and "HP noted that it continues to operate below its ceiling for supplies channel inventory." Nearly two weeks later, on December 10, 2018, Wolfe Research issued a report titled "Reinventing with Sprinkles of Magic; Initiate at Outperform," concluding: "For the year we see printer revenue up 1% with supplies the same. Supplies in the channel continue to be well managed, and the four box model is providing accurate visibility." Wolfe Research wrote that HP "now has better visibility on supplies usage."

287.  Defendant Fieler's statements in ¶¶ 283-85 were materially false and misleading when made because he failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and, instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendant Fieler's statements gave investors the misleading impression that his statements that the Supplies business would be stable and

viable had a reliable and accurate basis, when in fact they did not. Also, Defendant Fieler's statements in ¶¶ 283-85 were materially false and misleading when made because they lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

288.   Specifically, Defendant Fieler's statements in ¶¶ 283, 285 assuring investors that, based upon the Four Box Model, Supplies revenues would stabilize and even grow, including his statements that Supplies would be "flat to slightly up" in FY19 were materially false and misleading when made because they omitted the highly material facts that Defendants (i) lacked the data necessary to reliably and accurately quantify market demand for HP's Supplies through the Four Box Model, and, instead, (ii) based their statements on outputs from the Four Box Model predicated upon "lagging and incomplete" market share survey data "that wasn't changing over time." Indeed, without statistically sufficient, accurate, or reliable telemetry data for commercial printers, Defendants did not know how many of these printers were still active, how often those printers were being used, the amount of historical, current, or potential toner usage, or the size of HP's Supplies market share. In turn, Defendants had no reasonable basis to assure investors regarding the impact of HP's marketing efforts and changes to Supplies pricing. As a result, Defendants had no reasonable basis to make statements about the historical, current, or potential trajectory and sustainability of HP's Supplies business. As such, Defendants' assurances of Supplies revenue stabilization and growth were materially false and misleading when made and lacked any reasonable basis.

289.   In addition, Defendant Fieler's statements in ¶ 284 assuring investors that HP's Supplies inventory levels were properly aligned with market demand, including his statement that "[w]e continue to operate below our ceilings for Supplies channel inventory" were materially false and misleading when made because Defendants had represented that the inventory ceiling was set based on market demand, when in reality they did not know the demand for HP's Supplies business given that they lacked statistically sufficient, accurate, or reliable telemetry data from HP's toner-based printer units necessary to accurately determine the demand for HP-branded supplies and instead relied on "lagging and incomplete" third-party market share data "that wasn't changing over time." Indeed, Defendants later admitted that HP had placed at least $100 million in excess inventory into its Supplies channel.

**C.**   **Defendants' Materially False and Misleading Statements in 2019**

    **1.**   **January 8, 2019 CES Citigroup TMT West Conference and January 2019 Analyst Meetings**

290.  On January 8, 2019, HP attended the CES Citigroup TMT West Conference in Las Vegas, Nevada. During the conference, an analyst questioned the "disconnect" between the fact that, despite HP's market share for physical printer units growing significantly, "the supplies hasn't quite paralleled that type of growth." Defendant Lores responded:

> Actually, there is not a disconnect. When we look at our supplies business, the supplies business is driven by the installed base of printers that we have. And both our consumer category has an installed base that is shrinking, but also as we integrate the portfolio of the installed base from Samsung, they also had a shrinking installed base. So these are significant headwinds for our supplies business that we compensate by increasing the number of units that we place every quarter, but one thing compensates the other. And *we have been very clear since Q1 last year, declaring that as we enter into 2019, our prediction for the supplies business was that it was going to be flat to slightly up*, because the additional units and the expansion into A3 and the growth that we get in our graphics business are compensating the decline and the shrinkage in the installed based, both in the consumer side and of the original Samsung installed base.

291.  Additionally, Lores met with Wolfe Research analysts in January 2019. In a January 22, 2019 report titled "Wolfe Pack Bus Tour: Cisco, Arista, HP Inc," Wolfe Research provided the following summary of the meeting: "HP Inc Enrique Lores President, Imaging, Printing and Solutions Supplies revenue flat-to-up is not conservative." Printer supplies drives company profitability; the print business is roughly 60% commercial and 40% consumer. ***Lores reiterated guidance of flat-to-up supplies revenue in F19***, disputing that it is a low-balling forecast. He pointed out that the consumer printer base is declining as are parts of the Samsung's acquired base."

292. Defendant Lores' statements set forth in ¶¶ 290-91 above were materially false and misleading when made because he failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and, instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendant Lores'

statements gave investors the misleading impression that his statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendant Lores' statements in ¶¶ 290-91 were materially false and misleading when made because they lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

293. Specifically, Defendant Lores' statements in ¶¶ 290-91 assuring investors that, based upon the Four Box Model, Supplies revenues would stabilize and even grow, including his reiteration of "flat-to-up supplies revenue in F[Y]19" were materially false and misleading when made because he omitted the highly material facts that Defendants (i) lacked the data necessary to reliably and accurately quantify market demand for HP's Supplies through the Four Box Model, and, instead, (ii) based their statements on outputs from the Four Box Model predicated upon "lagging and incomplete" market share survey data "that wasn't changing over time." Indeed, without statistically sufficient, accurate, or reliable telemetry data for commercial printers, Defendants did not know how many of these printers were still active, how often those printers were being used, the amount of historical, current, or potential toner usage, or the size of HP's Supplies market share. In turn, Defendants had no reasonable basis to assure investors regarding the impact of HP's marketing efforts and changes to Supplies pricing. As a result, Defendants had no reasonable basis to make statements about the historical, current, or potential trajectory and sustainability of HP's Supplies business. As such, Defendants' assurances of Supplies revenue stabilization and growth were materially false and misleading when made and lacked any reasonable basis.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

294. As more fully alleged above, a host of facts give rise to a strong inference that, throughout the Class Period, Defendants knew, or were deliberately reckless in not knowing, that the statements identified in Section V, *supra*, concerning the predictive nature of the Four Box Model, the "big data" the purportedly informed the Four Box Model, HP's increasing Supplies market share, HP's Supplies channel inventory levels, and the sustainability and viability of HP's Supplies business were materially false and misleading when made, and omitted material facts necessary to make their statements not misleading. In particular, Defendants: (i) knew and/or were deliberately reckless in not knowing that the statements issued

and disseminated in the name of the Company were materially false and misleading and/or omitted material facts necessary to render those statements not false or misleading; (ii) knew that these statements were issued and disseminated to the investing public; and (iii) knowingly and substantially approved, participated, or acquiesced in, and had control and ultimate authority over, the issuance or dissemination of such statements as primary violators of the federal securities laws.  In addition to the specific facts enumerated above, the following facts also support a strong inference of scienter.

### A.  Defendants' Repeated Statements and Admissions Reveal that They Had Actual Knowledge of the Falsity of Their Misstatements During the Class Period

295.  Defendants' statements throughout the Class Period make clear that they had knowledge of the Four Box Model and its inputs. In fact, each Defendant spoke about the Four Box Model and its inputs in detail during the Class Period. *See, e.g.*, Weisler at March 1, 2017 Morgan Stanley Technology, Media & Telecom Conference, May 31, 2017 Sanford C. Bernstein Strategic Decision Conference, May 31, 2018 Sanford C. Bernstein Strategic Decisions Conference; Lesjak at March 1, 2016 Morgan Stanley Technology, Media & Telecom Conference, September 6, 2017 Citi Global Technology Conference; Lores at October 13, 2016 Securities Analyst Meeting, October 3, 2018 Securities Analyst Meeting; Fieler at June 6, 2018 Bank of America Merrill Lynch Global Technology Conference; Schell at September 12, 2018 Deutsche Bank Technology Conference.

296.  Defendant Weisler further confirmed on May 31, 2018 that he had access to the "spreadsheet" used to analyze the "big data" used in the Four Box Model, telling an analyst that "[t]he whole thing is – it's pretty complicated. You would even be impressed with the spreadsheet." The next month Defendant Fieler confirmed that when he returned to HP, "one of the first things . . . [he] did [wa]s actually looked at the 4-box model," explaining to analysts that "it's actually rather detailed as you look at geographies and SKUs and things, and it's only getting better with the incremental data and insight we get from our installed base."

297.  Defendants' statements before and during the Class Period likewise make clear that Defendants were familiar and intimately involved with the Four Box Model. For example, Defendant Lores told investors at a June 6, 2017 conference that "we constantly work to improve and to refine [the Four Box Model]," including "check[ing] . . . the usage" against the assumptions after new printers are launched

to "adjust" the Four Box Model "over time." Defendant Lesjak made similar statements in 2016, noting that "we are constantly refining the model with the data that we get. . . . [W]e use the big data that we were getting to refine the model and we are now doing this on a fairly regular basis."

298. Defendant Weisler likewise confirmed that "[e]very time we close a quarter, we go back and look at the 4-box drivers, what it predicted and what it returned" and "through that exercise, what we're seeing is our installed base assumptions, our usage assumptions, and to a large extent our pricing." He further stated that "we go back and test all of those every single quarter" and that he held his team "accountable for . . . deliver[ing] on the senior metrics of the company." Defendant Schell confirmed as much, telling investors on September 12, 2018 that in his "daily job with [his] team" there "are . . . 2 key components we're working on"—installed base and market share—both of which are informed by "a predictive tool . . . we call . . . the 4-box tool." He further stated, "[w]e are following a clear predictive tool when we give this guidance, when we say it's flat to slightly positive, then that's really what we currently see."

299. More specifically, Defendant Lores represented that Defendants were "able to monitor and to measure at the country level and what is the usage across different territories" and in fact utilize data to monitor and measure usage "at a more granular level." Defendant Lesjak similarly confirmed in June 2018 that "you can look at the United States and you can actually zero in on a zip code and know whether or not these types of SKUs in that zip code tend to buy, on average, a lot of supplies or not." In response to an analyst question as to whether Defendants "go back and check whether . . . [the Four Box Model is] actually working" and how they "judge[d] the success of that model," Lesjak confirmed that they received this data from the United States as well as "other countries" and, based thereon, were "always updating kind of the view of that is an NPV-positive SKU in order to make sure that we're placing those units."

300. Defendants' statements also make clear that they relied upon the Four Box Model, and specifically the telemetry or "big data" purportedly utilized within the Model, to make strategic decisions for and investments in HP's all-important Supplies business. For example, on May 31, 2018, Defendant Weisler confirmed that "big data . . . informs us about where we want to make . . . investments" and "figur[e] out exactly where you want to place . . . [printer] units" to "ensur[e] that they're NPV positive."

He further noted that Defendants were able to "understand[] . . . through big data, what the competitive environment is looking like region by region, country by country."

301.  Defendants' statements likewise make clear that they purportedly relied upon "[o]ur big data capabilities" to understand the "effectiveness" of those strategic decisions and investments. Defendant Lores confirmed as much in 2016, stating: "The pricing and promotion decisions on HP supplies will now be managed centrally at the global and regional levels to align timing and to maintain our value position. . . . Our big data capabilities give us a very good understanding of the effectiveness of our activities. Going forward, we will leverage this information to focus only on high-return-on-investment targeted promotions." Defendant Lores similarly confirmed in October 2017 the importance of "big data" to HP's Supplies business noting that "[b]ig data and analytics are becoming very important both in how do we manage our business but especially on how do we improve the profitability going forward and therefore, how do we improve shareholder value."

302.  Relatedly, Defendants statements during the Class Period revealed that Defendants were keen on increasing HP's Supplies market share, and that they purportedly relied on the Four Box Model to do so. For example, during the June 6, 2018 Bank of America Merrill Lynch Global Technology Conference, in response to a question concerning the "key drivers" of the Four Box Model, Defendant Fieler stated that, for home printers, HP had "***been very focused on share gains***," among other things, and that "[s]imilar to home, we have sort of the usage decline per unit but also placing higher-quality units, ***focused on share*** and roughly flattish pricing on the office side."

303.  Defendants' admissions beginning on February 27, 2019 also make clear that they had knowledge that HP lacked sufficient (or any) telemetry data for commercial printers with which to forecast toner pricing, usage, or market share via the Four Box Model during the Class Period.

304.  For example, Defendant Weisler admitted on February 27, 2019 that "[w]e did not have a statistically significant sample from the system telemetry and the instrumentation nor the capabilities to calculate share for toner-based products in the installed base." Specifically he admitted that while "[w]e've had this data for ink-based products, but due to the limited number of machines that were phoning home in commercial due to enterprise firewall constraints and otherwise unconnected devices, we've had to build the connected installed base over time." During an analyst conference the next day, Defendant Weisler

1    admitted that telemetry data from commercial printers "has never been statistically relevant for us to rely

2    on it, many of them [the printers] sitting behind firewalls." Defendant Weisler further confirmed at an

3    analyst conference three months later that HP was not receiving "statistically relevant" telemetry data and

4    that the Four Box Model was not a true "demand-driven model" until 2019.

5        305. Defendant Fieler made similar admissions, including that HP needed to improve the

6    "quantity" of telemetry data by increasing the "ship[ment]" and "install[ation]" of newer printers and

7    ensuring that "we have access to" the telemetry data flowing from these newer printers, and the "quality

8    and speed" in which the telemetry data is analyzed once it is actually available.

9        306. These admissions were confirmed by Former Employee #1 ("FE-1"), who worked at HP from

10   before the Class Period through 2Q19 as an executive in the Asia Pacific and Japan ("APJ") region

11   reporting to several senior executives including Nick Lazaridis, Senior Vice President, APJ, then Rich

12   Bailey, President of APJ, and later to Tian Chong Ng, President and Managing Director of APJ. FE-1

13   reported that HP did not have telemetry data for the full installed base of toner printers—for some printers

14   it was "not present at all" and for others it was "very patchy."

15       307. Defendants' admissions beginning on February 27, 2019 likewise make clear that Defendants

16   knew that HP was using less reliable or accurate third-party data to calculate pricing, usage, and market

17   share instead of the "big data" Defendants repeatedly touted to investors at the time they made the

18   statements set forth in Section V, *supra*. For instance, Defendant Fieler admitted on February 27, 2019 that

19   "[p]reviously, we had relied primarily on lagging and incomplete market share surveys."

20       308. That same day, Defendant Weisler admitted that "[p]reviously, we had used periodic third-

21   party survey data and market research aggregators to estimate toner supply shares." The following day,

22   Defendant Weisler confirmed that HP had been tracking market share through "periodic surveys" and

23   "some third-party data that we got from other analyst firms" which "inform[ed] what we assume for supply

24   share." Defendant Weisler further confirmed his knowledge of the use of third-party data on May 30, 2019,

25   admitting that Defendants "solve[d] some problems" with obtaining telemetry data (e.g., "getting through

26   Commercial firewalls") by "relying on third-party share information that wasn't changing, over time, in

27   any kind of dramatic way." FE-1 confirmed Defendants' admissions, reporting that "market share" was

28   not based on actual data concerning customer purchases, but instead was based on sell through of supplies

from Tier 1 to Tier 2 of HP's sales channel, and the number of weeks of inventory in the sales channel. As a result HP's "market share" input was always a problem because HP just did not have the end user data, which made it a "guesstimate" for ink and toner. FE-1 stated that FE-1 considered the Four Box Model to be indirect and at times unreliable because market share and usage data are imputed and not actual. FE-1 likewise confirmed that Weisler would have known of these challenges of the Four Box Model. Indeed, FE-1 said this was common knowledge, which was "taken as a normal, as a given" at HP.

309. Defendants also understood the material negative impact of the lack of sufficient telemetry data and using "lagging and incomplete market share surveys," within the Four Box Model at the time they made the statements alleged in Section V, *supra*. For example, on February 27, 2019, Defendant Fieler admitted that the "4-box model is only as good as its assumptions" and required "enhancements in both big data and software and an increasing installed base of newer, connected toner-based products" in order "to have an increasingly clearer picture of office supplies share. On the same date, Defendant Weisler confirmed that "we had incorrect Supplies share assumptions in our 4-box model regarding the plans for Supplies selling in quarter 1'19 and in prior quarters" which impacted HP's ability to "spot the buying behavior change as a trend" because the incorrect assumptions were "masking the underlying problem." Indeed, Defendant Weisler confirmed that the impact of the lack of viable telemetry data and the use of "lagging and incomplete" survey data occurred over several quarters prior to 1Q19.

310. Defendants also were aware of internal forecast misses during the Class Period. For instance, FE-1 confirmed that every Thursday, HP held world-wide CEO briefing calls, which were attended by, among others, the CEO and his staff, and executives from each of HP's regions, including the APJ President, Finance VP, and category heads and the equivalent personnel in EMEA and the U.S. While FE-1 did not personally attend these meetings, FE-1 received a debriefing on the calls from Rich Bailey who was in attendance. Based on these debriefings, FE-1 reported that the "famous hot seat" was the EMEA region, which was "unstable" and had "big problems" in the Supplies space.

311. FE-1 recalled that, circa 2Q18, EMEA experienced a particularly egregious Supplies forecast miss. FE-1's superiors, including Bailey, told FE-1 that Defendant Weisler (who was then HP's CEO) was "really angry" and thereafter held a series of "crisis" meetings to understand the miss. According to FE-1's superiors who attended the meetings, Weisler was informed that the miss occurred because HP lacked

insight into the sales channel and, thus, did not have full appreciation for the total effect of the trend of consumers buying Supplies from competitors online. In sum, CEO Weisler was informed in 2Q18 that the EMEA Supplies leads missed their sales estimates because of a lack of insight into the sales channel and end user buying patterns.

### B.     HP's Supplies Business Was Its Core Operation

312.    HP's Supplies business has long been the Company's core operation and profit engine. Prior to and during the Class Period, Defendants consistently represented that HP's Supplies business was its lifeblood, and that a successful Supplies business was fundamental to the Company's business model. As Defendant Weisler explained during the Morgan Stanley Technology, Media & Telecom Conference held on March 1, 2017, "our business as a whole generates the vast majority of its profit from our printing segment and that our printing business is an annuity business. It's a razor/razor blade model. We lose money, generally speaking, when we place a unit." Shortly thereafter, at the Sanford C. Bernstein Strategic Decision Conference on May 31, 2017, Defendant Weisler further explained, "[t]oday, the single biggest investment that we make is placing a unit, because generally speaking, when we place units, we lose money. And *we make back money over time as supplies go into those units*."

313.    For years, Defendants also told investors that HP's business was "all about supplies."  For example, during HP's September 2015 Securities Analyst Meeting, Defendant Lores proclaimed, "*this business is all about supplies. Every action that we've -- I have been describing, the improvements in the product portfolio, the new programs that we are launching, the new services we're launching have one common objective. Improve our supplies business.*" During the same meeting, Defendants Weisler and Lesjak offered similar refrains, each noting that HP's business was "all about supplies."  During HP's 2016 Securities Analyst Meeting, held on October 13, 2016, Defendant Lores again highlighted the importance of the Supplies business, stating: "*The key area of focus for us is our supplies*.  And we will -- *every action we take across our core growth or future segments has one consistent objective, get the supplies business to growth*."  Defendant Lores again reiterated during the Company's 2018 Securities Analyst Meeting held on October 3, 3018, "let me say one more time, going forward, this business is all about supplies and services." In fact, Defendant Lores so frequently emphasized the importance of Supplies

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

that, during the June 6, 2017 Bank of America Merrill Lynch Global Technology Conference, an analyst referred to him as "Enrique 'It's all about the supplies' Lores from HP."

314.  Moreover, HP's Supplies business contributed significantly to the Company's quarterly and annual financial results. During HP's 2015 Securities Analyst Meeting, held on September 15, 2015, Defendant Lesjak explained, "the net revenue of the Company is made up of about 60% from personal systems, 40% from printing and over the last four quarters, the operating profit mix is comprised of printing at 78%, *driven largely by supplies* and personal systems at 22%."

315.  In addition, HP's Supplies business had particularly high profit margins and a correspondingly large impact on the Company's bottom line, which Defendants emphasized throughout the Class Period. For example, during the Morgan Stanley Technology, Media & Telecom Conference on March 1, 2017, Defendant Weisler explained, "*our business as a whole generates the vast majority of its profit from our printing segment* . . . ." Later in 2017, at the September 6, 2017 Citi Global Technology Conference, Defendant Lesjak emphasized that the Supplies business in particular drove HP's profitability, explaining, "*not only is a big portion of our profits coming from Print, but when you further drill down, a big portion of the profits is really coming from supplies* . . . . So that means you really have to look at what your supplies business -- how to drive your supplies business."

316.  Indeed, as alleged above, HP's Supplies generated most of the Company's *total profits*. To be sure, analysts estimated that the HP's Supplies business accounted for between 80% and 110% of the Company's profits. For instance, Deutsche Bank estimated that, because HP lost more money selling printer hardware than it made selling PCs, the Supplies business actually accounted for more than 100% of the Company's profits. Similarly, UBS wrote in 2016 that "Printing [wa]s about 80% of profit and should be investors' focus."

317.  The importance of HP's Supplies business supports the strong inference that Defendants knew, or were deliberately reckless in not knowing, that HP's Four Box Model suffered from a material deficiency in that stale and outdated third-party market share data was used to calculate HP's commercial market share, that HP historically lacked adequate internal telemetry data to calculate market share for its toner-based products, and that, as a result, Defendants' statements regarding the sustainability of and revenue projections for HP's Supplies business lacked any reasonable basis.

**C.** **The Individual Defendants Were HP's Most Senior Executives and Controlled the Content of Their Statements During the Class Period**

318.  The Individual Defendants' control over the entire Company and unfettered access to non-public information also support a strong inference of scienter. As HP's top executives during the Class Period, Defendants Weisler (President, CEO, and Director), Lesjak (CFO and interim Chief Operating Officer), Fieler (CFO and Head of Global Treasury), Lores (President of Imaging, Printing and Solutions), and Schell (President of the Americas region and President of 3D Printing and Digital Manufacturing) controlled the Company's day-to-day operations and were informed of and responsible for HP's all-important Supplies business.

319.  Specifically pertaining to Defendant Lores, as President of Imaging, Printing and Solutions, he was intimately involved in returning HP's Supplies business to growth and profitability during the Class Period.  Indeed, Defendant Weisler highlighted Defendant Lores' key involvement in the purported turnaround in the Supplies business, stating, "Enrique and the regional presidents . . . and the teams did a great job in stabilizing Supplies earlier than expected last year."  Analysts likewise acknowledged Defendant Lores' critical role related to Supplies, with one Bank of America Merrill Lynch analyst remarking during a June 6, 2017 conference, "[w]e're delighted to have HP, Inc. with us today. We have Enrique 'It's all about the supplies' Lores from HP. . . . Enrique has been a big part of seeing the supply story turn around at HP."

320.  Likewise, each executive was intimately involved with the Four Box Model as demonstrated by their own statements and admissions set forth above in Section V.

321.  Defendants' high-level positions, and their involvement with HP's core operation (e.g., its Supplies business) and the Four Box Model allowed them to control the contents of the material misstatements alleged in Section V, *supra*. Each of the Individual Defendants controlled the contents of the oral statements they uttered during various earnings calls and investor conferences during the Class Period. In addition, because of their high-level positions, each Individual Defendant was provided with, or had access to, copies of the presentations alleged herein to be false and misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

322. Additionally, because of their high-level positions and access to material non-public information concerning the Company, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made to investors, including statements concerning the Four Box Model, the trajectory and sustainability of the Supplies business, and HP's Supplies market share and inventory, were materially false, misleading, and incomplete, and/or lacked any reasonable basis.

323. As a result, the Individual Defendants were responsible for the accuracy of HP's corporate statements, and each is therefore responsible and liable for the representations contained therein or omitted therefrom. HP knowingly and/or recklessly made the materially false and misleading statements and omissions of material fact alleged herein based on the fact that Individual Defendants knew and/or recklessly disregarded that the Company's statements were materially false and misleading and/or omitted material facts at the times that such statements were made. Each of the Individual Defendants was among the most senior executives of the Company throughout the Class Period and a member of the Company's management, and their knowledge may be imputed to the Company.

324. Defendants' statements during the Class Period strongly and plausibly suggest each had access to negative material undisclosed information. Indeed, Defendants' material misrepresentations and omissions explicitly or implicitly pertained directly to HP's Four Box Model, including the critical data inputs for that model, as well as the sustainability and trajectory of the Supplies business and HP's Supplies market share and inventory, and could not have been made with any reasonable basis in fact, as the Defendants belatedly and gradually disclosed, among other things, Defendants historically lacked critical telemetry data from HP's toner-based printers and instead relied on lagging and out-of-date third-party data to calculate commercial market share for HP's Supplies, that, as a result, HP oversold roughly $100 million of Supplies product into its sales channels, and that the Company revised its commercial market share calculations significantly downward.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

D.   **The Close Temporal Proximity Between Defendants' False Assurances and the Partial Revelation of the Relevant Truth**

325.  The temporal proximity between Defendants' January 8, 2019 assurances and the Company's disclosures on February 27, 2019 further supports a strong inference of scienter. As noted above, during the January 8, 2019 CES Citigroup TMT Conference, Defendant Lores engaged in the following colloquy with Citi analyst Jim Suva:

> **SUVA**: Can you talk a little bit about printing?  The last couple of earnings, you beat on revenues, your quarterly earnings calls, but your bottom line EPS was basically in line. And on the conference call, you and your CEO talked about investing more units in the market, like print units in the market. But we've seen your market share grow a lot, but the supplies hasn't quite paralleled that type of growth. What's the disconnect there between gaining share so much in units in the market and the supplies not following it? Is it a lagging leading indicator? Is people just printing a lot, lot, lot less, or what's the disconnect?

> **LORES**: Actually, there is not a disconnect. When we look at our supplies business, the supplies business is driven by the installed base of printers that we have. And both our consumer category has an installed base that is shrinking, but also as we integrate the portfolio of the installed base from Samsung, they also had a shrinking installed base. So these are significant headwinds for our supplies business that we compensate by increasing the number of units that we place every quarter, but one thing compensates the other.

> ***And we have been very clear since Q1 last year, declaring that as we enter into 2019, our prediction for the supplies business was that it was going to be flat to slightly up***, because the additional units and the expansion into A3 and the growth that we get in our graphics business are compensating the decline and the shrinkage in the installed based, both in the consumer side and of the original Samsung installed base.

326.  The proximity between Defendant Lores' assurance that HP's Supplies revenue would be "flat to slightly up" entering 2019—a projection based on the Four Box Model—and the revelation just seven weeks later that Supplies revenue in HP's 1Q19 was negative 3%, and that critical market share assumptions Defendants used as an input in the Four Box Model "relied primarily on lagging and incomplete market share surveys," supports the strong inference that Lores was, at best, deliberately reckless in making positive representations regarding the Supplies business.

E.   **Weisler's and Lores' Suspicious Insider Trading and Defendants' Motive to Conceal the Relevant Truth About HP's Supplies Business Further Confirm a Strong Inference of Their Scienter**

327.  During the Class Period, Defendants Weisler and Lores collectively disposed of over ***$115 million*** in HP stock while in possession of adverse material, nonpublic information regarding the

inaccuracy and unreliability of the Four Box Model, as well as market demand, market share, and inventory levels for HP's Supplies business. As the results of Defendants' materially false and misleading statements and omissions of material fact, these stock dispositions were executed at artificially inflated prices under suspicious circumstances.

328.  During the Class Period, Defendant Weisler disposed of 4,171,223 shares of HP stock at an average price of $20.83, for a total proceeds of over *$86.87 million*. Defendant Weisler's trades are set forth in the following chart:

| Dion Weisler | | | |
|---|---|---|---|
| Transaction Date | Shares Disposed | Price | Value Disposed |
| 8/7/17 | 430,903 | $19.3181 | $8,324,227 |
| 9/25/17 | 95,521 | $19.9700 | $1,907,554 |
| 9/26/17 | 635,981 | $19.9700 | $12,700,541 |
| 10/13/17 | 525,719 | $20.9700 | $11,024,327 |
| 11/2/17 | 525,719 | $21.2229 | $11,157,282 |
| 11/2/17 | 87,408 | $21.4000 | $1,870,531 |
| 11/6/17 | 80,102 | $21.4693 | $1,719,734 |
| 12/4/17 | 28,022 | $21.0800 | $590,704 |
| 12/4/17 | 190,163 | $21.0800 | $4,008,636 |
| 12/7/17 | 53,267 | $20.9700 | $1,117,009 |
| 12/9/17 | 73,715 | $21.0700 | $1,553,175 |
| 12/10/17 | 18,111 | $21.0700 | $381,599 |
| 10/31/18 | 44,400 | $24.1400 | $1,071,816 |
| 11/2/18 | 84,952 | $24.6300 | $2,092,368 |
| 11/6/18 | 7,399 | $24.5500 | $181,645 |
| 11/7/18 | 78,990 | $24.8272 | $1,961,101 |
| 11/26/18 | 320,725 | $22.8100 | $7,315,737 |
| 12/7/18 | 95,414 | $22.9300 | $2,187,843 |
| 12/9/18 | 71,644 | $22.9300 | $1,642,797 |
| 12/11/18 | 116,134 | $22.9874 | $2,669,619 |
| 3/18/19 | 36,799 | $20.0000 | $735,980 |
| 6/27/19 | 132,964 | $20.9500 | $2,785,596 |
| 8/26/19 | 437,171 | $18.0100 | $7,873,450 |
| **TOTAL** | **4,171,223** | **$20.83 (average)** | **$86,873,270** |

329.  During the Class Period, Defendant Lores disposed of 1,255,145 shares of HP stock at an average price of $22.68, for a total proceeds of over ***$28.46 million***. These trades are set forth in the following chart:

| Enrique Lores | | | |
|---|---|---|---|
| Transaction Date | Shares Disposed | Price | Value Disposed |
| 3/18/17 | 56,961 | $17.5600 | $1,000,235 |
| 5/31/17 | 59,000 | $18.8003 | $1,109,218 |
| 10/6/17 | 40,965 | $20.5000 | $839,783 |
| 10/13/17 | 40,965 | $21.5000 | $880,748 |
| 10/30/17 | 26,101 | $21.3900 | $558,300 |
| 11/21/17 | 40,965 | $22.5000 | $921,713 |
| 12/4/17 | 55,465 | $21.0800 | $1,169,202 |
| 12/7/17 | 16,647 | $20.9700 | $349,088 |
| 12/9/17 | 21,502 | $21.0700 | $453,047 |
| 12/10/17 | 4,102 | $21.0700 | $86,429 |
| 1/12/18 | 37,820 | $22.4900 | $850,572 |
| 1/17/18 | 53,484 | $22.4900 | $1,202,855 |
| 1/18/18 | 249,409 | $23.4900 | $5,858,617 |
| 3/9/18 | 302,895 | $24.4900 | $7,417,899 |
| 3/18/18 | 58,838 | $23.5100 | $1,383,281 |
| 10/30/18 | 25,367 | $23.6700 | $600,437 |
| 10/31/18 | 15,752 | $24.1400 | $380,253 |
| 11/26/18 | 95,669 | $22.8100 | $2,182,210 |
| 12/7/18 | 32,341 | $22.9300 | $741,579 |
| 12/9/18 | 20,897 | $22.9300 | $479,168 |
| **TOTAL** | **1,255,145** | **$22.68 (average)** | **$28,464,634** |

330.  Both the amount and timing of Weisler's and Lores' trades were highly unusual and suspicious.  For example, the shares that Weisler disposed of during the Class Period represented approximately ***89%*** of his total reported HP common stock holdings during the Class Period (comprising common stock held at the beginning of the Class Period plus all shares that he acquired during the Class

Period). Similarly, Lores' Class Period stock dispositions represented approximately **83%** of his total reported HP common stock holdings during the Class Period.[4]

331.  Defendant Weisler's and Lores' Class Period trades were also suspicious because they were dramatically out of line with their prior trading history. In particular, during a "Control Period" from November 2015 to the beginning of the Class Period, Weisler only sold 255,912 shares of HP stock for total proceeds of approximately $3,878,622.[5]  Comparatively, during the Class Period, Weisler sold an average of 1,577,519 shares per year, for average yearly proceeds of $32,854,688—**more than eight times higher** than his proceeds during the Control Period.  Similarly, during the Control Period, Lores only sold approximately 114,000 shares of HP stock, for total proceeds of approximately $1,525,603. Comparatively, during the Class Period, Lores sold an average of 474,685 shares per year, for average yearly proceeds of $10,765,068—**nearly seven times higher** than his proceeds during the Control Period.

332.  In addition to the amount and timing, the pricing of the trades further highlight their suspicious nature. Indeed, both Weisler and Lores engaged in unusually high volume sales at a time when Defendants' misleading statements and omissions had inflated HP's stock price to all-time highs. More specifically, during the Class Period Weisler and Lores disposed of HP stock at average share prices of $20.83 and $22.68, respectively. In comparison, during the Control Period, Weisler and Lores disposed of significantly less stock at average share prices of $15.16 and $13.38, respectively.

333.  Finally, although certain of Weisler's and Lores' trades were executed pursuant to Rule 10b5-1 trading plans, those trading plans were put in place during the Class Period, **after** Weisler and Lores were **already** in possession of adverse material non-public information, as discussed herein. In particular,

---

[4]      Given the complexity and lack of complete publicly available data regarding Weisler's and Lores' unvested and vested options activity prior to and during the Class Period, as well as HPQ's split from the Hewlett-Packard Company in November 2015, Defendant Lores' lack of public reporting of options activity prior to November 2015, and Lores' lack of Schedule 14A options listings prior to December 31, 2017, Lead Plaintiffs believe the most reliable measure of Weisler's and Lores' insider trading activity during the Class Period is reflected above.

[5]      This Control Period was chosen because HPQ common stock did not begin trading until November 2015—when HPQ split from the Hewlett-Packard Company. Moreover, Defendant Lores did not report his sales on Form 4 prior to November 2015—when he was promoted to President of Imaging, Printing and Solutions for HP. Given that the Class Period is longer than the Control Period, and to ensure a (more than) fair comparison, Lead Plaintiffs used Defendants' average yearly Class Period sales (i.e., average sales per 12 months) as a comparison for the 15-month Control Period.

Weisler made certain Class Period trades of HP stock pursuant to Rule 10b5-1 trading plans adopted on June 23, 2017, June 28, 2018, December 28, 2018, and June 20, 2019. Likewise, Lores made certain Class Period trades of HP stock pursuant to Rule 10b5-1 plans adopted on September 28, 2017 and December 27, 2017. Accordingly, the adoption of these Rule 10b5-1 plans calling for increased sales of HP common stock while Weisler and Lores were already in possession of adverse material non-public information and were making materially false and misleading statements and omitting material facts, further reinforces a strong inference of scienter.

334.  The Individual Defendants were also motivated to ensure the success of a business model and a revenue model on which they had staked their careers at HP. Indeed, after years of disappointing results, the Individual Defendants had doubled-down on the "razor/razor blade" business model as well as the reliability and accuracy of the Four Box Model. Indeed, as noted above, they repeatedly touted the merits of the Four Box Model to the market—until the end of the Class Period when they abandoned their business model entirely. Because these executives had specifically pinned their success on both the business model and the Four Box model, they were motivated to mislead investors as to the limitations and failings of both until the truth was undeniable.

## VII.   LOSS CAUSATION

335.  As a result of Defendants' materially false and misleading statements, omissions of material facts, and fraudulent course of conduct, HP's common stock traded at artificially inflated prices during the Class Period. Relying on the integrity of the market price for HP common stock and public information relating to HP, Lead Plaintiffs and other Class members purchased or otherwise acquired HP common stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein. As a result of their purchases or acquisitions of HP common stock during the Class Period at artificially inflated prices and the removal of that inflation upon the disclosures set forth in Sections VII.A.–VII.C., *infra*, Lead Plaintiffs and the Class suffered economic losses (i.e., damages) under the federal securities laws.

336.  Defendants' false and misleading statements, material omissions, and deceptive course of conduct had their intended effect, directly and proximately causing HP common stock to trade at artificially inflated prices during the Class Period, trading as high as $27.08 per share on October 4, 2018. Those

misrepresentations and omissions of material fact that were not immediately followed by an upward movement in the price of HP common stock served to maintain the price of HP common stock at an artificially inflated level.

337. Had Defendants been truthful about HP's Supplies business and the systemic flaws in its Four Box Model, Lead Plaintiffs and other Class members would not have purchased or otherwise acquired their HP common stock at the artificially inflated prices at which they traded. It was entirely foreseeable to Defendants that misrepresenting and concealing material facts from the public would artificially inflate the price of HP common stock. The economic losses (i.e., damages suffered by Lead Plaintiffs and other members of the Class) were a direct, proximate, and foreseeable result of Defendants' materially false and misleading statements and omissions of material fact.

338. Lead Plaintiffs and other Class members suffered actual economic loss and were damaged when the material facts and/or foreseeable risks concealed or obscured by Defendants' misstatements and omissions were partially revealed and/or materialized through the disclosure of new information concerning HP on three dates: February 27, 2019, August 22, 2019, and October 3, 2019.

A.   **February 27, 2019: The Relevant Truth Regarding HP's Supplies Business and the Flaws in its Four Box Model Begins to Emerge**

339. On February 27, 2019, HP issued its financial results for 1Q19. In its press release, the Company disclosed that Supplies revenue was down 3%. During a same-day conference call, Defendant Weisler stated that: "Supplies revenue was weaker than anticipated, particularly in EMEA, where Supplies declined 9%. As you know, we look at our Supplies business *in terms of our four-box model*: in store base, usage, share and price. The 2 factors that varied from our plan were a *decline in share* and, to a lesser extent, pricing." Weisler noted, "[w]e saw this most significantly in our commercial channels, which is having the larger impact on office Supplies." Weisler also revealed that HP's "regional share assumptions" from its Four Box Model "were overestimated" over "multiple quarters" resulting in a glut in Supplies inventory. He also stated that the problem "*changes our assumptions in the 4-box model* for the remainder of the year. As a result, *we no longer expect Supplies to be flat to slightly up in fiscal '19*."

340. Likewise, Defendant Fieler stated that "[f]irst quarter Supplies revenue was $3.3 billion, down 3%, which is below our expectations, driven primarily by EMEA" and revealed that "*we had relied*

*primarily on lagging and incomplete market share surveys*" and that "*new telemetry data indicated* that HP's Supplies share, and particularly in our office business, was *significantly lower than what we had assumed in our 4-box model*." Fieler also disclosed a "$100 million headwind to Supplies revenue for the remainder of FY '19 or roughly 1% of total Supplies revenue" and stated that "[w]e expect this impact, combined with the lower go-forward Supplies share and pricing assumptions, to *result in a Supplies revenue decline of approximately 3% for the year*." Fieler also noted "we need to enhance our business management system, including more telemetry data to improve the quality of our inputs. *Our 4-box model is only as good as its assumptions*."

341.    During the question-and-answer portion of the conference call, analysts expressed surprise at the instability of the Supplies business and pushed Defendants for further detail about the underlying cause. For example, Bank of America Merrill Lynch asked:

> Dion [Weisler], can you talk about why you're seeing this particularly in EMEA in Supplies and the risk that this spreads to other regions as well? And how confident are you about this prediction of 3% decline you -- and that you have actually captured an appropriate amount of data and telemetry that's guiding that given that this is not the first time that we'll see the Supplies reset?

342.    Defendant Weisler responded that "the *underlying cause* as we outlined during the call, was the surprise around our assumptions about share were wrong, and it was most specifically in EMEA." Weisler also explained "[w]here we went wrong is that *we had incorrect Supplies share assumptions in our 4-box model* regarding the plans for Supplies selling in quarter 1 '19 and in prior quarters. This made it very difficult to spot the buying behavior change as a trend. *It didn't necessarily all happen in Q1*, but now that we understand the trend better, it has driven a change in our expectations for share going forward." Weisler also noted "[w]e also received new share analytics. It's a really important point, and we were able to triangulate that our *revised share assumptions were below our previous ones*. And so in retrospect, when the new share insights are applied, we believe that *our inventories in the ecosystem -- in the whole ecosystem began growing in prior quarters. However, the prior share assumptions made it hard to call this out as a trend as it was masking the underlying problem*."

343.    Similarly, Defendant Fieler focused on problems with the Four Box Model, including HP's use of "incorrect share assumptions":

So in Q1, certainly, the revenue weakness and the ***incorrect share assumptions*** were primarily in EMEA. And while the multi-tier channel dynamics that have been described are ***not unique to EMEA***, they are more prevalent there. That said, the competitive trends are global, and both the changes in the customer buying with more commercial customers purchasing supplies online and the pricing that Dion just referred to are more macro in nature. And therefore, ***when we revisited our 4-box assumptions, we did look at all regions and revised our share and pricing accordingly***, and that's all embedded in our guidance. . . .

344. Fieler also connected the problems with the Four Box Model to the $100 million inventory drawdown: "***We compared our old share assumptions with the revised one that have been informed by big data***, and we also looked at prior selling statistics and CI trends. We then estimated how much additional downstream channel inventory may exist, and we believe $100 million is the right estimate."

345. Goldman Sachs analyst Roderick Hall also asked about the "telemetry question" surrounding the Four Box Model: "***I just want to come back to the telemetry question*** and ask you if you could give us some idea where you are in the process of ***improving telemetry***. So have you -- what kind of sample you have? So should we expect for you to continue to look at this and improve telemetry over time, and therefore, maybe come back to us and continue to adjust this inventory in the channel? Or is everything pretty much done now, and you wouldn't expect any changes?"

346. In response, Fieler stated that "the 4-box model historically has been a relatively good predictor. And I think we need to acknowledge that it is not perfect. There is data and science. There is also judgment and art to it. And to your question, ***we do need to get better with the telemetry data***." He also noted "we have been pretty good at predicting with the 4-box model, and this is fine-tuning."

347. Morgan Stanley analyst Katy Huberty also focused on the negative Supplies issues and the telemetry data used in the Four Box Model:

Just following up on the Printer Supplies discussion. It sounds like some of the visibility into market share ***came on the back of the telemetry data***, which is something that you've talked about for a couple of years. Why this quarter did that show you a picture that actual market share was different than you thought? ***Why weren't the systems flagging that ahead of time?*** And do you have to invest in technology so that you can get better insights out of that data?

348. In response, Defendant Weisler stated:

To help you understand it better, let me explain a little bit about our methodology that drives the share assumptions we use on office supplies, which is primarily toner-based, and how it's changed. It's worth noting that it's different than ink-based products, where we've

historically had more telemetry data. ***Previously, we had used periodic third-party survey data and market research aggregators to estimate toner supply shares. We did not have a statistically significant sample from the system telemetry and the instrumentation nor the capabilities to calculate share for toner-based products in the installed base***. We've had this data for ink-based products, but due to the limited number of machines that were phoning home in commercial due to enterprise firewall constraints and otherwise unconnected devices*, we've had to build the connected installed base over time. And so with the increasing mix of newer products and the growth of the connected installed base, combined with improvements in big data, we've been able to move to a better source of share data based on system telemetry. It's worth noting that the share we calculate through big data reflects the share at the time the customer hits the print button, which may be months after they actually purchase the supplies. So when the new share insights are applied, ***we believe that the inventory in the ecosystem had been growing during . . . [1Q19] and previous quarters***. And the combined effect of the change in market dynamics impacting share and the lack of visibility to the change resulted in excess HP supplies in the market and lower Tier 1 channel sell-through. Having said all that, ***we will obviously need to continue to refine the telemetry data*** and our instrumentation and business management system as we move forward.

349.  Fieler also provided the market with a specific "update of ***where we are on the 4-box***":

Enrique shared at SAM what we thought the various 4-box arrows looked like. And if Enrique were doing that today, given the changes we've seen driven by the commercial channel and evolving marketplace Dion described, first, we wouldn't expect any changes to installed base or usage. Where we would expect some change is in office. ***Whereas we have previously had an arrow going up of gaining share, given the new data, we'd actually expect share to be down to a lesser extent on office***. Pricing, which was a down arrow, driven by the mix more to A3, we offer additional commentary that there would be pricing pressures, again as we described on the call. On home, almost all the boxes will remain the same except for share, given that a smaller portion of home does have toner-based products. And so the share we have previously had going up, it would still be going up but not as, I guess, strong of an arrow going up, as we had said at SAM.

350.  In the wake of these disclosures, the Company's share price declined $4.12 per share—or more than 17%—in a single trading day, from a close of $23.85 per share on February 27, 2019, to close at $19.73 per share on February 28, 2019. Thus, HP lost over $6.34 billion in shareholder value in a single day.

351.  Analyst reports following the conference call uniformly focused on the surprising negative news regarding the instability of HP's Supplies business and the underlying problems with the Four Box Model.  For example, Wells Fargo issued a same-day report stating "HP reported disappointing Printing revenue at $5.056B (vs. consensus $5.168B estimate) ***driven by a material, unexpected decline in supplies revenue***. Supplies revenue at $3.267B vs. our prior $3.49B estimate (consensus $3.42B); down 3% y/y vs.

+7% y/y in the prior quarter." Wells Fargo also noted that "*we expect shares to be under pressure following negative printer supplies (attributed mostly to commercial toner) results / guide*" and that "[t]he company noted that incremental telemetry data led to it *significantly decrease its supplies share assumption in its 4-box model* and as a result it will lower its inventory moving forward creating a $100M headwind to supplies revenue. HP now expects supplies to be down ~3% y/y vs. prior expectation of flat to up slightly."  Wells Fargo further explained:

> Incremental / more accurate telemetry market share data tracked by HP indicated the company's share (particularly in office) was *significantly lower than previously assumed in HP's 4-box model* and thus resulting in downward revision to forward expectations. . . .While the company reiterated F2019 non-GAAP EPS guide at $2.12- $2.22/sh. (including +$0.02 from Apogee acquisition), *we think investors will now be left to incrementally gauge HP's visibility into its 4-box model*.

> \*         \*         \*

> HP's *significantly weaker than expected supplies growth and negative commentary around market share lead us to be meaningfully more cautious around our print assumptions*. We think that investors will be left to consider whether weakness identified in EMEA will spread to additional geographies. We are focused on HP's ability to maintain its LT EBIT% target of 16%-18% moving forward; management noting that this will become more difficult to reach its +16% target in F2019.

352.  Similarly, Morgan Stanley issued a next-day report titled "*Supplies Miss Not a Quick Fix*" stating "printer supplies miss and guide down means . . . [management] needs to restore confidence in future supplies growth before the stock can work despite maintaining FY19 EPS / FCF guide." The report noted "*HPQ shares are down 12% in the aftermarket after the company disclosed an unexpected printing supplies guide down in FY19* that is reminiscent, though not parallel in our view, of issues the company faced in FY16. . . .":

> After investigating the shortfall, *the company discovered through new telemetry data that HP supplies share was overstated in management's 4 box model* due to a lack of data from newer phone-home office based units than in the past. HP alluded to the fact that these issues were largely contained to the commercial supplies market in EMEA but investors will question 1) if/when this customer purchasing behavior (i.e. greater online purchasing, where HPQ has less of a presence vs. traditional channel and retail) spreads to other geographies going forward and 2) how much HPQ can do to combat the persistent threat of low cost supplies alternatives. As a result of this issue, we now model FY19 printing supplies revenue declines of 3% vs. 1% growth previously as HPQ reduces channel sell-in this year to return channel inventory to healthier levels. Going forward, HPQ will need to make investments in supplies GTM/marketing, brand protection, *and more accurate*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*telemetry and analytics software so that these issues are identified ahead of time but we see this as a multi-quarter issue unlikely to be resolved in the near-term*.

353. Likewise, additional analysts issued reports on February 28, 2019 focusing on the negative disclosures regarding Supplies and the Four Box Model:

Susquehanna: "Supplies disappointed and FY19 outlook revised downward, with no visibility on a rebound. HPQ reported weaker Supplies revenue of $3.27B vs. our estimate of $3.39B, attributing the lion's share of the miss to EMEA, where supplies fell 9% Y/Y. . . . *[T]he company's 'four box model,' which has done a strong job of predicting Supplies streams, had overestimated HPQ's market share as well as sell-through downstream*. . . .[I]t remains unclear to us if the secular dynamics that are in play (pricing, share loss) can be resolved swiftly - if at all. As such, we lack conviction in a rebound in Supplies revenue in FY20."

Wolfe Research: "Supplies Downside Surprise Not a Quick Fix" and "we didn't expect a decline of 3% in F1Q, which is the new annual guidance. *Supplies is the lifeblood of HP, which makes the share and price challenges faced in Europe a serious investor concern*." The report also noted the "*[f]our box model [is] out of kilter*," "[e]arnings upside likely gone," and that "HP needs to take down channel inventory by $100mn and adjusted sales expectations for lower share and pricing. The challenges mostly are in Europe with supplies off 9% but bleed into other geos as well."

Argus: "HPQ was slammed because weakness in printing supplies revenue could persist" and "*investors were concerned about weakness in its printing supplies business that could persist across FY19*." The report also noted "*the company's 'four box' printing model ran into serious headwinds*" and "[w]hile this model has been successful, HPQ has had to change its assumptions around aftermarket share, particularly in the commercial space and particularly online."

BMO Capital Markets: "Bottom Line: HPQ delivered results that were disappointing on the top line largely *due to a Supplies shortfall*, where we think a resolution could take a few quarters to iron out." The report noted "[m]anagement lowered expectations for Supplies revenue growth, and now expects a y/y decline of 3% in F2019 vs. prior expectations of flat to slightly up (we had been modeling +0.8%)" and "*management needs to address inventory levels, rework four-box model assumptions, and address share issues*. . . ."

UBS: "Near-term, the stock would likely trade down because *the supplies miss was a surprise to us and many investors*."

**B.**     **August 22, 2019: Investors Learn New Information Regarding the Instability of HP's Supplies Business**

354. On August 22, 2019, the relevant truth concealed by Defendants' misrepresentations and omissions continued to make its way into the market. HP announced 3Q19 financial results that missed expectations, driven by a 7% year-over-year decline in Supplies revenue, and a decline in EMEA Supplies

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

revenue in the "mid-teens." HP reduced 2019 Supplies revenue guidance to a range of between -4% and -5% (from prior guidance of -3%) and stated that "*we are not planning for supplies revenue to grow in FY '20*." HP also announced "senior leadership changes in EMEA" and that Defendant Weisler would be stepping down. Weisler's departure was publicly attributed to a "family health matter" with no further details. Market commentators noted that this was a "sudden departure."

355. During the question-and-answer portion of HP's conference call, analysts focused on the unexpected adverse news regarding the Supplies business, including its continued instability and deterioration of growth. For example, Sanford C. Bernstein analyst Toni Sacconaghi noted that Supplies results and growth expectations were "dramatically worse" than expected and questioned why the business was suffering despite an overall healthy macroeconomic environment:

> I just wanted to follow up on the Printing. *So it sounds like things have gotten notably worse* in the last couple of months because, as you noted, your guidance originally was Supplies to be down 3%, and you were tracking to that through the first half of the year, and now you're suggesting it's going to be down 4% or 5%, *which would suggest that the second half is going to be down 6% or 7%, which is dramatically worse than you had thought*. And I think initially your thought, through tactical improvement, things might actually get a little progressively better over the course of the year.

> And so if I just reflect on the *magnitude of that change in outlook*, are you really suggesting that most of this is a bigger strategic headwind from cloning and alternatives than you had originally thought? Or are you suggesting that the economic weakness in Europe is the principal driver? Because I guess my observation would be, globally, the economy is still pretty healthy. And so if we're seeing with relatively healthy global economy, *normalized Supplies growth is minus 6% or minus 7%, that's pretty rough to me*. So perhaps you could clarify that . . . .

356. In response, Fieler reiterated that "in the first half, our total Supplies revenue was down 3%. EMEA was down roughly 9% in the same period. And in Q3, total Supplies was down 7% with EMEA down mid-teens. I say that because I want to be very clear that our Supplies performance continues to be driven by EMEA." Weisler noted the "larger-than-anticipated decline in EMEA" and "senior management changes in EMEA," explaining that "we underestimated the immediacy, the reaction and the size of the impact on the back half of the year."

357. Similarly, Evercore ISI analyst Amit Daryanani questioned whether the negative Supplies results were spreading: "I'd love to hear your conviction and confidence on why you think this issue's not spread beyond EMEA to North America or APJ as well." In response, Fieler stated: "I think it's important

to highlight . . . if you just reflect on the first half of the year in Print, our Supplies were down 3%, and we grew operating profit dollars in that period. And ***I do want to acknowledge we do not grow OP dollars in Print in Q3, given the larger Supplies decline***, but we do have multiple levers across our Print business from more profitability on our hardware services, more growth in our growth initiatives as well as cost structure items to address in Print." Weisler also acknowledged the growing problems in Supplies and noted "***the size and the timing of the ripples caused in the back half of this year is something that we underestimate***." Similarly, Fieler stated: "***[Y]es, the timing extent and sort of the immediacy of the impact was harder than we anticipated*** . . . ."

358. Following these disclosures, the price of HP stock fell $1.12 per share, or approximately 6%, from a close of $18.93 per share on August 22, 2019, to close at $17.81 per share on August 23, 2019. This decline erased approximately $1.66 billion in market capitalization.

359. Analysts covering HP stock uniformly focused on the negative disclosures regarding Supplies. For example, Credit Suisse issued reports on August 22 and August 23, 2019 noting: "Supplies revenue is key for the stock and was down 7% y/y ($3.16bn vs. CSe/Street $3.22bn/$3.33bn) as trends deteriorated vs. F1H" and "Supplies Shortfall Overshadows Solid PCs/FCF":

> F3Q19 Earnings Recap: While HP's headline revenue was largely in-line ($14.60bn vs. CSe/Street $14.72bn/$14.62bn) and EPS of $0.58 beat CSe/Street of $0.55/$0.55, ***the details underneath were less encouraging particularly given the sharp deterioration in Supplies*** (-7% y/y vs. -3% y/y in F1H). Digging in and starting with Supplies, management attributed the shortfall to (1) lingering (and accelerating) disruption from distribution changes and channel inventory reductions, mostly in EMEA; and (2) incremental macro softness weighing on end customer demand. As a result, ***HP now expects a similar pace of decline in F4Q and continued Supplies headwinds into FY20***.

360. The report also noted "[a]s we've detailed extensively in the past, ***Supplies remains the key metric for HP following the disappointing reset in F1Q***" and "without line-of- sight to sustained ***Supplies stabilization***, we think it will be difficult for the stock to re-rate ahead and prefer to remain on the sidelines."

361. Other analysts similarly focused on the negative Supplies news:

> Susquehanna: "[E]xpectations continue to remain ***plagued by a challenging Printing business - namely Supplies revenue, which came in weaker than expected***. Specifically, EMEA Supplies Rev declined 'mid-teens' Y/Y, and management's anticipation of another Y/Y Rev decline in FY20 (with sobering commentary around structural EMEA market

---

124                                                                 Case No. 3:20-cv-01260-SI
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

dynamics) *gives us a lack of confidence that Supplies revenue can rebound any time soon*."

Evercore ISI: "*[T]he real disappointment comes from softer trends in Supplies* (down -7% vs. FH1:19 trendline at -3%) driven by weaker EMEA performance combined with macro and execution issues. Based on management's comments, we think the decline in supplies for FH2 will be around ~6-7%, however the risk we think will be what happens if the macro and broader issues from EMEA become a more global issue?. . . . *[W]e think the stock may languish until we see an improvement in the Supplies revenue* trajectory something we currently do not have a line of sight for (management does not expect Supplies revenue to grow in FY20)."

Morningstar: "Weak Printing Results Overshadow PC Strength" and "the performance gap between personal systems and printing was alarming." The report also noted "[w]ith a *more pessimistic view on the timetable for which printing supplies could return to growth* and expected challenges in the PC market, we are lowering our fair value estimate to $19 per share from $22."

Barclays: "Supplies Overhang Persists" and "printing disappointed due to continued excess supplies inventories in the channel and macro weakness in EMEA," and "printing seems unlikely to recover in the near-term." The report cut its price target for HP stock and concluded that "[w]e remain on the sideline given the supplies headwind."

Deutsche Bank: "HP reported an EPS beat driven by higher PC revs/profits, *but Supplies was guided to decline* -4% to -5% in FY19 down from low-single digits prior (implied -1% to +3% q/q in FY4Q19E) and was guided to decline y/y in FY20E, *which is likely to pressure the stock tomorrow*. With the main area of PC OM% strength (memory) likely to be cyclical in nature, coupled with the apparent secular nature of Supplies decline (Supplies has declined y/y 9 out of the last 15 quarters in CC), *it remains difficult to see signs of bullishness in Supplies* that can create an upward operating profit/EPS inflection for HPQ."

### C.   October 3, 2019: HP Abandons the Four Box Model and Admits its Supplies Business is Fundamentally Unsound

362.   On October 3, 2019, HP held a Securities Analyst Meeting and admitted that it was effectively abandoning its flawed Four Box Model and moving away from the "supplies-centric" business model that it previously touted to investors throughout Class Period. Specifically, HP revealed that it was "departing from the purely transactional supplies-centric business model" and transitioning to a profit-driven business model in which "customers will be able to choose between paying a higher price for hardware and having a more flexible supplies model or buying a subsidized hardware unit that will only work with HP original supplies." The Company also revealed that the "business model shift" would de-emphasize dependence on the Four Box model as HP focuses on "the key metrics . . . [of] service growth and operating profit dollars, which better reflect[] the system profitability" and thus "*we think Supplies is going to be down beyond*

*FY '20*." HP's incoming CEO, Lores, acknowledged that this substantial switch in strategy "may hurt . . . [HP] on revenue" as the Company pursues a new business model that management believes "is much better from a profitability perspective in the medium and long term." The Company also noted that it was "navigating market headwinds, particularly in supplies in EMEA." In connection with the business model shift, HP also announced that it expected to cut between 7,000 and 9,000 jobs, roughly 15% of its workforce, over the next three years.

363.  During the question-and-answer session of the Securities Analyst Meeting, analysts expressed surprise regarding the business model shift away from Supplies and noted the "conspicuous[]" absence of any discussion of, or reliance on, the Four Box Model that Defendants had repeatedly touted to investors during the Class Period. For instance, Bank of America Merrill Lynch analyst and Director of Research Division, Wamsi Mohan noted:

> **[The] last several years, you guys have been talking about the 4-box model in Printing, and this was conspicuously absent in this analyst presentation**. Do you think that, that framework is not the right framework anymore? Or if it is the right framework, is it just the uncertainty of the inputs? And once you get better clarity or visibility, that is something that you will bring back? Or is that something that's sort of not valid anymore? And secondarily, aren't you just pushing the Supplies problem of third parties out just 2 years because if you sell a printer upfront with higher hardware revenue but supply is enough to satisfy the first 2 years, wouldn't third-party problems still exist in your installed base beyond those 2 years?

364.  In response, Lores admitted that "we didn't cover the 4-box model today because, as we have said several times, *we don't think that going forward, supplies is the best metric to measure to understand the health of our business*." Thus, Lores explained that HP "decided to share less information" regarding the Four Box Model.

365.  On this news, the price of HP stock fell $1.76 per share, or approximately 10%, from a close of $18.40 per share on October 3, 2019, to close at $16.64 per share on October 4, 2019. This decline wiped out over $2.6 billion in shareholder value.

366. Following HP's disclosures, analysts noted the direct connection between HP's business model shift away from Supplies and the abandonment of the Four Box Model.  For example, Wells Fargo issued a report titled "HPQ: *RIP 4-Box Model* – HP Moves to Systems Based Printing Strategy." The

report emphasized the "[a]bandon[ment]" of the 4-box model and HP's "capitulation" on its Supplies model as "key takeaways" that would negatively impact investor sentiment:

> [K]ey takeaways include: 1) ***4-Box Print Model Abandoned***: HP announced that it was moving away from its 4-Box printing model and transitioning to a systems-based strategy that will ***de-emphasize printing supplies***. The new model will give customers the choice between discounted hardware that can only use HP supplies or higher-priced hardware with the option to choose third-party ink suppliers. While we think that this move was largely unavoidable, ***we think that investors will view HP's capitulation as net-negative***. We think that there is growing execution risk associated with HP's realignment of its printing business and simultaneous cost-cutting efforts.

The report also noted that "[m]anagement expects supplies revenue to decline in F2020 with operating margins at ~16%."

367.   Numerous additional analysts confirmed their understanding that HP's business model shift and abandonment of its Four Box Model reflected the reality that HP's Supplies had never stabilized as previously represented. For example, Argus issued a next day report stating: "[w]e are lowering our intermediate-term rating on HP Inc. to HOLD from BUY, as the company's most profitable business of print & imaging continues to struggle." The report noted "***[i]nvestors are concerned that HP's 'crown jewel' business will be unable to staunch secular decline*** in margins over the long term" and that HP's "***actions were insufficient to reassure investors, and HPQ sold off by 10% on the restructuring news***."

368.   Likewise, Wolfe Research issued a report stating "***the stock traded down 6% in the aftermarket on a printing strategy shift***. Upending of traditional hardware subsidized model (new customers will now have to pay for flexibility), coupled with an announced cost savings plan, equated to ***near-term capitulation*** on efforts to stem existing installed base supplies headwinds. Despite the longer-term efforts laid out yesterday to steer purchase behavior, we have lingering secular concerns about printed pages."

369.   Morgan Stanley echoed these comments and noted that the change in business model would negatively impact HP's Supply business in both the short and long term: "Where the strategy most noticeably changes is in core Printing and Imaging, where HP is pivoting the business model to capture more up front profit at the point of hardware sale, and rely less on supplies to drive system-wide operating profit dollars. ***This business model shift will take time and pressure near to medium-term profits***." The report further stated that "many of the announced changes will take multiple quarters - and some years - to

implement, and come with considerable risks" and that "HP plans to roll this model out to new customers over the next several years (starting with emerging markets) to their >150M unit installed base, *which suggests printing supplies revenue will decline not just in FY20, but over a multi-year period*, which we now reflect in our model. We also see risk that competitors don't follow suit, *which would result in accelerated hardware and supplies share losses*."

370. Similarly, Evercore ISI issued a report noting investor concerns regarding the change in Supplies business model:

> The stock has sold off by more than 10% since the event (vs. the S&P 500's <1% decline) *which we believe is attributable to the change in HPQ's Printing business model* (pricing hardware units to sell for a profit in markets with limited supplies attach), magnitude of restructuring announcement (7-9k employees or 13-16% of HPQ's total workforce), and disappointing FY20 FCF guide (company guided to "at least $3B" of FCF for FY20, which is down from "at least $3.7B" in FY19) which is due to incremental restructuring (~$400M) and other items (~$300M, cash tax headwind and other 1x items). While we think the shift in print strategy makes sense, *we think the concern among investors is around 1) what type of impact a business model change will have for HPQ's print market share, and 2) at a macro level, what does this mean for the broader print market outlook?* . . .Net/net: The change in print strategy could introduce an element of execution risk particularly if conditions in the print market or global macro deteriorate.
>
> *       *       *
>
> At a segment level, HPQ sees a 3-5% operating margin for its Personal Systems business (consistent with historical target range) and a ~16% EBIT margin for Printing. HPQ indicated that Supplies revenue will decline on a y/y basis in FY20.

371. In addition to market analysts, numerous high-profile media outlets reported on the negative news surrounding HP's Supplies business. For example, on October 4, 2019, the *Los Angeles Times* reported that "[t]he company's printing business, a major source of profit, has seen falling sales and recently was dubbed a '*melting ice cube*' by analysts at Sanford C. Bernstein."

372. Similarly, on October 4, 2019, *The Wall Street Journal* published an expose on the Company, highlighting the negative disclosures regarding Supplies:

> The other part of the plan is targeted at *HP's struggling printing business*. That segment has long depended on the 'razorblade' model, meaning printers were sold at a loss and the profit came from ink and toner supplies. But the rise of alternative supplies such as remanufactured, third-party ink cartridges makes this more challenging. So HP plans to start offering customers a choice between subsidized printers that would only work with the company's own supplies or pricier hardware that would accept supplies from other sources. *That will take years*, given the huge installed base of HP printers out in the world. *It is also no sure thing*, though the company points out it is already trying this approach in China,

where it has worked well. ***But the other problem is that the company's new stated goal to maximize operating profit in printing amounts to a tacit admission that the supplies business is no longer growing***. Historically, HP's stock hasn't worked when its high-margin supply business is under pressure. ***The shares already had lost 9% this year following a string of disappointing results for this segment, and Friday brought another 10% decline***.

Granted, HP needed to do something. Since the company split off its enterprise tech side in 2015, ***HP has depended on the printing segment for 80% or more of the company's total profit***. But people and businesses are simply printing less these days, which has led to HP's supply revenue shrinking by an average of 3% annually over the past decade. Charging customers more for printers won't get them to print more.

## VIII.   PRESUMPTION OF RELIANCE

373.   At all relevant times, the market for HP's common stock was efficient for the following reasons, among others:

1.   HP's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

2.   As a regulated issuer, HP filed periodic reports with the SEC and the NYSE;

3.   HP regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

4.   HP was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

374.   As a result of the foregoing, the market for HP's common stock reasonably promptly digested current information regarding HP from all publicly available sources and reflected such information in the price of HP's common stock.  All purchasers and acquirers of HP common stock during the Class Period suffered similar injury through their purchase or acquisition of HP common stock at artificially inflated prices, and a presumption of reliance applies.

375.   A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972),

because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

376. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements pleaded in this complaint. None of the statements complained of herein was a forward-looking statement. Rather, they were either: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; or (ii) or omitted to state material current or historical facts necessary to make the statements not misleading.

377. To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by HP were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

378. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, Defendants did not actually believe the statements, had no reasonable basis for the statements, or were aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## X.    CLASS ACTION ALLEGATIONS

379. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of HP between February 23, 2017, and October 3, 2019, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of HP at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

380. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, HP shares were actively traded on the NYSE. Over the course of the Class Period, HP had between 1.69 billion shares (as of January 31, 2017) and 1.48 billion shares (as of July 31, 2019) of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members of the proposed Class. Class members who purchased or otherwise acquired HP common stock may be identified from records maintained by HP or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

381. Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

382. Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

383. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.    whether the Defendants made statements to the investing public during the Class Period that were false, misleading, or omitted material facts;

c.    whether Defendants acted with scienter; and

d.    the proper way to measure damages.

384. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

XI.    **CONTEMPORANEOUS TRADING**

385.  During the Class Period, Lead Plaintiffs relied on the integrity of the market for HP common stock, which was presumed to be determined by ordinary supply and demand and free from manipulation, distortion, and insider trading on the basis of material, nonpublic information.

386. Defendants Weisler and Lores (the "Insider Trading Defendants") sold stock while in possession of material, nonpublic information as alleged herein, including concerning, *inter alia*, the flaws of HP's Four Box Model, the relevant truth concerning Defendants' misrepresentations regarding HP's Supplies market share, demand, and inventory, and the instability of HP's Supplies business and revenue stream. Defendants Weisler's and Lores' Class Period trades are set forth in Section VI.E., *supra*.

387.  As set forth in their sworn certifications previously filed in this action and attached herewith, Lead Plaintiffs purchased HP common stock during the Class Period on the dates and for the prices indicated, and thus traded contemporaneously with the Insider Trading Defendants. For example, Iron Workers purchased: (i) 9,245 shares of HP common stock on March 9, 2018, contemporaneously with Defendant Lores' sale of 302,895 shares of HP common stock on that same day, March 9, 2018; and (ii) 12,935 shares of HP common stock on November 15, 2017, contemporaneously with Defendant Weisler's sale of 80,102 shares of HP common stock on November 6, 2017. Additionally, Rhode Island purchased 40,900 shares of HP common stock on December 20, 2017, contemporaneously with: (i) Defendant Weisler's sales of 73,715 and 18,111 shares of HP common stock on December 9, 2017, and December 10, 2017, respectively, and (ii) Defendant Lores' sales of 21,502 and 4,102 shares of HP common stock on December 9, 2017, and December 10, 2017, respectively.

XII.    **CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT**

**COUNT I**

**For Violations of Section 10(b) of the Exchange Act
and SEC Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

388.  Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

389.  This count is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiffs and all other members of the Class, against all Defendants.

390.  During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause economic harm to Lead Plaintiffs and other members of the Class.

391.  Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

392.  Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

393.  During the Class Period, Defendants made the false and misleading statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

394.  Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to conceal HP's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

395.  Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased or acquired HP common stock and were harmed when the truth about HP negatively impacted the price of those securities.  Lead Plaintiffs and the Class would not have purchased or acquired

HP common stock at the prices they paid or at which they acquired them, or at all, had they been aware of the truth about HP.

396.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered harm in connection with their respective purchases or acquisitions of the Company's common stock during the Class Period.

397.  By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

### COUNT II

**For Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

398.  Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

399.  This Count is asserted pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiffs and all other members of the Class, against the Individual Defendants.

400.  As alleged above, the Company and the Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by making materially false and misleading statements and/or omissions of material fact in connection with the purchase or sale of HP's common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter, and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's and/or the other Individual Defendants' statements alleged herein to have been materially false and misleading when made and/or omitted material facts necessary to make the statements not misleading in light of the circumstances under which they were made, and the fraudulent nature of the Company's and the Individual Defendants' scheme during the Class Period.

401.  As set forth above, the Individual Defendants were controlling persons of the Company and one another during the Class Period due to, among other things, their senior positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the

same. As such, the Individual Defendants had regular access to nonpublic information about HP's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings or meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

402.  By virtue of the foregoing, each of the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company and the other Individual Defendants, including the content of their public statements with respect to HP's operations.

403.  The Individual Defendants were culpable participants in the Company's and the Individual Defendants' fraud alleged herein, by acting knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired the Company's common stock during the Class Period.

404.  By reason of the foregoing, each Individual Defendants is liable to Lead Plaintiffs and the members of the Class as controlling persons of the Company and the other Individual Defendants in violation of Section 20(a) of the Exchange Act.

## <u>COUNT III</u>

**For Violations of Section 10(b) and 20A of the Exchange Act
and SEC Rule 10b-5 Promulgated Thereunder for Insider Trading
(Against the Insider Trading Defendants)**

405.  Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

406.  This Count is asserted pursuant to Sections 10(b) (15 U.S.C. § 78j(b)) and 20A (15 U.S.C. § 78t-1(a)) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiffs and all other members of the Class who purchased shares of HP common stock contemporaneously with the sale of HP common stock by the Insider Trading Defendants while they were in possession of material, non-public information as alleged herein, including concerning, *inter alia*, the flaws of HP's Four Box Model, the truth concerning Defendants' misrepresentations regarding HP's

Supplies market share, demand, and inventory, and the instability of HP's Supplies business and revenue stream.

407.  Section 20A(a) of the Exchange Act provides that "[a]ny person who violates any provision of . . . [the Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . securities of the same class."

408.  As set forth herein, the Insider Trading Defendants violated Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder for the reasons stated in Counts I and II above. Additionally, the Insider Trading Defendants further violated Exchange Act Section 10(b), SEC Rule 10b-5, and SEC Rule 10b5-1 (17 C.F.R. § 240.10b5-1) by selling shares of HP common stock while aware, in possession, and on the basis of material, nonpublic adverse information including concerning, *inter alia*, the flaws of HP's Four Box Model, the truth concerning Defendants' misrepresentations concerning HP's Supplies market share, demand, and inventory, and the instability of HP's Supplies business and revenue stream. The Insider Trading Defendants were required to abstain from trading or disclose this material nonpublic adverse information, but failed to do so, as more fully alleged herein.

409.  Contemporaneously with the Insider Trading Defendants' insider sales of HP common stock, Lead Plaintiffs and other Class members purchased shares of HP common stock on a national securities exchange.

410.  Lead Plaintiffs and other members of the Class have been damaged as a result of the violations of the Exchange Act alleged herein.

411.  By reason of the violations of the Exchange Act alleged herein, the Insider Trading Defendants are liable to Lead Plaintiffs and other members of the Class who purchased shares of HP common stock contemporaneously with the Insider Trading Defendants' sales of HP common stock during the Class Period.

412.  Lead Plaintiffs and the other members of the Class who purchased contemporaneously with the Insider Trading Defendants' insider sales of HP common stock seek damages and/or other applicable remedies, including disgorgement by the Insider Trading Defendants of profits gained or losses avoided

from the Insider Trading Defendants' transactions in HP common stock that were contemporaneous with Lead Plaintiffs' and other Class members' purchases of HP common stock.

413.  This action was brought within five years of the date of the last transaction that is the subject of the Insider Trading Defendants' violation of Section 20A, and, with respect to the underlying violations of Section 10(b) of the Exchange Act alleged in this Count and in Count I above, was brought within five years after the date of the last transaction that violated Section 20A of the Exchange Act by the Insider Trading Defendants.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

A.   Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.   Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

C.   Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.   Such other and further relief as the Court may deem just and proper.

## XIV.   JURY DEMAND

Lead Plaintiffs demand a trial by jury.

Dated:  July 20, 2020                          Respectfully submitted,

**KESSLER TOPAZ MELTZER & CHECK, LLP**

*/s/ Jennifer L. Joost*
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
ELI R. GREENSTEIN (Bar No. 217945)
(egreenstein@ktmc.com)
STACEY M. KAPLAN (Bar No. 241989)
(skaplan@ktmc.com)
PENG SHAO (Bar No. 319624)
(pshao@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:    (415) 400-3000
Fax:    (415) 400-3001

-and-

GREGORY M. CASTALDO*
(gcastaldo@ktmc.com)
EVAN R. HOEY*
(ehoey@ktmc.com)
RAPHAEL JANOVE*
(rjanove@ktmc.com)
280 King of Prussia Road
Radnor, PA 19087
Tel:    (610) 667-7706
Fax:    (610) 667-7056

*Counsel for Lead Plaintiff the State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island and Co-Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**

JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:    (310) 819-3470

-and-

HANNAH ROSS*
(hannah@blbglaw.com)
JEREMY P. ROBINSON*
(jeremy@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:    (212) 554-1400
Fax:    (212) 554-1444

*Counsel for Lead Plaintiff Iron Workers Local 580 Joint Funds and Co-Lead Counsel for the Class*

*\*pro hac vice motion forthcoming*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS