**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:  (310) 819-3470

*Counsel for Lead Plaintiff Iron Workers Local 580*
*Joint Funds and Co-Lead Counsel for the Class*

**KESSLER TOPAZ MELTZER & CHECK, LLP**
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
STACEY M. KAPLAN (Bar No. 241989)
(skaplan@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA  94104
Tel:  (415) 400-3000
Fax:  (415) 400-3001

*Counsel for Lead Plaintiff the State of Rhode*
*Island, Office of the General Treasurer, on behalf of*
*the Employees' Retirement System of Rhode Island*
*and Co-Lead Counsel for the Class*

[Additional counsel appear on signature page.]

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE HP INC. SECURITIES LITIGATION | Case No. 3:20-cv-01260-SI |
| | **LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT** |
| | Date: February 5, 2021<br>Time: 10:00 A.M.<br>Location: Courtroom 1, 17th Floor<br>Judge: Hon. Susan Illston<br>Date Action filed: February 19, 2020 |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................. iii

I.      INTRODUCTION ................................................................................................................ 1

II.     STATEMENT OF FACTS .................................................................................................. 5

        A.    HP's Supplies Business Was Key To Its Success....................................................... 5

        B.    Heading Into the Class Period, HP's Supplies Business Was In
              Decline ...................................................................................................................... 6

        C.    Defendants Doubled Down on HP's Razor/Blade Business Model ....................... 7

        D.    Defendants' Class Period Misrepresentations And Omissions................................ 8

        E.    Defendants Knowingly Or Recklessly Misrepresented The Truth
              To Investors ............................................................................................................ 9

        F.    The Relevant Truth Is Revealed: Defendants Admit The Four Box
              Model Is Deeply Flawed, Market Share Is Down And Inventory Is
              Overstated ............................................................................................................ 10

III.    ARGUMENT ...................................................................................................................... 12

        A.    The Complaint Alleges Actionable Misstatements And Omissions..................... 12

              1.    Defendants Misrepresented Present Fact In Touting The
                    Four Box Model's Access To And Use Of Telemetry Or
                    "Big Data" (Category #1) .............................................................................. 14

              2.    Defendants Misrepresented Present Fact In Stating That
                    HP's Market Share Had Increased (Category #2).................................... 17

              3.    Defendants Misrepresented Present Fact In Stating That
                    Inventory Was Aligned With "True Demand" (Category
                    #3) ................................................................................................................ 19

              4.    Defendants Misrepresented Present Or Historical Fact In
                    Stating That HP's Supplies Business Was On Track To
                    Stabilize And Had Stabilized (Category #4)............................................ 20

              5.    None Of Defendants' Misrepresentations Are Immunized
                    By The Safe Harbor, Including Misstatements Concerning
                    The Stabilization And Growth Of HP's Supplies Business
                    And Revenue (Category #5) ...................................................................... 21

              6.    Defendants' Statements Regarding The Reliability Of The
                    Four Box Model Are Actionable (Category #6)....................................... 25

        B.    THE COMPLAINT PLEADS A STRONG INFERENCE OF
              SCIENTER ............................................................................................................ 26

              1.    Defendants' Statements And Conduct Confirm Scienter ......................... 27

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

2.     The Former HP Employee's Account Confirms Scienter..........................30

3.     The Fact That The Supplies Business Was HP's "Core Business" Contributes To A Strong Inference of Defendants' Scienter .......................................................33

4.     The Complaint Pleads Deliberate Recklessness .......................................34

5.     Defendants' Stock Sales Support Scienter..................................................36

6.     The Temporal Proximity Between The False Statements and the Revelation of the Truth Bolsters the Totality of Scienter Allegations .......................................................37

7.     Defendant Weisler's Departure Supports the Inference of Scienter .......................................................................38

C.     Plaintiffs Adequately Plead Claims Under Sections 20A and 20(a).....................38

IV.     CONCLUSION...........................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Adaptive Broadband Sec. Litig.*,
2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ...............................................................................38

*In re Amylin Pharm., Inc. Sec. Litig.*,
2003 WL 21500525 (S.D. Cal. May 1, 2003)............................................................................24

*Applestein v. Medivation, Inc.*,
2011 WL 3651149 (N.D. Cal. Aug. 18, 2011) ........................................................................37

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................................................12

*Berson v. Applied Signal Tech. Inc.*,
527 F.3d 982 (9th Cir. 2008) ..............................................................................12, 19, 33, 38

*In re Boeing Sec. Litig.*,
40 F. Supp. 2d 1160 (W.D. Wash. 1998)......................................................................16, 17, 18

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019)......................................................................................37

*In re Celera Corp. Sec. Litig.*,
2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) ..........................................................................23

*In re Century Aluminum*,
749 F. Supp. 2d 964 (N.D. Cal. 2010) ....................................................................................29

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ...............................................................................................4, 26

*City of Westland Police and Fire Ret. Sys. v. Sonic Solutions*,
2009 WL 942182 (N.D. Cal. Apr. 6, 2009) .............................................................................39

*In re Connetics Corp. Sec. Litig.*,
2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) ........................................................................12

*In re Copper Mountain Sec. Litig.*,
311 F. Supp. 2d 857 (N.D. Cal. 2004) ...............................................................................21, 23

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...................................................................................38

*In re CV Therapeutics, Inc.*,
2004 WL 1753251 (N.D. Cal. Aug.5, 2004) ......................................................................16, 18

iii

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ........................................................................................ passim

*Desai v. Gen. Growth Properties, Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) .................................................................................17

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y 2010)..................................................................................32

*Gammel v. Hewlett-Packard Co.*,
2013 WL 1947525 (C.D. Cal. May 8, 2013) ......................................................................34

*Howard v. Everex Sys., Inc.*
228 F.3d 1057 (9th Cir. 2000) ...........................................................................................39

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005)............................................................................23, 24

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) ............................................................................13, 29

*Johnson v. Knapp*,
2009 WL 764521 (C.D. Cal. Mar. 16, 2009).....................................................................34

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ............................................................................................13

*Kipling v. Flex Ltd.*,
2020 WL 2793463 (N.D. Cal. May 29, 2020) ....................................................................18

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ...........................................................................................32

*Mallen v. Alphatec Holdings, Inc.*,
861 F. Supp. 2d 1111 (S.D. Cal. 2012)..............................................................................23

*McCasland v. FormFactor Inc.*,
2008 WL 2951275 (N.D. Cal. July 25, 2008).....................................................................13

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) ..................................................................................12, 15, 20

*Mulligan v. Impax Labs, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ............................................................................21, 33

*Murphy v. Precision Castparts Corporation*, 2017 WL 3084274 (D. Or. June 27,
2017), *report and rec'n adopted*,
2017 WL 3610523 (D. Or. Aug. 22, 2017)..........................................................................32

iv

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) ...................................................................................................35

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ........................................................................................... passim

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 F. App'x 480 (9th Cir. 2019) ...........................................................................................32

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) .............................................................................................37

*Pirani v. Slack Tech. Inc.*,
   445 F. Supp. 3d 367 (N.D. Cal. April 21, 2020).....................................................................13

*In re PMI Grp., Inc. Sec. Litig.*,
   2009 WL 3681669 (N.D. Cal. Nov. 2, 2009) ..........................................................................28

*Police Ret. Sys. Of St. Louis v. Intuitive Surgical Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ..........................................................................................17, 29

*In re Portal Software, Inc. Sec. Litig.*,
   2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) ........................................................................23

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ................................................................................................25

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ........................................................................................... passim

*Rabkin v. Lion Biotechnologies, Inc.*,
   2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ..........................................................................33

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ......................................................................................5, 30, 36

*Robb v. Fitbit, Inc.*,
   2017 WL 219673 (N.D. Cal. Jan. 19, 2017) .....................................................................32, 33

*Roberti v. OSI Sys., Inc.*,
   2015 WL 1985562 (C.D. Cal. Feb. 27, 2015).....................................................................23, 31

*Roberts v. Zuora, Inc.*,
   2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ............................................................19, 25, 26

*Rodriguez v. Gigamon Inc.*,
   325 F. Supp. 3d 1041 (N.D. Cal. 2018) ............................................................................17, 18

*S. Ferry LP #2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009).........................................................................28, 36

v

*Schueneman v. Arena Pharm., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ...............................................................................................12, 26

*SEB Inv. Mgmt. AB v. Symantec Corp. et al.*,
    335 F.R.D. 276 (N.D. Cal. 2020)................................................................................................38

*In re Secure Computing Corp. Sec. Litig.*,
    184 F. Supp. 2d 980 (N.D. Cal. 2001) ......................................................................................21

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010)......................................................................................................23

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) ..............................................................................13, 16

*In re STEC Inc. Sec. Litig.*,
    2011 WL 2669217 (C.D. Cal. June 17, 2011) ...........................................................................20

*Tellabs Inc. v. Makor Issues and Rights Ltd.*,
    551 U.S. 308 (2007)........................................................................................................... passim

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) .................................................................................31, 38

*In re VeriFone Holdings, Inc., Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ....................................................................................................26

*Welgus v. TriNet Grp., Inc.*,
    2017 WL 167708 (N.D. Cal. Jan. 17, 2017) .............................................................................16

*Wozniak v. Align Tech., Inc.*,
    2011 WL 2269418 (N.D. Cal. June 8, 2011).............................................................................36

*Xu v. Chinacache Int'l Holdings Ltd.*,
    2016 WL 4370030 (C.D. Cal. Aug. 15, 2016)...........................................................................14

*Yourish v. California Amplifier*,
    191 F.3d 983 (9th Cir. 1999) ...............................................................................................15, 38

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ....................................................................................................29

**STATUTES**

15 U.S.C. §78u-5(c)(1)(A)(i) ............................................................................................................23

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

**MEMORANDUM OF POINTS AND AUTHORITIES**

Lead Plaintiffs ("Plaintiffs") hereby oppose Defendants' motion to dismiss ("Motion").

**STATEMENT OF ISSUES TO BE DECIDED**

Whether Plaintiffs' Complaint sets forth facts that, considered holistically, adequately plead claims under Section 10(b) of the Securities Exchange Act (the "Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, and Sections 20(a) and 20A of the Exchange Act, 15 U.S.C. §§78t(a) and 78t-1, including based on Defendants' own admissions of knowing or reckless misconduct harming investors.

## I.    INTRODUCTION

This securities class action concerns Defendants' misleading statements and omissions regarding the stabilization of HP's printing supplies business and the data inputs and reliability of its "Four Box" revenue model. After misleading investors for over two years during the Class Period, the relevant truth was revealed through a series of corrective disclosures in which Defendants admitted that they never had the data to accurately assess HP's supplies business and then abandoned both the Four Box Model and HP's entire business model. In response, HP's stock price declined precipitously and caused investors to suffer enormous damages.

HP sells printers and printing supplies, including ink and toner. Through a "razor/razor blade" business model, HP sold its printers at a loss and made profits on sales of high-margin ink and toner printing supplies ("Supplies"). Leading up to the Class Period, competitors had been eating into the Company's Supplies market share—offering cartridges for HP's printers at a fraction of the cost. As a result, HP's critical Supplies revenue had declined for five straight years. Thus, the key question for investors was whether HP could prevent further market share erosion and thereby turn around and stabilize its Supplies business.

To assure investors of the health of the Supplies business during the Class Period, Defendants pointed to their Four Box revenue model's access to real time "telemetry" or "big" data, *i.e.*, real-time feeds of remote data sent automatically by HP's printers (*i.e.*, its "installed base"). According to Defendants, their access to telemetry data allowed them to accurately measure at a "very granular level" the four "boxes" in the Model: (1) the size of HP's installed

base, (2) printing usage, (3) HP's Supplies market share, and (4) price. Armed with the imprimatur of the Four Box Model, Defendants told investors during the Class Period that HP's Supplies market share had increased, inventory was in line with "true demand," and the business was stabilizing and, later, had stabilized and was growing.

None of this was true. As Defendants eventually admitted, HP never had sufficient real-time data, and as a result "did not have the capabilities to calculate [market] share" for its Supplies business. Instead, unbeknownst to investors, Defendants based their assurances about HP's Supplies business on "lagging and incomplete" third party surveys for HP's office-based printers that did not "chang[e] over time" to reflect true market conditions. Defendants knew very well the true state of the Four Box Model's data inputs. After all, the Model was key to HP's Supplies turn-around, and Defendants repeatedly boasted about how they closely scrutinized it, worked to refine it, and used its "big data" to make strategic decisions. But internally at HP, as confirmed by a former HP employee, Defendants knew that the Four Box Model was unreliable because the market share and usage boxes were imputed and not based on actual real-time data. At the end of the Class Period, Defendants also admitted that HP's Supplies market share was down (not up) and its inventory was overstated by $100 million. HP's CEO stepped down and Defendants abandoned both the Four Box Model and HP's entire Supplies business model. These disclosures shocked the market, precipitating dramatic declines in HP's stock price that caused HP's investors to suffer enormous losses.

In the Motion, Defendants do not contest that the information they allegedly misrepresented was material, or that its disclosure caused the Class to suffer damages. Defendants argue that none of their statements were misleading and, even if they did mislead investors, they are immunized by the PSLRA's safe harbor or lacked scienter. Defendants' arguments fail.

**Falsity.** Plaintiffs allege that Defendants made false and misleading statements and omissions regarding: (1) the Four Box Model's access to telemetry or "big data;" (2) increased market share; (3) inventory matching "true" demand; (4) that HP's Supplies business and revenues had been stabilized or were on track to stabilize; (5) throughout the Class Period, the stabilization and growth of HP's Supplies business; and (6) the reliability of the Four Box Model.

Categories #1 to #4 are misstatements of present or historical fact. Defendants try to spin these as forward-looking statements or assert that they were not misleading. Starting with the latter, Defendants' claim that their statements were not misleading cannot be reconciled with their own admissions. For example, Defendants said that they had access to real-time "big data" from millions of HP's printers that enabled them to accurately evaluate the Company's Supplies business—only to later admit that they never had "statistically relevant" data for office printers and thus could not accurately assess market share. Defendants told investors that Supplies market share had increased, then later admitted the opposite was true. They said that "big data" showed Supplies inventory to be aligned with true market demand, but later conceded that they never had the data to understand what "true demand" was, and as a result had $100 million of excess inventory in the channel. They assured the market that HP's Supplies business was stabilized, then later admitted that they had lacked sufficient data to analyze the issue and that Supplies revenue would continue to decrease. In short, Defendants' admissions alone establish that these representations were objectively false when made—or at least highly misleading by omission of critical facts that investors needed to understand Defendants' representations. *See infra* Section III.A.

Defendants also sweepingly claim that, even if they did mislead investors, nearly all of their statements—even false statements of present fact—are immunized by the PSLRA safe harbor. For example, Defendants argue that statements about *present* data capabilities and *present* market share increases are forward-looking because they were "assumptions" underlying HP's projections. Defendants are incorrect. The Ninth Circuit has squarely rejected this argument, explaining that "the safe harbor is not designed to . . . protect companies and their officials when they . . . make a materially false or misleading statement about current or past facts . . . and combine that statement with a forward-looking statement." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017).

Further, even Defendants' statements that are properly construed as forward-looking are not protected by the safe harbor. *First*, Plaintiffs allege that Defendants' statements were misleading because they omitted *present* facts regarding their access to telemetry data and ability

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

to understand market share. Thus, the safe harbor does not apply. *Second*, Defendants' cautionary language is a boilerplate recitation of risks that failed to adequately caution investors. The generic warnings that Defendants point to—*e.g.*, "all forward-looking statements involve risks, uncertainties and assumptions"—fall far short. *See Quality Sys.*, 865 F.3d at 1146-48 (rejecting similar warnings). Further, the Ninth Circuit has held that where, as here, Defendants combine their forward-looking statements with statements of present fact, "virtually no cautionary language short of an outright admission that the non-forward-looking statements were materially false and misleading would [be] adequate." *Id*. at 1148. *Third*, Plaintiffs have also adequately pled that Defendants' misstatements were made with actual knowledge.

Nor is there any merit to Defendants' argument that their statements regarding the reliability of the Four Box Model are inactionable opinions. Where such a statement is alleged to be misleading by omission, as the reliability misstatements are here, Plaintiffs need only allege that the statement lacked a reasonable basis. *See, e.g.*, *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017). The Complaint does exactly that, alleging that Defendants had no reasonable basis to assure the market that the Four Box Model was reliable when they did not have the data needed to undertake statistically relevant analyses or to calculate market share, and instead used stale and incomplete third party data.

**Scienter.** Defendants' scienter arguments fare no better. Defendants attempt to scrutinize each fact in isolation in the hope of discrediting each separately and thereby displace the overall strong inference of Defendants' scienter. But the Supreme Court has expressly rejected this approach at the pleading stage. *See Tellabs Inc. v. Makor Issues and Rights Ltd.*, 551 U.S. 308, 326 (2007) ("the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically"). Here, a holistic analysis of the facts alleged in the Complaint establishes an inference of scienter that is cogent and at least as compelling as any competing inference.

Indeed, Defendants were laser-focused on the Four Box Model—on which they had pinned the success of the Supplies business after years of troubling financial results. Defendants also told investors that they owned the Four Box Model and repeatedly touted its purported reliability, its access to a vast treasure trove of telemetry data, how they closely monitored the data and how they

4

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

used the Four Box Model to make strategic decisions. Given Defendants' admissions that they "use[d] [the model] extensively," "focus[ed] on [it] very carefully," were "constantly work[ing] to improve and refine" it, were "always updating [it]," and tested the Model "every single quarter," the most compelling inference is that Defendants were aware of the massive gaps in the Model's data. *See Quality Sys.*, 865 F.3d at 1145-46 (scienter established where "executives themselves told investors they had real-time access to, and knowledge of, sales information" and "[defendant] stated that it 'continually updated' its revenue estimates using . . . software"). This inference is bolstered by a former HP employee 1 ("FE-1"), who provided details highlighting Defendants' knowledge of the data limitations of the Four Box Model, including that HP lacked the end-user data needed to calculate market share.

Thus, any inference that Defendants were not aware of the actual data HP used is implausible and "directly contradicted by the fact that [Defendants] specifically addressed [the data] in [their] statements." *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (defendant "bridge[d] the [scienter] gap . . . by referencing the data directly"). At a minimum, it was the height of recklessness for Defendants to consistently tout the real-time data in their Model if they truly had no idea what data they were using. Plus, the Complaint alleges additional facts, including the critical importance of HP's Supplies business, suspicious stock sales, and the sudden departure of HP's CEO that strengthen the already cogent and compelling inference of scienter. In sum, when Plaintiffs' scienter allegations are considered holistically, as they must be, the Complaint pleads a strong inference of scienter. *Tellabs*, 551 U.S. at 326.

Accordingly, Plaintiffs respectfully submit that the Motion should be denied.

## II. STATEMENT OF FACTS

### A. HP's Supplies Business Was Key To Its Success

HP sells computers, printers, and Supplies for those printers (*i.e.*, ink and toner cartridges). ¶¶45-46.[1] During the Class Period, HP utilized a "razor/razor blade" business model in which it sold printers at a loss, then sought to recoup those losses by selling high-margin ink and toner

---

[1] "¶__" refers to paragraphs in the Complaint. Further, unless otherwise stated, all capitalized terms herein have the meaning assigned to them in Plaintiffs' Complaint (Dkt. No. 35), all emphasis is added, and all internal citations and punctuation are omitted.

5

supplies. As Defendant Lores described, "We lose money on printers. We make money on supplies." ¶47. HP's Supplies business thus generated most, if not all, of the Company's profits. Indeed, analysts estimated Supplies sales accounted for up to 110% of HP's total profits (reflecting the fact that hardware sales generated a loss). ¶¶49, 314. As a result, Supplies were the key driver of HP's success, and ultimately its stock price. ¶¶50-52. (HP's business was "all about supplies)."

### B.    Heading Into the Class Period, HP's Supplies Business Was In Decline

HP's razor/razorblade business model only worked if its customers bought Supplies from HP rather than third parties; otherwise, HP never recouped its losses. ¶56. Leading up to the Class Period, however, HP was losing market share to competitors, who often sold their Supplies for HP printers at a fraction of the cost—as low as 18 cents on the dollar compared to HP. ¶¶57-58. As a result, HP's Supplies revenues had declined for five straight years. ¶53.

By the fall of 2015, HP's Supplies business was in such dire straits that the Company resorted to a series of desperate tactics. *First*, as was only recently revealed on September 30, 2020, when HP settled an enforcement proceeding with the Securities and Exchange Commission ("SEC"), HP officials engaged in a fraudulent scheme from November 2015 to June 2016 to artificially inflate Supplies revenue, including using "a variety of incentives to accelerate, or 'pull-in,' sales that were otherwise expected to materialize in later quarters." *See* Declaration of Jeremy P. Robinson, Ex. 1 at 2 (the "SEC Order"). The scheme caused inventory in HP's channel to swell as HP pushed more inventory into the channel than actual demand warranted. *Id*. at 5. Critically, the SEC Order charged that HP did not have sufficient data regarding its Supplies inventory: "HP did not receive channel inventory data from all of its Tier 2 channel partners, and thus only estimated its Tier 2 channel inventory following the end of quarters ***using incomplete data***" which "***left it without meaningful insight into its overall channel health***." *Id*. at 5, 10. Ultimately, on June 21, 2016, HP announced that it would reduce Supplies inventory in its channel by $450 million, thus creating a massive headwind to HP's 2016 Supplies revenue, but disclosed nothing about the fraudulent scheme or incomplete data. ¶80.

*Second*, a few months later, in an attempt to stem Supplies market share losses, HP placed an update in its printers that prevented them from working with competitors' cartridges. ¶59.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

Following massive backlash from customers and consumer groups, HP had to quickly walk back the change and ultimately pay fines. *Id.*

As a result of these issues, the central question dogging HP before the Class Period was whether it could stabilize its Supplies business by avoiding further inventory problems and market share losses. Indeed, multiple analysts reported that the "[k]ey to the stock appreciation will be stabilization of after market printer supply share." ¶¶58, 60. Likewise, analysts noted that "[s]tabilizing the supplies business and driving further growth in this segment" was HP's "most important strategic priority," "investors are focused on printing supplies stability," and "turnaround in supplies will be key to the stock's performance." ¶¶60, 68.

### C.    Defendants Doubled Down on HP's Razor/Blade Business Model

Rather than admitting that HP's "razor/razor blade" business model was unsustainable, Defendants doubled down on it, claiming they would only place inventory into the sales channel when actual demand warranted it and shifting from a "push" approach to a purportedly more accurate, demand-driven "pull" approach to the distribution of Supplies. ¶81.

In the face of market skepticism, Defendants assured investors that, this time, HP would use "big data" to turn around the Supplies business with a key focus on market share. ¶¶78-79, 312-13. For example, asked by an analyst "how do you see the risk of losing [market] share," Defendant Lores responded, "the fact that we have now big data and that with big data we can track the return on investment of our activities make us very confident in our ability to differentiate actions that will drive good results versus actions that will not drive any payoff." ¶86.

To this end, Defendants touted an analytical framework titled the "Four Box Model" (or herein "Model") and boasted that it could accurately predict HP's Supplies revenue. ¶¶86, 89, 92-94, 107, 113, 118-21, 126. According to HP, the Model analyzed the "four key levers that [would] drive supplies revenue growth." ¶69. The first box analyzed the "installed base," *i.e.*, the number of printers in use. The second box analyzed the "usage," or the amount the installed base was printing. The third box analyzed Supplies market share, *i.e.*, the percentage of Supplies that HP was capturing compared to competitors. And, the fourth box analyzed the price of HP Supplies. *Id.*

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

Defendants claimed that the Four Box Model could accurately project Supplies revenue because the inputs to the four boxes were based on real-time "big data" that HP was receiving from printers in its installed base. ¶¶89-94. This data, referred to as "telemetry data," is collected when an HP printer automatically sends HP data about how that printer is being used. ¶71. Defendants referred to this live feed of data as their printers "phoning home," and portrayed this to be giving them accurate, real-time data regarding Supplies demand and market share. ¶¶71-72, 88.

With the purported analytical power of the Four Box Model at hand, Defendants told investors that they would stabilize Supplies revenue by improving the "usage" and "market share" boxes. ¶¶76-78. Thus, leading into the Class Period, both analysts and investors were focused on HP's Supplies market share growth. ¶¶77-79.

**D.    Defendants' Class Period Misrepresentations And Omissions**

By way of brief summary, throughout the Class Period, Defendants represented that the Four Box Model had access to telemetry or "big" data from millions of HP printers phoning home, which allowed them to accurately predict HP's Supplies revenue stream (¶¶71-72, 88), determine that HP's Supplies market share had increased (¶¶200, 204, 242), conclude that Supplies inventory was aligned with "true demand" (¶¶124, 171) and claim that the Company was stabilizing and later had stabilized its Supplies business and revenues (¶¶108-09, 111-12). For example, Defendants repeatedly told investors that their installed printers were "phoning home" and providing telemetry data to the Four Box Model. ¶¶71-72, 88-89. Defendants claimed that this telemetry data gave them insight into Supplies demand at a "very granular level," down to particular "geographies," "ZIP Code[s]," and printer "SKUs" (¶¶89-90), and that, as a result, the Four Box Model gave them a detailed understanding of the "competitive environment" of the Supplies market and was a reliable, predictive tool capable of projecting growth. (¶¶91-94).

Armed with the Four Box Model, Defendants told investors that HP had increased its Supplies market share. ¶¶100-03. Defendants also repeatedly assured investors that, based on the "big data" analytics of the Four Box Model, HP would stabilize Supplies revenue growth by the end of fiscal year 2017 (¶¶108-09, 111), HP had indeed stabilized Supplies revenue by the end of 3Q17 (¶112), and that moving forward into fiscal year 2019, Supplies revenue growth would be

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

"flat to slightly positive." ¶¶118-21. In achieving the purported stabilization of Supplies revenue, Defendants also said that the Four Box Model ensured that inventory levels matched true demand in the sales channel, averting the types of inventory issues that led to the sizable $450 million inventory headwind in fiscal 2016. ¶¶123-27.

Defendants' statements were materially false and misleading. In particular, Defendants failed to disclose that they "did not have" sufficient telemetry data from the Company's laser printer fleet and, as a result, it "ha[d] never been statistically relevant for . . . [HP] to rely on it." ¶96. Moreover, without statistically relevant telemetry data, Defendants were also blind to HP's market share for laser printer Supplies. Indeed, they later conceded that HP "did not have . . . the capabilities to calculate share for toner-based products in the installed base." ¶98. So instead, Defendants had been basing their assurances on "lagging and incomplete market share survey[]" data that "wasn't changing, over time" to reflect actual market conditions. ¶99. Thus, while reassuring investors that HP's Supplies market share had improved, inventories were aligned with true demand, and the Supplies business was stabilized, Defendants failed to disclose that they never had the real-time data necessary to accurately and reliably determine market share, true demand, or the state of HP's Supplies business. ¶¶104, 122, 128. As Defendants also later admitted, market share had actually decreased, and HP had flooded the channel with $100 million in excess inventory. ¶¶105, 129. In sum, HP's Supplies business had not "stabilized." Indeed, at the end of the Class Period, Defendants finally conceded that they could not stem the market share losses caused by third-party aftermarket suppliers, and as a result, HP's "razor blade" business model was not viable. ¶122.

**E.    Defendants Knowingly Or Recklessly Misrepresented The Truth To Investors**

Defendants knew that HP did not have the "big data" necessary to determine Supplies market share or demand, or at the very least were deliberately reckless in disregarding this reality. ¶107. Defendants repeatedly professed their ownership, control, and intimate familiarity with the Four Box Model and its data inputs during the Class Period. For example, Lores told investors that they "constantly worked to improve and refine" the Model. ¶297. Lores and Lesjak said that they monitored Supplies usage at a "granular level," even monitoring Supplies metrics at the level of

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

particular zip codes, with Lesjak touting the Company's ability to "zero in on a zip code" to see whether printers there "tend to buy . . . a lot of supplies or not." ¶¶89-90; 299. Weisler also claimed that he checked the accuracy of the Model at the close of every quarter, looking at each of its levers and checking actual results against forecasted results. ¶¶107, 298. Schell called it his "daily job" to work on the installed base and market share drivers in the Model. *Id*. Fieler stated that he "actually looked at the 4-box model."[2] ¶296. Defendants later admitted that they never had statistically significant telemetry data (¶134), could not determine market share (*id.*), and instead had been primarily relying on lagging third-party market share surveys (¶¶135, 137).

FE-1, an executive in HP's Asia Pacific and Japan region reporting to several senior executives at HP, supplied facts confirming that the Individual Defendants knew that the Four Box Model was deficient during the Class Period. ¶¶306-11. FE-1 corroborated Defendants' admissions, stating that the Four Box Model was "unreliable" because market share and usage data were imputed and not actual. ¶308. This former HP employee  also confirmed that Weisler "would have known of these challenges of the Four Box Model" because the data problems with the Model were "common knowledge" and "a given" within the Company. *Id.* FE-1 also explained that, after a forecast miss in the Europe, the Middle East, and Africa ("EMEA") region, Weisler held a series of "crisis meetings" where he was informed that the miss occurred because HP lacked insight into the sales channel and end user buying patterns. ¶311.

**F.    The Relevant Truth Is Revealed: Defendants Admit The Four Box Model Is Deeply Flawed, Market Share Is Down And Inventory Is Overstated**

Unbeknownst to investors, HP never had the "big data" necessary to reliably assess Supplies revenue, market share and demand. ¶¶96-99, 134-35. The relevant truth began to emerge when, contrary to their assurances that Supplies revenue had stabilized, on February 27, 2019, Defendants announced that Supplies revenue had declined by 3% for 1Q19, driven primarily by a miss in its EMEA region and, critically, would continue to decline by 3% for the rest of fiscal year

---

[2] With HP's stock price artificially inflated by their misleading statements, Lores and Weisler sold 83% and 89% respectively of their total HP holdings during the Class Period, netting $28.46 million and $86.87 million respectively. ¶¶328-31. These sales were dramatically out of line with their previous stock sales—more than eight times greater than Weisler's sales from the control period and seven times greater than Lores's sales during the control period.  ¶331.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

2019. ¶132. The same day, Defendants disclosed that the Company "did not have" sufficient telemetry data from its installed based "due to the limited number of machines that were phoning home in commercial due to enterprise firewall constraints and otherwise unconnected devices," meaning that the data "*ha[d] never been statistically relevant for . . . [HP] to rely on it*." ¶134.

Further, Defendants admitted that HP "did not have . . . the capabilities to calculate [market] share for toner-based products in the installed base" since, instead of receiving real-time telemetry data, they "*had relied primarily on lagging and incomplete market share surveys*." ¶¶134-35. Defendants also admitted that instead of having increased market share, as had been represented to investors, HP's market share had declined. ¶135. In addition, HP's inability to measure market share meant that it had badly overestimated the amount of inventory it needed in its sales channels. In contrast to earlier assurances that Supplies inventory levels matched true demand, Defendants disclosed the need to lower channel inventory levels by $100 million—an overstatement that created a significant headwind to revenues. ¶132. Defendants revealed that they had "continue[d] to fulfill orders likely over multiple quarters based on our original [market] share assumptions, which we now believe were overestimated. This resulted in additional HP supplies in the ecosystem." ¶138. As a result of these disclosures, HP's stock price plummeted 17% on high trading volume, erasing over $6.34 billion in shareholder value. ¶139.

Then on August 22, 2019, HP announced a disappointing 7% decline in 3Q19 Supplies revenue, a downward revision of its 2019 Supplies revenue guidance, and that it did not expect Supplies revenue growth in 2020. ¶143. Lores attributed the downward guidance revision to continued market share losses from third-party suppliers. *Id*. CEO Weisler's exit was announced that same day, with market commentators noting that it was "sudden." ¶144. As a result of these disclosures, HP' stock dropped nearly 6% on high trading volume, erasing approximately $1.66 billion in shareholder value. ¶146.

Finally, on October 3, 2019, HP announced that it was abandoning its "razor/razor blade" model altogether and would instead offer either higher priced printers capable of using third-party supplies or the option of a lower-priced model that could only use HP Supplies. ¶149. HP admitted that its business model shift was a direct result of Supplies market share losses. ¶150. Analysts

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

echoed the sentiment, writing that the change was a "direct response to increasing competition from supplies remanufacturers" who had "cut into HP's IPG operating profit." ¶151. Defendants also conceded that the Supplies revenue declines were permanent: "[W]e are not relying on Supplies revenues to grow beyond FY '20." ¶152.

When asked about the Four Box Model, Lores responded that "we didn't cover the 4-box model today because . . . we don't think that going forward, supplies is the best metric to measure to understand the health of our business." ¶153. Analysts viewed HP's sudden about face as a "capitulation" to "supplies headwinds." ¶154. As a result of these disclosures, HP's stock declined approximately 10% on high trading volume, erasing a further $2.6 billion in shareholder value. ¶156. Defendants' disclosures caused HP investors to suffer enormous damages. ¶¶1, 44.

## III.    ARGUMENT

To survive a motion to dismiss, Plaintiffs need only "state a claim to relief that is plausible on its face," *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), based on alleged facts that "raise a right to relief above the speculative level." *Id.* at 55. On such a motion, courts "accept all factual allegations as true" and construe them in the light most favorable to the plaintiff. *Tellabs*, 551 U.S. at 322-24. As this Court has noted, even if the chance of recovery seems remote, plaintiffs must be afforded the ability to "develop the case at this stage of the proceedings." *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, *2 (N.D. Cal. Aug. 14, 2008) (Illston J.).

### A.    The Complaint Alleges Actionable Misstatements And Omissions

A statement is misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Further, "statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Thus, if a company presents positive information, it must also "disclos[e] adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). Whether a statement is misleading cannot be resolved as a matter of law unless "the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ." *Khoja v. Orexigen*

*Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018); *see also Pirani v. Slack Tech. Inc.*, 445 F.Supp.3d 367, 385 (N.D. Cal. April 21, 2020) (Illston J.) (same; also noting "whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact''").

The Complaint adequately alleges falsity. As noted above, Plaintiffs allege that Defendants made six main categories of materially false and misleading statements, all of which had the effect of reassuring investors about the state of HP's Supplies business: **Category #1** includes statements concerning the Four Box Model's access to real-time "big data" (¶¶71-72, 88-91, 170, 206, 242, 247, 250, 299); **Category #2** includes statements about the increase in HP's Supplies market share (¶¶200, 204-05, 242); **Category #3** includes statements that Supplies inventory matched "true" demand (¶¶124-25, 171, 221, 234, 255, 284); **Category #4** includes statements that HP's Supplies business and revenues had been stabilized or were on track to stabilize (¶¶109, 193-94, 204, 230, 241, 247, 249, 270); **Category #5** includes statements, made throughout the Class Period, concerning the stabilization of HP's Supplies business and revenues (¶¶159-164, 171, 179, 183-84, 200, 204, 207-09, 221-23, 230, 236, 241, 248-249, 256, 262, 265, 273-76, 283, 285, 290-91); and **Category #6** includes statements touting the reliability of the Four Box Model (¶¶93 119-20, 134-35, 170, 221, 230, 241, 247, 256, 262, 265, 275).

For each alleged misleading statement, the Complaint pleads with particularity who made it, when and where it was made, and why it was materially false and misleading. Thus, Defendants' passing effort to label the Complaint a "puzzle pleading" should be rejected.[3] Defendants further argue that none of the alleged statements was materially false or misleading. As set forth below, Defendants' own admissions establish the opposite. As such, there can be no real dispute that the Complaint adequately pleads falsity.

---

[3] A so-called "puzzle pleading" requires the "court to sort out the alleged statements and match them with the corresponding adverse facts," *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1075 (N.D. Cal. 2001), or fails to provide "any specific reasons for falsity," *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014). Here, by contrast, the Complaint specifies the reason why each alleged statement was false and misleading. *See, e.g.*, ¶¶157-293. This case is therefore unlike *FormFactor*, where the complaint contained an "undifferentiated mass of public statements . . . follow[ed] . . . with the 'same blanket paragraph' to assert falsity." *McCasland v. FormFactor Inc.*, 2008 WL 2951275, at *7 (N.D. Cal. July 25, 2008).

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

**1.    Defendants Misrepresented Present Fact In Touting The Four Box Model's Access To And Use Of Telemetry Or "Big Data" (Category #1)**

Throughout the Class Period, Defendants repeatedly represented that HP printers were sending them real-time telemetry data (or "phoning home"), which was then input into the Four Box Model. For example, Lores touted the capacity that they "have **_now_** to connect with millions of printers in our installed base and **_to capture the data from them_**." ¶¶88, 206 (Lores: "**_Now_** we can look at the profitability per printer and per user"). Lesjak boasted: "we can see inside the ZIP Code level, and we get that data all the time." ¶¶250, 299. Weisler stated:

> "Some units return more supplies than other units, home versus office, different countries, different ZIP codes. And that's the kind of **_big data that we have_** that informs us about where we want to make those investments because **_every print unit we place_**, by and large, is an investment that returns supplies over time."

¶242. Analysts echoed Defendants' statements, trumpeting, for example, HP's "ability to continuously collect data from the printer installed base." ¶211.

Defendants' statements were false and misleading. As they later admitted, HP **_never_** had telemetry data—or even "statistically relevant" data—for a large and key portion of its installed base, *i.e.*, laser printers. ¶¶104, 122, 128, 134. As such, Defendants were not using real-time data to monitor HP's critical Supplies market share metric; instead, they were relying "primarily on lagging and incomplete market share surveys." ¶¶134-35. Because Defendants later admitted that they "**_never_**" had complete statistically relevant telemetry data and instead "**_relied primarily_**" on insufficient surveys, their prior statements were necessarily false when made—or at least were highly misleading by omission. This establishes falsity. *See, e.g.*, *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("The most direct way to show both that a statement was false when made . . . is via contemporaneous . . . data, available to the party, which contradict the statement."); *see also In re Daou Sys., Inc.*, 411 F.3d 1006, 1021 (9th Cir. 2005) (finding statements regarding training programs misleading where alleged facts showed that the training program never existed).[4]

---

[4] The context of Defendants' data input representations highlights how seriously misleading these statements were when made. After years of troubling results, Defendants pinned their effort to turn around HP's Supplies business on the Four Box Model and its access to "big data." This context is properly considered in the Court's analysis. *See, e.g., Xu v. Chinacache Int'l Holdings Ltd.*,

14

Defendants' arguments to the contrary fail. For example, Defendants claim that the fact that they had *some* data means that their statements were not misleading. Mot. at 36-37. This argument cannot be squared with Defendants' admission that they ***never had statistically relevant data*** for their entire laser fleet, nor their concession that they ***never had the data necessary to determine market share*** for their office-based Supplies. ¶¶96-99 134-35. In other words, Defendants were not simply missing small pieces of data at the margins, but instead had gaping holes that spanned entire business segments that created huge blind spots concerning HP's most critical metrics. Moreover, Defendants filled these gaping data holes with "lagging and incomplete" surveys instead of real-time telemetry data.[5]

Citing *In re Silicon Storage Tech Inc.*, Defendants argue that the complaint "contains no facts demonstrating that Defendants' statements . . . were untrue at the time they were made." Mot. at 36.; 2006 WL 648683, at *7 (N.D. Cal. Mar. 10, 2006). But unlike in *Silicon Storage*, here, Defendants' own admissions make clear that their statements were false when made, as they conceded that they ***never*** had the data they claimed to have. Defendants' other authorities fare no better. For example, Defendants claim that the Ninth Circuit's opinion in *Yourish* states that "[a] later statement can only establish falsity of an earlier statement when a later statement is similar to 'I knew it all along.'" Mot. at 36 (citing *Yourish v. Cal. Amplifier*, 191 F.3d 983, 996 (9th Cir. 1999)). Yet the *Yourish* opinion does ***not*** contain the language that Defendants purport to quote. Even leaving aside Defendants' fabricated quotation, *Yourish* merely stands for the unremarkable proposition that "a complaint <u>can</u> establish that a statement was false when made by alleging "[a] later statement . . . along the lines of 'I knew it all along.'" *Id.* It does not hold that such a statement is necessary. In any event, Defendants' admission that they ***never*** had sufficient telemetry data for office-based printers and instead relied on insufficient market surveys without disclosing that fact

---

2016 WL 4370030, at *5 (C.D. Cal. Aug. 15, 2016) ("Court[s] evaluate[] defendants' alleged false statements in the context in which they were made."); *Miller, supra,* 519 F.3d 879.

[5] The missing data was also critical to HP's ability to accurately assess its Supplies business. As one analyst wrote after a meeting with Defendant Fieler, "[m]isestimating laser supplies share by even a point has a material revenue impact." ¶99.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

to investors is tantamount to the type of "I knew it all along" statement that Defendants claim is required.[6]

Next, Defendants suggest that even if they did misrepresent HP's big data capabilities, their misstatements are immunized by the PSLRA safe harbor because they were "assumptions underlying or related to" forward-looking statements. Mot. at 30. Defendants' position is that any statement related to a forecast or projection—even a misrepresentation of present fact—is "forward-looking." The Ninth Circuit has soundly rejected this argument, ruling that "the safe harbor is not designed to . . . protect companies and their officials when they . . . make a materially false or misleading statement about current or past facts . . . and combine that statement with a forward-looking statement." *Quality Sys.*, 865 F.3d at 1142 (holding that the company's "optimistic projections" could not insulate statements of fact related to its then-present pipeline); *see also In re CV Therapeutics, Inc.*, 2004 WL 1753251, at *10 (N.D. Cal. Aug.5, 2004) (Illston, J.) ("The fact that defendants used those inadequately disclosed historical facts to support unsound projections does not shield their alleged misrepresentations as forward-looking statements."). Indeed, Defendants' statements about their current access to real-time telemetry data are akin to the present-fact "access to sufficient sources of funds" statements that the Ninth Circuit cited in *Quality Systems* as being a "useful example of an unprotected false or misleading non-forward-looking statement." *Id.* at 1142.

*In re Boeing Sec. Litig.* is instructive. 40 F. Supp. 2d 1160, 1169 (W.D. Wash. 1998). There, like here, the defendants argued that their present-fact statements were "covered by the safe harbor because they [we]re assumptions underlying their forward-looking statements." *Id*. In rejecting this argument, the *Boeing* court explained:

> [a]ssumptions entitled to safe harbor protection must be just that: assumptions underlying projections and expectations. The statements at issue here, which

---

[6] Defendants' other cases are similarly unavailing. In *Welgus v. TriNet Grp., Inc.*, 2017 WL 167708, at *7 (N.D. Cal. Jan. 17, 2017), the plaintiffs alleged that defendants' risk management statements were false but did "not include **any** allegations about [those] practices [] during the class period." Here, by contrast, Defendants themselves admitted that HP never had statistically relevant data during the Class Period. *Splash Tech.* stands for the unremarkable notion that "the complaint must allege that the 'true facts' arose prior to the allegedly misleading statement." 160 F. Supp. 2d at 1075. The Complaint does so by alleging that HP *never had* statistically relevant telemetry data for toner printers and, thus, necessarily did not have this data when the statements were made.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

concern present production problems, are not assumptions, they are present facts. To interpret the safe harbor protection of underlying assumptions in the manner suggested by the defendants would allow the exception to swallow the rule.

*Id.*; *see also Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1050 (N.D. Cal. 2018) ("[defendant's] statement includes facts regarding the present state of the Company, not assumptions"); *Desai v. Gen. Growth Properties, Inc.*, 654 F. Supp. 2d 836, 848 (N.D. Ill. 2009) (there is an "obvious distinction between an 'assumption' of fact and a statement of an existing fact").[7]

Defendants' cases are inapposite. Mot at. 29. For example, their reliance on *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.* and *In re LeapFrog Ent., Inc. Sec. Litig* is misplaced because in each of those cases, unlike here, the statements at issue related wholly to future expectations and performance and contained no present or historical facts.[8]

In sum, the Complaint adequately alleges falsity for Defendants' statements about HP's current access to real-time telemetry data.

### 2. Defendants Misrepresented Present Fact In Stating That HP's Market Share Had Increased (Category #2)

Defendants' accurate assessment of market share was critical to turning around HP's failing Supplies business. During the Class Period, Defendants repeatedly represented that HP's Supplies market share had increased. For instance, Defendant Lesjak boasted of the "progress in our market share" (¶200), Weisler touted the "improvements in the aftermarket share" (¶242), and Lores said, "You may be asking what we did to stabilize the supplies business . . . . It is about . . . increased share and price. This is what we did." ¶204. Defendants presented a table with a "check mark" in the "Share" column, indicating that market share had increased "in line with expectations." *See, e.g.*, ¶205. Analysts seized on these representations, reporting that HP's "higher supplies share" and "increasing supplies share" gave them "confidence" that HP's Supplies business was sustainable. *See, e.g.*, ¶¶112, 118.

---

[7] Even if these statements are properly classified as forward-looking (they are not), the safe harbor still does not protect Defendants' statements here, as explained below. *See infra* Section III.A.5.
[8] 759 F.3d 1051, 1058-59 (9th Cir. 2014); 527 F. Supp.2d 1033, 1046 (N.D. Cal. 2007).

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

Contrary to Defendants' argument (Mot. at 36), these statements were misleading. While reassuring investors that HP had increased its critical Supplies market share, Defendants failed to disclose that HP never had the data necessary to make that determination. ¶¶134-35. Defendants also omitted disclosure of the fact that their market share statements were based on "incomplete and lagging" data that "wasn't changing, over time" to reflect reality. ¶¶98-99. Defendants' statements were also demonstrably false. As they later admitted, market share had ***declined***, not increased. ¶132. For example, Fieler stated: "Whereas we have previously had an arrow going up of gaining share . . . we'd actually expect share to be down to a lesser extent on office." ¶¶135, 349. Defendants also disclosed that HP's actual Supplies market share was "significantly lower." ¶¶105-06.

Next, Defendants again seek refuge in the PSLRA safe harbor, attempting to recast their market share statements as "assumptions underlying or related to" forward-looking statements. Mot. at 30-31. This argument fails for the same reasons set forth in the prior section—namely, "the safe harbor is not designed to protect companies and their officials when they . . . make a materially false or misleading statement about current or past facts . . . and combine that statement with a forward-looking statement." *Quality Sys.*, 865 F.3d at 1142; *CV Therapeutics*, 2004 WL 1753251, at *10; *Boeing*, 40 F. Supp. 2d at 1169. Defendants' market share statements plainly indicated that market share ***had*** increased, which refers to a present fact. Indeed, these statements are equally present fact (if not more so) as the "still going strong" statement cited by the Ninth Circuit in *Quality Systems* as another example of the type of statements that are non-forward-looking and unprotected by the safe harbor. *Quality Sys.*, 865 F.3d at 1142. Other courts have likewise found similar statements to be non-forward-looking. *See, e.g.*, *Kipling v. Flex Ltd.*, 2020 WL 2793463, at *10 (N.D. Cal. May 29, 2020) (statement that "[w]e have to drive significant volume, which we're doing today," which related to a financial projection was "not protected by the safe harbor because it constitutes a claim that Flex was 'driv[ing] significant volume'"); *Rodriguez*, 325 F. Supp. 3d at 1050 (defendants' "non-forward-looking statement regarding [their] . . . 'consistent quarterly linearity,' which provided the factual predicate for [defendants'] revenue prediction" not protected by the safe harbor because it "include[d] facts regarding the present state of the

18

Company, not assumptions").[9] Thus, the "falsity" of Defendants' market share statements is sufficiently alleged.

### 3.    Defendants Misrepresented Present Fact In Stating That Inventory Was Aligned With "True Demand" (Category #3)

Defendants represented that their access to real-time telemetry data allowed them to align inventory with "true demand" for HP's Supplies. For instance, Weisler stated that the Company was "really on fulfilling when there's true demand." ¶¶124, 171. Lesjak reiterated that HP was seeing "[l]inearity . . . that mirrors the demand." ¶124. Based on Defendants' representations, analysts reported that HP had "solved the problem of excess supplies in channel," "aided by increasing data HP receives on printer use." ¶125.

In reality, however, Defendants never had the "big data" necessary to understand "true demand" for Supplies. *See* ¶¶96-99, 134-35. Instead, as Defendants later admitted, HP "continue[d] to fulfill orders likely over multiple quarters based on our original share assumptions, which we now believe were overestimated. This resulted in additional HP supplies in the ecosystem." ¶138. Thus, far from keeping inventories in line, during the Class Period, Defendants had actually flooded the channel with $100 million in excess Supplies inventory. ¶129 ("$100 million of excess inventory that we didn't have visibility to was flowing into the system with no real readout as to an ongoing issue with demand because the share assumptions were incorrect.").

Defendants argue that their representations simply "turned out" to be wrong. Mot. at 37. This misses the point. Plaintiffs allege that Defendants deceived investors into believing that HP had the data necessary to accurately assess market demand and keep inventories under control when, as Defendants later admitted, they never had the ability to do either—a conclusion corroborated by their admission that inventory was too high by $100 million. *See Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *7 (N.D. Cal. Apr. 28, 2020) (Illston, J.) (falsity adequately pled where defendants' statements "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists").

---

[9] Even if forward-looking (they are not), the safe harbor does not immunize these statements for the reasons set forth in the next section, including because Defendants' omissions of existing facts do not qualify for safe harbor protection. *E.g., Berson*, 527 F.3d at 989. *See infra* Section III.A.5.

19

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

Defendants also argue that when they stated that inventory met "true demand," they meant only their own internal estimates of demand. Mot. at 37. This also fails. To start, it ignores Defendants' actual words, which stated that they were fulfilling on "true demand" (¶¶46, 11, 19, 124, 171) and that inventory linearity "mirror[ed] demand" (¶124). These statements were expressly designed to, and did, lead investors to believe that inventory was meeting "true" or actual demand. Further, even if Defendants' words about meeting demand within a ceiling were technically true (they were not), courts consistently recognize that even literally accurate statements can be misleading. *See, e.g.*, *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at \*5 (C.D. Cal. June 17, 2011) ("Rule 10b–5(b) prohibits the telling of . . . material half-truths, where the speaker omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."); *see also Miller*, 519 F.3d at 886 ("[S]tatements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.").[10]  Here, Defendants led investors to believe that they had the ability to align inventories with demand when they did not. Falsity is adequately pled.

### 4. Defendants Misrepresented Present Or Historical Fact In Stating That HP's Supplies Business Was On Track To Stabilize And Had Stabilized (Category #4)

From 3Q17 until the end of the Class Period, Defendants repeatedly boasted that they had stabilized HP's Supplies business. For example, Lesjak stated that HP "*achieved* supply stabilization a quarter earlier than expected" (¶193); Lores explained what they had done "to stabilize the supplies business" (¶204); Weisler stated "[w]e *stabilized* supplies a quarter earlier than we said we would" (¶241); and Fieler noted "we felt comfortable in the *supply stabilization last year*. Again, it was in Q3 of '17, a quarter earlier than expected" (¶249). Analysts repeated these statements, trumpeting for example that "HP stabilized its supplies business one quarter earlier than expected" (¶210) and "earlier than expected supplies stabilization in FY17" (¶211).

---

[10] Defendants argue that Plaintiffs "badly misstat[ed]" HP's $100 million inventory overstatement in February 2019 by referring to it as a "write-down." Mot. at 37.  This is a red herring.  To start, half the paragraphs cited by Defendants refer to HP's $450 million revenue write-down in *2016* (not 2019).  *E.g.*, ¶¶82, 112, 122.  Further, notwithstanding Defendants' quibble with the term "write-down," the Complaint clearly explains that HP disclosed an excess $100 million inventory in the channel, which required it to lower channel inventories by the same amount and, thus, created a "$100M headwind to supplies revenue." *See, e.g.*, ¶¶16, 138.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

Relatedly, Defendants stated that HP's Supplies business was "on track" to stabilize. For example, on February 22, 2017, Lesjak stated, "we remain on track to stabilize supplies revenue…." ¶109.

These statements were misleading because Defendants failed to disclose that the Company never had the real-time data necessary to reliably and accurately understand the state of the Supplies business or project its future trajectory. ¶¶96-99; 134-35. Indeed, ultimately, Defendants conceded that they had not stemmed HP's Supplies market share losses, so HP's Supplies business would continue to decline indefinitely. ¶132.

Defendants argue that these statements are all forward-looking and protected by the PSLRA safe harbor. Mot. at 30. Defendants are wrong. On the contrary, Defendants' repeated statements that HP's Supplies business *had* stabilized were not forward-looking but, rather, were statements of present or historical fact. Indeed, Defendants repeatedly insisted that the Company had "achieved" Supplies stabilization and that Supplies revenues had "stabilized." Relatedly, many courts have held that statements that a company is "on track" to meet projections are statements of present fact that are not subject to the safe harbor's protections. *See, e.g.*, *Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942, 964-65 (N.D. Cal. 2014) (statement that company was "on track" was a representation of current fact); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004) (statement that company was "on track" to meet future goals was not forward-looking "to the extent that such statement[] rested upon a characterization of the present state of the company"); *In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980, 990 (N.D. Cal. 2001) ( "statements . . . concern[ing] whether [defendants were] 'on track' to meet [their] financial goals" were "statements of current business conditions . . . [and] were not forward-looking."). Regardless, even for those statements that are forward looking, the safe harbor offers no protections for the reasons discussed in the next section.

     **5.**     **None Of Defendants' Misrepresentations Are Immunized By The Safe Harbor, Including Misstatements Concerning The Stabilization And Growth Of HP's Supplies Business And Revenue (Category #5)**

Throughout the Class Period, Defendants represented to investors that, based on the Four Box Model, they expected HP's Supplies revenue and business to stabilize and grow.  For example, Defendants' constant refrain throughout the Class Period was that the Four Box Model and its "big

21

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

data" told them that HP's Supplies business and revenue would be "flat to slightly up." ¶¶241, 248, 256, 262, 265, 273, 275, 283, 285, 290. Further, Defendant Weisler stated "we remain confident that supplies revenue growth . . . will stabilize by the end of 2017, consistent with our Four Box Model analytics that we see." ¶161; *see also* ¶184 (Weisler: "the Four Box Model continues to predict supplies revenue will stabilize . . . by the end of '17"). Lores stated "we project a stable or slightly positive revenue growth for supplies in fiscal year 2018 . . . [a]nd this forecast is supported by the predictions of our Four Box Model." ¶207. Fieler said that "it really goes to that – the 4-box drivers . . . . [F]actoring it all in, we have confidence in continued stabilization next year." ¶249. And, for 2019, Weisler stated, for example, "the Four Box Model has been the strong predictor of outcomes for us. And as a result of that, we believe that supplies in '19 will be flat to slightly up." ¶223.

Defendants' statements were misleading. Defendants repeatedly tethered their statements about expected stabilization and growth to the Four Box Model and its purported "big data" access. Critically, however, Defendants failed to disclose that, for a critical portion of HP's business— namely, its office-based laser/toner printers—the Four Box Model's inputs were not real-time telemetry data. ¶233. It was not until February 2019 that Defendants finally confessed to investors that the Four Box Model's inputs for office-based toner printers were based "primarily on lagging and incomplete market share surveys," which, unlike telemetry data, was static and that HP, in fact, "did not have . . . the capabilities to calculate [market] share for toner-based products in the installed base." ¶¶134-35. In other words, while assuring investors that HP's Supplies business would stabilize and even grow, Defendants failed to disclose that they never had the data necessary to understand the reality or make that determination.

Defendants argue that these statements—and, indeed, most of the statements alleged in the Complaint[11]—are immunized by the safe harbor. Mot. at 28-33. They are wrong for the reasons set forth below.

---

[11] As noted above, to the extent that any of the misstatements discussed in Sections III.A.1, III.A.2, III.A.3, and III.A.4are deemed to be forward-looking statements, then the safe harbor still does not apply for the reasons set forth in this section.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

***The Safe Harbor Does Not Protect Omissions Of Present Or Historical Fact***. The Complaint alleges that the vast majority of Defendants' statements are misleading by omission. Plaintiffs allege that when stating, for example, that market share had increased, inventories were aligned with demand, and the Supplies business would and had stabilized, Defendants omitted disclosure of the highly material facts that they lacked statistically relevant data from HP's office-based printers, had no capability to determine market share for those printers, and were instead resting their assurances on stale, incomplete market share survey data. *E.g.*, ¶¶168, 175, 181. Courts consistently hold that the PSLRA's safe harbor does not apply to such omissions of present or historical fact. *See, e.g., Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *9 (C.D. Cal. Feb. 27, 2015) ("[T]o the extent Plaintiffs [ ] challenge Defendants' alleged *omission of present facts* with respect to the challenged statements, the PSLRA's safe harbor does not apply.") (emphasis in original); *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012) (same); *In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923, at *13 (N.D. Cal. Aug. 10, 2005) (no safe harbor protection for "omissions of past and current facts"); *accord In re Celera Corp. Sec. Litig.*, 2013 WL 4726097, at *2 (N.D. Cal. Sept. 3, 2013). Thus, the safe harbor does not protect Defendants' omissions of present fact.

***Defendants Did Not Provide Meaningful Cautionary Language***. The safe harbor also does not protect Defendants here because they failed to provide investors with meaningful cautionary language that warned of the risks that materialized.[12] To be meaningful, "[t]he cautionary warning ought to be precise and relate directly to the forward-looking statements at issue," *Copper Mountain*, 311 F. Supp. 2d at 882, and "must warn of risks of similar significance to the risk actually realized." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005); *see also* 15 U.S.C. §78u-5(c)(1)(A)(i).

Here, the best that Defendants can muster is to point to generic warnings that "all forward-looking statements involve risks, uncertainties and assumptions" or that HP could be "unsuccessful at addressing [its] business challenges." Mot. at 32-33. These vague, boilerplate cautions are

---

[12] It is Defendants' burden to establish that they provided meaningful cautionary language. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 773 (2d Cir. 2010). They fail to carry that burden here.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

insufficient under the law of this Circuit. *See Quality Sys., supra,* 865 F.3d at 1146-48 (rejecting similar cautionary language as insufficient); *Immune Response*, 375 F. Supp. 2d at 1035 ("The PSLRA drafters did not intend boilerplate cautionary language to be sufficient. Rather, the cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement."); *In re Amylin Pharm., Inc. Sec. Litig.*, 2003 WL 21500525, at *7 (S.D. Cal. May 1, 2003) ("Vague or boilerplate disclaimers are insufficient to invoke safe harbor protection."). Further, Defendants conceded the inadequacy of their cautionary disclosures by revising them *after* the first and second corrective disclosures. ¶¶141, 147. For example, on March 5, 2019, HP warned that "omnichannel resellers and distributors" were cutting into its Supplies business, which "may negatively impact [its] financial performance" going forward. ¶141; *see also* ¶147 (August 2019 update to risk disclosures).

In addition, in this Circuit, when a statement is identified as forward-looking but is accompanied by a non-forward-looking factual statement the "cautionary language must be understood in the light of the non-forward looking statement." *Quality Sys., supra*, 865 F.3d at 1146–47. As such, even if all of Defendants' statements are deemed forward-looking, but mixed with present-fact aspects, the safe harbor analysis requires an evaluation of the cautionary language in light of both the present-fact and forward-looking aspects of the statements. This analysis also applies to, for example, Defendants' statement that "we remain confident that supplies revenue growth in constant currency will stabilize by the end of 2017, consistent with our Four Box Model analytics that we see" (¶161), which contains present-fact statements about the "analytics that we see" as well as forward-looking aspects. As to the present-tense aspects of such mixed statements, the Ninth Circuit explained that "if the non-forward-looking statement is materially false and misleading, it is likely that that ***no cautionary language—short of an outright admission*** of the false or misleading nature of the non-forward-looking statement—would be 'sufficiently meaningful' to qualify the statement for the safe harbor." *Id.* at 1146-47. Here, Defendants' cautionary language did not warn investors of the "risk actually realized," namely they did not have sufficient real-time telemetry data in the Four Box Model to accurately assess the Supplies

24

business so instead were using lagging and incomplete third-party surveys. Nor did Defendants mention that "the non-forward-looking statement[s] accompanying the forward-looking statement[s] might be false or misleading," which is what the Ninth Circuit requires. *Id.* at 1148.

*Defendants Had Actual Knowledge Of Their Misstatements*. The safe harbor also does not immunize Defendants' misleading statements because they made them with actual knowledge. *See infra* Section III.B. Contrary to Defendants' assertions ( *e.g.*, Mot. at 5), in this Circuit, actual knowledge is satisfied by pleading that Defendants had no reasonable basis for their belief, which is what the Complaint alleges here. *See Provenz v. Miller*, 102 F.3d 1478, 1487 (9th Cir. 1996); *see also Zuora,* 2020 WL 2042244, *10 (holding that forward looking statements were actionable where the "plaintiff allege[d] that defendants did not have a reasonable basis to believe [their statements were true]"). The Complaint pleads exactly that, alleging that Defendants had no reasonable basis to assure investors that market share was increasing, inventory was aligned with demand, or the Supplies business was stabilized when they did not have the data they needed to calculate market share or demand, and instead were inputting stale and incomplete third party data. *See, e.g.,* ¶254 (Defendants had "no reasonable basis" for statements regarding revenue stabilization), ¶288 ("no reasonable basis" for statements about sustainability of Supplies business).

### 6.    Defendants' Statements Regarding The Reliability Of The Four Box Model Are Actionable (Category #6)

Defendants also repeatedly expressed their confidence in the reliability and accuracy of the Four Box Model. Defendant Weisler stated, for instance, "[W]e have a continued confidence in the predictive value of the four box model." ¶119. Schell stated that "[w]e are following a clear predictive tool [in the Four Box Model] when we give this guidance . . ." ¶120. Lesjak stated that "we have a lot of confidence in the predictive capabilities of our 4-box model" and further noted "[w]e have seen that it has been very reliable." ¶93. These statements were misleading because, as discussed, Defendants omitted the facts that the Four Box Model did not have sufficient data to accurately assess the Supplies business. ¶¶134-35.

Defendants argue that their assurances about the accuracy and reliability of the Four Box Model are inactionable opinion statements. Mot. at 33-35. The Ninth Circuit has made clear that

25

where, as here, Plaintiffs allege that an opinion statement was misleading as a result of a material omission, falsity is satisfied through allegations that Defendants had "no reasonable basis" for their belief. *See Align*, 856 F.3d at 616 (where plaintiffs plead "an omissions theory of liability," falsity can be satisfied "by alleging that there is no reasonable basis for the belief"); *see also Zuora*, 2020 WL 2042244, *10 (holding that "statements of belief" or "corporate optimism" were actionable where the "plaintiff allege[d] that defendants did not have a reasonable basis to believe [their statements were true]"). The Complaint readily meets this standard. In particular, Plaintiffs allege that Defendants had no reasonable basis to assure the market that the Four Box Model was reliable when they did not have the data necessary to undertake statistically relevant analyses or to calculate market share, and instead were inputting "lagging and incomplete" third party data for the critical market share metric.[13]

Finally, Defendants' focus on the accuracy of the Four Box Model before it collapsed and was ultimately abandoned is unavailing. Mot. at 33-34. Defendants misleadingly claimed that the Four Box Model was reliable because real-time telemetry data formed the Model's inputs. This was untrue, which became clear when the Four Box Model began to break down. It is axiomatic that the fact that a broken clock tells the correct time twice a day does not make the clock accurate or reliable. Defendants' counter-factual narrative that the Model was reliable right up until the moment it failed is a factual dispute that cannot be resolved at the pleading stage.

**B.     THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER**

"Scienter can be established by intent, knowledge or certain levels of recklessness." *In re VeriFone Holdings, Inc., Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012); *see also Schueneman v. Arena Pharms.*, 840 F.3d at 705 (scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud . . . but also deliberate recklessness."). Assessing falsity and scienter is a "unitary inquiry," often "strongly inferred from the same set of facts." *Daou.*, 411 F.3d at 1015.

---

[13] Although Defendants cite *Align* (Mot. at 34-35), it actually supports Plaintiffs. There, the plaintiffs claimed that the company's goodwill estimations lacked a reasonable basis because they failed to disclose that they were using faulty assumptions. *Align*, 856 F.3d at 618. The court rejected this argument, finding that the plaintiff failed to plead that the defendants actually used the faulty assumptions in estimating goodwill. *Id.* Here, by contrast, Defendants *admitted* that they used faulty, stale market share inputs in their Model, as detailed in the Complaint.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

A district court should ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" *Quality Sys.*, 865 F.3d at 1144. Moreover, the scienter inference "need not be" of "the 'smoking-gun' genre" or even "the most plausible" inference—rather, it need only be "***at least*** as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324. As such, a tie between equally compelling inferences should be resolved in Plaintiffs' favor. *Id*.

Here, Defendants seek to isolate and refute each scienter fact separately. But the Supreme Court has expressly rejected this approach at the pleading stage. *Id.* at 326 ("the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically"); *Quality Sys.*, 865 F.3d at 1144 (complaint allegations must be "taken collectively" in scienter analysis). As summarized below, Plaintiffs' Complaint pleads particularized facts that, viewed holistically, raise an inference of scienter that is cogent and at least as compelling as any opposing inference.

### 1. Defendants' Statements And Conduct Confirm Scienter

Defendants' own statements and conduct support a strong inference that they knew or were deliberately reckless as to the fact that the Four Box Model lacked statistically relevant telemetry data for office-based (or laser) printers and, instead, relied on "lagging and incomplete" third-party surveys to analyze market share.

*First*, as the Ninth Circuit has repeatedly held, where defendants admit to monitoring and regularly using a company's sales database and forecasting model, there is a strong inference that the defendants were aware of the data being used in the model and what that data revealed. *See Quality Sys.*, 865 F.3d at 1145 (scienter established where "executives themselves told investors they had real-time access to, and knowledge of, sales information" and "[defendant] stated that it 'continually updated' its revenue estimates using . . . software"); *Oracle.*, 380 F.3d at 1231, 1234 (9th Cir. 2004) (defendants' admissions of monitoring database of sales data supported strong inference of scienter); *Daou*, 411 F.3d at 1022 ("specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database" supported scienter inference).

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

Here, the Complaint is replete with instances where Defendants admitted that they knew the Four Box Model in meticulous detail and were constantly looking at the Model and refining it. Indeed, Lores and Lesjak confirmed that, in using the Model, they monitored Supplies usage at a "granular level," even assessing the supply usage of particular countries and zip codes. ¶¶89-90, 299. Weisler admitted he had access to the "spreadsheet" used to analyze the "big data" that was input to the Four Box Model. ¶296. Weisler also told investors that he checked the accuracy of the Model at the close of every quarter by looking at each driver within the Model and checking what was predicted against the result that was returned. ¶¶107, 298 ("[e]very time we close a quarter, we go back and look at the 4-box drivers, what it predicted and what it returned").

Similarly, Schell told investors it was his "daily job with [his] team" to work on the installed base and market share drivers of the model." *Id*. Fieler stated that he "actually looked at the 4-box model" and noted to investors that "it's actually rather detailed as you look at geographies and SKUs and things, and it's only getting better with the incremental data and insight we get from our installed base." ¶296. Lores told investors they "constantly work to improve and refine" the Four Box Model. ¶297. Where, as here, a defendant speaks about the company's operations with a "high degree of specificity" and "represent[s] repeatedly . . . he ha[s] adequate information to make . . . predictions," this is sufficient to infer actual knowledge. *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259-60 (W.D. Wash. 2009) (holding actual knowledge inferred where "[defendant] maintained that he knew what he was talking about [and] displayed an intimate knowledge of [the company's] information delivery, risk-management structure, and hedging capacity"); *see also In re PMI Grp., Inc. Sec. Litig.*, 2009 WL 3681669, at *3 (N.D. Cal. 2009) (Illston, J.) (holding scienter was pled based, in part, on allegations that the defendants repeatedly acknowledged that credit quality was critical to the company's success and that they were directly involved with determining the company's risk management); *see also Quality Sys.*, 865 F.3d at 1145; *Oracle*, 380 F.3d at 1231, 1234; *Daou*, 411 F.3d at 1022.

Defendants also stated that they used the Four Box Model and its purported access to telemetry data to make strategic decisions. For example, Weisler confirmed "big data . . . informs us about where we want to make . . . investments" and "figur[e] out exactly where you want to

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

place . . . [printer] units" to "ensur[e] that they're NPV positive." ¶300. Prior to the Class Period, Lores stated, "Our big data capabilities give us a very good understanding of the effectiveness of our activities" and that they would "leverage this information to focus only on high-return-on-investment targeted promotions." ¶301. Lores reiterated this in October 2017: "[b]ig data and analytics are becoming very important both in how do we manage our business but especially on how do we improve the profitability going forward." *Id*.

In their Motion, instead of addressing each of Plaintiffs' factual allegations, Defendants sweepingly and summarily dismiss them as "bare allegations of 'access' and 'familiarity.'" Mot. at 14. Defendants are wrong and simply mischaracterize Plaintiffs' allegations. To be sure, the Complaint does not only plead access—it pleads a myriad of instances where Defendants admitted to scrutinizing the data coming from its installed base of printers, even on a printer-by-printer level in order to use the Model and make business decisions. ¶¶297-302. This also refutes Defendants' related claim that it is implausible that high-ranking executives would have accessed data in a large corporation. Mot. at 29-30. Simply put, that is exactly what Defendants told investors they were doing. For this reason, *Intuitive Surgical* is inapposite. Mot. at 29-30. There, the court declined to find scienter because "[t]he complaint lack[ed] allegations of specific admissions by the individual defendants regarding their involvement with [the company's] operations or with the software-generated reports." *Intuitive Surgical.*, 759 F.3d at 1062. Here, the opposite is true, as Defendants' own repeated statements confirm their direct and close involvement with the Four Box Model.[14]

*Second*, Defendants' own statements confirmed their ownership of the Four Box Model. For example, on February 27, 2019, Defendant Weisler stated that "*[w]e* did not have a statistically significant sample from the system telemetry and the instrumentation nor the capabilities to calculate share for toner-based products in the installed base." ¶348. Fieler stated that "*we* had relied primarily on lagging and incomplete market share surveys." ¶135. Weisler likewise stated:

---

[14] Defendants' reliance on *Century Aluminum* and *Zucco* is equally misplaced. Those cases involved allegations of complex accounting manipulations that would not have been evident even if defendants had analyzed the company's accounting numbers. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000-01 (9th Cir. 2009); *In re Century Aluminum*, 749 F. Supp. 2d 964, 973 (N.D. Cal. 2010). By contrast, this case does not turn on abstruse accounting principles but rather whether Defendants were aware that HP lacked sufficient telemetry data for its office printers, which was readily apparent to Defendants from their use of the Model.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

"[p]reviously, *we* [have] used periodic third-party survey data and market research aggregators to estimate toner supply shares" (¶308) and "where *we* went wrong is that *we* had incorrect Supplies share assumptions in *our* 4-box model regarding the plans to Supplies selling in quarter one 2019 and in prior quarters." ¶342. Fieler told analysts that "when *we revisited our* 4-box assumptions, *we* did look at all regions and revised *our* share and pricing accordingly." ¶343. In each instance, Defendants said "we" or "our"—meaning them (of course)—and plainly claimed ownership of the Model and its admittedly incorrect inputs. Plus, none of them disclaimed knowledge about the use of market share surveys when they were questioned by analysts on the February 27 earnings call. ¶¶134-135. As such, Defendants' own words and conduct contribute to a strong inference that they knew very well that they were using "lagging and incomplete" third-party surveys instead of telemetry data for office-based printers.[15] While Defendants will be free to argue at summary judgment that they actually meant the so-called "Royal We" or that their reactions were somehow consistent with a lack of knowledge—they are not entitled to the benefit of those inferences at the present stage. Rather, Plaintiffs are entitled to the natural inference of Defendants' own statements professing ownership and knowledge of the Four Box Model and its shortcomings. This alone establishes a strong inference of Defendants' scienter for pleading purposes.[16]

*Third*, the fact that Defendants repeatedly spoke in detail about the Four Box Model and its data access further adds to the already strong inference of scienter. Indeed, investors are entitled to assume that corporate executives, like Defendants here, are informed about the matters on which they speak publicly. *See, e.g., Reese*, 747 F.3d at 572 (an assertion that defendants were unaware of an alleged issue can be "directly contradicted by the fact that [they] specifically addressed it in [their] statement[s]"); *Roberti*, 2015 WL 1985562, at *12 ("[A]n inference of scienter can be established by the fact that the Defendants['] [statements] touched on the specific issue.").

## 2.    The Former HP Employee's Account Confirms Scienter

---

[15] Relatedly, the fact that Defendants used share assumptions instead of telemetry data also supports scienter. Simply put, Defendants knew they did not have sufficient telemetry data or else they would have had no need to use stale and incomplete surveys for market share.

[16] Thus, Defendants are wrong to declare that "nothing" in Defendants 2019 statements indicates knowledge that "there were gaps in the data." Mot. at 13.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

In addition to Defendants' own statements and conduct, the information supplied by FE-1 further confirms and bolsters the strong inference that Defendants knew that the Four Box Model lacked sufficient telemetry data.

FE-1 stated that it was well-known within HP that the Four Box Model was unreliable because it was not using real-time data to compute market share. ¶308; *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975 (N.D. Cal. 2009) (finding inference of scienter where undisclosed practices "were well known throughout the Company"). FE-1 also recounted that, during the Class Period after a big revenue forecast miss in EMEA,[17] Defendant Weisler was expressly informed in a series of "crisis" meetings that HP lacked insight into the sales channel and end user buying patterns, including the impact of competition. ¶311. Thus, FE-1's account provides direct evidence of Weisler's knowledge of HP's data failings and the unreliability of the Four Box Model.

The Complaint establishes the reliability of FE-1's statements. For these allegations to be credited, a complaint need only describe the confidential source "'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged' and the complaint contains 'adequate corroborating details.'" *Daou*, 411 F.3d at 1015. This standard is met where the Complaint "number[s] each witness and describe[s] his or her job description and responsibilities." *Id.* at 1016; *Quality Sys.*, 865 F.3d at 1145 (crediting confidential witness allegations where "the complaint includes each confidential witness's job description and responsibilities, and, in some instances, the witness's 'exact title and to which . . . executive the witness reported'").

Here, the Complaint provides the date range HP employed FE-1, identifies FE-1 as an executive, explains the geographic region for which FE-1 was responsible, and even identifies the names and titles of the executives to whom FE-1 reported. ¶306. Further, the Complaint explains how FE-1 came to have the information provided. ¶310. FE-1's statements are also corroborated by Defendants' admissions that the Four Box Model never had a statistically significant amount of telemetry data and relied on lagging third-party surveys to make assumptions about HP's market share. ¶¶308, 134-35; *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *14 (D. Or.

---

[17] EMEA is the same division that caused HP's revenue miss in 1Q19. ¶132.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

June 27, 2017), report and rec'n adopted sub nom. *Murphy v. Precision Castparts Corp.*, 2017 WL 3610523 (D. Or. Aug. 22, 2017) (confidential witness statement reliable where "further corroborated by [the company's] own statement that they engaged in the 'legitimate practice' of pulling in sales"); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y 2010) ("The fact that this case involves corroboration from multiple sources also supports an inference of a scienter."). Thus, FE-1's account is reliable.

Defendants scoff at FE-1's experiences at HP, sarcastically labeling the account "hardly smoking gun evidence." Mot. at 4. Yet they ignore the Supreme Court's express guidance in *Tellabs* that the inference of scienter need not be of the "'smoking-gun' genre." 551 U.S. at 326. Defendants also argue that FE-1 had no personal interaction with Defendants. Mot. at 17. But there is no requirement that a confidential witness must have personally interacted with a defendant. *See Robb v. Fitbit, Inc.*, 2017 WL 219673, at \*5 (N.D. Cal. Jan. 19, 2017) (Illston, J.) (rejecting defendants' argument that there can be no scienter because confidential witnesses lacked direct access to individual defendants and could not link specific reports to defendants). FE-1's account based on information supplied by FE-1's superiors is sufficiently reliable to be credited— especially at the pleading stage. *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (hearsay statements reported to confidential witness were "were specific in time, context, and details, and involved important communications from a chief executive officer to his Board" and thus were "sufficiently reliable for pleading purposes"); *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 485 n.5 (9th Cir. 2019) (concluding confidential witness's statement based on what a senior employee told him was sufficiently reliable because confidential witness was "'in a position to be personally knowledgeable'" that the senior employee met with the defendant).[18] In sum, FE-1's account bolsters and confirms Defendants' scienter.

---

[18]    Defendants' argument that FE-1 is not reliable because he or she did not work in the EMEA region or at HP's headquarters (Mot. at 16-17) is unavailing because the deficiency of telemetry data and the problematic use of imputed market share assumptions spanned the Company and were not merely confined to the EMEA region. Further, the Complaint describes how FE-1 came to possess this information by receiving debriefings from superiors who personally attended calls and meetings with the Individual Defendants. ¶¶310-11. This is sufficient to establish the witness's reliability. *Daou*, 411 F.3d at 1015.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

### 3.    The Fact That The Supplies Business Was HP's "Core Business" Contributes To A Strong Inference of Defendants' Scienter

Defendants touted the Four Box Model as the key to turning around HP's Supplies business (¶¶86, 108-21, 299-302)—a business that was not merely core to HP but was nearly the sole source of its profit. Indeed, analysts estimated that 80% to 110% of HP's total profits came from Supplies. ¶316. Defendants themselves admitted that the business was "all about supplies" and that their "key focus" was growing the Supplies business. ¶¶312-13, 51-52 ("[e]verything we do in this business has one objective, to grow our supplies business because this business, it's all about supplies."). The fact that the Supplies business was responsible for nearly all of the Company's profit and was the "key focus" of the Defendants supports scienter. *See Fitbit*, 216 F. Supp. 3d 1017 at 1033 (holding scienter was pled based, in part, on allegations the products at-issue "were key revenue drivers for the company" and accounted for 80 percent of its annual revenue). Indeed, given the centrality of the Supplies business and Defendants' repeated representations during the Class Period that the Four Box Model and its "big data" were the key to turning around the Company, it is "absurd to suggest" that Defendants were not aware that the Model lacked sufficient data. *Berson*, 527 F.3d at 988 ("[defendants] were directly responsible for Applied Signal's day-to-day operations . . . so it is hard to believe that they would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work"); *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at *12 (N.D. Cal. Feb. 15, 2018) (Illston, J.) (holding it was "absurd to suggest" defendant-CFO did not know about "pervasive scheme affecting the (in part) heart of the company's core operation"); *Mulligan*, 36 F. Supp. 3d at 970 (holding scienter pled because "it is 'absurd' to think that the CEO and CFO of a pharmaceutical company would be unaware of the alleged substandard, non-compliant conditions pervading [manufacturing division]—the heart of a company whose main business is manufacturing pharmaceuticals").

FE-1's statements that the Model's unreliability was widely known within the Company and that Defendant Weisler was informed of this at a series of "crisis" meetings further bolsters the inference of actual knowledge. ¶¶308, 311. *See Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *19 (C.D. Cal. May 8, 2013) (holding totality of allegations support scienter and

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

noting where information was "widely known" among employees, it "increase[s] the likelihood that a manager working with those employees would also be aware").

In response, Defendants argue that no facts show that they personally monitored the "granular market share" data fed into the Four Box Model. Mot. at 21. This simply disputes the detailed facts alleged in the Complaint, which cannot suffice. It also disputes Defendants' own admissions, as Lores and Lesjak told investors that they monitored supply usage at a "granular level." ¶¶89-90, 299. Defendants' related assertion, that the problem involved only "specific market share data from the EMEA region" likewise ignores the Complaint's allegations. Mot. at 21. To be sure, Defendants admitted that HP "did not have . . . the capabilities to calculate [market] share for toner-based products in the installed base"—a concession that was not limited to EMEA. ¶98. Defendants also acknowledged that it had been necessary to "look at all regions and revise[] our [market] share." ¶106. Regardless, Defendants cannot insert their own version of the facts in place of the Complaint's particularized allegations. *See Johnson v. Knapp*, 2009 WL 764521, at *4 (C.D. Cal. Mar. 16, 2009) ("[T]he Court ignores Defendants' version of the facts and relies, instead, on Plaintiff's version."). In sum, the core importance of the Supplies business, the Four Box Model and its access to "big data" further confirm and bolster the strong inference of scienter.

*         *         *

Assuming the alleged facts true and considering them holistically (as required), the inference of Defendants' knowledge is cogent and ***at least*** as compelling as Defendants' proposed counter-inference that they purportedly were not aware of the Four Box Model's lack of telemetry data and use of incomplete and flawed market surveys. Mot. at 23-24. As such, Plaintiffs' burden is satisfied. *Tellabs* 551 U.S. at 310 (to survive a motion to dismiss, plaintiff's scienter inference need only be "at least as compelling as any plausible opposing inference.").

### 4.    The Complaint Pleads Deliberate Recklessness

As discussed above, numerous facts establish a strong inference that Defendants had actual knowledge that the Four Box Model lacked telemetry data and could not accurately gauge HP's market share. But, even if Defendants' actual knowledge cannot be inferred, Plaintiffs need only plead "deliberate recklessness," and the Complaint's factual allegations overwhelmingly meet this

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

standard. *Oracle*, 380 F.3d at 1230 ("[W]e must consider 'whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness.'"). As explained above, the statements in Categories #1-#4 involve misrepresentations and omissions of present or historical facts. Thus, the recklessness standard plainly suffices to establish scienter for those statements.

Tellingly, Defendants make no meaningful effort to dispute that the deliberate recklessness standard is met here. Instead, they offer only unsupported conclusions. Mot. at 16 (asserting "Plaintiffs fail to plead any facts . . . demonstrating that any Defendant was 'deliberately reckless.'"). Defendants are wrong. As discussed above, Defendants repeatedly told investors they had a detailed knowledge of the Four Box Model, scrutinized it to improve and refine it, and used it to make strategic decisions. Moreover, they consistently boasted about the amount of real-time "big data" that HP was getting from its printers. At the very least, it was deliberately reckless for Defendants to tout the real-time data in the Four Box Model, the reliability of that Model, or any of its analyses if they had no idea what data HP had or what data was actually used in the Model.[19]

Furthermore, following HP's $450 million buy back of inventory in the wake of the fraudulent "pull-in" scheme to artificially boost Supplies sales, Defendants doubled-down on the "razor/razor blade" business model by assuring investors it would because their decisions were now guided by "big data." ¶86. Having staked the Company's entire business model on "big data," it was reckless for Defendants to tout the reliability and predictive ability of the Four Box Model (¶¶91-94) and report positive market share growth (¶¶100-03) if they had not actually verified whether telemetry data was being received from laser printers in the installed base. Further, Defendants also made clear that turning around declining market share was critical to stabilizing

---

[19] *Endologix* is not to the contrary. There, the court held that the plaintiff failed to sufficiently plead scienter because the complaint contained "no particularized allegations that FDA approval" of the drug at issue "turned on" the information defendants were alleged to have withheld from the market. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 418 (9th Cir. 2020). Here, the reliability of the Four Box Model turned on the information Defendants withheld—a lack of statistically relevant telemetry data and a resulting inability to determine market share for HP's fleet of laser printers.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

HP's Supplies revenue (¶¶78-79), so any failure to verify whether they actually had the ability to calculate market share was likewise deliberately reckless.[20]

Thus, even assuming Defendants' version of events—that they had no idea what data was in the Four Box Model—to be correct (it is not), the Complaint still pleads deliberate recklessness. *See, e.g.*, *Reese*, 747 F.3d at 572, 581 (inferring "at the very least, deliberate[] recklessness" and noting the assertion defendants were unaware of an alleged issue can be "directly contradicted by the fact that [they] specifically addressed it in [their] statement[s]"); *Killinger*, 687 F. Supp. 2d at 1260 (because "[defendant] maintained that he knew what he was talking about[,] . . . [i]f he did not in fact have such knowledge, it would be at least actionably reckless to reassure the public about these matters at all").

### 5.    Defendants' Stock Sales Support Scienter

Allegations of suspicious stock sales can be particularly cogent evidence of scienter. *Oracle*, 380 F.3d at 1232. Courts consider three factors to evaluate whether stock sales are suspicious: "(1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Id*. Here, these factors demonstrate that Defendants Lores's and Weisler's stock sales during the Class Period were suspicious. Defendant Weisler sold 89% of his HP holdings for proceeds of $86.87 million and Defendant Lores sold 83% of his holdings for proceeds of $28.46 million. ¶¶328-31. These percentages amply support the inference of scienter. *See Wozniak v. Align Tech., Inc.*, 2011 WL 2269418, at *14 (N.D. Cal. June 8, 2011) ("The Ninth Circuit has held that typically 'larger sales amounts' than 37% of a defendant's holdings are necessary to support scienter."). Additionally, these sales were dramatically out of line with Defendants Lores's and Weisler's prior trading histories as they garnered proceeds that were seven and eight times higher, respectively, than each defendant's proceeds during the "Control Period" of November 2015 to the start of the Class Period. ¶331. Equally troubling, these sales occurred when HP's stock price was at an all-time high during the Class Period. ¶332; *see Quality Sys.*, 865 F.3d at 1146 (scienter "reinforced" where "uncharacteristic sale" occurred after

---

[20] To the extent Defendants turned a blind eye to whether telemetry data was received from its commercial printers, that would be particularly egregious in light of HP's stated strategy of selling more commercial printers to turn around the Supplies revenue trajectory. ¶76.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

defendant reaffirmed the EPS guidance and falsely told investors that the sales pipeline was growing).

Defendants argue that their insider sales must be discounted because they were made pursuant to Rule 10b5-1 plans. Mot. at 19. However, the Complaint pleads that Defendants entered these plans after they already had access to material, nonpublic information. ¶333. Thus, the plans provide no affirmative defense and even strengthen the inference of scienter. *See Applestein v. Medivation*, Inc., 2011 WL 3651149, at *7 (N.D. Cal. Aug. 18, 2011) (holding plan did not preclude finding of fraud where defendants already had knowledge of the study's unblinding before they entered the plan); *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1261-62 (D. Nev. 2019) (when "executives enter into a trading plan during the Class Period and the Complaint sufficiently alleges that the purpose of the plan was to take advantage of an inflated stock price, the plan provides no defense to scienter allegations."). Tellingly, Defendants have not disclosed the plans, preventing the Court from scrutinizing their terms. *See* Mot. at 19-20. As such, not only is this a factual dispute, but it is based on Defendants' request that *they* receive the benefit of an inference that is unsupported. This plainly cannot suffice at the pleading stage.[21]

### 6. The Temporal Proximity Between The False Statements and the Revelation of the Truth Bolsters the Totality of Scienter Allegations

During a January 8, 2019 conference with investors, Defendant Lores represented that Supplies revenue was projected to be "flat to slightly up" in fiscal year 2019. ¶325. Less than two months later, on February 27, 2019, HP disclosed that Supplies revenue would *decrease* 3% in 2019 and that the Model's market share inputs were based on "lagging and incomplete market share surveys" instead of real-time telemetry data. ¶326. The close temporal proximity between a misleading statement and disclosure of the truth supports scienter. *See Berson*, 527 F.3d at 988 n.5

---

[21] Defendants' argument that increases in their stock holdings during the Class Period undercuts scienter also fails. Their holdings only increased through stock awards or the exercise of prior stock awards—not open market purchases. In other words, neither Defendant paid a penny out of his own pocket so the increase in holdings does not obviate the inference drawn from their suspicious stock sales. *See, e.g., In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (rejecting defendants' attempt to negate scienter by including "vested options and shares gained by exercising options" in calculation of equity interest).

37

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

(noting "the 'temporal proximity' of the misleading statement and the subsequent disclosure 'bolster[s]' the inference that defendants knew about the order when they made the statement").[22]

### 7.   Defendant Weisler's Departure Supports the Inference of Scienter

The strong inference of scienter is bolstered by Defendant Weisler's "sudden" departure on August 22, 2019, at the same time the Company revealed that Supplies revenue was not expected to grow in 2020 due to continued market share losses. ¶143; *see, e.g., UTStarcom*, 617 F. Supp. 2d at 976 (defendants' departures add "one more piece to the scienter puzzle"); *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) (resignation of CFO "as [company's] financial difficulties were coming to light" adds to scienter inference).

### C.   Plaintiffs Adequately Plead Claims Under Sections 20A and 20(a)

*Section 20A.*  For a Section 20A claim, a plaintiff must plead (1) an independent violation of another provision of the securities laws, (2) that defendants traded "while in the possession of material, nonpublic information," and (3) that "trading activity of plaintiffs and defendants occur 'contemporaneously.'" *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1202 (C.D. Cal. 2008). Here, Plaintiffs adequately plead an independent violation of Section 10(b) and allege that Weisler and Lores traded while in possession of material, nonpublic information—namely, that HP did not have the data necessary to determine Supplies market share or demand. *See supra* Section III.

Defendants argue that Plaintiffs do not satisfy the contemporaneous trading requirement at all for Weisler and satisfy it for only one of Lores's trades. Mot. at 38-39. Defendants are incorrect. Plaintiffs are only required to trade contemporaneously with <u>one</u> of a defendant's trades to have standing to assert a Section 20A claim for all of that defendant's class period trades. *See SEB Inv. Mgmt. AB v. Symantec Corp. et al.*, 335 F.R.D. 276, 286 (N.D. Cal. May 8, 2020) (ruling that, where a plaintiff in a securities class action has standing for one insider trade, it would "make little sense" to "further parse [a] plaintiff's Section 20A claim" by specific trades). And, contrary to

---

[22] Defendants distort the holdings of *Ranconi v. Larkin* and *Yourish* (Mot. at 22-23), which do not establish a bright line rule regarding the length of time needed to constitute "temporal proximity." 253 F.3d 423, 437 (9th Cir. 2001); 191 F.3d at 997. Instead, these cases merely state that temporal proximity, *without more*, does not establish scienter. As discussed above, much more is alleged here.

Defendants' assertion, the "contemporaneous trading" requirement does not mandate that trades occur on the same day or even within one day. Mot. at 39. Indeed, trades "nine days" apart are contemporaneous. *See, e.g., City of Westland Police and Fire Ret. Sys. v. Sonic Sols.*, 2009 WL 942182, *11 (N.D. Cal. Apr. 6, 2009) (rejecting argument that, "to be contemporaneous, [plaintiff's] trading must have occurred on the same day as [d]efendants'"). Because the Complaint pleads that Plaintiffs purchased HP shares on the same day as one of Lores's trades and within nine days of one of Weisler's trades, the contemporaneous trading requirement is satisfied.

**Section 20(a) Claim.** Plaintiffs' Section 20(a) claims should also be sustained. Defendants do not dispute "control," and, as set forth above, Plaintiffs sufficiently plead a primary violation of Section 10(b). *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).[23]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in its entirety.

Dated:  December 11, 2020

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER** 
    **& GROSSMANN LLP**

**KESSLER TOPAZ MELTZER &** 
    **CHECK, LLP**

*/s/ Jeremy P. Robinson*

*/s/ Jennifer L. Joost*

JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:  (310) 819-3470

JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
STACEY M. KAPLAN (Bar No. 241989)
(skaplan@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA  94104
Tel:  (415) 400-3000
Fax:  (415) 400-3001

        -and-

JOHN J. RIZIO-HAMILTON (admitted *pro hac vice*)
(johnr@blbglaw.com)
JEREMY P. ROBINSON (admitted *pro hac vice*)

        -and-

GREGORY M. CASTALDO (*pro hac vice* forthcoming)

---

[23] Should the Court deem any portion of the Complaint insufficient, Plaintiffs respectfully request leave to amend.

39

(jeremy@blbglaw.com)
ALEXANDER T. PAYNE (admitted *pro hac vice*)
(alex.payne@blbglaw.com)
BENJAMIN W. HOROWITZ
(admitted *pro hac vice*)
(will.horowitz@blbglaw.com)
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiff Iron Workers Local 580 Joint Funds and Co-Lead Counsel for the Class*

(gcastaldo@ktmc.com)
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

*Counsel for Lead Plaintiff the State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island and Co-Lead Counsel for the Class*

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

## CERTIFICATE OF SERVICE

I, Jeremy P. Robinson, declare as follows:

I am employed in the County of New York, State of New York, I am over the age of eighteen years and am not a party to this action; my business address is 1251 Avenue of the Americas, 44th Floor, New York, NY 10020, in said County and State.

I hereby certify that on December 11, 2020, the foregoing **LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT** was filed with the Clerk of the Court via CM/ECF. Notice of this filing will be sent electronically to all registered parties by the operation of the Court's electronic filing systems.

Dated: December 11, 2020

*/s/ Jeremy P. Robinson*
Jeremy P. Robinson

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI