**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:  (310) 819-3470

*Counsel for Lead Plaintiff Iron Workers Local 580
Joint Funds and Co-Lead Counsel for the Class*

**KESSLER TOPAZ MELTZER & CHECK, LLP**
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
STACEY M. KAPLAN (Bar No. 241989)
(skaplan@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA  94104
Tel:  (415) 400-3000
Fax:  (415) 400-3001

*Counsel for Lead Plaintiff the State of Rhode
Island, Office of the General Treasurer, on behalf of
the Employees' Retirement System of Rhode Island
and Co-Lead Counsel for the Class*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE HP INC. SECURITIES LITIGATION | Case No. 3:20-cv-01260-SI |
| | **DECLARATION OF JEREMY P. ROBINSON IN SUPPORT OF LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT** |
| | Date:  February 5, 2021<br>Time:  10:00 A.M.<br>Dept:  Courtroom 1, 17th Floor<br>Judge:  Hon. Susan Illston<br>Date Action Filed:  February 19, 2020 |

DECLARATION OF JEREMY P. ROBINSON
Case No. 3-20-cv-01260-SI

I, JEREMY P. ROBINSON, of full age, hereby certify as follows:

1.    I am a partner with the law firm of Bernstein Litowitz Berger & Grossmann LLP. I respectfully submit this Declaration in support of Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss Complaint. I have personal knowledge about the information in this Declaration and, if called upon as a witness, could and would competently testify thereto.

2.    On September 30, 2020, after the Complaint in the above-captioned action was filed (on July 20, 2020), the Securities and Exchange Commission ("SEC") issued an "Order Instituting Cease-And-Desist Proceedings Pursuant To Section 8A Of The Securities Act Of 1933 And Section 21C Of The Securities Exchange Act of 1934, Making Findings, And Imposing Remedial Sanctions And A Cease-And-Desist Order" (the "SEC Order"). A true and correct copy of the SEC Order is attached hereto as **Exhibit 1.**

I hereby declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 11, 2020.

_/s/ Jeremy P. Robinson_
Jeremy P. Robinson

1

DECLARATION OF JEREMY P. ROBINSON
Case No. 3-20-cv-01260-SI

## **<u>CERTIFICATE OF SERVICE</u>**

I, Jeremy P. Robinson, declare as follows:

I am employed in the County of New York, State of New York, I am over the age of eighteen years and am not a party to this action; my business address is 1251 Avenue of the Americas, 44th Floor, New York, NY 10020, in said County and State.

I hereby certify that on December 11, 2020, the foregoing **DECLARATION OF JEREMY P. ROBINSON IN SUPPORT OF LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT** was filed with the Clerk of the Court via CM/ECF. Notice of this filing will be sent electronically to all registered parties by the operation of the Court's electronic filing systems.

Dated: December 11, 2020                       _____/s/ Jeremy P. Robinson_____
                                                                    Jeremy P. Robinson

2

DECLARATION OF JEREMY P. ROBINSON
Case No. 3-20-cv-01260-SI

# EXHIBIT 1

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
Release No. 10868 / September 30, 2020

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 90060 / September 30, 2020

**ACCOUNTING AND AUDITING ENFORCEMENT**
Release No. 4183 / September 30, 2020

**ADMINISTRATIVE PROCEEDING**
File No. 3-20112

|  |
|---|
| **In the Matter of** |
| **HP INC.** |
| **Respondent.** |

**ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER**

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against HP Inc. ("HP" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which is admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Exchange Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

### Summary

1.      This matter concerns HP's failure to disclose between November 2015 and June 2016 material information regarding its print supplies channel inventory[2] management and sales practices.  During that period, certain regional managers at HP undertook undisclosed sales practices to increase quarterly operating profit, leading to an erosion of profit margin and an increase in channel inventory, while failing to disclose known trends and uncertainties associated with the conduct.

2.      Beginning in the second fiscal quarter of 2015, certain regional managers at HP used a variety of incentives to accelerate, or "pull-in," sales that they otherwise expected to materialize in later quarters.  In addition to the pull-ins, management in one region sold printing supplies to distributors known to be involved in selling the HP printing supplies outside of their territory (internally described as "gray marketing," and known in the region as "A-Business") causing significant margin erosion and cannibalization of HP sales in other regions.

3.      Despite the risk that these sales practices could negatively impact HP's operating profit in future quarters, HP did not disclose to the market during the relevant time period that its use of the pull-ins and A-Business were causing decreased margins and increased channel inventory.  HP further failed to disclose facts necessary to make its channel inventory disclosures not misleading, including that the channel inventory metric employed by the company in quarterly earnings calls only included channel inventory held by channel partners to which HP sold directly and not by channel partners further down the distribution chain, thereby disclosing only an incomplete picture of HP's channel health.

4.      In June 2016, HP announced that it was changing its go-to-market model, in part to address the practices described above.  In connection with that change, HP announced that it would undertake a channel inventory reduction that would reduce HP's net revenue by approximately $450 million during the third and fourth quarters of 2016.  HP's stock price dropped nearly 6% following the announcement.

### Respondent

5.      **HP Inc.** is incorporated in Delaware and headquartered in Palo Alto, California. HP is a U.S. technology company that, among other things, manufactures and sells personal computers, printers and printer supplies.  On November 1, 2015, Hewlett-Packard Company

---

[1] The findings herein are made pursuant to Respondent's Offer and are not binding on any other person or entity in this or any other proceeding.

[2] Channel inventory as used here refers to inventory sold by HP to its distribution channel that has not yet been sold to end users.  Increasing channel inventory indicates that HP has sold more to its channel partners than the channel is selling to end users.

completed the spin-off of certain portions of its business into a separate company. The remaining business was renamed HP Inc. HP retained Hewlett-Packard's Printing, Personal Systems and Corporate Investment Segment as well as its former stock ticker symbol on the New York Stock Exchange (Ticker: HPQ), and it remained registered with the Commission pursuant to Section 12(b) of the Exchange Act. HP's fiscal year ends on October 31.

### HP Emerges from Hewlett-Packard Split with a Focus on Supplies Revenue

6.      Hewlett-Packard was founded in 1939 and developed into a leading American technology company. On November 1, 2015, Hewlett-Packard separated into two public companies, and HP emerged from that split operating Hewlett-Packard's legacy Printing, Personal Systems and Corporate Investments reportable segments. HP's Printing segment is comprised of Consumer Hardware, Commercial Hardware, and Supplies business units. The Supplies business unit within the Printing segment sells supplies for use in HP printers, including ink and toner.

7.      HP operated three geographic regions: the Americas ("AMS"), Asia Pacific and Japan ("APJ") and Europe Middle East Africa ("EMEA"). These regions were consolidated into HP's corporate results at its worldwide level. HP policy and contracts with distributors specifically prohibit the sale of HP products, including supplies, outside the distributor's authorized territory.

8.      Prior to the split, consistent with the overall secular decline of printing, Hewlett-Packard's Printing segment had seen declining revenue for several years, with overall Printing revenues, as well as Supplies revenues, declining for multiple quarters in a row. However, because of the high profit margins, the Printing segment, and the Supplies business unit in particular, still delivered consistent cash flow and operating profit that Hewlett-Packard used to invest in its other business lines.

9.      With the announcement of the split in November 2014, the Printing segment would take on added importance for the smaller HP that would emerge post-split, especially its Supplies business unit, which was the primary profit generator for the Printing segment. Although the Printing segment had previously delivered solid cash flow and operating profit for Hewlett-Packard, its declining revenue in recent years posed a risk to the smaller post-split company.

10.     HP executives recognized the need to improve revenue and profitability in the Printing segment following the split, and emphasized the importance of meeting their Supplies budgets. This led regional managers in the Supplies business unit to take a number of actions in order to meet their individual budgets that ultimately increased channel inventory and reduced profit margins worldwide.

**<u>Channel Inventory Metrics for HP's "Push" Go-To-Market Model Only Told Part<br>of HP's Channel Inventory Story</u>**

11.     Hewlett Packard historically, and HP following the split, operated its print supplies business in what is known as a "push" go-to-market model.  Under the push model, the company would drive Supplies inventory to its channel partners using various sales incentives, and then would use a combination of marketing spend and discounts (referred to as "contra dollars") to promote the movement of inventory through the channel to end users.  Typically at the end of quarters, sales managers would use these "contra dollars" to try to manage the business to meet their sales targets to deliver on regional budgets for revenue, operating profit and channel inventory.

12.     HP operated its push model through a multi-tiered channel in all of its regions.  Although the number of tiers varied by region, HP would generally sell products directly to "Tier 1" distributors, which would then sell the products through to "Tier 2" resellers, which would either sell to end users or to resellers further down the distribution chain.  HP recognized revenue on channel sales at the time of the initial sale to a channel partner.  HP had no continuing obligations following the sale to the Tier 1 partner, and the sales were not contingent on the eventual sales on to the Tier 2 partner or end user.

13.     HP measured its channel inventory levels using Weeks of Supply (WOS), a calculation of HP's Tier 1 channel inventory divided by an average of previous weeks' sales in order to give an indication of how many weeks of inventory were in the channel if sales continued at the recent pace.  HP did not disclose its WOS metric to the market (or the calculations behind that metric), but on its quarterly earnings calls HP would disclose whether it was within or above its internal targeted WOS range as a proxy for its channel health.  Internally, HP referred to the upper end of its WOS range as a ceiling, and regional managers were expected to maintain their channel inventory below the WOS ceiling.

14.     Under the push model, WOS was an important control over sales managers' incentives to push excess inventory into the channel.  The WOS ceilings for each of the business units were established by HP's Finance Department annually and were recognized by sales managers in the Printing segment as a "high-visibility" and "do not exceed metric."

15.     Undisclosed to the market, HP only included its Tier 1 channel partners' inventory in its WOS calculation.  HP did not receive channel inventory data from all of its Tier 2 channel partners, and thus only estimated its Tier 2 channel inventory following the end of quarters using incomplete data.  As a result, HP did not report to the market Tier 2 channel inventory, meaning that disclosures about the company's position relative to its channel inventory ceiling only told part of the story regarding HP's channel health.  This allowed HP sales managers to reduce their WOS number when Tier 1 partners sold channel inventory to Tier 2, even when overall channel inventory was increasing.

## In Order to Meet Sales Targets, HP Provided Quarter-End Discounts to Pull Forward Sales from Future Quarters

16.     Consistent with a typical push model, HP offered discounts to its Tier 1 distributors, which the distributors could offer to partners further down the distribution chain to move product through the channel during the quarter.  Beginning in early 2015 and undisclosed to the market, HP sales managers began offering increased discounts at the end of quarters to meet sales targets.

17.     HP kept track of its sales performance through weekly "flash" reports that predicted the outcome of quarterly metrics against budget based on the actual performance of weeks past and anticipated performance for future weeks.  Regional managers used the flash reports to manage to budgeted revenue, operating profit and WOS numbers.  By early 2015, HP began to see regular gaps near the ends of quarters between the flash and budget.

18.     In order to achieve their targets, certain managers within the Printing segment took actions to accelerate sales into the channel to increase quarterly revenue.  Known internally as "accelerations" or "pull-ins," the managers would authorize additional discounts to encourage Tier 1 distributors to place orders earlier than they were otherwise planning to place them.  In internal presentations in early 2016, HP defined the accelerations as "pay[ing] the channel to take additional shipments within a given quarter."

19.     Over time, this use of discounting at the end of quarters created a pattern of lower sales during the first two months of the quarter and an expectation from the channel that HP would offer larger discounts in the third month of the quarter.  That pattern accelerated in late 2015 and early 2016, with HP managers offering steeper end-of-quarter discounts in order to meet quarterly sales targets.  As a result, HP's end-of-quarter accelerations and pull-ins were at lower profit margins than if the sales had materialized in line with anticipated demand.

20.     This pattern led to a known trend of increasing channel inventory and lower margin sales that continued over multiple quarters.  HP's Supplies Tier 1 channel inventory increased from the middle of its WOS ranges in the fourth quarter of 2014, to above its WOS range by the end of the second quarter in 2015.  Although HP disclosed during quarterly earnings calls in late 2015 and early 2016 that it was slightly above its targeted range, it failed to disclose that it was only describing its inventory in Tier 1, and that it lacked visibility into its Tier 2 channel inventory and beyond.

21.     During this period, one regional general manager in the Printing segment described "unhealthy levels of stock" in Tier 1 and Tier 2, saying that "we needed the Supplies Revenue & we used significant amounts of contra to push in Supplies at T1 to > 2 weeks above their optimal levels."

22.     Another regional general manager in the Printing segment explained that "partners do not want to carry the level of toner that we push into their warehouses. . . . [b]ut we push more toner in to help deliver on our financial plans."

23.    Another regional sales manager in the Supplies business unit complained that it was "becoming increasingly difficult to get partners to place orders at any price" because HP was "at historical highs with [its] accelerations."

## In Order to Meet Sales Targets, APJ Sales Personnel Engaged in Out-of-Region Sales

24.    In a further attempt to meet revenue and earnings targets, in early 2015 through June 2016, certain HP sales managers in APJ sold to resellers or brokers known to sell HP supplies outside of their territory, described internally as "gray marketing" and known in APJ as "A-Business." Despite increasing HP's channel inventory and decreasing its margins worldwide, the A-Business sales and their impact on HP's channel inventory and margins were not disclosed to the market.

25.    To execute the A-Business, APJ sales teams sold supplies to resellers or brokers who they expected would later sell those supplies outside of their territory. The practice had occurred on a small scale in APJ for years and came to be included in APJ's budgeting process. To engage in the A Business, sales managers in APJ provided HP product to resellers and brokers within their region at higher than normal discounts, knowing they would sell the goods through a network of firms into the Middle East.

26.    Beginning in early 2015 and continuing through the second quarter of 2016, sales managers in APJ significantly increased the A-Business in order to fill gaps to sales targets. To entice distributors to take additional product, sales managers offered discounts, in some instances in excess of forty percent for A-Business sales, while discounts for local distributors were in the teens. In certain instances, to avoid the gray-marketed goods going from one APJ country to another and undercutting local prices, managers in certain APJ countries granted additional discounts to their local distributors, further undercutting margins within the region. Internal company documents described the A-Business in 2015 and the first half of 2016 being conducted at contra levels three to four times HP's normal contra rates.

27.    As a result of the higher-than-normal discounts, between early 2015 and June 2016, HP saw a significant increase in product sold through A-Business. Some countries in HP's APJ region saw the amount of A-Business surpass the amount of their local business. In addition, the size of the discounts granted to encourage A-Business climbed, as distributors demanded larger discounts to accept the increased inventory.

28.    Many of the goods sold in the A-Business from APJ later appeared in HP's European and African markets. HP managers in EMEA and elsewhere recognized that the A-Business was "cannibalizing" sales from local HP distributors and reducing HP's margins, causing managers in those territories to reduce prices to combat gray marketing from the APJ region.

29.    As territories in HP's EMEA region reduced prices to combat gray marketing from the APJ region, some discounted goods from EMEA eventually made their way into certain markets in the AMS region, causing further sales cannibalization and pressuring margins in the

6

AMS region as well.  This influx of discounted goods from EMEA further exacerbated already growing channel inventory challenges in the AMS region.

**In an Attempt to Avoid Exceeding Tier 1 Channel Inventory Ceilings, HP Managers Offered Additional Discounts to Tier 1 Channel Partners to Sell to Tier 2 Channel Partners**

30.    In late 2015 and early 2016, as WOS in each of HP's three regions approached or exceeded their ceilings, HP's worldwide executives demanded that regional managers remain within their WOS ranges while still delivering sales and operating profit targets.

31.    Trying to achieve those results, sales managers in the regions offered additional discounts to HP's Tier 1 distributors to encourage sales from Tier 1 to Tier 2.  The movement of channel inventory from Tier 1 to Tier 2 partners allowed the regions to reduce WOS, but did not alter the overall inventory in the channel absent additional end-user sales.  For regions that were at or below their WOS ceiling, pushing inventory into Tier 2 provided additional room for managers to sell into Tier 1 to increase revenue without exceeding the WOS ceilings.

32.    In some cases, because the Tier 2 partners already had what they viewed to be sufficient inventory, they demanded steeper discounts to offset the cost of holding the additional inventory.  The additional incentives that HP offered would be paid to the Tier 1 partners, which would pass the discount on to the Tier 2 partner.

33.    In some instances in APJ, regional sales managers engaged in "simultaneous sell-in/sell-through deals," also called "in-and-out sales," described by one HP regional sales manager as "indent supplies that sells-in [to Tier 1] and through [to Tier 2] immediately" which had "no WOS implications and helps with our profit status."  Nevertheless, because the sales were based on meeting HP's budgeted numbers and not on specific end-user demand, they further increased HP's Tier 2 channel inventory.  Because HP's disclosures only described its Tier 1 channel inventory, this additional inventory was not part of HP's channel inventory disclosures.

**HP Addresses Pull-Ins and A-Business as Part of its Go-To-Market Model Change**

34.    In the first quarter of 2016 HP began considering a move from the company's traditional push model to a demand-driven pull model.  Under the pull model, HP's sales levels into the channel would be based on end user demand.  In connection with the change from the push to the pull model, HP sales managers involved in the process emphasized the need for significant channel inventory reductions.

35.    HP created a working group to explore a potential change from a push to a pull model.  That working group identified four operational issues to be addressed.  Among these issues were HP's inefficient use of contra, including regional end of quarter pull-ins to meet profit targets, and the significant increase in A-Business at elevated contra levels.

36.    In internal presentations associated with the change from a push to a pull model, the company identified significant negative impacts from "WOS Correction" and "Sell-Out

7

Impact" that would decrease HP's revenue and operating profit in the second half of fiscal year 2016. In an effort to lessen the negative impact to operating profit, HP timed the go-to-market model change to coincide with a divestiture of certain software assets.

37.     On June 21, 2016, HP held a "Business Update Call" midway through the company's third fiscal quarter. On the call, HP announced its change from a push to a pull model, and it explained that the company would be making a "one-time investment to reduce the level of supplies inventory across the channels." HP disclosed that, "[a]s a result of the channel inventory reduction, the supplies net revenue is expected to be reduced by $225 million in each Q3 and Q4."

38.     The $450 million reduction represented 5% of HP's reported Printing segment net revenue for the second half of 2016. Asked by an analyst about the size of the inventory reduction, HP's CFO described it as "fairly material, because as I mentioned it's about $450 million over a couple of quarters." Following the announcement, HP's stock price dropped nearly 6%, eliminating more than $1 billion of market capitalization.

### HP's Disclosure Failures Between 2015 and June 2016

39.     Between November 2015 and June 2016, HP's disclosures regarding channel inventory and gross margin omitted material information regarding the impact of the above-mentioned practices on these metrics, causing HP's disclosures to be incomplete and misleading. As a result of the conduct described above, Respondent omitted material information in: (1) its annual report on Form 10-K for fiscal year 2015; (2) its quarterly reports on Form 10-Qs for the first and second quarters of 2016; and (3) on quarterly earnings calls during that time period.

40.     Pursuant to Item 303 of Regulation S-K, 17 C.F.R. § 229.303, companies with an obligation to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act are required to disclose in Item 7 of Management's Discussion and Analysis of Financial Condition and Results of Operations of Form 10-K, among other things, information that the registrant believes to be necessary to an understanding of the company's "financial condition, changes in financial condition and results of operations."

41.     Item 303(a)(3)(ii) of Regulation S-K, 17 C.F.R. § 229.303(a), requires such companies to describe, among other things, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" in its annual report on Form 10-K. Instruction 3 to Item 303(a) of Regulation S-K requires that the "discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

42.     In its 2015 Form 10-K, HP failed to disclose the known trend of increased quarter-end discounting leading to margin erosion and an increase in channel inventory, and the unfavorable impact that the trend would have on HP's sales and income from continuing operations, causing HP's reported results to not necessarily be indicative of its future operating

results. The failure to disclose that material trend caused HP's 2015 Form 10-K to be materially misleading.

43.     Moreover, in periodic securities filings between November 2015 and June 2016, HP repeatedly disclosed decreases in its operating profits caused by declines in HP's gross margin. In each instance, HP provided various reasons for the decline in gross margin but omitted the material impact that pull-ins and the A-Business were having on HP's gross margins. Specifically, in its quarterly securities filings for the first two quarters of 2016, HP disclosed that its decreasing gross margins were the result of "competitive pricing environment" and "unfavorable currency impacts," but omitted from its description the impact that its use of pull-ins and A-Business was having on its gross margins.

44.     Moreover, on quarterly earnings calls between November 2015 and June 2016, HP repeatedly made disclosures regarding the level of its channel inventory relative to the company's "target weeks of supply range." HP's use of the phrase "channel inventory" without definition gave the impression that the internal measurement included all of HP's channel inventory and was a measure of HP's overall channel health. However, as described above, HP's internal channel inventory metric included only its Tier 1 channel inventory. HP's failure to describe its overall channel inventory provided the market with only a partial and misleading picture of HP's channel health and caused HP's channel inventory disclosures to be materially misleading.

45.     In addition, in several instances where HP's channel inventory was above its target range, HP omitted from the disclosure the material impact that pull-ins and A-Business were having on HP's channel inventory. Specifically, on its quarterly earnings calls in November 2015 and February 2016, HP omitted from its channel inventory disclosure the impact that pull-ins and A-business had in causing channel inventory to increase above the target range.

46.     During the relevant period, HP issued securities pursuant to employee benefit plans, including certain incentive compensation plans and an employee stock purchase plan. Pursuant to those plans, HP issued securities to employees upon their exercise of stock options and sold securities through its employee stock purchase plan. HP received $0.4 billion in cash from options exercises and purchases under its employee benefits plans in fiscal year 2015 and $48 million in fiscal year 2016.

### HP's Disclosure Control Failures

47.     Exchange Act Rule 13a-15(a) requires issuers such as HP to "maintain disclosure controls and procedures . . . as defined in paragraph (e) of this section." Paragraph (e) defines disclosure controls and procedures to include, among other things, "disclosure controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure."

48.     HP lacked sufficient disclosure controls and procedures to ensure that the use of pull-ins and A-Business to meet quarterly sales targets, and their negative impact on margin and potential impact on future quarters, was provided to the HP executives responsible for the company's disclosures in a timely manner as required by Rule 13a-15(a).  Among other things, HP lacked company-wide controls over the use of discounts by regional management. Moreover, HP's lack of visibility into channel inventory levels below Tier 1 left it without meaningful insight into its overall channel health.  In addition, HP's disclosure process lacked sufficient interaction with operational personnel who reasonably would have been expected to recognize that the known trends attributable to the pull-ins and A-Business were absent from HP's disclosures.

49.     Instead, HP's principal financial officers and principal executive officers who were responsible for the company's disclosures learned of the conduct in connection with HP's planned shift from a push to a pull model quarters after the actual conduct had taken place.  HP's failure to have controls and procedures in place to ensure the timely provision of information to the officers responsible for its disclosures violated Exchange Act Rule 13a-15(a).

### Violations

50.     As a result of the conduct described above, HP violated Section 17(a)(2) and (3) of the Securities Act, which prohibit any person from directly or indirectly obtaining money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser, in the offer or sales of securities.

51.     In addition, HP violated Section 13(a) of the Exchange Act and Rule 13a-1 and 13a-13 thereunder, which require reporting companies to file with the Commission complete and accurate annual and quarterly reports. HP also violated Rule 12b-20 of the Exchange Act, which requires an issuer to include in a statement or report filed with the Commission any information necessary to make the required statements in the filing not materially misleading.

52.     In addition, HP violated Exchange Act Rule 13a-15(a), which requires issuers required to file reports pursuant to Section 13(a) or 15(d) to maintain disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e).

### IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent's Offer.

Accordingly, it is hereby ORDERED that:

A.     Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Respondent shall cease and desist from committing or causing any violations and any future

violations of Section 17(a)(2) and (3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 13a-1, 13a-13, 13a-15, and 12b-20 thereunder.

B.      Respondent shall, within 30 days of the entry of this Order, pay a civil monetary penalty of $6,000,000.00 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury.  If timely payment is not made, interest shall accrue pursuant to 31 U.S.C. § 3717.
Payments must be made in one of the following ways:

        (1)     Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

        (2)     Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

        (3)     Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Service Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying HP Inc. as a Respondent in these proceedings, and the file number of these proceedings.  A copy of the cover letter and check or money order must be sent to Associate Director Melissa Hodgman, Division of Enforcement, Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549.

C.      Amounts ordered to be paid as civil money penalties in this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Commission.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

D.      It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. § 523, the findings in this Order are true and admitted by Respondent, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondent under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondent of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19).

By the Commission.

Vanessa A. Countryman
Secretary