**Pages 1 - 45**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan Illston, Judge

IN RE HP INC. SECURITIES          )
LITIGATION.                       )
                                  )     **NO. 20-01260 SI**
                                  )
                                  )
_____   )

San Francisco, California
Friday, February 5, 2021

**TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**

**APPEARANCES BY ZOOM WEBINAR:**

For Plaintiffs:
                    BERNSTEIN, LITOWITZ, BERGER & GROSSMANN LLP
                    1251 Avenue of the Americas - 44th Floor
                    New York, New York  10020
               BY:  **JOHN J. RIZIO-HAMILTON, ATTORNEY AT LAW**
                    **JEREMY P. ROBINSON, ATTORNEY AT LAW**

                    KESSLER, TOPAZ, MELTZER & CHECK LLP
                    One Sansome Street - Suite 1850
                    San Francisco, California  94104
               BY:  **JENNIFER L. JOOST, ATTORNEY AT LAW**
                    **STACEY M. KAPLAN, ATTORNEY AT LAW**

For Defendants:
                    GIBSON, DUNN & CRUTCHER LLP
                    555 Mission Street - Suite 3000
                    San Francisco, California  94105
               BY:  **BRIAN M. LUTZ, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

**APPEARANCES BY ZOOM WEBINAR**:   (CONTINUED)

For Defendants:
                    GIBSON, DUNN & CRUTCHER LLP
                    1050 Connecticut Avenue, NW
                    Washington, D.C.   20036
          BY:   **LISSA M. PERCOPO, ATTORNEY AT LAW**

                    SIDLEY AUSTIN LLP
                    555 California Street - Suite 2000
                    San Francisco, California   94104
          BY:   **SARA B. BRODY, ATTORNEY AT LAW**

For Defendant Catherine A. Lesjak:
                    WILSON, SONSINI, GOODRICH & ROSATI
                    650 Page Mill Road
                    Palo Alto, California   94304
          BY:   **STEVEN M. SCHATZ, ATTORNEY AT LAW**
                    **KATHERINE L. HENDERSON, ATTORNEY AT LAW**

**Friday - February 5, 2021**                    **10:14 a.m.**

                    **P R O C E E D I N G S**

                           **---000---**

        **THE CLERK:**  Now calling Case Number 20-cv-1260, In Re HP Inc. Securities Litigation.

     Counsel, please state your appearances for the record starting with plaintiff.

        **MR. RIZIO-HAMILTON:**  Good morning, Your Honor.  John Rizio-Hamilton, Bernstein, Litowitz, Berger & Grossmann, for the lead plaintiffs.

        **THE COURT:**  Good morning.

        **MR. ROBINSON:**  Good morning, Your Honor.  Jeremy Robinson, Bernstein, Litowitz, Berger & Grossmann, for plaintiffs.

        **THE COURT:**  Good morning.

        **MS. JOOST:**  Good morning, Your Honor.  Jennifer Joost from Kessler, Topaz, Meltzer & Check for the plaintiffs.

        **THE COURT:**  Good morning.

        **MS. KAPLAN:**  Good morning, Your Honor.  Stacey Kaplan from Kessler Topaz also for the plaintiffs.

        **THE COURT:**  Good morning.

        **MR. LUTZ:**  Good morning, Your Honor.  I think we're on to the defendants now.  Good morning, Your Honor.  This is Brian Lutz from Gibson Dunn on behalf of -- for the defendants.

        **THE COURT:**  Good morning.

**MR. SCHATZ:**  Good morning, Your Honor.  Steven Schatz, Wilson Sonsini, on behalf of Catherine Lesjak.

**THE COURT:**  Good morning.

**MS. PERCOPO:**  Good morning, Your Honor.  Lissa Percopo, also with Gibson Dunn, on behalf of defendants.

**MS. HENDERSON:**  Katherine Henderson from Wilson Sonsini also for Catherine Lesjak.

**MS. BRODY:**  Good morning, Your Honor.  Sara Brody, Sidley Austin, on behalf of defendants.

**THE COURT:**  Good morning.  Well, welcome.

This is defendants' motion to dismiss the amended complaint, and there are a couple of requests for judicial notice as well.

The issue is whether plaintiffs have adequately pled actionable misstatements and whether they've adequately pled scienter.  There's also a motion to dismiss the control person allegations based on the alleged failure to allege an underlying 10(b) claim.

I would be happy to hear from all of you.  My concerns are twofold.  Well, the primary concern I have is scienter, that there doesn't seem to be enough in there to explain how you get to scienter.  So that's the place that I'm most concerned.

I'll be happy to hear about everything, but that's my primary concern.  So if the plaintiffs want to go first, they may.

**MR. RIZIO-HAMILTON:**  Thank you very much, Your Honor. Again, this is John Rizio-Hamilton.

Your Honor, this is a case where there is a strong core operations inference.  It's not the only scienter fact, but it is the central one.

Here the supplies business and the Four Box Model were undoubtedly the company's core operation, and that's really undisputed.  To say that the supplies business was core to HP would be an understatement.  It accounted for substantially all of the company's profit.

And defendants had pegged their ability to stabilize and turn that business around on the Four Box Model and its purported big data or telemetry data analysis.

Importantly, you know, this is a scenario where defendants' own statements as well as other facts strongly suggest that they had actual access to the undisclosed facts; and within the context of the core operations doctrine, that's a meaningful factor.

Defendants repeatedly told investors in this case that they knew the Four Box Model in detail, they knew what data it was using, and they were constantly updating and refining it and, in fact, using the data at issue in the case to analyze profitability down to the ZIP code level.

Defendant Lesjak, for example, stated shortly before the class period begins that the company was, in fact, capturing

telemetry data from its commercial fleet as of the end of 2016. That's at paragraph 71.

Later on in the class period, defendant Lesjak reaffirmed her familiarity with the data that the company was supposedly using.  At paragraph 250 of the complaint, she stated (reading):

"Many of your printers phone home to us and tell us what kind of usage we're getting so we can look at, say, the United States and we can do this to other countries, but you can look at the United States and you can actually zero in on the ZIP code and know whether or not these type of SKUs in that ZIP code tend to buy on average a lot of supplies or not.  But broadly we can see inside the ZIP code level and we get that data all the time.  This is the biggest investment we make every day, every quarter, every year."

Defendant Weisler also professed familiarity with the data that was purportedly being used in the Four Box Model.

THE COURT:  Well, and what I'm concerned about is how do we -- what is your evidence that they knew to the contrary when they were saying those things?

MR. RIZIO-HAMILTON:  Well, so the situation here from the big picture perspective is that defendants professed intimate familiarity with the data that was underlying the Four Box Model.  The Four Box Model was absolutely central to the

company's profitability and success.

The missing data that we're talking about here related to the company's commercial fleet.  That fleet comprised approximately 60 percent of the entire supply business.  So we're talking about a massive data gap in the dataset that they said they were intimately familiar with time and time again both before the class period and throughout.

Beyond that, it would be impossible if they were truly familiar with the data that they claimed to know so well, it would be impossible to miss a gap that huge.  It was massive.  This was no trifling omission of data.  This was the data at the heart of the business.  This was the data for the commercial fleet.

The absence of this data completely devastated the model and showed that the business was nothing like what they had told investors it was.

Beyond that, Your Honor, that is, their statements professing intimate personal familiarity with the data coupled with this massive glaring absence of data for the core business, beyond that, they tried to backfill that hole by relying on lagging and incomplete third-party market surveys.  So that itself evinces an awareness that the data was missing.

**THE COURT:**  When did that happen?  When did that happen?

**MR. RIZIO-HAMILTON:**  That happened from the beginning

of the class period.  At the end of the class period, they say -- and this is, you know, roughly at paragraphs 134 and 135 of the complaint -- that "We never had this data that we claim to have.  We never had statistically significant data for the commercial part of the business," which was the heart of the business, "and previously" -- they used the word "previously" -- "we had been relying on incomplete, lagging, and inaccurate market surveys."

So that was a fact.  And they actually used the word "never."  It had never been statistically significant, that data.  Again, in paragraphs 134-135, thereabouts.

So the fact that they had been using these lagging, inaccurate third-party market surveys instead of the telemetry data that they claim to have from the beginning of the class period is a significant scienter fact here.

And when they made these disclosures to the market in February of 2019, they never say, "Oh, we were surprised to learn that the data was missing and we had backfilled the hole by relying on these third-party market surveys."  They never expressed surprise about that.  They said that, simply put, that's what they had done and it turned out that it threw the model off entirely.

So from a big-picture perspective, you have a situation here where they said time and again -- and the complaint is replete with examples of this, I started to give just a couple,

but time and again defendants told the market "We are intimately familiar with the data underlying this model.  We used that data from the commercial side of the business."  And they assured the market of that just before the class period begins.

They said, "We parse that data and look at it down to the ZIP code level, and we can actually assess profitability per printer based on this data.  That's how powerful and robust the data that we have is," when, in fact, they lacked the data for a massive portion of the business and they had backfilled that hole with lagging, incomplete, and inaccurate market surveys, an action that itself evinces awareness of the absence.

Beyond this, Your Honor -- by the way, I would say that that by itself under the species of core operations doctrine requiring the two-prong analysis of the core nature of the disputed information coupled with other facts suggesting that defendants had actual access to the disputed information, that by itself is enough to raise a strong inference of scienter, but there is more.

There's a report by Former Employee 1 who states that in approximately the second quarter of HP's 2018 year -- which in calendar terms ends April 30th, 2018, so now we're smack in the middle of the class period -- that there was a huge miss in revenue expectations for the EMEA region and that the CEO at the time, defendant Weisler, was livid over the miss and held a

series of crisis meetings to ascertain why the miss occurred.

And in connection with those meetings, defendant Weisler was informed that the Four Box Model was inaccurate and unreliable precisely because it lacked sufficient data, and in particular it lacked data with respect to market share, which is something that defendants admitted they lacked at the end of the class period here.

Subsequent to that, defendant Weisler made -- went out and made additional assurances to the market that the model was reliable and sound and that the data was robust, none of which were true.  That is another fact demonstrating -- I would say strongly suggesting -- that defendants had access to the disputed information at the highest level of the company.

Beyond this, Your Honor, we do have insider trading allegations with respect to two of the defendants.  I know that those are disputed by those defendants.  Their principal argument is that these defendants actually increased their holdings over the course of the class period, but I just want to unpack that a little bit because I don't think it really gives you the whole picture of what happened here.

If we take one example, and I will take -- let's see, I will take defendant Lores, he began the class period with 123,000 odd shares of common stock.  He then acquired during the class period through the exercise of highly profitable options, not going into the open market to purchase it but

exercising options that were already well in the money, almost 1.4 million shares.  He sold almost 1.3 million shares during the class period.

So while it's true that at the end of this trading activity he had more holdings than he began with, the fact remains that he sold 83 percent of his holdings during the class period for tens of millions of dollars.

And a very similar analysis applies to defendant Weisler. I won't walk through the minutia of the numbers, but suffice it to say that notwithstanding defendants' arguments about the increase in his holdings, the fact remains that he sold approximately 89 percent of his shares during the class period.

So when you step back and look at the scienter analysis holistically, as I think you're required to do, there are many facts here which give rise to the strong inference, the core operations doctrine and in particular that branch of the doctrine holding that you can raise a strong inference of scienter by itself with no other facts where you allege that the subject of the misstatements was core to the company, which is undisputed here, and there are additional facts strongly suggesting that defendants had access to the disputed information, which I believe exist here for the reasons stated.

When you couple that with the report of Former Employee 1 and the insider selling here that we see, which is extremely substantial notwithstanding the arguments that defendants make

in their opposition brief, I think that's enough to get us into discovery and to defeat a motion to dismiss at this early stage.

THE COURT: Okay. Thank you.

MR. RIZIO-HAMILTON: Thank you.

THE COURT: So who speaks for defendants.

MR. LUTZ: Thank you, Your Honor. This is Brian Lutz from Gibson Dunn.

I'll at least start [Audio Interference] --

THE COURT: Mr. Lutz, you're breaking up.

MR. LUTZ: Okay. I'm sorry. Can you hear me?

THE COURT: That's better.

MR. LUTZ: Okay. Sorry. I'm in my office. Hopefully this kicks in well. Technology.

Is it okay?

THE COURT: Yeah.

MR. LUTZ: Okay. So just to respond to some of the questions -- the principal question about scienter, I want to focus on that. Let's not forget this is a case about a financial model. This is a case about the Four Box Model that was part of the business in which -- focused on the supplies business in which HP sold ink and toner for its printers. So throughout 2017 and 2018, the Four Box Model in quarter after quarter worked as it was supposed to. HP announced the amount of revenue that the model predicted HP would earn and in each

quarter during those two years, the amount of supplies revenue met or exceeded the model's prediction.

Then in 2019, in early 2019, HP received new data indicating that one of the model's assumptions was off.  HP corrected the model and announced that the supplies business would be down by a few percentage points that quarter and for the rest of the year.

Now, plaintiffs don't claim that HP falsely recorded revenue.  There's no claim of overstated sales.  There's no claim that HP misrepresented some fundamental business metric. They don't claim that there was undisclosed business practices or unlawful conduct that led to a decline in the business. This is instead the unusual case where the focus is just on a financial model.

The crux of the claim, as you heard, is that the defendants must have known about problems with the model before February of '19, that they covered it up, and that they continued to rely on this model to make revenue projections even though they knew it was unreliable.  That's the claim here.

But plaintiffs plead no facts, and I'll get to the assertions made by my counsel -- my friend here.  There's no facts that anyone at HP, let alone the senior officers, knew before February of '19 that the model had a problem and was unreliable.  Rather, as HP's CEO said during that earnings call

in February, this was a surprise.

What's also missing from the complaint is a commonsense explanation for why anyone would commit the fraud that plaintiffs claim occurred here.  There's no theory from the plaintiffs why any defendant here would rely on a model that they knew was unreliable.  There's no motive alleged.  There's no rationale provided.  There's no explanation given for why the defendants would lie about a financial model for two years.

Now, just to the specific issues in scienter, the plaintiffs, of course, are required under the PSLRA to plead detailed facts giving rise to a strong inference of scienter.  Here, the principal argument as you saw and as you hear is that the defendants knew early in February of 2019 about problems with the model and, nonetheless, lied to the market about the model's reliability.  That is the claim.

I'll turn to the particular arguments in a second, but let's not forget that the Court must also weigh the nonfraudulent inferences here to draw from the pleading.  And here the innocent inference is particularly compelling given that for two full years, for virtually the entire class period, the Four Box Model repeatedly, consistently, and accurately projected HP's supplies revenue.  That's not contested.  In fact, the plaintiffs don't even mention it in their opposition brief, let alone try to address it.  And why?  Because the consistency of the model, its success in predicting revenue

over this extended period of time strongly undercuts any inference of scienter.  It undercuts --

THE COURT:  Let me ask you this:  Is the big question that information from Europe was not accessible in a way that they thought it was accessible?  Is that the problem?

MR. LUTZ:  The problem was over the course of the period, as HP told the market, that they were relying on all kinds of data.  Okay?  Both telemetry data, this is data coming from the printers themselves coming back to HP, but also other data, like market data, analyst data, historical trends as we disclosed in the very statements that the plaintiffs include in their complaint.

The problem was and over time the assessment taking the data from the telemetry data and all the other things was showing that we were doing okay, that our model was working, that the projections were accurate.

What happened over time as we got more and more data and, of course, HP repeatedly said, as quoted in the complaint, they were consistently getting more and more data over time as more of our printers get online and phone home, provide more data back, as more and more data started coming in towards the end of this period, we realized that we had been overestimating principally one of the assumptions in the model, and that's market share, concentrated in this one single geographic region.  That's what happened.

And we realized that, look, we had put -- we had overestimated this one assumption, which caused us to put too much product into a given market, a particular market.

THE COURT:  Was that market Europe?

MR. LUTZ:  EMEA, Europe, Middle East, and Africa.

THE COURT:  And was the issue because you weren't being able to get data from Europe in ways that you thought you were?

MR. LUTZ:  It was the data that we were relying upon was not -- was telling us -- caused us to overestimate the assumption.  We didn't have as much data in those regions as we would have wanted; and when more data came online, when we were able to get additional, more granular data, it showed that we had made one miss on our assumption in that region in particular.  That's what the problem was.

But, look, the fundamental issue here, Your Honor, and this is where your initial question was at the outset, is: What do they have to plead?  They have to plead knowledge, awareness of the problem; right?  It's not enough for plaintiffs to say that the defendants had access to information, that they had access to the model, that they knew how it worked.

The plaintiffs say -- that's what the claim here is.  They had access to the model so the plaintiffs say in their brief that it would be absurd to suggest that they didn't know about

the problems with the model.

Your Honor, that's the problem here and that's what the plaintiffs are missing.  It's not just about access to the model.  It's about plaintiffs needing to plead detailed facts showing that the defendants knew that the model itself was unreliable and had problems; right?  That's what's missing from the complaint.  That's the fundamental problem.

There aren't any allegations of meetings with the senior officers to talk about the problem before 2019.  The confidential witness, which I'll get to in more particularity in a second, the confidential witness doesn't say anything about, "Oh, I knew about the problem and I told the senior officers about it."  Far from it.  There's no such allegation in the complaint.

There aren't any allegations of reports or memos internally at the company reporting on the problem, let alone that there were any reports made to the senior officers of the company on these issues.

They don't even plead, there's no allegation in the complaint that any employee at HP knew before February 2019 that the model was unreliable, that the model had these problems, let alone that that was knowledge [Audio Interference] by these senior officers.  There are no factual allegations --

THE REPORTER:  Mr. Lutz, I'm sorry, but you cut out

and I missed part of your statement.

**MR. LUTZ:**  I think the point was there's no allegation of any memos or reports internally at HP reporting on the problem -- right? -- reporting on this data issue that's a problem and that the model is unreliable, let alone that any of those kinds of materials, those documents, those memos were reported up to the individual defendants.  There's nothing like that in the complaint.

**THE COURT:**  And did you tell me a couple of minutes ago that up until February 2019 the model worked?

**MR. LUTZ:**  Yes, absolutely.

**THE COURT:**  Is that what you said?

**MR. LUTZ:**  Absolutely, for two straight years, which, again, badly undercuts any inference of scienter.  It worked for two straight years, meaning that what the model predicted HP would receive -- would earn in revenue over those two years, HP went and either met it or exceeded that revenue.  And the plaintiffs don't claim that that revenue was invented.  I mean, that revenue was there.  There's no challenge there.  The model worked for two years.

That's why the lack of detailed allegations about access to the problem, knowledge to the problem is so important here, and that's why the cases that the parties go back and forth within the briefing are informative.

I mean, the principal issue here is that there's no

issue -- there's no allegation, there's no facts showing knowledge of the problem.  Plaintiffs' cases deal with very different factual circumstances where the knowledge of the problem was apparent.

The *Quality Systems* case, which is the case that plaintiffs rely on most specifically in their briefing, in that case it wasn't just access -- right? -- which is what's alleged here, to information by the individual defendants.  There were specific numerous witnesses providing detailed information that the defendants knew of the problem and then never disclosed it.

A former board member in that case, who is identified by name, said that the defendants, quote, "... were aware of realtime data that contradicted their public statements."

Another witness said he personally warned the CEO of the problem.  This is the *Quality Systems* case.  Another witness who was a senior officer and former board member said the defendants specifically received weekly and monthly reports showing the problem.

And yet another witness said that the CEO himself on a conference call internally said that he was aware of the problem and that that -- the problem that was contradicted by the public statements.  There is nothing even remotely close to that in this case.

The cases that we've cited for Your Honor, and there are legion in this district and in the Ninth Circuit, stand for the

proposition that it's not just access to information.  You have to plead -- to plead a strong inference of scienter, you have to plead facts showing that the adverse information was known to, was provided to the defendants.

In the *Intuitive Surgical* case, for example, the plaintiff alleged that the individual defendants had access to a computer system that tracked sales data.  It sounds like this case; right?  But Judge Koh in that case found that there was insufficient allegations of scienter because there were no allegations that the defendants actually were exposed to the adverse information.  They weren't told of the problem; right?

She said (reading):

"Particularity requires pleading the who, what, where, when, and how regarding each defendant's access to the relevant information that belies fraudulent intent."

The *Twitter* case, Judge Gonzalez Rogers just earlier -- or now it's 2021 -- last year found that there was no scienter in a similar circumstance where the senior officers were alleged to have received daily summaries showing Twitter's advertising revenue.  But there, like here, there's no facts alleged that the summaries contained any information that, quote, "was inconsistent with any of the defendants' public statements."

*Amyris*, same situation with Judge Orrick.  The CEO there had access to a database that supposedly showed that the business couldn't scale at a level that had been conveyed to

the market, and he found no inference of scienter again for the same reason.  There were no allegations that the CEO actually received the adverse information that contradicted his public statements.

I could go on and on, but the point is clear I think at this point.

Just a moment on the confidential witness too; right?  Allegations of a confidential witness can support an inference of scienter when two requirements are met.  One, that the witness is described in enough detail to establish their reliability and personal knowledge; and, two, that the statements from the witness themselves are indicative of scienter.  And here neither element is satisfied with respect to the single confidential witness that the plaintiffs identify.  Not 10 or 15.  There's a single confidential witness.

Let's start with reliability and personal knowledge.  Plaintiffs don't name the employee, which of course is standard.  I understand that.  But they don't identify the witness' title.  They call him or her a, quote/unquote, "executive."  They don't -- they admit that the witness did not work in the EMEA region, the geographic region that is at issue.  They admit -- or they don't allege that this witness worked on the Four Box Model; and they don't allege, most importantly, that the witness had any contact or any

interaction whatsoever with any individual defendant.

That means that the witness had no firsthand personal knowledge about what any defendant knew or what information was provided to them.  So on their face these hearsay allegations attributed to this single witness are unreliable.

But the allegations also don't work because they are not themselves indicative of scienter.  The witness says that he or she learned about an earnings miss in one region sometime in 2018; that Mr. Weisler, who at the time was the CEO, was upset about it; and that a meeting was held.

These allegations don't say anything about the Four Box Model.  And the witness doesn't even say that there was some fundamental defect in the model.  Rather, this witness, according to the complaint, says the model was, in his or her view, at times unreliable.  In his or her view, at times unreliable.  Not any communications with individual defendants about anything.

This is exactly like Your Honor's decision in the *FormFactor* case that was cited in our briefing where you said, quote (reading):

"Importantly, none of the confidential witnesses" -- and in that case there were nine -- "none of the confidential witnesses is alleged to have had any interaction or communication with any of the defendants or to have provided any defendant with information or to have

heard or read any statement by any defendant that

contradicted or even cast doubt on a public statement

during the class period."

This is exactly what we have here.  So the allegations from this single witness do not amount to scienter.

Look, stock sales, I mean, the elephant in the room, as it were, that my colleague did not mention here is that the vast -- all but one of the stock sales were made pursuant to a 10b5-1 plan or made to satisfy tax obligations.  This is not an individual going out to discretionary sales.  They're 10b5-1 sales, and that alone negates an inference of scienter for both defendants.

And it's undeniable that each of the defendants increased his holdings -- and this is Mr. Lores and Mr. Weisler -- each of them increased their holdings during the class period.  Mr. Lores more than doubled his holdings and Mr. Weisler increased his holdings by 200 percent.  This, again, under the law of this circuit negates an inference of scienter.

Look, the bottom line on scienter, the plaintiffs have to -- whether you look at it individually, each allegation, whether you look at it together, it doesn't matter.  The allegations don't give rise to a strong inference of scienter with respect to any of the defendants.  There's no specific facts pled that any individual defendants knew of the problem, had adverse information that cast doubt on or that made it

clear to them that the model was unreliable.

And, again, the nonfraudulent inference here is overwhelming that HP senior officers throughout the class period said that they believed in the model, it was a good tool for predicting the future performance of the supplies business; and that belief was supported by actual performance for two years.  For two years the model consistently, accurately, and reliably predicted that HP's revenue would stabilize and then would increase, and that's exactly what happened, Your Honor, for two years.

These facts support an inference that HP's senior officers didn't know about the vulnerability of the model before February of 2019 and were genuinely surprised to learn at that time that there was a flaw in the model.  Plaintiffs' theory that this was all a big ruse, that the defendants knew all along that the model was unreliable is not supported by any specific factual allegations in the complaint, which of course is absolutely required under the PSLRA.

So on scienter -- I can go on to falsity if you'd like, Your Honor, but on scienter the case should be dismissed on scienter grounds.

**THE COURT:**  Thank you.

**MR. LUTZ:**  Would you like me --

**THE COURT:**  No.  Let me go back to Mr. Rizio-Hamilton on the scienter issues.

So Mr. Lutz just said that the model worked up until February 2019.

**MR. RIZIO-HAMILTON:**  Yeah.  So there's a few responses to that, Your Honor.  The case isn't just about whether the model worked because the defendants spoke about things besides whether the model worked.  They specifically spoke about what data they were using in the model.

And the question arises:  Does the fact that the model worked for a period of time -- and I'll get to that in a minute -- give them license to misrepresent what data the model was using in the first place?  The answer to that is no.

The core statements at issue in the case concern defendants' assertions that the model was using this robust and powerful telemetry data across the company's business, including its commercial platform, when it, in fact, was not.

The fact that the model, quote/unquote, "worked for a period of time" does not excuse a misrepresentation about what data the model was using.  That --

**THE COURT:**  What difference would that make if it was working?

**MR. RIZIO-HAMILTON:**  Well, because the absence of that data, the entire reliability of the model was predicated on that data, and defendant said as much.  They said, you know, the model is only as good as its inputs.  And the data that defendants were getting, purporting to get, from the companies

installed base of printers is what supposedly made the model a powerful tool.  In the absence of that data, the model's efficacy was bound to fail at some point, which it did.

Now, my colleague across the bar said that the model worked perfectly up until the time that it didn't; but, in fact, the model was inaccurate in many respects throughout the class period.  These inaccuracies did not just arise all of a sudden in February of 2019.

For instance, one thing the defendants used the model for was to purportedly align sales with market demand so that they weren't having a situation where the channel had been stuffed, which HP had before the class period and, in fact, assured investors that it was going to avoid by using this model.

Well, in fact, the model failed not just in February '19 on this level but in multiple prior quarters throughout the class period, and defendants admitted that the model failed in this respect not just in February 2019 but, in their own words, in multiple quarters previous to February of '19.

In addition, the model failed to properly calculate market share throughout the class period, which was an absolutely critical metric for the company.  Again, in February 2019, defendants admitted that the model had failed to do this, and they admitted that the model had failed to do this for multiple quarters going back earlier in the class period.  It did not just arise all of a sudden in February of 2019.

Indeed, when you look at the disclosures, defendants admit in paragraph 19 that the failures had occurred over multiple quarters and that they had incorrect market share calculations in the model regarding not just Quarter 1 2019 but also, in their own words, in prior quarters.

So the concept that the model was perfectly accurate throughout the class period is not true; and, indeed, by the end of the class period the model had become so inaccurate due to the absence of the data that defendants repeatedly assured investors they had, that the company's financial performance just crashed.

So coming into the February 2019 disclosure, the defendants had assured investors that the company's business had stabilized and would either be flat to slightly up for 2019.  When they finally obtained the data that they said they had all along, it became clear that the business was contracting materially and suddenly such that it will be down 3 percent.  That ultimately was revised to be down by approximately 6 percent, and the situation grew so dire in the months that followed that the company ultimately had to abandon its business model and totally abandon the Four Box Model.

So the entire -- I reject the entire concept that this was some perfectly accurate model and it was all a surprise.  This model was riddled with flaws, all of which stemmed from the absence of the data that defendants repeatedly assured

investors that they had, and those flaws came home to roost as investors would have understood that they would do if defendants had been open and honest from the jump at the beginning of the class period about the fact that they did not have the powerful data that they claimed to have.

So that is in a nutshell the response to the argument that the model was so accurate.

There were a few other things that my colleague mentioned that I would just like to briefly touch upon, and I know the Court's time is precious so I'll do this as efficiently as I can, but I do think it's important.

He began his presentation by saying that this is a case about a financial model.  What's important for the Court to understand are two things.  First, this model was everything to the company and its investors.  This model was the means by which defendants assured the market that they were going to stabilize the business, save it, and turn it around.

So the model, while it does have a central role in the case, is of paramount importance.  It's not just some sort of, you know, run-of-the-mill financial model.

The second thing is, it's not just about the model itself. It's about -- at its core, at its heart the case is really about defendants stating that they had this very unique powerful form of data that made the model so useful and so reliable that they in fact did not have.  They've admitted as

much after repeatedly stating that they were personally very knowledgeable about the data that was being fed into the model, so knowledgeable in fact that they cut the data down to the level of the ZIP code.

THE COURT:  What evidence do you have that they knew that wasn't true?  Because the problem is that the logical explanation for all of this is that they didn't know.

MR. RIZIO-HAMILTON:  Well, you know, I don't think that that's necessarily true, Your Honor.  I think that there's another logical explanation.  Let's remember that they filled the gap of this data by going out and conducting and purchasing lagging, incomplete, and inaccurate third-party market surveys.

THE COURT:  Except for the adjectives they disclosed.

MR. RIZIO-HAMILTON:  They did not.  They absolutely did not disclose their use of those surveys.  Had they, this would be a different case.

What they did was they told investors time and again that they had exceedingly powerful telemetry data.  They also told investors that they had that data for the commercial side of the house.  That's paragraph 71.  Right before the beginning of the class period, defendant Lesjak says it right on the nose.

So nowhere does defendant Lesjak say the data that we're getting from the commercial side of the business, which again was 60 percent of the company, is statistically insignificant to such a degree that we need to go out and backfill it with

lagging and inaccurate third-party market surveys.  Had she said that, I can assure you the market reaction would have been swift and severe.  The market would have lost faith in the company's ability to manage its business.

Now, the fact that they had revenue projections that they were able to meet over a certain period of time again does not excuse a misrepresentation relating to the data that they were supposedly using.

Beyond this, you know, my colleague said that there's nothing that you have that -- the sort of core problem with the scienter theory is there's nothing that you have showing that anyone knew the model had a problem.  That's just not true.  I have, one, defendants' knowledge that they were using market surveys when they were saying otherwise.  That in itself is a problem.

Two, I have Former Employee 1 who says that about approximately the middle of the class period, the second quarter of 2018, which closes April 30th, 2018, the company had a bad miss in the EMEA region, which is precisely the region in which the problem was concentrated, but not limited to, in February of 2019.

And FE 1 says that based on this severe mess, defendant Weisler, then the CEO, was deeply upset, held a series of crisis meetings, and was informed that the company did not have sufficient information to gauge market share in EMEA.  Those

are the same problems that surfaced in a bigger way toward the end of the class period in February 2019.  So there is information that these problems were known long earlier than they were disclosed.

Now, sort of the last big picture point that I would make is that there's a very strong suggestion in the reply briefing, which I've heard some refrain about today, that the data acquired in February 2019 was supposedly all new and it was just, you know, supplementary.

The problem with that is that it's precisely the data that they were telling investors that they were receiving all along.  It was telemetry data from the commercial side of the house, not just from the European region, Your Honor, but we're talking about a failure that pervaded the entire commercial business, albeit concentrated to a greater degree in Europe.

And, you know, once defendants got this data, they saw that it wasn't just a new problem.  They admitted that it had created a situation where they oversold the channel by $100 million not just in the first quarter of 2019 but, in their own words, in prior quarters.  They saw that it had created a problem where their market share assumptions were dramatically lower than they had communicated to the market, not just for the first quarter of 2019 and going forward but in multiple prior quarters back through the class period; and they, frankly, admitted on the call that it didn't all happen

in Q1.  If you look at Defendants' Exhibit 13 at pages 10 through 11, defendant Weisler says that.

So the argument that all of this was new and purely forward looking contradicts the complaint, contradicts defendants' contemporaneous disclosures, and is not correct.

So there were -- there was also finally some mention about, you know, *QSI* as being the sort of standard for scienter.  There are cases in the Ninth Circuit, as Your Honor is well aware, that hold that even if you don't have a smoking gun, like a former employee who had direct contact with defendants and said that "I told the defendant about the undisclosed problem," and, you know, that's not legally required, by the way.  There are many cases in the Ninth Circuit that say so, including, you know, Your Honor's case in *Roberts*.  But *Lifeloc* is a Ninth Circuit decision that says you don't have to have direct contact with defendants as is *Lloyd* and, as I mentioned, Your Honor's decision in the *Robert vs. Zuora* case.

When you step back and look at all the scienter facts here, you can see that there's a real viable core operations theory here given that the subject of the misstatements, the supplies business and the Four Box Model and the data it was using, was undoubtedly core, indisputably so.  The defendants repeatedly stated that they had access to this data and were very familiar with it, including the fact that they weren't

getting commercial data.

And we have a former employee who stated that this issue became front and center at the highest levels of the company and defendant Weisler was focused on it in a very negative way and learned about it no later than the second quarter of 2018, right in the middle of the class period, long before it was disclosed.

When you look at all that, I respectfully submit that there's a strong inference of scienter; and defendants don't overcome that because the case really centers on the data that they said they had and they didn't and they backfilled with something else without disclosing that to the market.

**THE COURT:**  Thank you.

Mr. Lutz --

**MR. SCHATZ:**  Your Honor, may I briefly say a few words on behalf of Ms. Lesjak?

**THE COURT:**  You absolutely may, but let me ask one question while I'm still remembering it.

Mr. Lutz, I thought you said they did disclose market surveys and that sort of alternative information source prior to February 2019.

**MR. LUTZ:**  The premise of plaintiffs' view of the story here is that we -- HP told the market that all we used was this perfect telemetry data and that's not the case.  What we said was we have a lot of data, we have a lot of data from

printers that are phoning home, this telemetry data; but we also use third-party data, we use historical data, we use data from analysts, market data from analysts.  We said that we have a lot of telemetry data from our personal side of the business so, like, the printers that, you know, people on this phone have and over time it's getting better on the commercial side.

We never said that we had 100 percent telemetry data. Indeed, if you go through and you actually look at all of the paragraphs that they focus on for the statements about the data, what data we had, it's always the plaintiffs -- it's always -- the statement is always:  Well, it's getting better over time.  We're adding more printers over time.  It's only a model; right?  It's a model.  In other words, it includes assumptions and different data from different sources, but it's getting better over time.  We make iterations over time as additional data comes in.

That's what we said, and we never said it was only telemetry data, let alone that we had perfect, 100 percent telemetry data throughout the class period.  That is absolutely not what we said.

And, Your Honor, again, you asked the question to my colleague again:  Where is the knowledge?  Where are the facts that during those two years that any individual defendants knew or had information telling them that the model was unreliable? Where is that fact?  That is what differentiates this case from

every other case that they rely on.

THE COURT:  Well, I thought he switched the question to:  Where is the information that any of these defendants knew that there wasn't as much big data in telemetry and whatnot as they said there was?

MR. LUTZ:  And my response to that is we never said that we had 100 percent telemetry data.  We always said that we were adding more over time and we said that we relied on things other than telemetry data.

It is -- and if you look at the assertions, if you look at the statements, there's maybe six or seven statements that they focus on in the complaint about data, you'll see that we say it's focused on the personal side.  We identify that it's not just telemetry data.  More printers are getting added over time.  It's an iterative process.  It is not the black and white, it's all perfect telemetry data that the plaintiffs make it out to be.

I mean, the specific statements that they focused on when you actually piece them out, you know, there's not even facts. I mean, I know we're getting into falsity, but there's not even -- there's no facts alleged that they were false at the time they were made.  Statements like "We now have the ability to connect with millions of printers in our installed base," where are the facts that that was a false statement at the time it was made?  We did it.  There's no allegation that we didn't.

That every print unit that we place, by and large, is an investment that returns supplies over time, where is the -- where are the facts that that was false?  That was HP's business model.  You sell the printers and you want -- you sell the printers because you want to sell supplies to those printer buyers; right?  There is no -- those are the statements that they're focused on; right?  When you actually look at them, they're not even alleged -- there's no facts alleged that they were false, let alone facts giving rise to a strong inference that anybody knew during this two-year period when the model actually was working, when we were -- when it was predicting revenue that we indisputably, indisputably were achieving, and that's the critical fact here, there are no facts alleged that any of the individual defendants knew during that two-year period that the model had flaws and that the model was wrong. There's just no facts alleged and you can't get to scienter if you don't have those facts which do not exist.

Mr. Schatz, I don't want to cut you -- I want to give Mr. Schatz a chance to say something.

THE COURT:  Yes.

MR. RIZIO-HAMILTON:  Can I just respond very briefly?

THE COURT:  No, no.  I need to hear from Mr. Schatz now.

MR. SCHATZ:  Thank you, Your Honor.

First of all, I should say that nothing that I say is in

any way in derogation of Mr. Lutz's comments.  He's entirely correct and we believe the entire complaint should be dismissed, but we believe that Ms. Lesjak presents a particularly strong case for dismissal and let me lay out why.

Her last challenged statement was in June 2018.  That's approximately eight months before the statement where there was a determination and where they learned that there was some deficiency in the predictive capabilities of the model.  It's a year and a half before the end of the class period.  So that underscores even more so that she had no reason to believe that the model, which consistently worked during her tenure, was anything other than reliable.

Based on that model, they were able to forecast revenue accurately.  Based on that model, they were able to say that the inventory would be either at or below a self-imposed ceiling.  Based on that model, they were able to say that supplies would stabilize by the end of 2017, which it did, in fact a quarter early.  So from her perspective, the proof of the pudding was in the tasting and it tasted really good because it was accurate.

So I want to focus in now on Mr. Rizio-Hamilton's -- I'm sure it's not intentional -- distortion of what she actually said.

So with respect to the phoning at the home, they reference three instances, only one of which is in the class period.

When you actually look at those statements, they're cautionary.  They're first time in March of 2016 in response to a question (reading):

"We have a lot of printers that phone home and we are fine-tuning that model."

That's paragraph 17.  Not all.  Not most.  A lot of them.

Also before the class period in response to a question about whether it's 50 percent or 60 percent, the question wasn't 100 percent of the computers phoning home.  She says (reading):

"We had a bigger installed base printers phoning home in the ink space."

That's exactly what she said.  And then she says (reading):

"Over the course of 2016, we're now having the commercial side of the house phoning home too.  So we are constantly refining the model."

Again, a distinction between ink and toner.  The market never believed that it was the equivalent.

And let's --

THE COURT:  Mr. Schatz, you have to stay close enough to the mic so that we can hear you.

MR. SCHATZ:  I'm sorry.

THE COURT:  That's better.

MR. SCHATZ:  In my dotage, my voice I think carries

less strongly, Your Honor.

**THE COURT:**  Nothing the matter with a little dotage every now and then.

**MR. SCHATZ:**  And then with respect to the only time that she references it during the class period, again, again, it's in response to a question, she says "Many of our printers are phoning home."

And when she talks about the ZIP code -- first of all, she talks about individuals, and that's not at the commercial side. But if you step back, what is she interested in?  She doesn't know, as the CFO of a company with 55,000 employees between 8- and 10,000 individuals in finance, other than at a mile-high level the generic factors that are there.  So to suggest that the CFO would know the intricacies of that, it just defies logic.

She rather than saying I think he used the term they said it was -- used the term "robust," she was constantly saying that the model had to be -- had to be refined.

So when you look at this, you say to yourself, "Okay. What makes sense here?"  First, if you look at her statements, they even capture some of them in the complaint, she's cautionary all the time.  She's talking about competition. She's talking about the need to refine.

Second, as to her, there's no allegation whatsoever of improper trading.  And as to her, she stepped down as CFO.

Then there was a period of time where she transitioned in retirement to, quote, "interim COO," but even that was something like seven or eight months before the end of the class period.

And at the end of the day, you have to step back and say: Why would she authorize or allow the company to be run on a model that she did not believe in or that she had reason if she didn't believe it?  Quite the contrary.  All the evidence suggests that she had every reason to believe in that model.

And I guess this distinction between input and output, that she would know about the outputs but not the inputs, I want to point this out because there's some recent cases that talk about that.  Judge Koh's decision in *Solarcity*, and this is at -- the jump cite is at 1012, there was no allegation that the individual defendants were involved in working with the data inputs of Solarcity's forecasting model.

Similarly, if you looked at the Ninth Circuit's decision in *Yelp*, and that's a 2017 decision, that the court points out "... absent some additional allegation of specific information conveyed to management."  It's missing, as Your Honor pointed out.

To the same effect is the *Invuity* case and that's Judge White, and Judge Wilken's decision *In Re Rackable*, failure to allege any alleged deficiency in the ERP system was apprised to the defendants.

So when you look at this, Your Honor, and I think it applies to all the defendants, but I think Ms. Lesjak left substantially early, even more so to her, and when you look that it performed what she saw accurately, a far more cogent inference is that she believed in the reliability of the forecast and it's far more cogent and far more compelling than one of scienter.

THE COURT:   Thank you.

MR. RIZIO-HAMILTON:   Your Honor, may I have just one brief moment?   I know time is short.

THE COURT:   Of course.

MR. RIZIO-HAMILTON:   Thank you for the opportunity.   I appreciate it.

So the first thing I want to address, and I only have just two or three points, is that this concept that the company never said it had 100 percent perfect data or 100 percent complete data and, therefore, the case should be dismissed, it rests on a false premise, Your Honor.   That's not the standard for pleading falsity nor is it the standard for pleading scienter.

The question, as set forth in the Ninth Circuit's *Berson* case, and in many of Your Honor's own decisions, is that whether the defendants' statements created an impression that differ in a material way from the true state of affairs, and that's absolutely the case here.   Because when defendants'

statements are read as a whole, including Ms. Lesjak's statement at paragraph 71, as well as her statement in paragraph 250, what you see is that there was an impression created in the mind of the market that the company had sufficient data from the commercial side of the house to accurately assess its business, and that was just not true.

Second, Mr. Schatz noted that the last statement that Ms. Lesjak made was in June of 2018.  I would note that that's after Former Employee 1 reported that the issue had really kind of blown up internally at the company.

But beyond that, I think it's worth looking at those statements, and I won't read them word for word; but if you look at the statement in paragraph 71 that she made just before the class period begins, you see that she assured the market the company was getting data from the commercial portion of the business.  And in paragraph 250, the last statement that she makes, she says that the company's data, the data that it then has at the time, is so powerful that the company can look down into the ZIP code level to assess profitability when the then prevailing fact was --

THE COURT:  Well, she said that in the U.S.

MR. RIZIO-HAMILTON:  Yes, that's true, but she also says -- she also says, "We can do this in other countries." Paragraph 250 (reading):

"So they can look at, say, the United States and we

can do this too in other countries."

And she's --

**THE COURT:**    (reading):

"... but you can look at the United States and actually you can focus in on ZIP codes."

**MR. RIZIO-HAMILTON:**  True, but she also says "We can do this in other countries too."  I mean, she is talking generally about the power of the data; and, again, the omission here is not just limited to Europe, although that was where it was concentrated, but it applied broadly to the commercial business, including printers in the United States.

So I think when you look at the statements as a whole, they're fairly read to give the market an impression that differ materially from the one that actually existed, and this concept of perfect data or 100 percent complete data is a bit of a red herring because that's not the standard.

**THE COURT:**  All right.  Thank you.

Anybody else wish to be heard very, very briefly?

**MR. LUTZ:**  Just for 30 seconds.

You know, we've heard a lot about paragraph 71.  Paragraph 71 involves statements before the class period.  They're not even alleged to have been actionably false.  They're not in the class period.

And on 250, the statement that we're focused on, if you read the question from the analyst, the analyst is asking for

specifics:  Can you look at this by specific customer?  And the preface for Ms. Lesjak is, "No, you can't.  We can't look at it by specific customer, but here's some other ways that you can go about it.  In the United States you can look at it by ZIP code."  There are no facts alleged that that wasn't true; right?  There are no facts that are alleged.

We haven't talked at all about falsity today.  I think we have very powerful falsity arguments, particularly forward-looking statements, particularly after the *Tesla* decision handed down just last week in the Ninth Circuit.  It eviscerates certain of the alleged misstatements, including "on track" and other statements that the plaintiffs claim are actually present or past tense.

The vast majority of the statements are forward-looking statements and that's only confirmed by *Tesla*, but we'll refer to our briefs on that; but we appreciate the opportunity to spend some time with you today.

**THE COURT:**  Okay.  Well, thank you all very much.  You've been very helpful.  And the matter will be submitted.  You'll hear from me shortly.  Thank you.

**ALL:**  Thank you, Your Honor.

(Proceedings adjourned at 11:19 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Tuesday, February 9, 2021

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter