# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IRON WORKERS LOCAL 580 JOINT
FUNDS, et al.,

Plaintiffs,

v.

NVIDIA CORPORATION, et al.,

Defendants.

Case No. 18-cv-07669-HSG

**ORDER GRANTING MOTION TO
DISMISS AND DENYING MOTION TO
STRIKE**

Re: Dkt. Nos. 152, 154

This is a consolidated securities class action brought by Plaintiffs E. Öhman J:or Fonder and Stichting Pensionenonds PGB (collectively, "Plaintiffs") against Defendant NVIDIA Corporation ("NVIDIA" or "the Company") and Jensen Huang, co-founder and Chief Executive Officer, Colette Kress, Chief Financial Officer and Executive Vice President, and Jeff Fisher, Senior Vice President (collectively with NVIDIA, "Defendants"). In their initial complaint, Plaintiffs alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Dkt. No. 113 (Consolidated Class Action Complaint or "CCAC") ¶¶ 147–48. The Court dismissed the CCAC with leave to amend. *Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*, 2020 WL 1244936 (N.D. Cal. Mar. 16, 2020) ("Order"). Plaintiffs filed an amended complaint that reasserts the same claims. Dkt. No. 149 (First Amended Complaint or "FAC").

Now pending before the Court is Defendants' motion to dismiss the FAC. Dkt. Nos. 152 ("Mot."), 159 ("Opp."), 163 ("Reply"). Also pending before the Court is Defendants' motion to strike allegations in the FAC. Dkt. Nos. 154, 161, 165. For the following reasons, the Court **GRANTS** Defendants' motion to dismiss and **DENIES** Defendants' motion to strike.

United States District Court
Northern District of California

United States District Court
Northern District of California

## I.    BACKGROUND

Plaintiffs bring this securities action individually and "on behalf of all others who purchased or otherwise acquired common stock of NVIDIA Corporation" between May 10, 2017, and November 14, 2018, inclusive (the "Class Period"). FAC at 1. The following facts are taken from the FAC and judicially noticeable documents.

### A.    Graphic Processing Units

NVIDIA "is a multinational technology company" that produces graphic processing units ("GPUs"), types of processors that are used in rendering computer graphics. FAC ¶ 1. NVIDIA's GPU business is reported by market platforms, two of which are at issue in this case. *Id.* ¶ 39. The first platform is chips designed for videogames—the Gaming platform—comprised primarily of the "GeForce" GPU product line. *Id.* ¶¶ 39–40. Original Equipment Manufacturer & IP ("OEM") is a second platform for chips designed for devices such as tablets and phones. *Id.* The gaming platform is NVIDIA's largest market: "[i]n every quarter of the Class Period, [g]aming revenues exceeded those of the four other segments combined." *Id.* ¶ 40. Generally, NVIDIA does not sell GPUs directly to the end users, but rather to device manufacturers, referred to as "partners," that incorporate the GPUs into graphic or video cards. *Id.* ¶ 42.

Beginning in 2017, prices in the cryptocurrency market began to climb, creating a demand for GPUs processing power. *Id.* ¶¶ 52, 62. Generally, cryptocurrencies refer to digital tokens exchanged peer-to-peer through transactions facilitated by the Internet. *Id.* ¶¶ 44, 47. These transactions are secured by modern cryptology and are reported on a "decentralized, immutable ledger." *Id.* ¶ 45. To maintain the integrity of this ledger, transactions must be verified by network participants "by first consolidating and encrypting the data of a group of transactions using a cryptographic technique of 'hashing'—applying an algorithm to convert a string of text into an inscrutable, random sequence of numbers and letters." *Id.* ¶ 46. Users then compete to solve a "mathematical puzzle through laborious trial-and-error work performed by their computers" in order to verify transactions and receive a prize of the network's token—a process referred to as "crypto-mining," or simply "mining." *Id.* ¶¶ 46–47. This verification process requires significant processing power. Because the mining process has essentially become a

computational race, miners turned to "GPUs, which could execute the computationally intensive work of crypto-mining hundreds of times faster" than CPUs in home computers. *Id.* ¶ 52. Due to the significant hardware costs, as well as electricity costs to run and cool the machines, crypto-mining is only profitable when prices for cryptocurrencies are above a certain level. *Id.* ¶¶ 54–55. Thus, "[b]ecause cryptocurrency prices have swung wildly over their short history," this has also led to a relatively volatile demand market for mining hardware, including GPUs. *Id.* ¶ 55.

In 2013, Advanced Micro Devices, Inc. ("AMD"), NVIDIA's primary GPU competitor, experienced this volatility when prices for Bitcoin, used on the most popular cryptocurrency network, skyrocketed. *Id.* ¶¶ 57–58. AMD's GPUs were in heavy demand during this time, "with processors that usually sold for $200-300 per unit selling for $600-800 at the height of the bubble." *Id.* ¶ 57. However, when prices for Bitcoin later dropped more than 70%, so too did demand for AMD GPUs—"a problem compounded by miners dumping their AMD GPUs on the secondary market at steep discounts." *Id.* ¶ 58. "AMD revenues suffered as its crypto-related sales evaporated." *Id.*

In 2016, the price of Bitcoin again rallied, and many new currencies entered the market. Although Bitcoin miners moved away from GPUs to application specific integrated circuits ("ASICs"), miners for these new currencies still relied on GPUs. *Id.* ¶¶ 56 n.4, 59. The Ethereum network, "[t]he most significant" of the new cryptocurrency networks, also saw its cryptocurrency, Ether, rise in price: it "temporarily peaked at over $400 per token in June [2017] . . . [and s]everal months later, in January 2018, Ether topped $1,400 per token, an increase of more than 13,000% in a single year." *Id.* ¶ 60. "During this run up in GPU-mined cryptocurrency prices, miners turned to NVIDIA— specifically, its enormously popular line of GeForce Gaming GPUs—and began to purchase GeForce GPUs in droves." *Id.* ¶ 61. In May 2017, NVIDIA launched a special GPU designed specifically for cryptocurrency mining ("Crypto SKU"). *Id.* ¶ 6. Revenues from Crypto SKU sales were reported in NVIDIA's OEM segment, not the Gaming segment. *Id.* Plaintiffs allege that "[l]aunching the Crypto SKU and reporting its sales in the OEM segment thus allowed Defendants to claim that any mining-related revenues were cordoned off in OEM, creating the impression that NVIDIA's crown jewel Gaming business was insulated from crypto-

3

related volatility (and the crash in demand that would follow the cryptocurrency markets' inevitable bust)." *Id*.

### B.    Summary of Alleged False and Misleading Statements

"Throughout the Class Period, NVIDIA reported skyrocketing revenues in its core Gaming segment." *Id*. ¶ 63.  Plaintiffs allege that "investors and analysts alike questioned whether those revenues truly derived from GeForce GPU sales to gamers or, rather, were from sales of GeForce GPUs to cryptocurrency miners, whose demand was at risk of disappearing if the economics of mining turned negative." *Id*. ¶ 64.  Plaintiffs allege that three general representations in Defendants' responses to these questions were materially false and misleading "and concealed from investors the enormous risk to NVIDIA's financial results posed by the Company's outsized exposure to crypto-mining:"

> First, Defendants represented to investors that revenues from sales of its products to cryptocurrency miners were insignificant overall. Second, Defendants asserted that NVIDIA's soaring Gaming revenues indeed resulted from sales "for gaming"—not cryptocurrency mining.  And third, Defendants represented that NVIDIA's cryptocurrency-related revenues were contained primarily in the Company's OEM reporting segment, when in fact, almost two-thirds of such revenue came from GeForce sales recorded in its Gaming segment.

*Id*. ¶ 62 (emphasis omitted).  When the purported truth was revealed, NVIDIA's stock price fell and the putative class members suffered financial losses.  *See id*. ¶¶ 16–18.  For example, on November 15, 2018, NVIDIA cut its revenue guidance for the fiscal fourth quarter, allegedly "[a]ttributing the reversal to a 'sharp falloff in crypto demand' . . ., and it became fully apparent to the market that, contrary to Defendants' earlier representations, NVIDIA's revenues were unduly dependent on cryptocurrency mining." *Id*. ¶ 18.  Following these alleged disclosures, NVIDIA stock price "plummeted 28.5% over two trading sessions, from a close of $202.39 per share on November 15, 2018, to close at $144.70 per share on November 19, 2018." *Id*. ¶ 171.

#### i.    Overall revenues from miners were insignificant

On August 12, 2017, *VentureBeat* published an article that included a transcript of an interview with Defendant Huang.  FAC ¶ 183.  The interviewer asked if Defendant Huang "sa[id] a hallelujah for cryptocurrency?" *Id*.  Huang responded: "No?  Cryptocurrency is around.  But it

4

represented only a couple hundred million dollars, maybe $150 million or so. There's still crypto mining to go . . . [i]t comes and goes. It'll come again . . . [w]e're not opposed to it. But our core business is elsewhere." Dkt. 153-5, Ex. D at 3; *see also* FAC ¶ 183. Defendant Huang responded similarly in another *VentureBeat* article published on November 10, 2017, noting that cryptocurrency "is small but not zero. For us it is small because our overall GPU business is so large." Dkt. No. 153-12, Ex. M at 3; *see also* FAC ¶ 196. Defendant Huang again noted that "crypto was a real part of our business this past quarter, even though small, overall," in an article published by *Barron's* on February 9, 2018. Dkt. No. 153-19, Ex. T at 1; *see also* FAC ¶ 207. On March 26, 2018, in an article published by *TechCrunch*, Defendant Huang was reported to have said that "he still attributes crypto's demands as a small percentage of NVIDIA's overall business." Dkt. No. 153-23, Ex. X at 4; *see also* FAC ¶ 210.

On March 29, 2018, Defendant Huang appeared on the CNBC show *Mad Money*. FAC ¶ 213. When asked about the growth of cryptocurrency risks, Defendant Huang stated that "our core growth drivers come from video games. It comes from professional graphics visualization . . . [and] from our data center business, which is now a multi-billion dollar business doubling each year, as well as in several years our autonomous vehicle business. So, those are our primary growth drivers. . . . Cryptocurrency just gave it that extra bit of juice that caused all of our GPUs to be in such great demand." Dkt. No. 153-22, Ex. Y at 3; *see also* FAC ¶ 213.

### ii. Soaring gaming revenues resulted from sales "for gaming"

On May 10, 2017, NVIDIA held its 2017 Annual Investor Day in which Defendants Huang, Kress, and Fisher participated. FAC ¶ 176. While presenting the "Gaming" portion, Defendant Fisher said that "[t]he fundamentals of PC gaming . . . are also strong. What's driving PC gaming, eSports, competitive gaming AAA gaming [and] notebook gaming, all those fundamentals remain strong." Dkt. No. 153-2, Ex. A at 7; *see also* FAC ¶ 176.

On August 23, 2017, NVIDIA filed its Form 10-Q for the quarterly period ended July 30, 2017 ("Q2'17 10-Q") with the Securities and Exchange Commission ("SEC"), signed by Defendants Huang and Kress. FAC ¶ 187. The Management's Discussion and Analysis of Financial Condition and Results of Operations section discussed the GPU business. Specifically,

United States District Court
Northern District of California

5

the Q2'17 10-Q stated:

> GPU business revenue increased by 52% in the first half of fiscal year 2018 compared to the first half of fiscal year 2017. This increase was due primarily to increased revenue from sales of GeForce GPU products for gaming, which increased over 30%, reflecting continued strong demand for our Pascal-based GPU products . . . Revenue from GeForce GPU products for mainstream PC OEMs increased by over 90% due primarily to strong demand for GPU products targeted for use in cryptocurrency mining.

Dkt. No. 153-7, Ex. G at 27.  NVIDIA's Form 10-Q for the quarterly period ended October 29, 2017 ("Q3'17 10-Q") similarly stated that "GPU business revenue increased by 31% . . . due primarily to increased revenue from sales of GeForce GPU products for gaming, which increased over 10%."  Dkt. No. 153-13, Ex. N at 26; *see also* FAC ¶ 200.

On November 29, 2017, Defendant Kress represented NVIDIA at the Credit Suisse Technology, Media and Telecom Conference.  FAC ¶ 203.  A Credit Suisse analyst asked: "I think [the October quarter] was the first time that you had mentioned cryptocurrency as being partly driven by – that's partly driving the gaming side of the business. If you look at it historically, it's been in the OEM business.  I think it was down almost 50% sequentially in the OEM portion, did you say that some of that crypto demand was made up for in gaming.  Can you quantify that?"  Dkt. No. 153-14, Ex. O at 13.  Defendant Kress responded:

> In Q2 is when we started to create boards specifically for cryptocurrency that we classify in our OEM business.  Now keep in mind, what that means is these are boards that can be done for compute, okay, meaning they do not have any graphics capabilities so they can't be used for overall gaming.  And the reason we did this is we wanted to make sure that we supplied the overall cards that we needed to our gamers, because that is our very important strategic importance that we did.  However, in certain times, if there is not the overall availability and/or if price of Ethereum reaches high levels, there's a fairly good return on investment by buying a high-end card.  There could be a good return on investment that says, "I could actually buy a higher-end game.  I can actually do gaming and mining at the same time if I was doing that."  So you're correct, there probably is some residual amount or some small amount in terms of that, and that's not something that we can visibly see, we can visibly count in [indiscernible] there.  We do believe the majority does reside in terms of our overall crypto card, which is the size of about $150 million in Q2 and met our expectations in terms of Q3, that we thought it would be more residual and most probably closer to [indiscernible].

*Id.*; *see also* FAC ¶¶ 203–04.

United States District Court
Northern District of California

### iii.    Cryptocurrency-related revenues were primarily reported in the OEM segment

On August 10, 2017, NVIDIA held its second-quarter fiscal year 2018 earnings call. FAC ¶ 179. A Goldman Sachs analyst asked, "So Q2 revenue came in roughly about $250 million above your guide. Can you confirm what some of the drivers were to the upside relative to your guidance? Was it all cryptocurrency or was it a combination of multiple things?" Dkt. No. 153-4, Ex. C at 7. Defendant Huang responded:

> [T]he $250 million, you could see in our – what we categorized under the OEM SKUs, basically the cryptocurrency SKUs. And that, if you reverse-engineered it out, I think, is approximately $150 million. And I – and we serve the vast – I would say, the large majority of the cryptocurrency demand out of that specialized products. There's still small miners that buy GeForces here and there, and that probably also increased the demand of GeForces.

*Id.* Similarly, in Defendant Huang's statement in the August 12, 2017 interview with *VentureBeat*, he noted that cryptocurrency represented about $150 million in revenues, the same amount he referenced as being within the OEM segment during the second-quarter fiscal year 2018 earnings call. *See* Dkt. No. 153-5, Ex. D at 3; *see also* FAC ¶ 183.

On September 6, 2017, Defendant Kress spoke at the Citi Global Technology Conference. FAC ¶ 190. When asked "what steps has NVIDIA taken to avoid cannibalization of core gaming market from these cards," Defendant Kress responded:

> Cryptocurrency has been a very interesting market dynamics over the last couple of years. I think you'll remember 2 years ago, when the Bitcoin mining market came, it was probably one of the shortest-lived cryptocurrency time periods because that moved to the overall compute moving to custom ASICs. That wasn't a market that we particularly paid any attention to or were even a participant in terms of that. But the newest cryptocurrency market took quite a leap ahead in our second quarter that we just finished to where we had planned cryptocurrency cards that would be available to miners and exclusively for miners. So what we mean by that is we did not enable the capabilities for graphics with those cards. You'll see those cards in our OEM business not in our overall gaming business, and those were available throughout most of Q2. But there was very, very strong demand for mining as the overall price of Ethereum, one of the most popular cryptocurrencies, was very, very high. And so what you had seen in some of those shortages is there was a possibility in terms of some of the gaming cards that they might have bought as well. But we covered most of cryptocurrency with our cryptocards that we had developed and that was probably about $150 million in our quarter.

7

Dkt. No. 153-8, Ex. H at 9–10.[1]

On November 9, 2017, Defendants Huang and Kress hosted NVIDIA's third-quarter fiscal year 2018 earnings call. FAC ¶ 193. When asked to "quantify how much crypto was in the October quarter," Defendant Kress responded: "So in our results, in the OEM results, our specific crypto [boards] equated to about $70 million of revenue, which is the comparable to the $150 million that we saw last quarter." Dkt. No. 153-9, Ex. J at 11; *see also* FAC ¶ 193.

Outside of the three categories of statements detailed above, Plaintiffs also allege that one of Defendant Huang's answers during the second-quarter fiscal 2019 earnings call on August 16, 2018, was materially false and misleading. FAC ¶ 216. When asked about the channel inventory, Huang responded, "We're expecting the channel inventory to work itself out. We are the masters at managing our channel, and we understand the channel very well . . . we have plenty of opportunities as the – as we go back to the back-to-school and the gaming cycle to manage the inventory, so we feel pretty good about that." Dkt. No. 153-26, Ex. AA at 11. Plaintiffs allege that these statements were materially false and misleading because "(i) throughout the Class Period, the overwhelming majority of NVIDIA's cryptocurrency-related revenues . . . was made through the Gaming segment" and "(ii) the Company had a massive glut of unsold GeForce GPUs that NVIDIA had amassed to satisfy the anticipated demand, which no longer existed, from crypto- miners." FAC ¶ 217.

## II.    REQUEST FOR JUDICIAL NOTICE

### A.    Legal Standard

In *Khoja v. Orexigen Therapeutics*, the Ninth Circuit clarified the judicial notice rule and incorporation by reference doctrine. 899 F.3d 988 (9th Cir. 2018). Under Federal Rule of Evidence 201, a court may take judicial notice of a fact "not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Accordingly, a court may take "judicial notice of matters of public record," but "cannot take judicial notice of disputed facts contained in such public records."

United States District Court
Northern District of California

---

[1] Defendant Kress provided a similar response on the November 29, 2017 call with Credit Suisse. *See* Dkt. No. 153-14, Ex. O at 13; *see also* FAC ¶ 203.

*Khoja*, 899 F.3d at 999 (citation and quotations omitted). The Ninth Circuit has clarified that if a court takes judicial notice of a document, it must specify what facts it judicially noticed from the document. *Id.* Separately, the incorporation by reference doctrine is a judicially-created doctrine that allows a court to consider certain documents as though they were part of the complaint itself. *Id.* at 1002. This is to prevent plaintiffs from cherry-picking certain portions of documents that support their claims, while omitting portions that weaken their claims. *Id.* However, it is improper to consider documents "only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint." *Id.* at 1014.

### B.     Analysis

Defendants request that the Court take judicial notice of or consider incorporated by reference the following 35 documents: 15 items as to which the Court previously granted judicial notice, 13 items as to which the Court previously denied Defendants' request as moot, and 7 new items first alleged in the FAC. Dkt. No. 153 at 1, 15–16; Dkt. No. 153-1 ("Kirby Decl."), Exs. 2–36. Plaintiffs object to Defendants' request as to at least 14 of the 35 documents. *See generally* Dkt. No. 160.

Defendants re-attach exhibits as to which the Court previously granted judicial notice: Exhibits A, C, D, G, H, J, M, N, O, T, X, Y, AA, BB. Dkt. No. 153 at 2. The Court previously granted judicial notice as to these exhibits "for the purpose of determining what was disclosed to the market." Order at *5. Plaintiffs do not object to the Court considering these exhibits for that limited purpose. Dkt. No. 160 at 1 n.2. Accordingly, because "the plaintiff refers extensively to the document[s] [and] the document[s] form[ ] the basis of the plaintiff's claim," the Court **GRANTS** judicial notice of these exhibits for the purpose of determining what was disclosed to the market. *See Khoja*, 899 F.3d at 1002 (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)). The Court also **GRANTS** judicial notice on the same basis as to the following documents newly referenced in the FAC: Exhibits HH (Jon Peddie Research Report), II (NVIDIA Presentation – Citigroup Conference), JJ (NVIDIA Earnings Call –2Q 2016), KK (NVIDIA Presentation – Credit Suisse Conference), and LL (NVIDIA Presentation – Morgan Stanley

United States District Court
Northern District of California

9

Conference).[2]  The Court will also consider Exhibit MM, the internal company 2017 presentation drafted by members of NVIDIA's China market team.  Given that Plaintiffs include images of select slides in the FAC and rely on this presentation for various allegations, *see* FAC ¶¶ 11, 14, 119–26, 226, the Court finds it incorporated by reference, and **GRANTS** the request as to Exhibit MM on this basis.  Defendants also request that the Court deem Exhibit NN, a NVIDIA-produced video, incorporated by reference, but it is not clear whether Exhibit NN is the same video referenced in the FAC.  *See* Dkt. No. 160 at 3.  Given this uncertainty, the Court **DENIES** the request to incorporate by reference Exhibit NN.  Additionally, the Court **GRANTS** Defendants' request for judicial notice as to Exhibit FF because "stock price is public information capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  *See* Order at *6.  Lastly, Defendants' Exhibits B, E, K, L, P, Q, R, S, U, V, W, Z, and DD are not specifically referenced in the CCAC or relevant to the Court's analysis. Therefore, Defendants' request as to those exhibits is **DENIED AS MOOT**.

## III.    MOTION TO STRIKE

### A.    Legal Standard

Under Federal Rule of Civil Procedure 12(f), a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Motions to strike "should be denied unless the matter has no logical connection to the controversy at issue *and* may prejudice one or more of the parties to the suit."  *Hatamian v. Advanced Micro Devices, Inc.*, No. 14-CV-00226-YGR, 2015 WL 511175, at *1 (N.D. Cal. Feb. 6, 2015) (citing Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382 (1990)).  "In the absence of such prejudice, courts have denied Rule 12(f) motions 'even though the offending matter literally [was] within one or more of the categories set forth in Rule 12(f).' "  *Id.*  "With a motion to strike, just as with a motion to dismiss, the court should view the pleading in the light most favorable to the nonmoving party."  *Taylor v. Shutterfly, Inc.*, No. 18-CV-00266-BLF, 2020

---

[2] Though Plaintiffs contend that Exhibits II (transcript of presentation at Citigroup 2007 conference) and JJ (transcript of August 2015 earnings call) are not referenced in the FAC, Dkt. No. 160 at 2, Plaintiffs do cite statements from these exhibits.  *See* FAC ¶¶ 10, 43, 243.

United States District Court
Northern District of California

WL 1307043, at *4 (N.D. Cal. Mar. 19, 2020).

### B.    Analysis

In the FAC Plaintiffs attribute several allegations to FE-5, a newly identified confidential witness.  *See generally* FAC.  But Defendants indicate that FE-5 has signed a declaration disavowing key statements attributed to him in the FAC.  Dkt. 154-2 ("FE-5 Decl.").  In his declaration, FE-5 states that "several" of the statements attributed to him are "untrue and inaccurate" and that he "certainly did not make them."  FE-5 Decl. ¶ 5.  FE-5 details why a few key statements are false and states that he would have corrected any inaccuracies if Plaintiffs had allowed him to review the statements.  *Id.* at ¶¶ 12–13.  FE-5 notes that NVIDIA attorneys assured him that "even if [he] chose to say nothing further, NVIDIA would respect [his] privacy and not retaliate in any way."  *Id.* at ¶ 14.  Defendants argue that these discredited factual allegations are "unreliable and immaterial" and should thus be stricken.  Dkt. 154 at 3.

As an initial matter, Plaintiffs contend that the Court cannot consider FE-5's recanting declaration, which Defendants produced prior to the commencement of discovery.  Citing *Campo v. Sears Holdings Corp.*, 371 F. App'x. 212, 216–17 & n.4 (2d Cir. 2010), Defendants maintain that "extrinsic evidence may be considered at this stage for the limited purpose of assessing reliability of CW allegations."  Dkt. 165 at 3.  In *Campo*, the Second Circuit found no error in the district court's consideration of deposition testimony at the motion to dismiss stage "for the limited purpose of determining whether the confidential witnesses acknowledged the statements attributed to them in the complaint."  371 F. App'x. at 216 n.4.  In response, Plaintiffs point to the decision of a district court in this circuit stating that "while a district judge is considering a motion to dismiss, there is a strong argument that defendants should never be submitting recanting declarations, and that courts should be striking any such declarations sight unseen."  *See Union Asset Mgmt. Holding AG v. Sandisk LLC*, 227 F. Supp. 3d 1098, 1101 (N.D. Cal. 2017).  The crux of the parties' disagreement thus revolves around the appropriateness of resolving this issue at the motion to dismiss stage.

The Court agrees with Plaintiffs that it is improper to resolve factual disputes concerning FE-5's account at this stage.  The Court finds *Hatamian v. Advanced Micro Devices, Inc.*, 2015

11

WL 511175 (N.D. Cal. Feb. 6, 2015) ("*AMD*") persuasive. In *AMD*, the court considered a motion to strike the accounts of two confidential witnesses in a securities class action complaint. The defendants had filed declarations in which the confidential witnesses recanted or disclaimed certain statements attributed to them. *Id.* at *1. But because the allegations sought to be stricken "pertain[ed] directly" to the element of scienter, the court determined that those allegations did "not fall within the[] categories for which striking is permissible." *Id.* Concerning the defendants' argument that certain allegations were false, the court noted that the declarations did not establish that those allegations were "irrefutably false," and found that discovery would allow the "opportunity to explore" such questions. *Id.* at *3.

Here, the allegations sought to be stricken may bear on the litigation because Plaintiffs cite these statements in support of their scienter arguments. Accordingly, the allegations attributed to PE-5 "do not fall within the[] categories for which striking is permissible." *See id.* at *1. Defendants maintain that FE-5's declaration does not raise a factual dispute like the one in *AMD*, where the defendants asked the court to strike allegations as "false." Dkt. 165 at 9. Instead, Defendants contend that the truth of FE-5's allegations is "immaterial to whether" these allegations are "sufficiently reliable." *Id.* But, as Plaintiffs note, there plainly are factual disputes concerning whether FE-5 provided some of the information attributed to him and the reasons for FE-5's disavowals. Dkt. 161 at 13. The Court thus **DENIES** Defendants' motion to strike.

## IV. MOTION TO DISMISS

### A. Legal Standard

#### i. Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a

*United States District Court*
*Northern District of California*

claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

### ii.    Heightened Pleading Standard

Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance . . . . " 15 U.S.C. § 78j(b). Under this section, the SEC promulgated Rule 10b–5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). To prevail on a claim for violations of either Section 10(b) or Rule 10b–5, a plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

At the pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b–5 must not only meet the requirements of Federal Rule of Civil Procedure 8, but also satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Under Rule 9(b), claims alleging fraud are subject to a heightened pleading

13

requirement, which requires that a party "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Additionally, all private securities fraud complaints are subject to the "more exacting pleading requirements" of the PSLRA, which require that the complaint plead with particularity both falsity and scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

### B.    Analysis

Defendants contend that Plaintiffs fail to sufficiently plead falsity, scienter, and control person liability. *See generally* Mot. The Court agrees that Plaintiffs fail to adequately plead scienter. Because the Court finds that Plaintiffs' Section 10(b) claim fails, it must also dismiss the Section 20(a) control person liability claim. *See Zucco*, 552 F.3d at 990.

#### i.    Scienter

Under the PSLRA, whenever intent is an element of a claim, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The PSLRA's strong inference requirement has teeth," and "is an exacting pleading obligation." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (internal quotation marks omitted) (citing *Zucco*, 552 F.3d at 990). "The inference of scienter must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. The required state of mind is one of at least "deliberate recklessness." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999), *as amended* (Aug. 4, 1999). "[R]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *Id.* at 977. Additionally, where a complaint relies on statements from confidential witnesses, it must "pass two hurdles to satisfy the PSLRA pleading requirements. First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco Partners*, 552 F.3d at 995 (internal citations and quotation marks omitted).

The Court previously found that none of the statements by confidential witnesses

United States District Court
Northern District of California

United States District Court
Northern District of California

adequately supported Plaintiffs' scienter allegations under the PSLRA.  Order at *9–11.  The scienter allegations in the FAC are largely based on accounts of the same former employees detailed in the CCAC.  The FAC adds statements by FE-1 and FE-2, includes the same allegations regarding FE-3 and FE-4, and provides an additional account of a newly identified former employee, FE-5.  Relying on these former employee accounts, Plaintiffs argue that Defendants had "access to copious sales and technical usage data showing the dramatic surge in cryptocurrency-related sales during the Class Period."  FAC ¶ 219.  Specifically, Plaintiffs allege that Defendants had access to at least five sources of information concerning GeForce sales to miners:

> (1) Huang's access to a centralized sales database that expressly identified sales to miners; (2) regular meetings at which Huang, Fisher, and other top executives received reports quantifying sales to miners and discussed ways to capitalize on the cryptocurrency trend; (3) weekly "Top 5" reports from NVIDIA managers, initiated by and sent directly to Huang, that consistently discussed bulk GeForce orders by miners and the explosion of crypto-related demand; (4) GeForce Experience usage data compiled in monthly reports sent directly to Huang; and (5) a plethora of reports and sales data from NVIDIA's largest market, China, that both provide a "substantial window" into its global business and confirm that, contrary to their public prevarications, Defendants were tracking skyrocketing crypto-related sales all along.

Opp. at 1; *see also* FAC ¶¶ 78, 87, 94, 99, 109.

The Court finds that Plaintiffs' allegations again fail to raise a strong inference of scienter, largely because Plaintiffs do not adequately tie the specific contents of any of these data sources to particular statements so as to plausibly show that the Defendant who made each specified statement knowingly or recklessly spoke falsely.  Viewed as a whole, the FAC's factual allegations do not plausibly suggest that Defendants acted with at least deliberate or conscious recklessness.  While the Court reaches this conclusion after a holistic inquiry, the Court below discusses inadequacies in particular allegations with respect to each of the Defendants.

a.    Defendant Huang

Most of the FE statements concerning access to information focus on Defendant Huang.  The FAC alleges that Defendant Huang was authorized to access a centralized database, which "expressly identified crypto-miners as purchasers of large blocks of GeForce GPU products."  FAC ¶¶ 79, 81, 83–84 (citing statements by FE-1, who worked in the "China market").  The

related allegations primarily rely on the accounts of FE-1, a Senior Account Manager for NVIDIA in China, [3] and FE-2, a Senior Products Director who worked in Santa Clara, California until he left NVIDIA in May 2017. While the CCAC did not show that FE-2 ever personally communicated with any Defendant, *see* Order at \*11, the FAC now details that FE-2, "who personally met with Huang on a monthly basis," alleges that "Huang personally reviewed" the sales data through the database by referencing a video FE-2 saw during a 2017 meeting that showed Defendant Huang looking at the database.[4] *See* FAC ¶ 85. Given that FE-2 left NVIDIA in May 2017, the Court does not consider his allegations sufficiently reliable as to any alleged misstatements beyond that date. And even assuming that Defendant Huang reviewed the information referenced in FE-1's allegations about the content of the database concerning China, these allegations do not show that Defendant Huang had some contradictory information when he made any challenged statement concerning global sales.

The same is true for FE-1's allegation that Defendant Huang attended meetings where "sales data detailing GeForce sales to crypto-miners was presented" during the Class Period. *Id.* ¶¶ 87-88. FE-1 details that "business opportunities involving sales to crypto-miners were a topic of conversation at these meetings with Huang" and cites an example of a sales deal with Genesis, a company "well known in the cryptocurrency mining area." *Id.* ¶ 88. Putting aside the fact that FE-1 did not attend these meetings, there again is insufficient information pled about these meetings to establish that Defendant Huang actually learned of specific data and then made any statement contradicted by that data.

FE-5's allegations concerning regular meetings or emails are also insufficient. FE-5 served as "NVIDIA's Head of Consumer Marketing for South Asia from April 2014 to June

---

[3] FE-1 reported to a Senior Sales Director in China, who reported to the Senior Director for China in the United States, who reported to VP for Worldwide GeForce Sales, who reported to Defendant Fisher, who reported to Defendant Huang. FAC ¶ 33. In light of these levels of separation, the Court previously found that "Plaintiffs fail[ed] to establish the basis for FE-1's reliability and personal knowledge as to statements about NVIDIA's operations internationally, given his limited, low-level position in the China market." Order at \*11.

[4] Defendants argue that FE-2's only basis for alleging that Defendant Huang accessed the database was a "tongue-in-cheek training video made in 2012" that "has nothing to do" with any of the allegations. Mot. at 20.

2019." *Id.* ¶ 37. FE-5 stated that he attended regional quarterly meetings where managers broke down sales data for regional heads, who would then report that information directly to Defendant Huang. *Id.* ¶¶ 89–90. But FE-5 does not claim to have direct personal knowledge of what information would have been reported from the regional heads to Defendant Huang following these meetings. *Id.* FE-5 did report that he personally presented sales data to Defendant Huang at a 2017 meeting in India that "focused on NVIDIA's sales performance and marketing strategies and the performance of NVIDIA's channel partners." *Id.* ¶ 91. FE-5 noted that Defendant Huang had a great memory and that the first slide included "GeForce sales data," but crucially includes no further detail about the contents of the slide, such as whether it was even mining-related. *Id.* Additionally, with respect to the "Top 5 emails" that FE-5 asserts included discussion of mining-related GeForce orders, the Court agrees with Defendants that the FAC does not allege "facts about what any Top 5 email said on any given date, much less facts to show that any Top 5 email was inconsistent with any of the challenged statements." *See* Mot. at 15; *see also* Reply at 3 n.5.

The FAC also includes FE-1's allegations from the CCAC concerning GeForce Experience usage data. *Compare* CCAC. ¶¶ 102-108 *with* FAC ¶¶ 99–104. The Court previously found that these allegations "fail[ed] to provide any specific allegations as to the content of [that] data." Order at *11 n.3. The FAC adds related allegations from FE-5, who details that the usage data compiled in reports by regional managers "showed that over 60% of GeForce GPU sales during the Class Period were to miners." FAC ¶ 106 (emphasis not included). The Court agrees with Defendants that this allegation lacks particularized facts, such as whether Defendant Huang actually received this data, or whether the particular 60% statistic was presented in a particular report or was an average calculated from reports "during the Class Period." *See Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*, No. 15-CV-02938-HSG, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016) ("Generically asserting in an undifferentiated manner that facts occurred 'during the Class Period' is insufficient.").

Plaintiffs rely heavily on the Ninth Circuit's opinion in *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004), to support their access-based theory of scienter. The allegedly false statements challenged in *Nursing Home* were projections

United States District Court
Northern District of California

by defendants that Oracle would earn a certain amount per share and have certain revenues in its third quarter. *Id.* at 1228. Plaintiffs' theory was that when defendants made these statements, they knew that the company would not meet the forecasts based on internal data, including the fact that a number of large deals already had fallen through. *Id.* at 1231–32. The plaintiffs alleged that Oracle "maintained an internal database covering global information about sales of Oracle products and services," and contended that "Oracle must have been aware that it was not going to meet its sales projections earlier in the third quarter and that its statements to the contrary were therefore made with scienter." *Id.* at 1231. This was because "all sales information was in this database" and "the top executives admit[ted] to having monitored the database." *Id.*

The *Nursing Home* court found the plaintiffs' scienter allegations sufficient. *Id.* The Ninth Circuit noted that the complaint contained "hard numbers and ma[d]e specific allegations regarding large portions of Oracle's sales data," and that "specific" employee witness statements from "various regions of the United States . . . testifying to a major slowdown in sales" shed light on Oracle's overall financial health. *Id.* The court determined that these statements, combined with other allegations regarding "astronomical" stock sales "highly inconsistent" with the defendant CEO's trading history, and, "very importantly, . . . improper revenue accounting records," "create[d] a strong inference of scienter." *Id.* at 1231–33. In particular, plaintiffs alleged that "Oracle covered up its losses by creating phony sales invoices and improperly recognizing past customer overpayments as revenue." *Id.* at 1228. The Ninth Circuit also found that it could "reasonably infer" that "Oracle had known that it would not make its third quarter sales projections" based in part on admissions by the CEO that he was "heavily involved in an awful lot of th[e] deals that fell through in the third quarter." *Id.* at 1232–33 (internal quotation marks omitted).

The Court finds *Nursing Home* distinguishable. The plaintiffs there directly tied the statements at issue—forecasts about Oracle's third-quarter financial performance—to specific, identifiable underlying information known to the defendants that suggested knowledge that their statements were untrue when made. *Nursing Home* thus found a strong inference of scienter based on an overall record which included "specific allegations regarding large portions of Oracle's sales

data," suspicious stock sales, improper revenue accounting records, and the fact that the CEO was directly and heavily involved in many of the deals whose disappearance accounted for the eventual third-quarter shortfall. *Id.* at 1231–33, 1235. In contrast, here Plaintiffs challenge more generalized statements about cryptocurrency issues by the Individual Defendants that by their nature do not inherently suggest any knowing contradiction in the same way that the quarterly performance predictions did in *Nursing Home*. For example, Plaintiffs challenge Defendant Huang's statement in a November 10, 2017 *VentureBeat* article that for NVIDIA, cryptocurrency "is small but not zero. . . . It's large for somebody else. But it is small for us." *See* FAC ¶ 196. Plaintiffs similarly challenge Defendant Huang's comment in an article published by *Barron's* on February 9, 2018 that "crypto was a real part of our business this past quarter, even though small, overall." Dkt. No. 153-19, Ex. T at 1; *see* FAC ¶ 207. The Court agrees with Defendants that Plaintiffs' "impressionistic, high-level view" of both the content and context of Huang's statements and the reports of the former employees about NVIDIA's practices for keeping and disseminating data, Reply at 1, does not comport with the "exacting pleading obligation" imposed by the PSLRA. *Nguyen*, 962 F.3d at 414 (internal quotation marks omitted).[5]

Viewing the record holistically, the Court thus finds that Plaintiffs again fail to allege scienter with the specificity the PSLRA requires as to Defendant Huang.

### b. Fisher and Kress

The FAC adds very little with respect to Defendants Fisher and Kress. Plaintiffs again rely on FE-1 for the proposition that Defendant Fisher was aware that "sales to miners [in China] had caused GeForce sales to almost double in a short period" based on a presentation that FE-1 made

---

[5] The Court similarly finds *Quality Systems* distinguishable based on the nature of the challenged statements, which concerned the company's projected growth in revenue and earnings based on the current and past state of the company's sales pipeline. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1135, 1138 (9th Cir. 2017). The Ninth Circuit found the plaintiffs' scienter allegations sufficient where the individual defendants "had access to and used reports documenting in real time the decline in sales during the Class Period" and "told investors they had real-time access to, and knowledge of, sales information," a former employee averred that "sales reports were 'automatically delivered to the management team,'" and the defendant CEO had made a "massive and uncharacteristic [stock] sale . . . shortly after boasting to investors that [the company] anticipated record levels of sales." *Id.* at 1145–46. In this case, Plaintiffs neither proffer evidence of any suspicious stock sale nor tie the challenged statements to comparably specific underlying information known to the defendants so as to sufficiently suggest a knowing contradiction.

United States District Court
Northern District of California

that allegedly "emphasized the explosion of crypto-related sales of GeForce GPUs in China." FAC ¶ 115. But the Court previously found these allegations insufficient, where "Fisher's single alleged misrepresentation [about the fundamentals of PC gaming] did not concern China GeForce sales," and FE-1's allegations "d[id] not establish that he or she would be knowledgeable about NVIDIA's fundamentals internationally in several subsections of the Gaming segment." Order at *10. And the Court also noted that FE-1 shared no link to Kress. *Id.* No new allegations in the FAC changes the Court's conclusion that Plaintiffs have failed to allege scienter with respect to these Defendants. For example, FE-1 alleges that Defendants Fisher and Kress had authority to access the centralized database, *see* FAC ¶ 84, but as noted, FE-1's link to Fisher remains weak since Fisher's statement did not concern China sales and FE-1 is still not alleged to have ever communicated with Kress. Additionally, there is no FE account suggesting that either Defendant actually accessed the database. In sum, whether considered individually or holistically, the FE accounts again do not support a strong inference of scienter as to either of these Defendants.

### c. Core Operations Theory

The Court previously found that Plaintiffs did not meet the "heavy burden" of satisfying the core operations standard. Order at *11. "A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring . . . or witness accounts demonstrating that executives had actual involvement in creating false reports." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (quoting *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017)). A plaintiff may also meet the standard "[i]n rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008).

Defendants argue that the theory remains inapplicable. Mot. at 22. The Court agrees. With respect to the first prong, the Court previously noted that "[w]ithout particularized allegations indicating Individual Defendants' detailed involvement with this level of secondary

20

data, as opposed to higher-level information about direct sales by product type, the [Defendants'] statements alone do not meet the standard required to show scienter under the core operations theory." Order at *11.  Plaintiffs argue that Defendant Huang's statements that "we monitor sellout in the channel literally every day," "we stay very close to the [cryptocurrency] market," and "[w]e know its every single move" qualify as "precisely the type" of specific admissions required.  Opp. at 16.  The first statement is weak because it was made in 2015, years before the Class Period, *See* FAC ¶ 43; Dkt. No. 153-32, Ex. JJ at 9, and as Defendants note, the statement "referred to monitoring inventory in NVIDIA's channel (comprised of distributors and resellers)," rather than end-user data.  *See* Reply at 9 (emphasis not included).  And the second set of statements, made during NVIDIA's August, 10, 2017 earnings call, *see* FAC ¶ 66; Dkt. No. 153-4, Ex. C at 7, reflects more of a review of the general cryptocurrency market than a "specific admission[] . . . of detailed involvement in the minutia of a company's operations."  *See* Order at *11.

With respect to the second prong, Plaintiffs largely reiterate their previous arguments.  *See* Order at *12.  First, Plaintiffs again argue that "[t]he Gaming segment was NVIDIA's most important by far, and China was its most important market. . . . It would be absurd to suggest that Defendants were without knowledge of those revenues or that they were without knowledge of their exposure to and dependence on cryptocurrency."  Opp. at 16.  The Court's previous ruling— that it is not sufficient to allege that gaming was Defendants' core business—stands.  *See* Order at *12.  And the Court is not convinced by Plaintiffs' efforts to use the alleged importance of China's market to support the core operations inference.  Second, Plaintiffs again point to the "persistent analyst questions" relating to Defendants' exposure to cryptocurrency, but as the Court previously held, to show that "any lack of awareness must have been reckless," Plaintiffs "must allege facts that reflect 'some degree of intentional or conscious misconduct.' "  Order at *12 (citing *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at 977).  They do not do so here.  Accordingly, the Court finds that Plaintiffs have not shown that the core operations theory applies.

United States District Court
Northern District of California

21

## V.    CONCLUSION

The Court finds Plaintiffs have failed to adequately plead scienter.[6]  And because "Plaintiff[s] ha[ve] previously been granted leave to amend and ha[ve] subsequently failed to add the requisite particularity," the Court finds that leave to amend is unwarranted.  *See Zucco Partners, LLC*, 552 F.3d at 1007.  Accordingly, the Court **GRANTS** Defendants' motion to dismiss **WITHOUT LEAVE TO AMEND**.  The clerk is directed to enter judgment in favor of the Defendants and to close the case.


   **IT IS SO ORDERED.**

Dated: 3/2/2021

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[6] Because the Court finds that Plaintiffs failed to adequately plead scienter, it need not consider Defendants' arguments regarding falsity.

22