**KESSLER TOPAZ MELTZER**
   **& CHECK, LLP**
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
STACEY M. KAPLAN (Bar No. 241989)
(skaplan@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:    (415) 400-3000
Fax:    (415) 400-3001

*Counsel for Lead Plaintiff the State of Rhode*
*Island, Office of the General Treasurer, on behalf of*
*the Employees' Retirement System of Rhode Island*
*and Co-Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:    (310) 819-3470

*Counsel for Lead Plaintiff Iron Workers Local 580*
*Joint Funds and Co-Lead Counsel for the Class*

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE HP INC. SECURITIES LITIGATION | Case No. 3:20-cv-01260-SI |
| | **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | <u>CLASS ACTION</u> |
| | DEMAND FOR JURY TRIAL |
| | Dept.:  Courtroom 1, 17th Floor<br>Judge:  Hon. Susan Illston |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..............................................................................................................1

II.    JURISDICTION AND VENUE .....................................................................................12

III.   PARTIES ........................................................................................................................12

     A.    Lead Plaintiffs ....................................................................................................12

     B.    Corporate Defendant ..........................................................................................13

     C.    Individual Defendants .........................................................................................13

     D.    Relevant Non-Parties—Former HP Employees .................................................15

IV.    OVERVIEW OF DEFENDANTS' FRAUD ..................................................................17

     A.    HP's Success Depended on Its Printing Supplies Business ...............................17

     B.    Prior to the Class Period, HP's Supplies Revenue Had Been Declining for Years as Consumers Printed Less and Competition Increased in the Supplies Aftermarket ..........19

          1.    HP Was Selling Fewer Printers, Leading to Less Supplies Revenue ...................19

          2.    HP's Installed Base Was Obsolete and the Company Was Losing Supplies Market Share to Third-Party Aftermarket Suppliers, Leading to Lower Supplies Revenues and Profits ..............................................................................20

          3.    Consumers Were Printing Less, Leading to Lower Supplies Sales .....................22

     C.    Supplies Revenue Stabilization Was Critical to HP's Success but Early Missteps in Achieving It Shook Investor Confidence ............................................22

     D.    Defendants Assured Investors That HP's Four Box Model Could Accurately Assess Supplies Revenue ............................................23

     E.    Defendants Discovered and then Covered-Up the Impact of Unsustainable Supplies Sales Practices ............................................25

          1.    Prior to June 2016, Defendants Discovered That HP Was Using Unsustainable Sales Practices to Meet Quarterly Targets .....................................25

          2.    HP Announced a $450 Million Supplies Inventory Write-Off and Operational Changes Without Disclosing the Use of Pull-Ins or A-Business .......30

     F.    During the Class Period, Defendants Misleadingly Touted HP's Supplies Sales Model and Operational Changes to Maintain the Façade that Supplies Revenue Had Stabilized ..............................................................................36

          1.    Defendants Mislead Investors to Believe That HP Had Implemented the Supplies Sales Model and Operational Changes in June 2016 .............................36

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2.      Defendants Repeatedly Touted HP's Inventory Management Efforts Creating a Misleading Impression about the Company's Supplies Channel ........ 46

G.      Defendants Misleadingly Told Investors That the "Four Box Model" Relied on "Big Data," HP Was Placing NPV Positive Units, and Its Market Share Was Growing to Convince Investors That Supplies Revenue Had Stabilized ........................ 51

1.      Defendants Misled Investors to Believe That the Four Box Model Was Based on "Big Data" and, as a Result, Accurate and Reliable ............................ 51

2.      Defendants' Statements about Placing NPV Positive Hardware Units Were Materially False and Misleading ............................................................... 61

3.      Defendants' Statements Regarding HP's Market Share Growth Were Materially False and Misleading—as Defendants Eventually Acknowledged ............................................................................................ 67

H.      Defendants Misleadingly Represented That as a Result of the Supplies Sales Model and Operational Changes and Based on the Four Box Model, the Supplies Business Had Returned to Stability and Growth ............................................ 71

I.      The Relevant Truth Is Revealed Through a Series of Partial Disclosures ........................ 73

J.      Post-Class Period Events ............................................................................. 84

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS .................... 86

A.      Defendants' Materially False and Misleading Statements Regarding HP's Supplies Sales Model and Operational Changes Announced in June 2016 .................................... 86

1.      Defendants' Materially False and Misleading Statements Regarding the Shift to a Pull Model, the Impact of That Shift, and the Operational Changes ......................................................................................... 86

2.      Defendants' Materially False and Misleading Statements Regarding HP's Supplies Channel Inventory Management ........................................... 101

3.      Defendants' Materially False and Misleading Trend and Risk Disclosures ........ 111

B.      Defendants' Materially False and Misleading Statements Regarding the Four Box Model ....................................................................................................... 115

1.      Defendants' Materially False and Misleading Statements Regarding the Telemetry Data Purportedly Informing the Four Box Model ............................ 115

2.      Defendants' Materially False and Misleading Statements Regarding the Placement of Hardware Units ........................................................... 121

3.      Defendants' Materially False and Misleading Statements Regarding HP's Supplies Market Share ................................................................... 130

C.      Defendants' Materially False and Misleading Statements Regarding the Stabilization of HP's Supplies Business and Revenue .................................................. 133

VI.      ADDITIONAL ALLEGATIONS OF SCIENTER ........................................................ 141

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

A.   Defendants Knew about the Conduct Alleged in the SEC Cease-and-Desist Order by No Later than June 2016 and Knew or Recklessly Disregarded That This Conduct Continued During the Class Period ..................................................142

B.   Defendants' Repeated Statements and Admissions Reveal That They Knew or Recklessly Disregarded That Their Class Period Statements Were False and Misleading ..................................................................................................150

1.   Channel Inventory ..................................................................................150

2.   Supplies Pricing and Discounts ...........................................................153

3.   NPV Positive Printer Units ...................................................................154

4.   The Four Box Model ..............................................................................155

C.   HP's Supplies Business Was Its Core Operation ..........................................161

D.   The Individual Defendants Were HP's Most Senior Executives and Controlled the Content of Their Statements during the Class Period .....................................162

E.   Weisler's and Lores' Suspicious Insider Trading and Defendants' Motive to Conceal the Relevant Truth about HP's Supplies Business Further Confirm a Strong Inference of Their Scienter .................................................................167

VII.   LOSS CAUSATION ....................................................................................................170

A.   February 27, 2019: The Relevant Truth Regarding HP's Supplies Business Begins to Emerge .......................................................................................................171

B.   August 22, 2019: Investors Learn New Information Regarding the Instability of HP's Supplies Business .................................................................................178

C.   October 3, 2019: HP Abandons the Four Box Model and Admits Its Supplies Business Is Fundamentally Unsound ............................................................181

VIII.   PRESUMPTION OF RELIANCE ...............................................................................187

IX.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................................187

X.   CLASS ACTION ALLEGATIONS .............................................................................188

XI.   CONTEMPORANEOUS TRADING ...........................................................................189

XII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........................................190

XIII.   PRAYER FOR RELIEF ...............................................................................................195

XIV.   JURY DEMAND ..........................................................................................................195

Lead Plaintiffs the State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island ("Rhode Island") and Iron Workers Local 580 Joint Funds ("Iron Workers" and together with Rhode Island, "Lead Plaintiffs"), bring this action individually and on behalf of all others similarly situated who purchased or otherwise acquired the common stock of HP Inc. ("HP" or the "Company") between February 23, 2017 and October 3, 2019 (the "Class Period"), and were damaged thereby.

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief are based on the ongoing independent investigation of their undersigned counsel. This investigation includes review and analysis of, among other things: (i) HP's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of HP's conference calls with analysts and investors; (iv) Company presentations, press releases, and reports; (v) news and media reports concerning HP and other facts related to this action; (vi) price and volume data for HP's securities; (vii) materials obtained from the SEC with respect to its investigation of HP pursuant to the Freedom of Information Act of 1967; (viii) the Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order issued by the SEC on or around September 30, 2020 ("Cease-and-Desist Order"), attached hereto as Exhibit A; and (ix) information provided by former HP employees. Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants (defined below) or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   <u>INTRODUCTION</u>

1.     This securities class action arises from Defendants' materially false and misleading statements to investors concerning HP's printing supplies business and the Company's purported stabilization of printing supplies revenue. Before the Class Period, as the SEC later determined, HP materially misled investors regarding its "print supplies channel inventory management and sales practices." These practices caused the Company to announce a $450 million write-down of excess supplies

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

inventory in 2016. However, at that time, Defendants did not disclose the true reasons that HP took this inventory write-down. Then, during the Class Period, Defendants assured investors that they had made changes to HP's business practices to prevent excess inventory from flooding the channel again, including purportedly shifting from a "push" to a demand-driven "pull" business model. In reality, and with Defendants intently focused on HP's inventory management and sales practices (as confirmed in the SEC's 2020 Cease-and-Desist Order), HP continued to engage in the same undisclosed inventory and sales practices that the SEC determined rendered Defendants' public statements and SEC filings materially misleading. As such, at the end of the Class Period, had to again announce that at least $100 million in excess inventory had to be removed from the channel.

2.     This was part of a broader pattern of misstatements that Defendants made to convince investors of their "Supplies story"—that they could and, in fact, had stabilized the printing supplies business. More specifically, in order to convince investors of their "Supplies story," Defendants pointed to the purported switch to a "pull" sales model and HP's purported access to and use of real-time telemetry data to assure investors that HP was meeting only "true" demand, had stabilized supplies revenue through the placement of high-value printers, and were increasing HP's supplies market share. Defendants' assurances were materially false and misleading; HP was still pushing supplies into its channel that far exceeded true demand, HP never actually stabilized its supplies business, and its market share was in fact decreasing.

3.     When the relevant truth was eventually revealed through a series of corrective disclosures in 2019, Defendants disclosed material and sequential declines in supplies revenue, announced over $100 million in excess supplies inventory in HP's channel, and had to abandon entirely the razor/razor-blade business model. Beginning on February 27, 2019, Defendants acknowledged for the first time that HP had pushed at least $100 million in excess printing supplies inventory into the channel and that HP had never had the basic data inputs Defendants repeatedly touted. Defendants also admitted that, contrary to their Class Period representations to investors, HP never had sufficient visibility into whether its printing supplies inventory channel was aligned with true demand, its supplies market share was actually shrinking, and the Company had not, in fact, stabilized its printing supplies revenue and its supplies market share was shrinking. Ultimately, HP admitted that it had "gone too far" and had to overhaul HP's entire supplies-

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

based printing business model. These revelations shocked the market, and caused HP investors to suffer enormous damages.

4.     By way of background, HP sells personal computers, printers for both home and business consumers, as well as printing supplies like ink and toner for its printers ("Supplies"). During the Class Period, nearly all of HP's profits came from sales of Supplies. In fact, analysts estimated that the Company's Supplies business accounted for anywhere from 80% to 110% of its profits. This was due to HP's "razor/razor blade" business model, which involved selling its printers at a loss (i.e., for less money than it cost to make and sell them) in order to create a steady stream of once-profitable Supplies revenue. HP was willing to lose money on printer sales because it would more than recoup those losses by selling high-margin ink and toner supplies for those printers. As Defendant Enrique Lores ("Lores") summarized: "We lose money on printers. We make money on supplies."

5.     HP's business model only worked, however, if its printer customers (i.e., its "installed base") actually bought their printing supplies from HP instead of third parties. Otherwise, HP would be selling printers at a loss without profitable Supplies revenue streams to make up for those losses. As a result, the Company's mantra—both before and during the Class Period—was "it's all about supplies" and the Supplies business was by far the most important driver of HP's business and stock price.

6.     But in the years leading up to the Class Period, HP faced serious competition in the Supplies market (or "aftermarket"). Remanufacturers (or "remans") were refilling and then reselling used HP ink cartridges. Additionally, both legitimate third-party cartridge manufacturers and illegal counterfeiters were manufacturing their own ink and toner cartridges for use in HP printers. These aftermarket competitors sold cartridges for HP's printers at prices that were significantly lower than the price of HP original supplies. As a result, prior to the Class Period, HP was losing critical Supplies market share, and its all-important Supplies revenues had been declining for five straight years—posing a grave threat to the Company's business model.

7.     Then, in mid-2016, HP claimed announced that it had $450 million of excess inventory in its Supplies channel and was changing its sales model for the Supplies business to avoid future issues, purportedly shifting from a "push" model to a "pull" model based on actual end-user demand for HP Supplies. While HP blamed the glut of excess channel inventory on market forces, in reality it was the

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

result of undisclosed sales practices—known within HP as "pull-ins" and "A-Business"—that HP engaged to boost Supplies revenues. For instance, as the SEC later found, beginning in at least 2015, HP used a variety of inducements to "pull-in" sales the Company otherwise expected to materialize in later quarters in order to make internal quarterly sales targets. The Company also sold HP original supplies outside of designated territories, known internally as "gray marketing" or A-Business, in order to make internal quarterly sales targets. Finally, in order to continue to be able to report channel inventory levels below Tier 1 ceilings, in late 2015 Defendants pushed the Company's regional management to use ***additional*** discounts to generate "sell-through" to the unmonitored downstream portion of HP's channel. Although the excess inventory generated by the pull-ins and A-Business was still in HP's inventory channel, this had the effect of making it effectively disappear from metrics reported to investors. As a result of these sales practices, the Company overloaded its Supplies inventory channel with hundreds of millions of dollars in excess inventory in 2015 and 2016.

8.      Instead of telling the truth to investors about these practices and their effect on the Supplies business in June 2016, however, Defendants publicly cited the impact of the "omni-channel environment" to explain why HP reduced Supplies inventory by more than $450 million and purportedly implemented pricing, discounting, and inventory management changes. Defendants hid these practices from the market so that they could continue to engage in them. During the Class Period, Defendants knew or were at least reckless in disregarding the fact that HP was reliant on these same undisclosed sales practices that the SEC had found to be misleading in order to generate sufficient Supplies revenue and, in turn, to convince investors that the Company had "stabilized" the Supplies business. In other words, without the revenue generated from the undisclosed pushing of inventory into the channel irrespective of actual end-user demand, HP could not stabilize, let alone grow, Supplies revenue. This became clear in 2019 when Supplies revenues declined by 7% in 3Q19, 4Q19, and 1Q20, and Defendants ultimately had to abandon HP's whole razor/razor blade business model for selling ink and toner.

9.      Throughout the Class Period, Defendants also repeatedly reassured investors that they were turning HP's Supplies business around. In particular, Defendants told investors that: (i) the shift to an end-user demand driven "pull" sales model in 2016 had led to reduced inventory and global pricing consistency; (ii) Supplies inventory levels matched "true demand"; (iii) HP was placing "NPV positive" printer units—

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

units sold at a loss but based on the end-user's usage of toner or ink and willingness to purchase HP original supplies had a positive net present value; and (iv) Supplies market share was growing. Defendants claimed that they achieved Supplies revenue stabilization in the third fiscal quarter of 2017, one quarter earlier than expected, and repeatedly touted the purported fact of stabilization as an accomplishment throughout the rest of the Class Period. None of these statements were true.

10.    Indeed, contrary to Defendants' claim that HP had, for example, "changed the sales model" to focus "on the sales of supplies from the pull side and driving demand . . ." (instead of the push model previously in place), multiple former employees based in HP's Americas and EMEA regions during the Class Period confirmed that the Company continued to utilize discounts and other inducements to push ever increasing amounts of ink and toner inventory into the channel—irrespective of end-user demand— in order to meet monthly quotas and quarterly targets during the Class Period.

11.    Accounts from multiple former HP employees also belie Defendants' assertions that HP did not "want to be selling supplies on promo," had "reduce[d] the discounts we offered to channel partners," had "stabilized pricing" and achieved "global consistent pricing" during the Class Period. Rather, HP sold ink and toner into the channel supplies via quarter-end discounting and other inducements, creating the very pricing volatility Defendants claimed was significantly reduced. As Defendants subsequently publicly admitted in 2019, HP did not have "consistent pricing across the ecosystem" or "pricing discipline around the globe," and had otherwise failed to eliminate "pricing arbitrage" created by the Company's sales practices. Ultimately, the effect of these undisclosed sales practices (and the true state of the Supplies business concealed by them) required HP to abandon the razor/razor blade business model for its printing business.

12.    Further, Defendants failed to disclose to investors that the inventory metric they utilized throughout the Class Period to assure investors about the health of HP's Supplies inventory channel was limited to just the first tier of HP's multi-tiered distribution channel, and thus gave an inaccurate and misleading picture of the true health of HP's inventory channel. Indeed, HP later admitted that it never had visibility into a significant portion of its inventory channel. Moreover, investors remained unaware of HP's ongoing sales practice of pushing inventory into the channel at quarter-end irrespective of end-user demand. Indeed, even after the SEC began investigating these practices in early 2017, Defendants still kept

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

them concealed from investors so that they could continue to engage in them. Investors likewise remained in the dark about the fact that it was the inventory glut created by these practices, and not organic growth generated by a demand-driven sales model, fueling purported Supplies revenue "stabilization." As a result, each of Defendants' assertions regarding Supplies inventory during the Class Period were materially false and misleading when made.

13.     Moreover, investors remained unaware during the Class Period that Defendants did not have the data or visibility necessary to implement a true "pull" sales model or manage inventory based on end-user demand. Specifically, and as Defendants admitted in 2019, HP had no visibility into the downstream portion of the Company's multi-tiered inventory channel, and as a result, did not know how much inventory was in the channel. As a result, Defendants could not have known, let alone "see," as Defendants publicly claimed during the Class Period, "sell-out" of inventory directly to the end-user.

14.     Defendants also could not properly and reliably estimate end-user demand via market share assumptions in the Four Box Model because HP did not have the real-time, telemetry data it claimed to have for toner-based commercial printers. In particular, HP publicly claimed that its printers automatically collected data and measurements relevant to the four boxes, and then automatically "phone[d] home"— i.e., sent that data back to HP. This type of remote data collection is referred to as "telemetry" data. This data purportedly allowed HP to update the Four Box Model with respect to the Company's inventory demand, market share, and other trends in the four boxes in real-time. However, as Defendants later admitted, the Company never had "statistically relevant" telemetry data "for . . . [HP] to rely on" for its laser or toner-based printers to perform an accurate data analysis. As a result, for its laser fleet, HP had limited visibility into Supplies usage and market share.

15.     As HP later conceded the model that Defendants repeatedly hailed as the path to stable revenue, market share growth, and demand-based inventory levels in HP's all-important Supplies business "did not have . . . the capabilities to calculate [market] share for toner-based products in the installed base." Instead, HP was relying "primarily on lagging and incomplete market share surveys" that were not changing over time. Defendants were later forced to admit that, contrary to their Class Period representations, HP's actual market share was in fact, shrinking.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

16.   In addition to market share, Defendants also could not accurately determine usage without sufficient telemetry data, and, as a result, HP was not in a position to place NPV positive toner-based printer within the installed base as Defendants repeatedly claimed throughout the Class Period. And regardless, HP was not carefully placing NPV positive printers. Rather, as confirmed by its own former employees, HP pushing excess printers into the channel to meet monthly quotas and quarterly targets. Accordingly, and unbeknownst to investors, Defendants were not creating a foundation of NPV positive printers within the installed base to support Supplies revenue stabilization. Instead, they were loading the warehouses of their suppliers with excess printer inventory that was not being sold through to end-users and thus, could not generate the Supplies revenue necessary to be NPV positive.

17.   Significantly, by no later than the mid-2016, Defendants knew about and were focused on the pull-ins and A-Business, as well as the additional discounts to mask the effect of these practices by pushing the excess inventory to the unmonitored (and unreported) portions of the channel, and their impact on HP's Supplies business, including more than $450 million in excess channel inventory. Indeed, the SEC's September 2020 Cease-and-Desist Order confirmed, after a 3.5 year investigation involving massive amounts of data, as well as depositions, that "HP's principal financial officers and principal executive officers who were responsible for the company's disclosures learned of the conduct" by no later than 2016. Accordingly, before the start of the Class Period, Defendants knew that to achieve quarterly targets, HP paid "the channel to take additional shipments within a given quarter" and that these "pull-ins" accelerated in late 2015 and early 2016 as HP had to offer "steeper end-of-quarter discounts in order to meet quarterly sales targets," leading to "unhealthy levels of stock" in the Company's Supplies inventory channel.

18.   Defendants also knew that in order to meet revenue and earnings targets, HP's Asia Pacific, and Japan ("APJ") region "provided HP product to resellers and brokers within their region at higher than normal discounts," at times "in excess of forty percent," "knowing they would sell the goods . . . into the Middle East," which was part of the Europe, Middle East, and Africa ("EMEA") region. Defendants likewise were aware that as the "EMEA region reduced prices to combat gray marketing from the APJ region, some discounted good from EMEA eventually made their way into certain markets in the [Americas ("AMS")] region, causing further sales cannibalization" and exacerbat[ing] growing channel inventory challenges in the AMS region." And Defendants knew that they did not have visibility into the unmonitored

portions of their inventory channel because they had authorized additional discounts late 2015 and early 2016 to effectively mask the excess inventories created by these practices by pushing them into the unmonitored portion of the channel.

19.   Given Defendants' SEC-confirmed, pre-Class Period knowledge of the pull-ins, A-Business, and additional discounts to move inventory into the unmonitored portion of the channel, and Defendants' admissions that they were closely monitoring pricing, discounting, and inventory management, Defendants knew or recklessly disregarded the fact that HP continued to utilize these sales practices throughout the Class Period in both the Supplies and printer hardware segments. Defendants also knew or recklessly disregarded the fact that HP's Supplies inventory statements and its trend and risk disclosures were materially false and misleading when made as a result of the SEC's investigation into the Company's public disclosures from November 2015 to June 2016. Defendants' knowledge is bolstered by the recollections of multiple former HP employees from diverse locations, and the fact that the SEC was investigating the Company with respect to these sales practices and their impact on HP's Supplies inventory, revenues, and profits for nearly all of the 30 month Class Period.

20.   Additionally, Defendants knew or recklessly disregarded the fact that their Four-Box Model-based representations were based on stale and incomplete market survey information—and not the real-time "big data" they promised investors. Indeed, Defendants boasted of being "extensively" familiar with the Four Box model and said it was "something that we focus on very carefully" and "constantly work[ed] to improve and to refine." As Weisler himself stated, "we're constantly testing the model. Every time we close a quarter, we go back and look at the 4-box drivers, what it predicted and what it returned."

21.   The relevant truth concealed by Defendants' misrepresentations began to be revealed to the market on February 27, 2019. After the close of market that day, the Company shocked investors when it reported supplies revenue growth of negative 3% for the first quarter of fiscal 2019, and disclosed that it expected Supplies revenues to decline by 3% for the remainder of 2019.

22.   The Company also announced that, contrary to its Class Period assurances that Supplies inventory was aligned with true end-user demand, in reality HP had pushed at least $100 million in excess inventory into its channel, once again creating a massive Supplies headwind. Because HP had pumped far too much Supplies inventory into its channel, it had effectively cannibalized future sales and was now

experiencing a "slowdown in sell-through." Moreover, despite repeatedly representing during the Class Period that Supplies inventory levels were aligned with true demand, HP conceded that it never actually had visibility into the actual amount of inventory in its channel.

23. Defendants also finally admitted that, contrary to their prior representations, HP "did not have" sufficient telemetry data from its laser printers and so it "ha[d] never been statistically relevant for . . . [HP] to rely on it." As a result, for a huge portion of HP's installed base, the Company ***never*** had the real-time "big data" necessary to accurately understand "usage" or "market share"—the two most critical inputs in the Four Box Model.

24. Defendants also conceded that the Company's repeated reassurances to the market about Supplies stabilization and increasing market share were premised not on accurate, real-time data—as they had represented—but instead on "lagging and incomplete market share surveys." As HP finally gained access to real-time data from its printers, it became clear that its Supplies market share was actually decreasing and that, as a result, its Supplies revenues would also decrease for the remainder of the year.

25. As a result of these disclosures, the Company's stock price fell from $23.85 per share to $19.73 per share, or over 17%, on high trading volume. As such, HP lost over $6.34 billion in shareholder value in a single day.

26. HP's stock price, however, remained artificially inflated because—based on Defendants' repeated Class Period misrepresentations—investors still believed that HP could ultimately return its Supplies business to stability. For example, a Morgan Stanley analyst wrote in May 2019: "Key Debates . . . Can HP return to printer supplies growth? Yes, but we believe it will take multiple quarters as the company works through bloated channel inventory and takes operational and strategic actions to better defend against remanufacturers." In July 2019, after meeting with an HP representative, Evercore ISI reported that "[a]lthough HPQ lowered its supplies revenue expectations following its F1Q print, the company has since implemented remediation plans which we think should stabilize the trajectory of the overall printing business going forward." Thus, heading into HP's third quarter 2019 print, Deutsche Bank wrote that "we expect a continued path towards Supplies stabilization. . . ."

27. After market close on August 22, 2019, HP announced another large Supplies revenue decline—down 7% year-over-year. More fundamentally, HP lowered 2019 Supplies revenue guidance

even further—to negative 4% to 5%—and disclosed that it did not expect supplies revenue to grow in FY2020. HP blamed the lowered guidance, in large part, on continued market share losses: "[W]e have created a very attractive profit pool of supply but now has attracted many other companies to try to attack it, and capture a portion of it . . . . And because of that, we see an erosion of the overall profit pool that, according to our model, means a reduction in share and a reduction in price."

28.   Defendants further stated that while HP had reduced the inventory in its monitored upstream channels by nearly $100 million, which it called "good progress," it still did not know how much inventory was in its channel "given our lack of visibility into the entire channel ecosystem." As a result, the Company did not know how much excess inventory remained. Defendants also acknowledged that the actions they were taking to address the inventory, share, and pricing issues—including implementing "pricing discipline"—had impacted results in 3Q19 and would continue to impact Supplies revenues moving forward. Additionally, HP announced that Defendant Weisler would suddenly be stepping down as CEO.

29.   Following these disclosures, HP's common stock price dropped nearly 6%, from $18.93 per share to $17.81 per share, on high trading volume, which wiped out another $1.66 billion in market capitalization. As a result of Defendants' repeated misleading statements, however, investors still believed that HP's Supplies business was viable, but would simply take longer to stabilize than expected. For example, heading into HP's October 2019 Securities Analyst Meeting, Deutsche Bank wrote that, in its view, "a stabilization in Supplies is also expected eventually, albeit with the time frame pushed out into 2HFY20 or later."

30.   Then, on October 3, 2019, HP finally admitted that its Supplies business model could not be stabilized, and the declines were permanent: "we are not relying on Supplies revenues to grow beyond FY '20." In other words, as one analyst summed it up following the disclosure, "[e]xpect supplies to keep declining." In fact, going forward, HP told investors they should no longer rely on Supplies revenues or the Four Box Model to gauge the health of the Company's business, causing Wells Fargo to issue a report titled, "HPQ: RIP 4-Box Model – HP Moves To Systems Based Printing Strategy."

31.   Moreover, HP disclosed that it was fundamentally altering its "razor/razor blade" business model, and that, moving forward, any customer who wanted the option to use third-party aftermarket supplies would have to pay a premium for the printer up front to ensure HP a profit. In particular,

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Defendants admitted that the model was no longer viable because aftermarket competition was stealing HP's Supplies revenue share, and so the Company had been unable to recoup losses on negative margin printers: "[W]e don't know specifically if . . . [a printer purchaser] is actually going to be a user of HP original[] [supplies], or candidly, even a user of supplies" and so when HP sold printers at negative margins we "lose money on those customers."

32.     Market commentators viewed HP's business model change as a "***capitulation***" and a "***tacit admission that the supplies business is no longer growing***." Moreover, analysts overwhelmingly blamed HP's "capitulation" on market share losses to third-party suppliers. For example, Wells Fargo wrote that "[t]he model is a response to after-market supply producers that have cut into HP's IPG operating profit." Credit Suisse reported that the shift was a "response to the growing threat of aftermarket Supplies that are weighing on the highly-lucrative revenue stream." Morgan Stanley wrote, "HP's print strategy pivot . . . is a direct response to increasing competition from supplies remanufacturers, and even more so the growing market of counterfeits."

33.     In addition, Defendants revealed that HP was still working to implement the pricing consistency and inventory management practices that Defendants claimed were already in place since 2016. For example, HP was "changing our operating model" to "enable harmonized sales processes and pricing discipline around the globe" and was making changes to ensure "a tighter visibility and inventory and to manage it much, much more robustly." In fact, Lores revealed that HP had not actually changed to consistent global pricing after 2016, as it had represented to investors: "[w]ith this model, now we will be able to have consistency across the world, which is a very important change."

34.     As a result of these disclosures, the price of HP's stock dropped from $18.40 per share to $16.64 per share, or nearly 10%, on high trading volume—erasing another $2.6 billion in shareholder value.

35.     This action seeks to recover for the enormous losses suffered by investors due to Defendants' Class Period misrepresentations and omissions.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## II.    JURISDICTION AND VENUE

36.    The claims asserted herein arise under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1(a), respectively, and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

37.    This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa. In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337.

38.    Venue is proper in this District under 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. HP is headquartered and conducts business in this District, and many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

39.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

### A.    Lead Plaintiffs

40.    Lead Plaintiff the State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island is a public pension fund that provides benefits to public employees of the State of Rhode Island. As set forth in the previously-filed certification (ECF No. 35-1), Rhode Island purchased HP common stock and suffered damages as a result of the securities law violations alleged herein. By order dated May 20, 2020, the Court appointed Rhode Island a Lead Plaintiff in this action.

41.    Lead Plaintiff Iron Workers Local 580 Joint Funds is a provider of pension and health benefits to active and retired participants in the iron working industry. As set forth in the previously-filed certification (ECF No. 35-2), Iron Workers purchased HP common stock and suffered damages as a result of the securities law violations alleged herein. By order dated May 20, 2020, the Court appointed Iron Workers a Lead Plaintiff in this action.

### B.   Corporate Defendant

42.   Defendant HP is a global provider of personal computers, printers, and related supplies, solutions, and services. Incorporated in Delaware, the Company maintains its corporate headquarters at 1501 Page Mill Road, Palo Alto, California. The Company's common stock trades on the New York Stock Exchange ("NYSE") under ticker symbol "HPQ." Over the Class Period, HP had between 1.69 billion shares (as of January 31, 2017) and 1.48 billion shares (as of July 31, 2019) of common stock outstanding, which were owned by hundreds or thousands of investors.

43.   HP's fiscal year ("FY") begins November 1 and ends October 31. As such, HP' fiscal quarters are as follows: November 1 to January 31 ("1Q"); February 1 to April 30 ("2Q"), May 1 to July 31 ("3Q"); and August 1 to October 31 ("4Q"). The Class Period includes statements concerning HP's financial results for three fiscal years: November 1, 2016 to October 31, 2017 ("FY17"); November 1, 2017 to October 31, 2018 ("FY18"); and November 1, 2018 to October 31, 2019 ("FY19"). The Class Period likewise includes statements concerning HP's financial results for twelve fiscal quarters: November 1, 2016 to January 31, 2017 ("1Q17"); February 1, 2017 to April 30, 2017 ("2Q17"); May 1, 2017 to July 31, 2017 ("3Q17"); August 1, 2017 to October 31, 2017 ("4Q17"); November 1, 2017 to January 31, 2018 ("1Q18"); February 1, 2018 to April 30, 2018 ("2Q18"); May 1, 2018 to July 31, 2018 ("3Q18"); August 1, 2018 to October 31, 2018 ("4Q18"); November 1, 2018 to January 31, 2019 ("1Q19"); February 1, 2019 to April 30, 2019 ("2Q19"); May 1, 2019 to July 31, 2019 ("3Q19"); and August 1, 2019 to October 31, 2019 ("4Q19").

### C.   Individual Defendants

44.   Defendant Dion J. Weisler ("Weisler") served as President and Chief Executive Officer ("CEO") of HP from November 2015 until November 1, 2019. HP announced his resignation on August 22, 2019. Upon stepping down as President and CEO, Weisler assumed the role of Senior Executive Advisor, a non-executive officer role, through January 31, 2020. Weisler also served as a member of HP's Board of Directors from November 1, 2015, through the completion of the Company's 2020 Annual Meeting of Stockholders held on May 12, 2020. Previously, Weisler served as Executive Vice President of the Printing and Personal Systems Group of Hewlett-Packard Company from June 2013 to November 2015 and as Senior Vice President and Managing Director, Printing and Personal Systems, Asia Pacific and Japan from January 2012 to June 2013.

45.     Defendant Weisler made materially false and misleading statements during the: February 22, 2017 1Q17 earnings call (the "1Q17 Earnings Call"); March 1, 2017 Morgan Stanley Technology, Media & Telecom Conference (the "March 1, 2017 Conference"); May 24, 2017 2Q17 earnings call (the "2Q17 Earnings Call"); August 23, 2017 3Q17 earnings call (the "3Q17 Earnings Call"); October 12, 2017 Securities Analyst Meeting (the "FY17 SAM"); February 22, 2018 1Q18 earnings call (the "1Q18 Earnings Call"); May 29, 2018 2Q18 earnings call (the "2Q18 Earnings Call"); May 31, 2018 Sanford C. Bernstein Strategic Decisions Conference (the "May 31, 2018 Conference"); and October 3, 2018 Securities Analyst Meeting (the "FY18 SAM"). Defendant Weisler also signed HP's Forms 10-K for FY17 and FY18 and Forms 10-Q for 1Q17, 2Q17, 3Q17, 1Q18, 2Q18, and 3Q18.

46.     Defendant Catherine A. Lesjak ("Lesjak") served as HP's Chief Financial Officer ("CFO") from November 2015 until July, 2018 and served as HP's interim Chief Operating Officer from July 1, 2018 until February 2019. Lesjak also served as Executive Vice President and CFO for Hewlett-Packard Company from 2007 until the November 2015 split. Defendant Lesjak made materially false and misleading statements during the: 1Q17 Earnings Call; 2Q17 Earnings Call; 3Q17 Earnings Call; September 6, 2017 Citi Global Technology Conference (the "September 6, 2017 Conference"); FY17 SAM; November 21, 2017 4Q17 and FY17 earnings call (the "4Q17 & FY17 Earnings Call"); 1Q18 Earnings Call; February 27, 2018 Morgan Stanley Technology, Media & Telecom Conference (the "February 27, 2018 Conference"); 2Q18 Earnings Call; and June 6, 2018 Bank of America Merrill Lynch Global Technology Conference (the "June 6, 2018 Conference"). Defendant Lesjak also signed HP's Form 10-K for FY17 and Forms 10-Q for 1Q17, 2Q17, 3Q17, 1Q18, and 2Q18.

47.     Defendant Steven J. Fieler ("Fieler") has served as HP's CFO since July 2018. Previously, Defendant Fieler served as HP's Head of Global Treasury from January 2017 to June 2018. Prior to HP's separation from Hewlett-Packard Company, Fieler served in a range of finance and operational roles, including as Vice President, CFO for HP Software, Vice President of Sales Operations, Senior Director of Marketing Operations, Head of Investor Relations, and Director of Strategy and Corporate Development. Defendant Fieler made materially false and misleading statements during the: June 6, 2018 Conference; August 23, 2018 3Q18 earnings call (the "3Q18 Earnings Call"); and November 29, 2018 4Q18 and FY18

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

earnings call (the "4Q & FY18 Earnings Call"). Defendant Fieler also signed HP's Form 10-K for FY18 and Form 10-Q for 3Q18.

48.    During the Class Period, Defendant Enrique Lores served as HP's President of Imaging, Printing and Solutions, a role he held since November 2015. Since November 1, 2019, Lores has served as HP's President and CEO, and also as a member of HP's Board of Directors. Lores began his tenure at Hewlett-Packard Company in 1989, and served in a variety of roles, including as the Hewlett-Packard Company's Separation Leader from 2014 to October 2015. Defendant Lores made materially false and misleading statements during the: FY17 SAM; FY18 SAM; and January 8, 2019 Consumer Electronics Show ("CES") Citigroup TMT Conference (the "January 8, 2019 Conference").

49.    Defendants Weisler, Lesjak, Fieler, and Lores are collectively referred to hereinafter as the "Individual Defendants" (and collectively with HP, the "Defendants"). The Individual Defendants, because of their positions with HP, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's statements and presentations alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

D.    **Relevant Non-Parties—Former HP Employees**

50.    Former Employee #1 ("FE-1") worked at HP from before the Class Period through 2Q19 as an executive in the Asia Pacific and Japan ("APJ") region reporting to several senior executives including Nick Lazaridis, Senior Vice President, APJ, then Rich Bailey, President of APJ, and later to Tian Chong Ng, President and Managing Director of APJ.

51.    Former Employee #2 ("FE-2") worked at HP for more than 20 years, beginning in the 1990s in various positions that related to the management and sales of many HP product lines, including

computers, printers, and Supplies. From October 2015 through July 2017, FE-2 was a US Retail Laser Printer Business Manager at HP and was based in San Diego.

52.     Former Employee #3 ("FE-3") worked at HP for more than 25 years in various positions until FE-3 retired after the end of the Class Period. FE-3 was a Reseller Sales Person for approximately 15 years before changing positions in or around the summer of 2017. While FE-3 was a Reseller Sales Person, FE-3 reported to Tim Baker, Western Region Sales Manager. Baker reported to Craig Walters, U.S. Sales Manager for Supplies.

53.     Former Employee #4 ("FE-4") worked at HP from 2Q18 to 1Q19, as a Partner Business Manager – Supplies – United Kingdom and Ireland in Glasgow, Scotland. FE-4's role included, *inter alia*, assisting business partners grow HP ink and toner supplies sales and monitoring sales targets and revenue projections.

54.     Former Employee #5 ("FE-5") worked at HP starting before the Class Period and was a director in Product Management over Supplies from mid-2015 through early 2018, and then from early 2018 to late 2018, as a director involved in Devices Services. FE-5 was involved in developing the Four Box Model. FE-5's role also included projecting ink sales. FE-5 oversaw teams that were managing projections for the Four Box Model.

55.     Former Employee #6 ("FE-6") worked at HP from before the Class Period in an IT role, then became a Technical Project Manager at the end of fiscal year 2017, and remained in that role through 2Q19. During his tenure as a Technical Project Manager his responsibilities included Quality Assurance and Customer Experience. FE-6's role included assisting customers who experienced technical challenges related to adopting HP products and working across HP's portfolio to evaluate, recommend, and enable technologies, processes, standards, and metrics that pertain to development and quality assurance disciplines. FE-6 principally focused on quality assurance regarding printers and related issues.

56.     Former Employee #7 ("FE-7") worked at HP from before the Class Period through the end of calendar year 2019 as a Sales Manager in Canada. FE-7's role focused on the sale of industrial printers through HP's Indigo division.

57.     Former Employee #8 ("FE-8") worked at Samsung, in Bogota, Colombia, from before the Class Period to November 2017, until HP acquired Samsung's Print Division. FE-8 then continued working

at HP through 1Q18. FE-8's role at HP was to manage the business to business sales channels nationwide in Colombia and see that sales quotas were met. FE-8 reported to Sandra Enastrosa, Printing Manager, who reported to Mateo Figueroa, President of HP Printing in Colombia.

58.     Former Employee #9 ("FE-9") worked at HP as a LaserJet Supplies Market Analyst from 2007 to 2014, and then as an Inkjet Supplies Analyst until after the end of the Class Period. FE-9's side of the business and included forecasting Supplies revenues, and the drivers associated with that worldwide and on a regional basis. During FE-9's time as a LaserJet Supplies Market Analyst, FE-9 helped to develop the Four Box Model while on the Toner side of the business.

## IV.     OVERVIEW OF DEFENDANTS' FRAUD

### A.     HP's Success Depended on Its Printing Supplies Business

59.     HP was created following the November 2015 split of Hewlett Packard Company into Hewlett-Packard Enterprise ("HPE") and HP. In connection with the split, HP took and was focused entirely on the printer business and legacy computers.[1]

60.     The success of HP's entire business model as a separate public company depended on its printing business. HP's Printing segment comprised sales of commercial and consumer printer hardware, printer supplies, and related media, software, and services. Commercial hardware included commercial inkjet printers, large format printers, and laser printers, while consumer hardware included consumer and small/medium-sized business inkjet printers.

61.     HP's Printing segment included its Supplies business, the revenue of which was generated by the sale of consumable products, including ink and toner cartridges, for recurring use in HP's consumer and commercial printers. HP utilized a multi-tiered inventory channel in each of its three regions (Americas, APJ, and EMEA) to sell Supplies. According to FE-1, the EMEA and the North America regions were the "two giants" at HP, with the APJ region being smaller and less significant. Generally, HP sold ink and toner cartridges directly to "Tier 1" distributors. Tier 1 distributors then sold these products to "Tier 2" resellers. Tier 2 resellers either sold these products to the end-user or to another reseller further

---

[1]     HPE, on the other hand, would focus on enterprise and services, including servers, software, and cloud technology.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

down the distribution chain until the product was sold to an end-user. HP recognized revenue on these sales at the time of the Tier 1 distributor's initial purchase.

62.     All profit in HP's Printing segment came from its Supplies sales. That is because HP's business model—the so-called "razor/razor blade" model—was to sell its printers at a loss (negative margin) in order to generate revenue over time through the sale of supplies (i.e., ink and toner cartridges) for those printers. Likewise, Lores summed it up at the Company's October 3, 2018 Securities Analyst Meeting: "We lose money on printers. We make money on supplies."

63.     HP was willing to sell its printers at a loss because historically it was able to more than make up for that loss through the sale of HP original supplies in the years that followed the original hardware purchase. HP operated its Supplies business via a "push" go-to-market model, which was hidden from investors during the Class Period. Under a "push" model, HP sold Supplies inventory to its channel partners using various incentives. Then, to promote the movement of the inventory held by its partners through the channel and, ultimately, to end-users at the end of the distribution chain, HP used a combination of marketing spend and discounts, also known as "contra dollars." HP measured its Tier 1 channel inventory levels using Weeks of Supply ("WOS"), a calculation of HP's Tier 1 channel inventory divided by an average of the previous weeks' sales. HP referred to the upper portion of its internal targeted WOS range as a "ceiling." HP expected its regional managers to maintain their Tier 1 channel inventory level below the WOS ceiling. Sales managers within HP's Printing segment (which included Supplies) recognized the WOS ceiling as a "high-visibility" and "do not exceed metric."

64.     Because printing Supplies carried extremely high gross margins—in the 50-70% range—the Supplies business created a steady stream profit for HP. In fact, the Supplies business accounted for most, if not all, of HP's *total* profits, with analysts estimating that the Company's Supplies business accounted for anywhere from 80% to 110% of its profits. As a result, Supplies were **the** key driver of HP's success as a separate public company. As an analyst from Morgan Stanley wrote, "the reality is ink drives the majority of the profit." Similarly, Deutsche Bank noted that "supplies growth is the most important driver of profit growth for HP." Given this, analysts and investors were keenly focused on HP's Supplies business before and throughout the Class Period. For example, a UBS analyst wrote in an August 18, 2016 report that "[p]rinting is about 80% of profit and should be investors' focus." According to a Class Period survey

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1  UBS conducted, investors ranked "printer margin and supplies growth" as the most important issues to

2  them regarding HP.

3       65.   Defendants also knew that HP's success was determined by its Supplies business. To be sure,

4  during HP's first annual Securities Analyst Meeting ("SAM"), just before the split was officially finalized,

5  Defendants Weisler and Lores told analysts and investors that HP's "business is all about supplies."

6  Likewise, on the first day of the Class Period, Weisler stated, "[a]s we always say, it's all about

7  supplies . . . ."

8  
9         **B.**     **Prior to the Class Period, HP's Supplies Revenue Had Been Declining for Years as Consumers Printed Less and Competition Increased in the Supplies Aftermarket**

10       66.   At the time of the creation of HP and HPE, the former-Hewlett-Packard's Printing segment

11  had posted declining revenue results for several years, with overall Printing segment revenues and Supplies

12  revenues declining for multiple quarters in a row. As *The Wall Street Journal* wrote in June 2016, HP's

13  Supplies business "has been in state a slow-but-steady decline for the past three years. And that decline

14  has accelerated."

15       67.   Due to its high profit margins, however, the Supplies business continued to deliver consistent

16  cash flow and profit to Hewlett-Packard pre-split, which the multi-billion dollar conglomerate utilized to

17  invest in its other business lines. When Hewlett-Packard announced its intention to split into two

18  companies, preventing further declines in the Printing segment and, in particular, the Supplies business,

19  became critical to HP's ability to succeed as a separate public company. Whereas Hewlett-Packard had

20  been able to invest Supplies cash flow to build its other, faster-growing businesses, HP would be almost

21  entirely dependent on cash flow from the Supplies business to demonstrate revenue growth.

22       68.   As detailed below, Supplies revenue declined before the Class Period in part due to the

23  following trends: (i) consumers were purchasing less printer hardware (i.e., consumers were not replacing

24  their printers as often); (ii) HP was losing Supplies market share to third-party aftermarket suppliers; and

25  (iii) consumers were using their printers less.

26         **1.**     **HP Was Selling Fewer Printers, Leading to Less Supplies Revenue**

27       69.   The Supplies business was dependent on the hardware business because the sale and use of

28  HP printers generated the need to purchase ink and toner cartridges. As a result, any decrease in printer

sales meant a corresponding future decrease in opportunities to sell Supplies. Leading into the Class Period, HP's printer hardware sales had been in decline for years. In fact, when the split was announced in November 2014, Hewlett-Packard's printing hardware revenues had been declining since at least 2012. Heading into the Class Period, HP expected the printer hardware declines to continue. As Lesjak stated during HP's October 13, 2016 Securities Analyst Meeting: "Our print business assumptions specifically include a market forecasted to decline slightly year-over-year, primarily driven by the consumer segment." Similarly, Credit Suisse wrote: "The printing industry is around $58bn in terms of hardware, excluding supplies. Over the long term, we see the market gradually declining at a rate of 2% per annum."

70.    Further complicating matters, HP's razor/razor blade model meant that Defendants needed to do more than sell more printers; they needed to sell NPV positive units. NPV positive units are units that are sold at a loss or negative margin but when placed with end-users generate sufficient cash flow from the sale of HP original supplies over the life of the unit that it makes up for that loss. In other words, the Company had to identify and place "high value hardware units with strong supplies attach" that would "result in long term profitable revenue streams from supplies." During the Class Period, Defendant Lesjak confirmed that HP wanted "to place as many NPV positive units" "so that we keep the flywheel effect of placing units, getting supplies, placing units and getting supplies going." On the other hand, if HP sold printers without regard to whether they were "NPV positive," the resulting installed base would not generate the level of Supplies revenue necessary be profitable.

### 2.    HP's Installed Base Was Obsolete and the Company Was Losing Supplies Market Share to Third-Party Aftermarket Suppliers, Leading to Lower Supplies Revenues and Profits

71.    HP's business model of selling printers at a loss, but making up the difference through the sale of supplies, only worked if its printer customers (i.e., its "installed base") bought supplies from HP, rather than third parties. These third-party aftermarket suppliers, including remanufacturers or "remans" (i.e., vendors who refill and resell original HP ink and toner cartridges), clones (i.e., legal look-alike ink and toner cartridges), and illegal counterfeit ink and toner cartridges for HP's printers, often sold their products at significantly lower prices than HP's original supplies. An April 2016 Maxim Group analyst

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

report noted that "large re-mans" often sold HP ink supplies at "50 cents on the dollar," while (albeit less reliable) "mom and pop[]" third-party alternatives could sell for as low as "18 cents on the dollar."

72.   In the years leading up to the Class Period, however, HP was losing market share in the Supplies aftermarket due to competition from third-party ink and toner suppliers, remanufacturers or "remans" (i.e., vendors who refill and then resell original HP ink cartridges), and illegal counterfeiters.

73.   In 2014, HP reported that its Supplies revenue was declining due to the size and quality of its installed base. For instance in 2Q14, HP reported a 4% decline in Printing segment revenues "driven by a decline in supplies revenue, primarily related to lower toner sales." At the time HP conceded that the problem "goes back a number of years," to when the Company had failed to make timely and necessary product innovations, leading to "a weaker installed base" from which it generated supplies revenues. By 4Q14, Hewlett-Packard admitted that "clones and the remands [sic] attacking" HP's "aging installed base" was a further drag on "[o]n the toner side" of the Supplies business.

74.   As a result, in the years leading up to the Class Period, HP had been forced to discount its HP-brand ink and toner cartridges in an attempt "to combat after-market alternatives," which, in turn, drove down its critical Supplies profits and margins.

75.   Notwithstanding these discounts, HP continued to lose significant market share to third-party aftermarket suppliers heading into the Class Period. For example, a Sanford C. Bernstein analyst noted on the Company's February 24, 2016 1Q16 earnings call that, "after-market share actually declined this quarter[] [a]nd my belief is over the last five years, it's also gone down." Argus wrote in a March 1, 2016 analyst report that "[i]nk used to be the 'jewel in the crown' business for HP Printing. But the Company has been losing ground to low-priced competitors."

76.   Moving into the Class Period, therefore, regaining market share in the Supplies was critical to HP's profits and its stock price. As Maxim Group put it, "we believe evidence of re-man share gains being stemmed will be the key to catalyzing HPQ stock price appreciation."

77.   This was particularly true given, as discussed below, that industry declines—which HP expected to continue unabated—were already driving down HP's Supplies revenues.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

### 3.     Consumers Were Printing Less, Leading to Lower Supplies Sales

78.     Finally, HP's Supplies revenue also depended on how much people actually used their printers. All else being equal, a decrease in "usage" meant a corresponding decrease in Supplies revenue. In the years leading up to the Class Period, however, printer usage also was declining across the industry. As Wells Fargo wrote in a November 3, 2015 report, "the printing supplies sales face secular pressures from a decline in the amount overall printing by consumers. . . ."

79.     Moreover, given the overall decline in printer usage, it became more important to understand the usage of end-users in each of HP's markets so that the Company could place NPV positive units that generated a consistent stream of Supplies revenues. If, for example, HP discounted that printer making it more attractive to an end-user with low usage, that could materially impact HP's ability to make up the loss on the printer through subsequent Supplies sales.

### C.     Supplies Revenue Stabilization Was Critical to HP's Success but Early Missteps in Achieving It Shook Investor Confidence

80.     Given the central importance of HP's Supplies business, heading into the Class Period, the key question for analysts and investors was whether HP could stabilize its declining Supplies business. For example, Deutsche Bank wrote that "the stabilization and recovery of supplies sales will be a key metric to track over the next two years . . . ." Morgan Stanley wrote that "[i]nvestors are focused on printing supplies stability" and "most investors are still waiting for numbers, in particular supplies Y/Y growth, to stabilize." Wells Fargo reported that "supplies stabilization is the key to HPQ."

81.     In August 2014, after multi-quarter declines in Supplies revenues, HP told analysts that it was "upgrad[ing]" its user base by placing "high value profitable" or NPV positive units in order to generate increased Supplies revenues. In light of these efforts, HP told analysts that it expected Supplies revenues to stabilize in FY15. Likewise, during the 4Q14 earnings call, the Company reassured investors that it had put into place "an aggressive plan" to "optimize" hardware "unit trends and supplies [revenue] growth" This plan included "be[ing] more aggressive in placing units with the keen focus on placing high value units that will drive future supplies growth." Over the next three quarters, Hewlett-Packard confirmed that it was focused "on stabilizing supplies revenue" and that it would "continue placing higher value hardware units with greater supplies attach."

82.   However, during the last earnings call before the split, Defendants Weisler and Lesjak were forced to change the timeline for HP's "supplies revenue trajectory." As Weisler reported, HP now expected the "stabilization in ink supplies revenue to be delayed towards the end of 2017." Analysts were surprised by the news. UBS wrote in a December 15, 2015 report that "the surprise" in 4Q15 "was the decline in printer units and pushing out inkjet supplies stabilization one year to late F17." During the earnings call itself, one a Credit Suisse analyst noted that "once upon a time, not long ago you were saying the supplies business would stabilize by the middle of this year then it was the end of '16, now it's by the end of '17" concluding that "this four box model manages the business which is supposed to give this predictability" but "[i]t doesn't seem that predictable I guess" and posing the following question: "how much faith do you have in that continued model about [HP's] supplies business eventually turning?"

### D.   Defendants Assured Investors That HP's Four Box Model Could Accurately Assess Supplies Revenue

83.   At HP's 2015 Securities Analyst Meeting—just before the split was finalized—Defendants Weisler and Lesjak previewed the Company's Four Box Model. The Four Box Model purportedly allowed HP to accurately assess Supplies revenue by analyzing the four "key levers that will drive supplies revenue growth." The first box analyzed the size of HP's "installed based"—i.e., how many hardware printer units were in use. The second box analyzed "usage"—i.e., how much HP's installed base was printing. The third box analyzed HP's printer Supplies market share or supplies "attach"—i.e., the percentage of aftermarket supplies that HP was capturing compared to third-party supplies. Finally, the fourth box analyzed the price of supplies.

84.   HP claimed that the Four Box Model was able to accurately and reliably predict Supplies revenues because it was based on updated, real-time "big data"—which derived from the "telemetry data" or data that is automatically sent from remote instruments that the Company received directly from its printers. For example, during a November 2016 Credit Suisse conference, Lesjak represented that HP was collecting telemetry data from both its home and commercial printers: "So we get printers [that] phone home regularly and we had a bigger installed base printers phoning home in the ink space and over the course of 2016 we now are having the commercial side of the house, **and those laser jet printers are**

*phoning home too* . . . ." Thus, heading into the Class Period, investors understood that HP was collecting telemetry data from its commercial printers.

85.    Based on its printers "phoning home," HP claimed to have a constant feed of real-time "big data" that allowed HP to analyze and pinpoint trends in the different boxes in the Four Box Model. "Big data" means large data sets that may be analyzed computationally to reveal patterns, trends, and associations. HP claimed that it was constantly updating the Four Box Model with this real-time big data so that it had an accurate and updated view of Supplies demand. For example, in November 2015, Lesjak stated: "as we have collected more big data-and every week we collect new data, we update, basically, the [Four Box] model." Lesjak also represented that "we are constantly refining the model with the data that we get."

86.    Analysts echoed the Company's statements about its "big data" capabilities. In October 2015, Credit Suisse reported "that management has noted that for a significant part of its installed base the company receives real-time information on printed pages and usage, and that this big data has been leveraged to effectively predict its supplies business." In June 2016, Morgan Stanley noted that HP "has better visibility compared to the September 2015 analyst data as new printers are networked and give HP insights on print behavior." In a November 2016 report, Credit Suisse wrote that "[m]anagement also revealed that the model is constantly refined, based on data it receives from its printers in the installed base."

87.    Before and during the Class Period, Defendants relied heavily on the Four Box Model, the "big data" that purportedly fed into it, as well as HP's purported efforts to place NPV positive printers, to convince analysts and investors of the "supplies story"—namely, that Defendants could stabilize and grow revenues after years of declining results and in the face of an unabated secular decline in the industry. For example, in response to an analyst who noted that "the questions I get from investors is, the hardware business didn't really grow" and "[h]ardware is really what drives the long-term sustainability of the [Supplies] business" and asked what "would make investors feel more comfortable" that "the sustainability of the [Supplies] business is there?" both Lores and Weisler touted HP's purported placement of NPV positive units, and Weisler confirmed that HP's purported placement of NPV positive units and reliance

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

on big data and the Four Box Model was why "[t]his business" had "return[ed] to growth" and "has been growing for the last couple of quarters," which "[i]t hasn't done" "since late 2011."

**E.**     **Defendants Discovered and then Covered-Up the Impact of Unsustainable Supplies Sales Practices**

88.     By mid-2016, however, HP's Supplies business was floundering once again—this time due to self-inflicted wounds from unsustainable sales practices that pushed massive amounts of excess inventory in HP's Supplies channel, effectively cannibalizing future sales growth.

89.     As a result, and as explained further below, on June 21, 2016, HP announced a massive $450 million inventory reduction that severely harmed HP's income for the next several quarters. At the time, Defendants blamed the reduction on the impact of the omnichannel environment and online transactions leading to greater global price visibility. Defendants then announced that HP had moved to a new, demand-driven "pull" model, and had implemented control over its pricing, discounting, and inventory management efforts, to avoid any repeat of the problem in the future.

90.     The undisclosed reality, however, was much different. In truth, HP was engaged in widespread unsustainable sales practices that caused the need to take the $450 million inventory reduction—and Defendants were well aware of this undisclosed fact. Equally bad, after taking this $450 million reduction, HP continued the unsustainable sales practices it misled the market into believing its new purported "demand-driven" or "pull" sales model had extinguished.

**1.**     **Prior to June 2016, Defendants Discovered That HP Was Using Unsustainable Sales Practices to Meet Quarterly Targets**

91.     On September 30, 2020, the SEC issued the Cease-and-Desist Order against HP. Following a multi-year investigation that began in March 2017, the SEC found that HP "fail[ed] to disclose between November 2015 and June 2016 material information regarding its print supplies channel inventory management and sales practices." Cease-and-Desist Order, ¶1.

92.     Specifically, the SEC determined that when "HP began considering a move from the company's traditional push model to a demand-driven pull model" in 1Q16, Defendants learned of HP's use of "sales practices to increase quarterly operating profit" and the associated "erosion of profit margin and an increase in channel inventory." Cease-and-Desist Order, ¶¶ 1, 34. The SEC also concluded that HP

took the $450 million inventory reduction to address the impact of these practices. *Id.*, ¶¶ 34-36, 48. The SEC further found that HP timed the disclosure of this reduction to "coincide with a divestiture of certain software assets" in order "to lessen the negative impact to operating profit" of the inventory reduction and operational changes. *Id.*, ¶ 36.

93.  According to the Cease-and-Desist Order, declining revenues in HP's Printing segment and, in particular, its Supplies business, "posed a risk to the smaller post-split company." *Id.*, ¶ 9. As a result, "HP executives recognized the need to improve revenue and profitability in the Printing segment following the split, and emphasized the importance of meeting their Supplies budgets." *Id.*, ¶ 10. This recognition and emphasis "led regional managers in the Supplies business unit to take a number of actions in order to meet their individual budgets that ultimately increased channel inventory and reduced profit margins worldwide." *Id.* Internally, these actions were known as "pull-ins" and "A-Business." *Id.*, ¶ 2.

94.  **Discounts to Meet Targets or "Pull-ins."** The SEC determined that HP used weekly "flash" reports to manage budgeted revenue as well as operating profits. Cease-and-Desist Order, ¶ 17. By early 2015, the Company "began to see regular gaps near the ends of quarters" in the weekly "flash" reports. *Id.* In response, "HP executives . . . emphasized the importance of" HP's Supplies regional managers "meeting their Supplies budgets." *Id.*, ¶ 10. Because they could not meet their targets with organic Supplies sales growth, this emphasis "led [these] regional managers . . . to take a number of actions in order to meet their individual budgets that ultimately increased channel inventory and reduced profit margins worldwide." *Id.*

95.  These actions included "offering increased discounts at the end of quarters to meet sales targets," which HP sales managers began doing in early 2015. Cease-and-Desist Order, ¶ 16. Known internally as "accelerations" or "pull-ins," managers "would authorize additional discounts to encourage Tier 1 distributors to place orders earlier than they were otherwise planning to place them." *Id.*, ¶ 18. According to the SEC's review of internal HP documents, this was known as "pay[ing] the channel to take additional shipments within a given quarter." *Id.*, ¶ 18. These actions created the "expectation from the channel that HP would offer larger discounts in the third month of the quarter," with "[t]hat pattern accelerat[ing] in late 2015 and early 2016" as "HP managers offer[ed] steeper end-of-quarter discounts in order to meet quarterly sales targets." *Id.*, ¶ 19. In late 2015 or early 2016, one "regional sales manager in the Supplies business unit complained that it was 'becoming increasingly difficult to get partners to place

orders at any price' because HP was 'at historical highs with [its] accelerations.'" *Id.*, ¶ 23 (alteration in original).

96.     Routinely pushing Tier 1 distributors to take on more inventory than they needed also had the effect of materially increasing the amount of inventory in the channel. According to the SEC, "HP's Supplies Tier 1 channel inventory increased from the middle of its WOS ranges in the fourth quarter of 2014, to above its WOS range by the end of the second quarter in 2015." Cease-and-Desist Order, ¶ 20. Moreover, this pattern was not indicative of demand from end-users or even channel partners. As one "regional general manager in the Printing segment explained" in late 2015 or early 2016, "partners do not want to carry the level of toner that we push into their warehouses. . . . [b]ut we push more toner in to help deliver on our financial plans." *Id.*, ¶¶ 20, 22 (alterations in original).

97.     **A-Business**. The SEC also determined that "management" in HP's APJ region "sold printing supplies to distributors known to be involved in selling the HP printing supplies outside of their territory (internally described as 'gray marketing,' and known in the region as 'A-Business') . . . ." Cease-and-Desist Order, ¶ 2. According to the SEC, "[t]o execute the A-Business, APJ sales teams sold supplies to resellers or brokers who they expected would later sell those supplies outside of their territory." *Id.*, ¶ 25. For instance, "sales managers in APJ provided HP product to resellers and brokers within their region at higher than normal discounts, knowing they would sell the goods through a network of firms into the Middle East," part of HP's EMEA region. *Id.*

98.     The SEC found that "[b]eginning in early 2015 and continuing through the second quarter of 2016, sales managers in APJ significantly increased the A-Business in order to fill gaps" and make sales targets. Cease-and-Desist Order, ¶ 26. To entice these resellers and brokers "to take additional product, sales managers offered discounts, in some instances in excess of forty percent for A-Business sales" as compared to discounts for local, in-region distributors in the teens. *Id.* To ensure that resellers and brokers in one APJ country did not push the gray-marketed goods into another APJ country, managers in the APJ region "granted additional discounts to their local distributors" which served to further undercut the margins in the APJ region. *Id.* According to the SEC, "[i]nternal company documents described the A-Business in 2015 and the first half of 2016" as occurring at "levels three to four times HP's normal contra

rates." *Id.* In other words, the A-Business required APJ to provide discounts at rates three to four times higher than other regions.

99.   Like the pull-ins, APJ's use of A-Business to meet its sales targets led to inventory and pricing issues in all three of HP's regions. First, "[a]s a result of the higher-than-normal discounts, between early 2015 and June 2016, HP saw a significant increase in product sold through A-Business." Cease-and-Desist Order, ¶ 27. In fact, the A-Business surpassed the local business in certain APJ countries. *Id.* Additionally, as it had with respect to the pull-ins described above, "the size of the discounts granted to encourage A-Business climbed, as distributors demanded larger discounts to accept the increased inventory." *Id.* Moreover, the SEC determined that "[m]any of the goods sold in the A-Business from APJ later appeared in HP's European and African markets," effectively "'cannibalizing' sales from local HP distributors [in EMEA] and reducing HP's margins" in that region. *Id.*, ¶ 28. APJ's A-Business thus led to managers in the EMEA region "to reduce prices to combat gray marketing from the APJ region," which in turn led to "discounted goods from EMEA" making "their way into certain markets in the [Americas] region, causing further sales cannibalization and pressuring margins in the [Americas] region" and "further exacerbat[ing] already growing channel inventory challenges in the [Americas] region." *Id.*, ¶¶ 28-29.

100.   **Additional Discounts to Manage Tier 1 Inventory**. The channel inventory metric Defendants disclosed to investors "only included channel inventory held by channel partners to which HP sold directly and not by channel partners further down the distribution chain . . . ." Cease-and-Desist Order, ¶ 3. As a result, "HP sales managers [were able] to reduce their WOS number when Tier 1 partners sold channel inventory to Tier 2, even when overall channel inventory was increasing." *Id.*, ¶ 15. According to the SEC, the "use of the pull-ins and A-Business were causing . . . increased channel inventory." *Id.*, ¶ 3. Between late 2015 and early 2016, "one regional general manager in the Printing segment described 'unhealthy levels of stock' in Tier 1 and Tier 2, saying that 'we needed the Supplies Revenue & we used significant amounts of contra to push in Supplies at T1 to > 2 weeks above their optimal levels." *Id.*, ¶ 21.

101.   But despite the fact that regions were using the "pull-ins" and "A-business" to make their sales targets, "HP's worldwide executives," including Defendants Weisler, Lesjak, Fieler, and Lores, "demanded that regional managers remain within their WOS ranges while still delivering sales and operating profit targets." Cease-and-Desist Order, ¶ 30. This led HP regional managers to provide *further*

discounts to Tier 1 distributors in order to encourage them to sell their inventory to Tier 2 resellers. *Id.*, ¶ 31. The further discounting allowed HP to reduce its WOS metric but, critically, "did not alter the overall inventory in the channel absent additional end-user sales." *Id.*, ¶31. And, "[b]ecause HP's disclosures only described its Tier 1 channel inventory," the inventory moved through the use of these practices "was not part of HP's channel inventory disclosures." *Id.*, ¶ 33. In other words, HP could mask the excess inventory caused by the pull-ins and A-business by pushing that inventory into the unmonitored (and unreported) portion of its channel.

102.  Based on its investigation, the SEC determined that HP's FY15 Form 10-K was materially misleading because the Company "failed to disclose the known trend of increased quarter-end discounting leading to margin erosion and an increase in channel inventory," as well as "the unfavorable impact that the trend would have on HP's sales and income from continuing operations;" HP's 1Q16 and 2Q16 Forms 10-Q contained materially misleading statements regarding the reasons for the decline in HP's gross margins; and HP's "failure to describe its overall channel inventory provided the market with only a partial and misleading picture of HP's channel health" and concealed "the material impact that pull-ins and A-Business were having on HP's channel inventory." Cease-and-Desist Order, ¶¶ 42, 44-45. The SEC found the Company's channel inventory disclosures made during quarterly earnings calls between November 2015 and June 2016 to be materially misleading for the same reasons. *Id.*, ¶¶ 44-45.

103.  Despite Defendants' knowledge by no later than the first half of 2016 of the "pull-ins" and "A-Business," as well as the additional discounts to manipulate publicly reported inventory levels, Defendants concealed the real reason why the Company suddenly decided to reduce its Supplies inventory by nearly half a billion dollars and purportedly change its sales model, including changing to a "pull" sales model and overhauling its inventory management, pricing, and discounting programs and controls. In fact, investors remained unaware of the true reasons why Defendants reduced inventory by $450 million and announced changes to the Supplies sales model and operations until 2019.

104.  Instead, Defendants kept investors in the dark so that they could continue these practices during the Class period. Indeed, contrary to Defendants' assertions in June 2016 and throughout the Class Period that HP was aligning its Supplies inventory with true end-user demand and had put into place inventory management, pricing, and discounting policies and controls to prevent excess channel

inventories, numerous former employees confirm that HP continued to rely on quarter-end discounts to push Supplies inventory into the channel to meet its quarterly targets and, ultimately, to make it appear to analysts and investors that HP had finally stabilized the Supplies business.

105. Moreover, as explained below in Section V.A., HP's channel inventory and profit margin statements, as well as its quarterly and annual trend disclosures continued to be misleading throughout the Class Period. Additionally, Defendants' Class Period statements concerning (i) the reasons for the $450 million inventory reduction and Supplies operational changes, (ii) the reactions of partners and customers to the Supplies sales model and operational changes, and (iii) HP's efforts to stabilize global pricing and use contra dollars for marketing instead of discounts were materially false and misleading because Defendants failed to disclose these practices. *See* Section IV.E.

## 2.   HP Announced a $450 Million Supplies Inventory Write-Off and Operational Changes Without Disclosing the Use of Pull-Ins or A-Business

106. On June 21, 2016, following yet another large year-over-year decline in Supplies revenue, HP announced that it needed to "fundamentally change how [it] run[s] and manage[s] [its] supplies business." Despite their knowledge of the pull-ins and A-business that had necessitated the change, Defendants publicly blamed the pivot on "two key changes in the management of supply sales globally"— namely, the challenges purportedly posed by the "omnichannel" and HP's use of promotional pricing and discounts. According to HP, the combination of the shift to an omnichannel environment "and the growing trend of online transactions and the global nature of business" generated "a lot more transparency in the market with regards to [Supplies] pricing."

107. Defendants represented that as part of this "fundamental change," HP was taking two steps. HP told investors that in order "[t]o harmonize global pricing and improve margins over time," it was going to reduce the level of Supplies inventory in its channel by $450 million. In particular, the Company disclosed that it would be making an "investment" of $225 million in each of the next two quarters (a total of $450 million) to buy back supplies from its channel partners, a "fairly material" reduction and a "fairly substantial change to channel inventory."

108. Further, in order to "support [its] strategy of maintaining a more consistent value proposition" for HP Supplies, the Company claimed that it would only put Supplies inventory into the channel when

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

demand warranted it, shifting from a "push" approach to a demand-driven "pull" approach. HP told investors that this approach would "deliver lower inventories and increased efficiencies across the system, ultimately resulting in sort of greater stability and predictability in the supplies revenue."

109. In order to "manage this plan operationally," HP said that it would take "four actions." *First*, in addition to reducing channel inventory by $450 million, HP told investors that it would "reduce and tighten the desired ranges for ink and toner [inventory] in each" of its three regions." With respect to HP's purported inventory management efforts, Defendant Lores explained that "[i]t will be critical, as it is today, for me to hold the sales team accountable to remain within the [inventory] ranges going forward," and "[y]ou can expect us to report on this during the quarterly earnings calls, as we have done in the past."

110. *Second*, to exert "further control," HP stated that it would "align channel compensation and programs to a market demand selling motion [sic] and will shift [away] from compensating" based "on sell-in to a combination of sell-through and sell-out volumes." In other words, HP claimed to be moving away from compensating for "sell-in," or moving Supplies inventory from HP to its Tier 1 distributor partners, to compensating for "sell-through," when a Tier 1 distributor sells to a Tier 2 reseller, and ultimately "sell-out," when the Supplies inventory makes it to end of the distribution chain and is in the hands of the end-user. According to Lesjak, HP wanted to "compensate for the right behaviors," including reporting back to HP data regarding sell-through and sell-out of inventory in the channel. Lesjak also stated that "there's fairly regular reporting and its been the case for some time, so that we can really understand what's going on, certainly within Tier 1 globally." With respect to Tier 2, Lesjak stated that reporting "may be a bit spottier" and that HP was "increasing what we are doing in that space," but ultimately reaffirmed that "we've got a pretty robust process already."

111. *Third*, "to achieve better consistency of pricing globally," HP announced that it was "changing [its] pricing policy." With these changes HP wanted to "drive price stability in the market and through [its] marketing efforts" and "raise [its] average selling price," which it claimed to have already done in 1Q16 and 2Q16. Moreover, Lores confirmed that "[t]he pricing and promotion decisions on HP supplies will now be managed centrally at the global and regional levels to align timing and to maintain our value position [sic]" and that HP "will reduce the frequency and discount levels of inducive promotions and eliminate low-value and channel promotions." In other words, HP "will not be paying as many discount

dollars to get the product into the channel and then to move it out of the channel." Lores further confirmed that HP would have in place "controls to ensure adherence to policies and escalation processes."

112. *Finally*, HP announced that it was "shifting some investment dollars from price promotions to inductive marketing" in order "to demonstrate the value of HP Original Supplies" and "creat[e] loyalty and supplies [market] share." When asked whether HP was worried about losing marketing share due to lower inventory and fewer promotions, Defendant Lores responded that these actions will help to "grow our share" in Supplies, as we will have both better pricing consistency across the regions" and "the ability to invest in driving awareness of the value of HP Original Supplies."

113. The inventory write-down and the shift to a market demand-focused "pull" approach surprised analysts. For example, in a June 21, 2016 report, UBS noted that: "Last earnings call management noted it was satisfied with channel inventory levels, so the sudden shift could be a signal of continued weakness." Likewise, during HP's June 21, 2016 printing update call, a Sanford C. Bernstein analyst registered his consternation with HP's unexpected announcement:

> [W]e had an earnings call less than four weeks ago and you said you were comfortable with supplies inventory levels. Given all the analysis that you have done on this, I'm surprised you said that statement so unequivocally, given that you are now basically coming back to us and saying that's not the right supplies channel inventory level for the new economic reality of what supplies is today. So did you have an inkling, in which case why didn't you share that with us? Or has the market changed at all in the last four weeks that has changed your perception of where inventory levels need to be?

114. In response, Defendants Lesjak and Lores attempted to deflect the damage of the inventory reduction by pointing to the shift in focus to market demand. Specifically, Lesjak said that "if we continued to manage our supplies business the way we had been managing it, then channel inventory levels were the right levels." Lores, continued:

> This is why we wanted to share the other changes that we are doing internally because this is really not just a change of the inventory level. We are changing most of the processes that we use to manage the supplies. We are changing the metrics and this will enable us to operate in this different and more efficient way going forward.

115. Additionally, Defendants assured investors that HP had "big data" sufficient to execute these changes. For example, during the June 21, 2016 call, a Bank of America Merrill Lynch analyst asked how HP had determined the "right level of inventory" to have in the channel. In response, Weisler stated:

So we've done a significant amount of analysis through the collection of big data. We've spoken at length to our channel partners. We've analyzed all areas of the business to determine what generates -- both at a Tier 1 level and a Tier 2 level, what generates market demand so that we move from this push model to a pull model. So we're fairly confident that the sums that we've talked about in the prepared remarks are the right amount of inventory to reduce in order to effect that pivoting model.

116.  Defendants also referred to "big data" when faced with analysts who were concerned that by removing discounts HP risked losing crucial Supplies market share. For instance, during the June 21, 2016 call, a Morgan Stanley analyst stated, "I struggle with the idea that as you raise prices . . . that that's actually going to drive a market share increase rather than an accelerated share shift towards some of those remanufacturers." Defendant Lores, however, assured the market that HP was confident in its new strategy because "[o]ur big data capabilities give us a very good understanding of the effectiveness of our [discounting and promotional] activities." Lores claimed that the Company had "seen that there are several" marketing efforts "that really drive very good returns relatively fast," noting that as HP "focused more on online marketing" they saw "immediate responses."

117.  Ultimately, with respect to HP's Supplies revenue stabilization goal, Defendant Lesjak stated that "there's no fundamental change with how we think about the trajectory around supplies" "but for the fact that over time we do expect to be able to gain more share in HP branded aftermarket supplies" and "higher revenue as a result of not having to discount as much as we've been discounting." She further stated that "the fundamentals" as to "how supplies [revenue] on a constant currency basis [is] going to stabilize by the end of 2017" have not changed.

118.  Based on Defendants' statements during the June 21, 2016 Conference Call, analysts issued a number of reports confirming their understanding of the Supplies sales model and operational changes and their impacts. For example, analysts concluded that, as Morgan Stanley reported on June 21, 2016, HP planned to "transition the printing supplies business from a push to a pull sales model." In a same day report, Wells Fargo described the Supplies sales model and operational changes as follows: "management will . . . shift the business from one of a push model to one of a pull model by . . . 1) further reducing channel inventory (despite exiting FQ2 within the range) to reduce and tighten inventory ranges, 2) change the channel compensation program from a sell-in to a sell-through/out model, 3) reducing the frequency of low value channel promotions . . . , and 4) moving dollars from price promotions to marketing." UBS

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

similarly noted in its same day report that "HP plans to (1) materially reduce channel inventory, . . . (2) shift to a demand-pull business model (3) reduce the frequency of discounts, and (4) manage pricing at a global level." And in a June 22, 2016 report, RBC Capital Markets confirmed its understanding that HP was "adjusting to a demand-based model."

119.   Analysts also issued reports describing the steps they understood Defendants had or would take with respect to global pricing and discount management, including "standardizing pricing" and "reducing promotional activity." For instance, the June 21, 2016 Morgan Stanley report noted that HP "intends to lower every day pricing" and "reduce frequent promotions and associated deep discounts." On June 22, 2016, Barclays issued a report asserting that "HP will focus on more efficient promotional spend and shift channel incentives towards sell-through vs. sell-in, while providing fewer periods of increased discounting." Brean Capital's June 22, 2016 report further noted that "key areas of improvements" included "centrally manage promotions with lower frequency and a controlled ROI strategy" and "using promotions selectively to add to HP Inc. value proposition." Finally, JP Morgan explained in its June 22, 2016 report that HP planned to "manage pricing centrally and reduce the frequency and level of discounts."

120.  Analysts likewise issued reports regarding the $450 million inventory reduction and changes to inventory management. For example, a June 22, 2016 Credit Suisse report concluded that HP "will further reduce Tier 1 and Tier 2 supplies channel inventory globally, for both ink and toner, in 2H 2016." In a same day report, Brean Capital explained that HP would "reduce tier 1 and tier 2 channel inventory in H2 globally for both ink and toners to a targeted range" and "align channel compensation programs to market demand including switching from sale-in to sale-through and sale-out." JP Morgan likewise noted in its June 22, 2016 report that HP planned "to reduce its Tier 1/2 supply channel inventory" and "change sales compensation from sell-in to a combination of sell-through and sell-out volumes."

121.  Additionally, analysts bought in to Defendants' story that HP had shifted to a pull model, reduced channel inventories by $450 million, and implemented pricing, discounting, and inventory changes to address the impact of the "omnichannel environment." For example, in a June 21, 2016 report, Morgan Stanley reported that HP "highlighted challenges to managing the 'four P's' (product, price, promotion and place) in an increasingly omni-channel sales environment that provides transparency to price variations." UBS concluded in its June 21, 2016 report that "[t]he changes are a response to omni-channel purchasing

trends that have increased price transparency in the supplies market," nothing that "increased price transparency, frequent promotions and discounts create market instability and confusion." Also in a June 22, 2016 report, RBC Capital Markets contended that HP made these changes "to address two key challenges" "price variability due to omni channel market" and "decreased impact from promotional activity." Finally, in a June 23, 2016 report, Argus echoed Defendants' assertions as to why they were implementing the Supplies sales model and operational changes citing the realities of the omnni-channel environment and online price visibility: "with always-on and real-time information available in all customer channels, the use of discounts and incentives is proving counter-productive. Rather than encouraging customer sales, the uneven allocation of incentives creates confusion and resentment among full-price customers. This is disrupting both direct sales and sales made by channel partners."

122. Moreover, analysts reiterated Defendants' assertions that the Supplies sales model and operational changes would, as Morgan Stanley concluded in its June 21, 2016 report, "drive better operational efficiency and increase supplies market share." Brean Capital asserted in its June 22, 2016 report that "[t]he concerted efforts of inventory reduction and the reinvestments in omni-channel go to market sales model will create value proposition as HPQ supplies shifts from a promotion heavy push model to a pull model driven by end-user demand." Finally, in its June 22 report, RBC Capital Markets asserted that "[b]etter global pricing alignment" would "allow for better price stability (less promotional activity, use of big data analytics to set appropriate pricing)." RBC also asserted that by "aligning channel compensation to a demand-based model and shifting to sell-through/sell-out model" would lead to "better management of product, pricing, promotion, and placement."

123. Significantly, at no point prior to 2019 did Defendants disclose the real reason why they shifted to a pull sales model and took the surprise $450 million inventory write-down—the pull-ins that cannibalized future sales, the A-Business, and the additional discounts—to conceal the excess inventory caused by these practices. As a result, analysts and investors remained unaware that HP had been using these practices to meet its Supplies sales targets/quotas and that they had caused the excess Supplies channel inventories.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

F.     **During the Class Period, Defendants Misleadingly Touted HP's Supplies Sales Model and Operational Changes to Maintain the Façade that Supplies Revenue Had Stabilized**

1.     **Defendants Mislead Investors to Believe That HP Had Implemented the Supplies Sales Model and Operational Changes in June 2016**

124.  On the first day of the Class Period, in response to an analyst query about how the "supplies model change" was working "roughly three quarters into it now," Defendant Lesjak claimed that HP had executed on all aspects of the model change announced in June 2016. For instance, Lesjak stated that HP was "getting closer to global pricing consistency" in the Supplies business and had seen "improvement in terms of discounting." She further stated that HP was taking the cash flow that was not used for discounts and "reinvesting" that "back into marketing to drive print relevancy and usage" because HP "do[es] not want to be selling supplies on promo." Additionally, Lesjak reported that the "supplies model change" had been "great from a partner perspective," i.e., HP's channel partners, because "they're carrying lower channel inventory."

125.  In response to the same analyst query, Defendant Weisler reported that the "supplies model change" had "increase[d] customer satisfaction" as well, because "gray marketing activity" was "significantly reduced" and there were "much more stable prices in the market." One week later, Defendant Weisler made similar statements, telling the Morgan Stanley analyst that HP was "seeing the [] benefits" of shifting to a demand-driven model, that HP was "operating within" "narrowed" and "lowered" Supplies channel inventory ranges.

126.  On May 24, 2017, Defendant Weisler responded to an analyst question regarding how "HP original supplies attach" had "evolved over the past year or so" by confirming that HP had "changed the supplies sales model due to the increased impact of the omnichannel environment" and that the model change had led to "cost savings that we previously had put towards discount dollars."

127.  On September 6, 2017, Lesjak noted that in "a pretty significant move," HP had "changed [its] sales supplies model" in 2016 and "took channel inventories down significantly in Q3 and Q4 last year." She confirmed that the supplies sales model change "enabled us to . . . manage discounts" and that "having that global consistent pricing that we get with the new sales model has been incredibly helpful." Approximately one month later, on October 12, 2017 during the Company's annual SAM, Defendant Lores

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

reiterated Defendant Lesjak and Weisler's statements throughout the year: "we redefined the supplies model and we moved to a demand-driven model. And this is – we are starting to see the results of that." He likewise confirmed that HP has "been able to reduce our channel discounts," and has "increased and improved linearity and predictability within the quarter." Lores also explained that with respect to Supplies pricing, HP has "been able to reduce the discounts that we offered to channel partners," and "increase selectively prices in some areas." He further reported that "[w]orking with lower channel inventories is helping us to prevent gray marketing access – around the globe."

128.   Also at the 2017 SAM, in response to an analyst question about the impact of the sales model change on the Supplies inventory channel, Defendant Weisler reported that "the supply sales model change has been incredibly well received by partners" because it has "actually helped their business." He further noted that while "[i]t was short-term painful as they went through the withdrawal symptoms of how we've operated this business over the last 30 years," the model change has "made their business more predictable." As he explained, "in this omnichannel world, its stabilized pricing and that's good news for their business." In response to the same question, Lores made similar statements, noting that "[w]hen we say we operate with lower channel inventory, it means they need to invest less capital in managing our business." According to Lores, this "is a very clear benefit" to HP's channel partners "on top of . . . price stabilization." The following year at the 2018 SAM, Defendant Lores once again confirmed that "2 years ago, we did a big adjustment of how we managed supplies. We went from a push model to a pull model." Similarly, during a January 8, 2019 conference, Lores stated, "we changed the sales model, really focusing the sales of supplies from a pull side and driving demand . . . rather than in having the channel to push supplies into the market."

129. Analysts reiterated Defendants' statements regarding the Supplies sales model and operational changes. For example, in a June 26, 2017 report, a Morgan Stanley analyst concluded that "addressing high printer supplies channel inventory allows for a shift of marketing dollars to end-user education and away from incentivizing bad partner behavior" and "pushing supplies share higher." An August 23, 2017 Guggenheim report noted that "HPQ revamped its go-to-market for harmonized pricing across channels that included a big cut to inventories for a new pull vs. push model. The next day, UBS

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

issued a report concluding that "[l]ast year's implementation of consistent pricing across channels and providing product based on sell-through rather than channel forecast has proven successful."

130.  A September 9, 2017 Jefferies report claimed that "the company went from a promotion driven 'high/low' pricing model to an 'every day low price model.'" The Jefferies report concluded, "[u]nder the new program, channel partners come to [HP] when they need product, creating a much more stable source of demand driven by end usage."

131.  Moving into 2018, analysts connected the Supplies sales model and operational changes to HP's purported stabilization of Supplies revenues as of 3Q17. For example, in a March 8, 2018 report, RBC Capital Markets stated: "Following the company's supply chain actions in FH2:16, we think HPQ's Supplies revenue trajectory has since stabilized and should continue to stabilize through FY19." On May 20, 2018, UBS issued a report noting that "[a]lthough HP Inc got off to a rough start following the split, execution has been excellent since cleaning up supplies in the channel in 2016." Argus issued a May 31, 2018 report contending that "[f]or 2Q18, Supplies revenue (66% of printing revenue) was up 9% annual, as the new supplies model (now fully in place) continues to support more stable revenue and margin contributions." In an August 24, 2018 report, Argus similarly contended with respect to HP's printing margins that "HP Printing in September 2016 had to navigate a shift in its channel inventory distribution policies; that caused printing margin to slip to the 14% range for fiscal 4Q16. As the company moved into its new supplies distribution strategy, printing margins recovered to 17.1% for all of fiscal 2017."

132.  In reality, however, each of Defendants' statements was materially false and misleading when made because Defendants failed to disclose the existence and impact of pull-ins and A-Business, or additional discounts to mask the excess inventory caused by these practices, that animated the changes. *See* Section V.A.1. Specifically, without disclosing *why* HP had $450 million in excess inventory in its channel, or the fact that its regions had to engage in these practices to make sales quotas, Defendants' statements touting the purported benefits of these actions gave investors a misleading impression about the reasons for these changes and HP's ability to meet Supplies sales quotas without these undisclosed practices. In addition, by keeping investors in the dark about these practices, HP was able to continue them during the Class Period.

133.  These statements also were materially false and misleading because HP continued to use end-of-quarter discounts and promotions to push inventory into its channel in order to meet quarterly targets during the Class Period. Indeed, with the channel cleared of the excess inventory caused by HP's "pull-ins" and "A-business" from the 2015 to 2016 timeframe, the Company proceeded to again overfill it with excess inventory through the same or similar practices. For example, FE-2, who worked in the U.S. from 2015 to June 2017, stated that FE-2 did not believe anything changed in the way sales representatives push product following the June 2016 announcement that HP was switching to a demand-driven, pull model. FE-2 stated that there was still "aged inventory sitting in the channels" and the Company was still trying to push product down the distribution channels. When FE-2 started at HP in 2015, the Company already was experiencing excess inventory issues. FE-2 confirmed that the directives from HP's upper management always emphasized that HP needed to move more supplies, including through "Acceleration Asks" which set targets well over normal/standard demand. Per FE-2, HP attempted to increase demand by running various promotions at the consumer level and by creating incentives at the reseller level.

134.  It also was a common practice at HP for sales representatives to ask resellers to take much more stock than the resellers' consumption numbers would justify, according to FE-2. As FE-2 explained, in the printer supplies business, normal inventory controls would allow for two weeks' worth of inventory on store shelves; however, per FE-2, resellers HP asked to take excess inventory over and above the resellers' sales forecasts were asking to get paid via incentives to hold eight weeks of inventory. FE-2 recalled one instance in which FE-2 was personally involved where HP had approximately $35 million in excess inventory that needed to be distributed out to all the retailer-level resellers. FE-2 said that HP management wanted the inventory to ship-out even though there was no demand.

135.  FE-2 further explained that there were some large retailers who were easier to convince to take excess product. Because Office Depot—one of the four biggest Retail-Level resellers—had its own financial issues, FE-2 reported that "it was easy to twist their arm" to take more product. HP simply gave Office Depot a huge credit line to induce them to increase their printer supplies orders, according to FE-2. FE-2 recalled that during her tenure the head of Office Depot wanted to discuss the excess inventory issue with HP's head of Supplies.

136. FE-2 also recalled that another one of the four biggest Retail-Level resellers, Staples, complained that it had no place to store the goods after it agreed to take HP's excess supplies inventory. As a result, per FE-2, HP leased trailers and warehouse space for Staples in order to get the retailer to take excess product. Staples' need for trailers and warehouse space to take excess HP supplies was discussed at monthly meetings, according to FE-2. FE-2 further confirmed that given the size of the customers involved and the need to get approvals, FE-2 believes that Defendant Lores would have been aware of this effort and would have had to approve HP leasing the trailers and warehouse space. FE-2 also confirmed that HP was offering significant incentives to resellers, including discounts and "incentive dollars" to get them to take more supplies inventory." According to FE-2, these incentives were so significant that Defendant Lores' approval was necessary to obtain the incentive dollars.

137. FE-2 recalled that "you were always pushing product" during FE-2's tenure at HP, but FE-2 confirmed that it was not normal to overfill retailers' warehouses as HP did. FE-2 explained that the Company was using "fake sell-through" numbers to justify pushing more supplies down to the resellers. FE-2 confirmed that "sell-through" meant the product is sold off the retailer's shelf and is in the hands of the customer. Per FE-2, stacking up inventory at the retail level should not count as "sell-through." According to FE-2, the true "sell-through" numbers would have been available to HP management because the Company's contracts with its resellers required the resellers to provide the sell-through numbers.

138. By the time FE-2 left the Company approximately one year after HP purportedly switched to a pull model and implemented inventory management processes, the amount of excess inventory in the channel was significant. Per FE-2 the amount of excess inventory was "absolutely" tens of millions of dollars per quarter. FE-2 confirmed, moreover, that directives to push Supplies inventory into the channel came from the top at HP. According to FE-2, Supplies sales is the first thing upper management looks at when the numbers are rolled up. As a result, FE-2 confirmed that pushing inventory downstream was not the result of some mid-level management directives. FE-2 stated that "it is not in the DNA of the company" for mid-level managers "to do something rogue." The sales teams were not acting on their own initiative when they asked resellers to take more product, FE-2 stated, those directives were "always coming from the top."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

139.  FE-3 confirmed that FE-3's toner sales unit engaged in the "pulling in" of sales from future quarters when FE-3 worked as a Reseller Sales Person for toner supplies. FE-3 was in that position until approximately the summer of 2017, when FE-3 transferred to another role in the Company

140.  FE-3 recalled that quarter-end discounting activity was fairly common at HP. It occurred at the end of approximately every other quarter, and most often at the end of the six month and yearly fiscal periods, according to FE-3. FE-3 confirmed that these discounting practices occurred throughout every region in the U.S., including sales representatives who reported to all three toner regional sales managers (Western, Central, and Eastern).

141.  FE-3's toner sales unit pulled in sales via quarter-end incentives to HP's Tier 1 resellers and wholesalers across HP. FE-3 confirmed that HP was "just pushing inventory out there" that resellers had to get rid of before they could buy more inventory. According to FE-3, HP's executives were only managing the current quarter and not beyond it. FE-3 stated that HP sales employees knew that they were "taking sales from future quarters and just kicking the can down the road." Per FE-3, even though HP sales representatives felt that these actions were "dumb and not sustainable," they did it because it impacted their quotas and pay.

142.  FE-3 explained that HP's effort to pull in sales via quarter-end incentives was managed via an incentive agreement, which was approximately five pages and was provided to each reseller/wholesaler. The incentive agreement was commonly referred to in emails as the "quarterly incentives," according to FE-3. FE-3 recalled that an incentive agreement might state that in order to receive a particular incentive/discount, resellers had until the 20th of the last month of the quarter to place an order for a minimum amount of the specific SKUs listed in the incentive agreement and take delivery of the items by the end of the month.

143.  FE-3 understood that the incentive agreements were created by HP's promotions/inventory team. The incentive agreements were handed down from sales managers to sales persons on the first day of the third month in a quarter. At that point, FE-3 recalled, the sales persons "shopped" the incentives to all resellers, which was like a "fire sale." FE-3 confirmed that the incentive agreements included as a condition that a reseller could not give the excess inventory back to HP.

144. FE-3 stated that these incentives were uniformly provided to all resellers in order to push inventory into the channel. Per FE-3, HP offered quarter-end discounts to the entire U.S. region in order to be fair; they had to be offered to all resellers who competed with each other. However, FE-3 stated, the discount percentage for these quarter-end deals were not offered across the board for all of HP's toner SKUs; each discount offer was tied to buying a specific amount per SKU. FE-3 recalled that the Tier 2 percentage discounts were under 5%, and probably less than 2%, which added up to billions of dollars in discounts overall. FE-3 confirmed that even a .5% or 1% discount was a big deal because of the size of HP's overall business.

145. FE-3 reported that toner sales managers would tell employees that the quarter-end discounts came from HP higher ups. FE-3 confirmed that the quarter-end discounts always came from the top of the HP organization or, at a minimum, were approved by them. FE-3 stated that everyone in the US who worked in toner supplies knew about these sales practices, including inventory personnel and their supervisors. With respect to inventory personnel, FE-3 explained that they would have known about these sales practices because they managed HP's inventory and handled the logistics for warehousing HP's excess inventory. As a result, per FE-3, HP's inventory staff knew which SKUs would be discounted and made sure that HP could handle the logistics behind it, including the scenario where every reseller took the quarter-end discount.

146. FE-3 stated that all resellers eventually needed more toner, so the issue for them was how much toner did they actually need at the time HP offered a quarter end discount, and did they have the space to store the toner inventory for the next six months until it sold. Some resellers purchased toner at HP's quarter-end discounted price even though they were full of inventory and their sales were not great. Per FE-3, "those customers were taking it early." This would have a negative impact on future periods, according to FE-3. FE-3 recalled that one quarter could be good for FE-3's sales quota, but the next could be a problem. FE-3 also confirmed that resellers stopped purchasing HP toner because they had taken HP's quarter end discount in a prior quarter. FE-3 stated that lots of resellers would only take the quarter end discount every other quarter because they already had taken too much toner inventory in a prior quarter.

147. Part of FE-3's job function until FE-3 switched to a different position in or around the summer of 2017 was to help resellers plan how the inventory was going to be moved once it arrived. Because HP

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

was pushing inventory into the channel at quarter end, it would take longer for resellers to sell it through. FE-3 recalled that FE-3 was not using Tier 2 inventory data to determine who to sell product to. Instead, FE-3's role was to support Tier 2 resellers by helping them to assemble business plans to better engage customers. FE-3 also recalled instructing Tier 2 resellers to buy product from one of the Tier 1 wholesalers who had taken the quarter-end discount. FE-3 would inform the Tier 2 reseller that, if they purchased a specific amount of a specific SKU from that specific wholesaler, then they would get a certain discount passed through to them.

148.   FE-4, who worked with the United Kingdom & Ireland group from 2Q18 to 1Q19, confirmed that in some instances certain of the HP business partner managers pushed unneeded or unwanted supplies onto channel partners in order to meet their quotas or monthly or quarterly targets. According to FE-4, business partner managers were interested in reaching their targets in order to obtain their bonuses. FE-4 explained that partner business managers have their own quarterly quotas to meet, given to them by sales managers, which included attached bonuses, so there was incentive for these managers to get their customers to buy more stock. FE-4 confirmed that it was typically at the end of a quarter when the business partner managers would ask partners to buy more stock to meet their quotas. FE-4 reported that efforts to push cartridges into the channel occurred during his entire tenure at HP.

149.   FE-4 explained that business partner managers are HP employees who look after HP business partners and sometimes requested the partners "stock a little" more to meet targets. Alternatively, FE-4 recalled that business partner managers might order HP business partners more stock so that they could maintain their customer status level—silver, gold, or platinum partner—and HP and the business managers could meet their targets. FE-4 recalled that measures taken to get business partners to take on more product were discussed at forecasting meetings. FE-4 stated that these meetings occurred weekly and included all managers responsible for partner relationships.

150.   According to FE-4, HP's go-to-market model depended on the type of cartridge that was sold. For instance, FE-4 confirmed that larger, white cartridges that print more than others were heavily discounted and were only sold to business partners at silver-level or above who could guarantee regular purchases from HP of at least a certain amount of these cartridges each year. "Ordinary" cartridges were

sold in a push system. FE-4 confirmed that HP was trying to push as many ordinary cartridges as possible into the channel.

151. Additionally, FE-8, who was based in Bogota, Columbia, confirmed that from November 2017 when the Samsung acquisition closed until FE-8 left HP in February 2018, HP required FE-8 to sell a certain amount of consumables (supplies) with the sale of each printer. According to FE-8, consumables such as toner and ink were set at a ratio of roughly 3.5 to 4.0 units per printer. So, for example, if FE-8 sold 1,000 printers, HP also required FE-8 to sell 3,500 to 4,000 supplies cartridges into the channel. FE-8 recalled that this was considered a bundle. This also meant that the channel partners FE-8 dealt with were required to take even higher levels of ink and toner inventory than printer units. FE-8 confirmed that HP's mandate proved challenging because the channel partners FE-8 dealt with were used to getting supplies from Samsung at much cheaper prices than those offered by HP. While FE-8 was not involved in the sale of supplies after the printer was placed in the field, FE-8 confirmed that the supplies business had the same type of discounting practices as with printers. Everything that FE-8 ever saw while FE-8 was with HP looked like a push model, with channel partners being compelled to take both printers and supplies.

152. Defendants effectively admitted in 2019 that some or all of its regions continued to push inventory into the channel following HP's purported shift to a demand-driven "pull" model, with Defendant Weisler conceding on February 27, 2019, that HP had at least $100 million of excess Supplies inventory in its channel. Moreover, HP admitted that they did not even have visibility into the amount of inventory in its channel or how much was being sold-out to end-users. For example, Defendants admitted during the February 27 call that the "downstream portion" of its Supplies inventory channel—i.e., portions of Tier 2 and higher, as well as the end-user—was "unmonitored" and "beyond our reporting visibility." And, without visibility into actual end-user demand—or sell-out, as opposed to sell-through—HP could not have shifted to a demand-driven "pull" model with respect to its Supplies business as Defendants claimed in June 2016.

153. HP also had not stabilized Supplies pricing or otherwise achieved Supplies pricing consistency in each of its regions, let alone on a global basis. For instance, FE-4 reported that sometimes prices were set "roughly" for distribution in UK and mainland Europe, because currency fluctuations are a bit higher in the UK than in Europe. FE-4 also confirmed that business partners circumvented HP's system

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and bought cartridges in mainland Europe using euros then tried to sell them in the UK where prices were higher. FE-4 provided an example of this, explaining that a partner FE-4 worked with might say that it was buying HP product from a distributor, but then FE-4 would discover that the partner was instead buying HP product in mainland Europe and undercutting UK prices. Per FE-4, "That tends to happen quite often, it's not supposed to happen, and (we) report it if we come across it then it's investigated." FE-4 also recalled that some partners would not buy from approved UK distributors and used distributors in mainland Europe instead and then transfer them to the UK. According to FE-4, this is something HP did not want happening because the revenue decreased in the UK as a result.

154. As Defendants ultimately admitted in 2019, HP had not actually attained global pricing consistency in its Supplies business following the June 2016 announcements. In fact, as Defendant Lores conceded on October 3, 2019 in announcing yet another set of operational changes, "[i]n the model we announced 3 years ago, we were having [pricing] consistency per region" and with these changes "we will be able to have [pricing] consistency across the world, which is a very important change." However, as set forth above in Section IV.E., it was ***not regional*** pricing consistency Defendants promised analysts and investors in June 2016 and then purportedly delivered by 2Q17, it was ***global*** pricing consistency. Defendants also effectively conceded in 2019 that HP did not have "a disciplined channel partner program" and it needed to "change[] and improve[] the controls around our discount policy." Additionally, despite telling the market that HP would "harmonize global pricing," achieve "better global pricing alignment" for Supplies in June 2016, Defendants effectively conceded in 2019 that HP did not have "consistent pricing across the ecosystem, including the omnichannel," "deal pricing discipline," or "pricing discipline around the globe," and had failed to eliminate "pricing arbitrage" created by an overstuffed channel. Finally, despite telling analysts and investors in June 2016 that HP would "more consistent[ly] manage the Four Ps"– product, price, promotion, and placement – "globally," three years later, Defendants conceded that they still needed to have "a lot more consistency in how we manage the 4Ps of marketing" on a global basis.

155. Moreover, in addition to the statements identified above and consistent with the SEC's findings in the Cease-and-Desist Order, HP's Printing business trend disclosures in the Company's Forms 10-Q for 1Q17-3Q17 and 1Q18-3Q18 and Forms 10-K for FY17 and FY18 were materially misleading

because Defendants "failed to disclose the known trend of increased quarter-end discounting" that continued throughout the Class Period, "leading to margin erosion and an increase in channel inventory, and the unfavorable impact that the trend would have on HP's sales and income from continuing operations."

156. In fact, Defendants subsequently added to HP's 3Q19 and FY19 Printing business trend disclosures information available to them as early as June 2016, and certainly before the start of the Class Period given Defendants' knowledge of the pull-ins and A-Business, as well as additional discounting to maintain the façade that HP was effectively managing its inventory channel, including the following language: "We also face challenges in Printing due to our multi-tier distribution network, primarily in EMEA, including limiting grey marketing and the potential misuse of pricing programs. A competitive pricing environment, including from non-original supplies (which includes imitation, refill or remanufactured alternatives), and a weakened market in certain geographies with associated pricing sensitivity of our customers also present challenges in Printing." The challenges Defendants belatedly disclosed were present throughout the Class Period as HP continued to rely on sales practices to push inventory into the channel irrespective of end-user demand in order to meet quarterly targets.

### 2. Defendants Repeatedly Touted HP's Inventory Management Efforts Creating a Misleading Impression about the Company's Supplies Channel

157. Defendants also continued to mislead investors regarding HP's Supplies inventory channel and management during the Class Period, maintaining the same misleading impression of its overall channel health that led the SEC to find that "HP's use of the phrase 'channel inventory' without definition" and disclosures regarding the level of its channel inventory relative to HP's internal "range" "provided the market with only a partial and misleading picture of HP's channel health and caused HP's channel inventory disclosure to be materially misleading."

158. For example, on February 22, 2017, Defendant Lesjak stated, "[o]ur channel inventory levels are healthy. They are below the top end of the newly lowered and narrowed ranges." On March 1, 2017, Defendant Weisler that HP was seeing "the benefits" of the Supplies sales model change, including "fulfilling [inventory] when there's true demand" and noted that "[w]e narrowed the [Supplies channel inventory] ranges, and we lowered the [Supplies channel inventory] ranges, and we're operating within

those ranges." On the Company's 2Q17 earnings call on May 24, 2017, Lesjak stated, "we did make a change to our supply sales model last year, and that is driving better linearity. Real structural, better linearity. Linearity in the quarter that mirrors the demand that we're seeing." Lesjak further stated, "channel inventory remains below our reduced ceiling."

159. Further, with the presentation of its results for 2Q17, HP changed its terminology from a channel inventory "range" to a channel inventory "ceiling." Following that change, Defendant Lesjak or Defendant Fieler confirmed on each quarterly earnings call through the presentation of HP's 4Q18 and FY18 financial results that HP was below its Supplies inventory channel ceiling. During the 2Q18 earnings call, Lesjak confirmed that "we have been consistently below the ceiling for Supplies, frankly, since we made the change to our supply sales model."

160. Defendants also provided additional commentary on HP's Supplies inventory channel. For instance, on May 24, 2017, Lesjak confirmed that HP had done "year-over-year inventory drawdowns" of Supplies channel inventory "this quarter" and explained that HP had "continued to keep channel inventory kind of at" the Company's 3Q16 and 4Q16 inventory levels "or even in [sic] a little bit lower." Later in the same call, Defendant Weisler confirmed that "[w]e're holding less weeks of stock in channel inventory, both year-over-year and quarter-over-quarter." On August 23, 2017, Lesjak told analysts and investors that HP had "lowered our channel inventory ceiling to better reflect the more demand-driven sales model. . . ." Similarly, at the October 2017 SAM, Defendant Lores confirmed that "we redefined the supplies model and we moved to a demand-driven model . . . . We operate now with lower-channel inventories."

161. Analysts echoed Defendants' statements. On July 24, 2017, UBS reported: "The change in go-to-market seems to have solved the problem of excess supplies in channel. Previously, supplies were sold in based on the channel's forecast, and the bigger the forecast the more discretionary dollars HP provided. Now the approach is sell out to replenish, aided by increasing data HP receives on printer use."

162. These statements were materially false and misleading when made for the same reasons given by the SEC. *See supra* Section IV.E.1. For example, by touting that HP's channel inventories were below HP's ceiling, without disclosing that both the "ceiling" and the inventory levels being discussed only made up a small portion of HP's channel, Defendants gave the market a misleading impression about the actual amount of inventory in its full channel. In other words, "HP's use of the phrase 'channel inventory' without

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

definition gave the impression that the internal measurement included all of HP's channel inventory and was a measure of HP's overall channel health" when in reality it "included only its Tier 1 channel inventory." Thus, unbeknownst to investors, "disclosures about the company's position relative to its channel inventory ceiling only told part of the story regarding HP's channel health" and "provided the market with only a partial and misleading picture of HP's channel health."

163.   To that end, Defendants admitted for the first time on February 27, 2019, that its inventory channel "ceiling" comprised only inventory in its Tier 1 channel. Defendants further admitted that only a portion of Tier 2 was monitored and that otherwise HP had no visibility into the unmonitored, downstream portion of the channel. As Defendant Weisler admitted on May 30, 2019, "[w]e know what the Tier 1 channel inventory is and some parts of Tier 2, and then we don't have visibility to all the downstream Tier 3, Tier 4 and some of Tier 2." FE-8 confirmed as much, reporting that HP closely tracked its own inventory and its shipments to channel partners via a world-wide platform called HP Management Inventory. However, once inventory was delivered to a channel, HP no longer tracked it and HP did not keep track of how much inventory its channel partners had sold to end-users.

164.   Thus, prior to 2019, Defendants' failure to disclose that it did not have visibility into the actual amount of inventory in its channel and thus were only reporting on inventory levels for a portion of it provided investors with a materially misleading picture of HP's Supplies channel inventory health and rendered these statements materially misleading.

165.   These statements also were materially false and misleading because HP was still pushing Supplies inventory into the channel irrespective of end-user demand in order to meet quarterly targets. These statements also were materially misleading because, as discussed herein (*see* Section V.A.2.), while representing to investors that HP's inventories were aligned with "true demand" and were within the proper ranges determined by that demand, Defendants failed to disclose that HP ***never had*** the "big data" actually necessary to determine that demand. Instead HP was using "lagging and incomplete" third-party market share data "that wasn't changing over time" to reflect true market conditions.

166.   Further, in addition to the statements identified above, HP also included an inventory management risk disclosure in each of its Forms 10-K for FY16, FY17, and FY18, which were incorporated by reference in each of HP's Class Period Forms 10-Q. These risk disclosures were materially false and

misleading when made because they did not disclose the risks of the pull-ins or A-Business identified by the SEC or sufficiently describe the risks associated with HP's channel inventory, including HP's lack of visibility into the channel beyond Tier 1 or the fact that HP's internal metrics only tracked Tier 1 inventory. *See* Section V.A.3. HP's inventory management risk disclosures also were materially misleading because they failed to disclose the risks associated with HP continuing to push Supplies inventory into the channel irrespective of end-user demand in order to meet quarterly targets after June 2016.

167. In December 2019 and again in December 2020, Defendants added language to HP's inventory management risk disclosure. For instance, HP's Form 10-K for FY19 filed with the SEC on December 13, 2019, included the following language: (i) HP utilized "a multi-tiered channel" which "may reduce our visibility into inventories;" (ii) "[s]ales of our products by channel partners to unauthorized resellers or unauthorized resale of our products could also make our forecasting more difficult and impact pricing in the market;" (iii) "factors in different markets may cause differential discounting between the geographies where our products are sold, which makes it difficult to achieve global consistency in pricing and creates the opportunity for grey marketing." Similarly, in HP's FY20 Form 10-K filed with the SEC on December 10, 2020, included the following language: "For example, in the past we have had channel partners sell products outside of their agreed territory, and misrepresent sales to unauthorized resellers as sales to end-users, frustrating our efforts to estimate channel inventory and maintain consistent pricing, and negatively impacting gross margins."

168. However, Defendants were aware of all of this information, as well as the impact and risks posed by the pull-ins and A-Business, and the additional discounts HP utilized to manage the appearance of its inventory channel, by no later than the first half of 2016 and their failure to include it in the Class Period inventory management risk disclosures rendered them each materially misleading when made. Defendants also belatedly disclosed the existence of the pull-ins and A-Business even though Defendants had been aware of these practices and their impacts on HP's Supplies business—channel inventory levels, consistent pricing, and gross margins—and therefore the risks that flowed from them, since the first half of 2016. The failure to disclose these practices and the associated risks, as well as the fact that these practices continued, rendered Defendants' Class Period inventory management risk disclosures materially misleading when made.

169. Ultimately, to address the impact of HP's sales practices, HP had to reduce its Tier 1 channel inventory by "over $100 million." This inventory reduction followed and was in addition to efforts to reduce Tier 1 channel inventory in 1Q19, when Supplies revenue declined for the first time in at least six quarters by 3% year-over-year. The $100 million reduction of Tier 1 inventory also was in addition to a reduction of "monitored Tier 2 channel inventory" throughout FY19, which Defendants did not quantify. HP also saw material Supplies revenue declines across the business and particularly in EMEA as follows:

| | Supplies Revenue (in millions) | Y-o-Y $ Decline (in millions) | Y-o-Y % Decline |
|---|---|---|---|
| 1Q19 | $3,267 | ($90) | -3% |
| 2Q19 | $3,331 | ($103) | -3% |
| 3Q19 | $3,164 | ($241) | -7% |
| 4Q19 | $3,159 | ($226) | -7% |
| | | | |
| FY19 | $12,921 | ($654) | -5% |

170. Each quarter's disappointing Supplies revenue results caused Defendants to revise the guide for Supplies revenues for FY19 lower. Supplies revenue continued to decline into FY20, including an additional 7% y-o-y in 1Q20, for a total of $880 million in revenue declines in the aggregate for FY19 and the first fiscal quarter of 2020. In addition to the inventory reduction, and the decline in Supplies revenue, HP reported a significant decline in its Print operating profit margins in the second half of FY2019, with operating profit margins falling to 15.6% as a result of the deterioration of the Supplies business, suggesting that HP continued to experience the negative impact of using undisclosed quarter-end discounts to push inventory in the channel in order to create the appearance that HP had stabilized the Supplies business. And, critically, these sustained declines in both revenues and profit margins occurred just six quarters after HP had purportedly "stabilized" the Supplies business. Accordingly, the impact of the undisclosed sales practices on HP's business was far greater than the original $100 million inventory reduction disclosed in February 2019.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**G.** **Defendants Misleadingly Told Investors That the "Four Box Model" Relied on "Big Data," HP Was Placing NPV Positive Units, and Its Market Share Was Growing to Convince Investors That Supplies Revenue Had Stabilized**

**1.** **Defendants Misled Investors to Believe That the Four Box Model Was Based on "Big Data" and, as a Result, Accurate and Reliable**

171.  As noted above, prior to the Class Period, Defendants had boasted that HP's commercial printers were providing telemetry data, which gave them confidence in the reliability and accuracy of the Four Box Model. Throughout the Class Period, Defendants continued to represent to investors that the Four Box Model was reliable and accurate because it was based on real-time "big data" collected directly from HP's printers. Defendants referred to the process of their printers sending this data back to HP as the printer "phoning home." For example, during a March 1, 2017 Morgan Stanley conference, Weisler represented, "we have an incredible amount of data" because "[o]ur printers in many cases *phone home*" and "we put all of that information into this [Four Box] model." At HP's 2017 Securities Analyst Meeting, Lores again touted the Company's "[b]ig data and analytics" based on "the capacity that we have now to connect with millions of printers in our installed base and to capture the data from them."

172.  Moreover, according to Defendants, the "detailed" telemetry data that the Company collected from its printers gave it insight into Supplies demand at a "very granular level." For example, at the June 6, 2018 Bank of America Merrill Lynch Global Technology Conference, Fieler stated:

> [W]hat's really important about the [Four Box] model is the predictability around it. And it's actually rather detailed as you look at geographies and SKUs and things, and it's only getting better with the incremental data and insight we get from our installed base. . . . And so the model, based upon sort of historical trends and other insights that we're gathering, can predict what we believe the supplies business will look like in the future. And so you take that and get us a very granular level . . . .

173.  During the same conference, Lesjak similarly represented that "many of your printers phone home to us and tell us what kind of usage we're getting. So we can look at, let's say, the United States, and we can to [sic] this in other countries, but you can look at the United States and you can actually zero in on a ZIP Code and know whether or not these types of SKUs in that ZIP Code tend to buy, on average, a lot of supplies or not. . . . But broadly, we can see inside the ZIP Code level, and we get that data all the time."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

174.   Defendants also represented that HP's "big data" provided them with a detailed understanding of the "competitive environment" in the Supplies market. For example, at the May 31, 2018 Sanford C. Bernstein Strategic Decisions Conference, Defendant Weisler stated that HP had the capability to "deeply understand[] again, through big data, what the competitive environment is looking like region by region, country by country," which purportedly allowed them to properly price Supplies.

175.   Given these purported capabilities, Defendants repeatedly assured investors that the Four Box Model was an accurate, reliable method to determine demand for HP's Supplies. For example, during a March 1, 2017 Morgan Stanley conference, Weisler stated that the Four Box "model has been very predictive for us, and we have a lot of confidence in it." At the Company's October 12, 2017 Securities Analyst Meeting, Lores represented that the Four Box Model had given HP "confidence in our ability to project and to predict this business in the future but also to manage it for growth."

176.   In turn, Defendants premised their Supplies revenue targets and statements regarding HP's ability to meet or beat those targets on the purported reliability of the Four Box Model. For instance, at a May 2018 conference, Weisler stated, "the 4-box driver model has been a good predictive tool for us" and "[s]o we feel good about the guidance that we're giving." During the Company's 3Q18 earnings call on August 23, 2018, Defendant Weisler stated that he had, "a lot of confidence in the predictive value of our 4-box model, which is the basis for what we guided for the rest of FY '18 and '19."

177.   Defendants' statements regarding the Four Box Model were materially false and misleading. Indeed, contrary to Defendants' repeated representations that the Four Box Model was being constantly refined based on "big data" sent from HP's printers, Defendants later admitted that they "*did not have*" sufficient telemetry data from the Company's toner-based products (i.e., laser printers). Defendants later explained that HP "had this data for ink-based products, but due to the limited number of machines that were phoning home in commercial due to enterprise firewall constraints and otherwise unconnected devices," it did not have sufficient data for its laser printers and so it "*ha[d] never been statistically relevant for . . . [HP] to rely on it*."

178.   FE-9 reported that HP had obstacles to obtaining telemetry data because of security concerns that companies had, as well as firewalls. FE-9 recalled that the firewall problem had been hampering HP efforts to expand its usage data for years. In fact, according to FE-9, the firewalls had a huge impact

specifically on HP's ability to receive business (commercial) usage data. FE-9 confirmed that FE-9's bosses at the VP level, including Mercè Barcons and Michael Bordoni, knew directly about the firewall issues because they would make comments about those issues and referenced them in a way that made it clear that they were common knowledge. FE-9 also believed that the firewall issues were common knowledge among those who worked in the Printing division and would have been shocked if Lores did not know about the firewall issues, although FE-9 never personally heard Lores talk about them.

179. As a result of firewalls in place at commercial businesses, FE-9 stated that HP was only getting data from lower usage printers, namely home offices and consumers, not the larger volume commercial printers. According to FE-5, the following factors caused gaps in the telemetry data for ink and toner: (i) the type, number, and age of various HP printers; (ii) unreliable internet connections; (iii) interruption by business IT groups, including personnel reconfiguration issues; (iv) issues with internet service providers; and (v) firewalls. FE-5 confirmed that firewalls often made it harder to get telemetry data on the toner side.

180. It was important for HP to be able to accurately forecast Toner revenue because, per FE-9, the Toner business was a larger portion of the overall business than Ink. FE-9 stated that the number of printers sold and their locations also could significantly impact when in the printer's lifecycle HP received telemetry data. For instance, with an older printer, HP likely would never receive it according to FE-9. For a newer printer, HP might eventually receive the data within 90 days to one year but how many printers HP sold and where HP was selling them significantly impacted when the Company received data per FE-9. For the toner business, it took much longer to get data. If printers were placed without telemetry data capabilities, the printer could possibly last as long as 7.5 years and HP would not have data for that machine for that entire period of time. Therefore, according to FE-9, HP needed to be sure the printer was placed correctly with the right pricing and strategy because the Company knew it would last a long time.

181. FE-9 stated that the Toner business lacked statistically significant telemetry data. For instance, FE-9 recalled that in March/April 2017, FE-9 and Bajtay were working together and there were concerns with telemetry data. "There was never a time though that they did not complain about receiving Telemetry data." Bajtay and FE-9 were always editing each other's work and FE-9 recalled Bajtay saying that he did not have statistically significant telemetry data for the majority of product lines.

182.  FE-9 explained that for toner supplies, usage and share are different and share data was slower to come on board than usage data. Specifically, FE-9 confirmed it was "the majority of product lines that did not have enough statistically significant telemetry data for share." Share was generally lower for toner because it was hard to measure. According to FE-9, in order for a printer to send back share data, it had to have the capability to determine whose ink or toner cartridge the customer was using and whether or not the cartridge was used or new. None of this was easy to determine. FE-9 stated that while HP came up with a solution for determining this information for ink, because Canon makes HP's toner cartridges, it was a process to get Canon to buy in and HP did not even begin shipping printers/cartridges with the capability to send back data about toner share until 2016. Per FE-9, HP had usage data from its toner-based printers years before it had share data.

183.  According to FE-9, the question was always whether or not they had enough printer data samples to inform them on the direction of the usage or market share going up or down and the level of share. The decision about whether there were enough samples often was made at a per printer level. Once the printer met a certain threshold of data coverage then FE-9's team could give a reliable amount of information about the forecast.

184.  With respect to statistical significance, FE-5 noted that there was "an art to the science"; sometimes the data does not make sense and you have to go back and "scrub" it. FE-5 confirmed that you never have a full population for a sample; instead, per FE-5, you are using a sample size of a couple of thousands of printers. FE-5 confirmed that with telemetry data you look at sample size and bias. Per FE-5 there was no hard and fast rules regarding how big a sample or how much data was needed. A bigger sample size always is better, but the issue was always bias. For bias, you have to consider if there is a broken factor, something you cannot use or do not believe. FE-5 gave an example, suggesting that firewalls could create biases in the data given that larger companies like GE may have better firewalls (and thereby less telemetry data) than a local tire shop. FE-5 noted that one of the hardest parts regarding bias were the emerging markets as they were not connected and there were lots of issues.

185.  In 2017/2018, FE-9 and Bajtay maintained a "dashboard" that included all the printer lines to keep track of the amount of big data coverage HP was getting for each of its printer lines. FE-9 confirmed that there were different dashboards for ink and toner. FE-9 and Bajtay color-coded the dashboard with

green, yellow, and red columns. The red column was data HP would never get, yellow was data that HP did not yet have but expected to get at some point, and green meant HP had the data. According to FE-9 there also were different dashboards for usage vs share data. There wasn't a big difference on the coverage for the ink side, according to FE-9, but a much larger difference for the toner business. For instance, on the ink side, they might have 80% of the usage data for the particular portfolio of printers but only 77% of the share data. For toner, however, per FE-9, it would be maybe 60% usage and 30% share, which was a bigger gap.

186. When they first started the dashboard, FE-9 recalled that only 30% of the Toner dashboard was green. By 2017/2018, FE-9 recalled, Toner usage telemetry data was approximately 40% green and less than 50% red, while the rest was yellow. By 2017/2018 on the Toner dashboard, FE-9 said that the portion of the Toner market share dashboard that was green may have been as low as 10%, but was most likely in the 20-30% range. The portion of the Toner market share dashboard that was red would have been around 2/3, and the remainder was yellow.

187. FE-9 believed that Defendant Lores knew at a high level what the telemetry data coverage was for the different printer lines. This is because FE-9 would present data about the telemetry data coverage, during QBR meetings that FE-9 held with FE-9's supervisor, Mercè Barcons, then the General Manager and Global Head of the Supplies business. The purpose of the information that FE-9 provided to Barcons was so that Barcons could then be prepared to discuss that information with Lores in a separate QBR meeting between Barcons and Lores. FE-9 indicated that Lores was a very detailed individual and he liked detailed analyses, which is why FE-9 spent so much time discussing the data with Barcons to prepare her for meetings with Lores. In fact, FE-9 recalled spending hours on FE-9's own QBRs with Barcons to make sure she had tremendously detailed information about data coverage to discuss with Lores. FE-9 also believed that Lores knew about the telemetry data coverage because following Barcons' meetings with Lores, FE-9 would get follow-up questions about the coverage numbers from Lores and his staff. FE-9 also received emails from Barcons that included questions from Lores about improvement of coverage. Some of the questions FE-9 recalled receiving were "what are we doing in order to increase the numbers, how long will it take and can we speed that up?"

188.  At the QBR meetings that FE-9 attended, FE-9 confirmed that the meeting attendees also reviewed how they did, what they thought would happen, what actually happened, and the forecast itself. If asked what happened during a QBR meeting, FE-9 would explain to the group that they did not have the data, stating for example: "we didn't have any data, so that's why we don't have answers." FE-9 confirmed that they would go through what was happening in different regions and try to determine if the missing data was a reason for the miss. FE-9 also noted that they discussed at QBR meetings the fact that a portfolio of products had not been around long enough could hurt the accuracy in a particular region because they could not validate the sales curve. FE-9 also confirmed that FE-9 and Bajtay attended meetings where the issues with the telemetry data were discussed.

189.  The lack of statistically relevant telemetry data rendered the Four Box Model unreliable and inaccurate. At its most basic level, without telemetry data from its commercial printers, Defendants had no visibility into the "usage" of those machines (the second "box" in the model). This problem was only exacerbated by HP's strategy of shifting the mix of its installed base to include more purportedly high usage commercial printers. The fact that HP never had statistically relevant telemetry data for toner-based products (e.g., commercial printers) also meant that the Company was blind as to the success of that strategy. Similarly, although HP knew the total number of printers it had sold, without telemetry data, it did not know how many of the printers were actually being used or still active (box one).

190.  Moreover, without statistically relevant telemetry data, HP also was blind to its market share for toner-based printer supplies. Indeed, HP later conceded that it "***did not have . . . the capabilities to calculate share for toner-based products in the installed base***." In this respect, Defendants' statements were all the more egregious given that, far from relying on accurate, real-time data, during the Class Period HP was instead relying "primarily on ***lagging and incomplete market share surveys***" to form the "market share" inputs into its Four Box Model. This third-party market share data "***wasn't changing***, over time" to reflect true market conditions. Finally, without accurate market share data, HP also had no insight into the impact of its marketing efforts or the changes in Supplies pricing (box four). As a result, the Four Box Model could not and did not provide HP or investors with an accurate depiction of the HP's Supplies market share or demand, nor the trajectory of HP's Supplies revenues.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

191.   FE-9 reported that the Toner business was very much relying third-party data for certain product lines for which they could not get statistically significant telemetry data. FE-9 also confirmed that HP had hired a company, RS Consulting, to look at 1,000 printers, including checking each sheet on the printer, then go to the settings and read a number off to the analysts, and then ask customers how much they print, how much they buy, etc. This helped HP determine the curve for each product as well as the usage. If HP lacked telemetry data, FE-5 confirmed that they made assumptions and it was not an exact science. According to FE-5, if HP lacked telemetry it would use the aftermarket share in its installed base. Per FE-5, third parties provide usage data through surveying customers.

192.   FE-9 reported that there were two different forecasts used at HP: one forecast if the data was in the red in the dashboard and one if it was in the green. For instance, according to FE-9, if there was not enough data being sent back from the printers, the forecaster would have maybe five points on a chart and they would say those points were the numbers that RS Consulting came up with and then a line would be drawn through those points or a curve was made from those points. The derived numbers from those points were really the best they could do based on the information they had at the time, according to FE-9.

193.   If they had enough data from the printers (the dashboard was green), then FE-9 confirmed that they would use a more complex forecasting model. For example, when the dashboard was green, FE-9 used a complicated AI model that took four different forecast methods and combined it into one good forecast that was easy to run. Per FE-9, the more complicated and more accurate methods of forecasting could only be done when the dashboard was green because it was all about pattern recognition. In order to recognize the pattern FE-9 confirmed that they needed more data and they had to do it over and over again, which takes longer.

194.   The following charts, generated by Lead Counsel, illustrate how the amount and nature of the data used to create a forecasting model can significantly impact the ability to see and predict actual trends. The first chart illustrates a set of hypothetical sales data for a 50 month period, with Sales revenues in millions on the vertical axis and months into the sales cycle tracked in the horizontal axis (for illustration, Lead Counsel started the sales cycle at month 40):

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9



**Chart 1**

10   195.   The second chart illustrates a trend line created by a more complex forecasting model (see

11  the blue line) utilizing sufficient data from the same hypothetical sales results from the first chart. When

12  you compare this trend line to the hypothetical sales results, it is clear that this model tends to predict

13  directional changes—e.g., when sales are trending up or down—in the sales results, making it a more

14  accurate model.

15

16

17

18

19



20

21

22

23

24   **Chart 2**

25

26

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

196. The third chart illustrates how a forecasting model can be generated by sampling a handful of data points from the hypothetical sales results. The fourth chart then illustrates the trend line created by a forecasting model utilizing only a handful of data points from the same set of hypothetical sales results. When you compare the sales trend generated by the sampling approach (Chart #4) to the hypothetical sales results, it is clear that the sampling model misses key directional changes—e.g., when sales are trending up or down—in the sales results, making it a less accurate model.

 

**Chart 3**                    **Chart 4**

197. The final chart compares the results of both forecasting models to the hypothetical sales results. Overall, the forecasting model with sufficient data (blue line) accurately recognizes the directional changes in the actual sales results and is able to discern trends and accurately forecast, while a model that uses only a handful of sampled points (black line) is less accurate and misses the directional changes and, ultimately, the trend. For instance, as depicted in the chart below, the forecasting model based on sampled points (black line) missed entirely the substantial decline in sales experienced between months 59.5 through 87, which is clearly reflected in the forecasting model using sufficient data (blue line).

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10



**Chart 5**

11    198.  FE-9 confirmed that the Supplies forecasting was not as accurate on the Toner side as it was

12  on the Ink side. During FE-9's tenure with InkJet, the Ink Supplies forecast was within +/-2% of actual

13  results approximately 80% of the time. There were also some years where the Ink forecast was off by 6-

14  7%, and it was more accurate (+/- 1/2%) about 20% of the time. On the other hand, FE-9 said that the

15  Toner Supplies actual results tended to land at more like -5% compared to the Toner forecast. FE-9 said

16  that the actual results for Toner were always negative (or lower than) what was forecasted. FE-9 also stated

17  that some years the Toner actual results were more like -8% below the forecast. FE-9 said that Lores would

18  have known what was being forecasted for Supplies revenues for the Ink and Toner sides of the business

19  because he had to approve them. According to FE-9, Lores also knew what the actual results were for

20  Supplies because they were reported to the street. Because Lores knew what was being forecasted for Ink

21  and Toner and also saw actual results, FE-9 believed that Lores would have had an understanding of how

22  accurate the Ink and Toner forecasts were.

23    199.  Defendants also knew that relying on "lagging and incomplete market share surveys" to

24  calculate the "market share" input in its Four Box Model rendered the entire model unreliable and

25  inaccurate. Indeed, as Defendant Fieler himself stated, the "4-box model is only as good as its

26  assumptions." This is particularly striking given that the Four Box Model was highly sensitive to changes

27  in market share assumptions. As Wolfe Research reported on April 15, 2019, following a meeting with

28  Fieler, "[m]isestimating laser supplies share by even a point has a material revenue impact." In the end,

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Defendants' decision to abandon the Supplies focused business model and, thereby, the Four Box Model, prompted analysts to write in October 2019: "RIP 4-Box Model."

### 2.    Defendants' Statements about Placing NPV Positive Hardware Units Were Materially False and Misleading

200.  As explained above, while HP's business was "all about supplies," it was also "about placing good units, units that are going to get placed in large part at a loss upfront and then get an annuity stream from supplies." And so, as Defendant Lesjak explained during a September 9, 2016 appearance at an analyst conference, "we talk about it in terms of [placing] an NPV positive" unit. According to Lesjak, selling a printer is "the single biggest investment that we make every single day and we are very disciplined about it." HP must place NPV positive units in order to "tap into this flywheel of placing the units and getting the supply stream over time."

201.  HP purportedly determined whether a unit was NPV Positive by relying on telemetry data; the Company further assessed the impact of its hardware sales through the first and second boxes within the Four Box Model—installed base and usage. According to Defendant Lesjak, the make-up of the installed based was important. For instance, "[a] home printing unit may give you a $20, a $50 type NPV over the life of that unit whereas, of course, the high-end graphics machines give you many, many orders of magnitude more than that. And, to assess usage, per Lesjak, "big data is very informative because . . . if you take an OfficeJet Pro X . . . and you place it in Manhattan, you are going to get one NPV" and "a very different NPV" if "the exact same unit" is placed "in Korea, or in the Midwest in the US" because "usage is different."

202.  During the Class Period, Defendants consistently told investors that HP was placing NPV positive units. For example, on March 1, 2017, Defendant Weisler noted that "[w]e're not placing share for share's sake. There had to be positives. That's rule number one." During a September 6, 2017 analyst conference, Defendant Lesjak confirmed that "we do focus on placing positive NPV units and taking advantage of the opportunities that we see to go ahead and do that," noting that HP specifically "focus[es] on higher usage printer hardware units." Lesjak concluded, "[s]o we want to make sure we place the units, but we also want to make sure we got high-quality units. And we're seeing that shift in our portfolio, in our installed base over time." During the October 2017 SAM, Lores reported that "we continue improving

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the quality of the units that we place" and reiterated, "It is about improving the installed base . . . This is what we did."

203.  On HP's 4Q17 earnings call, Defendant Weisler defended the Print business's declining operating profit margins, explaining that the decrease was actually a good thing because HP was placing more NPV positive hardware units: "[t]he rate was slightly down this quarter, but we did place sequentially many more units than we ordinarily wouldn't, of course. That, being the razor-razorblade business model, generally returns over time. It's positive NPV units and a good deal for our investors." The following quarter, Lesjak also defended the Print business's operating profit margins explaining that the second factor to consider "is the NPV positive unit placement. We have seen a significant increase sequentially relative to normal seasonality with unit placements. And of course, we all know that you've got to place the units in order to get the recurring revenue on Supplies." Later that same year, on November 29, 2018, Defendant Fieler reiterated, "[f]or us, we're going to remain very disciplined on pursing profitable share [of the printer market]. It's what we did in the last quarter, and you see it in the calendar quarter 3."

204.  Analysts issued reports reiterating Defendants' statements about placing NPV positive printer units. For example, in a May 25, 2017 report, JP Morgan concluded: "We believe that HP continues to do a good job in unit placement . . .The fact that placement units grew this well even as margins rebounded is a testament to how well management is balancing the margins . . . while investing as much as possible in placement units to try to drive longer term growth in Supplies." A July 24, 2017 UBS report noted that "[i]mproved business practices have allowed HP to increase the placement of positive NPV units." The following month RBC issued a report stating, "HPQ continues to opportunistically use gross cost savings to place NPV positive print hardware units."

205.  These statements were materially false and misleading when made because HP was pushing hardware into the channel to meet monthly quotas and quarterly targets irrespective of whether those units were NPV positive. According to FE-6, HP was basically structured to be a push model. To that end, FE-6 confirmed that after HP purportedly shifted to a pull model for its Supplies business, it continued to push hardware into the channel. According to FE-6, the printers were pushed out to suppliers. If the suppliers had trouble selling them, they would do discounting and coupon offerings. According to FE-6, HP provided some retailers with massive discounts on hardware at quarter end.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

206.  As FE-6 stated, "They were dramatically discounted and this was a running joke." HP would develop a pricing model for a printer and then reality set in a quarter later, which, according to FE-6 resulted in a totally different price. FE-6 recalled that there were occasions when HP ramped up production on certain printers and then had to clear them out at discounted prices like $199.00. But, FE-6 confirmed, you could find these units available at Costco for $99.00. FE-6 confirmed that it got to the point where it was cheaper to buy a printer with ink in it, than just buy the ink. FE-6 further confirmed that the discounting of hardware continued up to early 2019, at which time there was a drop in demand and HP started reducing SKUs and making fewer printers.

207.  FE-7, who was based in Canada during the Class Period, reported that there was pressure to hit numbers and that employees in the Print division were being very aggressive in asking partners to take excess inventory at year end through deep discounting. FE-7 was aware that this was happening based on FE-7's interactions with employees of the Print division during training sessions FE-7 attended. FE-7 recalled that management told employees to observe ethical standards but at the same time gave them goals that were inconsistent with ethical behavior. FE-7 confirmed that a lot of HP employees were disgruntled because the quotas set by HP management were arbitrary and had a direct impact on their compensation. If an employee did not meet his or her quota, HP would get rid of them.

208.  Per FE-7, HP's revenue forecasting had become increasingly aggressive and illogical, other than the numbers had to go up every year. FE-7 recalled that FE-7 was under pressure to forecast numbers for the Indigo division that were not realistic and the numbers FE-7 saw for the last half of 2019 made no sense at all to FE-7. FE-7 stated, "You were given a number and you just had to hit it." FE-7 further confirmed that, with the revenue forecast going up each year, the inventory sales had to go up as well. FE-7 reported that it was getting worse in 2018, and then still worse in 2019. FE-7 relayed that FE-7's experience in the Indigo division was happening across the board. According to FE-7, HP "wrote a check, it couldn't cash." FE-7 specifically recalled attending a training course in August or September 2019 with roughly 15 attendees including Printing segment employees. The attendees questioned the Company's forecasting and expressed sentiments that the numbers were not attainable. FE-7 recalled that a chief complaint at that training was that HP's partners had been stuffed to the gills with inventory and that HP was pressuring them to take even more.

209.  Moreover, when HP's purchase of Samsung's printer business closed in 4Q17, the Company had new distribution channels in which to push hardware inventory. According to FE-8, Samsung did not have inventory issues prior to HP's acquisition because Samsung uses a just-in-time-system and printers need to be ordered 3 or 4 months ahead. FE-8 confirmed that HP employed the opposite model for its printers: it builds machines just to build them and fills up warehouses requiring HP to push the product down its distribution channels. Before HP purchased Samsung's printer division, FE-8 was aware through speaking with HP's customers that HP provided various incentives, including discounts and extended terms. HP premised these discounts on the purchase of a certain number of units, which was usually more than the customer wanted to purchase.

210.  FE-8 reported that while at HP, FE-8 was required to push printers and supplies into the channel month after month to meet FE-8's sales quotas. According to FE-8, HP required FE-8 to sell anywhere from 1,000 to 1,500 printers per month, plus 3,000 consumables (supplies) into each channel; FE-8 handled 12 channels. FE-8 confirmed that FE-8 had weekly meetings with FE-8's managers, Sandra Enastrosa and Mateo Figueroa, where they would dictate to FE-8 how many more printers needed to be pushed into the channel. As a result, FE-8 confirmed FE-8's understanding that HP had a push model.

211.  This differed from FE-8's understanding of Samsung's model, which FE-8 described as project development based, where Samsung assisted customers with integrated solutions employing a whole line of Samsung products, including phones and tablets. HP, on the other hand, just wanted the channels to be given inventory immediately. This was distressing for FE-8 because when FE-8 was at HP boot camp in Boise as part of the merger transition in mid-November 2017, HP assured FE-8 that it would continue with Samsung's philosophy. However, that did not happen and FE-8's channel partners— including major retailers like Kmart and Costco—felt betrayed. According to FE-8, because a lot of the channel partners FE-8 worked with objected to the way HP did business, they began looking for other suppliers. FE-8 confirmed that these channel partners did not like being pushed to take inventory they did not need or want.

212.  FE-8 stated that everything at HP was about fulfilling quotas. Enastrosa and Figueroa gave FE-8 a quota to meet every month. According to FE-8, this number came from the top down based on a market analysis completed in Boise that dictated how many printers needed to be put into the field for the

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

next year. The analysis was broken down by months and channels. Each channel had to take so many units. While at the HP boot camp, FE-8 learned that HP employees in Boise would consult HP's platform to check on the number of boxes of printers that had been shipped and then generate a new quota. According to FE-8, the quota numbers obtained from the U.S. would be discussed at a meeting at the start of each month by Enastrosa, Figueroa and all the channel managers. Each channel manager was told how many boxes they had to move to fulfill the quota. FE-8 recalled that FE-8 had to insist that channel partners take on more and more inventory because HP did not want to hear excuses. Per FE-8, HP was only interested in the sale to the channel partners and there were times when inventory would sit in a channel partner's warehouse for up to six months.

213.  FE-8 confirmed that HP did not like to carry inventory in its own warehouses such that when product arrived from the manufacturer, HP wanted to move it out as soon as possible. Per FE-8, this was a weekly exercise, pushing out product to channel partners before they wanted it. FE-8 recalled that everything done with the channels, moreover, needed approvals by HP HQ. If a customer did not want an early delivery and balked, for instance, FE-8 stated that HP's attitude was "We don't care" and FE-8 confirmed that HP would try to pressure channel partners to take inventory via discounts or by demanding immediate payment on any outstanding invoices.

214.  FE-8 recalled that it was difficult to move 2,000 or 3,000 boxes of printers every month, particularly when the channel partners FE-8 sold to did not want more printers or did not have room for more inventory in their warehouses because they had failed to sell HP printers received from FE-8 during the prior month. When FE-8's channel partners objected to taking additional product, FE-8 took the issue to his managers. FE-8's managers, Enastrosa and Figueroa, would authorize discounts for the channel partners. When Enastrosa authorized a discounted price, FE-8 would go into HP's pricing and discount system and enter something like, "We are making a sellout of 500 boxes through Channel A, at a discount of $210." That request was then digitally approved by Enastrosa and Figueroa and FE-8 would receive an email over HP's system approving the incentive. According to FE-8, each discount required the approval of three managers in the U.S. through the pricing and discount platform and the approvals usually came from offices in different locations, including California, Boise, New York, and Atlanta.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

215.  These incentives encouraged the sale and allowed the channel partners to take a bigger profit margin when the end-user ultimately purchased the product. FE-8 provided the following example. A printer might be listed at $300 as the channel price, but when channel partners complained that their warehouses were stacked the roof with printers and they could not take any more inventory, HP would first drop the price to $230 or $250 per printer. According to FE-8, if the channel partners still refused, HP would then drop the price to perhaps $170 or $180 per unit. FE-8 confirmed that these incentives were provided to get channel partners to accept more units than they wanted to.

216.  If channel partners resisted taking additional inventory, they would not get beneficial payment terms, according to FE-8. For example, if channel partners who declined additional inventory were late in making payments because of cash flow issues, they were not given extended payment terms unless they took more inventory. FE-8 stated, "I had to tell them to take more inventory or that they had to pay." The payment terms were set by FE-8's managers. FE-8 further noted that there were a couple of occasions where partners wanted to return inventory. FE-8 specifically recalled an incident with Veneplast, a partner developed by FE-8 before HP acquired Samsung. Veneplast would receive shipments from HP of anywhere from 350 to 600 printers weekly plus an average of 700 units of ink or toner cartridges. At some point, Veneplast wanted to return inventory that HP had pushed on it. According to FE-8, the situation was resolved after HP agreed to hold off on further shipments of inventory to Veneplast for two or three months.

217.  FE-8 advised that FE-8 would sometimes assist channel partners to move inventory in order to make the quotas set by HP. FE-8 recalled, "They were always up to their neck in inventory" so FE-8 "had to work both sides to hit quota." To that end, FE-8 would look for opportunities in the private sector that could be referred to one of his channel partners.

218.  FE-8 spoke with other ex-Samsung employees, including from Peru and Argentina, that FE-8 had met during HP boot camp in Boise and discovered that others were all doing the same thing as FE-8 was, pushing printer and supplies inventory into the channel. FE-8 stated, "It was the same for everybody."

219.  Of course, it goes without saying that printers stacked in warehouses are not generating the Supplies sales necessary to be NPV positive. Moreover discounting printers to push them into the channel required HP to take even more of a loss on those printers, making it even more difficult to make up for that loss through the sale of Supplies. Because HP was not carefully placing printers that were NPV positive to

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

drive Supplies revenues, but instead was just pushing discounted printers into its channel, Defendants' Class Period statements were materially false and misleading.

220.  These statements also were materially false and misleading because, as explained above, HP did not have sufficient data to know whether a printer would be NPV positive when it was sold into the channel. In order to determine whether a particular printer will be NPV positive once it is installed by an end-user, HP needed to know certain information about the end-user, including the end-user's usage of the printer and whether the end-user utilized HP original supplies. If an end-user did not use the printer or did not purchase HP original supplies in sufficient quantities, then the unit would not be NPV positive. In other words, HP would not make enough money on the sale of HP original supplies to overcome the loss from selling the printer. If, as Defendants conceded in 2019, HP was not receiving sufficient usage information via telemetry data for toner-based printers, the Company would not have known whether a unit was NPV positive when it sold it into the channel.

### 3.   Defendants' Statements Regarding HP's Market Share Growth Were Materially False and Misleading—as Defendants Eventually Acknowledged

221.  Throughout the Class Period, Defendants repeatedly told investors that HP's Supplies market share was growing. For example, at the October 12, 2017 Securities Analyst Meeting, Defendant Lores stated that the Company had stabilized Supplies by, among other things, "increas[ing] share." Moreover, Lores included in his presentation two charts, showing both that Supplies market share had increased "in line with expectation" in 2017 and that, based on the Four Box Model, HP expected market share to continue to increase in 2018:




AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

222.  HP executives also repeatedly represented that HP was improving its Supplies market share. For example, after meetings with Nick Lazaridis, then-President of EMEA (i.e., Europe, the Middle East, and Africa), and Kitt Tanner, HP's Director of Investor Relations, Morgan Stanley reported on June 26, 2017, in a report titled, "Meetings Highlight Sustainable Growth," that "HP accelerated printer hardware innovation and refresh cycles *allowing for higher supplies share*" and that "[r]eallocating dollars from contra spend for channel partners to end user education of the benefits of HP branded supplies is *also pushing supplies share higher*." Morgan Stanley concluded that supplies stabilization was "sustainable" in the longer-term. During the September 6, 2017 Citi Global Technology Conference, Lesjak stated that "market share supply, that's obviously pretty important" and "we've done a really good job of managing our discounts, and we're taking that savings and we're putting some of that back into marketing. . . . to drive preference for that HP-branded supplies. *And so you've also seen us have progress in our market share*."

223.  During the May 31, 2018 Sanford C. Bernstein Strategic Decisions Conference, Sanford C. Bernstein analyst A.M. ("Toni") Sacconaghi asked Defendant Weisler whether there were certain boxes in the model that were positives or negatives: "[I]n terms of the levers within 4-box, I don't want to mechanically go through each one, but are there 1 or 2 that are sort of positive pluses and minuses? Meaning -- *I know aftermarket capture rates is obviously a very big factor. You move that needle a little bit either way. That can really have a big impact.* Obviously, install base is a big factor. So are there 1 or 2 levers that structurally are getting a little bit better, becoming more of a challenging headwind within that model . . . .?" In response, Weisler again reiterated that "*we're making improvements in the aftermarket share*."

224.  During the Company's October 3, 2018 Securities Analyst Meeting, Lores included in his presentation a chart, showing that, based on the "all the assumptions" in the Four Box Model, HP expected market share to continue to increase in both home and office supplies in 2019:

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

225. These statements were materially false and misleading. In particular, as discussed in *infra* Section V while assuring investors that HP's Supplies market share was improving, Defendants failed to disclose that HP had ***never had*** the "big data" necessary to reliably and accurately determine supplies market share. In fact, HP later conceded that it "***did not have . . . the capabilities to calculate [market] share*** for toner-based products in the installed base." Nor did Defendants disclose that they were basing their repeated reassurances to investors on "lagging and incomplete" third-party market share data "that wasn't changing over time" to reflect true market conditions.

226. Defendants also were aware of internal forecast misses during the Class Period. For instance, FE-1 confirmed that every Thursday, HP held world-wide CEO briefing calls, which were attended by, among others, the CEO and his staff, and executives from each of HP's regions, including the APJ President, Finance VP, and category heads and the equivalent personnel in EMEA and the U.S. While FE-1 did not personally attend these meetings, FE-1 received a debriefing on the calls from Rich Bailey, who was in attendance. Based on these debriefings, FE-1 reported that the "famous hot seat" was the EMEA region, which was "unstable" and had big problems in the Supplies space. FE-1 confirmed that EMEA was a "problem child" and stated that the region's problems included not performing up to plan, experiencing too many flash misses, poor predictability, complex organizational structure, and high costs. According to FE-1, these problems persisted in EMEA throughout FE-1's entire tenure. Indeed, FE-1 stated that Lazaridis was put in charge of the EMEA region because he was a trusted friend of Defendant Weisler's—a further indication of Defendant Weisler's focus on the region FE-5 confirmed that EMEA

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

was a "more complicated" region than North America because, in EMEA, there were more sales channels and more currencies involved. Further, FE-5 stated that European data privacy laws made it more difficult to access telemetry data in EMEA as compared to North America—a fact that he stated HP's executives would have known.

227. FE-1 recalled that, circa 2Q18, EMEA experienced a particularly egregious Supplies forecast miss. FE-1's superiors, including Bailey, told FE-1 that Defendant Weisler was "really angry" and thereafter held a series of "crisis" meetings to understand the miss. According to FE-1's superiors who attended the meetings, as well as what FE-1 heard in conversation with Lazaridis' team, Weisler was informed that the miss occurred because HP lacked insight into the sales channel and, thus, did not have full appreciation for the total effect of the trend of consumers buying Supplies from competitors online. More specifically, FE-1 recalled that end-users were buying consumables on-line from non-HP sources, and the models didn't see that the consumers were buying from non-HP channels because HP simply did not have visibility into the end-user online purchases. That was what drove the miss, according to FE-1's conversations with Lazaridis' team. In sum, CEO Weisler was informed in 2Q18 that the EMEA Supplies leads missed their sales estimates because of a lack of insight into the sales channel and end-user buying patterns.

228. In fact, more than just having zero insight into market share, Defendants repeatedly told investors that HP's Supplies market share was *increasing*, when it was *actually going down*. At the end of the Class Period, Defendants eventually admitted this reality, stating: "[w]hereas we have previously had an arrow going up of gaining share, *given the new data, we'd actually expect share to be down* to a lesser extent on office." Indeed, when HP was finally able to access actual "big data" from its printers and was actually able to calculate its "*real share number*," Defendants found that "HP's Supplies share, and particularly in . . . [its] office business, was *significantly lower* than what . . . [it] had assumed in . . . [the] 4-box model." As Wolfe Research wrote in May 2019 after meeting with Defendant Fieler: "The four-box model had incorporated share gain, which no longer is the case." Simply put, because HP used unreliable market survey data, its "*assumptions about share were wrong*." Ultimately, as a result of Defendants' false and misleading statements and omissions of material fact, investors were left with the misleading impression that HP's critical Supplies market share had improved when it had not.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

229.  Moreover, Defendants conceded that HP's market share assumptions had been incorrect for quite some time: "Where we went wrong is that we had incorrect Supplies share assumptions in our 4-box model regarding the plans for Supplies selling *in quarter 1 '19 and in prior quarters*." Nor was the error limited in geographic scope. As Fieler admitted, HP was forced to "look at all regions and revised our share" based on insights from the actual "big data."

230.  Defendants, who admitted to extensively using and constantly refining the Four Box Model, knew that that it was based on unreliable market share surveys or at the very least were deliberately reckless in disregarding this reality. For example, Weisler stated that, "the four-box model is a predictive tool, and *we use it extensively*" and "it is something that *we focus on very carefully*." Lores explained that HP's management was "constantly work[ing] to improve and to refine" the Four Box Model. Weisler similarly stated, "*we're constantly testing the model*. Every time we close a quarter, we go back and look at the 4-box drivers, what it predicted and what it returned." HP's senior executives also closely scrutinized Supplies market share. For example, during the September 12, 2018 Deutsche Bank Technology Conference, Christoph Schell (then-President of HP's Americas region) admitted that because market share was "very important" to "inform the guidance that we give," it was a "key component" that he worked on "in my daily job with my team."

H.   **Defendants Misleadingly Represented That as a Result of the Supplies Sales Model and Operational Changes and Based on the Four Box Model, the Supplies Business Had Returned to Stability and Growth**

231.  In addition, throughout the Class Period, Defendants repeatedly assured investors that as a result of the June 2016 Supplies sales model and operational changes, and based on the big data and analytics in the Four Box Model, as well as improvements in NPV positive unit placement and aftermarket share, HP's Supplies business had stabilized. While making these statements, however, HP failed to disclose that these assertions were based not on sustainable sales practices, concrete actions HP claimed it had taken, reliable, real-time "big data," or improvements in supplies attach—as Defendants had repeatedly represented—but instead on, among other things, unsustainable sales practices and unreliable "lagging and incomplete" market share survey data "that wasn't changing over time" to reflect true market conditions.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

232.  For example, on August 23, 2017, Defendants announced that "supply stabilization occurred" in 3Q17 "one quarter earlier than expected." In response to an analyst question about the "type of long-term growth" investors could expect "based on the 4-box model," Defendant Weisler stated:

> I think it's important to remind everybody how we define stabilization. We've done that on previous calls, and we've said that supplies revenue and constant currency not declining further is our definition. We also walked you over the last couple of years through the 4-box model drivers and our consistent focus on driving improvement across each of those 4 boxes. *Now in quarter 3, our focus and execution over the last 2 years on all 4 of those drivers saw the supplies revenue mature and stabilize 1 quarter ahead of plan*, and we're very, very encouraged by that. . . .

233.  Six weeks later at the FY17 SAM, Defendants repeatedly assured analysts and investors that HP had, in fact, stabilized Supplies revenue as of 3Q17. During his presentation, Defendant Weisler stated, "the pundit said, Printing was destined to decline, but we're proving them wrong. Some of you said we couldn't do it, but we are. . . . Supplies revenue stabilized during our third fiscal quarter, a quarter earlier than we said it would." Weisler further noted that "[t]he team did an excellent job managing the transitions in our supply sales model, and our focus on the four box model drivers is really working for us. Stabilizing our core business sets us up for growth opportunities . . . ." During a call to discuss HP's 4Q17 and FY17 financial results in response to a question regarding EPS, Defendant Lesjak confirmed, "in print, what we were really focused on this quarter was not only keeping Supplies stabilized, which we did. . . ." During the 1Q18 earnings call on February 22, 2018, Lesjak concluded that "our Supplies results reflect our sustained efforts around stabilizing supplies." Later that year at the FY18 SAM, Defendant Weisler again touted Supplies revenue stabilization: "We've had, to put it mildly, an impressive year. Print supplies have not only stabilized, but the business overall has been consistently growing to for the past 6 quarters."

234.  Analysts repeated Defendants' assurances. For example, on August 24, 2017, JP Morgan reported that, "[t]he company expects Supplies revenue to continue to be stable going forward." In a same-day report, Morgan Stanley wrote "Printer supplies growth sustainable," attributing it, in part, to "higher supplies share." An October 12, 2017 RBC Capital Markets report asserted that "[i]n Printing, HPQ has stabilized supplies and is focused on driving growth." The following day, Guggenheim reported, "HPQ at least stabilized supplies in its latest quarter (following inventory/go to market changes as planned) and believes it has potential to grow longer term." On October 17, 2017, Argus wrote that "[t]he issues with supplies that set the company back in 2015-2016 are now largely resolved." Similarly, on October 22,

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2017, Deutsche Bank reported that, after meeting with Chris Lee, HP's Director of Investor Relations, it was "more convinced that the days of declining Y/Y printing sales are behind us."

235.   In reality, and as HP ultimately conceded in 2019, the Supplies revenue had never been stabilized and never would be, sealing the fate of the razor/razor blade model for the Company's Printing business. Indeed, investors learned that HP's financial results and, in particular, its Supplies business only appeared to be successful during the Class Period due to Defendants' efforts to artificially maintain the façade that the razor/razor blade model was working and that Supplies revenues had stabilized.

## I.   <u>The Relevant Truth Is Revealed Through a Series of Partial Disclosures</u>

236.   Heading into HP's 1Q19 print, analyst JP Morgan wrote that "[w]e expect HPQ to post F1Q19 results in line with expectations" and that "[i]nvestors will be focused on Supplies performance."

237.   After the close of market the following day, February 27, 2019, the Company shocked the market when it reported Supplies revenue growth of *negative* 3% for 1Q19, driven mostly by a miss in EMEA, where Supplies revenue declined 9%. The Company also announced that HP once again pushed far too much Supplies inventory into its channel, and the removal of that excess inventory in the first tier of its channel would create at least a $100 million headwind to the Company's Supplies revenue for the remainder of FY19. The Company further disclosed that it expected Supplies revenues to continue to decline by 3% for the remainder of 2019, due to the $100 million Tier 1 inventory reduction (~1%) and lower go-forward Supplies share and pricing assumptions (~2%), and otherwise declined to discuss the Supplies trajectory beyond that.

238.   Analysts were surprised by the miss. For example, Wells Fargo noted that HP's Supplies growth was "*significantly weaker than expected*" and that its "negative commentary around market share lead us to be meaningfully more cautious around our print assumptions." BMO Capital Markets reported that "HPQ delivered results that were *disappointing* on the top line largely due to a Supplies shortfall, where we think a resolution could take a few quarters to iron out." Wolfe Research wrote that "*we didn't expect a decline of 3% in F1Q*, which is the new annual guidance. Supplies is the lifeblood of HP, which makes the share and price challenges faced in Europe a serious investor concern."

239.   During the call, HP disclosed that notwithstanding Defendants' Class Period assurances that they had carefully aligned the Supplies inventory in the channel with true customer demand, in reality HP

never had visibility into the actual amount of inventory in its channel: "[S]ince we don't have much visibility into the downstream channel ecosystem and we were maintaining CI [channel inventory] levels below our Tier 1 ceiling, we did not seek clearly enough that we had an issue." Instead, unbeknownst to investors, HP was only monitoring and reporting on the channel health of a small portion of its channel—Tier 1 and some portion of Tier 2: "[W]e continued to maintain the levels of channel inventory under our Tier 1 ceiling and monitor Tier 2 inventory, where we had some visibility." As Wolfe Research later summed up, "[t]here was channel build in distributor tiers 2 and 3, which HP missed because it only sees tier 1." Wolfe further wrote that although HP had provided an estimate of $100 million of inventory reduction, "we wouldn't be shocked to see it higher."

240. Moreover, HP also did not have visibility into how much of the Supplies inventory it was pumping into the channel that had been sold through to actual end-users, as opposed to just sitting in the "unmonitored" downstream channel. Indeed, although HP estimated that it had pushed $100 million dollars in excess inventory into its channel, it noted that it had no way to be sure: "we can't be precise on all fronts, especially because we don't have visibility into the entire downstream unmonitored ecosystem." Unsurprisingly, given the glut of downstream inventory, HP was now experiencing a "slowdown in sell-through from Tier 1" to the downstream channels and "[t]he size of the slowdown made it increasingly apparent that inventory had grown in the ecosystem, including the downstream portion beyond [its] reporting visibility." In other words, by pushing Supplies inventories into the channel that far exceeded true user demand, HP had cannibalized future sales.

241. JP Morgan wrote that "excess channel-inventory is expected to weigh on overall high-margin materials for the rest of FY19." Susquehanna reported that, "[m]anagement anticipates reducing $100M of inventory through FY19, but also reducing sell-in to ensure inventory levels are leaner." UBS noted that "Supplies decline includes $100MM related to clearing of the downstream (tier-2 and tier-3 distributors/resellers) channel inventory" and that "HP had a similar supplies challenge roughly three years ago."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

242.   Following these disclosures that HP had pushed too much Supplies inventory into the channel, market commentators also recognized that the Company's purported Supplies "stabilization" in 2018 had in fact been "inventory-fueled." For example, in April 2019 Credit Suisse wrote that "[w]e do not think the stock will rerate until investors regain confidence in the steady-state outlook for Supplies, which will likely take time given the (inventory-fueled) return to growth in FY18 led to optimism that HP had finally turned the corner." Credit Suisse even created a chart detailing the likely "over-ship in FY18" and wrote that was "likely to weigh on FY19":



243.   The Company also disclosed that contrary to its prior representations, it "did not have" sufficient telemetry data from the Company's toner-based products (i.e., laser printers). Defendants explained that HP "had this data for ink-based products, but due to the limited number of machines that were phoning home in commercial due to enterprise firewall constraints and otherwise unconnected devices," it did not have sufficient data for its entire fleet of laser printers and so it "ha[d] never been statistically relevant for . . . [HP] to rely on it." As a result, HP "did not have . . . the capabilities to calculate [market] share for toner-based products in the installed base."

244.   Shockingly, Defendants also admitted that during the Class Period HP "***had relied primarily on lagging and incomplete market share surveys***." As HP finally gained access to real-time data from its printers, however, it became clear that "HP's Supplies share, and particularly in [its] office business, was

*significantly lower than what [it] had assumed in [its] 4-box model*." Indeed, the Company admitted that contrary to its prior representations, market share had been declining, not improving: "Whereas we have previously had an arrow going up of gaining share, given the new data, we'd actually expect share to be down to a lesser extent on office." To address these issues, Defendants disclosed that they were "implementing additional share improvement plans, including online programs, targeted marketing and brand protection to promote the value of HP original supplies." Defendants further confirmed that HP needed to "enhance [its] business management systems, including more telemetry data to improve the quality of [its] inputs." HP further stated that it had "seen further price sensitivity among customers, pressuring both [its] share and [its] supplies pricing."

245. Following the call, Wells Fargo issued a report titled, "HPQ: Unexpected Print Supplies Issues Leave 4-Box Model Visibility In Focus," which reported that, "we think investors will now be left to incrementally gauge HP's visibility into its 4-box model." Wolfe Research wrote that the "Four box model [is] out of kilter." Moreover, Credit Suisse later reported that "we are concerned about HP's lack of visibility into usage trends, particularly in contrast to commentary in recent years about the increasing amount of data from units 'phoning home.'"

246. Defendants blamed the Supplies revenue miss, inventory write-down, and lowered guidance on the incorrect market share data and HP's lack of visibility into its Supplies inventory channel. For example, Weisler stated that "[w]here we went wrong is that we had incorrect Supplies share assumptions in our 4-box model regarding the plans for Supplies selling in quarter 1 '19 and in prior quarters" but "now that we understand the trend better, it has driven a change in our expectations for share going forward." Weisler further explained that after applying the correct, updated market share data, "[i]t also changes our assumptions in the 4-box model for the remainder of the year. As a result, we no longer expect supplies to be flat to slightly up in fiscal '19." In a same-day report, Wells Fargo wrote that "Incremental / more accurate telemetry market share data tracked by HP indicated the company's share (particularly in office) was significantly lower than previously assumed in HP's 4-box model and *thus resulting in downward revision to forward expectations*." Similarly, Wolfe Research later wrote that "[t]he company blamed [its lowered 2019 guidance on] poor market share intelligence such that it no longer assumes supplies gain share."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

247.  With respect to the inventory write down, Defendants disclosed that HP "continue[d] to fulfill orders likely over multiple quarters based on [their] original share assumptions, which [they] now believe were overestimated. **This resulted in additional HP supplies in the ecosystem**, including in the unmonitored downstream portion." Moreover, applying the correct, updated market share data made clear that inventories were overstated: "We compared our old share assumptions with the revised one that have been **informed by big data**, and we also looked at prior selling statistics and CI trends. We then estimated how much additional downstream channel inventory may exist, and we believe $100 million is the right estimate." As a result, HP had to take "actions to lower the level of supplies inventory in the market to be consistent with [its] new share assumptions." As Wells Fargo noted after the call, "[t]he company noted that incremental telemetry data led to it significantly decrease its supplies share assumption in its 4-box model and **as a result it will lower its inventory moving forward creating a $100M headwind to supplies revenue**." Wolfe later reported that, "[d]emand was overestimated in part due to HP's aftermarket supplies share being less than expected. HP has used surveys to estimate share but now is receiving data from laser printers phoning home."

248.  As a result of these disclosures, the Company's stock price declined from $23.85 per share to $19.73 per share, or over 17%, on high trading volume. Analysts attributed the stock decline to the supplies problems. For example, in a February 27, 2019 report, Wells Fargo wrote, "we expect shares to be under pressure following negative printer supplies (attributed mostly to commercial toner) results / guide. HP now expects supplies revenue to decline 3% y/y in F2019 (vs. prior guide of flat to slightly up y/y)." JP Morgan likewise reported that: "We expect the lower Printer materials [supplies] outlook to weigh on the stock and expect the stock to trade sideways here with limited catalysts ahead." This precipitous decline erased over $6.34 billion in shareholder value in a single day.

249.  On February 28, 2019, Argus reported that "HPQ was slammed because weakness in printing supplies revenue could persist." In a same-day report, Morgan Stanley wrote that "HPQ shares are down 12% in the aftermarket after the company disclosed an unexpected printing supplies guide down in FY19 that is reminiscent, though not parallel in our view, of issues the company faced in FY16. There is no quick fix to the supplies issue given channel inventory now needs to be worked down." UBS likewise noted that "[n]ear-term, the stock would likely trade down because the supplies miss was a surprise to us and many

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

investors." *The Wall Street Journal* later reported: "In the company's fiscal first quarter, a drop in revenue related to printer supplies like ink and cartridges surprised investors, who had been expecting a gain, and caused a selloff in the stock." In May 2019, Wolfe Research reported that "[t]he stock has been under pressure after reporting a supplies decline of 3% and strategic challenges across Europe in F1Q. HP is now down 22% since the print and off 11% year-to-date, underperforming both the S&P 500 (+12%) and the Tech Select Index (+18%)."

250.  Following this disclosure, HP updated the risk disclosures in its Form 10-Q filed with the SEC on March 5, 2019, to add the following language:

> Customers are increasingly using online and omnichannel resellers and distributors to purchase our products. These resellers and distributors often sell our products alongside competing products, including low-cost alternatives, or they may highlight the availability of low-cost alternatives. We expect this competition will continue, and it may negatively impact our financial performance, particularly if large commercial customers purchase competing products instead of HP products.

251.  Defendant Weisler also represented HP at the May 30, 2019 Sanford C. Bernstein Strategic Decisions Conference. During a question and answer session with Sanford C. Bernstein analyst, Toni Sacconaghi, Weisler confirmed that, with respect Supplies pricing, "[w]e know what the pricing environment is like because we set the prices." Additionally, Weisler confirmed that with request to HP's 2Q19 results, "[a] little bit of pricing was part of the . . . problem because when you have excess inventory, it drives unusual behavior in the channel, which affects pricing." Finally, Weisler noted that HP had to make "sure we're in the right inventory position so there is no pricing arbitrage that is going on."

252.  Even after the February 27, 2019 disclosures, however, HP's stock price remained artificially inflated because, as a result of Defendants' repeated misrepresentations throughout the Class Period, investors still believed that HP could ultimately return its Supplies business to stability. For example, in a May 24, 2019 report, Morgan Stanley wrote: "Key Debates . . . Can HP return to printer supplies growth? Yes, but we believe it will take multiple quarters as the company works through bloated channel inventory and takes operational and strategic actions to better defend against remanufacturers." On July 2, 2019, after meeting with HP management, UBS reported that "HP seems to have printing supplies under control" and "it now believes it has better data sources to track its share" so it can be "more confident in the in-channel results it sees." UBS further reported that based on its "better data," HP "still expects low single digit

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

declines this year, but it should improve." As a result, UBS reiterated its "[b]uy" rating with a "$28 price target." On July 10, 2019, after meeting with HP Director of Investor Relations Tesh Dahya, Evercore ISI reported that a "[k]ey highlight from the meeting[]" was that "[a]lthough HPQ lowered its supplies revenue expectations following its F1Q print, the company has since implemented remediation plans which we think should stabilize the trajectory of the overall printing business going forward." Thus, heading into HP's 3Q19 print, Deutsche Bank wrote that: "We expect an in-line report/guide from HPQ. . . . [I]n Printing, we expect a continued path towards Supplies stabilization."

253.   Then, after market close on August 22, 2019, HP announced disappointing 3Q19 earnings results, with Supplies revenue down 7% year-over-year, with EMEA Supplies revenue down in the mid-teens. HP further announced a 15.6% operating profit margin for the Printing segment which was below the Company's 16% target. Defendants acknowledged that the actions they were taking to address the inventory, share, and pricing issues—including implementing "pricing discipline"— had impacted results in 3Q19 and would continue to impact Supplies revenues moving forward. Defendants further stated that while HP had reduced the inventory in its monitored upstream channels by nearly $100 million, which it called "good progress," it still did not know how much inventory was in its channel: "the sizing of the overall inventory is a triangulation, given our lack of visibility into the entire channel ecosystem." As a result, the Company did not know what impact it had made on the remainder of its channel inventory nor how much excess remained in the channel: "[I]t's not possible to specifically quantify what impact we've made in the rest of the unmonitored downstream ecosystem." Moreover, HP revised Supplies revenue guidance for 2019 down even further—to negative 4% to 5%—and ***disclosed that it did not expect Supplies revenue growth in 2020***.

254.   As Susquehanna reported after the call, "while HPQ has mostly executed to its $100M channel inventory reduction, management suggested additional excess channel inventory may exist given a lack of visibility in the unmonitored downstream ecosystem. Looking out to FY20, management anticipates Supplies revenue to decline further, and did not offer any insight into when revenue would stabilize/grow." On August 23, 2019, Credit Suisse wrote that "[o]n channel inventory in particular, while the company has executed on nearly the entire $100mn planned reduction, they noted an ongoing lack of visibility below Tier 1 distributors which makes sizing the downstream impact inherently difficult." Credit

Suisse further reported, "we'd highlight continued risk to the downside to our current forecasts, given a potential sustained move below-average **to offset FY18 over-ship**. We continue to view Supplies stabilization as the key metric for HP's stock price, and think the multiple will have a hard time re-rating without line-of-sight to sustained improvement ahead."

255.  According to HP, the primary driver of the downward guidance revision was its longer-term strategic issues: "[T]hat's the more sustainable impact for us, and it's really the primary driver of why we don't expect Supplies to grow in FY '20. . . ." As Lores explained, the "strategic issues" involved continued market share losses to third-party suppliers: "[W]e have created a very attractive profit pool of supply but now has attracted many other companies to try to attack it, and capture a portion of it without having to have a significant investment that are necessary to create the hardware installed base. And because of that, we see an erosion of the overall profit pool that, according to our model, means a reduction in share and a reduction in price." Lores likewise confirmed that these "strategic issues presumably will have a longer term impact, and we see [it] will be impacting us not only this year but also the years to come."

256.  The Company also announced that Weisler was stepping down and that Lores would succeed him as CEO. Weisler's exit was publicly attributed to a "family health matter"—but market commentators noted that it was a "sudden departure."

257.  The following month, UBS wrote that "[w]e think HP's four-box model is challenged and the company may have to revamp its forecast model. We are changing our F20 supplies revenue estimate from flat to down 1%."

258.  As a result of HP's disclosures, the price of HP stock dropped nearly 6%, from $18.93 per share to $17.81 per share, on high trading volume—erasing approximately $1.66 billion in shareholder value. Market commentators attributed the stock price decline to the decreased Supplies revenue guidance. For example, on August 22, 2019, Deutsche Bank wrote that: "Supplies was **guided to decline -4% to -5% in FY19** down from low-single digits prior (implied -1% to +3% q/q in FY4Q19E) and was **guided to decline y/y in FY20E**, which is likely to pressure the stock tomorrow." The same day, *The Wall Street Journal* reported that "investors watch HP's supplies business closely, given the outsize impact on the bottom line. HP shares slid 17% in February after the first print supply miss. Thursday's report took the stock down an additional 6% after hours."

259.  Following this disclosure, HP updated its trend disclosure in its Form 10-Q filed with the SEC on August 29, 2019, to add the following language:

> We also face challenges in Printing due to our multi-tier distribution network, primarily in EMEA, including limiting grey marketing and the potential misuse of pricing programs. A competitive pricing environment, including from non-original supplies (which includes imitation, refill or remanufactured alternatives), and a weakened market in certain geographies with associated pricing sensitivity of our customers also present challenges in Printing.

260.  Even after the August 22, 2019 disclosures, however, HP's stock remained artificially inflated because, based on Defendants' misleading statements, investors still believed that HP's Supplies business was viable and would stabilize—albeit later than originally thought. For example, the next day, Wolfe Research wrote that "[m]anagement guided to flat to down F20 Supplies growth; we look to October's investor event for the longer-term plan for stabilizing Printing." Similarly, heading into the October event, Deutsche Bank wrote that "a stabilization in Supplies is also expected eventually, albeit with the time frame pushed out into 2HFY20 or later." Evercore ISI reported that focus at the event would be on "Supplies trajectory long-term and potential for HPQ to alter that via share gains, new markets, ASPs, etc."

261.  On October 3, 2019, HP finally conceded that its Supplies business model could not be stabilized after all, announcing during HP's annual Securities Analyst Meeting that the Company would make a fundamental shift to its model. In particular, moving forward, Defendants announced that HP printer "customers will be able to choose between paying a higher price for hardware and having a more flexible supplies model or buying a subsidized hardware unit that will only work with HP original supplies." In short, HP's customers would have to choose between either: (i) paying less for a printer up front that would not accept anything but HP original supplies; or (ii) paying more for a printer up front (and thus guaranteeing HP a profit) if they wanted the flexibility to use third-party aftermarket supplies. As Credit Suisse reported the following day, "management detailed a fundamental change to their business model going forward, as they look to move away from the traditional 'razor/razor blade' approach to Supplies toward a new focus on 'system' profitability." Evercore ISI similarly wrote, "HPQ intends to shift their business model by ensuring that customers pay a higher price on printing hardware if they want to have flexibility on using competitive supplies solutions, while subsidizing the hardware for customers who commit to only using HPQ hardware and ink."

262.  HP admitted that its business model shift was a direct result of Supplies market share losses:

> [W]e made printers more affordable by placing the hardware at a loss and then making profit with supplies over time. . . . But today, I think we've gone too far because this model creates an attractive opportunity for others, thus we're seeing increased competition in the aftermarket. Today, alternatives, supplies, competitors are growing without having to invest in hardware development, production or placement cost.

Ultimately, HP's business model was not working, because it was selling printers at a loss, but since it customers were purchasing supplies from third-party suppliers, it never recouped that loss:

> [W]e don't know specifically if . . . [a printer purchaser] is actually going to be a user of HP original[] [supplies], or candidly, even a user of supplies. . . .and when we do so . . . we lose money on the hardware placement upfront, we lose money on those customers.

Indeed, Lores disclosed that for approximately 20% of HP's printer customers, "the usage is not enough for them to be profitable" so the Company was effectively walking away from them.

263.  Market commentators likewise attributed the model change to HP's losses in the Supplies aftermarket. For example, Wells Fargo wrote that "[t]he model is a response to after-market supply producers that have cut into HP's IPG operating profit. . . . The strategy will work to reduce HP's reliance on the Supplies business." Morningstar noted that "[t]o alleviate concerns about aftermarket ink and toner vendors affecting supplies sales, HP will now only sell discounted printer hardware to new customers who use genuine HP supplies." Credit Suisse similarly reported that "HP is looking to systematically raise price on printing HW for targeted segments of the market, in response to the growing threat of aftermarket Supplies that are weighing on the highly-lucrative revenue stream." Morgan Stanley wrote, "HP's print strategy pivot represents the second in 3 years, and is a direct response to increasing competition from supplies remanufacturers, and even more so the growing market of counterfeits."

264. In addition, Defendants revealed that HP was still working to implement the pricing consistency and inventory management practices that Defendants claimed were already in place since 2016. For example, Defendants stated, "we have to leverage data and manage the channels more effectively through a centralized pricing process and a disciplined channel partner program. This allows us to deepen our relationship with our channel partners and customers, including Tier 1 and Tier 2 channels, to get a tighter visibility and inventory and to manage it much, much more robustly." Further, HP was "changing [its] operating model" to "enable harmonized sales processes and pricing discipline around the globe." Christoph Schell (then-President of 3D Printing & Digital Manufacturing) stated that "we want to have a

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

lot more consistency in how we manage the 4Ps of marketing: so product, price, place and promotion. I think it's super important in a market that has become globally much more transparent, to be more consistent in how we execute." Further, in response to an analyst question about whether the changes were "along the same path" as the changes announced "3 years ago," Lores revealed that HP had not actually changed to consistent global pricing after 2016, as it had represented to investors: "[w]ith this model, now we will be able to have consistency across the world, which is a very important change." Moreover, to allow HP to actually track its channel inventories and sales to end-users, the Company was also "investing in digital tools and analytics that help us track, verify cartridges from our factories through our multi-tier distribution channels and to our end customer."

265.   During the call, Defendants also conceded that the Supplies revenue declines were permanent: "[W]e are not relying on Supplies revenues to grow beyond FY '20." As JP Morgan reported the following day: "Printing supplies are not expected to grow beyond FY20." Morgan Stanley wrote, "printing supplies revenue will decline not just in FY20, but over a multi-year period, which we now reflect in our model." *The Wall Street Journal*, in an article titled, "HP Has No Easy Way Out of Printer Jam," reported that Defendants' announcement "amounts to a tacit admission that the supplies business is no longer growing." As Evercore ISI aptly summed up: "Expect supplies to keep declining."

266.   Indeed, after reassuring the market the entire Class Period that they could return HP's Supplies revenue to stabilization and growth, Defendants now told the market that they should no longer focus on Supplies revenue growth. For example, during the call, an analyst posed the following question: "[L]ast several years, you guys have been talking about the 4-box model in Printing, and this was conspicuously absent in this analyst presentation. Do you think that, that framework is not the right framework anymore?" In response, Defendant "It's all about Supplies" Lores stated, "we didn't cover the 4-box model today because, as we have said several times, we don't think that going forward, supplies is the best metric to measure to understand the health of our business."

267.   Multiple analysts characterized this sudden pivot as a "capitulation." For example, in an October 3, 2019 report titled, "HPQ: *RIP 4-Box Model* – HP Moves To Systems Based Printing Strategy," Wells Fargo wrote that "HP announced that it was moving away from its 4-Box printing model and transitioning to a systems-based strategy that will de-emphasize printing supplies. . . . While we think that

this move was largely unavoidable, ***we think that investors will view HP's capitulation as net-negative***." The following day, Wolfe Research reported that "[u]pending of traditional hardware subsidized model (new customers will now have to pay for flexibility), coupled with an announced cost savings plan, ***equated to near-term capitulation on efforts to stem existing installed base supplies headwinds***."

268.  Following the call, market commentators also highlighted the significant risks associated with HP's transition—in particular, the risk that by raising prices, HP risked losing even ***more*** critical market share. For example, Credit Suisse wrote that "we see a potentially disruptive transition over the near-term, which brings risk of increased volatility" and "raising price into a mature market will be tough, particularly if competitors choose not to follow." Morningstar reported that "we have concerns about HP losing market share from customers who do not adopt this sales model." Deutsche Bank noted, "[w]e believe that investors will question how this change impacts HP's market share and profitability long-term." Morgan Stanley wrote that "[w]e also see risk that competitors don't follow suit, which would result in accelerated hardware and supplies share losses." Evercore ISI reported that "this is an interesting idea but implementation of this and what do peers do will be crucial to ensure HPQ doesn't end-up losing market share." Wells Fargo summed it up, "we think investors will be focused on the potential execution risks of this transition." As a result of these disclosures, the price of HP's stock dropped from $18.40 per share to $16.64 per share, or nearly 10%, on high trading volume—erasing over $2.6 billion in shareholder value.

## J.    Post-Class Period Events

269.  On November 26, 2019, Defendants released HP's 4Q19 and FY19 financial results. During the earnings conference call, Defendants confirmed that in 4Q19, Supplies revenue declined 7%, and for FY19 it had declined 5%, or $654 million. Defendants noted that they expected HP's "new commercial organization will drive better global best practices and consistency in Supplies execution." With respect to inventory, Defendants reported "a significant reduction in Tier 1 and monitored Tier 2 channel inventory dollars in EMEA throughout the year." Additionally, Defendants confirmed that HP had reduced channel inventory "by over $100 million," noting that it was "more than what [they] initially estimated." Further, the Printing segment's operating profit margins remained depressed at 15.6%.

270.  On December 12, 2019, HP filed with the SEC on Form 10-K its financial results for FY19. In the Form 10-K, the Company updated and augmented its inventory management risk disclosure to

include the following language: (i) HP's "multi-tiered channel[] may reduce visibility into inventories"; (ii) "Sales of our products by channel partners to unauthorized resale of our products could also make our forecasting more difficult and impact pricing in the market"; and (iii) "factors in different markets may cause differential discounting between geographies where our products are sold, which makes it difficult to achieve global consistency in pricing and creates the opportunity for grey marketing."

271. In 1Q20—its last fiscal quarter before the COVID-19 pandemic began impacting businesses—HP reported another 7% Supplies revenue decline.

272. On September 4, 2020, HP filed its results for 3Q20 on Form 10-Q. In the Litigation and Contingencies section of its Form 10-Q, HP disclosed that "[i]n 2017, the Company received a subpoena from the SEC requesting documents regarding HP's printing supplies business for the time period before June 2016" and that, following an investigation, HP had reached a settlement agreement with the SEC. If approved, HP disclosed that it would pay a civil penalty of $6 million "for failure to disclose certain known trends and uncertainties regarding supplies sales practices and their impact on margin and supplies channel inventory and for incomplete disclosures regarding supplies channel inventory in its SEC filings and related earnings calls from November 2015 and June 2016." On September 30, 2020, the SEC made public the Cease-and-Desist Order.

273. On December 10, 2020, HP filed with the SEC its FY20 financial results on Form 10-K. In the Form 10-K, the Company added the following additional language to its inventory management risk disclosure: "For example, in the past we have had channel partners sell products outside of their agreed territory, and misrepresent sales to unauthorized resellers as sales to end-users, frustrating our efforts to estimate channel inventory and maintain consistent pricing, and negatively impacting gross margins."

# V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

## A.     Defendants' Materially False and Misleading Statements Regarding HP's Supplies Sales Model and Operational Changes Announced in June 2016

### 1.     Defendants' Materially False and Misleading Statements Regarding the Shift to a Pull Model, the Impact of That Shift, and the Operational Changes

274. After the market closed on February 22, 2017, HP held an earnings call to discuss the Company's 1Q17 financial results. During the 1Q17 Earnings Call, Defendants Lesjak and Weisler engaged in the following colloquy with Deutsche Bank analyst Sherri Ann Scribner:

> **SCRIBNER**: And then, just the supplies model change that you made, we're roughly three quarters into that now. How do you feel about that change, is it working? I assume that you're going to say it is working, but maybe more detail in retrospect about how that's working out for you?

> **LESJAK**: I'm very pleased with how it's working out. We basically believe that ***by getting to closer to global pricing consistency***, that there would be a number of benefits. . . .

> But ***it is also great from a partner perspective because, of course, they're carrying lower channel inventory***, and therefore that's their working capital. **. . .** And then, ***we're also seeing in the quarter, improvement in terms of discounting. . . .***

> And as I mentioned, ***we're taking that in lower discounts***, and basically reinvesting them back into marketing to drive print relevancy and usage. And it's very important that we do that, because ***we do not want to be selling supplies on promo.*** We want to drive the value, to help our customers understand the value of using HP branded ink and toner, and marketing is going to be important to that.

> **WEISLER**: And again, looking through the eyes of a customer, ***it increases customer satisfaction when there's not enormous price volatility in the market, but encourages gray imports, and all of the issues associated with that, and the frustrations associated with that. So we've seen the gray marketing activity significantly reduced. We're seeing much more stable prices in the market, which is a benefit for the customers, channel partners, and our business performance.***

275. Following the 1Q17 Earnings Call, analysts issued reports echoing Defendants' statements. For instance, Deutsche Bank issued a report on February 22, 2017, concluding that HP was "stabilizing its main profit generating supplies segment after adjusting its channel strategy last year." On February 23, 2017, UBS issued a report stating, "[t]he company believes its four box model is on track for stabilization, aided by cost reductions and more consistent omnichannel pricing." That same day, Guggenheim issued a report noting that "HPQ seems to be working through its moves to better harmonize pricing across channels and cut channel inventories to enable a pull vs. push model." On February 27, 2017, Argus issued a report

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   stating, "[i]n the supplies business, which represents 67% of printing revenue, HP has reduced channel

2   inventory, increased marketing spending, and done away with discounts, which were adversely impacting

3   everyday pricing."

4           276.  Weisler's and Lesjak's statements in ¶ 274 were materially false and misleading when made

5   because Defendants failed to disclose that HP: (i) continued to use discounts to push Supplies inventory

6   into the channel in order to make monthly quotas and meet quarterly targets after June 2016; (ii) had not

7   shifted to a demand-driven pull model for Supplies (nor could it); and (iii) did not implement the

8   operational changes addressing pricing, discounting, and inventory management announced on June 21,

9   2016. Moreover, Defendants Weisler's and Lesjak's statements in ¶ 274 were materially false and

10  misleading when made because Defendants failed to disclose that the $450 million in excess inventory and

11  sales model changes were necessitated by HP's use of unsustainable business practices, including pull-ins

12  and A-Business, as well as steep discounts mask the excess channel inventory caused by these practices,

13  in 2015 and 2016 to enable its regions to meet Supplies sales targets. Without disclosing the real reasons

14  why HP had $450 million in excess inventory in its channel, or the fact that its regions had to engage in

15  these practices to make sales quotas, Defendants' statements touting the purported benefits of these actions

16  gave investors a misleading impression about the reasons for these changes and HP's ability to meet

17  Supplies sales quotas without these undisclosed practices. In addition, by keeping investors in the dark

18  about these practices, HP was able to continue them during the Class Period.

19          277.  More specifically, Lesjak's statements in ¶ 274 that the Supplies sales model and operational

20  changes were "great from a partner perspective because, of course, they're carrying lower channel

21  inventory" and Defendant Weisler's statements in ¶ 274 that "we've seen the gray marketing activity

22  significantly reduced" were materially false and misleading when made because HP was still engaging in

23  the same or similar unsustainable sales practices during the Class Period, including pushing channel

24  partners to accept more inventory than they needed to meet monthly quotas and quarterly targets.

25  Defendants' statements in ¶ 274 also were materially false and misleading when made because Defendants

26  failed to disclose *why* HP's channel partners previously carried larger amounts of inventory or gray

27  marketing was more prevalent—the Company's own unsustainable sales practices that led to $450 million

28

in excess inventory in the channel in 2016 and rampant gray marketing activity impacting each of HP's three regions.

278. Additionally, Lesjak's statements in ¶ 274 that HP was "getting [] closer to global pricing consistency," "seeing in the quarter, improvement in terms of discounting," and that the Company was not "selling supplies on promo" and Weisler's statements in ¶ 274 that "there's not enormous price volatility in the market" were materially false and misleading when made because Defendants failed to disclose that HP continued to use end-of-quarter discounts in order to meet internal quotas or targets, irrespective of end-user demand, forcing Defendants to concede in 2019 that HP did not have "consistent pricing" or "pricing discipline around the globe" and had not yet implemented "a disciplined channel partner program" or sufficient "controls around our discount policy."

279. Defendant Weisler participated in the March 1, 2017 Conference. During this conference, Morgan Stanley analyst Katy Huberty questioned Defendant Weisler about HP's Supplies business model shift:

> **HUBERTY**: Now, comps get easier in supplies as you get into the summer months, because a year ago you chose to move towards this pull away from a push model. You lowered channel supplies inventory. Are you happy with where channel supplies inventory is today, and does that, in fact, increase your confidence in reaching that supplies target, given the comps do get easier?
>
> **WEISLER**: Look, *I'm really happy with the decision we took around the supplies change model. I think it was a very important change for us to make.* It was a big investment for us to make. . . .
>
> *And we're seeing the same benefits.* . . . *We're frustrating less partners, and we're certainly frustrating less customers.* We're able to spend our [contra] money and channel it towards marketing to drive original HP supplies. So all sorts of benefits.
>
> And, yes, you're right. Our comps do get easier off the back of that. But we're holding ourselves to a very high standard. We said that we would stabilize supplies by the end of 2017 in constant currency without those actions. So actually what you should expect [us to do is] we'll grow supplies when you just look at the absolute level. But we're holding to our original standard.

280. Following Defendant Weisler's statements at the March 1, 2017 Conference, UBS issued a report on March 31, 2017, reporting that "[t]he company took its printing lumps last year to reduce supplies inventory and move to consistent pricing and now is well positioned." An April 12, 2017 Morgan Stanley report likewise concluded, "channel inventory reductions and a shift to a pull, from a push, model allows the stable razor/blade business model to show through."

281. Defendant Weisler's statements in ¶ 279 were materially false and misleading when made because he failed to disclose that HP: (i) continued to use discounts to push Supplies inventory into the channel in order to make monthly quotas and meet quarterly targets after June 2016; (ii) had not shifted to a demand-driven pull model for Supplies (nor could it); and (iii) did not implement the operational changes addressing pricing, discounting, and inventory management announced on June 21, 2016. Moreover, Defendant Weisler's statements in ¶ 279 were materially false and misleading when made because he failed to disclose that the $450 million in excess inventory and sales model changes were necessitated by HP's use unsustainable business practices, including pull-ins and A-Business, as well as steep discounts mask the excess channel inventory caused by these practices, in 2015 and 2016 to enable its regions to meet Supplies sales targets. Without disclosing the real reasons why HP had $450 million in excess inventory in its channel and had to change its sales model, or the fact that its regions had to engage in these practices to make sales targets, Defendants' statements touting the purported benefits of these actions gave investors a misleading impression about the reasons for these changes, HP's ability to meet Supplies sales targets without these undisclosed practices, and ultimately HP's ability to stabilize its Supplies business. In addition, by keeping investors in the dark about these practices, HP was able to continue them during the Class Period.

282. More specifically, Defendant Weisler's statement in ¶ 279 that HP had changed its sales model to an end-user demand-driven pull model was materially false and misleading because HP continued to push Supplies inventory into the channel utilizing discounts and other inducements irrespective of end-user demand in order to meet monthly quotas and quarterly targets. Weisler's statements in ¶ 279 also were materially false and misleading when made because, as Defendants admitted in 2019, HP "continue[d] to fulfill orders likely over multiple quarters based" not on actual end-user demand but "regional share assumptions," that, for toner-based printers, were based not on statistically relevant telemetry data, as Defendants claimed, but on lagging and incomplete third-party market share surveys that were not changing over time. Weisler's statements in ¶ 279 also were materially false and misleading when made because, as Defendants conceded in 2019, the "downstream portion" of HP's Supplies inventory channel, as well as the end-user—was "unmonitored" and "beyond [the Company's] report visibility—and, as a result, Weisler had no visibility into actual end-user demand necessary to deploy a "pull" sales model.

283.  Additionally, Weisler's statements in ¶ 279 that HP was "seeing the . . . benefits" from the Supplies sales model and operational changes and that HP was "frustrating less partners" were materially false and misleading when made because HP was still engaging in the same or similar unsustainable sales practices during the Class Period, including pushing channel partners to accept more inventory than they needed to meet monthly and quarterly targets. Weisler's statements in ¶ 279 also were materially false and misleading when made because Defendants failed to disclose *why* HP's partners previously were frustrated with the Company—namely, because of HP's own unsustainable sales practices that led to $450 million in excess inventory in the channel as of 2016 and rampant gray marketing activity impacting each of HP's three regions.

284.  Further, Weisler's statements in ¶ 279 that HP was "able to spend our [contra] money" on "marketing to drive original HP supplies" were materially false and misleading because Defendants failed to disclose that HP continued to use end-of-quarter discounts in order to meet internal quotas or targets, irrespective of end-user demand which led to price volatility, forcing Defendants to concede in 2019 that HP did not have "consistent pricing" or "pricing discipline around the globe" and had not yet implemented "a disciplined channel partner program" or sufficient "controls around our discount policy."

285.  On May 24, 2017, HP hosted an earnings call to discuss its 2Q17 financial results. During the 2Q17 Earnings Call, Defendant Lesjak responded to a question from Cross Research LLC analyst Shannon Cross regarding the Print segment operating margin:

> **CROSS**: And then second question is just on the Printing operating margin. Supplies seem to be improving a little bit ahead of schedule which obviously is going to benefit margins. But I'm curious how you think about sort of the balance of flow-through of investment of those dollars into 3D Printing, A3, other growth initiatives versus letting it fall to the bottom line. So how are you balancing that? And how should we think about operating margin as you go through the year?
>
> **LESJAK**: So I think the way to think about it, and we talked about this before, is that the [sic] we expect that the Print operating margin, which have historically been in the mid-teens, will continue to be in the mid-teens. That's kind of 15% to 18%. And that the variability within that range is largely going to be driven by the opportunity to place more units. For '17 specifically, we're very focused on our productivity initiatives and bringing those -- realizing those as we progress through the year. We are also taking some of ***the savings, a lot of the savings, frankly, that we're getting from lower discount dollars around supplies directly related to the supplies sales model change that we made last year***, and we're basically reinvesting those back into marketing. We told you we were going to do that, and that is in fact what is happening. We're doing that in order to drive Print relevancy, drive more Print and also to drive preference for HP-branded supplies. And then finally, we are investing. We're investing in A3, we're investing in graphics and we're investing in 3D.

286.  During the same call, Defendant Weisler responded to Bank of America Merrill Lynch analyst Wamsi Mohan's question about "HP original supplies attach" as follows:

> **MOHAN**: Dion, maybe you could talk about what you're seeing in HP original supplies attach? How has that evolved over the past year or so? How much more room do you see over the next few years in driving increased attach, given that's of relatively high significance to your strategy over the past several years?

> **WEISLER**: And I think about the entire Four Box Model when I think about our supplies business and its stabilization. And so I'll comment a little bit on each of the levers. I mean, the Four Box Model continues to predict supplies revenue will stabilize in constant currency and adjusted for the change in the supplies sales model by the end of '17. It's also performed in line with or better than our expectations that we had at the beginning of each of the 4 prior quarters. ***And recall that we changed the supplies sales model due to the increased impact of the omnichannel environment*** and believe that this would be a more efficient model. . . . And ***we're achieving the cost savings that we previously had put towards discount dollars*** and that's supporting an increase in the marketing to drive the Print relevance. And that's really at the center of your question, the increase in the marketing dollars and the stable environment out there is enabling us to sell the value of original supplies. And as a result of that, that has an impact on that particular box. But we're making improvements in all 4 areas. . . .

287.  Following the 2Q17 Earnings Call, analysts issued reports reflecting Defendants' statements. For example, a May 24, 2017 Guggenheim report claimed that "Jul-qtr comps are expected to improve further still, as HPW works pasts its multi-quarter hits form steps taken to harmonize pricing across channels and cut channel inventories for a pull vs. push model."

288. Defendants Lesjak's and Weisler's statements in ¶¶ 285-86 were materially false and misleading when made because they failed to disclose that HP: (i) continued to use discounts to push Supplies inventory into the channel in order to make monthly quotas and meet quarterly targets after June 2016; (ii) had not shifted to a demand-driven pull model for Supplies (nor could it); and (iii) did not implement the operational changes addressing pricing, discounting, and inventory management announced on June 21, 2016. Moreover, Weisler's and Lesjak's statements in ¶¶ 285-86 were materially false and misleading when made because Defendants failed to disclose that the $450 million in excess inventory and sales model changes were necessitated by HP's use unsustainable business practices, including pull-ins and A-Business, as well as steep discounts mask the excess channel inventory caused by these practices, in 2015 and 2016 to enable its regions to meet Supplies sales targets. Without disclosing the real reasons why HP had $450 million in excess inventory in its channel and had to change its sales model, or the fact that its regions had to engage in these practices to make sales targets, Defendants' statements touting the

purported benefits of these actions gave investors a misleading impression about the reasons for these changes, HP's ability to meet Supplies sales targets without these undisclosed practices, and ultimately HP's ability to stabilize its Supplies business. In addition, by keeping investors in the dark about these practices, HP was able to continue them during the Class Period.

289.   More specifically, Lesjak's statement in ¶ 285 regarding "the supplies sales model change that we made last year" and Weisler's statement in ¶ 286 that "we changed the supplies sales model" were materially false and misleading when made because HP continued to push Supplies inventory into the channel utilizing discounts and other inducements irrespective of end-user demand in order to meet monthly quotas and quarterly targets. Lesjak's and Weisler's statements in ¶¶ 285-86 also were materially false and misleading when made because, as they admitted in 2019, Defendants "continue[d] to fulfill orders likely over multiple quarters based" not on actual end-user demand but "regional share assumptions," that, for toner-based printers, were based not on statistically relevant telemetry data, as Defendants claimed, but on lagging and incomplete third-party market share surveys that were not changing over time. Lesjak's and Weisler's statements in ¶¶ 285-86 also were materially false and misleading when made because, as Defendants conceded in 2019, the "downstream portion" of HP's Supplies inventory channel, as well as the end-user—was "unmonitored" and "beyond [the Company's] report visibility—and, as a result, Lesjak and Weisler had no visibility into actual end-user demand necessary to deploy a "pull" sales model.

290.   Additionally, Weisler's statement in ¶ 286 that HP "changed the supplies sales model due to the increased impact of the omnichannel environment" was materially false and misleading because Defendants failed to disclose that it was the use and impact of HP's unsustainable sales practices, not the "impact of the omnichannel environment" that necessitated reducing inventory in the Supplies channels by $450 million in excess inventory and purportedly putting into place operational changes addressing pricing, discounting, and inventory management in June 2016.

291.   Further, Lesjak's statement in ¶ 285 that HP was seeing "savings" "from lower discount dollars around supplies directly related to the supplies sales model change," as well as Weisler's statement in ¶ 286 that HP was "achieving the cost savings that we previously had put towards discount dollars" were materially false and misleading when made because Defendants failed to disclose that HP continued to use

1  end-of-quarter discounts in order to meet internal quotas or targets, irrespective of end-user demand,

2  forcing Defendants to concede in 2019 that HP did not have "consistent pricing" or "pricing discipline

3  around the globe" and had not yet implemented "a disciplined channel partner program" or sufficient

4  "controls around our discount policy."

5  292. On May 31, 2017, Defendant Weisler participated in the May 31, 2017 Conference. During

6  that conference, Weisler responded to a question from Bernstein analyst Toni Sacconaghi regarding "some

7  of the dynamics" affecting HP's Supplies business:

8  **SACCONAGHI**: And you talked about the Four Box Model levers, and one of them being
9  supplies attach. Can you talk about the dynamics that you're seeing with reman? We've
   estimated, I know these aren't your numbers, that you might capture 65% of supplies on
10  the laser side and 35% might go to reman, and we have estimated that you might capture
   85% of supplies on the Inkjet side and 15% might be reman, but how is that -- what are
11  you seeing in the reman market? Do you feel like that's been relatively flat, those numbers,
   over time? We've also started to hear some reports of some -- I don't know if they're
12  Chinese or other, but starting to make new cartridges illegally to compete with HP-branded
   cartridges and whether you're seeing any of that. Obviously, you have a legal basis for
13  suing them, but perhaps you can talk about some of the dynamics.

14  **WEISLER**: . . . .There's 3 kind of things that we do in order to ensure that we give our
   customers the best possible experience, and the first thing is we keep refreshing our
15  technology. . . . The second lever is, as *we changed the supplies sales model*, we said that
   we would channel more marketing into our customer base so that we could market the
16  benefits of original HP supplies. And we're seeing some benefit from that already. And
   then the third area, of course, is to move from a transactional motion with the customer to
17  a contractual motion with the customer whereby we're signing a 3, 4, 5, 7-year contract
   with the customer. . . .

18  293. Following Defendant Weisler's statements at the May 31, 2017 Conference, Morgan Stanley

19  issued a report on June 26, 2017, identified "three things" that "have changed since separation that allow

20  for total company growth," including "addressing high printer supplies channel inventory" which "allows

21  for a shift of marketing dollars to end user education and away from incentivizing bad partner behavior."

22  Approximately one month later, UBS issued a report on July 24, 2017, asserting the following: "The change

23  in go-to-market seems to have solved the problem of excess supplies in channel. Previously, supplies were

24  sold in based on the channel's forecast, and the bigger the forecast the more discretionary dollars HP

25  provided. Now the approach is sell out to replenish, aided by increasing data HP receives on printer use."

26  294. Defendant Weisler's statements in ¶ 292 were materially false and misleading when made

27  because he failed to disclose that HP: (i) continued to use discounts to push Supplies inventory into the

28  channel in order to make monthly quotas and meet quarterly targets after June 2016; (ii) had not shifted to

a demand-driven pull model for Supplies (nor could it); and (iii) did not implement the operational changes addressing pricing, discounting, and inventory management announced on June 21, 2016. Moreover, Weisler's statements in ¶ 292 were materially false and misleading when made because he failed to disclose that the $450 million in excess inventory and sales model changes were necessitated by HP's use unsustainable business practices, including pull-ins and A-Business, as well as steep discounts mask the excess channel inventory caused by these practices, in 2015 and 2016 to enable its regions to meet Supplies sales targets. Without disclosing the real reasons why HP had $450 million in excess inventory in its channel and had to change its sales model, or the fact that its regions had to engage in these practices to make sales targets, Defendants' statements touting the purported benefits of these actions gave investors a misleading impression about the reasons for these changes, HP's ability to meet Supplies sales targets without these undisclosed practices, and ultimately HP's ability to stabilize its Supplies business. In addition, by keeping investors in the dark about these practices, HP was able to continue them during the Class Period.

295.  More specifically, Weisler's assertion in ¶ 292 that "we changed the supplies sales model" was materially false and misleading when made because HP continued to push Supplies inventory into the channel utilizing discounts and other inducements irrespective of end-user demand in order to meet monthly quotas and quarterly targets. Defendant Weisler's statements in ¶ 292 also were materially false and misleading when made because, as they admitted in 2019, Defendants "continue[d] to fulfill orders likely over multiple quarters based" not on actual end-user demand but "regional share assumptions," that, for toner-based printers, were based not on statistically relevant telemetry data, as Defendants claimed, but on lagging and incomplete third-party market share surveys that were not changing over time. Defendant Weisler's statements in ¶ 292 also were materially false and misleading when made because, as Defendants conceded in 2019, the "downstream portion" of HP's Supplies inventory channel, as well as the end-user— was "unmonitored" and "beyond [the Company's] report visibility—and, as a result, Weisler had no visibility into actual end-user demand necessary to deploy a "pull" sales model.

296.  On September 6, 2017, Defendant Lesjak participated in the September 6, 2017 Conference. During the event, Defendant Lesjak responded to Citi analyst Jim Suva's question asking her to "remind"

investors about recent actions HP had taken with in an effort to "stabilize" the Supplies business. After discussing the first two "levers" of the Four Box Model, she continued:

> **LESJAK**: . . . The third one is market share supply, that's obviously pretty important when making investments in go-to market, specifically around kind of where we go to market, so on the sales side, but also marketing. ***We are taking – we've done a really good job of managing our discounts***, and we're taking that savings and we're putting some of that back into marketing. Marketing that helps people understand and are aware of the value of buying HP-branded supplies and then helping to drive preference for that HP-branded supplies. And so you've also seen us have progress in our market share. And then the fourth driver is really around pricing. We're making sure that we've got exactly the kind of the fine-tune pricing that we need, so that we maximize on kind of what the profit that we can make from printing without hurting the demand. And ***what we did last year, which was a pretty significant move is that we changed our sales supplies model. We took channel inventories down significantly in Q3 and Q4 last year. And what that has enabled us to do is manage discounts.*** And like I said, we plow it back, some of it back into marketing. ***But having that global consistent pricing that we get with the new sales model has been incredibly helpful.*** So again, if you manage all of these levers well, which I believe we have been, you get supply stabilization in constant currency and that helps set us up for kind of sustainability in that from a stabilization perspective.

297.  On October 12, 2017, HP hosted its annual Securities Analyst Meeting. During the FY17 SAM, Defendant Lores made a presentation concerning the printer business. In his prepared remarks, Lores stated

> ***we redefined the supplies model and we moved to a demand-driven model. And this is – we are starting to see the results of that change in our business***" and further stated, "***We are able -- we have been able to reduce our channel discounts*** and increase our marketing investment . . . . And the combination of both the supply stabilization, the management of the drivers of the model and the change in supplies, this has great confidence in our ability to project and to predict this business in the future but also to manage it for growth.

298.  Also during the FY17 SAM, Defendant Lores responded to a question from Bank of America Merrill Lynch analyst Wamsi Mohan

> **MOHAN**: If I could ask a quick follow-up. In the 4-box model, you seem to do a little bit better on -- than your expectations on the pricing lever, and I was wondering, is that really a function of the changes that were made in channel inventory and we are yet to see the pricing improvements that you spoke about, about your big data analysis? Is that the right way to think about it?

> **LORES**: Effectively, a combination of many different factors. I explained before, ***we have been able to reduce the discounts that we offered to channel partners. This is helping. We have also been able to increase selectively prices in some areas. This is also helping. Working with lower channel inventories is helping us to prevent gray marketing across -- around the globe. This is also helping.*** So there is not one factor alone, but the combination of all of them driving the assumptions that we have been sharing.

299. Likewise during the FY17 SAM, Defendants Weisler and Lesjak engaged in the following discussion with UBS analyst Steven Milunovich:

**MILNUNOVICH**: I wanted to continue on the channel discussion, you said over 85% of your products go through the channel. Could you talk about sort of the competitive dynamics in the channel? There have been a lot of changes last year. Particularly on the PC side, you've got Dell. Maybe you can talk a little bit about what you are seeing from them? Lenovo recently made some changes, which I don't think are being terrifically well received. And on the Printer side, are we through any breakage? I mean, you made some dramatic changes a year ago, you just alluded to, and they seem to have gone very smoothly, but maybe you can talk a little bit more about exactly how the channel (inaudible)?

**WEISLER**: As it relates to Printing, ***I would say that the supply sales model change has been incredibly well received by partners.*** We recently conducted our HP Partner Forum that we do every single year. I met with many, many of our partners and I know the rest of the team did as well. And I was at Canali's, I think, about a week ago or 2 weeks ago -- the week's kind of blend at the moment and I'm not quite sure. I was speaking to another cohort of channel partners there, and ***I would say that the change that we made to the supplier's sales model actually helped their business. It was short-term painful as they went through the withdrawal symptoms of how we've operated this business over the last 30 years, but it's made their business more predictable and in this omni-channel world, it's stabilized pricing and that's good news for their business.***

**LESJAK**: I had 2 channel partners that I met with come out and thank me for making the changes that we made in the supply's sales model. So it's very well received.

**LORES**: And think about the implication for them. ***When we say we operate with lower channel inventory, it means they need to invest less capital in managing our business. So there is a very clear benefit from that on top of what Dion was saying about price stabilization. This really helps their business model.***

300. Additionally, during the FY17 SAM, following up on statements by Defendant Lores, Defendant Weisler praised HP's Print team, stating:

**WEISLER**: I mean, I think hats off to the Print team. They have taken what seems to be a fairly simple business, which is actually pretty complicated and used a lot of data and analytics and modeling to really understand what was driving the business and then built plans that didn't just do 1 or 2 things, did a whole handful of things across many customers, many geographies around the world. Not just chase, again, share for share's sake but take quality share, drive print relevance through incredible marketing campaigns that Antonio and his team do to bring Print alive. One of the things is I love it when Enrique says, 'You kind of click what you like, and you print what you love.' And sort of exposing a new generation of customers that have never printed before to the power of print is very cool. ***Very carefully managing pricing,*** very carefully looking to grow aftermarket share. This business return to growth has been growing for the last couple of quarters. It hasn't done that since late 2011.

301. Following the FY17 SAM, analysts issued reports echoing Defendants' statements. For example, Guggenheim wrote on October 13, 2017, that Defendant Lores "pointed out that after several

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

years of priting declines, HPQ at last stabilized supplies in its latest quarter (following inventory/go to market changes as planned)." Argus concluded in an October 17, 2017 report that "[t]he issues with supplies that set the company back in 2015-2016 are now largely resolved. HP eliminated confusing discount programs hated by supplier partners and simplified its supply chain." The next day, Morgan Stanley issued a report noting that "HP's new end user demand driven supplies model allows the team to invest additional upside back into marketing to promote supplies branding, awareness, and relevance online, where HP had a minimal presence just 18 months ago. This should also help sustain supplies results."

302. Defendants' statements in ¶¶ 296-300 were materially false and misleading when made because they failed to disclose that HP: (i) continued to use discounts to push Supplies inventory into the channel in order to make monthly quotas and meet quarterly targets after June 2016; (ii) had not shifted to a demand-driven pull model for Supplies (nor could it); and (iii) did not implement the operational changes addressing pricing, discounting, and inventory management announced on June 21, 2016. Moreover, Defendants' statements in ¶¶ 296-300 were materially false and misleading when made because they failed to disclose that the $450 million in excess inventory and sales model changes were necessitated by HP's use unsustainable business practices, including pull-ins and A-Business, as well as steep discounts mask the excess channel inventory caused by these practices, in 2015 and 2016 to enable its regions to meet Supplies sales targets. Without disclosing the real reasons why HP had $450 million in excess inventory in its channel and had to change its sales model, or the fact that its regions had to engage in these practices to make sales targets, Defendants' statements touting the purported benefits of these actions gave investors a misleading impression about the reasons for these changes, HP's ability to meet Supplies sales targets without these undisclosed practices, and ultimately HP's ability to stabilize its Supplies business. In addition, by keeping investors in the dark about these practices, HP was able to continue them during the Class Period.

303. More specifically, Lesjak's statements ¶ 296 that "we changed our sales supplies model" and "took inventories down significantly in Q3 and Q4 last year," Lores' statements in ¶ 297 that "we redefined the supplies model and we moved to a demand-driven model," and Weisler's statements in ¶ 299 to "the supply sales model change" and "the change that we made to the supplier's sales model" were materially

false and misleading when made because HP continued to push Supplies inventory into the channel utilizing discounts and other inducements irrespective of end-user demand in order to meet monthly quotas and quarterly targets. Defendants' statements in ¶¶ 296-97, 299 also were materially false and misleading when made because, as they admitted in 2019, Defendants "continue[d] to fulfill orders likely over multiple quarters based" not on actual end-user demand but "regional share assumptions," that, for toner-based printers, were based not on statistically relevant telemetry data, as Defendants claimed, but on lagging and incomplete third-party market share surveys that were not changing over time. Defendants' statements in ¶¶ 296-97, 299 also were materially false and misleading when made because, as Defendants conceded in 2019, the "downstream portion" of HP's Supplies inventory channel, as well as the end-user—was "unmonitored" and "beyond [the Company's] report visibility—and, as a result, Weisler had no visibility into actual end-user demand necessary to deploy a "pull" sales model.

304. Additionally, Weisler's statements in ¶ 299 that "the supply sales model change has been incredibly well received by partners," "actually helped their business," and "was short term painful as they went through the withdrawal symptoms . . . but its made their business more predictable" and Lores' statements in ¶ 298 that "[w]orking with lower channel inventories is helping us to prevent gray marketing . . . around the globe" and allows HP's partners "to invest less capital in managing [HP's] business" were materially false and misleading when made because Defendants failed to disclose that HP was still engaging in the same or similar unsustainable sales practices during the Class Period, including pushing channel partners to accept more inventory than they needed to meet monthly and quarterly targets. Defendants' assertions in ¶¶ 298-99 also were materially false and misleading because Defendants failed to disclose *why* HP's channel partners previously carried larger amounts of inventory or gray marketing was more prevalent—the Company's own unsustainable sales practices that led to $450 million in excess inventory in the channel in 2016 and rampant gray marketing activity impacting each of HP's three regions.

305. Lesjak's statement in ¶ 296 regarding "global consistent pricing that we get with the new sales model," Weisler's statement in ¶ 299 that the supplies sales model change has "stabilized pricing," which was reiterated by Lores, and Weisler's statements in ¶ 300 that "the Print team" including Lores was "[v]ery carefully managing pricing," were materially false and misleading when made because Defendants failed to disclose that HP continued to use end-of-quarter discounts in order to meet internal quotas or

targets, irrespective of end-user demand, forcing Defendants to concede in 2019 that HP did not have "consistent pricing" or "pricing discipline around the globe" and had not yet implemented "a disciplined channel partner program" or sufficient "controls around our discount policy." Likewise, Lesjak's statements in ¶ 296 that the "sales supplies model" change "has enabled us to . . . manage discounts" and "we've done a really good job of managing our discounts" as well as Lores's statements in ¶ 297 that "we have been able to reduce our channel discounts" and "increase selectively prices in some areas" were materially false and misleading when made for the same reasons.

306.  On October 3, 2018, HP held its annual Securities Analyst Meeting. During his presentation at the FY18 SAM, Defendant Lores stated, "Let me give a couple of specific examples that will bring what Dion was explaining to life. One of our board members used to work in a business that has a very similar business model to Print. We lose money on printers. We make money on supplies. And from the first day, he challenged us on our model, especially on how were we managing the supplies business. And usually, if you remember, *2 years ago, we did a big adjustment of how we managed supplies. We went from a push model to a pull model.*"

307.  On January 8, 2019, Defendant Lores attended the January 8, 2019 Conference. During the conference, Citi analyst Jim Suva asked Defendant Lores about how HP was able to achieve its recent financial results:

> **SUVA**: A lot of that's impressive, but what exactly did you do, or what were the actions that you did at HP to allow this financial flow through to happen?
>
> **LORES**: Sure. If you -- let me give you three specific examples. The first year after we separated, we did a lot of work to improve our cost structure, and we removed from our cost more than $1 billion that enabled us to place more profitable units.
>
> *We also did a big change in how do we manage our supplies business, going from -- and we changed the sales model, really focusing the sales of supplies from a pull side and driving demand from (inaudible) sales, rather than in having the channel to push supplies into the market. . . .*

308.  Defendant Lores' statements in ¶¶ 306-07 were materially false and misleading when made because he failed to disclose that HP: (i) continued to use discounts to push Supplies inventory into the channel in order to make monthly quotas and meet quarterly targets after June 2016; (ii) had not shifted to a demand-driven pull model for Supplies (nor could it); and (iii) did not implement the operational changes addressing pricing, discounting, and inventory management announced on June 21, 2016. Moreover,

Lores' statements in ¶¶ 306-07 were materially false and misleading when made because he failed to disclose that the $450 million in excess inventory and sales model changes were necessitated by HP's use unsustainable business practices, including pull-ins and A-Business, as well as steep discounts mask the excess channel inventory caused by these practices, in 2015 and 2016 to enable its regions to meet Supplies sales targets. Without disclosing the real reasons why HP had $450 million in excess inventory in its channel and had to change its sales model, or the fact that its regions had to engage in these practices to make sales targets, Defendants' statements touting the purported benefits of these actions gave investors a misleading impression about the reasons for these changes, HP's ability to meet Supplies sales targets without these undisclosed practices, and ultimately HP's ability to stabilize its Supplies business. In addition, by keeping investors in the dark about these practices, HP was able to continue them during the Class Period.

309.  More specifically, Defendant Lores' claim in ¶¶ 306-07 that HP "[w]ent from a push model to a pull model" and changed its "sales model" and "focusing the sales of supplies from a pull side . . . rather than in having the channel to push supplies into the market" was materially false and misleading when made because HP continued to push Supplies inventory into the channel utilizing discounts and other inducements irrespective of end-user demand in order to meet monthly quotas and quarterly targets. Defendant Lores' statements in ¶¶ 306-07 also were materially false and misleading when made because, as they admitted in 2019, Defendants "continue[d] to fulfill orders likely over multiple quarters based" not on actual end-user demand but "regional share assumptions," that, for toner-based printers, were based not on statistically relevant telemetry data, as Defendants claimed, but on lagging and incomplete third-party market share surveys that were not changing over time. Defendant Lores's statements in ¶¶ 306-07 also were materially false and misleading when made because, as Defendants conceded in 2019, the "downstream portion" of HP's Supplies inventory channel, as well as the end-user—was "unmonitored" and "beyond [the Company's] report visibility—and, as a result, Lores had no visibility into actual end-user demand necessary to deploy a "pull" sales model.

**2.      Defendants' Materially False and Misleading Statements Regarding HP's Supplies Channel Inventory Management**

310.  During the question and answer portion of the 1Q17 Earnings Call, Defendant Lesjak responded to a question from Morgan Stanley analyst Katy Huberty regarding HP's free cash flow:

> **HUBERTY**: Cathie, a question on free cash flow. You're starting the year up, $900 million year-on-year. So I'm struggling to understand why you'd end up, even at the high end of the range, down versus last year? Were there any one-time items this quarter, or are there any headwinds that you see hitting, as you move through the year?

> **LESJAK**: So we're really pleased with the Q1 cash flow, and it really came on the back of two things. One was the incredible strength in personal systems, where we saw sequential growth which is atypical for Q4 to Q1, where we typically would see a decline. ***But we also saw much better linearity in the quarter, much more linear. And so, that helped basically bring in revenue earlier, and therefore we could collect it. So some of that is timing, but it's not all timing. So the supply sales model change that we made in the second half last year, one of the benefits we expected to see, was more linear sell-out, which means there's more linear sell-in. And we think that that is in fact structural.*** And therefore, the uptick that we saw in Q1 as a result of that, will stick to our fingers in the year. . . .

311.  During the 1Q17 Earnings Call, Defendant Lesjak also responded to a question from Bernstein analyst Toni Sacconaghi regarding HP's Supplies inventory:

> **SACCONAGHI**: And then, just as a follow-up please, can you just comment on channel inventory, both for PCs and for printing on a sequential basis, did you have any change in inventory in either of those businesses, in the channel inventory?

> **LESJAK**: So in both -- for print, let me start with PC. So for PC, channel inventory, we did have some channel inventory reductions sequentially. ***On the print side, in total, we were down a bit. In supplies, we were obviously down materially year-over-year***, as a result of the change in the sales model, ***and we were also down a bit sequentially***.

312.  Later during the 1Q17 Earnings Call, in response to a question from Deutsche Bank analyst Sherri Ann Scribner regarding how HP's purported Supplies sales model change was "working out," Defendant Lesjak stated:

> **SCRIBNER**: And then, just the supplies model change that you made, we're roughly three quarters into that now. How do you feel about that change, is it working? I assume that you're going to say it is working, but maybe more detail in retrospect about how that's working out for you?

> **LESJAK**: I'm very pleased with how it's working out. We basically believe that by getting to closer to global pricing consistency, that there would be a number of benefits. ***One was going to be just much more linear supplies performance. As I said, we'd have linear sales out, that then therefore we would have more linear sales in, and we're absolutely seeing that***. And as I said, that's what gives us some confidence we will get some permanent linearity benefit this year.

But it is also great from a partner perspective because, of course, they're carrying lower channel inventory, and therefore that's their working capital. ***Our channel inventory levels are healthy. They are below the top end of the newly lowered and narrowed ranges.*** So we're feeling good about that as well. . . .

313. Following the 1Q17 Earnings Call, analysts issued reports reiterating Defendants' statements regarding HP's Supplies inventory management. For instance, Wells Fargo issued a February 23, 2017 report identifying as part of "[t]he [g]ood," that "[c]hannel inventory for . . . supplies was down seq." A Maxim report issued the same day concluded: "Another contributor to the CFO beat was better linearity of printing supplies sell-out and sell-in as a result of the $450M drawdown of printing supplies channel inventory in F2H16. . . . The primary driver in our rationale" for raising FCF estimates "is the better linearity in printing supplies due to a change from a push to a pull enabled by the $450M channel inventory drawdown that we believe will likely prove sustainable." Similarly, Argus noted in a February 27, 2017 report that "channel inventories are in tighter ranges."

314. Defendant Lesjak's statements in ¶¶ 310-12 were materially false and misleading when made. Lesjak's use of the phrase "channel inventory" without definition gave the materially misleading impression that the internal measurement, whether expressed as a "range" or a "ceiling," included all of HP's Supplies channel inventory and was a measure of the overall health of HP's entire Supplies multi-tiered distribution channel when, in reality, that internal measurement included only HP's Tier 1 channel inventory. Additionally, Lesjak's use of the phrase "channel inventory," in conjunction with statements concerning HP's purported shift to an end-user demand-driven pull model and that Defendants were "seeing" "sell out" gave the materially misleading impression that Defendants had visibility through to the end of its distribution chain and knew when the product was purchased by the end-user (or "sell-out") when, in reality, and as they admitted in 2019, Defendants had no visibility into the downstream portion of HP's Supplies inventory channel, and as a result, could not assess the size or relative health of the channel beyond Tier 1. Further, Defendant Lesjak's statements in ¶¶ 310-12 were materially false and misleading when made because Defendants failed to disclose that HP employed unsustainable sales practices that had the effect of pushing inventory into the channel at the end of quarters to make targets irrespective of end-user demand as well as the material impact HP's unsustainable sales practices had on the Company's channel inventory levels.

315.  More specifically, Lesjak's statements in ¶¶ 310 and 312 that one of the "benefits" of the "sales model change" was "more linear sell-out" or "sales out" and "more linear sell-in" or "sales in," which Lesjak confirmed in ¶ 312 that HP was "absolutely seeing" that benefit were materially false and misleading when made because HP had no way of knowing whether there was "sell-out"—meaning purchased by an end-user—let alone "linear sell-out," because the Company had no visibility into the downstream portion of the channel. Lesjak's statements in ¶¶ 310 and 312 also were materially false and misleading because HP's "sell-in" was not linear or based on "linear sell-out," it was the result of unsustainable sales practices that had the effect of pushing inventory into the channel at the end of quarters in order to make targets irrespective of end-user demand.

316.  Additionally, Lesjak's claims in ¶ 311 that "in total," "print" channel inventories "were down a bit" and that Supplies channel inventory was "down materially year-over-year" and "down a bit sequentially" due to the Supplies sales model change and that "[o]ur channel inventory levels are healthy" and "below the top end of the newly lowered and narrowed ranges" were materially false and misleading when made because Lesjak discussed channel inventory and the health of the channel without disclosing that the internal measurement only included HP's Tier 1 channel inventory and thus gave an inaccurate and misleading picture of HP's actual inventory channel and because HP employed unsustainable sales practices that had the effect of pushing inventory into the channel at the end of quarters to make targets irrespective of end-user demand. Further, Lesjak's statement in ¶ 311 regarding overall print inventory was materially false and misleading because Defendants failed to disclose that HP was pushing hardware into the channel to meet monthly quotas and quarterly targets irrespective of whether those units were NPV positive.

317. During the March 1, 2017 Conference, Morgan Stanley analyst Katy Huberty asked Defendant Weisler about HP's inventory in its Supplies channel:

**HUBERTY**: Now, comps get easier in supplies as you get into the summer months, because a year ago you chose to move towards this pull away from a push model. You lowered channel supplies inventory. Are you happy with where channel supplies inventory is today . . . ?

**WEISLER**: Look, I'm really happy with the decision we took around the supplies change model. I think it was a very important change for us to make. It was a big investment for us to make. . . . And we're seeing the same benefits. *We're seeing unbelievable linearity in our business now, as you would expect, because we're really on fulfilling when there's true demand. We narrowed the ranges, and we lowered the ranges, and we're operating*

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*within those ranges. They were down significantly year-over-year, and they were also down a bit sequentially, as well.*

*So I'm happy with where they are in the ranges*, but I'm even happier with the business outcome. . . .

318.   During Lesjak's prepared remarks on the 2Q17 Earnings Call she stated that in HP's 2Q17, "Supplies revenue mix was 67%, flat year-over-year, and *channel inventory remains below our reduced ceiling*."

319.   Also during her prepared remarks, Lesjak stated: "On a full year basis, we remain confident that *the revenue linearity improvements we saw in the first half resulting from changes to our supply sales model are structural improvements*."

320.   During the 2Q17 Earnings Call, Bank of America Merrill Lynch analyst Wamsi Mohan and Defendant Weisler engaged in the following exchange regarding HP's "supplies attach":

**MOHAN**: Dion, maybe you could talk about what you're seeing in HP original supplies attach? How has that evolved over the past year or so? How much more room do you see over the next few years in driving increased attach, given that's of relatively high significance to your strategy over the past several years?

**WEISLER**: . . . . [R]ecall that we changed the supplies sales model due to the increased impact of the omnichannel environment and believe that this would be a more efficient model. And it's certainly proving to be a more efficient model, *our execution of the demand-driven change has seen improved sell-out linearity.*

*We're holding less weeks of stock in channel inventory, both year-over-year and quarter-over-quarter, as Cathie mentioned*. . . .

321.   During the same call, Defendant Lesjak and Bernstein analyst Toni Sacconaghi engaged in the following colloquy regarding HP's Supplies channel inventory:

**SACCONAGHI**: I have one for you, Cathie, and one for Dion. So just you had talked about how we should think about adjusting supplies growth rate for drawdowns in channel inventory. And last year in fiscal Q2, you said that supplies were negatively impacted by 7% from a drawdown in channel inventory, which would point to about a $250 million drawdown in inventory last year in Q2. So if we add that back to last year, it actually looks like, on an inventory-adjusted basis, supplies were down 5% or 6% this quarter in Q2. Is that the right way to think about it? Or were there's some supplies inventory drawdowns this quarter?

**LESJAK**: *So there were also year-on-year inventory drawdowns this quarter. If you think about the fact that we did that pretty significant step-down in channel inventory Q3 and Q4 of last year and then we have continued to keep channel inventory kind of at those levels or even in a little bit lower. I think in Q1 I mentioned that sequentially we were down in terms of (inaudible), we're down again both year-over-year and*

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*sequentially. And so there is a little bit of an add back as a result of those drawdowns in channel inventory.*

322.  Also during the 2Q17 Earnings Call, Defendant Lesjak responded to a question from Evercore ISI analyst Amit Daryanani as follows:

**DARYANANI**: Cathie, could you just talk about the cash conversion cycle and how you expect that to track in the back half? And I guess, looking at accounts payable getting to 100 days, is that something that's sustainable in your opinion? And on another side, I think inventory days went up as well. So do you think these just normalize each other and offset in the back half? Or is there room for conversion to actually improve, especially the [DPO] stay north of 100?

**LESJAK**: So I'm very pleased with the progress that we're making from a cash flow perspective. We, over the last probably year-ish, have been really driving cash flow in the company, at just about every level in the company. So employees really understand the importance of free cash flow, they understand what role they play in helping us to drive free cash flow, and I think of those as being really sustainable. Secondly, we did make a change to our supply sales model last year, *and that is driving better linearity. Real structural, better linearity. Linearity in the quarter that mirrors the demand that we're seeing.* And that has also then provided benefit because we're getting – *we're basically shipping revenues earlier in the quarter, beyond the fact that -- and we also do it at a lower discount level, and so that's real structural improvement*.

323.  Analysts responded favorably to Defendants' statements. For example, on May 24, 2017, Barclays issued a report titled, "Model Stands on Two Pillars," stating, "[w]e think there is staying power to HP's product and channel optimization efforts to underpin continued market share and operating improvements," and "recommend[ed] that long-term investors build, or add to, positions in shares of HP Inc." The following day, a Credit Suisse report stated: "We note management highlighting better linearity in printing supplies, driven by change in supplies sales model." Subsequently, on July 20, 2017, RBC Capital Markets issued a report noting, "[w]e think channel inventory levels have stabilized and HPQ should see an uptick in their 'sell-in' levels for supplies."

324.  Defendants' statements in ¶¶ 317-22 were materially false and misleading when made. Defendants' use of the phrase "channel inventory" without definition gave the materially misleading impression that the internal measurement, whether expressed as a "range" or a "ceiling," included all of HP's Supplies channel inventory and was a measure of the overall health of HP's entire Supplies multi-tiered distribution channel when, in reality, that internal measurement included only HP's Tier 1 channel inventory. Additionally, Defendants' use of the phrase "channel inventory," in conjunction with statements concerning HP's purported shift to an end-user demand-driven pull model and that Defendants were

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

"seeing" "sell out" gave the materially misleading impression that Defendants had visibility through to the end of its distribution chain and knew when the product was purchased by the end-user (or "sell-out") when, in reality, and as they admitted in 2019, Defendants had no visibility into the downstream portion of HP's Supplies inventory channel, and as a result, could not assess the size or relative health of the channel beyond Tier 1. Further, Defendants statements in ¶¶ 317-22 were materially false and misleading when made because Defendants failed to disclose HP employed unsustainable sales practices that had the effect of pushing inventory into the channel at the end of quarters to make targets irrespective of end-user demand as well as the material impact HP's unsustainable sales practices had on the Company's channel inventory levels.

325. More specifically, Defendant Weisler's assertion in ¶¶ 317, 320 that HP is "seeing unbelievable linearity . . . because we're really on[ly] fulfilling when there's true demand" and "our execution of the demand-driven change has seen improved sell-out linearity," and Defendant Lesjak's statements in ¶¶ 319, 322 that "the revenue linearity improvements we saw in the first half resulting from changes to our supply sales model are structural improvements," the Supplies sales model change "is driving better linearity" and "[l]inearity in the quarter mirrors the demand we're seeing" were materially false and misleading when made because Defendants had no way of knowing whether there was "sell-out"—meaning purchased by the end-user—let alone "sell-out linearity" given that Defendants had no visibility into the downstream portion of the channel and, therefore, could not determine end-user demand or "true demand" for HP original Supplies.

326. Additionally, Weisler's statements in ¶¶ 317, 320 that "[w]e narrowed the ranges, and we lowered the ranges, and we're operating within those ranges," inventory was "down significantly year-over-year" and "down a bit sequentially," HP is "holding less weeks of stock in channel inventory," as well as Lesjak's statements in ¶¶ 318, 321 that "channel inventory remains below our reduced ceiling," "there were . . . year-on-year inventory drawdowns this quarter," and "we have continued to keep" inventory at the second-half FY16 "levels or even a little bit lower" were materially false and misleading when made because Defendants discussed channel inventory and the health of the channel without disclosing that the internal measurement only included HP's Tier 1 channel inventory and thus gave an inaccurate and misleading picture of HP's actual inventory channel and because HP employed

1   unsustainable sales practices that had the effect of pushing inventory into the channel at the end of quarters

2   to make targets irrespective of end-user demand.

3   327.  Further, Lesjak's statement in ¶ 321 that "we did that pretty significant step-down in channel

4   inventory Q3 and Q4 of last year" was materially false and misleading when made because Defendants

5   failed to disclose why HP reduced inventory by $450 million in the second half of FY16—namely, that the

6   pull-ins and the A-Business, steep discounts mask the excess channel inventory caused by these practices,

7   made it necessary to write-down $450 million in inventory and purportedly put into place operational

8   changes addressing pricing, discounting, and inventory management in June 2016. Without disclosing the

9   real reasons why HP had $450 million in excess inventory in its channel and had to change its sales model,

10   or the fact that its regions had to engage in these practices to make sales targets, Defendants' statements

11   touting the purported benefits of these actions gave investors a misleading impression about the reasons

12   for these changes, HP's ability to meet Supplies sales targets without these undisclosed practices, and

13   ultimately HP's ability to stabilize its Supplies business. In addition, by keeping investors in the dark about

14   these practices, HP was able to continue them during the Class Period.

15   328.  On the 3Q17 Earnings Call, Defendant Lesjak stated during her prepared remarks, "*[a]nd in*

16   *Q3, channel inventory levels were below the ceiling. As a reminder, as part of making the supplies sales*

17   *model changes last year, we lowered our channel inventory ceiling to better reflect the more demand-*

18   *driven sales model*."

19   329.  Following the 3Q17 Earnings Call, Guggenheim issued a report on August 23, 2017,

20   confirming that "HPQ believes it exited the quarter with lean Supplies channel inventory."

21   330.  Defendant Lesjak's statements in ¶ 328 were materially false and misleading when made.

22   Lesjak's use of the phrase "channel inventory" without definition gave the materially misleading

23   impression that the internal measurement, whether expressed as a "range" or a "ceiling," included all of

24   HP's Supplies channel inventory and was a measure of the overall health of HP's entire Supplies multi-

25   tiered distribution channel when, in reality, that internal measurement included only HP's Tier 1 channel

26   inventory. Additionally, Lesjak's use of the phrase "channel inventory," in conjunction with statements

27   concerning HP's purported shift to an end-user demand-driven pull model gave the materially misleading

28   impression that Defendants had visibility through to the end of its distribution chain and knew when the

1    product was purchased by the end-user (or "sell-out") when, in reality, and as they admitted in 2019, given

2    that Defendants had no visibility into the downstream portion of HP's Supplies inventory channel. Further,

3    Defendant Lesjak's statements in ¶ 328 were materially false and misleading when made because

4    Defendants failed to disclose that HP employed unsustainable sales practices that had the effect of pushing

5    inventory into the channel at the end of quarters to make targets irrespective of end-user demand as well

6    as the material impact HP's unsustainable sales practices had on the Company's channel inventory levels.

7        331.  During the FY17 SAM, Defendant Lores stated: "On top of that, *we redefined the supplies*

8    *model and we moved to a demand-driven model. And this is – we are starting to see the results of that*

9    *change in our business. We operate now with lower-channel inventories* . . . . *[W]e have increased and*

10   *improved linearity and predictability within the quarter*."

11       332.  Following the FY17 SAM, analysts issued reports discussing in part HP's Supplies channel

12   inventory. For example, Morgan Stanley issued a report on October 13, 2017, noting that "[i]mproved data

13   and analytics on customer usage and lower supplies channel inventory increase visibility of supplies

14   revenue, reducing earnings risk, in our view." In an October 20, 2017 report, JP Morgan concluded that

15   HP's move "to a demand driven model with reduced channel, less discounts, but improved linearity."

16       333.  Defendant Lores' statements in ¶ 331 were materially false and misleading when made. Lores

17   use of the phrase "channel inventory" without definition gave the materially misleading impression that

18   the internal measurement, whether expressed as a "range" or a "ceiling," included all of HP's Supplies

19   channel inventory and was a measure of the overall health of HP's entire Supplies multi-tiered distribution

20   channel when, in reality, that internal measurement included only HP's Tier 1 channel inventory.

21   Additionally, Lores' use of the phrase "channel inventory," in conjunction with statements concerning

22   HP's purported shift to an end-user demand-driven pull model and that Defendants were "seeing" "sell

23   out" gave the materially misleading impression that Defendants had visibility through to the end of its

24   distribution chain and knew when the product was purchased by the end-user (or "sell-out") when, in

25   reality, and as they admitted in 2019, Defendants had no visibility into the downstream portion of HP's

26   Supplies inventory channel. Further, Defendant Lores' statements in ¶ 331 were materially false and

27   misleading when made because Defendants failed to disclose that HP employed unsustainable sales

28   practices that had the effect of pushing inventory into the channel at the end of quarters to make targets

irrespective of end-user demand as well as the material impact HP's unsustainable sales practices had on the Company's channel inventory levels.

334.  On November 21, 2017, Defendants held an earnings conference call to discuss HP's financial results for 4Q17 and FY17. During her prepared remarks Defendant Lesjak stated, "***[w]e continue to operate below our channel inventory ceiling***."

335.  Additionally, during her prepared remarks as part of the 1Q18 Earnings Call, Defendant Lesjak stated, "***we continue to operate below our channel inventory ceiling***."

336.  Analysts reiterated Defendants' statements. For example, in a February 23, 2018 report titled, "Estimates Move Higher on Lower Tax and Continued Share Gains," Morgan Stanley reported "healthy channel inventory levels and played a part in the operational EPS guidance increase of $0.05 for FY18." Similarly, a March 8, 2018 report from RBC Capital Markets concluded, "[w]e believe channel inventory levels have stabilized and HPQ has seen an uptick in its 'sell-in' levels for supplies as a result."

337.  Defendant Lesjak's statements in ¶¶ 334-35 were materially false and misleading when made. Lesjak's use of the phrase "channel inventory" without definition gave the materially misleading impression that the internal measurement, whether expressed as a "range" or a "ceiling," included all of HP's Supplies channel inventory and was a measure of the overall health of HP's entire Supplies multi-tiered distribution channel when, in reality, that internal measurement included only HP's Tier 1 channel inventory. Further, Defendant Lesjak's statements in ¶¶ 334-35 were materially false and misleading when made because Defendants failed to disclose that HP employed unsustainable sales practices that had the effect of pushing inventory into the channel at the end of quarters to make targets irrespective of end-user demand as well as the material impact HP's unsustainable sales practices had on the Company's channel inventory levels.

338.  On May 29, 2018, Defendants held an earnings conference call to discuss HP's financial results for 2Q18. During her prepared remarks, Defendant Lesjak stated that "***we continue to operate below our ceiling for Supplies channel inventory***."

339.  During the same call, analysts asked questions regarding various aspects of HP's businesses and financial results. For instance, Defendant Lesjak responded to questions from Sanford C. Bernstein analyst Toni Sacconaghi about HP's Supplies channel inventory:

**SACCONAGHI**: And were there any changes to your channel inventory? I think you said you were under your ceiling, but it's a little bit of a different commentary from prior quarters where I think you said you were within your range, so just a follow-up on the ASPs and then Supplies, please.

**LESJAK**: *In terms of the channel inventory, I think we changed our commentary, I want to say, 2 or 3 quarters ago, when we really now are managing below a ceiling. And we have been consistently below the ceiling for Supplies, frankly, since we made the change to our supply sales model*.

340. Following HP's 2Q18 Earnings Call, analyst issued reports reiterating Defendants' statements. For instance, Wells Fargo issued a report titled, "HPQ: Consistent Execution = Increased F2018 EPS + FCF (+$3.7B) Outlook," on May 29, 2018 stating, "HPQ's supplies channel inventory was noted to be below the ceiling of the company's targeted levels." RBC Capital Markets subsequently issued a report on June 20, 2018, noting, "[w]e think channel inventory levels remain below 'ceiling' levels."

341. Defendant Lesjak's statements in ¶¶ 338-39 were materially false and misleading when made. Lesjak's use of the phrase "channel inventory" without definition gave the materially misleading impression that the internal measurement, whether expressed as a "range" or a "ceiling," included all of HP's Supplies channel inventory and was a measure of the overall health of HP's entire Supplies multi-tiered distribution channel when, in reality, that internal measurement included only HP's Tier 1 channel inventory. Additionally, Lesjak's use of the phrase "channel inventory," in conjunction with statements concerning HP's purported shift to an end-user demand-driven pull model the materially misleading impression that Defendants had visibility through to the end of its distribution chain and knew when the product was purchased by the end-user (or "sell-out") when, in reality, and as they admitted in 2019, Defendants had no visibility into the downstream portion of HP's Supplies inventory channel. Further, Defendant Lesjak's statements in ¶¶ 338-39 were materially false and misleading when made because Defendants failed to disclose that HP employed unsustainable sales practices that had the effect of pushing inventory into the channel at the end of quarters to make targets irrespective of end-user demand as well as the material impact HP's unsustainable sales practices had on the Company's channel inventory levels.

342. On August 23, 2018, HP held an earnings call to discuss financial results for 3Q18. During his prepared remarks, Defendant Fieler stated, "*we continue to operate below our ceilings for Supplies channel inventory*."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

343.  On November 29, 2018, HP held its earnings call to discuss its financial results for 4Q18 and FY18. During Defendant Fieler's prepared remarks, he stated: "***We continue to operate below our ceilings for Supplies channel inventory***."

344.  Following HP's 4Q18 & FY 18 Earnings Call, analysts issued reports reiterating Defendants' statements. In particular, in a November 29, 2018 report titled, "HPQ: Solid Execution; Focus On Intel PC CPU Supply Constraints & Macro Risk," Wells Fargo wrote, "HP noted that it continues to operate below its ceiling for supplies channel inventory." Nearly two weeks later, on December 10, 2018, Wolfe Research issued a report titled, "Reinventing with Sprinkles of Magic; Initiate at Outperform," concluding: "Supplies in the channel continue to be well managed, and the four box model is providing accurate visibility."

345.  Defendant Fieler's statements in ¶¶ 342-43 were materially false and misleading when made. Fieler's use of the phrase "channel inventory" without definition gave the materially misleading impression that the internal measurement, whether expressed as a "range" or a "ceiling," included all of HP's Supplies channel inventory and was a measure of the overall health of HP's entire Supplies multi-tiered distribution channel when, in reality, that internal measurement included only HP's Tier 1 channel inventory. Further, Defendant Fieler's statements in ¶¶ 342-43 were materially false and misleading when made because Defendants failed to disclose that HP employed unsustainable sales practices that had the effect of pushing inventory into the channel at the end of quarters to make targets irrespective of end-user demand as well as the material impact HP's unsustainable sales practices had on the Company's channel inventory levels.

### 3.     Defendants' Materially False and Misleading Trend and Risk Disclosures

346.  HP's 1Q17 Form 10-Q contained the following disclosures regarding "trends, uncertainties and other factors that could impact [its] continuing operating results":

> We continue to experience challenges that are representative of trends and uncertainties that may affect our business and results of operations. . . . A third set of challenges relates to business model changes and our go-to-market execution.
>
> *          *          *
>
> In Printing, we are experiencing the impact of demand challenges in consumer and commercial markets. We are also experiencing an overall competitive pricing environment and the strength of the yen has allowed our Japanese competitors to be aggressive in their pricing. We obtain a number of components from single sources due to technology, availability, price, quality or other considerations. For instance, we source laser printer engines and laser toner cartridges from Canon. Any decision by either party to not renew our agreement with Canon or to limit or reduce the scope of the agreement could adversely

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

affect our net revenue from LaserJet products; however, we have a long-standing business relationship with Canon and do not anticipate non-renewal of this agreement.

347. HP's 2Q17 and 3Q17 Forms 10-Q and HP's FY17 Forms 10-K and 10-K/A contained materially similar disclosures regarding "trends, uncertainties and other factors that could impact [its] continuing operating results," stating:

We continue to experience challenges that are representative of trends and uncertainties that may affect our business and results of operations. . . . A third set of challenges relates to business model changes and our go-to-market execution.

\*       \*       \*

In Printing, we are seeing signs of stabilization of demand in consumer and commercial markets, but are still experiencing an overall competitive pricing environment. We obtain[] a number of components from single sources due to technology, availability, price, quality or other considerations. For instance, we source [. . .] laser printer engines and laser toner cartridges from Canon. Any decision by either party to not renew our agreement with Canon or to limit or reduce the scope of the agreement could adversely affect our net revenue from LaserJet products; however, we have a long-standing business relationship with Canon and [] anticipate []renewal of this agreement.

348. HP's 1Q18, 2Q18, and 3Q18 10-Qs, and 2018 10-K contained the following materially identical disclosures regarding "trends, uncertainties and other factors that could impact [its] continuing operating results":

We continue to experience challenges that are representative of trends and uncertainties that may affect our business and results of operations. . . . A third set of challenges relates to business model changes and our go-to-market execution.

\*       \*       \*

In Printing, we are seeing signs of stabilization of demand in consumer and commercial markets, but are still experiencing an overall competitive pricing environment. We obtain[] [certain] components from single sources due to technology, availability, price, quality or other considerations. For instance, we source the majority of our A4 and a portion of our A3 portfolio of laser printer engines and laser toner cartridges from Canon. Any decision by either party to not renew our agreement with Canon or to limit or reduce the scope of the agreement could adversely affect our net revenue from LaserJet products; however, we have a long-standing business relationship with Canon and anticipate renewal of this agreement. We are also seeing increases in commodity costs . . . .

349. Defendants' statements in ¶¶ 346-48 were materially false and misleading when made because Defendants failed to disclose the known trend of quarter-end discounting leading to an increase in channel inventory, and the unfavorable impact that the trend would have HP's Supplies sales and income, causing HP's reported results to not necessarily be indicative of its future operating results. More

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

specifically, Defendants' statements in ¶¶ 346-48 were materially false and misleading when made because Defendants failed to disclose the existence and impact of the pull-ins and A-Business and the fact that HP continued to engage in unsustainable sales practices to push inventory into the channel at quarter-end in order to meet quotas or targets irrespective of end-user demand. As a result, investors were left with the misleading impression that the trends and uncertainties disclosed in these statements were the sum total of the trends and uncertainties impacting HP's Printing segment when, in reality, HP's unsustainable business practices and the pricing volatility and gray marketing that resulted from them, was a trend and uncertainty that Defendants concealed from investors. Indeed, in September 2019, Defendants added the following language to HP's Printing segment: "We also face challenges in Printing due to our multi-tier distribution network, primarily in EMEA, including limiting grey marketing and the potential misuse of pricing programs." Defendants, however, were aware of all of this information, as well as the impact and risks posed by the pull-ins and gray marketing, and the additional discounts HP utilized to manage the appearance of its inventory channel, by no later than the first half of 2016. Their failure to include this trend in the Class Period Printing segment trend disclosures rendered them each materially misleading when made.

350.  Immediately following the disclosures set forth above in ¶¶ 346-47, each of the 1Q17, 2Q17, and 3Q17 Forms 10-Q referred investors to the "Risk Factors" section set forth in HP's 10-K for the fiscal year ended October 31, 2016. The 1Q17, 2Q17, and 3Q17 Forms 10-Q incorporated by reference the following Risk Factor set forth in the FY16 Form 10-K regarding inventory management:

> Our inventory management is complex, as we continue to sell a significant mix of products through distributors. We must manage both owned and channel inventory effectively, particularly with respect to sales to distributors, which involves forecasting demand and pricing challenges. Distributors may increase orders during periods of product shortages, cancel orders if their inventory is too high or delay orders in anticipation of new products. Distributors also may adjust their orders in response to the supply of our products and the products of our competitors and seasonal fluctuations in end-user demand. Our reliance upon indirect distribution methods may reduce our visibility into demand and pricing trends and issues, and therefore make forecasting more difficult. If we have excess or obsolete inventory, we may have to reduce our prices and write down inventory. Moreover, our use of indirect distribution channels may limit our willingness or ability to adjust prices quickly and otherwise respond to pricing changes by competitors.

351.  Additionally, immediately following the disclosures set forth above in ¶ 347 regarding the "trends, uncertainties and other factors that could impact [its] continuing operating results," the FY17

1  Forms 10-K and 10-K/A referred investors to the "Risk Factors" section of the same report. The "Risk

2  Factor" section of the FY17 Form 10-K and 10-K/A included the same risk disclosures from HP's FY16

3  Form 10-K referenced above in ¶ 350.

4      352.  Further, immediately following the disclosures set forth above in ¶ 348 regarding the "trends,

5  uncertainties and other factors that could impact [its] continuing operating results," each of the 1Q18,

6  2Q18, and 3Q18 10-Qs referred investors to the "Risk Factors" set forth in HP's 2017 10-K. The 1Q18,

7  2Q18, and 3Q18 Forms 10-Q incorporated by reference the risk disclosure referenced above in ¶ 350.

8      353.  Similarly, immediately following the disclosures set forth above in ¶ 348 regarding the

9  "trends, uncertainties and other factors that could impact [its] continuing operating results," the FY18 Form

10  10-K referred readers to the "Risk Factors" section of the same report. The "Risk Factor" section of the

11  FY18 Form 10-K included the same risk disclosures from HP's FY16 Form 10-K referenced above in

12  ¶350.

13      354.  Defendants' statements in ¶¶ 346-53 were materially false and misleading when made

14  because Defendants failed to disclose the known risk of quarter-end discounting leading to an increase in

15  channel inventory, as well as gray marketing. More specifically, Defendants' statements in ¶¶ 346-53 were

16  materially false and misleading when made because Defendants failed to disclose the existence and impact

17  of the pull-ins and A-Business and the fact that HP continued to engage in unsustainable sales practices to

18  push inventory into the channel at quarter-end in order to meet quotas or targets irrespective of end-user

19  demand. As a result, investors were left with the misleading impression that the risk factors disclosed in

20  these statements were the sum total of the risk factors impacting HP's inventory management when, in

21  reality, HP's unsustainable business practices that cannibalized future sales, and the excess channel

22  inventory that resulted from them, posed a significant and material risk to the Company and its future sales

23  and income that Defendants concealed from investors.

24      355.  Indeed, December 2019 and again in December 2020, Defendants added language to HP's

25  inventory management risk disclosures, including that HP utilized "a multi-tiered channel" which "may

26  reduce our visibility into inventories," that "[s]ales of our products by channel partners to unauthorized

27  resellers or unauthorized resale of our products could also make our forecasting more difficult and impact

28  pricing in the market," that "factors in different markets may cause differential discounting between the

geographies where our products are sold, which makes it difficult to achieve global consistency in pricing and creates the opportunity for grey marketing," and that "in the past we have had channel partners sell products outside of their agreed territory, and misrepresent sales to unauthorized resellers as sales to end-users, frustrating our efforts to estimate channel inventory and maintain consistent pricing, and negatively impacting gross margins." Defendants, however, were aware of all of this information, as well as the impact and risks posed by the pull-ins and A-Business, and the additional discounts HP utilized to manage the appearance of its inventory channel, by no later than the first half of 2016. Their failure to include these risk factors in the Class Period inventory management risk disclosures rendered them each materially misleading when made.

**B.** **Defendants' Materially False and Misleading Statements Regarding the Four Box Model**

      **1.** **Defendants' Materially False and Misleading Statements Regarding the Telemetry Data Purportedly Informing the Four Box Model**

356. During the March 1, 2017 Conference, Morgan Stanley analyst Katy Huberty questioned Defendant Weisler about "the elements" of the Four Box Model that gave HP "confidence" that it would stabilize supplies. In response, Defendant Weisler stated:

> **WEISLER**: We first introduced the concept of the four-box model to the market when we separated the Company. We've been operating in this four-box model for many years. And it's a method that – it's just a model, like all of your models. You've got very complicated models. You have some assumptions. You've got some trailing data. You've got some data that looks forward. ***And we have all that data, as well. We have an incredible amount of data. Our printers in many cases phone home, sending us all sorts of information about usage. We know what the install base is. We know what we plan to put into the market. We know what the analysts are saying the market size is going to be. And we put all of that information into this model, and we call it the four-box model because it has four drivers***.

357. Analyst reacted favorably to Defendant Weisler's remarks. For example, on April 12, 2017, Morgan Stanley issued a report titled, "Building Durable Earnings Stream; Increase PT to $22," announcing a price target increase: "Across HP's printer line-up, improved analytics and 'phone home' capabilities provide management with better visibility into supplies usage trends. On the back of this, we forecast 80bps of Y/Y supplies growth exiting FY17, accelerating to 3.5% in FY18 . . . . Price target

increase to $22 (from $19) reflective of growth inflection and improving earnings durability." Morgan Stanley further stated: "We expect HP's high margin printer business to at least stabilize exiting FY17."

358.  Defendant Weisler's statements in ¶ 356 were materially false and misleading when made because he failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendant Weisler's statements gave investors the misleading impression that his statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendant Weisler's statements in ¶ 356 were materially false and misleading when made because he lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

359.  Additionally, Weisler's statements in ¶ 356 assuring investors that the Four Box Model was based on real-time data from HP's printers, including his statements that "[w]e have an incredible amount of data" and that "[o]ur printers in many cases phone home, sending us all sorts of information about usage" were materially false and misleading when made because, as Defendants later admitted, prior to 2019, as a result of enterprise firewall constraints and unconnected units, many toner-based printers *did not* send telemetry data to HP and the Company therefore *never had* statistically significant telemetry data for its toner-based printers, and instead relied on lagging and incomplete third-party market share surveys that were not changing over time to calculate market share for its toner-based printers.

360. During the 2Q17 Earnings Call, Defendant Weisler responded to Wells Fargo analyst Maynard Um's question regarding HP's ability "to place high-NPV printers":

> **UM**: So part of the [bear] thesis is that the Print market is in secular decline yet you've still been able to place high-NPV printers now pretty consistently. Is there a point where you think you won't be able to place any more of these printers and we start to see those profits flow down? Or has there been a change in the secular story in the broader Print market?
>
> **WEISLER**: I would say that, generally speaking, the answer always lies much more deeply down in the segmentation, that you can't tackle the Print market with a single brush. . . . . obviously, *we remain focused on the high-quality NPV units. We're getting a lot more*

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*big data, we're leveraging that big data to understand exactly where we're going to make those investments*. . . .

361.  Defendant Weisler's statements in ¶ 360 that "[w]e're getting a lot more big data" and "we're leveraging that big data to understand exactly where we're going to make those investments" were materially false and misleading when made because, as Defendants later admitted, prior to 2019, as a result of enterprise firewall constraints and unconnected units, many toner-based printers *did not* send telemetry data to HP and the Company therefore *never had* statistically significant telemetry data for its toner-based printers, and instead relied on lagging and incomplete third-party market share surveys that were not changing over time to calculate market share for its toner-based printers.

362.  During the FY17 SAM, Defendant Lores emphasized, among other things, the quality and quantity of the data used in the Four Box Model, stating:

> Let me talk now about the second capability. Big data and analytics are becoming very important both in how do we manage our business but especially on how do we improve the profitability going forward and therefore, how do we improve shareholder value. ***This is based on the ability that we -- and the capacity that we have now to connect with millions of printers in our installed base and to capture the data from them***. And I thought that rather than explaining it at a very high level, it was better to give 3 clear examples of things that we are doing today to leverage and to use this data. The first chart shows how we are able to monitor and to measure at the country level and what is the usage across different territories. Dion talked before about the heat in the market. This is one way for us to look at the heat in the market, and we can use this data to define specific marketing programs in those areas. The chart in the middle shows how do we use this at a more granular level. We work with some of our partners to understand what is the connect rate between supplies and hardware at the store level. And this enables us to build specific sales programs in those stores to improve that connect rate. And the third chart shows a very different use. In the past, we have talked about looking at the profitability per printer. ***Now we can look at the profitability per printer and per user, and this helps us to identify opportunities to improve our overall profitability by defining new type of products or defining new types of service models. This is really fundamental for us. It's going to be fundamental for us to manage our supplies business in the future***.

363.  Analysts were reassured by Defendants' statements. For example, Morgan Stanley credited many of Lores' statements in twin reports following the meeting. First, on October 13, 2017, in a report titled, "SAM 2017: Stabilization Shifts to Acceleration," Morgan Stanley reported that "[i]mproved data and analytics on customer usage and lower supplies channel inventory increase visibility of supplies

revenue, reducing earnings risk, in our view." Then in an October 18, 2017 report titled, "Management Meeting Reinforces Long-Term Growth Strategy," Morgan Stanley concluded:

> The ability to continuously collect data from the printer installed base means HP can more accurately forecast supplies usage per printer down to a zip code level and understand the elasticity of demand for customers in order to improve pricing and usage in a more targeted fashion. We therefore believe that, with a stabilizing office installed base and the capability to leverage big data to more accurately segment and optimize the market from a share, usage and pricing standpoint, supplies revenue will continue to grow in FY18, despite a declining inkjet installed base.

364. Defendant Lores' statements in ¶ 362 were materially false and misleading when made because he failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendant Lores' statements gave investors the misleading impression that his statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendant Lores' statements in ¶ 362 were materially false and misleading when made because they lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

365. Specifically, Defendant Lores' statements in ¶ 362 assuring investors that the Four Box Model was based on real-time data from HP's printers, including his statement regarding the "capacity that we have now to connect with millions of printers in our installed base and to capture the data from them," were materially false and misleading when made because, as Defendants later admitted, prior to 2019, as a result of enterprise firewall constraints and unconnected units, many toner-based printers **did not** send telemetry data to HP and the Company therefore **never had** statistically significant telemetry data for its toner-based printers, and instead relied on lagging and incomplete third-party market share surveys that were not changing over time to calculate market share for its toner-based printers.

366. During the May 31, 2018 Conference, Sanford C. Bernstein analyst Toni Sacconaghi asked Defendant Weisler to discuss the "levers within" the Four Box Model:

**SACCONAGHI**: And Dion, in terms of the levers within 4-box, I don't want to mechanically go through each one, but are there 1 or 2 that are sort of positive pluses and minuses? Meaning -- I know aftermarket capture rates is obviously a very big factor. You move that needle a little bit either way. That can really have a big impact. Obviously, install base is a big factor. So are there 1 or 2 levers that structurally are getting a little bit better, becoming more of a challenging headwind within that model that you could highlight for people without, again, untangling the whole thing?

\*     \*     \*

**WEISLER**: So I would say the install bases is just such a complicated box all by itself Because not all units are created equally. Some units return more supplies than other units, home versus office, different countries, different ZIP codes. ***And that's the kind of big data that we have that informs us about where we want to make those investments because every print unit we place, by and large, is an investment that returns supplies over time. So figuring out exactly where you want to place those units and ensuring that they're NPV positive is an entirely big, big data exercise in and of itself*** . . . . ***Usage is running pretty much according to plan, and pricing is just a function of market elasticity and deeply understanding again, through big data, what the competitive environment is looking like region by region, country by country.***

367.  During the June 6, 2018 Conference, Bank of America Merrill Lynch analyst Wamsi Mohan asked Defendants Fieler and Lesjak questions regarding the Four Box Model, including the following exchange:

**MOHAN**: Maybe, Steve, to follow up to placing these positive NPV units, I know also you guys have had a focus on sort of lowering the cost structure within that model so that every model allows you to chase a larger TAM in terms of positive NPV units, and you guys have done an excellent job of that. But can you give us some perspective, looking at this through the 4-box model, can you like maybe distill it down to what those key drivers are that you look at? What are the biggest sort of drivers as we look out over the next couple of years that will influence that supplies growth based on your 4-box model?

**FIELER**: Sure. Actually, this is an example where I mentioned I left the company and returned, and one of the first things I did is actually looked at the 4-box model. . . . ***And it's actually rather detailed as you look at geographies and SKUs and things, and it's only getting better with the incremental data and insight we get from our installed base*** . . . .

368.  Following Mohan's question-and-answer session with Defendants Fieler and Lesjak, other analysts posed questions regarding HP's business. For instance, another analyst inquired regarding the Four Box Model:

**UNIDENTIFIED ANALYST**: So just touching on the 4-box model, how often do you go back and check whether it's actually working? How do you judge the success of that model? For example, if you say that you're placing an NPV -- what do you think is an

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

NPV-positive printer, how often you go back and check whether that customer actually bought the quantity of supplies that you actually thought that they would?

**LESJAK**: So it's pretty difficult for us to go to a specific customer, given privacy and what have you, but your printers, ***many of your printers phone home to us and tell us what kind of usage we're getting. So we can look at, let's say, the United States, and we can to this in other countries, but you can look at the United States and you can actually zero in on a ZIP Code and know whether or not these types of SKUs in that ZIP Code tend to buy, on average, a lot of supplies or not***. We can't tell at an individual level. If we could, then there's probably some individuals we wouldn't sell to. ***But broadly, we can see inside the ZIP Code level, and we get that data all the time***. ***And we are always updating kind of the view of what is an NPV-positive SKU in order to make sure that we're placing those units***. This is the single biggest investment that we make every day, every quarter, every year.

369.   Defendants' statements above in ¶¶ 366-68 were materially false and misleading when made because they failed to disclose that the Four Box Model was fundamentally flawed, inaccurate, and unreliable. In particular, as Defendants later admitted, the Four Box Model lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and, instead, unbeknownst to investors, utilized inaccurate, stale, and lagging third-party survey data. The lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate. As a result, Defendants' statements gave investors the misleading impression that their statements that the Supplies business would be stable and viable had a reliable and accurate basis, when in fact they did not. Also, Defendants' statements in ¶¶ 366-68 were materially false and misleading when made because they lacked any reasonable basis, given that the lack of sufficient, accurate, or otherwise reliable telemetry data and the use of inaccurate, stale, and lagging third-party survey data made the Four Box Model unreliable and inaccurate.

370.   More specifically, Weisler's statement in ¶ 366 assuring investors that the Four Box Model was based on real-time data from HP's printers, including his statements about the "big data that we have that informs us" and the Defendants were able to "understand[]" "through big data, what the competitive environment is looking like region by region, country by country," Defendant Lesjak's statement in ¶ 368 that "many of your printers phone home to us and tell us what kind of usage we're getting," that "we can see inside the ZIP Code level, and we get that data all the time," and Defendant Fieler's statement in ¶ 367 that HP had and that the Four Box Model was "only getting better with the incremental data and insight

we get from our installed base" were materially false and misleading when made because, as Defendants

later admitted, prior to 2019, as a result of enterprise firewall constraints and unconnected units, many

toner-based printers did not send telemetry data to HP and the Company therefore never had statistically

significant telemetry data for its toner-based printers, and instead relied on lagging and incomplete third-

party market share surveys that were not changing over time to calculate market share for its toner-based

printers.

### 2.   Defendants' Materially False and Misleading Statements Regarding the Placement of Hardware Units

371.   During the 1Q17 Earnings Call, Defendant Lesjak engaged in the following colloquy with

Sanford C. Bernstein analyst Toni Sacconaghi:

> **SACCONAGHI**: I'm wondering if you can comment a little bit on printing operating margin dynamics? Operating margins for the printing segment were at 16%, and arguably you had a more favorable mix than you had envisioned. I think you had forecast that supplies would be down mid single-digits, and they were only down 2% in constant currency. So I'm just wondering, was there anything -- and if I look at hardware unit growth, it was good year-over-year, but that was a really easy comp. Sequentially, it was actually the lowest in the last seven years, in terms of hardware revenue on a sequential basis. So my question is the 16%, which I think is a decline from what we saw in Q3 and Q4 on an adjusted normalized basis, what drove that 16%, and is that sort of the right normalized level to think about, or what dynamics impacted that?

> **LESJAK**: . . . What I said on the Q4 earnings call is still true on the Q1 earnings call, and that's that we don't target a particular rate for print from an operating profit perspective, but we do expect that in 2017, that it'll be in that mid teens, kind of 16% to 18%. And the variability in that range is largely going to be driven by units that we place. And we've got a cost structure now that we think is quite competitive, and ***has allowed us to open up TAM for more positive NVP units. And when they're available, we want to go ahead and take advantage of them. And so, that's what we did this quarter,*** and we look forward to doing that the rest of the year as well.

372.   Following the 1Q17 Earnings Call, analysts issued reports echoing Defendants' statements

regarding placement of NPV positive printer units. For instance, RBC noted that "HPQ continues to

opportunistically use gross cost savings to place NPV positive print hardware units" in a February 22, 2017

report. That same day, BMO Capital Markets issued a report asserting that "[m]anagement continues to

expect Supplies sales to stabilize by late FY17, as the printer placement actions gradually create more

sustainable consumption . . . . management attributes the weakness [in the Printing operating margin] to

placement of positive NPV units, which should drive revenue growth longer-term." On February 23, 2017,

FBN Securities issued a report concluding that "HPQ has decided to sacrifice some printer margin to sell

more 'high-NPV' units (meaning that they can, over time, better help grow the supplies business, which is higher margin [hence high-NPV])." Similarly, Wells Fargo issued a February 23, 2017 report stating, "HPQ noted it had good success in placing positive NPV (net present value) hardware units and improving the quality of the install base," and concluding "we continue to believe reinvestment into positive NPV (net present value) printer placements is the right strategic decision that could help drive margins in future quarters."

373. Defendant Lesjak's statements in ¶ 371 were materially false and misleading when made because Defendants failed to disclose that HP was pushing hardware into the channel to meet monthly quotas and quarterly targets irrespective of whether those units were NPV positive. Defendant Lesjak's statements in ¶ 371 also were materially false and misleading when made because Defendants failed to disclose that HP did not have sufficient data to know whether a printer would be NPV positive when it was sold into the channel. As Defendants admitted in 2019, HP was not receiving sufficient usage and share information via telemetry data for toner-based printers, and, as such, Defendants would not have known whether a unit was NPV positive when it sold it into the channel.

374. During the March 1, 2017 Conference, Morgan Stanley analyst Katy Huberty questioned Defendant Weisler regarding HP's placement of printer units:

**HUBERTY**: Now, you brought up the fact that people worry that the install base has been declining and that's part of the reason why people didn't believe the supplies story. But you have turned around hardware. Hardware units were declining 20% if you go back a year ago. You've seen growth in recent quarters. So how important is that growing placement story to achieving the goal?

**WEISLER**: Well, it's an accelerator [sic]. If you have more MPV-positive units in the plan that are all yielding supplies, then it's going to get you there faster than if you didn't have it and you were just relying on the other three levers. So there comes the important initiative that we drove to take that $1 billion of cost out of the business. Because if we get that underlying cost out of the business, we have the potential to place more positive MPV units. *That's what we did*.

So after Q4 of last year, on the earnings call we said -- listen, we're going to go to work. We expect this competitive environment is the new norm. We're going to take this cost out of the business. We want to place those units. *We're not placing share for share's sake. There has to be positives. That's rule number one.* And then when we place it and we go from negative 20 to negative 16 to negative 12, I think it was, or 10, and then now we're plus 6, it makes a difference. And that's just off the back of the [cost] work that we were able to do.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

375.  Following Defendant Weisler's statements at the March 1, 2017 Conference, Wells Fargo issued a report on March 6, 2017, concluding: "While reinvestments into positive NPV printer placements have been impacting margins to some degree, we are comfortable with that as it provides better visibility to future revenue streams."

376.  Defendant Weisler's statements in ¶ 374 were materially false and misleading when made because Defendants failed to disclose that HP was pushing hardware into the channel to meet monthly quotas and quarterly targets irrespective of whether those units were NPV positive. Defendant Weisler's statements in ¶ 374 also were materially false and misleading when made because Defendants failed to disclose that HP did not have sufficient data to know whether a printer would be NPV positive when it was sold into the channel. As Defendants admitted in 2019, HP was not receiving sufficient usage and share information via telemetry data for toner-based printers, and, as such, Defendants would not have known whether a unit was NPV positive when it sold it into the channel.

377.  During the September 6, 2017 Conference, Defendant Lesjak responded to a question from Citi analyst Jim Suva regarding HP's focus on placing NPV units:

> **SUVA**: Cathie, what I like to do, if it's okay now is shift from the bigger-picture items to maybe your 2 different reporting business segments and I'd like to focus on printing first. And on purpose, I want to focus on printing because that's where you make the majority of your profits and the biggest pushback I get from investors, of people saying printing is dead and going through the structural headwinds that people are printing less. You've talked about extensively, both at your Securities Analyst Meeting and your conference calls about positive NPV units and stabilizing the supplies in the channel. And I believe you recently announced that you're a quarter ahead on that. Can you remind investors who may not be up to speed on the actions you've done about what exactly you have done and why?

> **LESJAK**: Sure. So not only is a big portion of our profits coming from Print, but when you further drill down, a big portion of the profits is really coming from supplies because we typically have a business model, where you place the units at very low margins or negative margins and you basically then get the supplies annuity to give you a positive NPV. So that means you really have to look at what your supplies business -- how to drive your supplies business. And that's where we talk about kind of the 4 levers that we have to pull, and if we pull all of these levers in the right mix, then that enables us to stabilize supplies in constant currency. We also call them that 4-box model drivers. The first one is units. So it is important to have units. And so ***we do focus on placing positive NPV units and taking advantage of the opportunities that we see to go ahead and do that***. But then you have to focus on almost more importantly, the second driver, which is usage. So giving a bunch of units that actually don't connect a lot or barely make a positive NPV isn't particularly fascinating. It's interesting, but not fascinating, I think is the expression. It's really important to get usage. ***And so that's where we focus on higher usage printer hardware units.*** That's where the fact that we have this disruptive technology in the A3 space is so incredibly important, because commercial units and A3 units are workhorse printers. They consume a lot of supplies. ***So we want to make sure we place the units, but***

*we also want to make sure we got high-quality units. And we're seeing that shift in our portfolio, in our installed base over time.* So those are the first 2 drivers: Units, usage. . . .

378.  During the FY17 SAM, Defendant Lores made a presentation concerning the printer business. In his prepared remarks, Lores stated the following with respect to growth in the Supplies business:

> You may be asking what did we do to stabilize the supplies business. It was all about rigorous execution of all the actions that influence the 4 drivers of the supplies business. *It is about improving the installed base, increasing usage, improving the mix of units that we share, that we ship, increased share and price. This is what we did*. . . .

379.  Also during the FY17 SAM, Defendants Lores and Weisler responded to questions from Deutsche Bank analyst Sherri Ann Scribner:

> **SCRIBNER**: And then for my second question on the Printer side, more of the questions I get from investors is, the hardware business didn't really grow or it's kind of bouncing around sometimes negative, sometimes positive this year. Hardware is really what drives the long-term sustainability of the supply's business. So how should we think about hardware growth next year? Are we going to start to see some consistent revenue growth in that? That would make investors feel more comfortable if the sustainability of the supply's business is there?
>
> **LORES**: I'm going to your question about Print. We have actually been growing both unit placements and hardware revenue during the last quarters. So we changed the trajectory of the business from that perspective. But even more important than that is that *we continue improving the quality of the units that we place*, because this is really what drives supply's revenue. So it's not only about how many units we place, it's a combination of the number of units and the value of those units. And as I was showing in the chart, *we have been improving that very steadily during the last 5 years*, and this is really what is driving the growth in the supply side.
>
> **WEISLER**: I mean, I think hats off to the Print team. They have taken what seems to be a fairly simple business, which is actually pretty complicated and used a lot of data and analytics and modeling to really understand what was driving the business and then built plans that didn't just do 1 or 2 things, did a whole handful of things across many customers, many geographies around the world. *Not just chase, again, share for share's sake but take quality share*, drive print relevance through incredible marketing campaigns that Antonio and his team do to bring Print alive. . . .

380.  Following the FY17 SAM, analysts issued reports reiterating Defendants' statements. For example, on October 13, 2017, Morgan Stanley issued a report noting that HP's Printing operating margin outlook "assumes the strategy of placing more positive NPV, but initially money losing, hardware units continue."

381.  Defendants' statements in ¶¶ 377-79 were materially false and misleading when made because Defendants failed to disclose that HP was pushing hardware into the channel to meet monthly

quotas and quarterly targets irrespective of whether those units were NPV positive. Defendants' statements in ¶¶ 377-79 also were materially false and misleading when made because Defendants failed to disclose that HP did not have sufficient data to know whether a printer would be NPV positive when it was sold into the channel. As Defendants admitted in 2019, HP was not receiving sufficient usage and share information via telemetry data for toner-based printers, and, as such, Defendants would not have known whether a unit was NPV positive when it sold it into the channel.

382.   During the question and answer portion of the 4Q17 & FY17 Earnings Call, Defendant Weisler stated:

> **WEISLER**: And Katy, just to reiterate a point that Cathie made to Jim's question. The rate was slightly down this quarter, but *we did play sequentially many more units than we ordinarily wouldn't, of course. That, being the razor-razorblade business model, generates returns over time. It's positive NPV units and a good deal for our investors.*

383.   Following the 4Q17 & FY17 Earnings Call, a Maxim November 22, 2017 report concluded that "revenue upside was offset by ongoing placement of 'positive NPV' printer units more so than prior periods, or in other words, initially margin-dilutive to negative printer units that will generate supply revenue stream, with operating profits that will exceed the effective upfront investment." That same day, UBS issued a report noting that "[p]lacement of hardware drove the printer margin down to 16.6%, a disappointment for some investors but critical to long term supplies stability."

384.   Defendant Weisler's statements in ¶ 382 were materially false and misleading when made because Defendants failed to disclose that HP was pushing hardware into the channel to meet monthly quotas and quarterly targets irrespective of whether those units were NPV positive. Defendant Weisler's statements in ¶ 382 also were materially false and misleading when made because Defendants failed to disclose that HP did not have sufficient data to know whether a printer would be NPV positive when it was sold into the channel. As Defendants admitted in 2019, HP was not receiving sufficient usage and share information via telemetry data for toner-based printers, and, as such, Defendants would not have known whether a unit was NPV positive when it sold it into the channel.

385.   During the question and answer portion of the 1Q18 Earnings Call Defendant Lesjak responded to a question from Citi analyst Jim Suva, as follows:

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**SUVA**: For Cathie, the operating margins in Print segment, which went down, I believe, about 20% -- 20 basis points year-over-year. Is that solely attributable to the Samsung integration or investing or something else?

**LESJAK**: So let me start with the Print margins. There are a few factors to consider. . . . *The second one is the NPV positive unit placement. We have seen a significant increase sequentially relative to normal seasonality with unit placements. And of course, we all know that you've got to place the units in order to get the recurring revenue on Supplies. . . .*

386. Following the 1Q18 Earnings Call, analysts issued reports reiterating Defendant Lesjak's statement. For example, Morgan Stanley issued a February 23, 2018 report noting that "the company highlighted growth irrespective of the Samsung addition as placing positive NPV units remains a key focus area despite the ongoing integration." In a report the same day Maxim Group concluded: "We believe the IPG [Image and Printing Group] upside was offset by ongoing placement of 'positive-NPV' printer units similar to prior periods, which tend to be margin dilutive initially, but then go-on to produce an approximate 7 year stream of supply revenues with cumulative operating profits generating an overall ROIC that is well above the company's WACC."

387. Defendant Lesjak's statements in ¶ 385 were materially false and misleading when made because Defendants failed to disclose that HP was pushing hardware into the channel to meet monthly quotas and quarterly targets irrespective of whether those units were NPV positive. Defendant Lesjak's statements in ¶ 385 also were materially false and misleading when made because Defendants failed to disclose that HP did not have sufficient data to know whether a printer would be NPV positive when it was sold into the channel. As Defendants admitted in 2019, HP was not receiving sufficient usage and share information via telemetry data for toner-based printers, and, as such, Defendants would not have known whether a unit was NPV positive when it sold it into the channel.

388. During his prepared remarks as part of the 2Q18 Earnings Call, Defendant Weisler stated, "*[W]e remain strongly positioned to place NPV positive units*."

389. During the June 6, 2018 Conference, Bank of America Merrill Lynch analyst Wamsi Mohan asked Defendant Lesjak about HP's Print segment profit margins:

**MOHAN**: If we move to Printing, which is basically the bulk of where your profits reside, when you look at the long-term margin targets that you have there, what does it take to really get towards the high end of your long-term margin target?

**LESJAK**: So first off, I think it's important that -- to understand that we don't have a target for quarterly of what the operating profit margin should be, rates should be. And the reason

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

for that is *we really want to place positive NPV units.* And many of those units come in and you have to place them at a loss or a very low margin. But of course, that creates a beautiful flywheel, a positive flywheel effect of those supplies over time. And so *we're very focused on placing those units,* and that can sometimes cause some volatility, among other factors, in the operating profit rate. We do expect that long term, we'd be at 16% -- in the 16% to 18% range. And the other thing is that as we fully integrate Samsung, the Samsung print business, or S-Print as we call it, and it's ramping along with the A3 ramp, and then also this continued focus on delivering on productivity initiatives, which is a never-ending task, we do expect that, over time, the margins will improve from the 60% that we delivered in Q2.

390. During his prepared remarks for the 3Q18 Earnings Call, Defendant Fieler stated, "The primary drivers of the year-over-year margin decline were the addition of S-Print and the *strong unit placements* and investments in growth and future initiatives, including A3 and 3D printing. Additionally, as expected, we experienced increased raw material cost in the quarter, which should remain elevated in Q4."

391. Following the 3Q18 Earnings Call, analysts issued reports echoing Defendant Fieler's statement. For instance, in an August 23, 2018 report Wells Fargo wrote: "Wells Thought: While we think some investors could focus on HP's printer operating margins as remaining at the low-end of the company's 16%-18% range, we think the company's overall F3Q18 Printing results reflect consistent execution to the company's 4-Box operating model strategy—i.e., strategic placement of +NPV hardware units for future recurring revenue growth . . . ."

392. Defendants' statements in ¶¶ 388-90 were materially false and misleading when made because Defendants failed to disclose that HP was pushing hardware into the channel to meet monthly quotas and quarterly targets irrespective of whether those units were NPV positive. Defendants' statements in ¶¶ 388-90 also were materially false and misleading when made because Defendants failed to disclose that HP did not have sufficient data to know whether a printer would be NPV positive when it was sold into the channel. As Defendants admitted in 2019, HP was not receiving sufficient usage and share information via telemetry data for toner-based printers, and, as such, Defendants would not have known whether a unit was NPV positive when it sold it into the channel.

393. During his prepared remarks at the FY18 SAM, Defendant Fieler stated, "We will continue to focus on placing NPV-positive units. . . . *We've been placing more units over the past 2 years across consumer and commercial*."

394.  Following the FY18 SAM, RBC Capital Markets issued a report on October 16, 2018 noting that "higher mix of NPV positive hardware unit placement . . . also weigh on margins."

395.  Defendant Fieler's statements in ¶ 393 were materially false and misleading when made because Defendants failed to disclose that HP was pushing hardware into the channel to meet monthly quotas and quarterly targets irrespective of whether those units were NPV positive. Defendant Fieler's statements in ¶ 393 also were materially false and misleading when made because Defendants failed to disclose that HP did not have sufficient data to know whether a printer would be NPV positive when it was sold into the channel. As Defendants admitted in 2019, HP was not receiving sufficient usage and share information via telemetry data for toner-based printers, and, as such, Defendants would not have known whether a unit was NPV positive when it sold it into the channel.

396.  During the question and answer portion of the 4Q18 & FY18 Earnings Call, UBS analyst Jon Marc Andre Roy asked Defendant Fieler about HP's Print segment margins:

> **ROY**: So you were able to pretty much hit your Print margin number for the quarter. Can you give us the puts and takes that would make that move around for the rest of fiscal '19? And what are you thinking essentially all-in when you sum it all together where you might come out for '19?

> **FIELER**: Well, we're pleased with the profit we drove in Print in Q4. . . . ***We're also going to continue to place units where we see NPV positive opportunities to do so.*** . . .

397.  During the same call, JP Morgan analyst Paul Coster asked Defendant Fieler about HP's Print segment market share:

> **COSTER**: Okay. One quick follow-up. The printer market share seems to bounce around a little bit. It's up year-on-year but only 200 basis points, which is a little less market share gain than the prior quarter. Probably doesn't mean much is my guess, but I'm just wondering if you can give us a little bit of color on whether there's any segments in which you think you're outperforming strongly or struggling a little bit.

> **FIELER**: Yes, I mean, we concur. I mean, I think the market in the long term has some ups and downs and pockets of growth. And in any particular quarter, share shifts will occur. ***For us, we're going to remain very disciplined on pursuing profitable share. It's what we did in the last quarter, and you see it in the calendar quarter 3. Where there's some pockets of the overall market, we're choosing not to compete.*** And we see that primarily on the low-end consumer. . . .

398.  Following the 4Q18 & FY18 Earnings Call, Wells Fargo issued a report on November 29, 2018 contending, "Wells Thought: HP continues to successfully execute on its 4 Box operating model strategy that calls for the strategic placement of +NPV hardware units for future recurring revenue growth."

399.  Defendant Fieler's statements in ¶¶ 396-97 were materially false and misleading when made because Defendants failed to disclose that HP was pushing hardware into the channel to meet monthly quotas and quarterly targets irrespective of whether those units were NPV positive. Defendant Fieler's statements in ¶¶ 396-97 also were materially false and misleading when made because Defendants failed to disclose that HP did not have sufficient data to know whether a printer would be NPV positive when it as sold into the channel. As Defendants admitted in 2019, HP was not receiving sufficient usage and share information via telemetry data for toner-based printers, and, as such, Defendants would not have known whether a unit was NPV positive when it sold it into the channel.

400.  On January 8, 2019, HP attended the CES Citigroup TMT West Conference in Las Vegas, Nevada. During the January 8, 2019 Conference, Citi analyst Jim Suva asked Defendant Lores about HP's Print segment hardware market share:

> **SUVA**: So what I'd like to do by opening things up is first of all thank Enrique for joining us here today, and maybe can we talk a little bit about your market share gains in the print division? It's been very impressive. How have you gained so much of your market share gains, while at the same time also improving your profits, because a lot of times companies gain shares while their profits go the opposite direction.

> **LORES**: Yes. I think it has been a consequence of the separation that we did 3 years ago. A need -- have really help us to have a much stronger performance than what the business had had in the past. And because of separation, we were able to do three things. *We were able to improve our operational processes, getting much more disciplined in managing and defining what units to place since our business is really driven by printers, but especially by supplies.* . . .

401.  Defendant Lores' statements in ¶ 400 were materially false and misleading when made because Defendants failed to disclose that HP was pushing hardware into the channel to meet monthly quotas and quarterly targets irrespective of whether those units were NPV positive. Defendant Lores' statements in ¶ 400 also were materially false and misleading when made because Defendants failed to disclose that HP did not have sufficient data to know whether a printer would be NPV positive when it was sold into the channel. As Defendants admitted in 2019, HP was not receiving sufficient usage and share information via telemetry data for toner-based printers, and, as such, Defendants would not have known whether a unit was NPV positive when it sold it into the channel.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

3. **Defendants' Materially False and Misleading Statements Regarding HP's Supplies Market Share**

402.  During the September 6, 2017 Conference, in response to Citi analyst Jim Suva's question seeking insight into the steps HP had recently taken to stabilize the Supplies business, Defendant Lesjak addressed the "market share" box of the Four Box Model, stating, "***you've also seen us have progress in our market share***."

403.  Defendant Lesjak's statement in ¶ 402 that "you've also seen us have progress in our market share" was materially false and misleading when made because Defendants failed to disclose that they never had the "big data" necessary to reliably and accurately determine HP's Supplies market share. In fact, HP later conceded that it "did not have . . . the capabilities to calculate share for toner-based products in the installed base." Instead, HP was using "lagging and incomplete" third-party market share data "that wasn't changing over time" to reflect true market conditions. As a result, investors were left with the misleading impression that HP's critical Supplies market share had improved when it had not. Indeed, as Defendants later admitted, HP's true market share was actually "significantly lower" than they previously represented and that although HP "previously had an arrow going up of gaining share, given the new data," Defendants "actually expect[ed] share to be down to a lesser extent on office."

404.  During HP's FY17 SAM, Defendant Lores made a presentation concerning the printer business. During his prepared remarks at the FY17 SAM, Lores stated the following with respect to growth in the Supplies business:

> You may be asking what did we do to stabilize the supplies business. It was all about rigorous execution of all the actions that influence the 4 drivers of the supplies business. It is about improving the installed base, increasing usage, improving the mix of units that we share, that we ship, ***increased share and price. This is what we did.***

405.  During his presentation at the FY17 SAM, Defendant Lores displayed the following slide, which showed market share increasing for office Supplies:

406. Defendant Lores' Defendants' statements and presentation slides set forth in ¶¶ 404-05 assuring investors that HP's Supplies market share was improving were materially false and misleading when made because Defendants failed to disclose that they never had the "big data" necessary to reliably and accurately determine HP's Supplies market share. In fact, HP later conceded that it "did not have . . . the capabilities to calculate share for toner-based products in the installed base." Instead, HP was using "lagging and incomplete" third-party market share data "that wasn't changing over time" to reflect true market conditions. As a result, investors were left with the misleading impression that HP's critical Supplies market share had improved when it had not. Indeed, as Defendants later admitted, HP's true market share was actually "significantly lower" than they previously represented and that although HP "previously had an arrow going up of gaining share, given the new data," Defendants "actually expect[ed] share to be down to a lesser extent on office."

407. During the May 31, 2018 Conference, Sanford C. Bernstein analyst Toni Sacconaghi asked Defendant Weisler to discuss the "levers within" the Four Box Model:

> **SACCONAGHI**: And Dion, in terms of the levers within 4-box, I don't want to mechanically go through each one, but are there 1 or 2 that are sort of positive pluses and minuses? . . . Obviously, install base is a big factor. So are there 1 or 2 levers that structurally are getting a little bit better, becoming more of a challenging headwind within that model that you could highlight for people without, again, untangling the whole thing?
>
> &ast;    &ast;    &ast;
>
> **WEISLER**: So I would say the install bases is just such a complicated box all by itself Because not all units are created equally. Some units return more supplies than other units, home versus office, different countries, different ZIP codes. . . . We've been -- as you noted, been aggressively putting units into the market this quarter, just gone over 15%

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

growth on units. So we do have, as I mentioned in -- with the Samsung business with A4, low-end of A4 coming out of that, because we're not aggressively putting those low-end units in. That becomes a bit of a headwind to the installed base. But you got to think about this huge install base, the M2 subsegments. And so I think we're making progress there in the layers of the more valuable units that we place. ***I would say we're making improvements in the aftermarket share, and that is goodness***.

408.  Defendant Weisler's statements in ¶ 407 assuring investors that HP's Supplies market share was improving, including his statement that "we're making improvements in the aftermarket share" were materially false and misleading when made because Defendants failed to disclose that they never had the "big data" necessary to reliably and accurately determine HP's Supplies market share. In fact, HP later conceded that it "did not have . . . the capabilities to calculate share for toner-based products in the installed base." Instead, HP was using "lagging and incomplete" third-party market share data "that wasn't changing over time" to reflect true market conditions. As a result, investors were left with the misleading impression that HP's critical Supplies market share had improved when it had not. Indeed, as Defendants later admitted, HP's true market share was actually "significantly lower" than they previously represented and that although HP "previously had an arrow going up of gaining share, given the new data," Defendants "actually expect[ed] share to be down to a lesser extent on office."

409.  During HP's FY18 SAM, Defendant Lores presented the following slide, showing growth of HP's office Supplies market share:



410.  Defendants' representations in ¶ 409 assuring investors that HP's Supplies market share was improving, including the slide Defendant Lores presented showing increased Supplies market share in both

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the Home and Office segments in FY19, were materially false and misleading when made because Defendants failed to disclose that they never had the "big data" necessary to reliably and accurately determine HP's Supplies market share. In fact, HP later conceded that it "did not have . . . the capabilities to calculate share for toner-based products in the installed base." Instead, HP was using "lagging and incomplete" third-party market share data "that wasn't changing over time" to reflect true market conditions. As a result, investors were left with the misleading impression that HP's critical Supplies market share had improved when it had not. Indeed, as Defendants later admitted, HP's true market share was actually "significantly lower" than they previously represented and that although HP "previously had an arrow going up of gaining share, given the new data," Defendants "actually expect[ed] share to be down to a lesser extent on office."

## C. Defendants' Materially False and Misleading Statements Regarding the Stabilization of HP's Supplies Business and Revenue

411. During the 3Q17 Earnings Call, Defendant Weisler stated in his prepared remarks that "***supply stabilization occurred in quarter 3, one quarter earlier than originally expected***." Thereafter, during her prepared remarks Defendant Lesjak stated that HP "***achieved supply stabilization a quarter earlier than expected***."

412. Following their prepared remarks, Defendants answered analysts' questions. With respect to Supplies revenues, Defendant Weisler engaged in the following colloquy:

> **SCRIBNER**: You guys have done a good job of returning supplies to some modest growth when you make the adjustments from last year. We saw 2% growth this quarter, which was the same growth we saw last year. What type of long-term growth would you expect based on the 4-box model? Should we assume that supply is generally flat long term or do you think that growth is modestly single digits? At some way, it would be helpful to learn your long-term perspective.

> **WEISLER**: I think it's important to remind everybody how we define stabilization. We've done that on previous calls, and we've said that supplies revenue and constant currency not declining further is our definition. We also walked you over the last couple of years through the 4-box model drivers and our consistent focus on driving improvement across each of those 4 boxes. ***Now in quarter 3, our focus and execution over the last 2 years on all 4 of those drivers saw the supplies revenue mature and stabilize 1 quarter ahead of plan***, and we're very, very encouraged by that. . . .

413.   Defendant Weisler ended the 3Q17 Earnings Call by stating, one of "[t]he key takeaways I'd love you to leave the call with is the following: *we stabilized revenue a quarter earlier than we expected*."

414.   The market reacted positively to these statements. For example, shortly after the call concluded, BMO Capital Markets issued a report titled, "Supplies Stabilized; Maintain Market Perform," stating, "Management believes that the [Supplies] business has now been stabilized, one quarter earlier than expected . . . ." That same day, Barclays issued a report stating that "continued growth exhibits the long-awaited supplies revenue stabilization coming to fruition," while Jefferies concluded that "FQ3 results were solid driven chiefly by strong Notebook sales and earlier-than-expected stabilization of Supplies." Morgan Stanley likewise issued a report on August 24, 2017, titled "Growing Evidence of Sustainable Growth," finding, "Printer supplies growth sustainable. HP reported two quarters in a row of 2% printer supplies revenue growth (adj. for inventory correction a year ago) and expects flat to growing trends in F4Q. We believe the combination of 1) growing laser printer installed base, 2) higher supplies share on newly installed printers, and 3) continued growth in graphics and MPS with high ink usage / share are contributors to continued low single-digit supplies revenue growth in 2018."

415.   Defendants' statements in ¶¶ 411-13 that HP had stabilized revenues for the Supplies business one quarter earlier than expected were materially false and misleading when made because Defendants failed to disclose that: (i) before and during the Class Period, HP used discounts and other incentives to push Supplies inventory into the channel to meet monthly quotas or quarterly targets irrespective of end-user demand, thereby effectively cannibalizing future sales; (ii) HP had not shifted (nor could it) to an end-user demand-driven pull model for its Supplies business; (iii) the Four Box Model was fundamentally flawed, inaccurate, and unreliable because it lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and utilized instead inaccurate, stale, and lagging third-party survey data; (iv) HP could not have known whether a commercial unit was NPV positive without statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based installed base and, in any event, the Company was pushing printer units into the channel to meet monthly quotas and quarterly targets irrespective of whether those printers were NPV positive; and (v) HP had not actually increased its aftermarket Supplies market share. As a result, investors were left with the misleading

impression that HP's Supplies business was stable when, in fact, the inventory-fueled "stabilization" was built on a house of cards.

416.  During his presentation at HP's FY17 SAM, Defendant Weisler stated:

For our shareholders, we are doing what we said we would do, delivering operational excellence, predictable shareholder returns and building a business for the long term. When we became a standalone company, we had to prove that we could deliver reliable earnings and cash flow, take profitable share, drive productivity, stabilize our core businesses and, importantly, establish growth, and we've been doing exactly that. . . . We delivered 3 quarters of non-GAAP earnings EPS within or at the high end of our guidance. We have grown total company revenue for 4 consecutive quarters, with broad-based growth and share gains across all 3 regions. In the third fiscal quarter, we grew revenue 10% year-over-year, and *we stabilized supplies revenue 1 quarter earlier than expected*. These results give us the confidence in our business fundamentals, including our ability to generate cash flow.

417.  Defendant Weisler further stated:

And in Printing, the pundit said, Printing was destined to decline, but we're proving them wrong. Some of you said we couldn't do it, but we are. We have grown revenue for the past 2 consecutive quarters, including growth in both hardware and supplies. *Supplies revenue stabilized during our third fiscal quarter, a quarter earlier than we said it would.* The team did an excellent job managing the transitions in our supply sales model, and our focus on the four-box model drivers is really working for us. Stabilizing our core business sets us up for growth opportunities, and the Print business has a strong track record of making targeted investments and generating positive returns.

418.  During his presentation at the FY17 SAM, Defendant Lores stated: "The fiscal year 2017 has been a year of great progress for the Print business. We did what we said we were going to do and more. When we met a year ago, I shared that our one objective was to stabilize the supplies business, and *we did it, and we did it one quarter ahead of plan*." Later, Lores reiterated, "*In 2017, we stabilized supplies*."

419.  Defendant Lores further stated:

*You may be asking what did we do to stabilize the supplies business. It was all about rigorous execution of all the actions that influence the 4 drivers of the supplies business. It is about improving the installed base, increasing usage, improving the mix of units that we share, that we ship, increased share and price. This is what we did. . . .*

420.  Defendant Lesjak also presented at the FY17 SAM. During her presentation, Lesjak stated: "*In Print, we've achieved supplies revenue -- supply stabilization a quarter earlier than expected*." Later,

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

she reiterated this, asking the audience, "And did we mention w*e stabilized constant currency supplies revenue a quarter earlier than expected*?"

421.    Following the FY17 SAM, analysts echoed Defendants' sentiments and credited the Four Box Model. For example, in an October 12, 2017 report titled, "Analyst Days Takeaways," BMO Capital Markets wrote: "HP stabilized its supplies business one quarter earlier than expected, lending credence to management's four-box model, which remains largely unchanged for FY18." A same-day Deutsche Bank report concluded, "What a difference a year makes for Print," stating: "The Supplies business, which drives all of the profitability in print, stabilized a quarter earlier than expected in FY-17." Additionally, on October 13, 2017, in a report titled, "SAM 2017: Stabilization Shifts to Acceleration," Morgan Stanley reported that "President of Imaging, Printing & Solutions, Enrique Lores, highlighted earlier than expected supplies stabilization in FY17 . . . " Guggenheim also wrote that Lores "pointed out that after several years of printing declines, HPQ at least stabilized supplies in its latest quarter (following inventory/go to market changes as planned) and believes it has potential to grow longer term."

422.    Defendants' statements in ¶¶ 416-20 that HP had stabilized revenues for the Supplies business one quarter earlier than expected were materially false and misleading when made because Defendants failed to disclose that: (i) before and during the Class Period, HP had used discounts and other incentives to push Supplies inventory into the channel to meet monthly quotas or quarterly targets irrespective of end-user demand, thereby effectively cannibalizing future sales; (ii) HP had not shifted (nor could it) to an end-user demand-driven pull model for its Supplies business; (iii) the Four Box Model was fundamentally flawed, inaccurate, and unreliable because it lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and utilized instead inaccurate, stale, and lagging third-party survey data; (iv) HP could not have known whether a commercial unit was NPV positive without statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based installed base and, in any event, the Company was pushing printer units into the channel to meet monthly quotas and quarterly targets irrespective of whether those printers were NPV positive; and (v) HP had not actually increased its aftermarket Supplies market share. As a result, investors were left with the misleading impression that HP's Supplies business was stable when, in fact, the inventory-fueled "stabilization" was built on a house of cards.

423.   During the 4Q17 & FY17 Earnings Call, Defendant Lesjak engaged in the following colloquy regarding EPS:

**SUVA**: I have 2 questions; I'll ask them at the same time. Perhaps the first one is to Dion or Cathie and the second one more towards Cathie. Regarding, Dion, the sales upside looks like across basically almost every line and every end market, which is great. But the drop through the EPS at the bottom, I guess, some investors could have wanted or hoped for more. Are you spending a little more for like investing in the business, in the channel, in products and R&D? And if so, what specific areas as to where you're investing or not seeing the drop-through? And a follow-up is on the Samsung acquisition, $0.01 of earnings, I assume that was first half of the year more of a headwind as you integrate and the accretion comes in at the tail end, and then longer term, it should be much more than $0.01 of annual EPS.

**LESJAK**: So Jim, let me start with the first one in terms of your comment around the drop. I think the way we think about this is if you go back to kind of the Q3 earnings call, we provided an EPS range and we ended up at the higher end of that range. So we anticipated kind of where we thought we would end up. Now we did see a little bit of upside from a Personal Systems perspective and that drove a lot of the top line. And there just isn't much drop in Personal Systems, especially when you combine that with commodity cost headwinds that we've seen in that business. ***And then on top of that, in Print, what we were really focused on this quarter was not only keeping Supplies stabilized, which we did, very pleased with the results there.*** But we also took advantage of a little bit bigger market and also the opportunity to place materially more printer units than what we would normally see on a sequential basis. And so that obviously puts some downward pressure on operating profit and EPS as well.

424.   During her prepared remarks for the 1Q18 Earnings Call, Defendant Lesjak stated: "Overall, ***our Supplies results reflect our sustained efforts around stabilizing supplies*** and an easier year-over-year compare."

425.   On the same call, Defendant Weisler engaged in the following back and forth with an analyst:

**DARYANANI**: I have 2 questions, I guess. Maybe the first 1 to start with, when I think about the 4% organic Supplies that you guys talked about in Q1, could you just maybe help connect that with the expectation that fiscal '18 will be flat to slightly up in Supplies, what do you guys see in the Four Box Model, I guess, that gives you pause that the trend you saw in Q1 doesn't sustain on an organic basis in Supplies?

*       *       *

**WEISLER**: So let me just add, Amit, that we have really high confidence in the Four Box Model and the team's ability to drive improvements in each element of each of the 4 boxes. I think, Enrique and the regional presidents -- Nick, Christoph, Richard -- and the teams did a great job ***in stabilizing Supplies earlier than expected last year.*** . . .

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

426.  During the February 27, 2018 Conference, Defendant Lesjak responded to questions posed by Morgan Stanley analyst Katy Huberty, including Huberty's question regarding the Four Box Model:

> **HUBERTY**: So let's spend a few minutes on Printing. Last year, the goal was to stabilize and return to printer supplies growth, which you did earlier than expected. For this year, you're talking about 5% to 7% growth in printing supplies but in the core business, ex-Samsung, flat to slightly up. Talk about which elements of that 4-box model give you the confidence that, that supply stability or growth can continue?

> **LESJAK**: . . . . You look at FY '17, and we were able to be in line with expectations or better than expectations across all of the different elements of the model. ***And ultimately, as you said, stabilize supplies a quarter earlier than expected***. . . .

427.  Defendants' statements in ¶¶ 423-26 that HP had stabilized revenues for the Supplies business one quarter earlier than expected were materially false and misleading when made because Defendants failed to disclose that: (i) before and during the Class Period, HP had used discounts and other incentives to push Supplies inventory into the channel to meet monthly quotas or quarterly targets irrespective of end-user demand, thereby effectively cannibalizing future sales; (ii) HP had not shifted (nor could it) to an end-user demand-driven pull model for its Supplies business; (iii) the Four Box Model was fundamentally flawed, inaccurate, and unreliable because it lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and utilized instead inaccurate, stale, and lagging third-party survey data; (iv) HP could not have known whether a commercial unit was NPV positive without statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based installed base and, in any event, the Company was pushing printer units into the channel to meet monthly quotas and quarterly targets irrespective of whether those printers were NPV positive; and (v) HP had not actually increased its aftermarket Supplies market share. As a result, investors were left with the misleading impression that HP's Supplies business was stable when, in fact, the inventory-fueled "stabilization" was built on a house of cards.

428.  During the May 31, 2018 Conference, Defendant Weisler answered questions posed by Sanford C. Bernstein analyst Toni Sacconaghi regarding HP's Supplies business, including the following exchange:

> **SACCONAGHI**: Okay. Maybe we can talk a little bit about just Supplies, and we've talked a lot in the past about this. But it's obviously where the money is. So we'll revisit that topic. So you said Supplies would be 5% to 7% for the remainder of the year. You came in at 6% last quarter, exactly on plan, and you've talked about Supplies next year being kind of flat to slightly up. Now one question that I've gotten is, look, last quarter Q1,

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

4% Supplies growth at constant currency, and the quarter before that and a couple of quarters, I think you were 2% and 3%. And now it feels like you're more like flat to down. And so -- but your unit placements are pretty good, and you're starting to get some traction in A3. So how do we reconcile that? Was there something unusual about the 3 previous quarters? And -- because otherwise, it sort of feels like it's a deceleration. So how do we reconcile those?

**WEISLER**: I don't think there is any surprises. We sat here a year ago, God, time flies, and we said that... So much fun. I'll be back next year. We said that we would stabilize Supplies. *We stabilized Supplies a quarter earlier than we said we would*. . . .

429.  Defendants' statements in ¶ 428 that HP had stabilized revenues for the Supplies business one quarter earlier than expected were materially false and misleading when made because Defendants failed to disclose that: (i) before and during the Class Period, HP had used discounts and other incentives to push Supplies inventory into the channel to meet monthly quotas or quarterly targets irrespective of end-user demand, thereby effectively cannibalizing future sales; (ii) HP had not shifted (nor could it) to an end-user demand-driven pull model for its Supplies business; (iii) the Four Box Model was fundamentally flawed, inaccurate, and unreliable because it lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and utilized instead inaccurate, stale, and lagging third-party survey data; (iv) HP could not have known whether a commercial unit was NPV positive without statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based installed base and, in any event, the Company was pushing printer units into the channel to meet monthly quotas and quarterly targets irrespective of whether those printers were NPV positive; and (v) HP had not actually increased its aftermarket Supplies market share. As a result, investors were left with the misleading impression that HP's Supplies business was stable when, in fact, the inventory-fueled "stabilization" was built on a house of cards.

430.  During the June 6, 2018 Conference, Defendant Fieler responded to a question from Bank of America analyst Wamsi Mohan about "the biggest sort of drivers . . . that will influence supplies growth based on [the] 4-box model" stating, "*We did stabilize supplies a quarter earlier than expected last year*."

431.  Mohan also asked Defendant Fieler about the underlying trends in the Supplies business as follows:

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**MOHAN**: And would you say like the underlying trends within the sort of ex S-Print installed base is still on an improving trajectory?

**FIELER**: Yes, *we felt comfortable in the supply stabilization last year. Again, it was in Q3 of '17, a quarter earlier than expected*. . . .

432.  Defendants' statements in ¶¶ 430-31 that HP had stabilized revenues for the Supplies business one quarter earlier than expected were materially false and misleading when made because Defendants failed to disclose that: (i) before and during the Class Period, HP had used discounts and other incentives to push Supplies inventory into the channel to meet monthly quotas or quarterly targets irrespective of end-user demand, thereby effectively cannibalizing future sales; (ii) HP had not shifted (nor could it) to an end-user demand-driven pull model for its Supplies business; (iii) the Four Box Model was fundamentally flawed, inaccurate, and unreliable because it lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and utilized instead inaccurate, stale, and lagging third-party survey data; (iv) HP could not have known whether a commercial unit was NPV positive without statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based installed base and, in any event, the Company was pushing printer units into the channel to meet monthly quotas and quarterly targets irrespective of whether those printers were NPV positive; and (v) HP had not actually increased its aftermarket Supplies market share. As a result, investors were left with the misleading impression that HP's Supplies business was stable when, in fact, the inventory-fueled "stabilization" was built on a house of cards.

433.  During the FY18 SAM, Defendant Weisler stated: "Now let's turn to Print. We've had, to put it mildly, an impressive year. ***Print supplies have not only stabilized, but the business overall has been consistently growing for the past 6 quarters***. This team is truly reinventing and igniting a print renaissance."

434.  Defendants' statements in ¶ 433 that HP had stabilized revenues for the Supplies business one quarter earlier than expected were materially false and misleading when made because Defendants failed to disclose that: (i) before and during the Class Period, HP had used discounts and other incentives to push Supplies inventory into the channel to meet monthly quotas or quarterly targets irrespective of end-user demand, thereby effectively cannibalizing future sales; (ii) HP had not shifted (nor could it) to an end-user

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

demand-driven pull model for its Supplies business; (iii) the Four Box Model was fundamentally flawed, inaccurate, and unreliable because it lacked statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based printers and utilized instead inaccurate, stale, and lagging third-party survey data; (iv) HP could not have known whether a commercial unit was NPV positive without statistically sufficient, accurate, and otherwise reliable telemetry data from HP's toner-based installed base and, in any event, the Company was pushing printer units into the channel to meet monthly quotas and quarterly targets irrespective of whether those printers were NPV positive; and (v) HP had not actually increased its aftermarket Supplies market share. As a result, investors were left with the misleading impression that HP's Supplies business was stable when, in fact, the inventory-fueled "stabilization" was built on a house of cards.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

435.  As more fully alleged above, a host of facts give rise to a strong inference that, throughout the Class Period, Defendants knew, or were deliberately reckless in not knowing, that the statements identified in Section V, *supra*, concerning the "big data" that purportedly informed the Four Box Model, the changes that HP had purportedly made to its sales model and inventory and pricing management, HP's increasing Supplies market share, HP's Supplies channel inventory levels, and the sustainability and viability of HP's Supplies business were materially false and misleading when made, and omitted material facts necessary to make their statements not misleading. In particular, Defendants: (i) knew and/or were deliberately reckless in not knowing that the statements issued and disseminated in the name of the Company were materially false and misleading and/or omitted material facts necessary to render those statements not false or misleading; (ii) knew that these statements were issued and disseminated to the investing public; and (iii) knowingly and substantially approved, participated, or acquiesced in, and had control and ultimate authority over, the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts enumerated above, the following facts also support a strong inference of scienter.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

A. **Defendants Knew about the Conduct Alleged in the SEC Cease-and-Desist Order by No Later than June 2016 and Knew or Recklessly Disregarded That This Conduct Continued During the Class Period**

436.  After a 3 ½ year investigation, including nearly the entirety of the 30-month Class Period and beyond, the SEC issued the Cease-and-Desist Order in September 2020. As explained in detail above, the SEC found that "HP's principal financial officers and principal executive officers who were responsible for the company's disclosures learned of the conduct" in connection with HP's planned shift from a push to a pull model. The reference to "principal financial officers" in 2016 included at least Defendant Lesjak, as CFO of HP, and Defendant Fieler, as HP's Treasurer and head of its corporate finance function. The reference to "principal executive officers" in 2016 included at least Defendant Weisler, as CEO of HP, and Defendant Lores, as the President of HP's Printing segment. The "conduct" includes the pull-ins, A-Business, and additional discounts to mask the excess inventory in HP's channel as a result of these unsustainable practices. Further, the "planned shift" was under consideration by no later than 1Q16 and was announced on June 21, 2016.

437.  Accordingly, Defendants Weisler, Lesjak, Fieler, and Lores knew the following about the use of "pull-ins" to meet quarterly targets by no later than June 2016 and, in any event, prior to the start of the Class Period:

- HP tracked its "sales performance through weekly 'flash' reports that predicted the outcome of quarterly metrics against budget based on the actual performance of weeks past and anticipated performance for future weeks. Regional managers used the flash reports to manage [] budgeted revenue" as well as "operating profit." Cease-and-Desist Order, ¶ 17.

- "By early 2015, HP began to see regular gaps near the ends of quarters between the [weekly] flash [reports] and budget." *Id.*

- HP "need[ed] to improve revenue and profitability in the Printing segment following the split" of Hewlett-Packard into HP and HPE and, as a result, "HP executives . . . emphasized the importance of meeting their Supplies budgets." *Id.*, ¶ 10.

- HP executives emphasis on "meeting their Supplies budgets" "led regional managers in the Supplies business unit to take a number of actions in order to meet their individual budgets that ultimately increased channel inventory and reduced profit margins worldwide." *Id.*

- "Beginning in early 2015 . . . HP sales managers began offering increased discounts at the end of quarters to meet sales targets." *Id.*, ¶ 16.

- Specifically, beginning in 2Q15, "certain regional managers at HP used a variety of incentives to accelerate, or 'pull-in,' sales that they otherwise expected to materialize in later quarters." *Id.*, ¶ 2.

- "Known internally as 'accelerations' or 'pull-ins,'" "certain managers within the Printing segment . . . . would authorize additional discounts to encourage Tier 1 distributors to place orders earlier than they were otherwise planning to place them." Internal HP presentations described these accelerations as "'pay[ing] the channel to take additional shipments within a given quarter.'" *Id.*, ¶ 18.

- HP's "use of discounting at the end of quarters created a pattern of lower sales during the first two months of the quarter and an expectation from the channel that HP would offer larger discounts in the third month of the quarter," with "[t]hat pattern accelerat[ing] in late 2015 and early 2016" as "HP managers offer[ed] steeper end-of-quarter discounts in order to meet quarterly sales targets." *Id.*, ¶ 19.

- In late 2015 or early 2016, one "regional sales manager in the Supplies business unit complained that it was 'becoming increasingly difficult to get partners to place orders at any price' because HP was 'at historical highs with [its] accelerations.'" *Id.*, ¶ 23 (alteration in original).

- "This pattern led to a known trend of increasing channel inventory and lower margin sales that continued over multiple quarters." *Id.*, ¶ 20.

- This pattern was not indicative of demand from end users or even channel partners. As one "regional general manager in the Printing segment explained" in late 2015 or early 2016, "partners do not want to carry the level of toner that we push into their warehouses. . . . [b]ut we push more toner in to help deliver on our financial plans." *Id.*, ¶ 22 (alterations in original).

438.  As a result, Defendants Weisler, Lesjak, Fieler, and Lores knew that HP's Printing business trend disclosure in its FY15 Form 10-K was materially misleading because the Company "failed to disclose the known trend of increased quarter-end discounting leading to margin erosion and an increase in channel inventory." Cease-and-Desist Order, ¶ 42.

439.  With respect to the A-Business, Defendants Weisler, Lesjak, Fieler, and Lores knew the following no later than June 2016 and, in any event, prior to the start of the Class Period:

- "[D]escribed internally as 'gray marketing,'" "[t]o execute the A-Business, APJ sales teams sold supplies to resellers or brokers who they expected would later sell those supplies outside of their territory." Cease-and-Desist Order, ¶¶ 24-25.

- "To engage in the A[-]Business, sales managers in APJ provided HP produce to resellers and brokers within their region at higher than normal discounts, knowing" that these resellers and brokers "would sell the goods through a network of firms into the Middle East," which was a part of HP's EMEA region. *Id.*, ¶¶ 7, 25.

- The "A-Business" sales "practice had occurred on a small scale in APJ for years" prior to 2015 and "came to be included in APJ's budgeting process." *Id.*, ¶ 25.

- "Beginning in early 2015 and continuing through the second quarter of 2016, sales managers in APJ significantly increased the A-Business in order to fill gaps to sales targets." *Id.*, ¶ 26.

- In order "[t]o entice distributors to take additional product, sales managers offered discounts, in some instances in excess of forty percent for A-Business sales, while discounts for local distributors were in the teens." *Id.*

- Further, to ensure that the A-Business was not impacting other countries within APJ, "managers in certain APJ countries granted additional discounts to their local distributors," which "further undercut[] margins within the region." *Id.*

- "HP saw a significant increase in product sold through A-Business" between early 2015 and June 2016, with "the amount of A-Business surpass[ing] the amount of [] local business" in certain APJ countries. *Id.*, ¶ 27.

- As the amount of produce sold through A-Business increased, "the size of the discounts granted to encourage A-Business climbed, as distributors demanded larger discounts to accept the increased inventory." *Id.*

- Internal HP documents confirmed that the A-Business was using "contra" or discount dollars at "levels three to four times HP's normal contra rates." *Id.*, ¶ 26.

- The A-Business inventory from APJ later appeared in HP's EMEA region where "HP managers . . . recognized that the A-Business was 'cannibalizing' sales from local HP distributors," which lead EMEA "managers . . . to reduce prices to combat [APJ] gray marketing." *Id.*, ¶ 28.

- As "HP's EMEA region reduced prices to combat [APJ] gray marketing . . . some discounted [EMEA] goods . . . eventually made their way" into HP's AMS region, "causing further sales cannibalization" in the AMS region as well. *Id.*, ¶ 29.

440. With respect to HP's Supplies channel inventory, Defendants Weisler, Lesjak, Fieler, and Lores knew the following no later than June 2016 and, in any event, prior to the start of the Class Period:

- "HP recognized revenue on channel sales at the time of the initial sale to a channel partner" and "HP had no continuing obligations following the sale to the Tier 1 partner, and the sales were not contingent on the eventual sales on to the Tier 2 partner or end user." Cease-and-Desist Order, ¶ 12.

- "HP's lack of visibility into channel inventory levels below Tier 1 left it without meaningful insight into its overall channel health." *Id.*, ¶ 48.

- "HP measured its channel inventory levels" internally "using Weeks of Supply (WOS)," which was "a calculation of HP's Tier 1 channel inventory divided by an average of previous weeks' sales . . . . Internally, HP referred to the upper end of its WOS range as a ceiling, and regional managers were expected to maintain their channel inventory below the WOS ceiling." *Id.*, ¶ 13.

- "The WOS ceilings for each of the business units were established by HP's Finance Department," which was headed by Defendants Lesjak and Fieler, "annually and were recognized by sales managers in the Printing Segment as a 'high visibility' and 'do not exceed metric.'" *Id.*, ¶ 14.

- "Regional managers used" the weekly "flash" reports "to manage to budgeted . . . WOS numbers." *Id.*, ¶ 17.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- "[T]he channel inventory metric employed by the company in quarterly earnings calls," namely, whether HP was above or below its inventory "range," with the range being a referenced to WOS, "only included channel inventory held by channel partners to which HP sold directly and not by channel partners further down the distribution chain." As a result, "[t]his allowed HP sales managers to reduce their WOS number when Tier 1 partners sold channel inventory to Tier 2, even when channel inventory was increasing." *Id.*, ¶¶ 3, 13, 15.

- "[U]se of the pull-ins and A-Business were causing . . . increased channel inventory." *Id.*, ¶ 3.

- For instance, the "influx of" goods discounted by EMEA in response to APJ gray marketing into the AMS region "exacerbated already growing channel inventory challenges in the AMS region." *Id.*, ¶ 29.

- Between late 2015 and early 2016, "one regional general manager in the Printing segment described 'unhealthy levels of stock' in Tier 1 and Tier 2, saying that 'we needed the Supplies revenue & we used significant amounts of contra to push in Supplies at T1 to >2 weeks above their optimal levels." *Id.*, ¶ 21.

- In late 2015 and early 2016, "HP's worldwide executives" including Defendants Weisler, Lesjak, Fieler, and Lores, "demanded that regional managers remain within their WOS ranges while still delivering sales and operating profit targets." *Id.*, ¶ 30.

- In order to remain within their WOS ranges but still deliver on sales and operating profit targets, "sales managers in the regions offered additional discounts to HP's Tier 1 distributors to encourage sales from Tier 1 to Tier 2. . . . The additional incentives that HP would be paid to the Tier 1 partners, which would pass the discount on to the Tier 2 partner." *Id.*, ¶¶ 31-32.

- In cases where the Tier 2 partners "already had what they viewed to be sufficient inventory," the Tier 2 partners "demanded steeper discounts" through the Tier 1 partners "to offset the cost of holding the additional inventory." *Id.*, ¶ 32.

- Additionally, APJ "regional sales managers engaged in 'simultaneous sell-in/sell-through deals,' also called 'in-and-out sales'" which according to "one HP regional sales manager" were "indent supplies that sells-in [to Tier 1] and through [to Tier 2] immediately," which had "no WOS implications" but would help APJ "meet[] HP's budgeted numbers" irrespective of "specific end-user demand." *Id.*, ¶ 33 (first two sets of brackets in original).

- These practices "reduce[d] WOS, but did not alter the overall inventory in the channel absent additional end-user sales." These practices also created space under the "WOS ceiling" for HP "to sell into Tier 1 to increase revenue without exceeding the WOS ceilings." And, "[b]ecause HP's disclosures only described its Tier 1 channel inventory," the inventory moved through the use of these practices "was not part of HP's channel inventory disclosures." *Id.*, ¶¶ 31, 33.

441. Defendants Weisler, Lesjak, Fieler, and Lores likewise knew that HP's public disclosures regarding channel inventory were "incomplete and misleading." Cease-and-Desist Order, ¶ 39. More specifically, Defendants knew that their "use of the phrase 'channel inventory' without definition" during the Company's quarterly earnings calls between November 2015 and June 2016 "gave the impression that the internal measurement included all of HP's channel inventory and was a measure of HP's overall channel health" when, in reality, "HP's internal channel inventory metric included only its Tier 1 channel inventory." *Id.*, ¶ 44. Defendants likewise knew that their "channel inventory disclosures" "omitted . . . the impact that pull-ins and A-Business." *Id.*, ¶¶ 44-45. As a result, the Defendants' "channel inventory disclosures" were "materially misleading." *Id.*, ¶ 44.

442. With respect to the purported Supplies sales model shift and operational changes, Defendants Weisler, Lesjak, Fieler, and Lores knew the following no later than June 2016 and, in any event, prior to the start of the Class Period:

- HP "chang[ed] its go-to-market model, in part to address" the pull-ins and A-Business. Cease-and-Desist Order, ¶ 4.

- "HP sales managers involved in the process" of "considering a move from [HP's] traditional push model to a demand-driven pull model . . . emphasized the need for significant channel inventory reductions." *Id.*, ¶ 34.

- A "working group" created "to explore" a shift to a pull model "identified four operational issues" that needed to be addressed including "HP's inefficient use of contra, including regional end of quarter pull-ins to meet profit targets, and the significant increase in A-Business at elevated contra levels." *Id.*, ¶ 35.

- Internal presentations related to HP's announced shift to a pull model "identified significant negative impacts from 'WOS Correction' and 'Sell-Out Impact' that would decrease HP's revenue and operating profit[s]" for the second half of FY16, so, "to lessen the negative impact to operating profit, HP timed the go-to-market model change to coincide with a divestiture of certain software assets." *Id.*, ¶ 36.

443. Testimony obtained by the SEC confirmed Defendants' knowledge of the conduct alleged in the SEC Cease-and-Desist order prior to the Class Period. For instance, Defendant Lesjak learned about the analyses underlying the Supplies Push Pull project ("SPP"), i.e., HP's effort to evaluate shifting the Supplies sales model from a "push" model to a "pull" model, in mid- to late-April 2016. This testimony also confirmed that Defendant Lesjak understood that the SPP was one way that HP was trying to address "nonoptimum promos," gray marketing activity, and HP's Supplies channel inventory issues. The Supplies

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

sales model change was presented to HP's board of directors, which included Defendant Weisler, on June 16, 2016, which also confirms Weisler's knowledge.

444. According to testimony obtained by the SEC, Defendant Lesjak became aware of "nonoptimum promos" during the SPP process. Prior to June 2016, HP had a back-end loaded quarter sales pattern where the Company would see lower sales in months one and two of the quarter, with increased sales in month three. A back-end loaded quarter sales pattern impacts HP's gross margins and profitability. Defendants Weisler and Lesjak understood the risks of HP's back-end loaded quarterly sales cycle. More specifically, Lesjak understood that this sales pattern causes a "vicious cycle": HP discounts in the third month of the quarter to obtain the business and then a pattern develops in which the Company's channel partners are waiting until the third month of the quarter when they know HP is going to discount to move the product.

445. Testimony obtained by the SEC also confirmed that Defendant Lesjak learned as part of the SPP that HP put more Supplies inventory into the channel during FY15 "to cover profit gaps." HP could cover "profit gaps" by executing more "sell-in" into Tier 1. Lesjak likewise was aware about the risks associated with "discount stacking" in the Supplies inventory channel: if HP has to discount to move Supplies inventory into Tier 2 and then has to discount the inventory again to move it further through the different levels or tiers of the channel, the Company may end up discounting at every tier which can be costly to HP by reducing revenue and, ultimately, gross margin.

446. Based on testimony obtained by the SEC, HP's A-Business was a form of gray marketing that occurred between APJ and EMEA; however, gray marketing can occur whenever there is price volatility—whether created by inconsistent pricing or the use of promotions and discounts—and aging inventory in the channel. More specifically, this testimony confirmed that gray marketing included a range of activities engaged in by market participants in order to take advantage of pricing arbitrage opportunities. These opportunities were created by inconsistent or unregulated pricing or pricing decisions from market to market, the heavy use of discounts and promotions, and lag times for inventory in the channel such that there is time to ship product to another market. Some or all of these factors created an environment where it made economic sense to take advantage of the arbitrage created by these actions by shifting product from one market to another and selling it via an unauthorized channel.

447. With respect to gray marketing, testimony obtained by the SEC revealed that Defendant Lesjak learned about gray marketing at HP in conjunction with the 4Q15 results. Defendant Lesjak understood that the higher the discounting level, the more likely such discounting would enable the gray marketing to take place. She also knew that HP was discounting Supplies probably heavier than was necessary and that inventory was ending up in EMEA, which caused EMEA to discount products in order to compete with the product that was coming in through unauthorized channels. By 4Q15, the A-Business was layered into the 4Q15 and FY16 budgets for APJ. This resulted in a number of discussions around how HP would address the FY16 budgets going forward.

448. In response, Lesjak and her team put a plan in place to start to wean HP off of gray marketing. HP began refusing to give the discounts and the Company lost sales as a result. HP also took "a big adjustment" in 4Q15, a $64 million correction, in an attempt to address the A-Business. Gray marketing from APJ to EMEA, however, continued into the first half of FY16. 2Q16 discounts in the APJ region were over 60% for that region's "indent business," or business HP effectuated through partners because it did not have a presence in a particular market, which included the A-Business.

449. With respect to Supplies channel inventory, according to testimony obtained by the SEC, HP had a floor and a ceiling for its Tier 1 channel inventory each quarter that was set at the beginning of the year. HP's global Supplies business unit determined inventory ranges on both a worldwide and regional level. HP internally published these ranges for all four quarters. The internally published ranges were the "acceptable ranges." HP's regions viewed the inventory ranges as coming from HP corporate or worldwide level. If changes to these ranges needed to be made, Lesjak's finance team would assess the business reasons for changing them. In 1Q17, HP "slightly" lowered its Tier 1 Supplies channel inventory ceiling. This change was approved by Defendant Lesjak.

450. Testimony obtained by the SEC confirmed that Defendant Lesjak knew that HP's EMEA and APJ regions operated the Supplies business with multi-tiered distribution channels. The expectation with respect to these regions was that they would typically have more inventory in Tier 2 and beyond than in the Tier 1 channel. Defendant Lesjak also was aware that HP tracked Tier 1 channel inventory levels. For example, at times Defendant Lesjak received channel inventory reports prior to externally reporting whether the Company was within or above the Supplies channel inventory range; however, this report only

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1  included Tier 1 inventory. When Lesjak disclosed whether HP was within its Supplies channel inventory

2  ranges, those were references to Tier 1 channel inventory. In the SEC testimony, Lesjak conceded that

3  there was nothing in HP's disclosures prior to June 21, 2016, as well as in the June 21, 2016 conference

4  call that would have alerted analysts or investors that HP's disclosures regarding its channel inventory only

5  related to Tier 1.

6         451.  HP had a weekly channel inventory reporting package ("Channel Inventory Report"). The

7  purpose of the Channel Inventory Report was to track what was going on within the Company's channel.

8  The Channel Inventory Report covered all of HP's businesses, including the Printing segment and, within

9  that segment, the Supplies and hardware businesses. The Channel Inventory Report utilized data HP

10  received from its channel to calculate and understand the Company's inventory levels. The Channel

11  Inventory Report included a "flash" estimating where HP believed it would end up once it received actual

12  results from Tier 1 partners. The Channel Inventory Report only addressed Tier 1 channel inventory; HP

13  did not have anything as formal as the Report for inventory in its Tier 2 channel.

14         452.  With respect to Tier 2 channel inventory, testimony obtained by the SEC demonstrated that

15  Defendant Lesjak was aware that coverage and frequency of HP's Tier 2 Supplies channel partners'

16  reporting was not good, and, "in many cases, the quality was unreliable and at times just not reasonable."

17  Lesjak likewise was not aware of any controls that HP had in place to ensure that the regions were not

18  moving excessive inventory into Tier 2. This testimony also confirmed that Lesjak understood that it was

19  possible for Tier 1 Supplies channel inventory to be within the set ranges, but the second and third tiers to

20  have excess inventory in them. She further understood that if HP did not have control over its inventory

21  and its channel partners were able to push HP to further discount Supplies, revenues, gross margin or gross

22  profit, operating profits, and earnings per share would be under pressure.

23         453.  Defendants also knew or recklessly disregarded the fact that HP continued to engage in these

24  sales practices after June 2016 and during the Class Period. As explained above, multiple former HP

25  employees confirm that the Company pushed both Supplies and hardware into the channel in order to meet

26  monthly quotas and quarterly targets. These same former employees confirm that Defendants' efforts to

27  centralize pricing and discounting decisions, as well as to implement controls and inventory management

28

procedures meant that Defendants knew or recklessly disregarded the use of discounts to push both Supplies and hardware into the channel irrespective of end-user demand.

454. In addition to their knowledge of the "conduct" the SEC identified in the Cease-and-Desist Order by no later than June 2016, during the Class Period, the SEC was investigating the undisclosed use of these sales practices at HP, and critically, whether Defendants had made material misstatements to investors regarding HP's supplies inventory and inventory management efforts as well as the negative impacts of these sales practices on HP's all-important Supplies business. This investigation began within the first full month of the Class Period, in March 2017, and continued until at least 2020 when the SEC issued the Cease-and-Desist Order. Critically, Defendants made many of the same or similar statements during the Class Period as the ones the SEC was investigating based on the Company's undisclosed Supplies sales practices. Accordingly, Defendants were on notice that their statements during the Class Period regarding HP's Supplies inventory channel were materially misleading. Defendants likewise were on notice that their failure to disclose that HP had used—and continued to use—sales practices that had the effect of pushing inventory into the channel in order to meet quarterly targets irrespective of user demand—rendered their statements materially false and misleading when made.

**B.** **Defendants' Repeated Statements and Admissions Reveal That They Knew or Recklessly Disregarded That Their Class Period Statements Were False and Misleading**

455. Defendants' Class Period statements make clear that they had knowledge of HP's Supplies inventory channel, Supplies pricing and discounts, the importance of placing NPV positive hardware printer units, and the Four Box Model and its inputs. In fact, as set forth herein, each Defendant spoke extensively and in detail about these subjects throughout the Class Period.

**1.** **Channel Inventory**

456. According to Defendant Lesjak, "[a]t the highest level, we've got to manage our channel inventory. It's absolutely critical to this business that you keep your channel inventory fresh." During the first HP SAM in September 2015, Defendant Weisler stated with respect to inventory: "We're on it every single day. We know exactly how much inventory we have . . . . We're always focused on the channel inventory."

457.  In June 2016, Defendant Lores announced several steps that Defendants purportedly planned to take with respect to Supplies inventory, including "one time reductions of inventory" and "reduc[ing] and tighten[ing] the desired ranges for ink and toner in each region." He further announced "further control[s]" on inventory, including "align[ing] channel compensation and programs to a market demand selling motion" and "shift[ing] form compensation on sell-in" e.g., selling inventory to Tier 1 distributors, "to a combination of sell-through and sell-out volumes." Notably, the additional discounts used to manage inventory that had been pushed into the Tier 1 channels in 2015 and the first had of 2016 were "sell-through" incentives. With respect to these purported efforts, Defendant Lores stated: "It will be critical, as it is today, for me to hold the sales teams accountable to remain within the ranges going forward."

458.  Defendant Lesjak claimed in June 2016 that "there's fairly regular reporting and its been the case for some time, so that we can really understanding what's going on, certainly within Tier 1 globally," noting that even though "Tier 2 is maybe a bit spottier" "we've got a pretty robust process already." Former HP employees confirmed that HP monitored Tier 1 channel inventory but did not have data for Tier 2. For instance, with respect to hardware inventory, FE-8 similarly recalled that HP used an internal platform to track inventory but once inventory was delivered to a channel HP no longer tracked it and HP did not keep track of how much inventory its channel partners had sold through to end-users.

459.  Thereafter, in an exchange with an analyst regarding the impact of the British Pound on Defendants' efforts to change the Supplies sales model in the U.K, part of the EMEA region, Defendants Weisler and Lesjak both confirmed that their knowledge of HP's Supplies channel inventory:

> **HALL**: I wanted to ask again on Supplies; this is an esoteric one but the Pound is very weak and I guess you guys called out that you're going to re-price at some point. I guess it relates mainly to the UK. But you can correct that if not; but does that cause people to hoard Supplies on Printing at all or affect your ability to adjust inventory there? Could you just comment whether that's an issue or not? Or do you have enough transparency into the channel and to avoid that? . . .

> **LESJAK**: So at this point, we're not seeing that impact. I will tell you that the change in the way we go to market on Supplies and the lower channel inventory levels, I think will certainly prevent some of the significant hoarding, or pantry effect, which is a nicer way of saying hoarding that we've seen in the past.

> **WEISLER**: There's effectively no incentive for them to do that; this is exactly why we moved to this demand-driven model in this omnichannel world.

> **HALL**: Okay, just if they anticipate price increases, wouldn't that then drive them to potentially engage the pantry effect, as you say, Cathie? I like that term, by the way.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**WEISLER**: And obviously, we're monitoring that through very carefully, watching the channel inventory levels, so –

**HALL**: Okay. So you just don't see that happening?

**LESJAK**: We won't allow it to happen.

460.   During the Class Period, Defendant Lesjak repeatedly touted the "health" of HP's Supplies inventory channel. For instance, in each of the 9 quarters reported during the Class Period, Lesjak, and subsequently Defendant Fieler, reported whether HP's Supplies inventory was within HP's "ranges" or under HP's "ceiling" for Supplies inventory. She likewise told investors at the start of the Class Period that "[o]ur channel inventory levels are healthy" because "[t]hey are below the top end of the newly lowered and narrowed ranges." Defendant Weisler also confirmed his knowledge of HP's Supplies inventory levels, stating: "We narrowed the ranges, and we lowered the ranges, and we're operating within those ranges." Similarly, Defendant Lores stated, "we are starting to see the results of that change in our business"— going to a "pull" model for Supplies— and "[w]e operate now with lower channel inventories."

461.   Defendant Lesjak also discussed inventory drawdowns, confirming in 2Q17 that "there were also year-on-year inventory drawdowns" that quarter as well as in 1Q17 and stating, "we did that pretty significant step-down in channel inventory in Q3 and Q4 of last year and then we have continued to keep channel inventory kind of at those levels or even a little bit lower." Similarly, Defendant Weisler stated: "We're holding less weeks of stock in channel inventory, both year-over-year and quarter-over-quarter."

462.   With respect to monitoring "sell-out," Defendant Weisler claimed that "we're of course able to triangulate . . . what is reported as sell-out across our systems." During the Class Period, Defendants Lesjak and Weisler both told investors that they were "seeing" "sell-out," or Supplies inventory sold to end-users. For instance, Defendant Lesjak stated, "As I said, we'd have linear sales out, that then therefore we would have more linear sales in, and we're absolutely seeing that." In the 2Q17 earnings call she further confirmed, "[l]inearity in the quarter . . . mirrors the demand that we're seeing." In addition to confirming that "we]re really only fulfilling when there's true demand," Defendant Weisler confirmed that he was "seeing unbelievable linearity" in the business and "our execution of the demand-driven change has seen improved sell-out linearity."

## 2. Supplies Pricing and Discounts

463. According to Defendant Lores at the FY16 SAM, "pricing stability is critical to an omnichannel world where there is price visibility across the word, across multiple channels. This is why we though changing the way we were managing supplies was so critical."

464. Defendant Lores told investors in June 2016 that "the pricing and promotion decisions on HP supplies will now be managed centrally at the global and regional levels" and HP was instituting "controls to ensure adherence to [these] policies." Defendant Weisler likewise confirmed in May 2019 that "[w]e know what the pricing environment is like because we set the prices." Former HP employees confirmed that HP had centralized platforms for the Company's headquarters to approve discounts. For example, FE-8 recalled that every request for a discount was submitted online for approval. Per FE-8 each deal required the approval of three managers in the U.S. through HP's pricing and discounting platform.

465. FE-2 similarly confirmed that HP was offering significant incentives to resellers including discounts and "incentive dollars" to get them more supplies inventory. Because these incentives were so significant, FE-2 stated "you couldn't get the authority . . . without Enrique Lores approval." FE-2 further recalled a time when HP leased trailers and warehouse space for Staples in order to get the retailer to take excess product. Per FE-2, given the size of the customer involved and the need to obtain approvals for such an incentive, Defendant Lores would have been aware of it and would have had to approve HP leasing the trailers and warehouse space to store the excess inventory.

466. With respect to pricing volatility, Defendant Lesjak claimed that HP was "getting closer to" and subsequently achieved "global consistent pricing." She further stated that "we've got exactly the kind of fine-tune pricing that we need, so that we can maximize on kind of what the profit that we can make from printing without hurting the demand." Defendant Weisler confirmed that "we're seeing much more stable prices in the market" and "we've seen the gray marketing activity significantly reduced." Similarly, Defendant Lores stated, "[w]orking with lower channel inventories is helping us to prevent gray marketing . . . around the globe."

467. With respect to discounts, Defendant Lesjak confirmed that "we do not want to be selling supplies on promo," noting in the 2Q17 earnings call that HP was shipping Supplies "at a lower discount level." Lesjak also claimed that taking "channel inventories down significantly in Q3 and Q4 last year . . .

has enabled us to . . . manage discounts." Defendant Lesjak also told investors that "we're also seeing in the quarter, improvement in terms of discounting" and confirmed, "we're taking . . . lower discounts." She further stated in September 2017, "we've done a really good job of managing our discounts." Defendant Lores likewise stated that "We have been able to reduce our channel discounts."

### 3.    NPV Positive Printer Units

468.    Defendants repeatedly told investors that placing NPV positive units was imperative to generating sufficient supplies attach to stabilize and grow Supplies revenues. For example, on August 24, 2016, Defendant Weisler reminded investors, "Recall that not all printers are created equally. Our key objective is to place hardware units with a higher usage of Supplies." Defendant Lesjak was fond of the "flywheel" analogy, explaining to investors on numerous occasions that "we want to place as many NPV-positive units so that we keep the flywheel effect of placing units, getting supplies, placing units and getting supplies going." According to Lesjak, it was necessary to place "positive NPV units, to keep the flywheel of supplies attached going" in order "to get to stabilization of supplies in constant currency."

469.    Defendant Lores likewise touted the importance of placing NPV positive units. In response to an analyst inquiry at the FY16 SAM regarding the "real driver for growth within that 4 box model seems to be getting supplies share" given that "the installed base" "seems to be a drag" "particularly in the office space" and "usage is sort of mixed," Defendant Lores stated:

> Yes, you are missing actually a very important variable in the model, which is the quality of the units that we place, and this is why we made so much emphasis on this, what will be driving or helping to drive the supplies business to grow in the office space is actually this change of mix. This is why placing high valuable units is so important for us. It is very different to place on high value MFP, multifunction printer versus a low-end laser. There are big differences in the consumption, big differences in the value of these units and this will be the key driver of that. On top of that, as you said, we expect to grow share. In developed countries, we have been growing share, mostly driven by the changes we have done in the go-to-market space by focusing on online, which was a segment that we were behind, by being more aggressive in certain segments and we are going to continue doing that during 2017.

470.    Prior to the start of the Class Period, during a November 29, 2016 appearance at an analyst conference, Defendant Lesjak unequivocally stated: "we're only placing NPV positive units."

471.    Moreover, Defendants admitted that just prior to the Class Period, they were contemplating switching the hardware sales model from a push to a pull model. For instance, during the FY16 SAM, Defendant Lores stated:

In June, we announced that we were changing our go-to-market model for supplies, and we said that we were changing that by shifting our focus from selling by -- with aggressive prices and aggressive discounts into the channel, evolving that and moving the focus to create end user demand. . . . In fact, during 2017, we may drive similar changes in how do we manage our hardware business, shifting our focus only from selling hardware to distribution to sell out hardware to end users. . . .

472.  Likewise, in response to a November 22, 2016 analyst inquiry "about whether or not we have made a change to the sales model for hardware," Defendant Lesjak stated: "our outlook today . . . does not include a change in that go to market model. We are still analyzing whether or not we want to do that and what it would take to do that."

473.  As explained in detail above, Defendants Weisler, Lesjak, Fieler, and Lores learned of the pull-ins, A-Business, and additional discounts to manage Tier 1 inventory "in connection with HP's planned shift from a push to a pull model" in the Supplies business. Accordingly, Defendants would have learned about the hardware sales practices identified above in Section IV.E. in connection with their analysis of shifting the hardware business from a push to a pull model in the second half of 2016 and, in any event, just before the beginning of the Class Period. Ultimately, instead of shifting the hardware sales model, Defendants chose to continue pushing hardware units into the channel regardless of whether they were being sold through to end-users and ultimately generating sufficient Supplies revenues to be NPV positive.

### 4.     The Four Box Model

474.  Defendants' statements throughout the Class Period make clear that they had knowledge of the Four Box Model and its inputs. In fact, each Defendant spoke about the Four Box Model and its inputs in detail during the Class Period. *See, e.g.*, Weisler at March 1, 2017 Morgan Stanley Technology, Media & Telecom Conference, May 31, 2017 Sanford C. Bernstein Strategic Decision Conference, May 31, 2018 Sanford C. Bernstein Strategic Decisions Conference; Lesjak at March 1, 2016 Morgan Stanley Technology, Media & Telecom Conference, September 6, 2017 Citi Global Technology Conference; Lores at October 13, 2016 Securities Analyst Meeting, October 3, 2018 Securities Analyst Meeting; and Fieler at June 6, 2018 Bank of America Merrill Lynch Global Technology Conference.

475.  Defendant Weisler further confirmed on May 31, 2018 that he had access to the "spreadsheet" used to analyze the "big data" used in the Four Box Model, telling an analyst that "[t]he whole thing is –

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

it's pretty complicated. You would even be impressed with the spreadsheet." The next month Defendant Fieler confirmed that when he returned to HP, "one of the first things . . . [he] did [wa]s actually looked at the 4-box model," explaining to analysts that "it's actually rather detailed as you look at geographies and SKUs and things, and it's only getting better with the incremental data and insight we get from our installed base."

476. Defendants' statements before and during the Class Period likewise make clear that Defendants were familiar and intimately involved with the Four Box Model. For example, Defendant Lores told investors at a June 6, 2017 conference that "we constantly work to improve and to refine [the Four Box Model]," including "check[ing] . . . the usage" against the assumptions after new printers are launched to "adjust" the Four Box Model "over time." Defendant Lesjak made similar statements in 2016, noting that "we are constantly refining the model with the data that we get. . . . [W]e use the big data that we were getting to refine the model and we are now doing this on a fairly regular basis." Moreover, FE-5 confirmed that in order to brief analysts about the Four Box Model, Defendant Lesjak herself would be briefed about the Model. While FE-5 recalled that given the nature of the Four Box Model, there was a lot of "executive planning" about it, including Defendant Lesjak. According to FE-5, there were executive briefings happening all the time because big data was a key topic at HP.

477. Defendant Weisler likewise confirmed that "[e]very time we close a quarter, we go back and look at the 4-box drivers, what it predicted and what it returned" and "through that exercise, what we're seeing is our installed base assumptions, our usage assumptions, and to a large extent our pricing." He further stated that "we go back and test all of those every single quarter" and that he held his team "accountable for . . . deliver[ing] on the senior metrics of the company."

478. More specifically, Defendant Lores represented that Defendants were "able to monitor and to measure at the country level and what is the usage across different territories" and in fact utilize data to monitor and measure usage "at a more granular level." Defendant Lesjak similarly confirmed in June 2018 that "you can look at the United States and you can actually zero in on a zip code and know whether or not these types of SKUs in that zip code tend to buy, on average, a lot of supplies or not." In response to an analyst question as to whether Defendants "go back and check whether . . . [the Four Box Model is] actually working" and how they "judge[d] the success of that model," Lesjak confirmed that they received this data

1   from the United States as well as "other countries" and, based thereon, were "always updating kind of the

2   view of that is an NPV-positive SKU in order to make sure that we're placing those units."

3       479.   Defendants' statements also make clear that they relied upon the Four Box Model, and

4   specifically the telemetry or "big data" purportedly utilized within the Model, to make strategic decisions

5   for and investments in HP's all-important Supplies business. For example, on May 31, 2018, Defendant

6   Weisler confirmed that "big data . . . informs us about where we want to make . . . investments" and

7   "figur[e] out exactly where you want to place . . . [printer] units" to "ensur[e] that they're NPV positive."

8   He further noted that Defendants were able to "understand[] . . . through big data, what the competitive

9   environment is looking like region by region, country by country."

10      480.   Defendants' statements likewise make clear that they purportedly relied upon "[o]ur big data

11  capabilities" to understand the "effectiveness" of those strategic decisions and investments. Defendant

12  Lores confirmed as much in 2016, stating: "The pricing and promotion decisions on HP supplies will now

13  be managed centrally at the global and regional levels to align timing and to maintain our value

14  position. . . . Our big data capabilities give us a very good understanding of the effectiveness of our

15  activities. Going forward, we will leverage this information to focus only on high-return-on-investment

16  targeted promotions." Defendant Lores similarly confirmed in October 2017 the importance of "big data"

17  to HP's Supplies business noting that "[b]ig data and analytics are becoming very important both in how

18  do we manage our business but especially on how do we improve the profitability going forward and

19  therefore, how do we improve shareholder value."

20      481.   Both FE-9 and FE-5 recalled that big data was an important initiative at HP before and during

21  the Class Period. For instance, FE-9 recalled that HP had invested millions of dollars into telemetry so part

22  of the reason the dashboards reflecting telemetry data coverage for ink and toner were created was to justify

23  the expense of obtaining telemetry data to HP management. FE-5 similarly stated that there was a large

24  financial investment in big data, calling the expense significant.

25      482.   FE-5 further recalled that "Big Data" was a huge initiative at HP, stating that if there was a

26  lack of telemetry data it was an issue. FE-5 noted that by way of example that Big Data was used to inform

27  decisions in ink as to whether sales were better in Korea or Japan and to move units from one country to

28  another based on the data. FE-5 confirmed that executives would have known that, for instance, U.S.-based

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

data was best and ink always had better telemetry data than toner because HP wanted to apply data everywhere. FE-5 stated that it was clear that Big Data was a huge initiative and one of the "pillars at HP."

483.  Relatedly, Defendants statements during the Class Period revealed that Defendants were keen on increasing HP's Supplies market share, and that they purportedly relied on the Four Box Model to do so. For example, during the June 6, 2018 Bank of America Merrill Lynch Global Technology Conference, in response to a question concerning the "key drivers" of the Four Box Model, Defendant Fieler stated that, for home printers, HP had "*been very focused on share gains*," among other things, and that "[s]imilar to home, we have sort of the usage decline per unit but also placing higher-quality units, *focused on share* and roughly flattish pricing on the office side." With respect to market share goals, FE-5 would provide numbers for ink to FE-5's superior and there was one additional layer between FE-5's superior and the C-Suite. FE-5 explained that at some point the goal per share would change. According to FE-5 this was a top down change not based upon projections but based on what those above FE-5 wanted. FE-5 called these changes "Go Find" changes, meaning go find 2 points of share. FE-5 confirmed that these "Go Find" changes were caused by the pressure of Supplies growth.

484. Defendants' admissions beginning on February 27, 2019 also make clear that they had knowledge that HP lacked sufficient (or any) telemetry data for commercial printers with which to forecast toner pricing, usage, or market share via the Four Box Model during the Class Period.

485. For example, Defendant Weisler admitted on February 27, 2019 that "[w]e did not have a statistically significant sample from the system telemetry and the instrumentation nor the capabilities to calculate share for toner-based products in the installed base." Specifically he admitted that while "[w]e've had this data for ink-based products, but due to the limited number of machines that were phoning home in commercial due to enterprise firewall constraints and otherwise unconnected devices, we've had to build the connected installed base over time." During an analyst conference the next day, Defendant Weisler admitted that telemetry data from commercial printers "has never been statistically relevant for us to rely on it, many of them [the printers] sitting behind firewalls." Defendant Weisler further confirmed at an analyst conference three months later that HP was not receiving "statistically relevant" telemetry data and that the Four Box Model was not a true "demand-driven model" until 2019.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

486. Defendant Fieler made similar admissions, including that HP needed to improve the "quantity" of telemetry data by increasing the "ship[ment]" and "install[ation]" of newer printers and ensuring that "we have access to" the telemetry data flowing from these newer printers, and the "quality and speed" in which the telemetry data is analyzed once it is actually available.

487. These admissions were confirmed by FE-1 who reported that HP did not have telemetry data for the full installed base of toner printers—for some printers it was "not present at all" and for others it was "very patchy."

488. Defendants' admissions beginning on February 27, 2019, likewise make clear that Defendants knew that HP was using less reliable or accurate third-party data to calculate pricing, usage, and market share instead of the "big data" Defendants repeatedly touted to investors at the time they made the statements set forth in Section V, *supra*. For instance, Defendant Fieler admitted on February 27, 2019 that "[p]reviously, we had relied primarily on lagging and incomplete market share surveys."

489. That same day, Defendant Weisler admitted that "[p]reviously, we had used periodic third-party survey data and market research aggregators to estimate toner supply shares." The following day, Defendant Weisler confirmed that HP had been tracking market share through "periodic surveys" and "some third-party data that we got from other analyst firms" which "inform[ed] what we assume for supply share." Defendant Weisler further confirmed his knowledge of the use of third-party data on May 30, 2019, admitting that Defendants "solve[d] some problems" with obtaining telemetry data (e.g., "getting through Commercial firewalls") by "relying on third-party share information that wasn't changing, over time, in any kind of dramatic way." FE-1 confirmed Defendants' admissions, reporting that "market share" was not based on actual data concerning customer purchases, but instead was based on sell through of supplies from Tier 1 to Tier 2 of HP's sales channel, and the number of weeks of inventory in the sales channel. As a result HP's "market share" input was always a problem because HP just did not have the end-user data, which made it a "guesstimate" for ink and toner. FE-1 stated that FE-1 considered the Four Box Model to be indirect and at times unreliable because market share and usage data are imputed and not actual. FE-1 likewise confirmed that Weisler would have known of these challenges of the Four Box Model. Indeed, FE-1 said this was common knowledge, which was "taken as a normal, as a given" at HP.

490.  Defendants also understood the material negative impact of the lack of sufficient telemetry data and using "lagging and incomplete market share surveys," within the Four Box Model at the time they made the statements alleged in Section V, *supra*. For example, on February 27, 2019, Defendant Fieler admitted that the "4-box model is only as good as its assumptions" and required "enhancements in both big data and software and an increasing installed base of newer, connected toner-based products" in order "to have an increasingly clearer picture of office supplies share." On the same date, Defendant Weisler confirmed that "we had incorrect Supplies share assumptions in our 4-box model regarding the plans for Supplies selling in quarter 1'19 and in prior quarters" which impacted HP's ability to "spot the buying behavior change as a trend" because the incorrect assumptions were "masking the underlying problem." Indeed, Defendant Weisler confirmed that the impact of the lack of viable telemetry data and the use of "lagging and incomplete" survey data occurred over several quarters prior to 1Q19.

491.  Defendants also were aware of internal forecast misses during the Class Period. For instance, FE-1 confirmed that every Thursday, HP held world-wide CEO briefing calls, which were attended by, among others, the CEO and his staff, and executives from each of HP's regions, including the APJ President, Finance VP, and category heads and the equivalent personnel in EMEA and the U.S. While FE-1 did not personally attend these meetings, FE-1 received a debriefing on the calls from Rich Bailey who was in attendance. Based on these debriefings, FE-1 reported that the "famous hot seat" was the EMEA region, which was "unstable" and had big problems in the Supplies space.

492.  FE-1 recalled that, circa 2Q18, EMEA experienced a particularly egregious Supplies forecast miss. FE-1's superiors, including Bailey, told FE-1 that Defendant Weisler (who was then HP's CEO) was "really angry" and thereafter held a series of "crisis" meetings to understand the miss. According to FE-1's superiors who attended the meetings, Weisler was informed that the miss occurred because HP lacked insight into the sales channel and, thus, did not have full appreciation for the total effect of the trend of consumers buying Supplies from competitors online. In sum, CEO Weisler was informed in 2Q18 that the EMEA Supplies leads missed their sales estimates because of a lack of insight into the sales channel and end-user buying patterns.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## C.    HP's Supplies Business Was Its Core Operation

493.  HP's Supplies business has long been the Company's core operation and profit engine. Prior to and during the Class Period, Defendants consistently represented that HP's Supplies business was its lifeblood, and that a successful Supplies business was fundamental to the Company's business model. As Defendant Weisler explained during the Morgan Stanley Technology, Media & Telecom Conference held on March 1, 2017, "our business as a whole generates the vast majority of its profit from our printing segment and that our printing business is an annuity business. It's a razor/razor blade model. We lose money, generally speaking, when we place a unit." Shortly thereafter, at the Sanford C. Bernstein Strategic Decision Conference on May 31, 2017, Defendant Weisler further explained, "[t]oday, the single biggest investment that we make is placing a unit, because generally speaking, when we place units, we lose money. And *we make back money over time as supplies go into those units*."

494.  For years, Defendants also told investors that HP's business was "all about supplies." For example, during HP's September 2015 Securities Analyst Meeting, Defendant Lores proclaimed, "*this business is all about supplies. Every action that we've -- I have been describing, the improvements in the product portfolio, the new programs that we are launching, the new services we're launching have one common objective. Improve our supplies business.*" During the same meeting, Defendants Weisler and Lesjak offered similar refrains, each noting that HP's business was "all about supplies." During HP's 2016 Securities Analyst Meeting, held on October 13, 2016, Defendant Lores again highlighted the importance of the Supplies business, stating: "*The key area of focus for us is our supplies*. And we will -- *every action we take across our core growth or future segments has one consistent objective, get the supplies business to growth*." Defendant Lores again reiterated during the Company's 2018 Securities Analyst Meeting held on October 3, 2018, "let me say one more time, going forward, this business is all about supplies and services." In fact, Defendant Lores so frequently emphasized the importance of Supplies that, during the June 6, 2017 Bank of America Merrill Lynch Global Technology Conference, an analyst referred to him as "Enrique 'It's all about the supplies' Lores from HP."

495.  Moreover, HP's Supplies business contributed significantly to the Company's quarterly and annual financial results. During HP's 2015 Securities Analyst Meeting, held on September 15, 2015, Defendant Lesjak explained, "the net revenue of the Company is made up of about 60% from personal

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

systems, 40% from printing and over the last four quarters, the operating profit mix is comprised of printing at 78%, ***driven largely by supplies*** and personal systems at 22%."

496.   In addition, HP's Supplies business had particularly high profit margins and a correspondingly large impact on the Company's bottom line, which Defendants emphasized throughout the Class Period. For example, during the Morgan Stanley Technology, Media & Telecom Conference on March 1, 2017, Defendant Weisler explained, "***our business as a whole generates the vast majority of its profit from our printing segment*** . . . ." Later in 2017, at the September 6, 2017 Citi Global Technology Conference, Defendant Lesjak emphasized that the Supplies business in particular drove HP's profitability, explaining, "***not only is a big portion of our profits coming from Print, but when you further drill down, a big portion of the profits is really coming from supplies*** . . . . So that means you really have to look at what your supplies business -- how to drive your supplies business."

497.   Indeed, as alleged above, HP's Supplies generated most of the Company's ***total profits***. To be sure, analysts estimated that the HP's Supplies business accounted for between 80% and 110% of the Company's profits. For instance, Deutsche Bank estimated that, because HP lost more money selling printer hardware than it made selling PCs, the Supplies business actually accounted for more than 100% of the Company's profits. Similarly, UBS wrote in 2016 that "Printing [wa]s about 80% of profit and should be investors' focus."

498.   The importance of HP's Supplies business supports the strong inference that Defendants knew, or were deliberately reckless in not knowing, that HP's Four Box Model suffered from a material deficiency in that stale and outdated third-party market share data was used to calculate HP's commercial market share, that HP historically lacked adequate internal telemetry data to calculate market share for its toner-based products, and that, as a result, Defendants' statements regarding the sustainability of and revenue projections for HP's Supplies business lacked any reasonable basis.

### D.     The Individual Defendants Were HP's Most Senior Executives and Controlled the Content of Their Statements during the Class Period

499.   The Individual Defendants' control over the entire Company and unfettered access to non-public information also support a strong inference of scienter. As HP's top executives during the Class Period, Defendants Weisler (President, CEO, and Director), Lesjak (CFO and interim Chief Operating

Officer), Fieler (CFO and Head of Global Treasury), and Lores (President of Imaging, Printing and Solutions) controlled the Company's day-to-day operations and were informed of and responsible for HP's all-important Supplies business.

500.  According to testimony obtained by the SEC, Defendant Weisler understood the operations of HP's business in detail and Lesjak obtained a deeper, more detailed understanding of how HP's operations worked following the split. Additionally, according to testimony obtained by the SEC, HP's investor relations or IR group reported to the Company's finance function which was headed by Defendant Lesjak. Notably, IR was primarily responsible for drafting the script used as part of the June 21, 2016 call to discuss the Supplies sales model change.

501.  Likewise, Defendant Lores, as President of Imaging, Printing and Solutions, was intimately involved in returning HP's Supplies business to growth and profitability during the Class Period. Indeed, Defendant Weisler highlighted Defendant Lores' key involvement in the purported turnaround in the Supplies business, stating, "Enrique and the regional presidents . . . and the teams did a great job in stabilizing Supplies earlier than expected last year." Analysts likewise acknowledged Defendant Lores' critical role related to Supplies, with one Bank of America Merrill Lynch analyst remarking during a June 6, 2017 conference, "[w]e're delighted to have HP, Inc. with us today. We have Enrique 'It's all about the supplies' Lores from HP. . . . Enrique has been a big part of seeing the supply story turn around at HP."

502.  Likewise, each executive was intimately involved with the Four Box Model as demonstrated by their own statements and admissions set forth above in Section V.

503.  Defendants' high-level positions, and their involvement with HP's core operation (e.g., its Supplies business) and the Four Box Model allowed them to control the contents of the material misstatements alleged in Section V, *supra*. Each of the Individual Defendants controlled the contents of the oral statements they uttered during various earnings calls and investor conferences during the Class Period. In addition, because of their high-level positions, each Individual Defendant was provided with, or had access to, copies of the presentations alleged herein to be false and misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

504.  **HP's Forms 10-K and 10-Q**. For instance, according to testimony obtained by the SEC, corporate HP employees worked with the Company's business unit to generate a first draft of the sections

of the Forms 10-K and 10-Q that were specific to those business units. Thereafter, Defendant Lesjak was involved in an iterative drafting process which ended when consensus was reached on what should be in the filing. Lesjak also reviewed these filings before HP filed them with the SEC, including, specifically, the Risk Factors and Management Discussion & Analysis sections of the Forms 10-K. Defendant Weisler relied upon Lesjak to oversee the process of putting together the filing, become comfortable with what HP was disclosing in these filings, and, ultimately, to sign off on them.

505.  With respect to the Risk Factors section of HP's Forms 10-K, testimony obtained by the SEC confirmed Defendant Lesjak's understanding that the purpose of this section was to identify for investors all of the different risks that were inherent in HP's business and that it was Lesjak's belief that it was important for investors to know about the risks in this section in order to understand whether HP stock was a good investment. More specifically, testimony obtained from the SEC confirmed that with respect to HP's "inventory management" risk disclosure, Lesjak believed that it was important for investors to understand the risks of and challenges associated with HP's use of channel distribution because that system was a "fundamental part" of how HP went to market, with 80% of HP's business on a revenue basis flowing through that system.

506.  **Quarterly Earnings Calls**. Additionally, based on testimony obtained by the SEC, Defendants first participated in a "level set" meeting where they discussed what happened in the quarter from a numbers perspective. Notably, Lesjak reviewed the SBTN or "the story behind the numbers" twice per quarter, once in the middle of the quarter based on projections of where HP believed it would be for the quarter and then after the fact with respect to the actual business results. During this first meeting, Defendants also took a first pass at the slide deck for the quarterly earnings call.

507.  At the second meeting, Defendants would again review the earnings slide deck, as well as review a draft script for the upcoming call and, typically, a draft press release. During this meeting the draft was read aloud and everyone in the room would go page-by-page and discuss whether the script flowed well, had the right tone, or was missing anything important. At the third meeting, Defendants conducted another review of the scripts; the earnings slide deck and the press release were now final. Defendants also began to brainstorm what they thought the key questions would be during the upcoming call so that answers could be prepared in advance. In the fourth meeting, Defendants would edit the "top[]

Q and A" document and otherwise try to put the draft answers together such that investors would understand what had happened in the quarter. Following the fourth meeting, Q and A would be assigned to specific people and Defendants would spend time practicing answering the key questions prior to the earnings call.

508. **Budgeting, Targets, and Quotas**. Further, according to testimony obtained from the SEC, HP's budgeting process for the next fiscal year began in May or June of the current fiscal year. The Company's budgeting process included "top-down" and "bottom-up" analyses, as well as an iterative process where HP corporate negotiated with the business units to arrive at the overall budget. The "top down" number is the Company's view as to "what's needed."

509. Because growing operating profit dollars was one of HP's goals following the split, the Company looked at ways it could potentially improve that metric at both a corporate and business unit level as part of the "top-down" analysis. Defendant Lesjak initially determined the amount by which HP should grow operating profits and then reviewed that with Defendant Weisler, who provided his input. Lesjak and her team would then provide the top-down guidance to the business units.

510. After Defendant Lesjak and her team had provided the top-down guidance to the business units and the units had provided HP corporate with their bottom-up analysis, HP would engage in an "interlock" process whereby corporate, including Lesjak's finance department, and the business unit would negotiate to determine the budget for the business unit and, ultimately, HP. At the end of the iterative process, HP corporate made the final decision on a business unit or region's budget. And, Defendant Weisler made the ultimate decision on what the final budget would be after this iterative process.

511. The resulting "targets," including revenue and profit targets, were top-down and reflected what HP corporate wanted the business unit to deliver for the quarter. The regions then worked with these targets to determine what they needed to do in order to meet them for each business. Once the regions received the targets, the region would then determine how to drive the targets through to the region's employees. This was done through "quotas." For the regional Printing business, there would be a quota for Supplies and one for hardware. HP managers, sales, and certain marketing employees have a level of incentive compensation determined by whether these quotas are met.

512. Additionally, because of their high-level positions and access to material non-public information concerning the Company, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made to investors, including statements concerning the Four Box Model, the sales model and pricing and inventory management changes, the trajectory and sustainability of the Supplies business, and HP's Supplies market share, hardware placement, and inventory, were materially false, misleading, and incomplete, and/or lacked any reasonable basis.

513. As a result, the Individual Defendants were responsible for the accuracy of HP's corporate statements, and each is therefore responsible and liable for the representations contained therein or omitted therefrom. HP knowingly and/or recklessly made the materially false and misleading statements and omissions of material fact alleged herein based on the fact that Individual Defendants knew and/or recklessly disregarded that the Company's statements were materially false and misleading and/or omitted material facts at the times that such statements were made. Each of the Individual Defendants was among the most senior executives of the Company throughout the Class Period and a member of the Company's management, and their knowledge may be imputed to the Company.

514. Defendants' statements during the Class Period strongly and plausibly suggest each had access to negative material undisclosed information. Indeed, Defendants' material misrepresentations and omissions explicitly or implicitly pertained directly to HP's Four Box Model, including the critical data inputs for that model, as well as the sustainability and trajectory of the Supplies business and HP's Supplies market share and inventory, and could not have been made with any reasonable basis in fact, as the Defendants belatedly and gradually disclosed, among other things, Defendants historically lacked critical telemetry data from HP's toner-based printers and instead relied on lagging and out-of-date third-party data to calculate commercial market share for HP's Supplies, that, as a result, HP oversold roughly $100 million of Supplies product into its sales channels, and that the Company revised its commercial market share calculations significantly downward.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

E.      **Weisler's and Lores' Suspicious Insider Trading and Defendants' Motive to Conceal the Relevant Truth about HP's Supplies Business Further Confirm a Strong Inference of Their Scienter**

515.   During the Class Period, Defendants Weisler and Lores collectively disposed of over ***$115 million*** in HP stock while in possession of adverse material, nonpublic information regarding the inaccuracy and unreliability of the Four Box Model, as well as market demand, market share, and inventory levels for HP's Supplies business. As the results of Defendants' materially false and misleading statements and omissions of material fact, these stock dispositions were executed at artificially inflated prices under suspicious circumstances.

516.   During the Class Period, Defendant Weisler disposed of 4,171,223 shares of HP stock at an average price of $20.83, for a total proceeds of over ***$86.87 million***. Defendant Weisler's trades are set forth in the following chart:

| Dion Weisler | | | |
|---|---|---|---|
| Transaction Date | Shares Disposed | Price | Value Disposed |
| 8/7/17 | 430,903 | $19.3181 | $8,324,227 |
| 9/25/17 | 95,521 | $19.9700 | $1,907,554 |
| 9/26/17 | 635,981 | $19.9700 | $12,700,541 |
| 10/13/17 | 525,719 | $20.9700 | $11,024,327 |
| 11/2/17 | 525,719 | $21.2229 | $11,157,282 |
| 11/2/17 | 87,408 | $21.4000 | $1,870,531 |
| 11/6/17 | 80,102 | $21.4693 | $1,719,734 |
| 12/4/17 | 28,022 | $21.0800 | $590,704 |
| 12/4/17 | 190,163 | $21.0800 | $4,008,636 |
| 12/7/17 | 53,267 | $20.9700 | $1,117,009 |
| 12/9/17 | 73,715 | $21.0700 | $1,553,175 |
| 12/10/17 | 18,111 | $21.0700 | $381,599 |
| 10/31/18 | 44,400 | $24.1400 | $1,071,816 |
| 11/2/18 | 84,952 | $24.6300 | $2,092,368 |
| 11/6/18 | 7,399 | $24.5500 | $181,645 |
| 11/7/18 | 78,990 | $24.8272 | $1,961,101 |
| 11/26/18 | 320,725 | $22.8100 | $7,315,737 |
| 12/7/18 | 95,414 | $22.9300 | $2,187,843 |
| 12/9/18 | 71,644 | $22.9300 | $1,642,797 |
| 12/11/18 | 116,134 | $22.9874 | $2,669,619 |

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| Dion Weisler | | | |
|---|---|---|---|
| Transaction Date | Shares Disposed | Price | Value Disposed |
| 3/18/19 | 36,799 | $20.0000 | $735,980 |
| 6/27/19 | 132,964 | $20.9500 | $2,785,596 |
| 8/26/19 | 437,171 | $18.0100 | $7,873,450 |
| **TOTAL** | **4,171,223** | **$20.83 (average)** | **$86,873,270** |

517. During the Class Period, Defendant Lores disposed of 1,255,145 shares of HP stock at an average price of $22.68, for a total proceeds of over ***$28.46 million***. These trades are set forth in the following chart:

| Enrique Lores | | | |
|---|---|---|---|
| Transaction Date | Shares Disposed | Price | Value Disposed |
| 3/18/17 | 56,961 | $17.5600 | $1,000,235 |
| 5/31/17 | 59,000 | $18.8003 | $1,109,218 |
| 10/6/17 | 40,965 | $20.5000 | $839,783 |
| 10/13/17 | 40,965 | $21.5000 | $880,748 |
| 10/30/17 | 26,101 | $21.3900 | $558,300 |
| 11/21/17 | 40,965 | $22.5000 | $921,713 |
| 12/4/17 | 55,465 | $21.0800 | $1,169,202 |
| 12/7/17 | 16,647 | $20.9700 | $349,088 |
| 12/9/17 | 21,502 | $21.0700 | $453,047 |
| 12/10/17 | 4,102 | $21.0700 | $86,429 |
| 1/12/18 | 37,820 | $22.4900 | $850,572 |
| 1/17/18 | 53,484 | $22.4900 | $1,202,855 |
| 1/18/18 | 249,409 | $23.4900 | $5,858,617 |
| 3/9/18 | 302,895 | $24.4900 | $7,417,899 |
| 3/18/18 | 58,838 | $23.5100 | $1,383,281 |
| 10/30/18 | 25,367 | $23.6700 | $600,437 |
| 10/31/18 | 15,752 | $24.1400 | $380,253 |
| 11/26/18 | 95,669 | $22.8100 | $2,182,210 |
| 12/7/18 | 32,341 | $22.9300 | $741,579 |
| 12/9/18 | 20,897 | $22.9300 | $479,168 |
| **TOTAL** | **1,255,145** | **$22.68 (average)** | **$28,464,634** |

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

518. Both the amount and timing of Weisler's and Lores' trades were highly unusual and suspicious. For example, the shares that Weisler disposed of during the Class Period represented approximately **89%** of his total reported HP common stock holdings during the Class Period (comprising common stock held at the beginning of the Class Period plus all shares that he acquired during the Class Period). Similarly, Lores' Class Period stock dispositions represented approximately **83%** of his total reported HP common stock holdings during the Class Period.[2]

519. Defendant Weisler's and Lores' Class Period trades were also suspicious because they were dramatically out of line with their prior trading history. In particular, during a "Control Period" from November 2015 to the beginning of the Class Period, Weisler only sold 255,912 shares of HP stock for total proceeds of approximately $3,878,622.[3] Comparatively, during the Class Period, Weisler sold an average of 1,577,519 shares per year, for average yearly proceeds of $32,854,688—***more than eight times higher*** than his proceeds during the Control Period. Similarly, during the Control Period, Lores only sold approximately 114,000 shares of HP stock, for total proceeds of approximately $1,525,603. Comparatively, during the Class Period, Lores sold an average of 474,685 shares per year, for average yearly proceeds of $10,765,068—***nearly seven times higher*** than his proceeds during the Control Period.

520. In addition to the amount and timing, the pricing of the trades further highlight their suspicious nature. Indeed, both Weisler and Lores engaged in unusually high volume sales at a time when Defendants' misleading statements and omissions had inflated HP's stock price to all-time highs. More specifically, during the Class Period Weisler and Lores disposed of HP stock at average share prices of

---

[2]      Given the complexity and lack of complete publicly available data regarding Weisler's and Lores' unvested and vested options activity prior to and during the Class Period, as well as HPQ's split from the Hewlett-Packard Company in November 2015, Defendant Lores' lack of public reporting of options activity prior to November 2015, and Lores' lack of Schedule 14A options listings prior to December 31, 2017, Lead Plaintiffs believe the most reliable measure of Weisler's and Lores' insider trading activity during the Class Period is reflected above.

[3]      This Control Period was chosen because HPQ common stock did not begin trading until November 2015—when HPQ split from the Hewlett-Packard Company. Moreover, Defendant Lores did not report his sales on Form 4 prior to November 2015—when he was promoted to President of Imaging, Printing and Solutions for HP. Given that the Class Period is longer than the Control Period, and to ensure a (more than) fair comparison, Lead Plaintiffs used Defendants' average yearly Class Period sales (i.e., average sales per 12 months) as a comparison for the 15-month Control Period.

$20.83 and $22.68, respectively. In comparison, during the Control Period, Weisler and Lores disposed of significantly less stock at average share prices of $15.16 and $13.38, respectively.

521. Finally, although certain of Weisler's and Lores' trades were executed pursuant to Rule 10b5-1 trading plans, those trading plans were put in place during the Class Period, *after* Weisler and Lores were *already* in possession of adverse material non-public information, as discussed herein. In particular, Weisler made certain Class Period trades of HP stock pursuant to Rule 10b5-1 trading plans adopted on June 23, 2017, June 28, 2018, December 28, 2018, and June 20, 2019. Likewise, Lores made certain Class Period trades of HP stock pursuant to Rule 10b5-1 plans adopted on September 28, 2017 and December 27, 2017. Accordingly, the adoption of these Rule 10b5-1 plans calling for increased sales of HP common stock while Weisler and Lores were already in possession of adverse material non-public information and were making materially false and misleading statements and omitting material facts, further reinforces a strong inference of scienter.

522. The Individual Defendants were also motivated to ensure the success of a business model and a revenue model on which they had staked their careers at HP. Indeed, after years of disappointing results, the Individual Defendants had doubled-down on the "razor/razor blade" business model as well as the reliability and accuracy of the Four Box Model. Indeed, as noted above, they repeatedly touted the merits of the Four Box Model to the market—until the end of the Class Period when they abandoned their business model entirely. Because these executives had specifically pinned their success on both the business model and the Four Box model, they were motivated to mislead investors as to the limitations and failings of both until the truth was undeniable.

## VII.   LOSS CAUSATION

523. As a result of Defendants' materially false and misleading statements, omissions of material facts, and fraudulent course of conduct, HP's common stock traded at artificially inflated prices during the Class Period. Relying on the integrity of the market price for HP common stock and public information relating to HP, Lead Plaintiffs and other Class members purchased or otherwise acquired HP common stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein. As a result of their purchases or acquisitions of HP common stock during the Class Period at artificially inflated prices and the removal of that inflation upon the disclosures set forth in

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Sections VII.A.–VII.C., *infra*, Lead Plaintiffs and the Class suffered economic losses (i.e., damages) under the federal securities laws.

524.  Defendants' false and misleading statements, material omissions, and deceptive course of conduct had their intended effect, directly and proximately causing HP common stock to trade at artificially inflated prices during the Class Period, trading as high as $27.08 per share on October 4, 2018. Those misrepresentations and omissions of material fact that were not immediately followed by an upward movement in the price of HP common stock served to maintain the price of HP common stock at an artificially inflated level.

525.  Had Defendants been truthful about the state of HP's Supplies business, Lead Plaintiffs and other Class members would not have purchased or otherwise acquired their HP common stock at the artificially inflated prices at which they traded. It was entirely foreseeable to Defendants that misrepresenting and concealing material facts from the public would artificially inflate the price of HP common stock. The economic losses (i.e., damages suffered by Lead Plaintiffs and other members of the Class) were a direct, proximate, and foreseeable result of Defendants' materially false and misleading statements and omissions of material fact.

526.  Lead Plaintiffs and other Class members suffered actual economic loss and were damaged when the material facts and/or foreseeable risks concealed or obscured by Defendants' misstatements and omissions were partially revealed and/or materialized through the disclosure of new information concerning HP on three dates: February 27, 2019, August 22, 2019, and October 3, 2019.

A.  **February 27, 2019: The Relevant Truth Regarding HP's Supplies Business Begins to Emerge**

527.  On February 27, 2019, HP issued its financial results for 1Q19. In its press release, the Company disclosed that Supplies revenue was down 3%. During a same-day conference call, Defendant Weisler stated that: "Supplies revenue was weaker than anticipated, particularly in EMEA, where supplies declined 9%. As you know, we look at our Supplies business in terms of our 4-box model: in store base, usage, share and price. The 2 factors that varied from our plan were a ***decline in share*** and, to a lesser extent, ***pricing***." Weisler noted, "[w]e saw this most significantly in our commercial channels, which is having the larger impact on office supplies." Weisler also revealed that HP's "regional share assumptions"

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

from its Four Box Model "were overestimated" over "multiple quarters" resulting in a glut in Supplies inventory in the channel. More specifically, Weisler revealed that HP's reported channel inventory ceiling only included Tier 1 inventory because HP did not have visibility into much of its channel: "we continued to maintain the levels of channel inventory under our Tier 1 ceiling and monitor Tier 2 inventory, where we had some visibility. However, we continue to fulfill orders likely over multiple quarters based on our regional share assumptions, which we now believe were overestimated. This resulted in additional HP supplies in the ecosystem, including the unmonitored downstream portion." As a result, Weisler explained, "*we no longer expect supplies to be flat to slightly up in fiscal '19*."

528.   Likewise, Defendant Fieler stated that "[f]irst quarter Supplies revenue was $3.3 billion, down 3%, which is below our expectations, driven primarily by EMEA" and revealed that "*we had relied primarily on lagging and incomplete market share surveys*" and that "*new telemetry data indicated* that HP's Supplies share, and particularly in our office business, was *significantly lower than what we had assumed in our 4-box model*." Fieler further revealed that despite Defendants' Class Period assurances that they were carefully aligning Supplies channel inventory with demand, in reality "inventory had grown in the ecosystem, including in the downstream portion beyond our reporting visibility." Indeed, the Company once again needed to "lower the inventory in the entire ecosystem." Fieler stated that by reducing channel inventories, "pricing should improve." Fieler also disclosed that the excess channel inventory would result in a "$100 million headwind to Supplies revenue for the remainder of FY '19 or roughly 1% of total Supplies revenue" and stated that "[w]e expect this impact, combined with the lower go-forward Supplies share and pricing assumptions, to *result in a Supplies revenue decline of approximately 3% for the year*."

529.   During the question-and-answer portion of the conference call, analysts expressed surprise at the instability of the Supplies business and pushed Defendants for further detail about the underlying cause. For example, a Bank of America Merrill Lynch analyst asked:

> Dion [Weisler], can you talk about why you're seeing this particularly in EMEA in Supplies and the risk that this spreads to other regions as well? And how confident are you about this prediction of 3% decline you -- and that you have actually captured an appropriate amount of data and telemetry that's guiding that given that this is not the first time that we'll see the Supplies reset?

530.  Defendant Weisler responded that "the ***underlying cause*** as we outlined during the call, was the surprise around our assumptions about share were wrong, and it was most specifically in EMEA." Weisler also explained "[w]here we went wrong is that ***we had incorrect Supplies share assumptions in our 4-box model*** regarding the plans for Supplies selling in quarter 1 '19 and in prior quarters. This made it very difficult to spot the buying behavior change as a trend. ***It didn't necessarily all happen in Q1***, but now that we understand the trend better, it has driven a change in our expectations for share going forward." Weisler further conceded that the Company did not have visibility into the actual amount of inventory in its Supplies channel: "since we don't have much visibility into the downstream channel ecosystem and we were maintaining CI levels below our Tier 1 ceiling, we did not see clearly enough that we had an issue." Weisler also noted "[w]e also received new share analytics. It's a really important point, and we were able to triangulate that our ***revised share assumptions were below our previous ones***. And so in retrospect, when the new share insights are applied, we believe that ***our inventories in the ecosystem -- in the whole ecosystem began growing in prior quarters***. ***However, the prior share assumptions made it hard to call this out as a trend as it was masking the underlying problem***."

531.  Similarly, Defendant Fieler focused on HP's use of "incorrect share assumptions":

So in Q1, certainly, the revenue weakness and the ***incorrect share assumptions*** were primarily in EMEA. And while the multi-tier channel dynamics that have been described are ***not unique to EMEA***, they are more prevalent there. That said, the competitive trends are global, and both the changes in the customer buying with more commercial customers purchasing supplies online and the pricing that Dion just referred to are more macro in nature. And therefore, ***when we revisited our 4-box assumptions, we did look at all regions and revised our share and pricing accordingly***, and that's all embedded in our guidance. . . .

532.  Fieler also discussed the excess Supplies inventory that HP had pumped into its channel and its resulting need to take a $100 million inventory drawdown: "***We compared our old share assumptions with the revised one that have been informed by big data***, and we also looked at prior selling statistics and CI trends. We then estimated how much additional downstream channel inventory may exist, and we believe $100 million is the right estimate." Fieler further noted that the Company could not be precise about the amount of excess inventory in its channel, because it did not have adequate visibility into its actual channel inventories: "while there are some things that are clear with data, there are others that we

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    need to triangulate on. And we can't be precise on all fronts, especially because we don't have visibility

2    into the entire downstream unmonitored ecosystem."

3       533.  Goldman Sachs analyst Roderick Hall also asked about the "telemetry question" surrounding

4    the Four Box Model: "*I just want to come back to the telemetry question* and ask you if you could give us

5    some idea where you are in the process of *improving telemetry*. So have you -- what kind of sample you

6    have? So should we expect for you to continue to look at this and improve telemetry over time, and

7    therefore, maybe come back to us and continue to adjust this inventory in the channel? Or is everything

8    pretty much done now, and you wouldn't expect any changes?"

9       534.  In response, Fieler stated that "the 4-box model historically has been a relatively good

10    predictor. And I think we need to acknowledge that it is not perfect. There is data and science. There is

11    also judgment and art to it. And to your question, *we do need to get better with the telemetry data*." He

12    also noted "we have been pretty good at predicting with the 4-box model, and this is fine-tuning."

13       535.  Morgan Stanley analyst Katy Huberty also focused on the negative Supplies issues and the

14    telemetry data used in the Four Box Model:

> Just following up on the Printer Supplies discussion. It sounds like some of the visibility into market share *came on the back of the telemetry data*, which is something that you've talked about for a couple of years. Why this quarter did that show you a picture that actual market share was different than you thought? *Why weren't the systems flagging that ahead of time?* And do you have to invest in technology so that you can get better insights out of that data?

19       536.  In response, Defendant Weisler stated:

> To help you understand it better, let me explain a little bit about our methodology that drives the share assumptions we use on office supplies, which is primarily toner-based, and how it's changed. It's worth noting that it's different than ink-based products, where we've historically had more telemetry data. *Previously, we had used periodic third-party survey data and market research aggregators to estimate toner supply shares. We did not have a statistically significant sample from the system telemetry and the instrumentation nor the capabilities to calculate share for toner-based products in the installed base. We've had this data for ink-based products, but due to the limited number of machines that were phoning home in commercial due to enterprise firewall constraints and otherwise unconnected devices*, we've had to build the connected installed base over time. And so with the increasing mix of newer products and the growth of the connected installed base, combined with improvements in big data, we've been able to move to a better source of share data based on system telemetry. It's worth noting that the share we calculate through big data reflects the share at the time the customer hits the print button, which may be months after they actually purchase the supplies. So when the new share insights are

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

applied, *we believe that the inventory in the ecosystem had been growing during . . . [1Q19] and previous quarters*. And the combined effect of the change in market dynamics impacting share and the lack of visibility to the change resulted in excess HP supplies in the market and lower Tier 1 channel sell-through. Having said all that, *we will obviously need to continue to refine the telemetry data* and our instrumentation and business management system as we move forward.

537.  Sanford Bernstein analyst A.M. Sacconaghi asked if the problems with the Supplies business were limited to EMEA and why HP had "confidence in minus 3% growth" for Supplies in 2019. In response, Fieler stated that although the primary issue in Q1 was in EMEA, HP had "looked and reanalyzed the entire business across all regions. And the minus 3%, we believe, is a prudent guide. It does take into account both, number one, the channel inventory in the entire ecosystem. Again, it's about a point of it, the $100 million takedown. And the second is we did revise our shares and pricing assumptions worldwide."

538.  Fieler also provided the market with a specific "update of *where we are on the 4-box*":

Enrique shared at SAM what we thought the various 4-box arrows looked like. And if Enrique were doing that today, given the changes we've seen driven by the commercial channel and evolving marketplace Dion described, first, we wouldn't expect any changes to installed base or usage. Where we would expect some change is in office. *Whereas we have previously had an arrow going up of gaining share, given the new data, we'd actually expect share to be down to a lesser extent on office*. Pricing, which was a down arrow, driven by the mix more to A3, we offer additional commentary that there would be pricing pressures, again as we described on the call. On home, almost all the boxes will remain the same except for share, given that a smaller portion of home does have toner-based products. And so the share we have previously had going up, it would still be going up but not as, I guess, strong of an arrow going up, as we had said at SAM.

539.  In the wake of these disclosures, the Company's share price declined $4.12 per share—or more than 17%—in a single trading day, from a close of $23.85 per share on February 27, 2019, to close at $19.73 per share on February 28, 2019. Thus, HP lost over $6.34 billion in shareholder value in a single day.

540.  Analyst reports following the conference call uniformly focused on the surprising negative news regarding the instability of HP's Supplies business and the underlying problems with HP's Supplies channel inventories, market share, and pricing. For example, Wells Fargo issued a same-day report stating "HP reported disappointing Printing revenue at $5.056B (vs. consensus $5.168B estimate) *driven by a material, unexpected decline in supplies revenue*. Supplies revenue at $3.267B vs. our prior $3.49B estimate (consensus $3.42B); down 3% y/y vs. +7% y/y in the prior quarter." Wells Fargo also noted that

"*we expect shares to be under pressure following negative printer supplies (attributed mostly to commercial toner) results / guide*" and that "[t]he company noted that incremental telemetry data led to it *significantly decrease its supplies share assumption in its 4-box model* and as a result it will lower its inventory moving forward creating a $100M headwind to supplies revenue. HP now expects supplies to be down ~3% y/y vs. prior expectation of flat to up slightly." Wells Fargo further explained:

> Incremental / more accurate telemetry market share data tracked by HP indicated the company's share (particularly in office) was *significantly lower than previously assumed in HP's 4-box model* and thus resulting in downward revision to forward expectations. . . .While the company reiterated F2019 non-GAAP EPS guide at $2.12- $2.22/sh. (including +$0.02 from Apogee acquisition), *we think investors will now be left to incrementally gauge HP's visibility into its 4-box model*.

> *                    *                    *

> HP's *significantly weaker than expected supplies growth and negative commentary around market share lead us to be meaningfully more cautious around our print assumptions*. We think that investors will be left to consider whether weakness identified in EMEA will spread to additional geographies. We are focused on HP's ability to maintain its LT EBIT% target of 16%-18% moving forward; management noting that this will become more difficult to reach its +16% target in F2019.

541.  Similarly, Morgan Stanley issued a next-day report titled, "***Supplies Miss Not a Quick Fix***" stating "printer supplies miss and guide down means [management] needs to restore confidence in future supplies growth before the stock can work despite maintaining FY19 EPS / FCF guide." The report noted "***HPQ shares are down 12% in the aftermarket after the company disclosed an unexpected printing supplies guide down in FY19*** that is ***reminiscent, though not parallel in our view, of issues the company faced in FY16***. There is no quick fix to the supplies issue given channel inventory now needs to be worked down":

> After investigating the shortfall, *the company discovered through new telemetry data that HP supplies share was overstated in management's 4 box model* due to a lack of data from newer phone-home office based units than in the past. HP alluded to the fact that these issues were largely contained to the commercial supplies market in EMEA but investors will question 1) if/when this customer purchasing behavior (i.e. greater online purchasing, where HPQ has less of a presence vs. traditional channel and retail) spreads to other geographies going forward and 2) how much HPQ can do to combat the persistent threat of low cost supplies alternatives. As a result of this issue, we now model FY19 printing supplies revenue declines of 3% vs. 1% growth previously as HPQ reduces channel sell-in this year to return channel inventory to healthier levels. Going forward, HPQ will need to make investments in supplies GTM/marketing, brand protection, *and more accurate*

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    *telemetry and analytics software so that these issues are identified ahead of time but we*

2    *see this as a multi-quarter issue unlikely to be resolved in the near-term*.

3    542. Likewise, additional analysts issued reports on February 28, 2019 focusing on the negative

4   disclosures regarding Supplies:

5    <u>Susquehanna</u>: "Supplies disappointed and FY19 outlook revised downward, with no

6    visibility on a rebound. HPQ reported weaker Supplies revenue of $3.27B vs. our estimate
of $3.39B, attributing the lion's share of the miss to EMEA, where supplies fell 9% Y/Y. .

7    . . *[T]he company's 'four box model,' which has done a strong job of predicting Supplies*

8    *streams, had overestimated HPQ's market share as well as sell-through downstream*. . . .
Given the change in market share assumptions and increased online activity, HPQ has

9    chosen to reduce channel inventories across the ecosystem. Management anticipates

10   reducing $100M of inventory through FY19, but also reducing sell-in to ensure inventory
levels are leaner. However, it remains unclear to us if the secular dynamics that are in play

11   (pricing, share loss) can be resolved swiftly - if at all. As such, we lack conviction in a
rebound in Supplies revenue in FY20."

12    <u>Wolfe Research</u>: "Supplies Downside Surprise Not a Quick Fix" and "we didn't expect a

13    decline of 3% in F1Q, which is the new annual guidance. *Supplies is the lifeblood of HP,
which makes the share and price challenges faced in Europe a serious investor concern*"

14    and that fixing "channel inventories could take the balance of the year." The report also
noted that the "*[f]our box model [is] out of kilter*," "[e]arnings upside likely gone," and that

15    "HP needs to take down channel inventory by $100mn and adjusted sales expectations for

16    lower share and pricing. The challenges mostly are in Europe with supplies off 9% but bleed
into other geos as well."

17    <u>Argus</u>: "HPQ was slammed because weakness in printing supplies revenue could persist"

18    and "*investors were concerned about weakness in its printing supplies business that could
persist across FY19*." The report also noted "*the company's 'four box' printing model ran*

19    *into serious headwinds*" and "[w]hile this model has been successful, HPQ has had to

20    change its assumptions around aftermarket share, particularly in the commercial space and
particularly online."

21    <u>BMO Capital Markets</u>: "Bottom Line: HPQ delivered results that were disappointing on the

22    top line largely *due to a Supplies shortfall*, where we think a resolution could take a few
quarters to iron out." The report noted "[m]anagement lowered expectations for Supplies

23    revenue growth, and now expects a y/y decline of 3% in F2019 vs. prior expectations of flat

24    to slightly up (we had been modeling +0.8%)" and "*management needs to address
inventory levels, rework four-box model assumptions, and address share issues*. . . ."

25    <u>JP Morgan</u>: "Weaker than expected Printer supplies drove the top-line miss, and excess

26    channel-inventory is expected to weigh on overall high-margin materials for the rest of
FY19. Management expects to remedy channel execution issues by expanding its online

27    channel, protecting IP, and diversifying product lines, none of which can be fixed
overnight." "We expect the lower Printer materials outlook to weigh on the stock and expect

28    the stock to trade sideways here with limited catalysts ahead."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UBS**: "Supplies rev is now expected to decline 3% in FY19 vs prior flat to slightly up guide" and "[n]ear-term, the stock would likely trade down because *the supplies miss was a surprise to us and many investors*." "Supplies decline includes $100MM related to clearing of the downstream (tier-2 and tier-3 distributors/resellers) channel inventory…" and "HP had a similar supplies challenge roughly three years ago when it changed the business model from a channel-push to demand-pull. The move impacted supplies revenue by $450mn over two quarters."

**B.    August 22, 2019: Investors Learn New Information Regarding the Instability of HP's Supplies Business**

543.    On August 22, 2019, the relevant truth concealed by Defendants' misrepresentations and omissions continued to make its way into the market. HP announced 3Q19 financial results that missed expectations, driven by a 7% year-over-year decline in Supplies revenue, and a decline in EMEA Supplies revenue in the "mid-teens." HP reduced 2019 Supplies revenue guidance to a range of between -4% and -5% (from prior guidance of -3%) and stated that "*we are not planning for supplies revenue to grow in FY '20*." HP also announced "senior leadership changes in EMEA" and that Defendant Weisler would be stepping down. Weisler's departure was publicly attributed to a "family health matter" with no further details. Market commentators noted that this was a "sudden departure."

544.    During the call, Defendants also disclosed that in 2019 HP was still working to "centralize[] pricing decisions" and to "change[] and improve[] the controls around our discount policy," changes which they had purportedly made back in 2016. Defendants also further detailed HP's "lack of visibility" into the actual health of its Supplies channel inventories, noting that "the sizing of the overall inventory is a triangulation, given our lack of visibility into the entire channel ecosystem." As a result, HP did not know the actual amount of excess inventory in its channel, despite having removed nearly $100 million: "since Q1, we brought down our channel inventory dollars that we monitor, so this is both the Tier 1 and parts of the Tier 2 where we have visibility. The total channel inventory dollar reduction is nearly the $100 million that we initially estimated. So we have made good progress. However, it's not possible to specifically quantify what impact we've made in the rest of the unmonitored downstream ecosystem." Defendants further noted that while they had expected some impact from the changes HP had made to pricing and channel inventories, among other things, "we underestimated the immediacy, the reaction and the size of the impact on the back half of the year."

545.   During the question-and-answer portion of HP's conference call, analysts focused on the unexpected adverse news regarding the Supplies business, including its continued instability and deterioration of growth. For example, Sanford C. Bernstein analyst Toni Sacconaghi noted that Supplies results and growth expectations were "dramatically worse" than expected and questioned why the business was suffering despite an overall healthy macroeconomic environment:

> I just wanted to follow up on the Printing. ***So it sounds like things have gotten notably worse*** in the last couple of months because, as you noted, your guidance originally was Supplies to be down 3%, and you were tracking to that through the first half of the year, and now you're suggesting it's going to be down 4% or 5%, ***which would suggest that the second half is going to be down 6% or 7%, which is dramatically worse than you had thought***. And I think initially your thought, through tactical improvement, things might actually get a little progressively better over the course of the year.

> And so if I just reflect on the ***magnitude of that change in outlook***, are you really suggesting that most of this is a bigger strategic headwind from cloning and alternatives than you had originally thought? Or are you suggesting that the economic weakness in Europe is the principal driver? Because I guess my observation would be, globally, the economy is still pretty healthy. And so if we're seeing with relatively healthy global economy, ***normalized Supplies growth is minus 6% or minus 7%, that's pretty rough to me***. So perhaps you could clarify that . . . .

546.   In response, Fieler reiterated that "in the first half, our total Supplies revenue was down 3%. EMEA was down roughly 9% in the same period. And in Q3, total Supplies was down 7% with EMEA down mid-teens. I say that because I want to be very clear that our Supplies performance continues to be driven by EMEA." Weisler noted the "larger-than-anticipated decline in EMEA" and "senior management changes in EMEA," explaining that "we underestimated the immediacy, the reaction and the size of the impact on the back half of the year."

547.   Similarly, Evercore ISI analyst Amit Daryanani questioned whether the negative Supplies results were spreading: "I'd love to hear your conviction and confidence on why you think this issue's not spread beyond EMEA to North America or APJ as well." In response, Fieler stated: "I think it's important to highlight . . . if you just reflect on the first half of the year in Print, our Supplies were down 3%, and we grew operating profit dollars in that period. And ***I do want to acknowledge we do not grow OP dollars in Print in Q3, given the larger Supplies decline***, but we do have multiple levers across our Print business from more profitability on our hardware services, more growth in our growth initiatives as well as cost structure items to address in Print." Weisler also acknowledged the growing problems in Supplies and

noted "*the size and the timing of the ripples caused in the back half of this year is something that we underestimate[d]*." Similarly, Fieler stated: "*[Y]es, the timing extent and sort of the immediacy of the impact was harder than we anticipated* . . . ."

548.  Following these disclosures, the price of HP stock fell $1.12 per share, or approximately 6%, from a close of $18.93 per share on August 22, 2019, to close at $17.81 per share on August 23, 2019. This decline erased approximately $1.66 billion in market capitalization.

549.  Analysts covering HP stock uniformly focused on the negative disclosures regarding Supplies. For example, Credit Suisse issued reports on August 22 and August 23, 2019 noting: "Supplies revenue is key for the stock and was down 7% y/y ($3.16bn vs. CSe/Street $3.22bn/$3.33bn) as trends deteriorated vs. F1H" and "Supplies Shortfall Overshadows Solid PCs/FCF":

> F3Q19 Earnings Recap: While HP's headline revenue was largely in-line ($14.60bn vs. CSe/Street $14.72bn/$14.62bn) and EPS of $0.58 beat CSe/Street of $0.55/$0.55, *the details underneath were less encouraging particularly given the sharp deterioration in Supplies* (-7% y/y vs. -3% y/y in F1H). Digging in and starting with Supplies, management attributed the shortfall to (1) *lingering (and accelerating) disruption from distribution changes and channel inventory reductions*, mostly in EMEA; and (2) incremental macro softness weighing on end customer demand. As a result, *HP now expects a similar pace of decline in F4Q and continued Supplies headwinds into FY20*.

550.  The report also noted that "[o]n channel inventory in particular, while the company has executed on nearly the entire $100mn planned reduction, they noted an ongoing lack of visibility below Tier 1 distributors which makes sizing the downstream impact inherently difficult." Further, "we'd highlight continued risk to the downside to our current forecasts, *given a potential sustained move below-average to offset FY18 over-ship*. We continue to view Supplies stabilization as the key metric for HP's stock price, and think the multiple will have a hard time re-rating without line-of-sight to sustained improvement ahead." Additionally, "we'd also note lingering unit declines (-9% y/y in F3Q, down two quarters in a row) could further pressure the installed base and subsequent Supplies stream." The report also noted, "[a]s we've detailed extensively in the past, *Supplies remains the key metric for HP following the disappointing reset in F1Q*" and "without line-of- sight to sustained *Supplies stabilization*, we think it will be difficult for the stock to re-rate ahead and prefer to remain on the sidelines."

551.  Other analysts similarly focused on the negative Supplies news:

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Susquehanna: "[E]xpectations continue to remain **plagued by a challenging Printing business - namely Supplies revenue, which came in weaker than expected**. Specifically, EMEA Supplies Rev declined 'mid-teens' Y/Y, and management's anticipation of another Y/Y Rev decline in FY20 (with sobering commentary around structural EMEA market dynamics) **gives us a lack of confidence that Supplies revenue can rebound any time soon**." Moreover, "HPQ's $100M channel inventory reduction target is largely achieved, but more channel inventory reductions may be necessary given lack of insight into 'unmonitored downstream ecosystem.'"

Evercore ISI: "Declines in this [Printing] segment were due to negative performance in Supplies (-7%) . . . ." "**[T]he real disappointment comes from softer trends in Supplies** (down -7% vs. FH1:19 trendline at -3%) driven by weaker EMEA performance combined with macro and execution issues. Based on management's comments, we think the decline in supplies for FH2 will be around ~6-7%, however the risk we think will be what happens if the macro and broader issues from EMEA become a more global issue?. . . . **[W]e think the stock may languish until we see an improvement in the Supplies revenue** trajectory something we currently do not have a line of sight for (management does not expect Supplies revenue to grow in FY20)."

Morningstar: "Weak Printing Results Overshadow PC Strength" and "the performance gap between personal systems and printing was alarming." The report also noted "[w]ith a **more pessimistic view on the timetable for which printing supplies could return to growth** and expected challenges in the PC market, we are lowering our fair value estimate to $19 per share from $22."

Barclays: "Supplies Overhang Persists" and "printing disappointed due to continued excess supplies inventories in the channel and macro weakness in EMEA," and "printing seems unlikely to recover in the near-term." The report cut its price target for HP stock and concluded that "[w]e remain on the sideline given the supplies headwind."

Deutsche Bank: "HP reported an EPS beat driven by higher PC revs/profits, **but Supplies was guided to decline** -4% to -5% in FY19 down from low-single digits prior (implied -1% to +3% q/q in FY4Q19E) and was guided to decline y/y in FY20E, **which is likely to pressure the stock tomorrow**. With the main area of PC OM% strength (memory) likely to be cyclical in nature, coupled with the apparent secular nature of Supplies decline (Supplies has declined y/y 9 out of the last 15 quarters in CC), **it remains difficult to see signs of bullishness in Supplies** that can create an upward operating profit/EPS inflection for HPQ."

C.    **October 3, 2019: HP Abandons the Four Box Model and Admits Its Supplies Business Is Fundamentally Unsound**

552.  On October 3, 2019, HP held a Securities Analyst Meeting and admitted that it was effectively abandoning its flawed Four Box Model and moving away from the "supplies-centric" business model that it previously touted to investors throughout Class Period. Specifically, HP revealed that it was "departing from the purely transactional supplies-centric business model" and transitioning to a profit-driven business model in which "customers will be able to choose between paying a higher price for hardware and having a more flexible supplies model or buying a subsidized hardware unit that will only work with HP original

supplies." The Company also revealed that the "business model shift" would de-emphasize dependence on the Four Box model as HP focuses on "the key metrics . . . [of] service growth and operating profit dollars, which better reflect[] the system profitability" and thus "*we think Supplies is going to be down beyond FY '20*."

553.  HP's incoming CEO, Lores, acknowledged that this substantial switch in strategy "may hurt . . . [HP] on revenue" as the Company pursues a new business model that management believes "is much better from a profitability perspective in the medium and long term." HP further revealed that the Company was still working to implement the pricing consistency and inventory management practices that Defendants had told the market were in place in 2016. For example, Defendants stated, "we have to leverage data and manage the channels more effectively through a centralized pricing process and a disciplined channel partner program. This allows us to deepen our relationship with our channel partners and customers, including Tier 1 and Tier 2 channels, to get a tighter visibility and inventory and to manage it much, much more robustly." Further, HP was "changing our operating model" to "enable harmonized sales processes and pricing discipline around the globe." To allow HP to actually track its channel inventories and sales to end-users, the Company was also "investing in digital tools and analytics that help us track, verify cartridges from our factories through our multi-tier distribution channels and to our end customer." The Company also noted that it was "navigating market headwinds, particularly in supplies in EMEA." In connection with the business model shift, HP also announced that it expected to cut between 7,000 and 9,000 jobs, roughly 15% of its workforce, over the next three years.

554.  During the question-and-answer session of the FY19 SAM, analysts expressed surprise regarding the business model shift away from Supplies and noted the "conspicuous[]" absence of any discussion of, or reliance on, the Four Box Model that Defendants had repeatedly touted to investors during the Class Period. For instance, Bank of America Merrill Lynch analyst and Director of Research Division, Wamsi Mohan noted:

> *[The] last several years, you guys have been talking about the 4-box model in Printing, and this was conspicuously absent in this analyst presentation*. Do you think that, that framework is not the right framework anymore? Or if it is the right framework, is it just the uncertainty of the inputs? And once you get better clarity or visibility, that is something that you will bring back? Or is that something that's sort of not valid anymore? And secondarily, aren't you just pushing the Supplies problem of third parties out just 2 years because if you sell a printer upfront with higher hardware revenue but supply is enough to satisfy the first

2 years, wouldn't third-party problems still exist in your installed base beyond those 2 years?

555.  In response, Lores admitted that "we didn't cover the 4-box model today because, as we have said several times, *we don't think that going forward, supplies is the best metric to measure to understand the health of our business*." Thus, Lores explained that HP "decided to share less information" regarding the Four Box Model.

556.  During the call, analyst Shannon Cross of Cross Research asked, "Just a follow-up. I'm curious, what percent of the market do you think you'll be effectively walking away from or do you think, at this point, not profitable?" In response, Lores disclosed that approximately 20 percent of HP's printers were not profitable (i.e., NPV positive): "Okay. So I'll answer the first, and maybe, Christoph, you want to build on the second. In terms of the percentage of customers, we -- I will be vague on the answer. But above 20% of the customers today -- for 20% of the customers today, the usage is not enough for them to be profitable. So this gives you an order of magnitude. Of course, it's different by region. It's different by product. But this gives you an order of magnitude."

557.  Cross further asked, "you went through this whole inventory change and everything you did, I don't know, 3 years ago in the summer. And I guess there are a lot of changes made at that point in time in terms of go-to-market and pricing and trying to be more harmonized. Like is this along that same path or is there a mix shift?" In response, Lores revealed that HP had not previously had consistent global pricing, as it had previously represented to investors: "Yes. This is totally along that same line. It is very aligned to the work that we have been doing in the last quarters to understand how to improve the performance issues we were seeing in EMEA. Christoph was leading that group, and all the learnings there have been applied in the redesign of the go-to-market model that we have done. In the model we announced 3 years ago, *we were having consistency per region*. With this model, *now we will be able to have consistency across the world, which is a very important change*."

558.  On this news, the price of HP stock fell $1.76 per share, or approximately 10%, from a close of $18.40 per share on October 3, 2019, to close at $16.64 per share on October 4, 2019. This decline wiped out over $2.6 billion in shareholder value.

559. Following HP's disclosures, Wells Fargo issued a report titled, "HPQ: *RIP 4-Box Model –* *HP Moves to Systems Based Printing Strategy*." The report emphasized the "[a]bandon[ment]" of the 4-box model and HP's "capitulation" on its Supplies model as "key takeaways" that would negatively impact investor sentiment:

> [K]ey takeaways include: 1) *4-Box Print Model Abandoned*: HP announced that it was moving away from its 4-Box printing model and transitioning to a systems-based strategy that will *de-emphasize printing supplies*. The new model will give customers the choice between discounted hardware that can only use HP supplies or higher-priced hardware with the option to choose third-party ink suppliers. While we think that this move was largely unavoidable, *we think that investors will view HP's capitulation as net-negative*. We think that there is growing execution risk associated with HP's realignment of its printing business and simultaneous cost-cutting efforts.

The report also noted that "[m]anagement expects supplies revenue to decline in F[Y]2020 with operating margins at ~16%."

560. Numerous additional analysts confirmed their understanding that HP's business model shift and abandonment of its Four Box Model reflected the reality that HP's Supplies had never stabilized as previously represented. For example, Argus issued a next day report stating: "[w]e are lowering our intermediate-term rating on HP Inc. to HOLD from BUY, as the company's most profitable business of print & imaging continues to struggle." The report noted "*[i]nvestors are concerned that HP's 'crown jewel' business will be unable to staunch secular decline* in margins over the long term" and that HP's "*actions were insufficient to reassure investors, and HPQ sold off by 10% on the restructuring news*."

561. Likewise, Wolfe Research issued a report stating "*the stock traded down 6% in the aftermarket on a printing strategy shift*. Upending of traditional hardware subsidized model (new customers will now have to pay for flexibility), coupled with an announced cost savings plan, equated to *near-term capitulation* on efforts to stem existing installed base supplies headwinds. Despite the longer-term efforts laid out yesterday to steer purchase behavior, we have lingering secular concerns about printed pages."

562. Morgan Stanley echoed these comments and noted that the change in business model would negatively impact HP's Supply business in both the short and long term: "Where the strategy most noticeably changes is in core Printing and Imaging, where HP is pivoting the business model to capture more up front profit at the point of hardware sale, and rely less on supplies to drive system-wide operating

profit dollars. ***This business model shift will take time and pressure near to medium-term profits***." Further, "[m]anagement's rebuttal is that 20% of customers today do not use enough HP supplies for a positive total lifetime value. As a result, HP is likely to lose revenue but with a much lower, and sometimes positive, impact on profits." The report further stated that "many of the announced changes will take multiple quarters - and some years - to implement, and come with considerable risks" and that "HP plans to roll this model out to new customers over the next several years (starting with emerging markets) to their >150M unit installed base, ***which suggests printing supplies revenue will decline not just in FY20, but over a multi-year period***, which we now reflect in our model. We also see risk that competitors don't follow suit, ***which would result in accelerated hardware and supplies share losses***."

563. Similarly, Evercore ISI issued a report noting investor concerns regarding the change in Supplies business model:

> The stock has sold off by more than 10% since the event (vs. the S&P 500's <1% decline) ***which we believe is attributable to the change in HPQ's Printing business model*** (pricing hardware units to sell for a profit in markets with limited supplies attach), magnitude of restructuring announcement (7-9k employees or 13-16% of HPQ's total workforce), and disappointing FY20 FCF guide (company guided to "at least $3B" of FCF for FY20, which is down from "at least $3.7B" in FY19) which is due to incremental restructuring (~$400M) and other items (~$300M, cash tax headwind and other 1x items). While we think the shift in print strategy makes sense, ***we think the concern among investors is around 1) what type of impact a business model change will have for HPQ's print market share, and 2) at a macro level, what does this mean for the broader print market outlook?*** . . . .Net/net: The change in print strategy could introduce an element of execution risk particularly if conditions in the print market or global macro deteriorate.
>
> \*     \*     \*
>
> At a segment level, HPQ sees a 3-5% operating margin for its Personal Systems business (consistent with historical target range) and a ~16% EBIT margin for Printing. HPQ indicated that Supplies revenue will decline on a y/y basis in FY20.

564. Morningstar noted that "[t]o alleviate concerns about aftermarket ink and toner vendors affecting supplies sales, HP will now only sell discounted printer hardware to new customers who use genuine HP supplies." Deutsche Bank wrote that "HPQ outlined a shift in their go-to-market strategy where print hardware will be sold at higher margins." Credit Suisse reported that "HP is looking to pivot its Printing business model from a Supplies monetization approach to more of a focus on the profitability of the overall 'system,' while being willing to walk away from unprofitable market share." Moreover, the

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

report noted that HP was "focusing on right-sizing channel inventory" "following a meaningful oversihp in FY18-19."

565.  In addition to market analysts, numerous high-profile media outlets reported on the negative news surrounding HP's Supplies business. For example, on October 4, 2019, the *Los Angeles Times* reported that "[t]he company's printing business, a major source of profit, has seen falling sales and recently was dubbed a '***melting ice cube***' by analysts at Sanford C. Bernstein."

566.  Similarly, on October 4, 2019, *The Wall Street Journal* published an expose on the Company, highlighting the negative disclosures regarding Supplies:

> The other part of the plan is targeted at ***HP's struggling printing business***. That segment has long depended on the 'razorblade' model, meaning printers were sold at a loss and the profit came from ink and toner supplies. But the rise of alternative supplies such as remanufactured, third-party ink cartridges makes this more challenging. So HP plans to start offering customers a choice between subsidized printers that would only work with the company's own supplies or pricier hardware that would accept supplies from other sources.
>
> ***That will take years***, given the huge installed base of HP printers out in the world. ***It is also no sure thing***, though the company points out it is already trying this approach in China, where it has worked well. ***But the other problem is that the company's new stated goal to maximize operating profit in printing amounts to a tacit admission that the supplies business is no longer growing***. Historically, HP's stock hasn't worked when its high-margin supply business is under pressure. ***The shares already had lost 9% this year following a string of disappointing results for this segment, and Friday brought another 10% decline***.
>
> Granted, HP needed to do something. Since the company split off its enterprise tech side in 2015, ***HP has depended on the printing segment for 80% or more of the company's total profit***. But people and businesses are simply printing less these days, which has led to HP's supply revenue shrinking by an average of 3% annually over the past decade. Charging customers more for printers won't get them to print more.

567.  Following the Class Period, during the Company's November 26, 2019 earnings conference call, Defendants noted that HP had, in fact had more than $100 million dollars in excess inventory in its Supplies channel during the Class Period and that it was continuing to remove those inventories from the channel: "So throughout FY '19, we have reduced our channel inventory dollars by over $100 million. This is more than what we initially estimated. So we continue to make good progress. This includes both Tier 1 and parts of Tier 2, and note that we don't have complete visibility into the entire ecosystem."

568.  In response, on November 27, 2019, Credit Suisse reported that "channel inventory drawdowns remain key drags that should continue into FY20."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

VIII.   **PRESUMPTION OF RELIANCE**

569.   At all relevant times, the market for HP's common stock was efficient for the following reasons, among others:

1.   HP's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

2.   As a regulated issuer, HP filed periodic reports with the SEC and the NYSE;

3.   HP regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

4.   HP was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

570.   As a result of the foregoing, the market for HP's common stock reasonably promptly digested current information regarding HP from all publicly available sources and reflected such information in the price of HP's common stock. All purchasers and acquirers of HP common stock during the Class Period suffered similar injury through their purchase or acquisition of HP common stock at artificially inflated prices, and a presumption of reliance applies.

571.   A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

IX.   **INAPPLICABILITY OF THE STATUTORY SAFE HARBOR**

572.   The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements pleaded in this complaint. None of the statements complained of herein was a forward-looking statement. Rather, they were either: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; or (ii) or omitted to state material current or historical facts necessary to make the statements not misleading.

573.  To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by HP were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

574.  To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, Defendants did not actually believe the statements, had no reasonable basis for the statements, or were aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## X.      CLASS ACTION ALLEGATIONS

575.  Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of HP between February 23, 2017, and October 3, 2019, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of HP at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

576.  The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, HP shares were actively traded on the NYSE. Over the course of the Class Period, HP had between 1.69 billion shares (as of January 31, 2017) and 1.48 billion shares (as of July 31, 2019) of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members of the proposed Class. Class members who purchased or otherwise acquired HP common stock may be identified from records maintained by HP or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

577.  Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

578.  Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

579.  Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

a.  whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.  whether the Defendants made statements to the investing public during the Class Period that were false, misleading, or omitted material facts;

c.  whether Defendants acted with scienter; and

d.  the proper way to measure damages.

580.  A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## XI.  **CONTEMPORANEOUS TRADING**

581.  During the Class Period, Lead Plaintiffs relied on the integrity of the market for HP common stock, which was presumed to be determined by ordinary supply and demand and free from manipulation, distortion, and insider trading on the basis of material, nonpublic information.

582.  Defendants Weisler and Lores (the "Insider Trading Defendants") sold stock while in possession of material, nonpublic information as alleged herein, including concerning, *inter alia*, the flaws of HP's Four Box Model, the relevant truth concerning Defendants' misrepresentations regarding HP's Supplies market share, demand, and inventory, and the instability of HP's Supplies business and revenue stream. Defendants Weisler's and Lores' Class Period trades are set forth in Section VI.E., *supra*.

583.  As set forth in their sworn certifications previously filed in this action and attached herewith, Lead Plaintiffs purchased HP common stock during the Class Period on the dates and for the prices indicated, and thus traded contemporaneously with the Insider Trading Defendants. For example, Iron Workers purchased: (i) 9,245 shares of HP common stock on March 9, 2018, contemporaneously with Defendant Lores' sale of 302,895 shares of HP common stock on that same day, March 9, 2018; and (ii) 12,935 shares of HP common stock on November 15, 2017, contemporaneously with Defendant Weisler's sale of 80,102 shares of HP common stock on November 6, 2017. Additionally, Rhode Island purchased 40,900 shares of HP common stock on December 20, 2017, contemporaneously with: (i) Defendant Weisler's sales of 73,715 and 18,111 shares of HP common stock on December 9, 2017, and December 10, 2017, respectively; and (ii) Defendant Lores' sales of 21,502 and 4,102 shares of HP common stock on December 9, 2017, and December 10, 2017, respectively.

## XII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act**
**and SEC Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

584.  Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

585.  This count is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiffs and all other members of the Class, against all Defendants.

586.  During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause economic harm to Lead Plaintiffs and other members of the Class.

587. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and

deceit upon the purchasers and acquirers of the Company's common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

588.  Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

589.  During the Class Period, Defendants made the false and misleading statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

590.  Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal HP's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

591.  Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased or acquired HP common stock and were harmed when the truth about HP negatively impacted the price of those securities. Lead Plaintiffs and the Class would not have purchased or acquired HP common stock at the prices they paid or at which they acquired them, or at all, had they been aware of the truth about HP.

592.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered harm in connection with their respective purchases or acquisitions of the Company's common stock during the Class Period.

593.  By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

594.  Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

595.  This Count is asserted pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiffs and all other members of the Class, against the Individual Defendants.

596.  As alleged above, the Company and the Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by making materially false and misleading statements and/or omissions of material fact in connection with the purchase or sale of HP's common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter, and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's and/or the other Individual Defendants' statements alleged herein to have been materially false and misleading when made and/or omitted material facts necessary to make the statements not misleading in light of the circumstances under which they were made, and the fraudulent nature of the Company's and the Individual Defendants' scheme during the Class Period.

597.  As set forth above, the Individual Defendants were controlling persons of the Company and one another during the Class Period due to, among other things, their senior positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same. As such, the Individual Defendants had regular access to nonpublic information about HP's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings or meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

598.  By virtue of the foregoing, each of the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company and the

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

other Individual Defendants, including the content of their public statements with respect to HP's operations.

599. The Individual Defendants were culpable participants in the Company's and the Individual Defendants' fraud alleged herein, by acting knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired the Company's common stock during the Class Period.

600. By reason of the foregoing, each Individual Defendants is liable to Lead Plaintiffs and the members of the Class as controlling persons of the Company and the other Individual Defendants in violation of Section 20(a) of the Exchange Act.

### COUNT III

**For Violations of Section 10(b) and 20A of the Exchange Act**
**and SEC Rule 10b-5 Promulgated Thereunder for Insider Trading**
**(Against the Insider Trading Defendants)**

601. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

602. This Count is asserted pursuant to Sections 10(b) (15 U.S.C. § 78j(b)) and 20A (15 U.S.C. § 78t-1(a)) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiffs and all other members of the Class who purchased shares of HP common stock contemporaneously with the sale of HP common stock by the Insider Trading Defendants while they were in possession of material, non-public information as alleged herein, including concerning, *inter alia*, the flaws of HP's Four Box Model, the truth concerning Defendants' misrepresentations regarding HP's Supplies market share, demand, and inventory, and the instability of HP's Supplies business and revenue stream.

603. Section 20A(a) of the Exchange Act provides that "[a]ny person who violates any provision of . . . [the Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . securities of the same class."

604.  As set forth herein, the Insider Trading Defendants violated Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder for the reasons stated in Counts I and II above. Additionally, the Insider Trading Defendants further violated Exchange Act Section 10(b), SEC Rule 10b-5, and SEC Rule 10b5-1 (17 C.F.R. § 240.10b5-1) by selling shares of HP common stock while aware, in possession, and on the basis of material, nonpublic adverse information including concerning, *inter alia*, the flaws of HP's Four Box Model, the truth concerning Defendants' misrepresentations concerning HP's Supplies market share, demand, and inventory, and the instability of HP's Supplies business and revenue stream. The Insider Trading Defendants were required to abstain from trading or disclose this material nonpublic adverse information, but failed to do so, as more fully alleged herein.

605.  Contemporaneously with the Insider Trading Defendants' insider sales of HP common stock, Lead Plaintiffs and other Class members purchased shares of HP common stock on a national securities exchange.

606.  Lead Plaintiffs and other members of the Class have been damaged as a result of the violations of the Exchange Act alleged herein.

607.  By reason of the violations of the Exchange Act alleged herein, the Insider Trading Defendants are liable to Lead Plaintiffs and other members of the Class who purchased shares of HP common stock contemporaneously with the Insider Trading Defendants' sales of HP common stock during the Class Period.

608.  Lead Plaintiffs and the other members of the Class who purchased contemporaneously with the Insider Trading Defendants' insider sales of HP common stock seek damages and/or other applicable remedies, including disgorgement by the Insider Trading Defendants of profits gained or losses avoided from the Insider Trading Defendants' transactions in HP common stock that were contemporaneous with Lead Plaintiffs' and other Class members' purchases of HP common stock.

609.  This action was brought within five years of the date of the last transaction that is the subject of the Insider Trading Defendants' violation of Section 20A, and, with respect to the underlying violations of Section 10(b) of the Exchange Act alleged in this Count and in Count I above, was brought within five years after the date of the last transaction that violated Section 20A of the Exchange Act by the Insider Trading Defendants.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1  **XIII.**  **PRAYER FOR RELIEF**

2  WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

3  A.  Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the

4  Federal Rules of Civil Procedure on behalf of the Class defined herein;

5  B.  Awarding all damages and other remedies available under the Exchange Act in favor of

6  Lead Plaintiffs and all members of the Class against Defendants in an amount to be proven

7  at trial, including interest thereon;

8  C.  Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this

9  action, including attorneys' fees and expert fees; and

10  D.  Such other and further relief as the Court may deem just and proper.

11  **XIV.**  **JURY DEMAND**

12  Lead Plaintiffs demand a trial by jury.

13  Dated: May 3, 2021                    Respectfully submitted,

14                                         **KESSLER TOPAZ MELTZER**
                                           **& CHECK, LLP**
15

16                                         */s/ Jennifer L. Joost*
                                           JENNIFER L. JOOST (Bar No. 296164)
17                                         (jjoost@ktmc.com)
                                           STACEY M. KAPLAN (Bar No. 241989)
18                                         (skaplan@ktmc.com)
                                           One Sansome Street, Suite 1850
19                                         San Francisco, CA 94104
                                           Tel:    (415) 400-3000
20                                         Fax:    (415) 400-3001

21                                         -and-

22                                         GREGORY M. CASTALDO
                                           (gcastaldo@ktmc.com)
23                                         EVAN R. HOEY*
                                           (ehoey@ktmc.com)
24                                         280 King of Prussia Road
                                           Radnor, PA 19087
25                                         Tel:    (610) 667-7706
                                           Fax:    (610) 667-7056
26
                                           *Counsel for Lead Plaintiff the State of Rhode Island, Office*
27                                         *of the General Treasurer, on behalf of the Employees'*
                                           *Retirement System of Rhode Island and Co-Lead Counsel*
28                                         *for the Class*

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:     (310) 819-3470

-and-

HANNAH ROSS (*admitted pro hac vice*)
(hannah@blbglaw.com)
JOHN J. RIZIO-HAMILTON (*admitted pro hac vice*)
(johnr@blbglaw.com)
JEREMY P. ROBINSON (*admitted pro hac vice*)
(jeremy@blbglaw.com)
ALEXANDER T. PAYNE (admitted *pro hac vice*)
(alex.payne@blbglaw.com)
BENJAMIN W. HOROWITZ (admitted *pro hac vice*)
(will.horowitz@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:     (212) 554-1400
Fax:     (212) 554-1444

*Counsel for Lead Plaintiff Iron Workers Local 580 Joint
Funds and Co-Lead Counsel for the Class*

\**pro hac vice motion forthcoming*