**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Counsel for Lead Plaintiff Iron Workers Local 580*
*Joint Funds and Co-Lead Counsel for the Class*

**KESSLER TOPAZ MELTZER & CHECK, LLP**
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
STACEY M. KAPLAN (Bar No. 241989)
(skaplan@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001

*Counsel for Lead Plaintiff the State of Rhode*
*Island, Office of the General Treasurer, on behalf of*
*the Employees' Retirement System of Rhode Island*
*and Co-Lead Counsel for the Class*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE HP INC. SECURITIES LITIGATION | Case No. 3:20-cv-01260-SI |
| | **LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT** |
| | Date:  July 30, 2021<br>Time: 10:00 a.m.<br>Location: Courtroom 1, 17th Floor<br>Judge: Hon. Susan Illston<br>Date Action filed: February 19, 2020 |

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................................. 1

II.     STATEMENT OF FACTS ............................................................................................... 4

        A.      Prior to the Class Period, Defendants Became Aware of and
                Covered Up Sales Practices Leading to $450 Million of Excess
                Inventory .............................................................................................................. 4

        B.      During the Class Period, Defendants Misleadingly Stated That HP
                Had Changed Its Supplies Sales Model to Be Based on True
                Demand ................................................................................................................. 5

        C.      In Truth, HP Continued to Push Excess Inventory Into the Sales
                Channel, and Channel Inventory Materially Exceeded Demand ........................... 6

        D.      Defendants Misrepresented That the Four Box Model Relied on
                "Big Data," HP Was Placing NPV Positive Units, HP Stabilized
                Supplies, and Market Share Was Growing ............................................................. 7

        E.      Unknown to Investors, HP Lacked Statistically Significant
                Telemetry Data ...................................................................................................... 7

        F.      The Relevant Truth Emerges ................................................................................. 9

III.    ARGUMENT .................................................................................................................... 9

        A.      The Amended Complaint Alleges Actionable Misstatements and
                Omissions .............................................................................................................. 9

                1.      New Misrepresentations About HP's Purported Sales
                        Model Change ........................................................................................... 10

                2.      New Misrepresentations Regarding Channel Inventory
                        Management .............................................................................................. 17

                3.      New Misrepresentations About the Placement of Hardware
                        Units .......................................................................................................... 19

                4.      Misrepresentations Regarding the Four Box Model, HP's
                        Market Share and the Purported Stabilization of HP's
                        Supplies Business ...................................................................................... 20

        B.      The Amended Complaint Pleads a Strong Inference of Scienter ......................... 23

                1.      Defendants Knew of the Undisclosed Sales Practices and
                        Their Financial Impact Before the Class Period, and
                        Continued Them ........................................................................................ 23

                2.      Defendants' Concealment of the Real Reasons for the
                        Purported Model Change Further Demonstrate Scienter .......................... 26

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

3.    During the Class Period the SEC Was Actively Investigating HP's Use of "Pull-in" Sales Practices and Its Misleading Disclosures .................................................................. 26

4.    Defendants Closely Monitored Channel Inventory Levels ....................... 27

5.    The FE Accounts Are Reliable and Support Scienter .............................. 27

6.    Defendants Tracked and Quantified the Deficiency of the Telemetry Data Used In the Four Box Model .......................................... 29

7.    The Core Operations Allegations Support an Inference of Scienter ...................................................................................................... 30

8.    Insider Sales By Weisler and Lores Bolster the Inference of Scienter ...................................................................................................... 31

C.    The Amended Complaint Pleads Loss Causation ................................................. 31

D.    The Amended Complaint Alleges Claims Under Sections 20(a) and 20A ......................................................................................................................... 35

IV.    CONCLUSION .................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Alphabet, Inc. Sec. Litig.*,
2021 WL 2448223 (9th Cir. June 16, 2021) ..............................................................16, 17, 30

*In re Apple Inc. Sec. Litig.*,
2020 WL 64820114 (N.D. Cal. Nov. 4, 2020) ..................................................................14, 22

*Applestein v. Medivation, Inc.*,
2011 WL 3651149 (N.D. Cal. Aug. 18, 2011) .........................................................................31

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...................................................................................9, 15, 21

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) .................................................................................................32

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019).....................................................................................31

*Burgoon v. Narconon of N. Cal.*,
125 F. Supp. 3d 974 (N.D. Cal. 2015) ....................................................................................12

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2021 WL 1091891 (N.D. Cal. Mar. 22, 2021).........................................................................28

*In re Connetics Corp. Sec. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008) (Illston, J.).................................................................25

*In re Countrywide Fin. Corp. Deriv. Litig.*
554 F. Supp. 2d 1044 (C.D. Cal. 2008) .............................................................................11, 28

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..................................................................................35

*In re DDi Corp. Sec. Litig.*,
2005 WL 3090882 (C.D. Cal. July 21, 2005).........................................................................12

*Edenbrook Cap., LLC v. RhythmOne Plc*,
2019 WL 1791419 (N.D. Cal. Apr. 24, 2019) ........................................................................32

*In re Facebook, Inc. Consumer Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ....................................................................................26

*Harris v. Ivax Corp.*,
182 F.3d 799 (11th Cir. 1999) ................................................................................................17

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005)........................................................................17

*Irving Firemen's Relief & Ret. Fund v. Uber*,
    2018 WL 4181954 (N.D. Cal. Aug. 31, 2018) ........................................................13

*Jackson v. Microchip Tech. Inc.*,
    2020 WL 1170843 (D. Ariz. Mar. 11, 2020) ..........................................................23

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ...........................................................10, 15, 19, 21

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) .................................................................................28

*In re Mattel, Inc. Sec. Litig.*,
    2021 WL 1259405 (C.D. Cal. Jan. 26, 2021) .........................................................34

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ..........................................................9, 10, 15, 19

*Mineworkers Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ..........................................................31, 32, 33, 34

*In re Mylan N.V. Sec. Litig.*,
    2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ........................................................27

*Nathanson v. Polycom, Inc.*,
    2015 WL 12964727 (N.D. Cal. Apr. 16, 2015) ......................................................12

*Nguyen v. Radient Pharms. Corp.*,
    2011 WL 5041959 (C.D. Cal. Oct. 11, 2011).........................................................19

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) .................................................................................29

*Okla. Police Pension & Ret. Sys. v. LifeLock*,
    780 F. App'x 480 (9th Cir. 2019) ............................................................................28

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019)...........................................................12, 24, 30

*Pirani v. Slack Techs. Inc.*,
    445 F. Supp. 3d 367 (N.D. Cal. 2020) (Illston, J.).................................................10

*In re PMI Grp., Inc. Sec. Litig.*,
    2009 WL 3681669 (N.D. Cal. Nov. 2, 2009) .........................................................27

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) .................................................................................19

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ......................................................................................23, 27

*Rabkin v. Lion Biotechnologies, Inc.*,
    2018 WL 905862 (N.D. Cal. Feb. 15, 2018) (Illston, J.) .......................................................16

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014), *overruled on other grounds by City of Dearborn
    Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th
    Cir. 2017) ......................................................................................................................25

*Roberts v. Zuora, Inc.*,
    2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) (Illston, J.).........................................15, 21, 28

*S. Ferry LP #2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009)..............................................................................27

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ......................................................................................30

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ..............................................................................10, 23

*In re Silver Wheaton Corp. Sec. Litig.*,
    2016 WL 3226004 (C.D. Cal. June 6, 2016) ............................................................28

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009) ......................................................................................17

*Tellabs Inc. v. Makor*,
    551 U.S. 308 (2007).....................................................................................................9, 23

*In re Toyota Motor Corp. Sec. Litig.*,
    2012 WL 3791716 (C.D. Cal. Mar. 12, 2012).......................................................................25

*Utesch v. Lannett Co., Inc.*,
    385 F. Supp. 3d 408 (E.D. Pa. 2019) ....................................................................................27

*In re VeriFone Holdings, Inc., Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ......................................................................................23

*In re Verifone Sec. Litig*,
    784 F. Supp. 1471 (9th Cir. 1993) .......................................................................................35

*Waterford Twp. Police v. Mattel, Inc.*,
    321 F. Supp. 3d 1133 (C.D. Cal. 2018) ................................................................................31

*In re Wireless Facilities, Inc. Sec. Litig.*,
    2007 WL 9667131 (S.D. Cal. May 7, 2007)..........................................................................25

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

*Yourish v. Cal. Amplifier*,
    191 F.3d 983 (9th Cir. 1999) ...................................................................................................14, 22

*Zamir v. Bridgepoint Educ., Inc.*,
    274 F. Supp. 3d 1057 (S.D. Cal. 2017)..................................................................................25

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005) .............................................................................13, 25

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

## I. INTRODUCTION

In response to the Court's Order dismissing the Consolidated Complaint, Lead Plaintiffs undertook a thorough re-investigation of their claims to address the Court's concerns. Based on this investigation, the Amended Complaint ("AC") pleads a plethora of new facts based on, among other things, the September 2020 Cease-and-Desist Order ("SEC Order"), sworn testimony to the SEC, and the accounts of eight additional former employees ("FEs").[1] These new facts allowed Lead Plaintiffs to: (1) identify and plead several new categories of false and misleading statements; (2) plead new facts supporting falsity and scienter for both the new statements and those previously pled; and (3) explain why HP's Supplies business appeared to stabilize in 3Q17—because HP was engaging in unsustainable sales and inventory management practices that allowed HP to meet quarterly targets for a few quarters. Ultimately, however, these undisclosed Class Period practices flooded the channel with excess inventory far above demand that cannibalized futures sales, leading to an inventory reduction of more than $100 million, a $654 million decline in worldwide Supplies revenues for FY19, and the complete abandonment of HP's razor/razor-blade business model.

**New false statements.** Just before the Class Period, HP announced a damaging buy-back of $450 million of excess Supplies inventory, which it attributed to problems with the "omnichannel" environment. During the Class Period, Defendants assured investors that they had successfully changed HP's Supplies sales model and revamped HP's pricing, discounting, and inventory management practices to address the omnichannel environment. ¶¶128, 274, 279, 285, 286, 292, 296-300, 306-07, 320. Defendants represented that HP had implemented (1) a "pull" sales model to sell inventory into the channel only when there was "true demand" for Supplies by end-users (¶¶127, 158, 279, 285, 292, 296-99, 306-07), and (2) pricing, discounting, and inventory management practices tied to end-user demand (¶¶109-11, 124, 126, 127).

With respect to Supplies inventory, despite an ongoing SEC investigation into their pre-

---

[1] "¶__" refers to paragraphs in the AC (Dkt. 89), "Mot." refers to Defendants' Motion to Dismiss Amended Complaint (Dkt. 92), and "Op." or "Order" refers to the Court's Order granting Defendants' motion to dismiss the Consolidated Complaint (Dkt. 83). Emphasis is added and internal citations and punctuation are omitted.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

Class Period statements regarding channel inventory, during the Class Period, Defendants continued to make the same misleading statements to investors about the health of HP's Supplies inventory channel. Defendants touted HP's ability to stay within a healthy channel inventory range but omitted that the numbers they were reporting only included a small part of HP's inventory channel and that they did not have visibility into the remainder. Further, despite the SEC investigation, Defendants continued to make materially misleading trend and risk disclosures about HP's Print business and HP's inventory management. As explained below, the AC adequately alleges that all of these statements were materially false and misleading. *Infra* at 16-19. Defendants do not seriously contend otherwise.

**New allegations of falsity and scienter based the SEC Order, depositions taken by the SEC, and the accounts of nine FEs.** Sworn testimony and the SEC Order demonstrate that Defendants knew, before the Class Period, that the $450 million buy-back and purported changes that Defendants attributed to the "omnichannel" were, in reality, due to HP's use of: (1) heavy discounting to meet revenue targets by intentionally selling excess inventory into the channel that cannibalized future sales; and (2) "gray marketing," or the sale of inventory from one region to another at disparate prices, in order to meet financial targets and maintain the façade of a healthy Supplies inventory channel. ¶¶94-99. There is no serious dispute that Defendants knew these facts during the Class Period. Nor can there be any serious dispute that these concealed facts contradicted their innocent "omnichannel" explanation.

Worse yet, Defendants had not implemented a "pull" sales model, and HP was not in fact selling inventory into the channel only when there was "true demand"—all of which contradicted Defendants' statements to investors. The accounts of numerous well-placed FEs from around the world confirm that, contrary to Defendants' statements, HP *continued* to push material amounts of Supplies inventory into the channel far above true demand, including through the use of aggressive quarter-end discounting to meet short-term sales targets. ¶¶133, 136, 140-47, 205-07, 213-14. Defendants ask the Court to ignore these new facts entirely because the FEs did not personally interact with the named Defendants. As set forth herein, however, the law is clear that the reports of FEs may be considered where, as here, they were in a position to be knowledgeable

about the facts they reported. *Infra* at 28-29.

Further, Defendants' own admissions corroborated the FEs' reports. In February 2019, HP shocked the market by revealing that, notwithstanding Defendants' repeated assurances, it had sold at least $100 million of excess inventory into the channel over multiple prior quarters, again cannibalizing future revenue. Defendants attempt to minimize this as a small percentage of HP's annual revenue, but the AC explains that HP actually had far more than $100 million in excess inventory flooding the channel, which contributed to a $654 million worldwide Supplies revenue decline for FY19. ¶¶28, 152, 239-40, 527-28, 532, 544, 567.

**New facts showing Defendants misled investors about the Four Box Model's accuracy and HP's stabilization of Supplies revenue.** In its Order, the Court noted that the Four Box Model appeared to be accurate in predicting that the Supplies business would stabilize and asked Lead Plaintiffs to explain why it was not accurate. The AC does so. Because HP continued to "push" excess inventory into the sales channel above actual demand to meet quarterly revenue targets, the Four Box Model appeared to accurately predict that the Supplies business was stabilizing when, in fact, true demand for HP's Supplies was falling. ¶244. In other words, the Model's purported track record of accuracy was a mirage. This was confirmed when HP's business collapsed and HP abandoned the Four Box Model soon after disclosing that it had again sold massive amounts of excess inventory into the channel far above actual demand. ¶¶261-62, 267.

**New facts demonstrating scienter for claims arising from HP's lack of telemetry data.** The AC includes the accounts of two FEs who developed the Four Box Model and were responsible for forecasting using telemetry data. ¶¶178-88, 191-93, 198. They explain how the accuracy of the Model varied widely depending on the amount of telemetry data available, and their reports demonstrate that forecasts for toner were typically off by material amounts. ¶¶178-98. One of these FEs stated that the lack of telemetry coverage for toner products was meticulously tracked in a "dashboard," and analyses of the issue were prepared for meetings involving Defendant Lores, who, in response, inquired how the deficiencies in telemetry data could be corrected—demonstrating his knowledge of the problem. ¶¶185-87.

For the reasons set forth herein, Defendants' motion should be denied.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

## II.    STATEMENT OF FACTS

### A.    Prior to the Class Period, Defendants Became Aware of and Covered Up Sales Practices Leading to $450 Million of Excess Inventory

Leading up to the Class Period, unbeknownst to investors, HP employed a number of sales practices to meet short-term Supplies sales targets that pushed vast amounts of excess inventory into the channel, thus cannibalizing future revenue and reducing profit margins. ¶¶93-102. <u>First</u>, at the behest of HP executives, regional managers offered large end-of-quarter discounts on Supplies to boost sales and meet targets. ¶95. <u>Second</u>, HP's management in the APJ region sold Supplies to distributors with the knowledge that the distributors would sell them to resellers outside of their territory—a practice known as "gray marketing" or "A-business," which led to increased discounting in other regions. ¶97. <u>Finally</u>, because HP's executives, including several of the Individual Defendants, demanded that regional managers remain within their Weeks of Supply ("WOS") ranges (which were based on Tier 1 only (¶440)) while still meeting operating profit targets, sales managers further discounted Supplies in order to incentivize Tier 1 distributors to sell their inventory to Tier 2 resellers. ¶101. This allowed HP to push the excess inventory deeper into the unreported portions of the sales channel (i.e., Tier 2 and below), thus clearing room to push more excess inventory into Tier 1. *Id*. These sales practices also allowed HP to report what appeared to be positive sales numbers at the expense of cannibalizing future revenues. ¶123. The SEC determined that several of HP's prior disclosures were materially misleading as a result. ¶102.

Defendants were on notice of HP's harmful sales practices, their impact on HP's financial and inventory metrics, and HP's materially misleading statements before the Class Period. According to the SEC Order, Defendants knew of these sales practices no later than 1Q16. ¶92; SEC Order ¶¶1, 34. Testimony the SEC obtained further establishes that Defendants Lesjak and Weisler knew of the specific practices that flooded the sales channel with $450 million of excess inventory. ¶¶443-52.

As a result of these practices, HP was forced to reduce the level of Supplies inventory in its channel by $450 million. ¶106. On June 21, 2016, Defendants disclosed this reduction (¶89) but concealed the true cause of the inventory glut—i.e., intentional selling of excess inventory into

the channel to meet short-term sales targets while cannibalizing future revenue. Nor did Defendants disclose that their statements regarding HP's channel inventory only concerned a portion of the channel (i.e., Tier 1), and thus gave investors an incomplete and misleading picture. ¶450.

Instead of disclosing these sales practices, Defendants blamed the excess inventory on challenges posed by the "omnichannel" environment and announced that HP was shifting its Supplies business from a "push" sales approach to a demand-driven "pull" approach. ¶¶107-08. As part of its purported shift to a "pull" model, HP represented that it would only sell inventory into the channel when true demand warranted it. ¶¶112, 158, 317. Defendants also represented that they would closely monitor HP's channel inventory to ensure that it aligned with true demand. For example, Defendant Lores explained that it would be "critical" for him to "hold the sales team accountable to remain within the [inventory] ranges going forward" while Defendant Weisler stated that "we're monitoring [channel inventory levels] . . . very carefully." ¶¶109, 458-59.

**B.    During the Class Period, Defendants Misleadingly Stated That HP Had Changed Its Supplies Sales Model to Be Based on True Demand**

Given that HP's business was "all about supplies," which accounted for 80%-110% of HP's profits (¶65), it was essential that Defendants convince investors they had stabilized Supplies revenue (§IV.B). Thus, throughout the Class Period, HP misled investors to believe that HP had changed its sales model to be based on true demand (or "sell-out"). For example: Defendant Lesjak stated that HP had "changed [its] sales supplies model" in 2016 (¶127); Defendant Weisler stated that "we changed the supplies sales model" (¶292), and "the benefits" of "fulfilling [inventory] when there's true demand" included "lower[ing] the [Supplies channel inventory] ranges" (¶158); and Defendant Lores stated that HP "redefined the supplies model and we moved to a demand-driven model" (¶127). *See also* ¶¶126, 279, 285, 296-99, 306-07.

Defendants touted various benefits of the purported sales model change. For instance, they stated that the change facilitated and achieved "global pricing consistency." ¶¶274, 296. Defendants also claimed that lowering inventory levels was "helping . . . to prevent gray marketing" across the globe. ¶298. Defendant Lesjak extolled that HP's channel inventory levels

were "healthy" (¶¶158, 311) and stated that, following the purported model shift, HP's "channel inventory ceiling" "better reflect[ed] the more demand-driven sales model" (¶160). Defendant Lesjak also stated that, "what we did last year, which was a pretty significant move is that we changed our sales supplies model. We took channel inventories down significantly in Q3 and Q4 last year. And what that has enabled us to do is manage discounts." ¶296; *see also* ¶¶274, 286, 297.

## C. In Truth, HP Continued to Push Excess Inventory Into the Sales Channel, and Channel Inventory Materially Exceeded Demand

Unknown to investors, during the Class Period HP continued to use end-of-quarter discounts and promotions to push excess inventory into its channel beyond true demand to meet quarterly sales targets. Numerous FEs in several geographical regions reported that, throughout the Class Period, HP continued the very practices that caused its pre-Class Period inventory glut. ¶¶133-51, 207-08. As one example, FE-2, who worked at HP in San Diego for more than 20 years, reported that it was common for sales representatives to push resellers to take up to four times the amount of inventory their consumption numbers would justify, through incentives so large that they required Defendant Lores' approval. ¶¶134, 465. One of HP's largest channel partners, Staples, had so much excess inventory that HP had to pay for trailers and warehouse space for Staples to house the excess product. ¶136. FE-2 explained that directives to push Supplies into the sales channel "came from the top at HP." ¶138. FE-3 confirmed that quarter-end discounting was common at HP, occurred in every U.S. region, and accounted for billions of dollars of discounts (¶¶140-41, 144), and FE-2 recalled being personally involved in an effort to distribute $35 million in excess inventory into the sales channel at the behest of executives (¶134). FE-4 confirmed that the practice of pushing unwanted Supplies onto channel partners in order to meet sales quotas occurred in U.K. and Ireland. ¶¶148-50. FE-8 confirmed that similar practices occurred in South America. ¶151. FE-7 reported similar practices occurring in Canada. ¶207.

The continued sales practices meant that HP also failed to stabilize Supplies pricing, as Defendants had represented. ¶153. FE-4 stated that business partners would buy Supplies in mainland Europe and then sell them in the UK due to the higher prices in that market, a practice

6

that "tends to happen quite often." *Id*. Indeed, Defendants belatedly conceded in 2019 that HP had not achieved global price consistency and needed to remedy its discount policy. ¶¶154, 557

These new allegations not only set forth new categories of misleading statements but also address the Court's concern that the Four Box Model appeared to have accurately predicted revenues for several quarters. *See* Op. at 7. The reason why the Model was supposedly "accurate" is because HP sold excess inventory into the channel to meet its stated guidance, while misrepresenting to the market that it was selling to true demand.

**D.　Defendants Misrepresented That the Four Box Model Relied on "Big Data," HP Was Placing NPV Positive Units, HP Stabilized Supplies, and Market Share Was Growing**

Defendants also emphasized to investors that the Four Box Model was reliable because it was based on real-time "big data" collected directly from HP's commercial printers, a process referred to as "phoning home." ¶171. For example, Defendant Weisler stated that HP had "an incredible amount of data" because "[o]ur printers in many cases phone home" and "we put all of that information into this [Four Box] model." *Id*. Throughout the Class Period, Defendants also assured investors that the Company had stabilized Supplies revenue and claimed that HP's Supplies market share was growing. *See, e.g.*, ¶¶221-33.

Defendants attributed their purported ability to stabilize the Supplies business to HP's placing NPV-positive units (printers sold at a loss that would generate enough Supplies sales to make up for that loss (¶70))—a new category of false and misleading statements. Defendant Weisler stated that "[w]e're not placing share for share's sake. There had to be positives. That's rule number one." ¶202; *see also* ¶¶200, 377-78, 392, 396.

**E.　Unknown to Investors, HP Lacked Statistically Significant Telemetry Data**

Contrary to Defendants' statements, HP did not have sufficient telemetry data from its toner-based products, which it ultimately admitted. ¶177. Several FEs whose accounts are newly alleged in the AC corroborate this fact. FE-9 reported that FE-9's bosses, HP Vice Presidents, knew about the lack of telemetry data for toner-based products, which was common knowledge at HP (¶178); FE-9 presented on telemetry data coverage at HP's QBR meetings (¶187); and FE-9 believed Lores would have known HP's telemetry data coverage for different printer lines (*id*).

7

FE-5 recalled that HP made assumptions for product lines for which it lacked data. ¶191. FE-5 further recalled that Defendant Lesjak was briefed on the Model at various points during the Class Period to answer analysts' questions about it. ¶476. Defendants wrongly claim that Lead Plaintiffs fail to show the relevance of statistically significant data. Mot. at 20. In response to the Court's concern (*see* Op. at 6), the AC pleads that "[t]he lack of statistically relevant telemetry data rendered the Four Box Model unreliable and inaccurate," because it made HP blind to essentially all of its toner-based products and as such "could not and did not provide HP or investors with an accurate depiction of HP's supplies market share or demand." ¶¶189-90. The AC also uses illustrative data to depict how critical trends would be missed without statistically significant data. *See* ¶¶194-99.

Moreover, the AC alleges that HP was not placing NPV-positive units because its steep discounting eroded the units' profitability and because HP lacked adequate telemetry data to determine whether those units were NPV-positive. *See, e.g.*, ¶¶219-220. FE-6 recalled that the fact that printers "were dramatically discounted . . . was a running joke" at HP and that it was cheaper to buy a printer with ink in it rather than just the ink alone. ¶¶205-06. FE-7 recalled having to fill sales quotas that were unrealistic and inconsistent with ethical behavior (¶207) while FE-8 recalled being required to push printers and Supplies into the sales channel month after month to meet sales quotas (¶210). Because unwanted units pushed into the sales channel languished in warehouses, they could not generate Supplies sales and therefore be NPV-positive. ¶219.

Finally, HP never had the big data to accurately measure Supplies market share or true demand, and thus could not have known whether the Supplies business had in fact stabilized, market share was growing, or channel inventory was aligned with demand. FE-1 stated that HP executives were aware of their lack of visibility into the sales channel—and their concomitant inability to measure market share. In 2Q18, the EMEA region experienced an egregious Supplies forecast miss due to the fact that HP lacked visibility into its sales channel. ¶227. Defendant Weisler was informed that the forecast miss occurred for this reason. *Id*. Defendants eventually admitted that Supplies market share was actually decreasing rather than increasing and that they never had the data necessary to understand HP's market share or true demand. ¶246.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

**F.      The Relevant Truth Emerges**

On February 27, 2019, HP shocked the market when it reported that Supplies revenue growth was negative 3% for 1Q19 and that HP had again placed at least $100 million of excess Supplies into its channel. HP admitted that the excess inventory was not new, but rather was pushed into the sales channel over "multiple quarters." ¶¶152, 527-28, 532. HP further disclosed that it lacked visibility into large portions (Tiers 2 and 3) of its inventory channel and that it had never had the data necessary to understand its market share or true demand. ¶244. HP also admitted that, contrary to its representations, market share was declining. ¶244. HP's stock price fell 17%. ¶248.

On August 22, 2019 the Company announced further disappointing earnings results, with Supplies revenue down 7% on a year-over-year basis. ¶253. HP announced that it still could not be sure how much excess inventory remained in its sales channel and revised Supplies revenue guidance downward to negative 4-5%. *Id*. HP disclosed that it expected Supplies would not grow at all in 2020. *Id*. The Company's stock price dropped another 6%. ¶258.

On October 3, 2019, HP conceded that its Supplies business model was unsustainable, that it did not expect Supplies revenue to grow moving forward, and that it would abandon the "razor/razor blade" model altogether. ¶261. Defendants also revealed that they still had not implemented the pricing consistency and inventory management practices that they claimed were in place during the Class Period, stating that the Company had to "manage the channels more effectively through a centralized pricing process and a disciplined channel partner program" and mange inventory "much, much more robustly." ¶264. HP's share price plummeted 10%. ¶268.

**III.    ARGUMENT**

**A.      The Amended Complaint Alleges Actionable Misstatements and Omissions**

The Court "accept[s] all factual allegations in the complaint as true" and construes them in the light most favorable to Lead Plaintiffs. *Tellabs Inc. v. Makor*, 551 U.S. 308, 322-24 (2007). A statement is misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Further, "statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors."

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

*Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Thus, if a company presents positive information, it must also "disclos[e] adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). Whether a statement is misleading cannot be resolved as a matter of law unless "the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018); *see also Pirani v. Slack Techs. Inc.*, 445 F. Supp. 3d 367, 385 (N.D. Cal. 2020) (Illston, J.) (same).

### 1.   New Misrepresentations About HP's Purported Sales Model Change

The AC alleges that Defendants made several categories of misleading statements regarding HP's purported change from a "push" to a "pull" Supplies sales model.

**Misstatements Concerning the Change to a Demand-Driven Model.** Defendants repeatedly represented that HP had shifted to a pull sales model that was based on true demand. For example, Lores explained that HP had "redefined the supplies model" and "moved to a demand-driven model" (¶297) and touted HP's "big adjustment of how we managed supplies," changing "from a push model to a pull model" (¶306). *See also* ¶¶279 (Weisler: model change "very important"); 292 (Weisler: "we changed the supplies sales model"); 296 (Lesjak: in a "pretty significant move" Defendants "changed our sales supplies model"); 306 (Lores: "[w]e went form a push model to a pull model"); 307 (Lores: "big change . . . [in] the sales model"). Analysts echoed Defendants' statements. ¶¶129-31, 275, 280, 287, 293, 301.

These statements were materially false and misleading. In reality, as confirmed by multiple FEs across the globe, HP continued to "push" excess inventory into the channel above true demand to a material degree. *See* ¶¶ 133-38, 141, 144, 148, 150-51, 207, 210, 213-16, 218. FE-2 did not believe anything changed in the way HP sales representatives pushed product down the distribution channels. ¶¶133-38. FE-2 identified channel partners that HP pushed excess inventory onto, like Office Depot, which HP induced to take excess product by offering lines of credit, and Staples, for which HP leased trailers and warehouses to store all of the excess product HP pushed on it. ¶¶135-36. FE-2 also recounted an instance where FE-2 was personally involved in an effort to distribute $35 million worth of excess inventory into the channel, a practice that FE-2 described as

10

"common." ¶134. When FE-2 left HP in June 2017, HP had a "significant" amount of excess inventory in the channel, because it had continued to push tens of millions of dollars of inventory per quarter onto channel partners. ¶138.

Other FEs likewise confirmed that HP continued to push excess inventory into the channel to make sales quotas after it had assured investors that it had changed to a pull model. For example, FE-3 (a former HP Reseller Sales Person in the U.S.) recounted that HP used billions of dollars' worth of discounting incentives to push inventory into the channel. ¶¶141, 144. FE-4 (a former HP Partner Business Manager-Supplies in the U.K.) confirmed that HP managers pushed unneeded and unwanted Supplies onto channel partners at quarter end to meet quotas and obtain bonuses. ¶¶148, 150.

FE-8 (a former HP business-to-business sales manager based in Bogota, Columbia) stated that HP continued using a push model, reporting that FE-8 was required to push printers *and* Supplies into the channel every month to meet sales quotas. ¶210; *see also* ¶151. FE-8 explained that HP would pressure channel partners to take inventory that they did not want or need through discounts or extended payment terms or, conversely, by refusing beneficial payment terms. ¶¶213-16. FE-8's colleagues were engaging in the same practices. ¶218.[2]

That multiple FEs in different positions and different locations across the globe during the Class Period provided consistent accounts powerfully supports the AC's falsity allegations. *See In re Countrywide Fin. Corp. Deriv. Litig*. 554 F. Supp. 2d 1044 (C.D. Cal. 2008) (consistent accounts provided by different employees at different locations sufficient to plead improper practices). HP's continued practice of pushing excess inventory into the channel is also confirmed by its own admissions: in February 2019, Defendants conceded that over "multiple quarters" HP had pushed at least $100 million of excess Supplies inventory into its channel. ¶¶152, 527-28, 532, 544, 567. Moreover, given that HP lacked visibility into much of its channel and also did not have the data necessary to understand true demand, it was impossible from inception for HP to truly shift to a demand-driven "pull" model. ¶¶152, 528. Indeed, Weisler admitted at an analyst

---

[2] Defendants dismiss FE-8 as "not involved in the sale of supplies." Mot. at 17, fn 10. But HP required FE-8 to push Supplies into the channel in connection with each HP printer sold. ¶151.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

conference in 2019 that HP's sales model was not truly a "demand-driven model" until 2019—when the business essentially tanked. ¶485. In short, that Defendants continued selling excess inventory into the channel to meet financial targets while stating they were selling to true demand adequately alleges falsity. *See Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l*, Inc., 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019) (statements that inventory levels of printing supplies were "flat" and "neutral" misleading because "they failed to mention . . . that revenue reports reflected excessive 'sales' into channel").

Defendants do not meaningfully address most of these statements or facts. *See* Mot. at 15-18.[3] Instead, Defendants try to downplay the impact from HP's undisclosed Class Period sales practices, arguing that HP's $100 million inventory reduction constitutes "less than 1%" of HP's annual Supplies revenue. *See, e.g.*, Mot. at 9. But the AC explains that HP actually had far more than $100 million in excess inventory flooding the channel. ¶¶28, 152, 239-40, 269, 527-28, 532, 544, 567-68. Defendants admitted after the Class Period that HP had to reduce channel inventory by "*over* $100 million," noting that it was "more than what [they] initially estimated" in excess inventory. ¶¶567-68. These undisclosed Class Period practices also cannibalized future sales, contributing to a $650 million Supplies revenue decline in FY19. ¶¶169-70. Indeed, the situation created by Defendants' unsustainable sales practices ultimately caused HP to abandon entirely its razor/razor blade business model. ¶¶3, 552-68. These facts adequately allege that the undisclosed practices were material—particularly because they previously caused material harm to HP before the Class Period and triggered an SEC investigation. *See In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *11 (C.D. Cal. July 21, 2005) ("[A] court deciding a motion to dismiss shall be mindful that the issue of whether a statement or omission is material is usually a question for the fact finder.").

**Defendants Misrepresented the Reasons for the Model Change.** Defendants also made materially false and misleading statements about why HP had purportedly changed to a pull model. In truth, the purported change was spurred not by the "omnichannel environment," as Defendants

---

[3] Defendants' failure to do so constitutes a waiver. *See Nathanson v. Polycom, Inc.*, 2015 WL 12964727, at *1 (N.D. Cal. Apr. 16, 2015) ("Issues raised for the first time in the reply brief are waived."); *Burgoon v. Narconon of N. Cal.*, 125 F. Supp. 3d 974, 991 (N.D. Cal. 2015) (same).

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

represented, but by the undisclosed sales practices HP engaged in to meet sales goals. ¶¶132, 442, 442-54; *see also* ¶¶276, 281, 288, 294, 302, 308. Defendants' concealment of these facts not only misled investors as to the reasons for the initial problem, but also allowed HP to continue those same practices during the Class Period. ¶¶274, 279, 286, 298-99.

Defendants argue that these were pre-Class Period statements (Mot. at 15-16) but there can be no dispute that these statements were *made during the Class Period*. For example, Weisler made his statement about the "omnichannel" spurring the model change on May 24, 2017. ¶286. *See also, e.g.*, ¶299 (October 12, 2017) (Weisler: "in this omni-channel world" the sales model shift has "stabilized pricing").[4] Nor does it matter that the facts Lead Plaintiffs rely on to plead falsity occurred prior to the Class Period. Given that the Class Period statements at issue misrepresented events that themselves occurred prior to the Class Period, such a restriction would make little sense here.  And regardless, the law is clear that pre-Class Period facts can render Class Period statements misleading. *See Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 970 (N.D. Cal. 2005) ("[P]roposed class period dates function only to define the plaintiff class, not to restrict the universe of relevant . . . facts in [a] case.").

**Defendants' Misrepresentations Concerning Global Pricing Consistency.** Defendants also misrepresented that HP was working toward and had achieved global pricing consistency. Global pricing consistency was critical because if HP's Supplies prices varied across regions, resellers would purchase product from distributors in other regions with lower prices, thereby shifting sales from higher-priced regions and undercutting HP's Supplies operating profits and margins, which fueled the Company's entire business. Thus, in February 2017, Lesjak explained that the pull model sought to get HP "closer to *global pricing consistency*." ¶274. In September 2017, Lesjak claimed that HP had achieved this goal, stating that "*having that global pricing consistency* that *we get* with the new sales model *has been* incredibly helpful." ¶296.

The relevant truth was exposed in October 2019, when Defendant Lores admitted that the pull model sought only price "consistency per *region*"—not *global* price consistency. ¶557. As

---

[4] *Irving Firemen's Relief & Ret. Fund v. Uber*, 2018 WL 4181954 (N.D. Cal. Aug. 31, 2018), is inapposite. There, unlike here, the misleading statements were made before the class period.

13

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

Lores also explained, it was the changes in 2019 that first allowed HP to "now . . . have [pricing] consistency across the world"—which he highlighted as "a very important change" from the Class Period sales model. ¶557; *see, e.g.*, *In re Apple Inc. Sec. Litig.*, 2020 WL 64820114, *6 (N.D. Cal. Nov. 4, 2020) (later contradictory admission showed falsity of prior statements); *Yourish v. Cal. Amplifier*, 191 F.3d 983, 996-97 (9th Cir. 1999) (later contradictory statement may suggest knowledge of falsity of a prior statement).

Defendants' admissions are bolstered by FE-4, who worked at HP from 2Q18 to 1Q19 and confirmed that HP had not achieved even *regional* pricing consistency. As a result, FE-4 explained that HP's business partners were able to exploit price inconsistencies in the EMEA region by buying Supplies at lower prices in Europe and selling them at higher prices in the U.K. (also known as pricing arbitrage or gray marketing), which "happen[ed] quite often." ¶153. Defendants ultimately admitted that, contrary to their Class Period statements, they failed to deploy pricing discipline around the globe and otherwise eliminate pricing arbitrage created by overstuffed inventory channels. ¶¶11, 154

Defendants argue only that their statements were not misleading because they did not "promise . . . [to] deliver 100% consistent prices . . . throughout the world." Mot. at 25. But the AC alleges that Defendants represented in 2016 that HP was "changing its pricing policy" to achieve "*global[]*" price consistency (¶111) and in 2017 that HP sought *global* price consistency (¶274), only to later admit that this was false, as HP had only ever sought to implement *regional* price consistency (¶¶154, 557). Defendants also stated in 2017 that HP had *achieved* global pricing consistency (¶296), only to admit in 2019 that this also was untrue (¶557).

**Defendants' Misstatements About HP's Discounting Practices.** Defendants also told investors that the pull model enabled HP to "reduce the discounts that [HP] offered to channel partners" (¶298) and resulted in "lower discounts" (¶274). *See also* ¶¶285 (Lesjak: "lower discount dollars around supplies directly related to the supplies sales model change"), 297 (Lores: "we have been able to reduce our channel discounts"). In reality, Defendants continued to engage in a material amount of discounting to push excess inventory into the channel. For example, FE-3 recounted quarter-end discounting activity was common at HP, including throughout every U.S.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

region, and that HP continued to use billions of dollars' worth of discounts to push inventory into the channel. ¶¶140-41, 144. FE-3 recalled that HP had a formal process in place for offering these incentives: a 5-page incentive agreement, referred to internally as the "quarterly incentives," which was provided to each reseller/wholesaler to push inventory into the channel at "fire sale" discounted prices. ¶¶142-44. FE-6, FE-7, and FE-8 confirmed that HP also continued to use discounts to push Supplies into the channel in their regions. ¶¶205-07, 213-16.

Defendants concede that HP continued to use quarter-end discounting to push inventory into the channel—but argue that their statements are inactionable because they never claimed that "HP would eliminate *all* discounts." Mot. at 16-17. This argument contradicts the law and ignores the context of the statements. The argument assumes that statements can be actionable only when they are "literally false," but that is not the standard. "[S]tatements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Thane*, 519 F.3d at 886; *Orexigen*, 899 F.3d at 1014-15 ("technically accurate" results misleading because they omitted "information that diminished the weight of those results"). Regardless of whether Defendants promised to eliminate "all" discounting, Defendants repeatedly touted "lowered" and "reduced" discounting resulting from the change to a demand-driven model. These assurances were misleading because HP continued to use significant discounting tactics— amounting to billions of dollars' worth of discounts—to push excess inventory into the channel beyond what demand warranted. Thus, Defendants' statements are actionable because they gave investors an "impression of a state of affairs that differ[ed] in a material way from the one that actually exists." *Berson*, 527 F.3d at 985; *see also Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *7 (N.D. Cal. Apr. 28, 2020) (Illston, J.).

Defendants claim that FE-3 "never explains" when the discounting occurred, whether it occurred in other regions and does not "quantify" it. Mot. at 17. But FE-3 recounted that HP's discounting practices: continued during FE-3's tenure as a HP Reseller Salesperson, which extended several months into the Class Period (¶139); occurred throughout the U.S. (¶140); occurred at the end of approximately every other quarter (*id*.); and gave rise to billions of dollars' worth of discounts overall (¶144). As such, FE-3's account *does* indicate a larger material trend at

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

HP—one that is corroborated by other FEs (¶¶136, 205-08, 214) and HP's admission that it had flooded the channel with more than $100 million in excess inventory.

**Defendants' Misleading Trend and Risk Disclosures.** HP's trend and risk disclosures were misleading because they failed to disclose HP's pre-Class Period sales practices, continued pushing of excess inventory into the channel during the Class Period, failure to achieve "global pricing consistency," and lack of visibility into large portions of its inventory channel. ¶¶346-348 (Print business trend disclosures), 350-353 (inventory risk disclosures); *In re Alphabet, Inc. Sec. Litig.,* 2021 WL 2448223, at *11 (9th Cir. June 16, 2021) (risk disclosures actionable where defendants failed to disclose known security failures).[5] Defendants admitted as much when, in September 2019, HP added language to the Print business trend disclosure identifying "challenges in Printing" including "grey marketing and the potential misuse of pricing programs" (¶349), and in December 2019 and 2020 when HP added language to the inventory risk disclosure admitting that HP lacked "visibility into our inventories" and "differential discounting between the geographies," which made "it difficult to achieve global consistency in pricing" and created "grey marketing" opportunities (¶355).

Defendants knew of this information by no later than the first half of 2016, and thus should have added it to those risk disclosures during the Class Period. *See Alphabet,* 2021 WL 244823 at *10 ("[g]iven that the April 10-Q filing was made after" Google detected security vulnerabilities "omission of any mention of" these issues made the risk disclosure statements actionable). Indeed, the SEC determined in the SEC Order that nearly identical trend disclosures were materially misleading because—as here—HP "failed to disclose the known trend of increased quarter-end discounting leading to margin erosion and an increase in channel inventory." ¶¶102-03; SEC Order ¶¶42, 44-45; *see Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at *9 (N.D. Cal. Feb. 15, 2018) (Illston, J.) (falsity established where "[company] disclosed reasons why its stock might fluctuate, but failed to disclose that [it] was engaged in a promotion scheme intended to manipulate the price of its common stock").

---

[5] Like the plaintiff in *Alphabet*, Lead Plaintiffs allege that Defendants' duty to disclose arose from HP's affirmative trend and risk disclosure statements (e.g., so as not to render those actual statements misleading), not under Regulation S-K, Item 303. As such, *NVIDIA* is not applicable.

16

Defendants relegate their response to a footnote, repeating their claim that "no facts [show] . . . persistent steep discounting." Mot. at 17, n.11. Defendants' counter-factual arguments fail. *See supra* at 6-7, 15-16. Plus, Defendants disregard that their disclosures presented the risk of excess inventory as hypothetical when it had already materialized. For example, HP's risk disclosures stated "*If* we have excess . . . inventory, we *may* have to . . . write down inventory." ¶350. By presenting the risk of excess inventory as merely hypothetical, when they knew that excess inventory was being pushed into the channel, Defendants misled investors. *See Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (abstract risk disclosures related to lawsuits misleading where company was already facing multiple lawsuits); *Alphabet*, 2021 WL 2448223 at *11 (disclosing "as-yet-unrealized risks and contingencies" is misleading when the risks had already materialized).

**Defendants' Puffery Argument as to Two Statements Fails.** Defendants argue that certain statements are inactionable puffery. Mot. at 15. This argument fails because it ignores the misleading factual aspects of each statement. *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005) (*citing Harris v. Ivax Corp.*, 182 F.3d 799, 806 (11th Cir. 1999) ("If the allegation is that the [whole] statement is misleading, then it makes no sense to slice the [statement] into separate sentences.")). Defendants' statement that the pull model was "a very important change" is misleading because, as explained above, HP was still pushing material amounts of excess inventory into the channel. *See supra* at 6-7, 10-12. The same is true for Defendants' statements about discounting (*see supra* at 6-7, 15-16) and linearity (*see infra* at 18). Defendants' authorities (Mot. at 15) are inapposite because they concern vague statements of corporate optimism untethered to facts and not, as here, statements regarding specific practices like discounting or the purported switch from one model to another.

**2.    New Misrepresentations Regarding Channel Inventory Management**

The AC also adds new allegations that Defendants continued the same misleading impression of HP's channel health that the SEC found misleading in the SEC Order. The SEC determined for the 2015-16 period that "HP's use of the phrase 'channel inventory' without definition" and statements about inventory relative to HP's internal "range" provided investors

"with only a partial and misleading picture of HP's channel health and caused HP's channel inventory disclosure to be materially misleading." ¶¶102, 157.

During the Class Period, Defendants **continued** making the same or substantially similar statements. Lesjak stated "[o]ur channel levels are healthy" and "below the top end of [HP's] newly lowered and narrowed ranges." ¶312; *see also* ¶¶318, 321, 334-35, 338-39, 342-43 (Fieler: "we continue to operate below our ceilings for Supplies channel inventory"). Weisler likewise stated "we're really on fulfilling when there's true demand." ¶317; *see also* ¶¶328, 331. And Defendants repeatedly touted HP's purportedly "better," "improved," and "unbelievable" "linearity." ¶¶310, 312, 317, 319-20, 322, 331. These statements were misleading for the same reasons given by the SEC. By touting that HP's channel inventories were within range or below HP's ceiling without disclosing that both the channel inventory and the ceiling being discussed "included only [HP's] Tier 1 channel inventory," Defendants gave the misleading impression their statements included **all** of HP's channel inventory and were reflective of the health of the **entire** channel. ¶¶162, 310-45. In reality, HP's unsustainable sales practices led to a massive inventory build-up in Tier 2 and beyond, which remained concealed from investors until 2019 because, unbeknownst to them, HP disclosures about channel health only included Tier 1 inventory. Likewise, Weisler's statement that HP was fulfilling "true demand" was misleading because Defendants had no visibility into "true demand" (¶¶188-89, 226-27) which they admitted in February 2019 (¶¶163, 239).

Defendants admit that HP had regular reporting data only for Tier 1—and therefore lacked visibility into Tier 2 and end-user demand. Mot. at 19. But they argue that this was disclosed on June 21, 2016, when Lesjak stated that "data on lower tiers was 'spottier.'" *Id.* This argument fails for at least three reasons. <u>First</u>, neither the SEC's nor Lead Plaintiff's claims are premised solely on the lack of data for Tier 2. Instead, these claims are primarily based on Defendants' failure to inform investors that the publicly disclosed Supplies channel inventory metric included only the first tier of HP's multi-tier Supplies channel and therefore did not reflect sizeable amounts of inventory in the channel. The AC alleges that in testimony to the SEC Lesjak conceded that there was nothing in Defendants' statements on June 21, 2016 that alerted investors that HP's channel inventory disclosures only included Tier 1. ¶450. Defendants' Class Period statements regarding

18

these publicly disclosed inventory metrics were thus misleading for the same reasons the SEC found nearly identical statements in 2015-16 misleading.

Second, Defendants selectively quote their disclosure regarding "spottier" Tier 2 data. In actuality, Lesjak stated that Tier 2 reporting was "*maybe a bit* spottier" (than Tier 1) but HP was "increasing what we are doing in that space" and, regardless, HP had "a pretty robust process already." ¶110. Thus, Defendants' actual words belie their argument that the market understood they had little to no insight into their channel beyond Tier 1.

Third, Defendants' argument that they disclosed HP's lack of insight into Tier 2 is a fact-specific "truth-on-the-market" defense that should not be resolved at the pleading stage. "[A]s a general rule . . . the truth-on-the-market defense is intensely fact-specific, so courts rarely dismiss a complaint on this basis." *Nguyen v. Radient Pharms. Corp.*, 2011 WL 5041959, *7 (C.D. Cal. Oct. 11, 2011) (collecting cases). Defendants must prove that the withheld information was transmitted "with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression." *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996). Defendants here fall far short of this requisite showing.

Defendants next argue that no facts are pled showing that "HP was *not* . . . selling ink and toner at levels below [its] inventory 'ceilings.'" Mot. at 19. To start, this misses the point, described above, that Defendants misleadingly told only part of the story regarding channel health. Further, as detailed in the AC and summarized above, HP continued to push excess Supplies inventory into the channel during the Class Period to the tune of over $100 million, much of which was in the unmonitored downstream portions of the channel and would not, therefore, be included in HP's publicly disclosed channel inventory metric. Thus, HP's statements that the Supplies inventory metric they reported was below channel ceilings, even if literally true, were highly misleading because investors had no idea that that metric did not include massive amounts of unreported excess inventory in the channel. *Thane*, 519 F.3d at 886; *Orexigen*, 899 F.3d at 1014-15.

### 3.   New Misrepresentations About the Placement of Hardware Units

Another new category of misrepresentations concerns Defendants' statements that they were focused on selling "positive net present value" (or NPV) printers—i.e., printers sold at a loss

19

but that were expected to generate positive revenue based on the end-user's purchase of Supplies. ¶¶371-400. Lesjak touted HP's "focus on placing positive NPV units" (¶377), Weisler claimed they were selling "positive NPV units" (¶392) and Fieler said that HP would "continue to place units where we see NPV positive opportunities" (¶396). These statements were misleading for two principal reasons. First, FEs reported that HP was pushing excess printers into the channel regardless of whether they were NPV positive, and these tactics continued into early 2019. ¶¶205-06, 210. Second, because Defendants lacked sufficient data to determine whether laser printers were NPV positive, they did not know which laser printers were expected to be NPV positive. ¶220. It was misleading for Defendants to say that they were focused on selling NPV positive printers when they had no way to determine which laser printers would qualify. *Id*.

Defendants argue that "HP never promised" that "every printer . . . would be NPV positive" and its "goal of selling *more* NPV positive printers" was not false simply because it was not achieved. Mot. at 19-20. Again, Defendants misconstrue Lead Plaintiffs' allegations. Lead Plaintiffs allege facts showing that Defendants were not, and could not, be focused on selling NPV positive units—and, as such, Defendants' statements concerning that purported focus were misleading.

### 4. Misrepresentations Regarding the Four Box Model, HP's Market Share and the Purported Stabilization of HP's Supplies Business

Defendants made misrepresentations concerning the HP's access to telemetry data for its Four Box Model (¶¶171-99, 356-70), HP's purportedly growing Supplies market share (¶¶221-30, 402-10) and the stabilization of HP's Supplies business and revenue (¶¶231-35, 411-34). Defendants argue that the Court should dismiss these statements again because "[n]othing has changed." Mot. at 12-15. Defendants are wrong. The AC pleads new facts showing that these statements were misleading when made.

**Misrepresentations Concerning Telemetry Data.** Just before the Class Period, Defendants stated that HP's commercial printers were providing telemetry data. ¶84 ("over the course of 2016 we are now having the commercial side of house, and those laser jet printers are phoning home too"). Then, throughout the Class Period, Defendants repeatedly represented that

20

they were receiving real-time telemetry data, without distinguishing between data available for ink versus toner-based printers. ¶¶402-10. It was not until February 27, 2019 that Defendants first corrected this misimpression, admitting that HP "did not have a statistically significant sample" of telemetry data for toner-based printers and so instead "used period third-party survey data and market research aggregators to estimate toner market share." ¶535.

The Court asked Lead Plaintiffs to explain "why the lack of 'a statistically significant sample from the system telemetry' caused Defendants' statements about the Four Box Model's use of data to be misleading." Op. at 7. The AC answered this question. First, as noted above, the AC explains that, just prior to the Class Period, Defendants told investors that HP's toner-based printers were providing it with telemetry data. Thus, it was misleading for Defendants to repeatedly discuss the Four Box Model's purported access to telemetry data during the Class Period without noting that they did not have "a statistically significant sample" of telemetry data for toner-based printers. Defendants' omission of this key information gave "reasonable investor[s] the 'impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed].'" *Berson*, 527 F.3d at 985; *Zuora*, 2020 WL 2042244, at *7. Once Defendants publicly spoke of HP's access to telemetry data, they were "obligated to share [] information" that "diminished the weight" of their statements—i.e., the fact that HP did not have a statistically significant sample of telemetry data for toner-based printers. *Orexigen*, 899 F.3d at 1014-15.

Second, as explained in the AC, the lack of statistically relevant telemetry data rendered the Four Box Model unreliable and inaccurate. FE-9, who helped develop the Four Box Model (¶58), explained that toner was a larger portion of the business than ink. ¶180. Without statistically relevant telemetry data from HP's toner-based printers, Defendants had no real-time visibility into the "usage," "market share," or "pricing" boxes of the Four Box Model for toner-based printers. ¶¶189-90. As a result, the Four Box Model could not and did not provide HP or investors with an accurate depiction of HP's Supplies market share, demand, or revenue trajectory. ¶190.

Third, Charts 1-5 (¶¶194-99) explain how critical trends would be missed by a model using insufficient data. Defendants scoff that the Charts use hypothetical data. Mot. at 13, n.7. But this misses the point. The Charts illustrate that the lack of statistically relevant data would render the

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

Four Box Model inadequate, which in fact occurred. Defendants also ignore that the Charts seek to illustrate FE-9's description of the differences between the model HP used when it had sufficient telemetry data and the one it utilized when that data was not available. *E.g.*, ¶192 (explaining that if HP lacked "enough data" from its printers, the forecaster would plot points on a chart and then draw a line or a curve through those points).

Fourth, the AC explains why the Four Box Model was able to generate two years (2017 and 2018) of purportedly accurate forecasts—only to collapse in 2019. Simply put, this happened because Defendants continued to push excess inventory into the channel, which temporarily inflated HP's results in 2017 and 2018, but destroyed sales in 2019. ¶¶170, 231, 235, 242, 261.

**Misrepresentations Concerning Market Share.** Defendants repeatedly represented that HP's Supplies market was growing, including for commercial printers. Lesjak boasted of the "progress in our market share" (¶222) and Defendants presented investors with a table containing a "check mark" in the "Share" column for "Office" Supplies, indicating that market share had increased (*see, e.g.*, ¶221). However, in February 2019, Defendants admitted that HP "did not have . . . the capabilities to calculate market share for toner-based products." ¶¶190, 536. Defendants also admitted that "[w]hereas we have previously had an arrow going up of gaining share, given the new data, we'd actually expect share to be down[.]" ¶538. Defendants' acknowledgement that HP did not have even the "capabilit[y]" to calculate market share for office Supplies and, in reality, share was down, cannot be reconciled with their prior statements that office Supplies market share was growing. *See Apple*, 2020 WL 64820114 at *6; *Yourish*, 191 F.3d at 996-97.

**Misrepresentations About the Stabilization of Supplies Revenues.** Defendants stated that they had stabilized HP's Supplies business. Lesjak stated that HP "*achieved* supply stabilization a quarter earlier than expected" (¶411); Weisler stated "[w]e *stabilized* supplies a quarter earl[y]" (¶428); and Fieler noted "the *supply stabilization* . . . in Q3 of '17" (¶431). In reality, HP's Supplies business appeared to stabilize and return to growth because, unbeknownst to investors, HP was flooding the channel with excess Supplies above demand. Indeed, analysts specifically reported after the first corrective disclosure that the purported stabilization and return to growth was in fact "inventory-fueled"—precisely as the AC alleges. ¶242. Such allegations

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

adequately plead falsity. *See Jackson v. Microchip Tech. Inc.*, 2020 WL 1170843, at *9 (D. Ariz. Mar. 11, 2020) (failing to disclose that revenues were inflated by quarter-end practice of selling excess inventory into the channel "created an impression of a materially different state of affairs than the one that actually existed").

**B.   The Amended Complaint Pleads a Strong Inference of Scienter**

"Scienter can be established by intent, knowledge, or certain levels of recklessness." *In re VeriFone Holdings, Inc., Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012); *see also Schueneman*, 840 F.3d at 705 ("deliberate recklessness" suffices). A district court should ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017). The scienter inference "need not be" of "the 'smoking-gun' genre" or even "the most plausible" inference—it need only be "as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324. Numerous facts, considered holistically, show that Defendants acted with at least deliberate recklessness.

**1.   Defendants Knew of the Undisclosed Sales Practices and Their Financial Impact Before the Class Period, and Continued Them**

Going into the Class Period, Defendants knew HP had met quarterly sales targets by pushing inventory into the channel far above levels of actual demand. ¶¶436-40. After a 3.5-year investigation, the SEC found that "HP's principal financial officers and principal executive officers who were responsible for the company's disclosures learned of the conduct" no later than 1Q 2016. ¶¶436, 443-44. The SEC Order and testimony make clear that Defendants undertook a comprehensive evaluation of these practices and their impact in April 2016, including "end of quarter pull-ins to meet profit targets," and created a "working group" to examine them. ¶442. This evaluation was referred to internally as the "Supplies Push Pull project" ("SPP"). ¶443. The testimony also establishes that Lesjak knew that, prior to June 2016, HP had a "vicious cycle" of "back-end loaded quarterly sales" where channel partners waited until the last month of a quarter to make purchases knowing HP would steeply discount to move excess product.

Defendants also knew that these practices caused a massive $450 million inventory glut,

23

which required HP to buyback this excess inventory. ¶92. Newly alleged facts also demonstrate that Defendants then centralized oversight of HP's inventory, pricing, and discounting practices. HP: (1) established inventory ranges for each of its three regions, over which Defendant Lores took personal ownership (¶109); (2) received regular reporting from channel partners on "sell-through" and "sell-out", i.e., when distributors and resellers sell product down the sales channel (¶110); and (3) centrally managed pricing and discounting decisions (¶111).

Despite Defendants' knowledge of these facts, during the Class Period, HP continued to "push" Supplies into the channel, eventually requiring Defendants once again to announce that they oversold the channel by at least $100 million. ¶152. The well-corroborated accounts of multiple FEs make clear that the "pushing" of excess product into the channel to meet quarterly financial targets occurred across all HP regions, and that Defendants knew of these practices. For example, FE-2 stated that HP's upper management implemented "Acceleration Asks" that set sales targets well above normal demand and that it was common practice to ask resellers to take Supplies well above their sell-through numbers and four times above HP's inventory controls ¶¶133-34. FE-2 described how HP offered discounts and "incentive dollars" to resellers, the latter requiring Defendant Lores' approval, and how approvals were needed when HP leased trailers and warehouse space for Staples to take on HP's excess Supplies inventory—a fact FE-2 believed Defendant Lores would have been aware of given the size of the retail customer involved. ¶¶136, 465. Numerous other FEs from regions across the world offered similar accounts. *See* ¶¶138, 148-49, 151, 210-12, 218. The fact that Defendants continued pushing excess inventory into the channel despite assuring the market they had stopped demonstrates a strong inference of scienter. Additionally, the magnitude of the excess inventory pushed into the channel during the Class Period—at least (and likely far more than) $100 million—further supports an inference of knowledge. *See Lexmark*, 367 F. Supp. 3d at 38 ("inventory drawdown between $50 million and $70 million" supported inference defendants knew of excess inventory in channel because "the magnitude of the aftershock suggests more than a careless mistake or trivial miscalculation by Lexmark and its executives").

Defendants incorrectly argue that the SEC Order "may not be used to establish facts to

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

demonstrate scienter." Mot. at 23. Although a plaintiff fails to plead scienter where it "make[s] no effort to inform the Court what other sources of information besides" a government investigation it relies on, *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (Illston, J.), courts routinely consider government investigations as relevant to the scienter analysis, particularly when coupled with other facts. *See Reese v. Malone*, 747 F.3d 557, 574 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017) (sustaining scienter allegations in part based on "information . . . which came to light through discovery related to government investigations"); *Zamir v. Bridgepoint Educ., Inc.*, 274 F. Supp. 3d 1057, 1072 (S.D. Cal. 2017) ("The Court . . . considers Lead Plaintiffs' allegations concerning these government investigations as part of the Court's holistic [scienter] analysis."). Here, far from solely relying on the SEC Order, the AC is also based on information from nine FEs, testimony by HP executives, and corporate admissions.

Defendants also argue that the SEC Order and Defendants' testimony before the SEC cannot support scienter because they relate to a period before the Class Period. Mot. at 22. However, it is well-established that pre-class period knowledge is "not lost when the class period began." *In re Wireless Facilities, Inc. Sec. Litig.*, 2007 WL 9667131, at *8 (S.D. Cal. May 7, 2007) (collecting cases); *Zelman*, 376 F. Supp. 2d at 970 (class period dates function only to define the class "not to restrict the universe of relevant or actionable facts"). "[C]ommon sense dictates that facts relevant to scienter will ordinarily date from before any alleged misrepresentations" because the "circumstances preceding the statements . . . would be among those knowable at the time of the statements." *In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716, at *4 (C.D. Cal. Mar. 12, 2012).

Defendants also try to downplay the SEC Order by arguing it did not explicitly "mention" that any Defendant "intentionally or recklessly made or approved any false or misleading statement." Mot. at 21. Testimony provided to the SEC confirmed that Defendant Lesjak controlled the content of HP's statements (¶¶503-05), Defendants met to plan their statements to investors prior to earnings calls (¶¶506-07), and Defendants Lesjak and Weisler set the quarterly revenue targets for HP's business units (¶¶508-11). Thus, the conclusions about HP's misleading

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

disclosures in the SEC Order encompass the Individual Defendants' culpability.

Fundamentally, Defendants' argument is also a red herring. The SEC Order concludes that Defendants knew of the sales practices by June 2016—which Defendants do not dispute. Thus, Defendants entered the Class Period knowing these practices were used to meet quarterly financial targets and continued them despite their public statements to the contrary. ¶436.

### 2.   Defendants' Concealment of the Real Reasons for the Purported Model Change Further Demonstrate Scienter

When explaining HP's purported change to the demand-driven "pull" model during the Class Period, Defendants concealed the real reason for the original problems and the impetus for the purported switch, blaming it on the "omnichannel" environment." ¶¶106, 126, 286. In truth, HP had created the massive inventory glut by intentionally engaging in unsustainable sales practices designed to meet short-term targets by flooding the channel with Supplies far above actual demand. ¶¶436-54. That Defendants' public explanations contrasted so drastically with the undisclosed reality supports scienter. *See In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 800 (N.D. Cal. 2019) ("contrast" between "public-facing statements" and "reality" sufficient "to infer fraudulent intent"). It also supports the inference that Defendants knew about their continued use; indeed, if Defendants did not plan to continue using such practices, why did they go to such lengths to conceal them from the market?

### 3.   During the Class Period the SEC Was Actively Investigating HP's Use of "Pull-in" Sales Practices and Its Misleading Disclosures

Beginning in March 2017 and continuing through the Class Period, the SEC investigated HP's use of "pull-ins" and gray marketing to meet financial targets and its public statements regarding HP's sales and inventory practices and the health of its inventory channel. Defendants knew of SEC's investigation and its focus, having provided deposition testimony to the SEC on the precise subjects about which Defendants made materially false and misleading statements during the Class Period. ¶¶443-54, 504-08. These facts further support the strong inference that Defendants knew, or recklessly disregarded, the importance of these issues to investors and how their continuation of the conduct at the heart of the investigation would render Defendants'

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

statements materially misleading. ¶454; *see Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 423 (E.D. Pa. 2019) (scienter adequately pleaded based, in part, on the fact that "governmental entities [were] investigating pricing" at the time); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at \*13 (S.D.N.Y. Mar. 28, 2018) (defendant's receipt of a DOJ subpoena supported scienter).

### 4.    Defendants Closely Monitored Channel Inventory Levels

Defendants' statements just before the Class Period and the SEC testimony further demonstrate that they personally monitored channel inventory during the Class Period. The SEC testimony confirmed that: Lesjak's finance team was responsible for setting the "acceptable [inventory] ranges" for HP's regional teams (¶449); Lesjak received channel inventory reports (¶450); and HP generated a weekly channel inventory report package  (¶451).[6] When speaking about the measures HP would implement after the $450 million inventory reduction, Lores told investors "[i]t will be critical, as it is today, for me to hold the sales teams accountable to remain within the ranges going forward." ¶457.

Defendants' monitoring of inventory continued during the Class Period, as evidenced by their statements each quarter reporting whether Supplies inventory was within HP's "ranges" and under the "ceiling" set by them. ¶460. Because Defendants spoke to investors about HP's inventory management with a "high degree of specificity" and "represented repeatedly . . . [they] had adequate information," this supports an inference of scienter regarding HP's inventory excesses. *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259-60 (W.D. Wash. 2009) (scienter inferred where "[defendant] maintained that he knew what he was talking about"); *see also In re PMI Grp., Inc. Sec. Litig.*, 2009 WL 3681669, at \*3 (N.D. Cal. Nov. 2, 2009) (Illston J.) (scienter adequately pled based in part on defendants' statements that they were directly involved with relevant area); *Quality Sys.*, 865 F.3d at 1145 (scienter found where "[defendants] themselves told investors they had real-time access to, and knowledge of, sales information").

### 5.    The FE Accounts Are Reliable and Support Scienter

---

[6] Lesjak likewise told investors "there's fairly regular reporting . . . so that we can really understand[] what's going on, certainly within Tier 1 globally," and as for Tier 2, "we've got a pretty robust process already." ¶458. Similarly, Weisler told investors that "[w]e know exactly how much inventory we have . . . ." ¶456.

27

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

As noted above, multiple FEs representing diverse geographic regions tell consistent and corroborating accounts that HP continued to push excess inventory into the channel to a material degree (¶¶133-38, 139-44, 148, 151-52, 205-08, 212-18) and aggressively discounted Supplies to meet financial targets (¶¶136, 140-46, 206, 214-15) during the Class Period. Defendants ask the Court to ignore these accounts because each FE must personally interact with a named Defendant. Mot. at 26-28. The law does not require that a witness personally interact with a named defendant—a standard that is nearly impossible to satisfy at the pleading stage, during a discovery stay. *See, e.g.*, *Okla. Police Pension & Ret. Sys. v. LifeLock*, 780 F. App'x 480, 484-85 n.5 (9th Cir. 2019) (refusing to discount witness allegations because witness lacked direct contact with that defendant because the witness was "in a position to be personally knowledgeable" about the reported facts); *In re Silver Wheaton Corp. Sec. Litig.*, 2016 WL 3226004, at *3 n.3 (C.D. Cal. June 6, 2016) (witness in a position to infer information based on his position at the company); *Countrywide*, 554 F. Supp. 2d at 1059-60 (scienter strongly inferred though witnesses had not "ever spoken or had other contact with any of the seven non-management directors . . . and none is alleged to have personal knowledge relating to the two management directors"); *Zuora*, 2020 WL 2042244, at *10-11 (rejecting argument that FE allegations could not support scienter because they lacked "direct contact with the defendants"); *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) ("the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus"). Each FE's job responsibilities put them in position to know the alleged facts and to participate in the concealed sales practices. ¶¶50-58; *see City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2021 WL 1091891, at *18 (N.D. Cal. Mar. 22, 2021) ("CWs have sufficient personal knowledge of Oracle's sales practices by virtue of their job roles and Oracle's [internal] system."). The FE accounts should be credited by the Court.

Defendants characterize several of the FEs' statements as reflecting only "'speculative' awareness." Mot. at 27-28. However, the statements that Defendants single out were based on personal knowledge of how HP operated. For example, FE-2's belief "that Defendant Lores would have been aware of this effort and would have had to approve HP leasing the trailers and warehouse

28

space" was rooted in a personal knowledge of the approval process for discounts and incentives. ¶136. Furthermore, Defendants misstate the law. The Ninth Circuit does credit statements of FEs stating what "defendants would have known" on the basis of the information available. *See Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) (scienter adequately pleaded where FE "stated that, on the basis of the information available to them, the defendants would have known" certain facts).

Defendants also incorrectly argue that the witnesses' reports do not "contradict the challenged statements." Mot. at 28. Numerous witnesses reported facts showing that HP continued to push excess inventory into the channel beyond demand to a material degree, which renders the statements misleading. *See, e.g.*, ¶¶133-38, 140-48, 151, 205, 210.

### 6. Defendants Tracked and Quantified the Deficiency of the Telemetry Data Used In the Four Box Model

In its Order, the Court expressed concern that there were not enough facts showing that Defendants knew or recklessly disregarded that the Four Box Model lacked sufficient telemetry data. The AC presents new allegations from FE-9 demonstrating that, during the Class Period, HP closely tracked and quantified how much telemetry data HP received for each of its printer lines. FE-9 stated that HP maintained a "dashboard" that tracked how much telemetry data coverage HP had for its product lines. ¶¶185-86. According to FE-9, it was common knowledge in the Printing division and known by FE-9's superiors, Mercè Barcons, the Global Head of Supplies, and Michael Bordoni, that firewalls were preventing HP from receiving commercial usage data, and it was discussed at quarterly meetings that the insufficient amount of telemetry data impaired HP's forecasting accuracy. ¶¶178, 187-88. FE-9 said that the dashboard initially showed that HP received sufficient telemetry usage data for only 30% of toner-based printers. By 2017 and 2018, the dashboard showed only 40% of toner-based printers were in the "green," i.e., indicating HP had sufficient data. The remainder of the toner-based printer lines were either coded "red" or "yellow," indicating respectively that HP would either never get the data or did not yet have it. ¶¶185-86. As to market share data, FE-9 said that by 2017 and 2018, only 20-30% of the toner-based printers were coded "green," and at times as low as 10%, and two-thirds of toner-based

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

printers were coded "red," meaning HP knew it would ***never*** receive the data. ¶186. FE-9 presented data about the telemetry coverage regularly at meetings attended by Barcons. ¶187. FE-9 believed Lores knew about the deficiencies in telemetry data, as FE-9 prepared Barcons with detailed analyses regarding telemetry coverage for meetings that Barcons had with Lores. *Id*. FE-9 received emails from Barcons that included questions from Lores about how to improve telemetry data coverage and whether they could "speed that up." *Id*. Such facts support an inference of scienter.

### 7.　　The Core Operations Allegations Support an Inference of Scienter

The "core operations" inference applies with particular force where: (1) the subjects of the misrepresentations were essential to defendants' business; and (2) defendants maintained they monitored these essential subject matters closely. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008). The AC meets this standard. <u>First</u>, there can be no dispute that HP's Supplies sales model and inventory management were critical to its business given that Supplies accounted for nearly all of its profit and revenue. And the sales practices at issue had seriously harmed HP just before the Class Period, necessitating a buy-back of $450 million in inventory and leading to a 3.5 year SEC investigation. Lesjak testified to the SEC that the channel distribution system was a "fundamental part" of how HP went to the market as it facilitated 80% of its business on a revenue basis. ¶505. These allegations support an inference of scienter. *See Lexmark*, 367 F. Supp. 3d at 38 ("[T]he importance of EMEA channel inventory to Lexmark's business moves the needle in Plaintiffs' favor.").

<u>Second</u>, as the SEC Order and testimony show, Defendants were keenly aware of how unsustainable sales practices had created excess inventory in the channel. ¶¶436-54. Defendants instituted centralized discounting and pricing, with Defendant Lores' approval required for particular incentives. ¶¶111, 136, 214, 464-65. Throughout the Class Period, Defendants told investors that they monitored channel inventory, as explained above (*see supra* at 17-19). Such allegations give rise to an inference of knowledge. *See Alphabet*, 2021 WL 2448223, at *31 ("although the complaint does not directly allege that [the defendant] read the Privacy Bug Memo, we may consider a senior executive's role in a company to determine whether there is a cogent

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

and compelling inference that the senior executive knew of the information at issue").[7]

### 8.    Insider Sales By Weisler and Lores Bolster the Inference of Scienter

During the Class Period, Defendants Weisler and Lores sold HP stock for proceeds of $86.87 million and $28.46 million, respectively, while in possession of adverse material, nonpublic information about HP's sales practices and the insufficiency of the Four Box Model. ¶¶515-17. The sales disposed of approximately 89% and 83% of Weisler's and Lores' respective holdings, and were dramatically out of line with their prior trading history. ¶¶518-19. That certain trades occurred pursuant to Rule 10b5-1 plans does not does not immunize Defendants since they entered into the plans during the Class Period. *See Applestein v. Medivation*, *Inc.*, 2011 WL 3651149, at *7 (N.D. Cal. Aug. 18, 2011) (plan did not preclude scienter where defendants already had knowledge of the study's unblinding before they entered the plan); *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1261–62 (D. Nev. 2019) (trading "plan provides no defense to scienter allegations" when "executives enter into a trading plan during the Class Period").

### C.    The Amended Complaint Pleads Loss Causation

The loss causation inquiry "requires no more than the familiar test for proximate cause." *Mineworkers Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) ("*First Solar*"). Under the "general proximate cause test," plaintiffs "***need only show a 'causal connection' between the fraud and the loss***." *Id.* at 752-53. Notably, "loss causation is a context-dependent inquiry as there are an ***infinite variety of ways*** for a tort to cause a loss." *Id*. Significantly, *First Solar* considered and rejected the argument that Defendants repurpose here—namely, that a disclosure precipitating a stock price decline must reveal a "fraud" or reveal statements to be "false"—holding that: "***Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss***." *Id.* at 753; *accord Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1156-57 (C.D. Cal. 2018) (under *First Solar*, loss causation adequately pled where plaintiff "at least alleged

---

[7] The inference also applies to the claims concerning the lack of telemetry data for the Four Box Model. First, the Four Box Model was essential to HP's business. ¶¶84, 171-75, 493-98. Second, new allegations in the AC show that HP meticulously tracked its telemetry data coverage and Lores knew the coverage was not sufficient, having inquired how the coverage could be increased and how they could "speed [] up" that fix.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

a correlation between" disclosures and stock price declines); *Edenbrook Cap., LLC v. RhythmOne Plc*, 2019 WL 1791419, at *9 (N.D. Cal. Apr. 24, 2019). Moreover, the Ninth Circuit has held that the pleading standards applicable to loss causation allegations are not burdensome:

> ***The plaintiff must plausibly allege a causal connection between the defendant's misstatements and the plaintiff's economic loss*** . . . .***That effort should not prove burdensome***, for even under Rule 9(b) the [] allegations will suffice so long as they give the defendant notice of plaintiffs' loss causation theory and [] the court some assurance that the theory has a basis in fact.

*In re BofI Holding, Inc. Sec. Litig*., 977 F.3d 781, 794 (9th Cir. 2020). The AC meets these standards for the three disclosures.

**February 27, 2019:** Defendants announced that, contrary to their Class Period statements: (1) HP had pushed $100 million of excess inventory into the channel; (2) HP lacked adequate data to calculate market share; and (3) consequently, HP's sales had declined and would continue to decline by 3% for the remainder of 2019. In direct response to these disclosures, analysts reacted with surprise, HP's stock price declined by over 17% in a single day on high volume, and analysts connected the disclosures to the decline. ¶¶237-48, 527-39. These allegations "provide enough factual content to give the defendant some indication of the loss and the causal connection that the plaintiff has in mind." *BofI,* 977 F.3d at 794; *see also First Solar*, 881 F.3d at 752-53.

Defendants contend that loss causation is absent as a matter of law because these disclosures did not "reveal[]" specific statements "to be untrue." Mot. at 33. This argument fails because it misstates the law. As noted above, loss causation does not require that false statements or a fraud be revealed; rather, loss causation can be shown in "an infinite variety of ways." *First Solar*, 881 F.3d at 752-53. Thus, directly contrary to what Defendants contend—and of particular relevance here—the Ninth Circuit has held that "a plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *Id*. at 754. Similarly, to the extent Defendants assert that loss causation requires a "mirror image" disclosure demonstrating that a prior statement is false, this too is incorrect. *See BofI*, 977 F.3d at 790 ("a disclosure need not precisely mirror the earlier misrepresentation").

Also without merit is Defendants' argument that the February 27 disclosures "do not even

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

touch on the issue" of Defendants' misleading statements concerning the purported switch to the "pull" model. Mot. at 33. As noted above, on February 27 Defendants announced that HP had sold at least $100 million of excess inventory into the channel, which would negatively impact HP's financial performance moving forward. ¶¶237, 532. The AC alleges that this excess inventory existed *because* HP continued, to a material degree, the "push" model it had supposedly switched. *See* ¶¶133-38, 141, 144, 148, 150-51, 207, 210, 213-16, 218. Analysts tied this disclosure to the stock price decline. ¶¶241-42, 540-42. This suffices to allege a "'causal connection' between the fraud and the loss." *First Solar*, 881 F.3d at 752-53.

**August 22 and October 3, 2019:** On August 22, 2019, HP acknowledged that the amount of excess inventory it had pushed into the channel was likely higher than the $100 million it had announced in February, announced disappointing earnings, and revised its guidance down further to 4-5% for 2019, reflecting the additional excess inventory. These events were causally connected to the fact that, contrary to HP's prior statements, it had continued pushing excess inventory into the channel that cannibalized its future sales, had not been selling to true demand, and had not stabilized the Supplies business. HP's stock price fell another 6% on high volume, and analysts expressed surprise and connected the decline to the disclosures. ¶¶253-59, 543-51.[8] These allegations, too, plausibly allege a "causal connection" between the alleged fraud and the loss.

Similarly, on October 3, HP announced that its Supplies business model was unsalvageable and it would abandon it entirely, and did not expect Supplies revenues to grow moving forward. In so doing, Defendants acknowledged that they had not been selling to true demand and had not achieved global pricing consistency (and were in fact only now changing their operating model to do so), and that approximately 20 percent of HP's printers were not NPV positive. ¶¶261-62, 552-53, 556-57. Again, these events were causally connected to the fact that, contrary to HP's prior statements, it had continued pushing excess Supplies and printers into the channel, had not been selling to true demand, had not achieved pricing consistency, and had not stabilized the business. HP's stock price declined nearly 10% on high volume, and analysts again connected that decline

---

[8] Defendants also disclosed that HP was still working to "change[] and improve[] the controls around our discount policy." ¶544.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

to the disclosures. ¶¶263-68, 554-58.

Defendants again argue that loss causation is absent as a matter of law because neither of these disclosures "corrected" specific prior statements. Mot. at 33-34. But Defendants' assertion that loss causation requires either a "mirror image" disclosure or that the full "truth" or "fraud" be revealed is wrong; the law requires only a "causal connection" between the stock price decline and the allegedly misrepresented or concealed facts, which is alleged here. *See, e.g.*, *First Solar*, 881 F.3d at 754 (explaining that loss causation exists when "the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss").

Defendants also contend that loss causation cannot exist because these disclosures "said nothing new." Mot. at 34. Not so. As detailed in the AC and summarized above: (1) on August 22, HP acknowledged that the amount of excess inventory it had pushed into the channel was likely higher than the $100 million it had announced in February, announced disappointing earnings, and revised its guidance down farther to 4-5% for 2019; and (2) on October 3, HP announced that the business model was so impaired that it had been forced to abandon it entirely, and acknowledged that HP had not been selling to true demand and had not achieved pricing consistency. These facts were "new"; indeed, they surprised analysts and triggered large stock price declines on high volume, neither of which would have occurred if HP just repeated what it had previously disclosed.

Finally, Defendants argue that the "more plausible" reason for the stock price declines is that HP reported "disappointing financial results" but did not engage in any misconduct. Mot. at 34. Defendants are essentially arguing that they made no misstatements, but that is not a loss causation argument. The AC's theory is that HP reported "disappointing financial results" on these dates *because* it had engaged in the undisclosed sales practices, which cannibalized future sales. ¶¶258, 268, 523-26, 548, 558. That is precisely the sort of "causal connection" that satisfies the loss causation inquiry. In any event, determining the precise cause of a stock price decline requires detailed fact and expert evidence, and thus, "conclusively deciding reasons for the market's reaction is premature, and reasonable theories concerning that reaction do not warrant Rule 12 dismissal." *In re Mattel, Inc. Sec. Litig.*, 2021 WL 1259405, at *12 (C.D. Cal. Jan. 26, 2021).

**D.    The Amended Complaint Alleges Claims Under Sections 20(a) and 20A**

Defendants argue that the Sections 20(a) and 20A claims fail for lack of an underlying primary violation. As explained above, the AC adequately alleges primary violations. Defendants assert that the Section 20A claim fails because the trades were either made pursuant to 10b5-1 trading plans or to satisfy tax obligations. Mot. at 35. Neither assertion defeats the claim as a matter of law. Section 20A does not contain an exception for sales made under 10b5-1 plans.[9] Likewise, whether stock is sold to pay taxes has no to t bearing on the elements of Section 20A. Regardless of whether sales are made to pay taxes, or other obligations, the trades are actionable under Section 20A where, as here, they are made while the seller is "in possession of material, nonpublic information." *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1202 (C.D. Cal. 2008).

Defendants also incorrectly argue that Lead Plaintiffs do not satisfy the contemporaneous trading requirement for Weisler and satisfy it for only one of Lores' trades. Mot. at 35. The Court held that the prior complaint adequately pled contemporaneous trading for Weisler's November 6, 2017 sale *and* Lores' March 9, 2018 sale. Op. at 13-14. These allegations appear verbatim in the AC. The AC adequately pleads contemporaneous trading for Weisler's and Lores' December 9 and 10, 2017 sales, respectively, identifying purchases by Rhode Island within 10-11 days of Defendants' transactions. *See In re Verifone Sec. Litig*, 784 F. Supp. 1471, 1489 (9th Cir. 1993) ("a reasonable period of liability . . . could be as short as a few days, but no longer than a month").

**IV.    CONCLUSION**

The Court should deny Defendants' motion to dismiss. However, should the Court grant the motion in whole or in part, Lead Plaintiffs request leave to amend to include new facts learned from evidence recently produced by the SEC.[10]

---

[9] Further, Defendants have not produced the 10b5-1 plans, so the Court cannot assess what they say, much less whether they are exculpatory as a matter of law.

[10] On June 3, 2021, the day before Defendants moved to dismiss the AC, the SEC provided Lead Plaintiffs with redacted copies of four additional deposition transcripts. Based on these transcripts, Lead Plaintiffs believe that the deponents were Defendant Weisler, Defendant Lores, the VP & GM of the EMEA Print business, and the VP & GM of the Americas Print business. If necessary, Lead Plaintiffs would use Weisler's and Lores' testimony, as well as testimony from Defendant Lesjak and other executives, to amend the AC.

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

Dated: June 25, 2021

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

**KESSLER TOPAZ MELTZER & CHECK, LLP**

*/s/ Jeremy P. Robinson*

*/s/ Jennifer L. Joost*

JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

-and-

JOHN J. RIZIO-HAMILTON (admitted *pro hac vice*)
(johnr@blbglaw.com)
JEREMY P. ROBINSON (admitted *pro hac vice*)
(jeremy@blbglaw.com)
ALEXANDER T. PAYNE (admitted *pro hac vice*)
(alex.payne@blbglaw.com)
BENJAMIN W. HOROWITZ
(admitted *pro hac vice*)
(will.horowitz@blbglaw.com)
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiff Iron Workers Local 580 Joint Funds and Co-Lead Counsel for the Class*

JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
STACEY M. KAPLAN (Bar No. 241989)
(skaplan@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001

-and-

GREGORY M. CASTALDO (admitted *pro hac vice*)
(gcastaldo@ktmc.com)
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

*Counsel for Lead Plaintiff the State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island and Co-Lead Counsel for the Class*

36

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI

## CERTIFICATE OF SERVICE

I, Jeremy P. Robinson, declare as follows:

I am employed in the County of New York, State of New York, I am over the age of eighteen years and am not a party to this action; my business address is 1251 Avenue of the Americas, 44th Floor, New York, NY 10020, in said County and State.

I hereby certify that on June 25, 2021, the foregoing **LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT** was filed with the Clerk of the Court via CM/ECF. Notice of this filing will be sent electronically to all registered parties by the operation of the Court's electronic filing systems.

Dated: June 25, 2021

_/s/ Jeremy P. Robinson_
Jeremy P. Robinson

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 3:20-cv-01260-SI