**GIBSON, DUNN & CRUTCHER LLP**
BRIAN M. LUTZ, SBN 255976
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306
blutz@gibsondunn.com

LISSA M. PERCOPO (*pro hac vice*)
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
Telephone:  202.887.3770
Facsimile:  202.530.9528
lpercopo@gibsondunn.com

**SIDLEY AUSTIN LLP**
SARA B. BRODY, SBN 130222
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone:  415.772.1200
sbrody@sidley.com

*Attorneys for Defendants HP Inc., Dion J. Weisler, Catherine A. Lesjak, Steven J. Fieler, and Enrique Lores*

*Additional counsel on following page*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE HP INC. SECURITIES LITIGATION | Case No. 3:20-cv-01260-SI<br><br>**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Date:  August 13, 2021<br>Time:  10:00 A.M.<br>Location:  Courtroom 1, 17th Floor<br>Judge:  Hon. Susan Illston<br><br>Date Action Filed:  February 19, 2020 |

Gibson, Dunn &
Crutcher LLP

REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
Case No. 3:20-cv-01260

**WILSON SONSINI GOODRICH & ROSATI**
STEVEN SCHATZ, SBN 118356
650 PAGE MILL ROAD
PALO ALTO, CA 94304-1050
Telephone:  650.320.4856
SSchatz@wsgr.com

KATHERINE HENDERSON, SBN 242676
ONE MARKET PLAZA
SPEAR TOWER, SUITE 3300
SAN FRANCISCO, CA 94105-1101
Telephone:  415.947.2065
KHenderson@wsgr.com

*Attorneys for Defendant Catherine A. Lesjak*

REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
Case No. 3:20-cv-01260

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ................................................................................................ 1

II. ARGUMENT ......................................................................................................................... 3

     A.    The Opposition Confirms That Plaintiffs Fail To Plead An Actionable
         Misstatement ............................................................................................................ 3

         1.    Plaintiffs Have Not Cured Their Defective Pleading As To
              Any Previously Challenged Statement ................................................... 3

         2.    The Opposition Identifies No Facts To Show That Statements
              About HP's Pull Model Were False Or Misleading ................................ 4

         3.    The Channel Inventory Statements Were Not False Or
              Misleading ............................................................................................ 9

         4.    The Challenged Risk Disclosure Statements Were Not False
              Or Misleading ..................................................................................... 10

         5.    The Statements About NPV Positive Printers Were Not False
              Or Misleading ..................................................................................... 11

     B.    Plaintiffs' Opposition Shows That They Have No Cogent Theory Of
         Scienter .................................................................................................................. 11

         1.    Plaintiffs Concede They Cannot Plead Scienter As To The
              "Channel Inventory" And "NPV Positive Printer" Statements ................... 12

         2.    The SEC Settlement Does Not Establish Scienter ...................................... 12

         3.    The Former Employees Do Not Establish Scienter ..................................... 14

         4.    Plaintiffs Again Fail To Plead Scienter Under The Core
              Operations Theory ............................................................................... 16

          5.    The Previously Dismissed Allegations Still Fail ......................................... 18

     C.    The Opposition Confirms Plaintiffs Have Not Pled Loss Causation ......................... 18

     D.    The Opposition Cannot Salvage Plaintiffs' Claims Under Section 20(a)
         Or Section 20A ....................................................................................................... 20

CONCLUSION ......................................................................................................................... 20

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re Alphabet, Inc. Sec. Litig.*,
   2021 WL 2448223 (9th Cir. June 16, 2021) ...............................................................11, 17

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) ...........................................................................................................10

*In re BofI Holding, Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020)........................................................................................18, 19

*Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*,
   660 F.3d 1170 (9th Cir. 2011).............................................................................................10

*In re Countrywide Fin. Corp. Derivative Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) ..............................................................................15

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ...........................................................................................................19

*In re Facebook, Inc. Consumer Privacy User Profile Litig.*,
   402 F. Supp. 3d 767 (N.D. Cal. 2019) ................................................................................18

*In re Facebook, Inc. Sec. Litig.*,
   405 F. Supp. 3d 809 (N.D. Cal. 2019) ................................................................................14

*Fialkov v. Microsoft Corp.*,
   692 F. App'x 491 (9th Cir. 2017) .......................................................................................11

*Fialkov v. Microsoft Corp.*,
   72 F. Supp. 3d 1220 (W.D. Wash. 2014).............................................................................11

*Glazer Capital Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008)...............................................................................................12

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
   998 F.3d 397 (9th Cir. 2021)...............................................................................................19

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016)..............................................................................................15

*Mineworkers Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018)........................................................................................18, 19

*In re Mylan N.V. Sec. Litig.*,
   2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ....................................................................13

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004)..............................................................................................15

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014)..............................................................................................10

i

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019) ..............................................................................................17

*Okla. Police Pension & Ret. Sys. v. LifeLock Inc.*,
    780 F. App'x 480 (9th Cir. 2019) ..................................................................................................15

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ........................................................................................................18

*In re PMI Group, Inc. Sec. Litig.*,
    2009 WL 3681669 (N.D. Cal. Nov. 2, 2009) ................................................................................17

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ............................................................................................9, 10, 14

*Prodanova v. Wainwright & Co.*,
    993 F.3d 1097 (9th Cir. 2021) ......................................................................................................16

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ......................................................................................................17

*Rabkin v. Lion Biotechnologies, Inc.*,
    2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ................................................................................11

*Roberts v. Zuora*,
    2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ..............................................................................15

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ..........................................................................................................4

*S. Ferry LP #2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009) ....................................................................................17

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ..................................................................................................16, 17

*Sayce v. Forescout Techs., Inc.*,
    2021 WL 1146031 (N.D. Cal. Mar. 25, 2021) ........................................................................7, 8, 15

*In re Silver Wheaton Corp. Sec. Litig.*,
    2016 WL 3226004 (C.D. Cal. June 6, 2016) ................................................................................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ......................................................................................................................11

*In re Twitter, Inc. Sec. Litig.*,
    2020 WL 7260479 (N.D. Cal. Dec. 10, 2020) ..............................................................................17

*Utesch v. Lannett Co., Inc.*,
    385 F. Supp. 3d 408 (E.D. Pa. 2019) ............................................................................................13

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) .......................................................................................15

*West v. eHealth, Inc.*,
    2016 WL 948116 (N.D. Cal. Mar. 14, 2016)............................................................................10

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009).....................................................................................................16

Gibson, Dunn &
Crutcher LLP

iii

REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
Case No. 3:20-cv-01260

## I.    PRELIMINARY STATEMENT

At its core, Plaintiffs' theory of fraud is that HP never implemented a "pull" sales model for its Supplies business, while HP and its senior officers claimed it had for more than two years.  Opp. 2.  Plaintiffs' Opposition confirms that this highly dubious theory of fraud is grounded not on particularized facts, as required by the PSLRA, but on (i) contorted and false characterizations of HP's actual statements, (ii) former employees ("FEs") who say nothing more than that HP provided discounts on unquantified sales of Supplies at some undefined time, and (iii) a settlement with the SEC that relates entirely to events predating the time period at issue in this case and does not make any suggestion of misconduct by the Individual Defendants.  The Opposition confirms that Plaintiffs have failed to meet their burden of pleading specific facts establishing falsity, scienter, and loss causation with the rigor required under the PSLRA.

*No False or Misleading Statement.*    Plaintiffs acknowledge, as they must, that the SEC Settlement included no allegations or charges concerning any events or statements at issue in this case.  Plaintiffs claim, nonetheless, that the same degree of discounting and gray marketing (the sale of products from one region to another to take advantage of pricing discrepancies) alleged by the SEC to have occurred "quarters before" HP's shift from a push to a pull model in mid-2016 must have "continued" throughout the 2017-2019 period relevant to this case because some FEs say that HP discounted Supplies products.  But almost none of the FEs say anything about discounting during 2017-2019, and none says that HP offered significant discounts in that period.  One witness thought HP offered discounts that were "probably less than 2%" at an unspecified time.  This is entirely consistent with HP's statements:  As Plaintiffs acknowledge, Defendants told investors that *some* discounting would continue under the pull model.  Neither the SEC Settlement nor Plaintiffs' FEs offer factual allegations that HP did not implement a demand-driven business model or that its discounting practices were inconsistent with any of the challenged statements.

Without facts showing falsity, Plaintiffs substitute their misleading characterizations of Defendants' statements for the statements Defendants actually made.  But Defendants did not promise that HP had achieved perfect consistency in pricing for Supplies products across the globe, or that HP had calculated and sold products based only on "true demand."  Plaintiffs also once again

Gibson, Dunn & Crutcher LLP

challenge Defendants' statements about the Four Box Model, but these allegations are simply recycled (sometimes verbatim) from Plaintiffs defective Prior Complaint, or based on data Plaintiffs admit they invented themselves. Once again, Plaintiffs have failed to plead a misstatement.

*No Scienter.* Plaintiffs' scienter argument is based on speculation, not particularized facts. Plaintiffs admit that none of their FEs had any contact with the Individual Defendants. Plaintiffs are left with impermissible speculation about what HP senior management "must have known." Plaintiffs fail to offer a single fact showing that the pull model was not implemented, much less that any Individual Defendant knew and intended that the pull model had not been implemented. And even if Plaintiffs could plead that the Individual Defendants knew what the FEs purportedly knew— mostly isolated and undated facts concerning discounts and sales quotas—that would not show that any Individual Defendant deliberately deceived investors.

Plaintiffs fare no better with their argument that the Court can infer scienter under the core operations doctrine. Plaintiffs ignore this Court's prior ruling, following established Ninth Circuit law, that pleading scienter under this doctrine requires specific facts demonstrating that the Individual Defendants received reports or had access to specific information demonstrating that the challenged statements were false. Plaintiffs, again, do not even try to plead these facts. The undisputed fact that HP's Supplies revenue—which is not alleged to have been falsely recorded or restated—grew for two full years, in line with the Four Box Model projections, strongly undercuts any inference that the Individual Defendants lied about HP's adoption of a pull model or deliberately blinded themselves to flaws in the Four Box Model. Put simply, the Opposition is devoid of particularized facts showing that Mr. Weisler, Ms. Lesjak, Mr. Fieler, or Mr. Lores had contemporaneous knowledge of information contradicting any statement attributed to them.

*No Loss Causation.* Plaintiffs do not dispute that they rely on a corrective disclosure theory of loss causation. This theory requires a plaintiff to plead facts demonstrating that the "fraud" was revealed through information that corrected a prior misstatement. Plaintiffs cannot do so. Their loss causation theory is at odds with their multiple and divergent theories of fraud. How did the disclosure in February 2019 about the Four Box Model's use of incomplete data correct the alleged misstatements about HP selling NPV positive printers? How did this disclosure correct statements

Gibson, Dunn & Crutcher LLP

about channel inventory levels or HP's goal of stabilizing global pricing?  How did this disclosure reveal that Defendants' statements about shifting to a pull model were false?  Plaintiffs have not pled—and cannot plead—the basic facts required to answer any of these questions.

For all these reasons, as discussed below, the AC should be dismissed with prejudice.

## II.    ARGUMENT

### A.    The Opposition Confirms That Plaintiffs Fail To Plead An Actionable Misstatement[1]

#### 1.    Plaintiffs Have Not Cured Their Defective Pleading As To Any Previously Challenged Statement

The Court has already concluded that the statements challenged in the Prior Complaint—concerning the Four Box Model, HP's Supplies market share drawn from the model, and the revenue of HP's Supplies business—were not actionable because Plaintiffs failed to "explain how defendants' alleged misstatements about certain types of data are misleading."  Opinion 7; *see also* Mot. 12-15. Plaintiffs concede that they challenge no new statements regarding HP's use of telemetry data.  *See* Mot. 12-15; Opp. 20-23.  And Plaintiffs identify nothing new that should alter this Court's prior dismissal as to these statements.

Plaintiffs point to a pre-Class Period statement that HP was beginning to "'hav[e] the commercial side of the house … phoning home too,'" as supposedly new evidence that Defendants later misled investors about the amount of telemetry data HP received in the Class Period.  Opp. 20-21 (quoting AC ¶ 84).  But this allegation is not new, *see* Prior Compl. ¶¶ 8, 71, and does not show falsity; the clear implication of the statement was that the commercial side was just beginning to have telemetry data too.  Plaintiffs also reference FE-9, who said that toner was a "larger portion of the business than ink," Opp. 21, but this does not establish that any challenged statement was false either. And Plaintiffs refer to their own fabricated "hypothetical" data to claim that the "the Four Box Model [was] inadequate."  Opp. 20-21.  But again, litigation-generated charts based on fictitious data cannot

---

[1]    Plaintiffs make the demonstrably false claim that Defendants "do not meaningfully address" and therefore "waive[d]" arguments contesting Plaintiffs' theory of falsity, *see* Opp. 12 & n.3.  That assertion is belied by Defendants' moving papers, which appropriately grouped Plaintiffs' kitchen-sink pleading (with more than 75 alleged misstatements covering more than 160 paragraphs) into categories and explained why none of the statements is actionable.

Gibson, Dunn &
Crutcher LLP

demonstrate falsity as to any of the previously dismissed statements, Mot. 13 n.7, particularly when the charts leave out what HP disclosed (*see* Opinion 7), and what FE-9 separately confirmed (*see* AC ¶ 191): that the Company used more than just telemetry data to estimate the Four Box Model inputs.

Plaintiffs' arguments concerning previously challenged market share statements also are recycled from arguments the Court has already rejected. *Compare* Prior Opp. (ECF No. 59), at 17-18, *with* Opp. 22. This Court should again reject the unsupported premise that HP "never had the 'big data' necessary to reliably and accurately determine HP's Supplies market share." AC ¶ 403; *see* Opinion 6-7. The same holds for challenged statements about stabilizing Supplies revenue. The Court has already held that Plaintiffs' allegations are belied by the Four Box Model's accurate prediction of revenue stabilization in 2017 and growth in 2018. Opinion 7 (citing Prior Compl. ¶¶ 193, 241). That HP later realized that issues with the Four Box Model resulted in excess inventory does not show that the Company misstated revenue (HP never restated its financials) or that prior statements about revenue stabilizing were false or misleading when made.[2] *See Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001).

### 2. The Opposition Identifies No Facts To Show That Statements About HP's Pull Model Were False Or Misleading

In the Opposition, Plaintiffs continue to push their implausible theory that HP never adopted a pull model for its $13 billion Supplies business. Opp. 2. Pointing to innocuous allegations about discounting untethered to any particular time, to inconsistency in the price of HP's products, and to an SEC Settlement covering a different period, *id.* at 2, 16-17, Plaintiffs contend that HP never actually switched from a supply-driven "push" model to a demand-driven "pull" model. Plaintiffs also ignore or misstate HP's actual statements—including repeated statements that *some* discounting would continue under the pull model—as well as the contents of the SEC Settlement. Plaintiffs' theory that Defendants lied about HP's business model for two years crumbles without specific supporting facts.

---

[2]    Plaintiffs do not contest that Ms. Lesjak had stepped down long before the Q1 2019 surprise "miss."

REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
Case No. 3:20-cv-01260

Gibson, Dunn & Crutcher LLP

### a.  Former Employee Statements About Discounting Do Not Show That HP Never Adopted A Pull Model

In the Opposition, Plaintiffs rely on allegations drawn from FEs who say they provided or knew about discounts on the sale of Supplies inventory. *See* Opp. 10-12. Plaintiffs then leap to the conclusion that this "confirm[s]" HP's continuing use of a push model during the Class Period. *See id.*; *see also id.* 14-15. As before, Plaintiffs mischaracterize their modest factual allegations. At most, these FEs make the unremarkable claim that at some time (almost none of them say when), they provided or were aware of discounts provided toward the end of a fiscal quarter. *Infra*, at 5-6. Even if the FEs were describing sales practices that occurred in 2017-2019 (and the AC does not allege this with any specific facts), that does not mean that HP never adopted a pull model, *particularly when HP told investors that discounting would continue under the pull strategy*—a critical point Plaintiffs are forced to concede in their Opposition. Opp. 15 ("Regardless of whether Defendants promised to eliminate 'all' discounting, Defendants repeatedly touted 'lowered' and 'reduced' discounting resulting from the change to a demand-driven model.").

There are other problems with Plaintiffs' FEs, particularly FE-2 and FE-3, on whom Plaintiffs rely most heavily. *See* Opp. 10-11. Both left their roles within months of the start of the Class Period, and the vast majority of their statements do not specify whether the conduct they describe occurred during those few months or during the previous two decades they worked at the Company. *See id.*; AC ¶¶ 51-52. During the Class Period, FE-2 apparently sold printers, not Supplies, AC ¶ 51 (FE-2 was a laser *printer* business manager), but nonetheless claims that HP distributed "$35 million in excess inventory into the sales channel," Opp. 6, without specifying when during FE-2's "more than 20 years" at HP that supposedly occurred or how he or she would have known of it. *See* AC ¶ 51. FE-3 asserts that "overall" HP offered "billions of dollars' worth of discounting incentives," but this witness too does not say whether any of these discounts were offered during the three months of the Class Period when he or she worked as a "Reseller Sales Person," as opposed to the "more than 25 years" before the Class Period when this witness worked at HP. *See* Opp. 11; AC ¶ 144. And while the SEC Settlement referred to 40% discounts provided in the 2015-2016 period, SEC Settlement ¶ 26, the AC's only allegation quantifying a discount is from FE-3, who said that

REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
Case No. 3:20-cv-01260

Gibson, Dunn &
Crutcher LLP

discounts were "probably less than 2%"—without any claim that this happened during the Class Period.  AC ¶ 144.

Nor do any of the remaining FEs show that HP's statements that it adopted a pull model were false.  FE-4 and FE-8 say they had sales quotas they were expected to meet.  *See* Opp. 11; AC ¶¶ 148, 151.  But the fact that the Supplies sales force had sales requirements is entirely unremarkable, and certainly not inconsistent with the adoption of a pull model.  Plaintiffs also point to FE-4 to support their argument that gray marketing "continued" because he or she contends that certain business partners took advantage of pricing and currency disparity between Europe and the UK.  *See* Opp. 14; AC ¶ 153.  But FE-4 also says that gray marketing was "not supposed to happen," and that when it did, FE-4 would "report it" and "it [was] investigated."  AC ¶ 153.  FE-4's account undermines Plaintiffs' claims:  It shows that under the new pull model, a practice that may have occurred under the push model was no longer permitted or tolerated.  Plaintiffs acknowledge that many of the remaining FEs did not work in the Supplies business, and therefore could not have provided reliable, first-hand accounts of Supplies sales practices.  *See* Opp. 11 & n.2, 15; *see also* AC ¶¶ 55-57, 151 (FE-6 worked in IT, and FE-7 and FE-8 sold printers, not Supplies).  Ultimately, none of the FEs provides facts showing that HP did not move to a pull model or that any discounting in 2017-2019 was at all inconsistent with HP's public statements.

                  **b.**       **The SEC Settlement Cannot Salvage Plaintiffs' Failed Falsity Theory**

The Opposition is striking for what it ignores about the SEC Settlement.  Despite an investigation that Plaintiffs say lasted more than 3½ years—*spanning almost the entire Class Period of this case*—the SEC Settlement does not contain a single allegation related to the purported 2017-2019 class period.  The only information in the Settlement about HP's adoption of a pull model confirms the truth of the challenged statements:  that HP adopted this model in 2016.  *See* SEC Settlement ¶ 4.  Other than that, the SEC Settlement is confined to issues outside the Class Period under a different model.[3]

Plaintiffs argue that because the SEC alleged that steep discounting and gray marketing

---

[3]    Those issues, as noted, are the subject of a different securities action before Judge White, in which a motion to dismiss is currently pending.

REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
Case No. 3:20-cv-01260

Gibson, Dunn &
Crutcher LLP

occurred in 2015-2016 (the period relevant to the SEC Settlement), the same conduct must have "continued" at the same level during the 2017-2019 class period, in which HP had switched from a push to a pull model.  *See* Opp. 2, 6-7, 10-12.  Plaintiffs plead no facts supporting this speculation, and they ignore what the SEC alleged in the Settlement:  that steep quarter-end discounting and gray marketing occurred "quarters" before "HP's planned shift from a push to a pull model."  SEC Settlement ¶ 49.  HP announced the business model shift in June 2016; the SEC's allegations accordingly relate to 2015 and potentially to early 2016—not the class period here.

**c.**    **HP Never Promised "Global Pricing Consistency" For Its Supplies Products Or That It Would Only Sell According To "True Demand"**

The Opposition repeats the demonstrably false assertion that certain Defendants said the pull model had achieved worldwide pricing consistency for HP's Supplies products.  Opp. 13.  As set forth in the opening brief, Defendants said no such thing; instead, HP repeatedly said that one of the *goals* of the pull model was to *reduce inconsistency* in the price of HP's Supplies products, which would help reduce "gray marketing" or "A Business" (which in turn depends on geographic pricing discrepancies).  Mot. 17-18; AC ¶ 111 (describing goal of pull model as "achiev[ing] better consistency of pricing globally"); *id.* ¶ 274 (pull model designed to move HP "closer to global pricing consistency").  Plaintiffs do not allege facts showing that these statements were false.  Plaintiffs point to a statement in 2017 in which Ms. Lesjak answered an analyst's question by noting that the goal of the new sales model was to achieve global pricing consistency.  *See* Opp. 13 (quoting AC ¶ 296), but that is not a statement that HP had ever achieved perfect pricing consistency.  *See, e.g.*, *Sayce v, Forescout Techs., Inc.*, 2021 WL 1146031, at *5 (N.D. Cal. Mar. 25, 2021) (statement that sales pipeline "remain[s] strong" did "not guarantee the closure of every deal on the pipeline").  Plaintiffs also claim that HP "admitted" that it had not achieved "global price consistency" until the end of the Class Period, in October 2019.  Opp. 13.  In the statement Plaintiffs point to, however, Mr. Lores said nothing of the sort; he said merely that HP was "having consistency per region" under the pull model.  *See* AC ¶¶ 154, 557.  That does not mean HP did not also strive for global consistency.  And FE-4's allegations that some price variance existed in Europe, Opp. 13-14, is neither surprising nor inconsistent with any statement made.

7

REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
Case No. 3:20-cv-01260

Gibson, Dunn &
Crutcher LLP

Plaintiffs also argue that Defendants falsely promised that HP could calculate and sell products based on "true demand." Opp. 10-12. This argument is based on a single statement from Mr. Weisler: "We're seeing unbelievable linearity in our business now, as you would expect, because we're really on fulfilling when there's true demand." AC ¶ 317. Whatever Plaintiffs may posit this statement means, Mr. Weisler indisputably did not say that HP could pinpoint "true demand," or that the Company's sales model was perfectly calibrated to sell the exact amount of Supplies to match "true demand." Rather, as HP disclosed throughout the Class Period, the goal of the pull model was to sell HP's Supplies products based on consumer demand, which the Company *estimated* using the Four Box Model. *See* AC ¶¶ 83, 356; Opinion 7.[4] Accurately predicting demand always was one of HP's goals—but no Defendant ever promised that "true demand" had been (or could be) calculated.[5]

### d.    Plaintiffs Fail To Plead Facts Showing That HP Lied About Its Reason For Switching To A Pull Model

Plaintiffs also argue—contrary to their basic premise that HP never actually adopted a pull model—that Defendants lied about the reasons HP switched from a push to a pull model. *See* Opp. 12-13. According to this theory, HP failed to reveal that it made the shift because of unsustainable "pull-ins and A-Business, as well as steep discounts" that HP had experienced under the push model. AC ¶¶ 276, 281, 288, 294, 302, 308. Once again, Plaintiffs ignore what Defendants actually said. HP announced in June 2016—eight months before the purported class period—that it was shifting to a pull model in order to "minimiz[e] unofficial channels, eliminat[e] grey marketing activity and ultimately allo[w] for less price variability," Ex. 13 June 21, 2016 Tr. at 2. Similarly, the SEC has

---

[4]    Plaintiffs falsely assert that Mr. Weisler later "admitted … that HP's sales model was not truly a 'demand-driven model' until 2019." Opp. 11-12 (citing AC ¶ 485). Here again, Plaintiffs misrepresent what was actually said. In the cited statement Mr. Weisler explained that HP's data for certain lines was not "statistically relevant." *See* Ex. 15; Ex. 16. Even the most self-serving distortion cannot turn that into an admission that HP was not using a demand-driven model.

[5]    Mr. Weisler's statement that "we're really on fulfilling," and others like it, are precisely the types of comments that this Court has found to be "vague and non-actionable puffery." *Sayce*, 2021 WL 1146031, at *4; *see also* Mot. 15; AC ¶¶ 202, 274, 285-86, 297-99, 300, 310, 312, 317, 319-20, 322, 331, 374. Plaintiffs do not seriously contest that the puffery statements are not actionable. *See* Opp. 17. Nor do Plaintiffs contest that HP had, in fact, achieved greater linearity (selling products more evenly across a quarter, rather than with sales peaks at quarter end). *See* Opp. 17-18.

8

Gibson, Dunn & Crutcher LLP

noted that "[i]n June 2016, HP announced that it was changing its go-to-market model, in part to address these practices," meaning gray marketing and discounting. SEC Settlement ¶ 4. Defendants, in other words, acknowledged that the shift was designed to avoid gray marketing and adverse pricing pressure on the sale of Supplies products. HP had no obligation to use the words that Plaintiffs prefer ("A Business," for example, as opposed to "gray marketing"), and Plaintiffs point to no facts demonstrating that the statement was untrue.

### 3. The Channel Inventory Statements Were Not False Or Misleading

Plaintiffs fail to plead facts showing that Defendants made any false or misleading statements regarding channel inventory. Plaintiffs' theory is that HP did not state that its reported levels "only included Tier 1 inventory." Opp. 18. But HP disclosed that it had reliable inventory data only for Tier 1, and that its data for lower tiers was "spottier." AC ¶ 110 (quoting Ex. 13 June 21, 2016 Tr. at 10). Other statements HP made were consistent: The Company reported that it "recognized revenue on channel sales at the time of the initial sale" into Tier 1, and because title had passed at that point, it "had no continuing obligations following the sale to the Tier 1 partner." SEC Settlement ¶ 12. In short, the Opposition fails to show that the allegedly "omitted" information contradicted or otherwise rendered HP's statements materially misleading. *See, e.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014).

Plaintiffs' reliance on the allegations in the SEC Settlement, which focused on the distinction between inventory held by different levels of distributors across HP's sales channel, *see* Opp. 18-19, does not help them. Plaintiffs plead no facts suggesting that those allegations—which are confined to the 2015-2016 period—have any bearing on the 2017-2019 period at issue here, during which HP was using a fundamentally different business model and had disclosed that it had reliable inventory data only for Tier 1. *See* SEC Settlement ¶ 44; AC ¶ 110 (reporting in June 2016 that channel inventory below Tier 1 was "spottier"). Plaintiffs complain that HP's reference to "spottier" data was qualified by the word "maybe," *see* Opp. 19, but do not dispute that when the Company affirmatively discussed its visibility into channel data, it explicitly confined its remarks to Tier 1. Ex. 13 June 21, 2016 Tr. at 10 (referring to "fairly regular reporting" on Tier 1, and to the fact that the Company could "really understand what's going on within Tier 1 globally"—not for Tier 2 and below).

REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
Case No. 3:20-cv-01260

Gibson, Dunn & Crutcher LLP

Plaintiffs' contention that HP *should* have disclosed inventory levels for downstream tiers is both unsupported and self-defeating: Plaintiffs adopt the SEC's allegations that HP had a "lack of visibility" into and only "incomplete data" for these tiers, *see* SEC Settlement ¶¶ 15, 48, which undermines Plaintiffs' contention that Defendants committed fraud by not disclosing that data. *West v. eHealth, Inc.*, 2016 WL 948116, at \*6 (N.D. Cal. Mar. 14, 2016) ("[I]t is implausible" that defendant "could have avoided misleading their investors by disclosing more information about a metric that defendants could not accurately measure.").[6]

### 4.   The Challenged Risk Disclosure Statements Were Not False Or Misleading

Plaintiffs fail to state a viable claim regarding HP's trend and risk disclosures. Plaintiffs' argument is grounded on their assertion that HP "fail[ed] to achieve 'global pricing consistency'" and "lack[ed] … visibility" into its inventory channel. *See* Opp. 16. But that contention fails for the reasons explained above. Plaintiffs also fail to show that HP was required to disclose "HP's pre-Class Period sales practices," *id.*, given the absence of facts showing that the practices alleged in the SEC Settlement continued into the Class Period on a scale that warranted disclosure as a trend or risk. *See supra*, at 6-7. More fundamentally, the obligation to disclose particular known trends and risks is imposed by Item 303 of Regulation S-K, and purported violations of Item 303 do not give rise to Section 10(b) liability. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053-54 (9th Cir. 2014). Plaintiffs argue that they rely not on Item 303, but on a general duty to disclose facts necessary to keep affirmative statements from being misleading. But the affirmative statements they identify—HP's disclosures of risks about a "competitive pricing environment" and supply chains (AC ¶¶ 346-48)—are unrelated to purportedly omitted trends and risks concerning "pull-ins and A-Business" (AC ¶ 349). *See* Opp. 16 n.5. As a result, the alleged "omissio[n]" is not actionable. *See, e.g.*, *Intuitive Surgical*, 759 F.3d at 1061. Moreover, Plaintiffs' argument that HP had excess inventory at the time the risk factors were published is nothing more than fraud by hindsight. Opp. 17. Plaintiffs plead no

---

[6]   Plaintiffs also are wrong that the Court is required to assess a "truth-on-the-market" defense, which "is a method of refuting an alleged misrepresentation's materiality." *Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1177 (9th Cir. 2011), *aff'd*, 568 U.S. 455 (2013). Defendants are not making a materiality argument here; the point is that Plaintiffs have not alleged facts showing that the channel inventory statements were false or misleading in the first place.

REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
Case No. 3:20-cv-01260

Gibson, Dunn & Crutcher LLP

facts demonstrating any Defendant believed HP had excess inventory at any time before February 2019. *See Fialkov v. Microsoft Corp.*, 72 F. Supp. 3d 1220, 1230 (W.D. Wash. 2014) (failure to plead that Microsoft "should have regarded its then-held inventory as worrisomely large" at the time the statements were made was "a classic example of impermissible fraud by hindsight"), *aff'd*, 692 F. App'x 491 (9th Cir. 2017).[7]

### 5.    The Statements About NPV Positive Printers Were Not False Or Misleading

Plaintiffs argue that it was misleading for Defendants to say that HP was focused on placing "more positive [N]PV units," AC ¶ 374, working on "improving the installed base," *id.* ¶ 378, and "improving the quality of the units that we place," *id.* ¶ 379, because, according to Plaintiffs, HP continued to push printers into the market at a loss. *See* Opp. 20. This is a puzzling argument given Plaintiffs' own allegation that HP operated a "razor-razorblade business model," AC ¶ 382, under which HP sold printers "at very low margins or negative margins" with the goal of creating a "supplies annuity" designed to yield "a positive NPV," *id.* ¶ 377. But more fundamentally, Plaintiffs point to no facts—including from the two FEs they reference, Opp. 20—showing that HP did not try to sell printers that over time would generate a profit from the sales of Supplies. And Plaintiffs' argument that the printer statements were misleading because HP lacked necessary data to track profit by printer is just another version of their failed Four Box Model theory.

### B.    Plaintiffs' Opposition Shows That They Have No Cogent Theory Of Scienter

The Opposition confirms that Plaintiffs have no theory of scienter that is cogent, much less as compelling as the inference that Defendants believed the Four Box Model was reliable and the pull model was working. *See* Mot. 31 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). Plaintiffs do not contest that they have failed to allege scienter as to the challenged channel inventory and printer statements. As to HP's pull strategy and the Four Box Model, Plaintiffs' theory of fraud defies logic and is premised on patently inadequate allegations, including

---

[7]    This case is easily distinguishable from Plaintiffs' cases, where the plaintiff alleged facts showing that company executives knew, but failed to disclose, that disclosed risks had materialized. *See In re Alphabet, Inc. Sec. Litig.*, 2021 WL 2448223, at *4 (9th Cir. June 16, 2021) (executives "received and read" memo detailing security vulnerability but failed to disclose it); *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at *4 (N.D. Cal. Feb. 15, 2018) (CEO knew of and was orchestrating stock promotion scheme but failed to disclose it).

Gibson, Dunn & Crutcher LLP

11

(i) the SEC Settlement, which does not support an inference of scienter, and in any event covered a different time period and actually negates any inference of scienter, and (ii) statements from FEs who had no connection to the Individual Defendants. The "core operations" inference cannot help Plaintiffs either: They allege no facts showing that the Individual Defendants had access to information contradicting the challenged statements.

**1. Plaintiffs Concede They Cannot Plead Scienter As To The "Channel Inventory" And "NPV Positive Printer" Statements**

In the Opposition, Plaintiffs do not argue that any Defendant acted with scienter when making statements about channel inventory or printer sales. Plaintiffs' scienter argument is focused solely on alleged misstatements about the switch to the pull strategy and the Four Box Model. Opp. 23-31. Because Plaintiffs do not argue that they have pleaded facts giving rise to a strong inference that any Defendant acted with scienter when making statements about inventory levels or the sale of "NPV positive printers," the Court should dismiss the claims based on these statements.[8]

**2. The SEC Settlement Does Not Establish Scienter**

Plaintiffs argue that the SEC Settlement, which relates to practices that occurred in 2015-2016 somehow shows Defendants knew these same practices continued during 2017-2019. Opp. 23-26. This is wrong for multiple reasons.

At the outset, the PSLRA does not permit Plaintiffs to use allegations in SEC settlements to plead scienter—a conclusion underscored by Plaintiffs' inability to address the authorities cited by Defendants. *See* Mot. 23; *see also Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008). Moreover, the SEC Settlement said *nothing* about the 2017-2019 period relevant to this case, let alone that the sales practices alleged by the SEC continued during the Class Period or that Defendants knew it. The Settlement solely addressed conduct occurring between November 2015 and June 2016, even though the investigation continued through September 2020. SEC Settlement ¶ 1. If anything, the fact that the investigation was ongoing during the class period weighs against an

---

[8] Plaintiffs argue (without support) that the Individual Defendants monitored inventory levels, but this scienter argument is not directed at the challenged Tier 1 inventory statements. It is intended instead to show that HP never adopted the pull model because it continued to have excess inventory. *See* Opp. 27 ("[T]his supports an inference of scienter regarding HP's inventory excesses.").

REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
Case No. 3:20-cv-01260

Gibson, Dunn & Crutcher LLP

inference of fraud:  A company under investigation is unlikely to engage in purportedly improper conduct.[9]  It is implausible that for two years, HP was being investigated by the SEC while lying about a business model that did not exist, and the SEC either did not notice or did not care.  Nothing in the SEC Settlement supports Plaintiffs' conclusory assertion that "Defendants entered the Class Period knowing [the alleged] practices were used to meet quarterly financial targets *and continued them*."  Opp. 26 (emphasis added).

The SEC Settlement also undermines scienter in other ways.  Plaintiffs elide the chronology. They ask the Court to infer both that the 2015-2016 discounting and gray marketing activity the SEC alleged continued into the purported class period, and that the Individual Defendants learned of that conduct "no later than 1Q 2016."  Opp. 23 (quoting SEC Settlement ¶ 49).  But the SEC itself distinguished the 2015-2016 period to which its allegations related from subsequent periods.

Critically, the SEC also noted that HP's executives learned of the alleged conduct only *after* HP had already planned to shift from a push to a pull model, and only some number of quarters *after* the conduct took place:  "HP's principal financial officers and principal executive officers who were responsible for the company's disclosures learned of the conduct in connection with HP's planned shift from a push to a pull model *quarters after the actual conduct had taken place*."  SEC Settlement ¶ 49 (emphasis added).  The SEC alleged that the challenged sales practices "had taken place" *in the past*—not that the conduct continued unchecked into 2017 through 2019, nor that the Individual Defendants knew of it while it was ongoing.  This weighs against scienter, not in favor of it.

For the same reason, Plaintiffs' argument that "pre-class period knowledge is 'not lost when the class period began'" is a red herring.  Opp. 25.  The only "pre-class period knowledge" alleged is that certain unnamed HP officers learned in 2016 that in the past some salespeople had engaged in aggressive discounting practices.  AC ¶¶ 436, 443-45; SEC Settlement ¶ 49.  Contrary to what Plaintiffs say, Opp. 25, Defendants have never argued that they "lost" knowledge of the conduct

---

[9]    Plaintiffs' cases about government investigations are inapposite.  *Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 419-20 (E.D. Pa. 2019) (industry-wide antitrust investigation may constitute a "plus" factor under antitrust law and may show that company should have known of anti-competitive activities of its peers); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *13 (S.D.N.Y. Mar. 28, 2018) (noting "government investigations … generally do not demonstrate scienter").

REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
Case No. 3:20-cv-01260

Gibson, Dunn & Crutcher LLP

alleged in the SEC Settlement.  The point is that Plaintiffs plead no contemporaneous facts showing, as they must, that Mr. Weisler, Ms. Lesjak, Mr. Fieler, and Mr. Lores *each* made specific statements with the knowledge that these historical sale practices continued during the Class Period to any degree inconsistent with the challenged statements (in which, again, HP disclosed that discounting would continue) or that they lied about intending to switch to the pull model.[10]

To the contrary, the Amended Complaint alleges that HP changed its business model in 2016 "in part to address the[se] practices" SEC Settlement ¶ 4, and that Defendants "put a plan in place to start to wean HP off of gray marketing," including "refusing to give the discounts" that HP previously offered, AC ¶ 448.  *See id.* ¶ 443; *see also id.* ¶ 153 (FE-4 stating gray marketing was "not supposed to happen," and if it did, it would get "reported" and "investigated").  Plaintiffs' acknowledgment of these corrective measures undermines any inference of scienter.  *See, e.g.*, *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 848 (N.D. Cal. 2019) (historical "red flags" did not plead contemporaneous knowledge of data privacy issues because "[t]he stronger inference is that Facebook *had* addressed these problems").[11]

### 3.  The Former Employees Do Not Establish Scienter

Plaintiffs' FE allegations are insufficient to plead scienter because these FEs "did not interact with any of the individual defendants."  Mot. 27 (quoting Opinion 9).  The great weight of authority—including binding law in the Ninth Circuit and prior decisions from this Court—requires direct contact to substantiate that witnesses are personally knowledgeable about a defendant's state of mind, Mot. 27-28.  *See Intuitive Surgical, Inc.*, 759 F.3d at 1063 (rejecting allegations from confidential witnesses without "first hand knowledge" of what officers "knew or did not know").  Plaintiffs do not dispute that none of their FEs interacted with any of the Individual Defendants.  Plaintiffs nonetheless claim that statements about discounting drawn from these witnesses give rise to

---

[10]    The 35-page Opposition barely acknowledges Mr. Fieler, containing only *three* passing references to him—and *none* of these are in the Opposition's discussion of scienter.

[11]    Plaintiffs also heavily rely on broad mischaracterizations of SEC testimony—for which they provide no context, time frame, or even a citation to a transcript—to create the misimpression that it supports their claims while not disputing that the SEC testimony involved the time period *prior to* the Class Period, consistent with the allegations in the SEC Settlement.

Gibson, Dunn & Crutcher LLP

a strong inference that the Individual Defendants deliberately lied about HP's shift to a pull model. Opp. 29. Plaintiffs are wrong, and their cases are easily distinguishable.[12]

Even if the Court overlooked the absence of any connection between the FEs and the Individual Defendants, the allegations drawn from these FEs would not support an inference of intentional fraud. Plaintiffs cite dozens of paragraphs in the AC they claim establish that the "FE Accounts Are Reliable and Support Scienter." Opp. 27-29 (citing AC ¶¶ 133-148, 151-152, 205-208, 210, 212-218). But tellingly, only *one* of these paragraphs even arguably touches on what an Individual Defendant supposedly knew. AC ¶ 136 (about Mr. Lores). Most of the rest say nothing at all about scienter, or make vague references to "management" or what "everyone … knew" (*e.g.*, AC ¶ 145)—none of which is sufficient. *See, e.g.*, *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 814 (N.D. Cal. 2019) ("scienter cannot be established … by lumping 'management' and 'executives' together" or by alleging what was "common knowledge"); *see also Sayce*, 2021 WL 1146031, at *4-6 (CW allegations insufficient where, among other things, they did not establish the individual defendants' knowledge of facts contradicting statements).[13]

Even as to paragraph 136, the allegations by FE-2 fail to establish that Mr. Lores knew that any of the handful of statements attributable to him were false or misleading. Plaintiffs allege that "FE-2 *believes* that Defendant Lores would have been aware" that, at some unspecified time not tied to the Class Period, HP "leased trailers and warehouse space for Staples" to store "excess product." AC ¶ 136 (emphasis added). But such speculative "had to have known" allegations "are not

---

[12]    *See Okla. Police Pension & Ret. Sys. v. LifeLock Inc.*, 780 F. App'x 480, 484-85 n.5 (9th Cir. 2019) (witness knew of specific meeting where defendant discussed incriminating information); *In re Silver Wheaton Corp. Sec. Litig.*, 2016 WL 3226004, at *11 (C.D. Cal. June 6, 2016) (confidential witness provided facts sufficient to support inferences about information provided to defendants); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1059-60 (C.D. Cal. 2008) (specific allegations that Board committee had actual knowledge); *Roberts v. Zuora*, 2020 WL 2042244, at *10-11 (N.D. Cal. Apr. 28, 2020) (defendants copied on emails discussing relevant issues); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (hearsay allegation permitted because it was "specific in time, context, and details"); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) (CEO admitted "[w]e know exactly how much we have sold in the last hour around the world").

[13]    Plaintiffs also distort FE-5's account by trying to imply that, because Ms. Lesjak received briefing on the Four Box Model, she must have known it lacked telemetry data, without any allegations as to the information Ms. Lesjak learned from those briefings. *See* Opp. 8; AC ¶ 476.

Gibson, Dunn & Crutcher LLP

sufficient to create a strong inference of scienter." *Veal*, 423 F. Supp. 3d at 814-15. FE-2 does not allege a plausible factual basis for his belief about Mr. Lores' state of mind. Nor, again, is the allegation about FE-2's purported belief tied to the Class Period—which is not surprising, as only six months of FE-2's 20+ year career at HP fell within the Class Period. AC ¶ 51. Plaintiffs' allegation, attributed to FE-2, that "Defendant Lores' approval was necessary" when "significant incentives" were offered to resellers suffers from the same problem. AC ¶ 136. Plaintiffs do not tie this to the Class Period, and FE-2 does not specify the amount of alleged discounts. Plaintiffs' FEs do not support an inference even of falsity, let alone scienter.

### 4. Plaintiffs Again Fail To Plead Scienter Under The Core Operations Theory

This Court previously rejected Plaintiffs' effort to invoke the core operations theory, finding that Plaintiffs failed to plead facts demonstrating that the Individual Defendants had access to adverse information demonstrating the falsity of the challenged statements regarding the Four Box Model. Opinion 9-10. The Opposition identifies no new factual allegations showing that the Individual Defendants received reports or other information that revealed the falsity of their statements about the Four Box Model or the pull strategy. The Court need go no further, and should again reject Plaintiffs' core operations arguments.

Plaintiffs' allegations fall short of this Circuit's stringent pleading standard for the core operations theory. Contrary to Plaintiffs' argument, it is not enough to allege that "defendants maintained they monitored [] essential subject matters closely." *See* Opp. 30. Instead, Plaintiffs must plead "'detailed and specific allegations about management's exposure to factual information within the company'" that indicates their statements were false. Opinion 9-10 (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008)). Plaintiffs' allegations of managerial oversight of the Supplies business, setting targets and policies for that business (including inventory ranges and centralized pricing decisions), and monitoring reports about inventory, *see* Opp. 24, 25, 27, 29-30, are insufficient because they are not specific facts showing exposure to information establishing that Defendants' statements were false or misleading. *See* Opinion 9-10; *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009) (rejecting "allegations that senior management … closely reviewed the accounting numbers generated … each quarter … and that top executives had

Gibson, Dunn & Crutcher LLP

several meetings in which they discussed quarterly inventory numbers"); *see also Prodanova v. Wainwright & Co.*, 993 F.3d 1097, 1112 (9th Cir. 2021) (rejecting core operations theory when plaintiff did not "asser[t] that any [company] executive personally worked on or approved" the report at issue and no facts establishing that executives "would have known"); *In re Twitter, Inc. Sec. Litig.*, 2020 WL 7260479, at *14 (N.D. Cal. Dec. 10, 2020) (rejecting Plaintiffs' argument that "regular reporting on the progress, performance and revenue-generation of MAP creates a strong inference that they had knowledge of the declines in revenue and reasons for such declines").[14]

Similarly, Plaintiffs' allegation that "FE-9 *believed* that Defendant Lores knew at a *high level* what the telemetry data coverage was," AC ¶ 187 (cited in Opp. 30), does not show that Mr. Lores "had actual access to the whole system of telemetry" or was "involved in the data collections or supplies revenue calculation decisions of the Four Box Model." Opinion 10. Plaintiffs' general claim that Mr. Lores "inquired how the deficiencies in telemetry data could be corrected," Opp. 3, does not convert his "high level" awareness into specific knowledge about "granular" adverse data required to plead scienter as to Mr. Lores, and certainly not any other Individual Defendant. Opinion 10.[15]

Finally, Plaintiffs' allegation that $100 million in excess Supplies inventory had built up little by little "over multiple prior quarters" (Opp. 3) does not make this one of the "rare" cases where "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *S. Ferry*, 542 F.3d at 786. That amount is less than 1% of a single year of Supplies revenue. Mot. 25. This is nothing like *Lexmark*, cited by Plaintiffs (Opp. 24)

---

[14]   Plaintiffs misquote Mr. Weisler as saying "[w]e know exactly how much inventory we have," Opp. 27, n.6, omitting that he was talking about "how much inventory we have **in consumer, in commercial**"—not Supplies. *See* Ex. 17, at 41. The full quote actually shows that he was *contrasting* Personal Systems inventory with Supplies inventory. *See id.* at 41-42.

[15]   Plaintiffs' cases about access to data are easily distinguishable. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145-46 (9th Cir. 2017) (defendants allegedly "were aware in real time" of specific information that was "inconsistent" with their statements); *In re PMI Group, Inc. Sec. Litig.*, 2009 WL 3681669, at *3 (N.D. Cal. Nov. 2, 2009) (specific allegations from internal reports and confidential witnesses that "individual defendants were aware of th[e] problems"); *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1258 (W.D. Wash. 2009) ("Plaintiffs have adequately pleaded [defendant's] actual knowledge."); *see also Alphabet*, 2021 WL 2448223, at *12-13 (Google CEO allegedly read memo establishing falsity, and it could be inferred he told Alphabet CEO).

where the inventory drawdown amounted to *35%* of the company's revenue. *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019).[16]

### 5.    The Previously Dismissed Allegations Still Fail

Plaintiffs do not dispute that many of their allegations and arguments—including their stock sale allegations (Opp. 31)—already were considered and rejected by the Court.    Mot. 29-31. Plaintiffs point to no new factual allegations that would change this Court's prior conclusion.    There is no reason for the Court to revisit its holding that these allegations fail to plead scienter.[17]

## C.    The Opposition Confirms Plaintiffs Have Not Pled Loss Causation

As Defendants showed in their Motion, Plaintiffs' "corrective disclosure[]" loss causation theory fails because Plaintiffs do not identify the alleged misstatements whose purported falsity was revealed by the alleged 2019 disclosures.    Mot. 32 (quoting AC ¶ 3).    Plaintiffs do not dispute this. Instead, Plaintiffs argue that "loss causation does not require that false statements or a fraud be revealed; rather, loss causation can be shown in 'an infinite variety of ways.'"    Opp. 32 (quoting *Mineworkers Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 752-53 (9th Cir. 2018)).    But this general statement does not help Plaintiffs, because they have chosen one such way:    revelation through "corrective disclosures."    AC ¶ 3.    As a result, Plaintiffs must plead with particularity that the alleged corrective disclosures "revealed to the market that at least some of [defendant's] alleged misstatements were false."    *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 (9th Cir. 2020); *see also First Solar*, 881 F.3d at 754 ("When plaintiffs plead a causation theory based on market revelation of the fraud, this court naturally evaluates whether plaintiffs have pleaded or proved the facts relevant to their theory.").    Plaintiffs have not met this pleading requirement.

Plaintiffs have an even more fundamental pleading problem:    The allegations fail to "give

---

16    Plaintiffs erroneously contend that the Court can infer scienter because "Defendants' public explanations contrasted so drastically with the undisclosed reality."  Opp. 26.  This argument is based on a case not subject to PSLRA's heightened pleading standards.  *See In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 800 (N.D. Cal. 2019).  The argument also collapses scienter into falsity, which is further inconsistent with the PSLRA.  *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) (plaintiff must plead specific facts as to each element of a securities fraud claim).

17    It is undisputed that Plaintiffs' ineffectual stock sale arguments have no application to Ms. Lesjak or Mr. Fieler, neither of whom is alleged to have sold shares improperly.  Mot. 30, n.22.

Gibson, Dunn & Crutcher LLP

[Defendants] notice of [their] loss causation theory," or provide "the court some assurance that the theory has a basis in fact." Opp. 32 (quoting *BofI*, 977 F.3d at 794). Plaintiffs claim they meet this requirement by alleging that HP disclosed in February 2019 that there was excess inventory in HP's distribution channel, that HP's forecasting model used imperfect data, and that Supplies revenue had declined. *Id.* But these are simply the alleged corrective disclosures. Plaintiffs do not try to explain how the disclosures "corrected" any prior misstatement, let alone that it was "defendant's fraud [that] caused an economic loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 338 (2005); *see also* Opp. 32 (acknowledging requirement to allege a "causal connection" between the *fraud*—as opposed to a supposed corrective disclosure—and the loss) (citing *First Solar*, 881 F.3d at 752-53).

Plaintiffs allege more than 75 separate misstatements covering a variety of topics—including the Four Box Model, HP's Supplies revenue, pricing consistency, and channel inventory levels, among others. *See* AC, Section V. But Plaintiffs make no effort to parse out *which* alleged misstatements supposedly caused their losses. *See* Mot. 32; *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 407 (9th Cir. 2021) (rejecting "loss causation theory [that] lumps together more than 60 alleged misstatements"). The closest they come is an allegation—similar to that in the defective Prior Complaint—that statements purportedly corrected by HP's February 2019 disclosure about issues with the Four Box model caused their losses. *Compare* AC ¶¶ 523-67, *with* Prior Compl. ¶¶ 335-72. There are two problems here, both fatal. First, the Court has already found that Plaintiffs failed to plead that any of the Four Box statements were false or misleading, so the corrective disclosures in 2019 did not correct a prior Four Box *misstatement*. Second, Plaintiffs make no attempt to show that the *other* categories of challenged statements—about the switch to a pull model, the "NPV printers" and inventory levels—caused their alleged losses. Nor could they. Disclosures in February 2019 about "incorrect Supplies share assumptions in our 4-box model," AC ¶ 530, did not plausibly reveal any the "truth" about challenged statements that had nothing to do with the Four Box Model. Indeed, other than their own baseless allegations in their most recent Complaint, Plaintiffs point to no public statement suggesting that HP did not actually adopt a pull model.

Finally, Plaintiffs fail to rebut Defendants' argument that HP's August and October 2019

REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
Case No. 3:20-cv-01260

Gibson, Dunn &
Crutcher LLP

earnings calls cannot constitute corrective disclosures because they provided no new information about the problems facing the Supplies business. Mot. 34. Plaintiffs claim that these calls disclosed disappointing earnings announcements and a change in the business model. Opp. 34. But, again, these are just the *effects* of issues in the Supplies business that HP previously disclosed in February and May 2019; HP said nothing new on the August and October calls about those issues. Mot. 34. Plaintiffs do not even address this point in their Opposition.

**D.    The Opposition Cannot Salvage Plaintiffs' Claims Under Section 20(a) Or Section 20A**

The Opposition also confirms that the Section 20A claim fails for the additional reason that Plaintiffs have not pled what "material, nonpublic information" Mr. Weisler and Mr. Lores supposedly had when making these trades. Plaintiffs did not amend their theory of fraud for Section 20A, again alleging only that Mr. Weisler and Mr. Lores traded with material, non-public information regarding "flaws of HP's Four Box Model … Supplies market share, demand, and inventory, and the instability of HP's Supplies business and revenue stream." *Compare* Prior Compl. ¶ 408, *with* AC ¶ 604. In any event, the supposedly contemporaneous trades are all alleged to have occurred approximately one year before the disclosure about flaws in the Four Box model, and Plaintiffs make no effort to identify what material, non-public information these two individuals had before March 2018. *See* AC ¶ 583 (identifying purportedly contemporaneous trades between November 6, 2017 and March 9, 2018).[18]

<strong>CONCLUSION</strong>

The Court should dismiss the Complaint, this time with prejudice.[19]

---

[18]    Defendants also respectfully maintain that trades more than a week apart are not sufficiently "contemporaneous" to plead a violation of Section 20A.

[19]    The Court should reject Plaintiffs' request for the opportunity to file yet another amended complaint based on deposition transcripts. By their own admission, Plaintiffs obtained these transcripts before Defendants moved to dismiss. The time to seek additional amendment would have been before—not after—Defendants incurred the significant costs associated with this motion. Even if Plaintiffs' timing were not improper, Plaintiffs do not explain how the transcripts could cure their failure to state a claim.

Gibson, Dunn & Crutcher LLP

DATED:  July 9, 2021

**GIBSON, DUNN & CRUTCHER LLP**

By: */s/ Brian M. Lutz*
BRIAN M. LUTZ (SBN 255976)
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306
blutz@gibsondunn.com

LISSA M. PERCOPO (*pro hac vice*)
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
Telephone:  202.887.3770
Facsimile:  202.530.9528
LPercopo@gibsondunn.com

**SIDLEY AUSTIN LLP**
SARA B. BRODY, SBN 130222
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone:  415.772.1200
sbrody@sidley.com

*Attorneys for Defendants HP Inc., Dion J.*
*Weisler, Catherine A. Lesjak, Steven J. Fieler,*
*and Enrique Lores*

By: */s/ Steven Schatz*
**WILSON SONSINI GOODRICH & ROSATI**
STEVEN SCHATZ, SBN 118356
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  650.320.4856
SSchatz@wsgr.com

KATHERINE HENDERSON, SBN 242676
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105-1101
Telephone:  415.947.2065
KHenderson@wsgr.com
*Attorneys for Defendant Catherine A. Lesjak*

### ATTESTATION (CIVIL LOCAL RULE 5-1(i)(3))

In accordance with Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from the signatories.

Dated: July 9, 2021

**GIBSON, DUNN & CRUTCHER LLP**

*/s/ Brian M. Lutz*
BRIAN M. LUTZ

Gibson, Dunn &
Crutcher LLP

# CERTIFICATE OF SERVICE

I, Brian M. Lutz, declare as follows:

I am employed in the County of San Francisco, State of California, I am over the age of eighteen years and am not a party to this action; my business address is 555 Mission Street, Suite 3000, San Francisco, California 94105-0921, in said County and State.

I hereby certify that on July 9, 2021, the foregoing **REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** was filed with the Clerk of the Court via CM/ECF.  Notice of this filing will be sent electronically to all registered parties by operation of the Court's electronic filing systems.

DATED: July 9, 2021                              By: */s/ Brian M. Lutz*
                                                           Brian M. Lutz

Gibson, Dunn &
Crutcher LLP