UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELECTRICAL WORKERS PENSION FUND, LOCAL 103, I.B.E.W., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>HP INC., et al.,<br><br>Defendants. | Case No. 20-cv-01260-SI<br><br>**ORDER GRANTING DEFENDANTS' SECOND MOTION TO DISMISS**<br><br>Re: Dkt. No. 92 |

Now before the Court is a second motion to dismiss, filed by defendants HP Inc., Dion Weisler, Catherine Lesjak, Steven Fieler, and Enrique Lores (collectively, "defendants"). Dkt. No. 92. On August 9, 2021, the Court heard oral argument on defendants' motion. Dkt. No. 108. For the reasons stated below, the Court **GRANTS** defendants' motion to dismiss. The Court dismisses the Second Amended Complaint **WITH PREJUDICE**.

**BACKGROUND**

**I.   Factual Background**

The following allegations are taken from the Second Amended Complaint ("SAC"), which the Court must treat as true for the purpose of this motion.

This matter arose in connection with statements made by HP executives Dion Weisler, Catheringe Lesjak, Steven Fieler, and Enrique Lores (collectively, "Individual Defendants") about HP's Four Box Model, supplies sales model, channel inventory stock, market shares, supplies revenue, and hardware placement.

HP is a global provider of personal computers, printers, and related supplies. Dkt. No. 89 at ¶ 42. HP relied on its printing business to Tier 1 distributors for revenue. *Id*. at ¶¶ 60-61. In 2015,

HP introduced its Four Box Model, which allowed HP to evaluate supplies revenue based on four factors: installed base, usage, printer supplies market share or supplies attach, and price of supplies. *Id*. at ¶ 83. The Four Box Model used various forms of data and analytics to accurately predict supplies revenue. *Id*. In 2016, HP announced the company's transition from a supplies "push" model to a demand-driven "pull" model. *Id*. at ¶¶ 89-90.

During the class period, between February 23, 2017 and October 3, 2019, defendants told investors that the Four Box Model reliably predicted HP's supplies revenue and that HP increased its market shares of printers, stabilized supplies, held fewer printers in channel inventory, focused on placing NPV printer units, and transitioned to a sales pull model. *Id*. at ¶¶ 274-433.

On February 27, 2019, HP's Chief Executive Officer, defendant Weisler, stated

> Supplies revenue was weaker than anticipated, particularly in EMEA, where supplies declined 9%. As you know, we look at our Supplies business in terms of our 4-box model: in store base, usage, share and price. The 2 factors that varied from our plan were a decline in share and, to a lesser extent, pricing.
> . . . .
>
> [S]ince we don't have much visibility into the downstream channel ecosystem and we were maintaining CI levels below our Tier 1 ceiling, we did not see clearly enough that we had an issue.
>
> . . . .
> [W]e had used periodic third-party survey data and market research aggregators to estimate toner supply shares. We did not have a statistically significant sample from the system telemetry and the instrumentation nor the capabilities to calculate share for toner-based products in the installed base. We've had this data for ink-based products, but due to the limited number of machines that were phoning home in commercial due to enterprise firewall constraints and otherwise unconnected devices, we've had to build the connected installed base over time

*Id*. at ¶¶ 527, 530, 536. On August 22, 2019, HP announced a decline in supplies revenue. *Id*. at ¶ 543. On October 3, 2019, HP revealed the company would transition from its "purely transactional supplies-centric" Four Box Model to a profit-driven business model. *Id*. at ¶¶ 552, 555.

## II.   Current Matter

On February 19, 2020, the State of Rhode Island, Office of the General Treasurer, on behalf

2

of the Employees' Retirement System of Rhode Island and Iron Workers Local 580 ("plaintiffs") filed this securities class action lawsuit against defendants. Dkt. No. 1. On July 20, 2020, plaintiffs filed an amended complaint. On March 19, 2021, the Court issued an Order Granting Defendants' First Motion to Dismiss. Dkt. No. 83. On May 3, 2021, plaintiff filed a SAC. Dkt. No. 89. On June 4, 2021, defendants filed a second motion to dismiss. Dkt. No. 92. On June 25, 2021, plaintiffs filed an opposition. Dkt. No. 97. On July 9, 2021, defendants filed a reply. Dkt. No. 101. On September 9, 2021, the Court heard oral argument on defendants' motion.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a Defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (quoting *Twombly*, 550 U.S. at 557). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 679.

In deciding whether a plaintiff has stated a claim upon which relief can be granted, the court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

**DISCUSSION**

**I.  Defendant's Request for Judicial Notice and Incorporation-by-Reference**

In ruling on a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court may generally consider matters properly subject to judicial notice or incorporated by reference in the complaint. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007). The Court "may judicially notice a fact that is not subject to reasonable dispute because it: (i) is generally known within the trial court's territorial jurisdiction; or (ii) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201. The incorporation-by-reference doctrine allows the Court to consider documents that were either "necessarily depended on" in the complaint or referenced in the complaint and not subject to reasonable dispute. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).

Defendants request judicial notice or incorporation by reference of HP's Securities Filings, Quarterly Earnings Call Transcripts, Analyst Meeting Transcripts, and Presentation Transcripts. Dkt. No. 93. Plaintiffs argue the Court should not consider the truth of defendants' requested documents. Dkt. No. 98.

Without ruling on the admissibility of the exhibits, the Court **GRANTS** defendants' request for judicial notice and takes notice of the existence of the parties' exhibits. *See Coto Settlement v. Eisenberg,* 593 F.3d 1031, 1038 (9th Cir. 2010) ("On a motion to dismiss, [the court] may consider . . . matters of public record); *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir.2006) (SEC filings subject to judicial notice). The Court does not take judicial notice of the truth of the contents that are subject to reasonable dispute.[1]

**II.  Exchange Act Claims**

Defendants move to dismiss plaintiffs' Section 10(b), Section 20(a), and Section 20A claims. Dkt. No. 92.

---

[1] The Court will indicate which, if any, noticed contents are relied on for the purposes of this Order. *See Khoja,* 899 F.3d at 999.

4

**A. Section 10(b) of the Exchange Act**

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security...any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary." 15 U.S.C. § 78j(b). A plaintiff asserting a claim under Section 10(b) must adequately allege a material misrepresentation or omission by the defendant (falsity); scienter; reliance upon the misrepresentation or omission; economic loss; and loss causation. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014).

Defendants argue the SAC fails to sufficiently plead (1) material misrepresentations, (2) scienter; and (3) loss causation. Dkt. No. 92.

**1. Material Misrepresentations**

Defendants argue the SAC fails to plead particularized facts demonstrating the falsity of defendants' alleged misstatements. Dkt. No. 92. Plaintiffs argue the SAC adequately pleads falsity of defendants' alleged misstatements regarding (a) telemetry data and the four box model, (b) market share, (c) supplies revenue, (d) channel inventory management, (e) hardware placement, and (f) sales model change.

**a. Telemetry Data and the Four Box Model**

Defendants argue the SAC fails to plead particularized facts demonstrating defendants made a false statement regarding telemetry data and the four box model. Dkt. No. 92 at 12-15. Plaintiffs argue defendants failed to disclose material information about the Four Box Model. Dkt. No. 97 at 20-22.

The SAC's allegations regarding telemetry data and the Four Box Model are largely the same as plaintiff's first amended complaint. For the reasons as stated in the Court's Order Granting Defendants' First Motion to Dismiss, the Court finds the SAC fails to plead falsity of the statements regarding telemetry data and the four box model. The SAC fails to plead with particularity how Individual Defendant's statements were misleading. Individual Defendants indicated the limitations

5

of the Four Box Model. *See* ¶¶ 362 ("This is one way for us to look at the heat in the market, and we can use this data to define specific marketing programs in those areas. The chart in the middle shows how do we use this at a more granular level."); 366 ("install bases is just such a complicated box all by itself because not all units are created equally"); 368 ("it's pretty difficult for us to go to a specific customer, given privacy and what have you, but your printers, many of your printers phone home to us and tell us what kind of usage we're getting. . .We can't tell at an individual level").

Moreover, the SAC fails to plead facts indicating defendants assumed a duty to disclose the particularities of the Four-Box Model. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical*, *Inc. et al.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (holding disclosures are not required to follow "a rule of completeness . . . [because] '[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.'") (internal citations omitted); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (explaining PSRLA prohibits "misleading and untrue statements, not statements that are incomplete.").

### b. Market Share

Defendants argue the SAC fails to plead particularized facts demonstrating defendants made a false statement about HP's market shares. Dkt. No. 92 at 12-14. Plaintiffs argue defendants falsely claimed market shares increased because defendants did not have the capability to calculate market share for toner-based products. Dkt. No. 97 at 22.

The Court finds the SAC fails to plead falsity of the alleged misstatements regarding market shares. Market shares did not decrease during the quarters when the alleged misstatements were made. *See Police Ret. Sys. of St. Louis,* 759 F.3d at 1061 ("Nothing about the statements . . . would give a reasonable investor the impression that Intuitive's growth was different than it was in reality. The statements accurately reflect the company's growth in 2007; they do not purport to speak to any trends in Intuitive's growth or revenues and do not alter the total mix of information available to investors."). The SAC fails to plead facts demonstrating Individual Defendants assumed a duty a disclose exactly how the Four Box Model calculates market share. *See id.* (holding disclosures are not required to follow "a rule of completeness . . . [because] '[n]o matter how detailed and accurate

1  disclosure statements are, there are likely to be additional details that could have been disclosed but
2  were not.'"). Moreover, Individual Defendants disclosed that "FY19" market share predictions were
3  "projections based on currently available data and estimates." *See In re Quality Systems, Inc.*
4  *Securities Litig.*, 865 F.3d 1130, 1141-42 (9th Cir. 2017) ("companies and their officials" are
5  protected "from suit when optimistic projections of growth in revenues and earnings are not borne
6  out by events.")

### c. Supplies Revenue

Defendants argue the SAC fails to plead particularized facts demonstrating defendants made a false statement about supplies revenue. Dkt. No. 92 at 12-15. Plaintiffs argue defendants' statements regarding supplies stabilization are false because HP was flooding the "channel" with excess supplies. Dkt. No. 97 at 22-23.

The Court finds the SAC fails to plead particularized facts demonstrating falsity of defendants' statements about supplies stabilization. Although defendants' statements promised supplies stabilization in 2017 and 2018, the SAC does not allege supplies revenue did not stabilize during that time. Moreover, none of defendants' alleged misstatements indicated there would be no excess supplies in the channel. *See* Dkt. No. 89 at ¶¶ 417 ("our focus and execution over the last 2 years on all 4 of those drivers saw the supplies revenue mature and stabilize 1 quarter ahead of plan . . . we stabilized revenue a quarter earlier than we expected"); 419 ("You may be asking what did we do to stabilize the supplies business. It was all about rigorous execution of all the actions that influence the 4 drivers of the supplies business").

### d. Channel Inventory Management

Defendants argue the SAC fails to plead particularized facts demonstrating falsity of defendants' statements about HP's channel inventory management. Dkt. No. 92 at 18-19. Plaintiffs argue defendants' statements are false because defendants admitted to lacking visibility into the channel inventory. Dkt. No. 97 at 17-19.

The Court finds the SAC fails to plead particularized facts demonstrating falsity of alleged

misstatements about channel inventory stock. The SAC indicates Defendant Weisler's statement that HP lacked visibility into the "downstream channel ecosystem" is consistent with Individual Defendants' statements because the downstream channel ecosystem refers to the channels of third parties—not HP's own channel. *See* Dkt. Nos. 89 at ¶ 69 ("Generally, HP sold ink and toner cartridges directly to 'Tier 1' distributors. Tier 1 distributors then sold these products to 'Tier 2' resellers. Tier 2 resellers either sold these products to the end-user or to another reseller further down the distribution chain."); 89-1 (SEC Order) at ¶ 12 ("HP would generally sell products directly to 'Tier 1' distributors, which would then sell the products through to 'Tier 2' resellers, which would either sell to end users or to resellers further down the distribution chain . . . HP had no continuing obligations following the sale to the Tier 1 partner, and the sales were not contingent on the eventual sales on to the Tier 2 partner or end user."). Moreover, throughout the class period, Individual Defendants stated HP's channel inventory was measured in "ceilings" with their partners and defendants did not provide any concrete projections or methods regarding channel stock. *See* Dkt. No. 89 at ¶¶ 312 ("it is also great from a partner perspective because, of course, they're carrying lower channel inventory."); 328 ("channel inventory levels were below the ceiling. As a reminder, as part of making the supplies sales model changes last year, we lowered our channel inventory ceiling to better reflect the more demand driven sales model.").

### e. Hardware Placement

Defendants argue the SAC fails to plead particularized facts demonstrating falsity of statements regarding HP's placement of NPV printers. Dkt. No. 92 at 19-20. Plaintiffs argue defendants' statements about NPV printers are false because defendants lacked sufficient telemetry data to identify NPV printers. Dkt. No. 97 at 20.

The Court finds the SAC fails to adequately plead facts demonstrating the falsity of defendants' statements of NPV printer placement. Defendants did not admit to lacking data to identify NPV printers. *See* Dkt. No. 89 at ¶ 536 ("We did not have a statistically significant sample from the system telemetry and the instrumentation nor the capabilities to calculate *share* for toner-based products in the installed base. We've had this data for ink-based products.") (emphasis added).

1   Moreover, defendants did not state HP would only sell NPV printers. *See* Dkt. No. 89 at ¶ 377 ("we
2   do focus on placing positive NPV units and taking advantage of the opportunities that we see to go
3   ahead and do that"); 400 ("We were able to improve our operational processes, getting much more
4   disciplined in managing and defining what units to place since our business is really driven by
5   printers").

### f.  Sales Model Change

Defendants argue the SAC fails to plead particularized facts demonstrating falsity of statements regarding HP's transition from a push sales method to a pull sales method. Dkt. No. 92 at 16-18. Plaintiffs argue defendants discounted printers and continued to operate with a push model. Dkt. No. 97 at 10-14.

The Court finds the SAC fails to plead particularized facts demonstrating falsity of defendants' statements regarding the sales model change. Defendants' statements did not promise HP would stop offering discounts and did not promise any particular method for HP's new model. *See* Dkt. No. 89 at ¶¶ 128 ("we changed the supplies sales model, we said that we would channel more marketing into our customer base so that we could market the benefits of original HP supplies"); 307 ("We also did a big change in how do we manage our supplies business, going from – and we changed the sales model, really focusing the sales of supplies from a pull side and driving demand from (inaudible) sales, rather than in having the channel to push supplies into the market."). *See Police Ret. Sys. of St. Louis*, 759 F.3d at 1061 (holding disclosures are not required to follow "a rule of completeness . . . [because] '[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.'") (internal citations omitted); *Brody*, 280 F.3d at 1006 (explaining PSRLA prohibits "misleading and untrue statements, not statements that are incomplete.").

### 2.  Scienter

"To adequately plead scienter, the complaint must. . . 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Zucco Partners,*

*LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (citing 15 U.S.C. § 78u–4(b)(2)). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324. The scienter inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23. In *Zucco*, the Ninth Circuit explained that the scienter inquiry requires "a dual inquiry: first, we will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, we will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Zucco*, 552 F.3d at 992.

Defendants argue the SAC fails to adequately plead scienter. Dkt. Nos. 92 at 20-31; 101 at 11-18. Plaintiffs argue a strong inference of scienter is established by Individual Defendants' statements, the core operations theory, confidential witnesses, and Individual Defendants' stock sales trades. Dkt. No. 97 at 23-31.

For the reasons stated below, whether considered individually or holistically, plaintiffs' allegations do not plead a strong inference of scienter.

### a. Individual Defendants' Statements
#### i. SEC Order and Testimony

Plaintiffs argue a September 30, 2020 Cease-and-Desist Order from the SEC ("SEC Order") and Individual Defendants' alleged testimony during the SEC's investigation establish a strong inference of scienter. Dkt. No. 97 at 23.

The Court finds the SEC Order, which states defendants neither admitted nor denied the SEC's findings, does not establish a strong inference of scienter. The SEC Order involves undisclosed discounts offered by certain HP sales managers—not Individual Defendants—to meet sales targets. *See* Dkt. No. 89-1 (SEC Order) at ¶¶ 16-33. The SEC Order found HP executives did not learn of the HP sales managers' conduct until after the conduct occurred. *Id*. at ¶ 49. Therefore,

10

the SEC Order does not support a strong inference of scienter during the class period. *See Glazer Cap. Mgmt., LP v. Magistri,* 549 F.3d 736, 748-49 (9th Cir. 2008) (finding district court correctly held an SEC order was not sufficient to support scienter because related omissions "were largely legal conclusions, rather than particularized facts giving rise to a strong inference of scienter" and there was "nothing in either settlement agreement that would support the conclusion that [defendant] had actual knowledge of the violations.").

Similarly, plaintiffs' reliance on "testimony obtained by the SEC" does not indicate a strong inference of scienter because HP's executives did not know of sales managers' conduct until after the conduct occurred and the SAC does not plead Individual Defendants knew about misconduct during the class period.

### ii. Public Statements

Plaintiffs argue the contrast between defendants' public statements about HP's change to the pull model and "undisclosed reality" supports an inference of scienter. Dkt. No. 97 at 26.

The Court finds plaintiffs' conclusory assertion of an "undisclosed reality" is not indicative of scienter. *Zucco*, 552 F.3d at 998 ("conclusory assertions abouts the defendants' scienter . . . are usually insufficient, standing alone, to adequately allege scienter".)

### iii. Channel Inventory Levels

Plaintiffs argue defendants' alleged misstatements, made before the class period and during SEC testimony, demonstrate that they personally monitored channel inventory. Dkt. No. 97 at 27.

The Court finds defendants' alleged misstatements are insufficient to support a strong inference of scienter. The SAC includes bare allegations of scienter and does not include the particular language of defendants' alleged testimony. *Compare Glazer,* 549 F.3d at 746 ("[G]eneral allegations of defendants' 'hands-on' management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient" to create a strong inference of scienter") (internal citation and quotations omitted) *with In re Daou Sysm, Inc.,* 411 F.3d 1006, 1022 (9th Cir. 2005) ("specific admissions from top

11

executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter in light of improper accounting reports.")

### b. Core Operations Theory

Plaintiffs argue the core operations theory supports a strong inference of scienter regarding channel distribution and sales practices because defendants were "aware" of sales practices. Dkt. No. 97 at 30. Defendants argue the SAC fails to plead facts showing defendants received information regarding inventory and marketing. Dkt. No. 92 at 24.

The Court finds the core operations theory does not support a strong inference of scienter. The SAC fails to plead particularized facts showing individual defendants had access to information. *See Police Ret. Sys. of St. Louis,* 759 F.3d at 1062 ("A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring . . . or witness accounts demonstrating that executives had actual involvement in creating false reports."). There are no particularized facts indicating Individual Defendants accessed information regarding channel distribution or sales practices.

### c. Confidential Witnesses

Plaintiff relies on nine CWs to plead defendants significantly pushed inventory into the channel, discounted supplies to meet financial targets, and knew of the Four Box Model's deficiency. Dkt. No. 97 at 28. Defendants argue the CWs neither reported to, met, nor had contact with Individual Defendants and do not provide or plead evidence supporting scienter. Dkt. No. 92 at 27-29.

A complaint relying on CW statements must pass two hurdles: "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge" and "[s]econd, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco*, 552 F.3d at 995. Whether a CW is described with

sufficient particularity to establish reliability and personal knowledge depends on whether "a complaint has provided sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge." *Id*.

Here, the nine CWs are all former employees of HP and reported events that occurred within each of their respective departments. To the extent the CWs had personal knowledge about their departments, the Court finds the CW statements regarding inventory pushing and discounting were not themselves indicative of scienter. Plaintiff's allegations regarding inventory pushing rely on CW2, CW4, CW6, CW7, and CW8. Dkt. No. 97 at 28. The CWs' statements mention directions to sell inventory, but fail to provide information regarding Individual Defendants' mental state. *See* Dkt. No. 98 at ¶¶ 138 (CW2 stating "directives to push Supplies inventory into the channel came from the top at HP"); 148 (CW4 stating "business partner managers were interested in reaching their targets in order to obtain their bonuses"); and 206 (CW7 stating "management told employees to observe ethical standards but . . . gave them goals"). These statements are conclusory and do not indicate Individual Defendants' mental states. *See Zucco*, 552 F.3d at 998 (finding CW statements that executives "had to have known what was going on" and certain managers "knew" are generalized claims of corporate knowledge and do not indicate scienter). Plaintiff's allegations regarding discounting rely on CW2, CW3, CW6, and CW8 to demonstrate scienter. Dkt. No. 97 at 28. Similar to the allegations of inventory pushing, the CWs' statements about discounting are conclusory statements of corporate knowledge and do not indicate a strong inference of scienter. *See* Dkt. No. 89 (SAC) at ¶¶ 136 (CW2 stating "Defendant Lores would have been aware of this effort" to provide leasing space to Staples); 138 (CW2 stating discounting directives "always [came] from the top"; 145 (CW 3 stating "quarter-end discounts came from HP higher ups.").

Plaintiff relies on CW9 to establish a strong inference of scienter regarding deficiencies of the Four Box Model. CW9 presented information about telemetry data coverage to the General Manager and Global Head of Supplies in preparation for the manager's meeting with defendant Lores. Dkt. No. 89 at ¶ 187. CW9 reported defendant Lores knew about the lack of telemetry coverage because CW9 received an email from CW9's manager indicating questions from defendant

13

1   Lores, such as "what are we doing in order to increase the numbers, how long will it take and can
2   we speed that up?" *Id.* The Court finds CW9s' reports do not support an inference of scienter
3   regarding allegations about the Four Box Model. The SAC fails to plead when and whether CW9
4   presented to CW9's manager about any deficiency in telemetry data and whether any deficiency
5   was actually conveyed from CW9's manager to Individual Defendants. CW9 was not present during
6   any meetings with Individual Defendants and did not receive emails directly from Individual
7   Defendants. *See Police Ret. Sys. of St. Louis*, 759 F.3d at 1063 (holding witness statements
8   inadequate to plead scienter because witness "[did] not detail the actual contents of the reports the
9   executives purportedly referenced or had access to."); *Zucco*, 552 F.3d at 996 (finding CW
10  statements that executives "had to have known what was going on" and certain managers "knew"
11  are generalized claims of corporate knowledge and not indicative of scienter).

### d. Stock Sales

Plaintiffs argue that stock sales by defendants Weisler and Lores during the class period indicate a strong inference of scienter because the sales were out of line with defendants' prior trading history. Dkt. No. 97 at 31.

For the same reasons stated in the Court's First Order Granting Defendants' Motion to Dismiss, Dkt. No. 83, the Court finds defendants' stock sales do not support a strong inference of scienter. *See Zucco*, 552 F.3d at 1006 ("corporate stock sales must be significant enough and uncharacteristic enough to cast doubt on the defendant company's motives"); *Applestein v. Medivation, Inc.*, 10-cv-998-EMC, 2011 WL 3651149 at *9 (N.D. Cal. Aug. 18, 2011) (finding stock sales of one defendant to be insufficient of a strong inference of scienter either on his part of on the part of the other defendants because the court considers *"total* insider sales.").

Accordingly, when considering plaintiffs' scienter factors individually and holistically, the Court finds that the SAC fails to adequately plead a strong inference of scienter. The SAC fails to adequately plead defendants had actual knowledge of falsity in their alleged misstatements at the time when the alleged misstatements were made during the class period. For this additional reason, the Court **GRANTS** defendants' second motion to dismiss.

### 3. Loss Causation

Defendants argue the SAC failed to plead which alleged misstatements were corrected by defendants' alleged disclosures. Dkt. No. 92 at 32-33. Plaintiffs argue the SAC adequately pleads loss causation. Dkt. No. 97 at 31-32.

The Court finds the SAC specified which alleged misstatements were corrected by defendants' disclosures. *See* Dkt. No. 89 at ¶¶ 309 (stating 2019 disclosure that defendants lacked visibility corrected alleged misstatements regarding sales model); 341-355 (stating 2019 disclosure regarding visibility and ceilings corrected alleged misstatements regarding channel inventory); 369-370 (stating 2019 disclosure that defendants lacked telemetry data corrected alleged misstatements regarding four box model); 401 (stating 2019 disclosure regarding lack of data corrected alleged misstatements regarding hardware placement); 410 (stating 2019 disclosure that HP lacked data and used incomplete market share surveys corrected alleged misstatements regarding market share); and 410 (stating 2019 disclosure that HP lacked ability to calculate share for toner-based printers corrected alleged misstatements regarding supplies stabilization); c*f. In re Bofl Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) (The most common way for plaintiffs to prove that the [loss causation] is to identify one or more corrective disclosures . . . a corrective disclosure need not reveal the full scope of the defendant's fraud in one fell swoop.") (internal citations omitted). The SAC pleads HP's stock price declined after the HP's alleged disclosures. *See* Dkt. No. 89 at ¶¶ 539, 548, 558; *Mineworkers' Pension Scheme v. First Solar Incorporated*, 881 F.3d 750, 754 (9th Cir. 2018) ("A plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss.").

### B. Sections 20(a)

Defendants move to dismiss plaintiffs' claims under Section 20(a) of the Securities Exchange Act. Dkt. No. 92 at 35.

For the reasons stated above, the Court finds plaintiffs failed to adequately plead a violation of 10(b) of the Securities Exchange Act. For this additional reason, the Court **GRANTS** defendants'

15

motion to dismiss.

### C. Section 20A

Defendants move to dismiss plaintiffs' claims under Section 20A of the Securities Exchange Act. Dkt. No. 92 at 35. Plaintiffs argue the SAC adequately pleads contemporaneous trading. Dkt. No. 37 at 35.

The Court finds plaintiffs failed to adequately plead their Section 20A claims. *See In re Verifone Sec. Litig*., 784 F. Supp. 1471, 1488 (N.D. Cal. 1992), *aff'd,* 11 F.3d 865 (9th Cir. 1993) (requiring plaintiffs to adequately plead independent violation of securities law to establish Section 20A claims). For this additional reason, the Court **GRANTS** defendants' motion to dismiss.

### CONCLUSION

For the reasons stated above, the Court **GRANTS** defendants' second motion to dismiss. Plaintiffs request leave to amend to include facts from individual defendants' redacted SEC testimony. Dkt. No. 97 at 35. However, the SAC presently incorporates facts from the SEC's investigation of defendants. *See* Dkt. No. 89 at 1 ("Lead Plaintiffs' information and belief are based on . . . materials obtained from the SEC with respect to its investigation of HP . . . [and] the [SEC] Order Instituting Cease-and-Desist Proceedings."); ¶443-508 (citing "testimony obtained from the SEC"). Accordingly, the Court **DENIES** plaintiffs leave to amend the SAC and dismisses the complaint **WITH PREJUDICE**. *See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir.2008) ("The decision of whether to grant leave to amend nevertheless remains within the discretion of the district court, which may deny leave to amend due to . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment."); *see e.g., Zucco*, 552 F.3d at 1007 (finding plaintiff's failure to correct deficiencies in second amended complaint as 'a strong

indication that the plaintiffs have no additional facts to plead.'") (internal citation omitted).

**IT IS SO ORDERED**.

Dated: September 15, 2021

SUSAN ILLSTON
United States District Judge