Pages 1 - 53

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan Illston, Judge

IN RE HP INC. SECURITIES          )
LITIGATION.                       )  **NO. C 20-01260 SI**
                                  )
_____  )


San Francisco, California
Thursday, September 9, 2021

**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:
                    BERNSTEIN, LITOWITZ, BERGER &
                       GROSSMANN LLP
                    1251 Avenue of the Americas
                    New York, New York 10020
               BY:  **JOHN RIZIO-HAMILTON, ATTORNEY AT LAW**


                    KESSLER, TOPAZ, MELTZER & CHECK LLP
                    One Sansome Street, Suite 1850
                    San Francisco, California 94104
               BY:  **JENNIFER L. JOOST, ATTORNEY AT LAW**


For Defendants:
                    GIBSON, DUNN & CRUTCHER LLP
                    555 Mission Street, Suite 3000
                    San Francisco, California 94105
               BY:  **BRIAN M. LUTZ, ATTORNEY AT LAW**


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported Remotely By:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
                       CSR No. 7445, Official U.S. Reporter

```
 1    APPEARANCES VIA ZOOM:   (CONTINUED)

 2    For Defendants:
                              GIBSON, DUNN & CRUTCHER LLP
 3                            1050 Connecticut Avenue, NW
                              Washington, D.C. 20036
 4                BY:   LISSA M. PERCOPO, ATTORNEY AT LAW

 5                            SIDLEY AUSTIN LLP
                              1001 Page Mill Road,Building 1
 6                            Palo Alto, California 94304
                  BY:   MATTHEW J. DOLAN, ATTORNEY AT LAW
 7

 8    For Defendant Catherine A. Lesjak:
                              WILSON, SONSINI, GOODRICH & ROSATI
 9                            650 Page Mill Road
                              Palo Alto, California 94304
10                BY:   STEVEN SCHATZ, ATTORNEY AT LAW

11                            WILSON, SONSINI, GOODRICH & ROSATI
                              One Market Street
12                            Spear Tower, Suite 3300
                              San Francisco, California 94105
13                BY:   KATHERINE HENDERSON, ATTORNEY AT LAW

14

15

16

17

18

19

20

21

22

23

24

25
```

**Thursday - September 9, 2021**                                    **10:53 a.m.**

**P R O C E E D I N G S**

---o0o---

THE CLERK:  Now calling Case Number 20-cv-1260, In Re HP Inc. Litigation.

Counsel, can you please state your appearances for the record, starting with plaintiff.

MR. RIZIO-HAMILTON:  Good morning.  John Rizio-Hamilton, Bernstein Litowitz Berger & Grossmann, for the lead plaintiffs.

THE COURT:  Good morning.

MS. JOOST:  Good morning.  Jennifer Joost, Kessler Topaz Meltzer & Check, for the plaintiffs.

THE COURT:  Good morning.

MR. LUTZ:  Good morning, Your Honor.  Brian Lutz from Gibson Dunn on behalf of the defendants.

THE COURT:  Good morning.

MS. PERCOPO:  Good morning, Your Honor.  Lissa Percopo, also from Gibson Dunn, on behalf of the defendants.

THE COURT:  Good morning.

MR. DOLAN:  Good morning, Your Honor.

MR. SCHATZ:  Good morning --

MR. DOLAN:  Good morning, Your Honor.  Matt Dolan, from Sidley Austin, on behalf of the defendants.

THE COURT:  Good morning.

MR. SCHATZ:  I think it's my turn now.

1    **THE COURT:**  I think so.

2    **MR. SCHATZ:**  Good morning, Your Honor.  I'm Steven Schatz,

3    Wilson Sonsini, on behalf of Catherine Lesjak.

4    **THE COURT:**  Good morning.

5    **MS. HENDERSON:**  Good morning, Your Honor.  Katherine

6    Henderson, also Wilson Sonsini Goodrich & Rosati, on behalf of

7    Catherine Lesjak.

8    **THE COURT:**  Good morning.  So is that everybody?  I think

9    it is.

10   Okay.  This is a hearing on defendants' motion to dismiss

11   plaintiffs' amended complaint.

12   The amended complaint is a lot longer than the original

13   complaint, which was itself I thought quite long.  So we have a

14   lot to work with.  And I guess I have a few questions that

15   maybe I'll just toss out and folks can respond.

16   First, with respect to the Four Box Model statements,

17   which are still in there -- there's a lot of other stuff in

18   there now too -- but the original from the first complaint

19   Four Box Model alleged misrepresentations are still there.

20   And I guess my question to the defendants is whether

21   statements which omit to state that there was a lack of

22   telemetry data for toner printers is material.  So perhaps the

23   defendants could start with that.

24   **MR. LUTZ:**  Sure, Your Honor.  There is Brian Lutz.  I'll

25   start.

1    Look, the Four Box Model statements or this Four Box Model

2    theory is, I would say, still in the complaint, obviously, as

3    you note.  It is not the lead theory anymore by my read of the

4    complaint and is de-emphasized in the complaint in lieu of the

5    new and broader theory of the Pull Model didn't exist.

6    With respect to the Four Box Model theory itself, I think

7    it's almost verbatim the same as it was the last time around.

8    There are some around-the-edges changes, which I can get to;

9    but fundamentally, it's the same theory as before based on the

10   same allegations as before and should be dismissed for the same

11   reason that Your Honor dismissed it the last time around, which

12   is to say, there are no specific factual allegations

13   demonstrating that the statements regarding the contents or

14   reliability of the Four Box Model were materially false or

15   misleading, and there's no allegations demonstrating that any

16   defendant knew or was deliberately reckless in making

17   statements -- deliberately reckless in not knowing about the

18   lack of statistically significant sampling of telemetry data

19   and that that would then make the Four Box Model unreliable.

20   Those facts just don't -- they didn't exist the last time

21   around, and they don't exist this time around as well.

22   And really, the newest allegations -- really, the only new

23   allegations, I think, in the complaint as respects to the

24   Four Box Model are the charts that the plaintiffs have provided

25   which purport to show how, you know, differences in

1   statistically significant data might have impacted the

2   reliability of the Four Box Model.

3        As we set forth in our briefing, Your Honor, those are

4   made-up data.  Right?  Those are not actual data contained

5   anywhere other than from the lead plaintiffs themselves, as

6   they acknowledge, you know, candidly in their complaint.  Those

7   are not -- those were not factual allegations about anything.

8   Those are just made-up data.

9        So to answer your question, I don't think there's anything

10  materially different about the Four Box Model theory of fraud

11  in the amended complaint that would distinguish it from the

12  allegations in the prior complaint.  And that theory, which is,

13  again, heavily de-emphasized in the amended complaint, should

14  be dismissed for the same reason as Your Honor dismissed it the

15  first time around.

16       **THE COURT:**  Perhaps I asked the wrong question, but I was

17  concerned about whether or not you believe it's material, the

18  fact that telemetry data was not available from many of

19  these -- what is it?  The toner printers, I think, from

20  Europe -- whether that's material.  Is that material

21  information that should have been disclosed?

22       **MR. LUTZ:**  Given that HP disclosed during the course of

23  the relevant period that the Four Box Model relied on all sorts

24  of types of data, including telemetry data, I don't think that

25  specific piece of it is a material omission, that we didn't

1    disclose, you know, specific information about a specific part

2    of the telemetry data from a particular geographic region.

3          I would note, Your Honor, that information is not alleged

4    to have been known -- right? -- before February of 2019.

5    There's no factual allegation that anybody knew before February

6    that there was a gap in the telemetry data, and that that gap

7    indicated that there was a lack of statistically significant

8    telemetry data for that one particular region, and that as a

9    result of that, that the Four Box Model included flawed

10   assumptions regarding market share; ultimately overestimated

11   demand in one particular area.

12         But to directly answer your question, that specific piece

13   I don't think is material in light of all of the allegations

14   and the admissions and HP statements that there was more that

15   went into the Four Box Model than just one sliver of data or

16   one piece of the data.  It wasn't just telemetry data.  It was

17   all kinds of other things as well.

18         **THE COURT:**  Okay.  Thank you.

19         Who's going to speak for the plaintiffs today?

20         **MR. RIZIO-HAMILTON:**  I will, Your Honor.  This is John

21   Rizio-Hamilton.

22         **THE COURT:**  Okay.  What do you say about the materiality

23   of the failure to disclose lack of telemetry data from Europe

24   on the printers?

25         **MR. RIZIO-HAMILTON:**  The complaint alleges facts that

1  adequately support an inference of materiality for this

2  omission for several reasons.

3      First, as noted in paragraph 180 of the complaint, the

4  toner side of the business was actually the bigger side of the

5  business.  It was the commercial side.  And that's where HP

6  generated the majority of its supply revenue.  So that's

7  point one.

8      Point two is that the defendants themselves in February of

9  2019, in connection with a first corrective disclosure in the

10 complaint, attributed the very large miss in earnings to this

11 lack of telemetry data.  In particular, they stated that

12 revenue was down 3 percent for the quarter year over year, and

13 would be down 3 percent for all of 2019.  And the reason they

14 said this had occurred is because the telemetry data that they

15 had was wrong.  So that's point two.  You could see the impact

16 of this very clearly in the February 2019 disclosure, and that

17 impact was material.

18     Point three, I have to respectfully disagree with my

19 colleague that there's nothing new to see here.  There is

20 important new factual information in the amended complaint that

21 demonstrates just how severe the lack of data was and further

22 supports an inference of materiality for the omission.

23     In particular, Former Employee 9, who's a new former

24 employee added to the complaint since the last time Your Honor

25 took a look at this, told us that the company closely tracked

1    the level of telemetry data it was receiving in a dashboard

2    that it kept centrally.  Former Employee 9 reported that in the

3    2017 and 2018 time frame, this dashboard showed that the

4    telemetry data for market share, which was a critical input

5    into the Four Box Model, was at only 20 to 30 percent full, and

6    that there was about 70 to 80 percent that was missing, that

7    was not there.  Likewise, the telemetry data in that same time

8    frame for the usage box of the Four Box Model, another critical

9    input, was only 40 percent full.  That was 60 percent absent.

10         These new detailed factual allegations demonstrate that it

11   wasn't just some little bit of data that was missing.  It was

12   the lion's share.  And in the case of market share, it was the

13   substantial lion's share.  And that further supports an

14   inference of materiality because it shows how big the gap was.

15         And so I think when you look at all of these facts

16   together -- (a) the fact that the data related to the toner

17   side of the business which was the biggest side of the

18   company's business; (b) that the absence of this data, when it

19   came home to roost in February of 2019, had a profound impact

20   on the company's business; and (c) the new factual allegations

21   from Former Employee 9 which show how severe the gap in the

22   data was -- there is ample support for an inference of

23   materiality at the pleading stage.

24         And I would just add two more quick points.

25         One, this is particularly true given that materiality is a

1   fact issue, generally speaking; and at this stage of the game,

2   it's something that's typically not decided on the pleadings,

3   particularly where, as here, we do have support for the

4   inference.

5        And, two, another important aspect of what

6   Former Employee 9 says -- and on this point I also respectfully

7   disagree with my colleague -- is that the company's most senior

8   executives were monitoring this absence of data.  And I think

9   that tells you two things.  It tells you (a) that it was

10  significant because it caught their attention; and (b) it also

11  supports an inference of scienter with respect to the omission.

12       In particular, former employee stated that former employee

13  briefed his supervisor, the head of supplies, Ms. Marcons in

14  quarterly -- Ms. Barcons -- excuse me -- in quarterly business

15  review meetings repeatedly on the lack of telemetry data as set

16  forth in the dashboard; and the purpose of these meetings was

17  for Ms. Barcons to report to Defendant Lores on this subject.

18       And following these meetings that Ms. Barcons had with

19  Defendant Lores, Former Employee 9 would receive questions from

20  Ms. Barcons from Defendant Lores to the effect of:  What are we

21  doing in order to increase the numbers?  How long will it take,

22  and can we speed that up?

23       And this is set forth at paragraphs 186 and 187 of the

24  amended complaint.

25       And those facts, Your Honor, as I noted, are -- have

1    import for the materiality analysis because they show that the

2    most senior executives of the company were focused on this

3    issue, and they also have import for the scienter analysis.

4         **MR. LUTZ:**  Your Honor, may I respond?

5         **THE COURT:**  Yes, mm-hmm.

6         **MR. LUTZ:**  Yeah.  I mean, look, on the actively

7    monitoring, which I think is the phrase that my colleague used,

8    there is no support for that in the complaint.

9         There's one former employee who has no personal connection

10   to any of the individual defendants who says:  I provided

11   information on telemetry data -- because telemetry data was a

12   thing and the company was obviously using it for the

13   Four Box Model.  I provided telemetry data to my boss, who then

14   had meetings with one of the individual defendants; and that

15   there is a claim that questions came after that about telemetry

16   data.

17        That is not actively monitoring.  And it's also

18   insufficient to show that Mr. Lores or, frankly, any of the

19   other individual defendants knew that anything about the

20   telemetry data indicated that the Four Box Model was unreliable

21   or that the lack of statistical- -- that there was a lack of

22   statistically significant telemetry data for any of the anchor

23   toner lines in any of the geographies, or that that led to, or

24   that there was, any flaws in the Four Box Model as a result.

25        Those facts do not exist in the complaint.  They haven't

1    pled scienter.  This is a new allegation.  This is not an

2    allegation that establishes falsity, and this is not an

3    allegation that comes close to establishing scienter with the

4    specificity required under the PSLRA.

5         **THE COURT:**  Okay.  Thank you.

6         **MR. LUTZ:**  What you would need, Your Honor, is reports --

7    we went over this in the last argument.  Right?  What you need

8    to plead scienter is specific factual information provided to

9    the defendants or that somebody can say they knew that the

10   statements they were making were false.  Right?

11        You need, as to the Four Box Model or this other theory of

12   fraud, specific information:

13        "I was in a meeting where it was discussed that the

14   Four Box Model was unreliable and everybody knew it, or senior

15   officers knew it."

16        "I provided information that demonstrated the

17   unreliability of the Four Box Model; so people knew that the

18   statements about the Four Box Model being reliable were false."

19        That does not exist in the complaint.  That is not what

20   Former Employee Number 9 says, by any means.

21        **THE COURT:**  I want to ask a different but, I think,

22   related question; and this, I'll ask you, Mr. Rizio-Hamilton,

23   to begin with.

24        There's a chart in your papers, this "Maintaining Supply

25   Stability" chart, "Fiscal Year '19 4-Box Driver Trends."  Do

1    you know what I'm talking about?

2         **MR. RIZIO-HAMILTON:**  Which paragraph do you have that at,

3    Your Honor?

4         **THE COURT:**  I do not know that.

5         **MR. RIZIO-HAMILTON:**  Let's see.  I'm looking at the

6    charts.  We have five charts setting forth an illustration of

7    how a lack of statistically significant data would --

8         **THE COURT:**  No, no.  This is a chart that was used -- it's

9    like a PowerPoint chart that was used by one of the defendants,

10   Defendant Lores, to show market share increase.

11        **MR. LUTZ:**  409.

12        **MR. RIZIO-HAMILTON:**  409.

13        **MR. LUTZ:**  Judge Illston, can you say the name -- the

14   header on the slide again?

15        **THE COURT:**  I don't have it here.  I just have the --

16        **MR. LUTZ:**  Sorry.

17        **THE COURT:**  I'm sorry.  I just have the chart, the thing

18   itself.

19        There's a lot of pages in this --

20        **MR. LUTZ:**  You're telling me.

21        Does it say "Maintaining Supply Stability"?

22        **THE COURT:**  Yes.

23        **MR. LUTZ:**  Okay.  Paragraph 409.

24        **THE COURT:**  What I wanted to know is, you've characterized

25   what, I guess, Defendant Lores said, but do you have the text

1    of whatever was said about this chart?

2        **MR. RIZIO-HAMILTON:**  So we have -- we have reproduced the

3    chart itself here.  And the allegation here is that -- is that

4    the chart reflected an upward arrow for share when, in fact,

5    share was decreasing.  So --

6        **THE COURT:**  I wanted to know -- I wanted to know if you

7    have any information -- well, if you have the text of what was

8    actually said by the person presenting this chart.

9        **MR. RIZIO-HAMILTON:**  So I do not have it at my fingertips.

10       **THE COURT:**  It's not in the complaint.  I know that.

11       **MR. RIZIO-HAMILTON:**  Right.

12       **THE COURT:**  But I wondered if you have it.

13       **MR. RIZIO-HAMILTON:**  I do not have it presently with me.

14       **THE COURT:**  But do you have it?  Because I don't know what

15   the complaint claim was based on.

16       **MR. RIZIO-HAMILTON:**  Right.

17       **THE COURT:**  Is it based on a text you do have?

18       **MR. RIZIO-HAMILTON:**  Yes, it is based on a text of,

19   you know, (a) the slide itself; and (b) we do have the

20   underlying materials from this presentation.

21       **THE COURT:**  Including what was said?

22       **MR. RIZIO-HAMILTON:**  Right.  Right.  We would have that.

23       But I must confess, I don't have it, you know, with me at

24   the moment.

25       **THE COURT:**  All right.  Well, because I think the

1  defendants say that this is all puffery, and I just wondered

2  what was said about it, because that would matter.

3        **MR. RIZIO-HAMILTON:**  H'm.  Well, okay.  You know,

4  thank you for that because that's helpful context.

5        So this chart and the others like it in the complaint were

6  presented to investors to demonstrate to them that the

7  company's supplies business had stabilized and then ultimately

8  began to grow again in 2018.  And that was of the utmost

9  importance to investors because it accounted for substantially

10  all of the company's revenues and profits; and it had come,

11  these statements, a couple of years after the company had

12  disclosed this pretty devastating $450 million inventory

13  drawdown that it had to make.

14        And so in order to sort of rehabilitate the company's

15  value in the eyes of the market, the company had to convince

16  investors that the supplies business -- again, substantially

17  all the company's revenue and profit -- was stabilizing and

18  ultimately would return to growth.

19        And this chart was one such statement that defendants made

20  in order to convince investors of that turnaround story.

21  You know, you can see here that they say they're maintaining

22  supply stability, which was critical for the company to

23  demonstrate to the market for HP to have any real value.  And

24  the increase in market share was also critical for the company

25  to convince investors of because market share, and particularly

increases in market share, was the way the company was going to increase its business and its stock price.  A decreasing market share would mean a deteriorating and ultimately dying company.

And so these charts and the statements made around them were essential for -- to convince the marketplace of this central supplies narrative of stability and then, ultimately, growth that the company put forward throughout the class period but which ultimately wasn't true.  And it wasn't true at the time in significant part because -- you know, not only because of their inability to measure these things, given the lack of statistically significant telemetry data; but also because the company continued to push excess supplies into the sales channel above demand to create an illusion of stability and an illusion of growth in 2017 and 2018 that came crashing down beginning in early 2019.

And, you know, that is a new category of allegations in the complaint and I think one that answers an important question that Your Honor posed in Your Honor's dismissal order, which is:  Why did the Four Box Model appear at least to be accurate for some amount of time?

And the reason is because the company was selling excess inventory into the channel above demand in order to make numbers, and that ultimately crashed down in 2019 when the company admitted that it, yet again, had sold at least $100 million of excess inventory into the channel and market

1  share was not growing, as reflected in this slide, but was

2  shrinking.

3      **MR. LUTZ:**  Your Honor, may I respond?

4      **THE COURT:**  You may.

5      **MR. LUTZ:**  Yeah.  First off, there's absolutely nothing

6  new about this allegation.  It's just copied verbatim from the

7  prior complaint.  So I disagree with what my colleague just

8  said.

9      Just to go to your question, though, Your Honor, this is

10  not a slide that we claim contains puffery.  This was attached

11  as -- rather, it's a forward-looking statement.  If you read

12  the -- you can't see it in probably what you have before you,

13  but we attached an actual readable version of this slide --

14  because it wasn't legible in the first complaint or this

15  complaint, but we attached a legible version of it -- so we can

16  all actually look at it and read it -- as Exhibit 16 to my

17  colleague, Ms. Percopo's -- I'm sorry -- 17 to my colleague

18  Ms. Percopo's declaration in our first --

19      **THE COURT:**  In the first one?

20      **MR. LUTZ:**  Yeah.  I can just read to you what the --

21      **THE COURT:**  I see.

22      **MR. LUTZ:**  -- the relevant footnote says.

23      It says (reading):

24          "Data are projections based on currently

25      available data and estimates."

1        Okay?  There could not be clearer forward-looking

2   statement language than that.  What these are, are projections

3   based on the Four Box Model estimates.  As we discussed in

4   detail in our first motion to dismiss briefing, this is

5   straight forward-looking statements protected under the safe

6   harbor.

7        **THE COURT:**  All right.  Thank you.

8        I would be curious still to know what was said about it,

9   which I take it you both have.

10       **MR. LUTZ:**  Yeah.  Of course we have it.

11       I would note, if it's -- you know, the plaintiffs need to

12  make these allegations and they need to submit the information

13  so that we can all look at that.

14       I can look and maybe my colleague -- Ms. Percopo might be

15  looking at the same exhibits as me -- can look to see whether

16  the actual transcript is attached as an exhibit to her prior

17  declaration as well.  And maybe during the course of the

18  argument, we can find that.

19       **THE COURT:**  All right.  Another thing that I was struck

20  by -- and it's been alluded to, I think, by Mr. Rizio-Hamilton

21  in his last remarks -- is the statement about channel inventory

22  management, which is a neutral way to say what plaintiffs have

23  been alleging is channel stuffing.

24            ". . . we don't have much visibility into the

25       downstream channel ecosystem and we were maintaining

1          CI levels below our Tier 1 ceiling, we did not see

2          clearly enough that we had an issue."

3               ". . . we continued to maintain the levels of

4          channel inventory under our Tier 1 ceiling and

5          monitor Tier 2 inventory, where we had some

6          visibility."

7          I guess I'll ask you, Mr. Lutz.  What is your view of this

8     statement?

9          **MR. LUTZ:**  You're referring to Mr. Weisler's statement on

10    the February 2019 earnings call?

11         **THE COURT:**  I believe so, yeah.

12         **MR. LUTZ:**  Yeah.  So this is -- this is what -- let me

13    take a step back.

14         Channel inventory is one of the categories of alleged

15    misstatements.

16         **THE COURT:**  Right.

17         **MR. LUTZ:**  Channel inventory -- plaintiffs allege in the

18    complaint, essentially, that a number of statements that

19    defendants made during the class period reporting that HP was

20    selling its products under a lower inventory ceiling -- those

21    are the channel inventory statements.

22         Remember, channel inventory was one of the changes that HP

23    implemented as part of the shift from the Push to the

24    Pull Model.  This is back in 2016 when we made -- HP made the

25    business model shift.

1          When the company announced that shift -- this is before

2     the class period.  When the company announced that shift in

3     June of 2016, HP said that it would be lowering inventory

4     levels as part of the shift to more of a demand-driven model.

5          So instead of pushing inventory into the sales channel

6     through high inventory ceilings and steep discounts, under the

7     Pull Model HP would reduce discounts and lower the inventory

8     ceilings, meaning lessen the amount of inventory that it would

9     put in -- that it would sell to its distributors each quarter.

10          And that's exactly what HP did, according to the

11     complaint, and we'll get to it.  Throughout the class period,

12     HP reported each quarter that it had set lower inventory

13     ceilings, meaning lower limits on the number of supplies

14     products that it would sell to its distributors, and HP

15     reported each quarter that it was selling within those lower

16     inventory ceilings.

17          Plaintiffs do not allege that that was a false statement.

18     Okay?  There is not a single allegation that HP did not lower

19     its inventory ceilings during this whole period, and plaintiffs

20     don't allege that HP failed to sell within those lower

21     inventory ceilings.  So these statements about lowering the

22     inventory ceiling and selling within the lower ceilings are not

23     alleged to be false at all.

24          So plaintiffs' theory is that they were misleading.  Okay?

25     Plaintiffs' theory is that every time that HP talked about

1   inventory ceilings, they should have explained that they were

2   referring to inventory that HP itself sold to distributors.

3   And these are the Tier 1 distributors, HP's actual, you know,

4   contractual partners who buy the products from HP.

5        Plaintiffs' theory, beyond that, is that HP should have

6   also explained that it didn't have precise data for inventory

7   that these Tier 1 distributors in turn sold to other levels in

8   the distribution chain:  Tier 2, Tier 3, and so on.

9        But here's the point, Your Honor.  Remember, when HP

10  announced the shift from the Push to the Pull Model in June of

11  2016, the company told investors that it can only really

12  understand what was happening with Tier 1, meaning the tier

13  that we actually sell to, and that its data on Tier 2 was

14  spotty.  That's because, again, we had data on the level, the

15  distributors that we sold to.  We didn't sell to Tier 2

16  distributors.

17       Plaintiffs' theory on the channel inventory also relies on

18  a false premise.  Okay?  They say throughout their complaint,

19  whenever they're talking about channel inventory, that the

20  channel inventory statements were misleading because HP didn't

21  disclose that it hadn't transitioned to a Pull Model.  Right?

22  Their whole theory is we never transitioned to a Pull Model.

23  We continued to have steep discounts.  We continued to have

24  gray marketing activity.

25       So their theory is every time we talked about channel

1   inventory, those statements were misleading because we
2   didn't -- because, at the same time, we were still engaged in
3   these unsustainable business practices, their quote.
4       That theory of fraud, as we can talk about in detail today
5   and as we went over in our briefing, does not have factual
6   support.  There is no allegations, factual specific allegations
7   in the complaint that we didn't actually switch to a
8   Pull Model.  Right?  We did.  There's no allegations that we
9   didn't.
10      We can go through the confidential witnesses who say that
11  there were some level of discounting, almost all of whom don't
12  say when the discounting occurred or that it was at the same
13  level as had occurred under the earlier model.  Indeed, the
14  only confidential witness who talks about the actual level of
15  discounting says it was something less than 2 percent as
16  compared to the earlier model where the SEC settlement contains
17  an allegation of 40 percent discounts.  Okay?
18      So, again, I can go through in detail, but it's a false
19  premise to say that the channel inventory statements were
20  misleading because we didn't disclose all of these undisclosed
21  business practices.
22      And finally, on the channel inventory, you have to
23  remember, in the quote that you just read from Mr. Weisler,
24  there's no discussion in there about the problem.  Right?
25      Let me put it a different way.  Plaintiffs' theory is that

1    the problem here was that HP was aggressively discounting and

2    jamming product into the market.  Right?  That's their theory.

3    And that's why we had the problem.

4        What we disclosed is that we didn't have good visibility

5    because we had a flaw in the Four Box Model.  We had a flaw in

6    the telemetry data that we didn't realize until February of

7    2019.  And we disclosed it.  We said we thought that our demand

8    was something higher than what it actually turned out to be,

9    and that's what we disclosed.  And when we realized it, we

10   learned that we had too much inventory in the market.

11       We didn't say:  Oh, we've been aggressively discounting

12   and putting product into the market.  We didn't say that we

13   were putting product -- selling product above our lowered

14   channel inventory ceilings.  In fact, we said we're still

15   selling within our inventory ceilings.  We just didn't know

16   that the demand was not as high as we thought it was.

17       So the other thing I'll note too is, you talk about

18   this -- and plaintiffs spent a lot of time in their complaint

19   on this February earnings call; and in their pleading, they

20   actually quote a bunch of analyst reports.  I think it's very

21   telling that not a single one of the analysts said that there

22   was -- that they were surprise by the channel inventory or they

23   were surprised by the fact that we didn't have good visibility

24   below; they were surprised that our channel inventory ceilings

25   only included Tier 1 and we didn't have solid visibility below

1    that.  Not a single one said that.  Nobody said that.  Right?

2        What they focused on was gaps in the Four Box Model and

3    our misestimation of demand as a result of it.  Right?  That

4    was the problem.  The problem is, we realized we had a problem

5    and a gap in the Four Box Model and that, as a result, our

6    inventory ceilings were probably too high because we didn't

7    realize that the demand wasn't there.

8        The problem was not that nobody knew that channel

9    inventory ceilings only included Tier 1.  That was not the

10   problem.  The problem was not that we had been aggressively

11   discounting and putting in product into the market at levels

12   above our channel inventory ceilings.  That's what plaintiffs

13   want the problem to be.  There are no facts to support that.

14   No analyst said that.  No analyst focused on that because that

15   was not the issue.

16       Just on scienter, I mean, if we're on the channel

17   inventory statements, I think the scienter point is persuasive.

18   They don't come close to pleading scienter as to the channel

19   inventory statements.

20       Their only argument in the briefing is on page 27, and

21   they say that the statements -- defendants made statements

22   about the inventory levels during the class period; so they

23   must have, quote, closely monitored channel inventory levels,

24   unquote.  That's at page 27.

25       That allegation obviously is conclusory.  Right?  There's

no facts to support it.  But even beyond that, it doesn't say
anything to suggest scienter.  Plaintiffs don't even say what
defendants knew as a result of their supposedly close
monitoring of the inventory levels.

To plead scienter under this theory -- if you even credit
the theory -- but to plead scienter, they'd need to plead
specific facts showing that the individual defendants who made
the channel inventory statements knew that there were problems
below Tier 1 and that they, therefore, knew that it was
misleading to discuss channel inventory without referring to
tiers below Tier 1.

There aren't any facts to support that.  That is simply
not pled in the complaint.  There's no facts indicating that
before February any individual defendant believed or learned
that inventory was building up in any lower tier than Tier 1.
No facts at all.

There aren't any facts, any reports or other information
alleged in the complaint showing inflated levels of inventory,
let alone that any such report was provided to any of the
individual defendants.

Again, plaintiffs' theory is simply that the defendants
made statements about channel inventory so they must have known
that their statements were misleading.

That's not a way to plead scienter.  That's not scienter
in the Ninth Circuit.  If it were, there would be no

1  requirement under the PSLRA to plead specific facts giving rise

2  to a strong inference that an individual defendant knew that

3  his or her statements were false or had information available

4  to him or her demonstrating that the statements were false.

5  That is simply not alleged in the complaint for any of the

6  theories, for any of the misstatements but, in particular, for

7  the channel inventory statements.

8        I'll stop there and see if you have a question.

9        **THE COURT:**  Okay.  Thank you.

10       Mr. Rizio-Hamilton?

11       **MR. RIZIO-HAMILTON:**  Thank you, Your Honor.

12       So the theory of this branch of the case is that prior to

13  the class period, the defendants knew that the company had been

14  repeatedly, habitually pumping excess inventory into the

15  channel in order to meet the sales targets.

16       There can't really be any dispute that the defendants were

17  aware that the company was doing that coming into the class

18  period.  The SEC cease and desist order says it.  The SEC

19  testimony that we obtained confirms it.  Then they had to take

20  a $450 million inventory write-down as a direct result of that

21  practice, which materially harmed the company.

22       Coming into our class period --

23       **THE COURT:**  And there's a lawsuit about that.  Is that

24  correct?

25       **MR. RIZIO-HAMILTON:**  For a prior time period, yes.

1    **THE COURT:**  Yes.

2    **MR. RIZIO-HAMILTON:**  Yes.

3         Coming into our class period, they made a number of

4    statements designed to assure the market that they had

5    stabilized the business and changed the sales model in a way

6    that this would not recur.  They said that they moved from a

7    Push Model to a Pull Model that was based on true demand

8    repeatedly.

9         We allege detailed facts showing that that was not true

10   because the pushing of excess inventory into the sales channel

11   continued to a material degree.  That's kind of category of

12   statement one.

13        Category of statement two is that they misrepresented the

14   reason for the model change.  So they told the market very

15   vaguely at the time that they announced this model change that

16   it was really just due to the impact of what they call the

17   omni-channel environment, and they repeated that explanation

18   during the class period.

19        In fact, as the SEC cease and desist order and the SEC

20   testimony show, the real impetus behind the model change was

21   that the company had repeatedly and intentionally pumped excess

22   inventory into the sales channel in order to meet sales

23   targets.  But they didn't tell investors that that was why they

24   had to change the model.  And that's a very significant

25   misstatement because it's covering up the reason for this big

sea change in the business, and it shows they didn't want
investors to know what had actually been going on, and it also
shows that they wanted to continue it.  That's why they didn't
tell the full truth about what had been the impetus for this
change.

Then, in addition to these categories of misstatements,
they went out and told the market that:  We've lowered our
inventory ranges, and we're now staying within the newly
lowered ranges and the newly lowered ceilings.

This was highly misleading because what they didn't tell
investors was that these so-called lower ranges and ceilings to
which they were referring only included a part of the channel,
and one part of the channel that was often smaller than the
rest of the channel, such that when they told investors "Our
inventory levels are healthy and within our ranges," that
statement was misleading because the ranges to which they were
referring, unbeknownst to the market, excluded huge portions of
the channel, if not the majority of it.

They said --

**THE COURT:**  And what would that be, the huge channel that
it doesn't include?

**MR. RIZIO-HAMILTON:**  That would be Tier 2 and lower.

**THE COURT:**  And who runs Tier 2?

**MR. RIZIO-HAMILTON:**  So there's wholesalers that they sell
to, and then there's -- in Tier 1; and those wholesalers sell

1    through to smaller-level salers in Tier 2; and the

2    smaller-level salers sell through to smaller --

3         **THE COURT:**  So the wholesalers are in charge of Tier 2?

4         **MR. RIZIO-HAMILTON:**  Tier 1.  Tier 1.

5         So the wholesalers -- they're saying, you know:  This is

6    what we are pushing -- you know, we're within our range, our

7    ceiling, and our channel levels -- inventory levels are

8    healthy.

9         What they're not saying is that statement refers only --

10   those levels --

11        **THE COURT:**  What we are doing, and not do what somebody

12   else is doing.

13        **MR. RIZIO-HAMILTON:**  Well, they often offered discounts to

14   Tier 2 to take more inventory as well.  And they would give

15   discounts to Tier 1 so that they could give discounts to

16   Tier 2.  And they would push inventory down in the channel

17   beyond Tier 1 so that they could clear room in Tier 1 to sell

18   additional excess inventory into the channel and still be

19   within this, quote/unquote, range that they were giving the

20   market, without telling the market that the ceiling and the

21   range only encompassed a portion of the channel and a portion

22   that was often smaller than the remainder.

23        **THE COURT:**  And the proof you have of what you just said

24   is what now?

25        **MR. RIZIO-HAMILTON:**  So we have -- we know they did this

1    before the class period.  That, the SEC determined.

2        And we have multiple former employees whose reports are

3    new and are set forth in the complaint -- for instance,

4    Former Employees 2, 3, 4, and 8, among others -- who reported

5    that following the company's purported switch to this

6    demand-driven model, things didn't change.

7        Former Employee 2, for example, stated that the company

8    used these so-called acceleration asks and incentive dollars to

9    incentivize channel partners to take up to four times the level

10   of inventory that their demand actually warranted.  In fact,

11   said Former Employee 2, this was done with major partners like

12   Office Depot and Staples, and to such a degree with Staples

13   that HP actually rented warehouses and trailers to house excess

14   inventory for Staples that Staples had taken on above its

15   demand.

16       Former Employee 3, for example --

17       **THE COURT:**  When did that happen, that warehouse being

18   rented?

19       **MR. RIZIO-HAMILTON:**  So Former Employee 2 spoke about a

20   time period that extended through the summer of 2019, so

21   several months into the class period.  Former Employee 2

22   said -- Former Employee 2 had been at HP for many years, and

23   Former Employee 2 reported that nothing changed after the

24   announcement that they were moving to the Pull Model, and it

25   continued through former employee's tenure into July of 2019.

And our class period begins in February; so these activities were going on during our class period.

Former Employee 3 similarly reported -- and Former Employee 3's tenure in the relevant position ran through the summer of 2017 -- pardon me -- 2017, several months into our class period.  And the same with Former Employee 2, 2017, July, several months into our class period.

Former Employee 3 reported that the process of getting channel partners to take excess inventory was so institutionalized at HP that they had a five-page agreement called "The Quarterly Incentives" that they would put out to all the salespeople.  They would put it out on the first day of the third month of the quarter, so one month before the quarter was going to close; and it would set forth the discounts that the company was offering to get channel partners to take more inventory than they actually wanted.  And it provided that the inventory had to be purchased by the 20th of that third month of the quarter and it had to be taken by the end of that third month of the quarter.

And, you know, I understand that Former Employee 2 gave one example of a Tier 2-level discount that the company offered between 2 and 5 percent.  But Former Employee 3 said that even at that level, it would amount to billions of dollars in discounts because of the size of the company's business.  And Former Employee 3 did not report that the Tier 1 discounts were

1    limited to that level.  So --

2        **THE COURT:**  Former Employee 3, when did he say all this

3    stuff was happening?

4        **MR. RIZIO-HAMILTON:**  Former Employee 3 was talking about

5    the time period between when the company said it was switching

6    and the summer of 2019 -- 2017.  So that period includes

7    several months within our class period, which begins in

8    February of 2017.

9        And Former Employees 4 and 8 further corroborated that

10    these kinds of practices occurred in different regions

11    throughout the world; in the U.K. in the case of Former

12    Employee 4 and in South America in the case of

13    Former Employee 8.

14        And they also reported that these practices occurred

15    deeper into our class period.  Former Employee 8, for instance,

16    reported that they occurred up through the end of his tenure in

17    the first quarter of 2018.

18        And beyond this, beyond these reports of the former

19    employees, other facts demonstrate that this did, in fact,

20    occur; namely, the company's admission in February of 2017 that

21    it had oversold the channel by what it estimated at the time

22    was $100 million.  Turned out to be a lot more.  And the

23    company said at that time that the selling of excess inventory

24    into the channel had occurred in multiple prior quarters.

25        So we know from Former Employees 2 and 3 that this was

occurring between February and the summer of 2017 and the
beginning of our class period.  We know from Former Employees 4
and 8 that it continued in 2018.  And we know from the
company's own admissions that it continued throughout 2018 up
until the time that they were forced to disclose the excess
inventory buildup in February of 2019.

And, you know, analysts took note of this.  You know, I
respectfully disagree with my colleague.  Analysts specifically
stated -- and we cite this at paragraph 244 of our complaint,
among other places -- that the company's growth, what appeared
to be growth in 2018 was "inventory fueled," in the words of
the analysts.  It wasn't real.  It was because the company had
oversold inventory in the channel when it was telling investors
in a variety of ways that it was no longer going to do that.
And it was doing it at a time when the company's senior
executives knew that the company had engaged in this before,
said that the company was no longer overselling inventory, and
said that they were personally monitoring the situation.

Now, as to the scienter theory, you know, it rests on a
lot more than my colleague said.  First of all, we know from
the SEC's cease and desist order and the testimony that we
obtained that the company's most senior executives learned of
the excess inventory selling to meet revenue targets by no
later than the first quarter of 2016, which predates our class
period.  So we know they came into the class period with

1  knowledge that this had been occurring.

2      This conduct continued during the class period, despite

3  the fact that they said it wasn't.  That is compelling evidence

4  of scienter.  We know that they knew about it before, and yet

5  it continued, despite their statements to the contrary.

6      Not only did it continue during the class period, it

7  continued while the SEC was investigating the company for it.

8      Not only did it continue while the SEC was investigating

9  the company for it, but they continued to make the same kinds

10  of statements the SEC found misleading in September of 2020.

11  For instance, the SEC found misleading the statement that the

12  company was operating within its channel inventory ranges

13  because, as we allege now, the company didn't disclose that

14  those channel inventory ranges were materially incomplete and

15  actually did not give investors any true sense of what the

16  channel inventory level and health was.

17      And, finally, it is very true that the defendants stated

18  that they closely monitored channel inventory levels, and we

19  respectfully submit that that is additional support for the

20  scienter inference here.

21      We know from the SEC testimony that Defendant Lesjak's

22  finance team was responsible for setting the inventory ranges.

23  Defendant Lesjak received channel inventory reports.  And the

24  company generated a weekly channel inventory package.

25      Defendant Lores told investors coming into the class

1    period:  It will be critical, as it is today, for me to hold

2    the sales teams acceptable to remain within the ranges going

3    forward.

4         And the company stated -- and this is at paragraph 111 of

5    our complaint -- going into the class period, pricing and

6    promotional decisions will be managed centrally at the global

7    and regional level.

8         So the fact that the company knew this was happening

9    before the class period; made a series of statements to

10   investors representing that it was no longer occurring when it,

11   in fact, continued; and continued to make statements of the

12   sort that the SEC found misleading during our class period, all

13   the while ensuring investors that they were closely monitoring

14   these issues, and all the while they concealed from the market

15   the reasons for this purportedly critical model change, which

16   allowed them to continue it.

17        All of that, taken together, absolutely supports an

18   inference of scienter, particularly when viewed within the

19   context of how critical this business was to the company.  It

20   was essentially all the company's revenue and profit.  The

21   notion that the defendants had no idea this was going on is not

22   plausible, and it certainly isn't the most plausible inference

23   based on the totality of these facts.

24        **MR. LUTZ:**  Your Honor, may I respond to that?

25        **THE COURT:**  You may.

1          **MR. LUTZ:**   Thank you.

2          There was a lot there to go through.   That was -- let me

3    address a number of the points that were raised.

4          My colleague started by saying that we made misstatements

5    when describing the impetus for the change from the Push to the

6    Pull Model.   That was in June of 2016.   This is an argument

7    that I scratch my head at every time I hear it.   (A) it's

8    before the class period; but (b) if you look at the

9    transcripts, we say specifically in there that there was -- one

10   of the reasons for the change was that it was no longer -- that

11   we had too many discounts; that we didn't think that it was

12   efficient anymore because the discounts weren't paying off, and

13   we wanted to lower the amount of inventory in the market.   And

14   so we were lowering our inventory and trying to obtain price

15   stability, eliminate gray marketing.   Exactly their theory.

16         So that one just makes no sense to me.   It's right on the

17   page.   If you read page 2 of that transcript, it says it

18   explicitly why we were making the change.

19         Discounts.   There's a lot about discounts.   Their theory

20   in many ways is about aggressive discounting that they say

21   occurred before the class period and then continued to occur

22   during the class period here.

23         The fundamental point that they ignore, among others, is

24   what we said when we were making the shift from the Push to the

25   Pull.   We did not say -- HP did not say:   We are going to

1    eliminate discounts.  They said:  We are going to lower the

2    amount of discounting that we are going to do under the

3    Pull Model.  It was explicit in that June transcript,

4    June 2016.

5          Mr. Lores -- I'm sorry.  Mr. Weisler said it specifically,

6    and we've quoted them in our papers to you.  He said:  I

7    wouldn't say we're going to do no promotions.  He said:  We'll

8    have less promotions.

9          Ms. Lesjak said:  In total, we will have lower discounts

10   under the new model.

11         HP specifically said they were going to continue to do

12   discounts, albeit at a lower level than had been the case under

13   the Push Model.

14         The notion that some confidential witnesses say that they

15   were aware of discounting, that they knew discounting was

16   happening, that they sometimes did discounts is unremarkable.

17   We said discounting would continue.

18         The other thing, you asked Mr. Rizio-Hamilton:  When did

19   Confidential Witness 3 say that happened?  When did

20   Confidential -- when did the Staples thing happened?

21         He didn't answer your question, and the reason he didn't

22   answer your question is because they don't allege that in the

23   complaint.  The confidential witnesses do not provide specific

24   factual allegations demonstrating when the discounting that

25   they say occurred happened, whether it was in the prior period

1    or whether -- you know, when we -- when the SEC alleged that

2    there were higher levels of discounting, or during the class

3    period of this case when HP said discounting would continue,

4    just at a lower rate.

5         The other thing, you have to pay attention to what we say.

6    Like Ms. Lesjak:  In total, across the supplies business,

7    discounts will be lower.

8         Just because some -- even if you ignore the fact that the

9    plaintiffs have not provided specific factual allegations

10   demonstrating that discounting happened during the class

11   period, even if you ignore that and you just assume it all

12   happened during the class period, which is not a reasonable

13   assumption, if you make that assumption, where is the

14   allegation that, overall, the level of discounting at HP during

15   the class period was at the same level as it was before?  It

16   does not exist.

17        It doesn't matter that one or two or ten witnesses, which

18   they don't have, said:  Yeah, I was aware of discounting.  That

19   does not -- that is not a specific factual allegation

20   demonstrating that the same level of discounting or a higher

21   level of discounting occurred during the class period.

22        That's why when you read their brief, if you read it

23   closely -- and I've read it, obviously, about ten times in the

24   last week.  How many times do they say a material amount of

25   discounting?  They were pushing a material amount of inventory?

That's made-up words.  Right?  They don't have factual

allegations to support that.  They can't tie that back to a

specific factual allegation.  They can't allege that the same

level of discounting that occurred under the Push Model, before

the class period, occurred during the Pull Model.  In other

words, they can't allege that when Ms. Lesjak and Mr. Weisler

said, "Yeah, we're going to still do discounting; it's just

going to be lower," that that was false.  There's no factual

allegation to support that.

On the SEC issue -- and, again, this one, I scratch my

head over too.  The SEC settlement was a $6 million settlement

covering a time period that is irrelevant to this case,

happening in the 2015 and early 2016 time frame.  The --

you know, obviously, it can't impact the statements in this

case because it impacted -- it didn't cover the time period of

this case.  So there's no falsity allegation based on the SEC

settlement.

And as to scienter, Your Honor, if anything, this

settlement undercuts an inference of scienter here.  The

settlement -- the SEC didn't allege in the settlement that

anyone acted with scienter.  They didn't charge any individuals

at HP.  They didn't even mention any of the individual

defendants in this case.  And they -- the settlement says that

the discounting and gray marketing activity that occurred in

that earlier period happened without the knowledge of the

1  senior officers of HP.  That does not support any inference of

2  scienter.

3      And my colleague says:  Well, this investigation was

4  happening during the class period of this case.

5      And to me, I hear that and I say:  Is it really a

6  reasonable inference that during an entire class period,

7  two years, while the company is under investigation by the SEC,

8  that they're going to lie quarter after quarter about the

9  business model of the supplies business; that they're going to

10  continue to engage in conduct that is under investigation; that

11  they're going to shove -- you know, do massive discounts in

12  gray marketing and just hope the SEC doesn't realize it?  I

13  mean, it's preposterous.  Right?  It is not a reasonable

14  inference.

15      The strong inference goes the other way; that of course

16  the company is not going to do that.  This is a sophisticated,

17  large company who understands what an SEC investigation is.

18      Your Honor, the other thing, I just have to say, the

19  premise of the complaint -- right? -- is that all this stuff

20  was still going on, even though there's no real factual

21  allegations to support that:  gray marketing, steep

22  discounting.  And their theory in large part is:  Well, the

23  defendants knew about it and they covered it up.  They had to

24  have known about it.

25      I would direct your attention to paragraph 453, which when

I read the complaint, over and over I kept on coming back to
it.  This is their theory, and it's summed up in one sentence
that has no factual support.  They go through the whole thing.
It's just terrible things here.

        "Defendants also knew or recklessly disregarded
      the fact that HP continued to engage in these sales
      practices after June 2016 and during the class
      period."

    I mean, come on.  You have to have detailed factual
support for that.  You have to have confidential witnesses who
say:  I talked to them.  I told them this was bad, this was
happening, and they knew that their statements were false.  I
provided reports to them about the Four Box Model, showing that
it was flawed, or the steep discounting or gray marketing,
something; and they knew that that was happening at a level
similar to what had happened in the prior period.  And they
went out and knew that their statements -- they had to have
known their statements were false and they said it anyway.
Your Honor, that is completely lacking from the complaint.
Okay?

    At the end of the day, with scienter you have to,
obviously, weigh all the inferences that the plaintiffs ask you
to take, and you have to weigh the competing inferences here.
I would say that the competing inferences are very powerful
here.  I would say the most plausible inferences that you can

1   draw from the complaint is not an inference of scienter.   It

2   doesn't make sense, as a matter of basic common sense to me,

3   that HP senior officers would announce with fanfare in June of

4   2016 a fundamentally new business strategy for the company;

5   that they would then report quarter after quarter, year

6   after year on the progress of the company under that strategy;

7   but that secretly for two straight years that they knew all

8   along that the company had never even adopted that strategy.

9   That just doesn't make sense to me.

10       The most plausible inference, I believe, fairly read from

11   the allegations in the complaint is that the Pull Model

12   actually existed; that defendants believed that the Pull

13   strategy, the Pull Model was working, a belief that was

14   reinforced by two years of accurate predictions and increased

15   revenue from -- drawn from the Four Box Model; that defendants

16   reporting under the model of lower inventory ceilings, better

17   pricing, less gray marketing activity, and lower discounting

18   was accurate; and that the individual defendants were genuinely

19   surprised when in February of 2019 it turned out that the

20   Four Box Model had flawed data and was not reliable.   That is a

21   very plausible, highly plausible, much more plausible inference

22   than the counter inference that the plaintiffs ask you to draw.

23       I'll stop there.   I'd like to address loss causation, if

24   you want to hear about it; but I've been going on for such a

25   long time, I'll stop.

1          **THE COURT:**  Okay.  Thank you.

2          I wanted to ask you both.  As far as I know, I don't have

3     a copy of the SEC order.

4          **MR. LUTZ:**  Oh, it's in the submission.  I have it here.

5          **MR. RIZIO-HAMILTON:**  I believe it's Exhibit A, at

6     Document 89-1.  So it's Exhibit A to the amended complaint.

7          **THE COURT:**  Oh, okay.

8          **MR. RIZIO-HAMILTON:**  It's on the docket at 89-1.

9          Your Honor, may I briefly respond?

10         **THE COURT:**  Yes.

11         **MR. RIZIO-HAMILTON:**  Thank you.

12         So my colleague mentioned that we were required to allege

13    that the discounting occurred to the same level as it had

14    before, prior to the purported switch to the Pull Model.

15         That's a red herring.  We don't have to allege that it

16    existed to the exact same level.  All we have to do is allege

17    that it continued to a material degree.

18         And that, we do, based not only on the reports of the

19    former employees in the complaint but, in particular, based

20    upon the company's own admission -- admissions, I should say,

21    beginning in February of 2019, that they had oversold the

22    channel again by what they estimated in February was

23    $100 million, admitted in August was more than a hundred

24    million dollars, and then in November confirmed was more than a

25    hundred million dollars, without disclosing the full amount,

1   and confirmed that it was greater than they had initially

2   stated.

3        In addition, we see that the very large oversell of the

4   channel that occurred throughout our class period caused the

5   company to see a revenue decline of approximately

6   $650 million year over year, the end of our class period, and

7   then ultimately abandoned the business model entirely.

8        So the key question is not whether it existed to the same

9   level that it did before.  It's whether it continued to a

10  material degree.  And for all those reasons, we adequately

11  allege that it did.

12       Second, my colleague mentioned that the SEC settlement

13  said that this happened without the knowledge of the senior

14  officers of the company.  What the SEC cease and desist order

15  says -- and Your Honor can obviously read it for yourself --

16  which is confirmed by the testimony that we obtained, is that

17  while prior to the first quarter of 2016, the company's senior

18  officers lacked knowledge of these practices, as of the first

19  quarter of 2016 and certainly no later than June of 2016, those

20  senior officers did know that this was occurring.  So that's

21  point two.  They came into the class period with that

22  knowledge.

23       Point three, my colleague mentioned that the existence of

24  the SEC settlement undercut scienter because it is necessarily

25  implausible to believe that one would go about and continue

1    practices while under investigation by the SEC.

2         I respectfully disagree.  Why would they do that?  They

3    would do that because they had no choice.  The business was

4    dying.  They had to push massive amounts of excess inventory

5    into the channel, just -- before the class period, just to make

6    it look like it was doing well.

7         After they took a $450 million hit and cleared out the

8    channel, the only way for them to continue to show some level

9    of stability and growth that they had to, in the eyes of the

10   market, was to continue to sell excess into the channel.  Maybe

11   they didn't do it to the exact same degree, but they kept it up

12   because they had no other choice.  This was confirmed at the

13   end of the class period when they abandoned the business model

14   entirely.

15        You know, the only way that this company could purport to

16   show stability and growth to the market in 2017 and 2018 was to

17   oversell the channel and try and buy time.  That's why they

18   kept doing it.

19        **THE COURT:**  That's a pretty big leap.

20        **MR. RIZIO-HAMILTON:**  I respectfully disagree.  I think

21   it's supported by what the confidential witnesses say.  It's

22   supported by what ultimately occurred.

23        In February of 2019, the company disclosed that they had,

24   again, done this to a very significant degree.  And that was

25   why, as analysts concluded, the company purported, appeared to

```
 1   stabilize in 2017 and grow in 2018, because that was inventory,
 2   if you will.
 3       That's the way this company made its numbers.  That's the
 4   way it had to make its numbers because the business is not a
 5   great one, frankly.  You know, when you sell printers at a loss
 6   and try and make that loss up on supplies, you get cannibalized
 7   by other companies that make the supplies only and do it for
 8   less than you.
 9       And in the face of that, the only way that the company
10   could report the earnings that the market wanted to see and
11   show stability and growth was to oversell the channel.  They
12   did it before the class period, as admitted.  They did it
13   during the class period, as they disclosed in February of 2019.
14   It might not have been at the exact same level as they did
15   before, but it was still to a material degree.
16       MR. LUTZ:  Your Honor --
17       THE COURT:  All right.  Thank you.
18       MR. LUTZ:  I'm sorry.  Go ahead.
19       THE COURT:  Well, I was going to say, if anybody wants to
20   wrap up shortly, he may do so.
21       And, Mr. Schatz, if you want to say something, you may do
22   so also.
23       MR. SCHATZ:  Your Honor, I'll be very brief.
24       I'm reticent to say anything in light of Mr. Lutz's
25   persuasive comments, but I will point out that Ms. Lesjak is --
```

1    provides an even stronger argument for dismissal.

2         She stepped down as CFO in June 2018.  That's nine months

3    before the announcement and 15 months before the end of the

4    class period.

5         As Your Honor's prior order pointed out, those forecasts

6    were correct; and even to this day, the plaintiffs have not

7    come up with any facts that support that, during that time

8    frame, that which she said was incorrect.

9         This is no different than the prototypical

10   fraud-by-hindsight case; that the company learned after her

11   departure that there were issues with respect to certain

12   matters.  They said the market had changed.  There was more of

13   an emphasis on buying online and more sales to sellers that

14   were undercutting sales.  But that's -- so the company did

15   exactly what it should have done, which was to disclose it.

16   But there's nothing to suggest that during her class period,

17   her statements were incorrect.

18        And I just want to address one or two specific points.

19        The only former employee who even references Ms. Lesjak is

20   Former Employee Number 5, and they -- and the key paragraphs

21   there are 476 and 483.  And they say that she received -- he

22   says or she says that she received a report with respect to the

23   Four Box Model.

24        Putting aside that there's no reference to what the

25   content was, Your Honor, I'd like you to read 483, because in

 1   483 the plaintiffs state the basis for FE 5's comments, and
 2   it's either his boss's boss or his boss's boss's boss told him.
 3   Your Honor, we have read that paragraph multiple times.  We
 4   can't decide how many intervening bosses there are in between.
 5       But then I want you to also read page 8 of their
 6   opposition.  And it says that Former Employee Number 5
 7   recalled -- "recalled" -- that Ms. Lesjak got a report.
 8   "Recalled" normally suggests some direct knowledge; not two,
 9   three, four levels away.  So I just want to put an end to any
10   reference with respect to that.
11       And, Your Honor, with respect to the SEC order, I know I
12   speak for all the defendants that it's exculpatory.
13   Mr. Rizio-Hamilton eschewed mentioning that the SEC found that
14   information had not percolated up to senior management.  And as
15   Mr. Lutz eloquently pointed out, it would be implausible,
16   perhaps insane, for the senior management to countenance that
17   during the pendency of the investigation.
18       One last comment about the SEC testimony.  These are
19   sophisticated lawyers.  They know how to -- if they had wanted
20   to put in the transcript, you would have thought they might
21   have mentioned the time, the context, or even a page cite.
22   They chose not to.  What they tried to do is just sort of let a
23   little bit of unpleasant air into the atmosphere.  We think
24   it's not worth the page cites that they omit.
25       So, briefly, I think the entire case should be dismissed;

1  but Ms. Lesjak, who departed long before, should certainly be

2  dismissed.

3       **THE COURT:**  All right.  Thank you.

4       **MR. LUTZ:**  May I just have one minute to conclude, if I

5  may?

6       **THE COURT:**  Okay.

7       **MR. LUTZ:**  Yeah.  Just responding to Mr. Rizio-Hamilton's

8  last comment about "All they need to show is that, quote,

9  discounting continued to a material degree," I mean, that's a

10  made-up standard.  They haven't even pled it.  And it doesn't

11  make any sense in light of the fact of what we said as we were

12  going into the shift from the Push to the Pull, which is:

13  Discounting would continue, just at a lower rate than it had

14  before.

15      I won't go over loss causation because I know our time is

16  short.  I'll rest on the papers.

17      I would just direct Your Honor to the recent *Uber* case.

18  There, like here, there were multiple statements.  I think

19  60 there and there were 75 here.

20      The plaintiffs have the obligation, when they have a

21  corrective disclosure theory, which is indisputable here, to

22  actually plead facts demonstrating that the revelation of new

23  information corrected some prior misstatement.

24      They have an impossible task when they have 75 alleged

25  misstatements.  Just like in *Uber*, they can't do it here.  They

1  haven't even tried to do it.

2      And the reason they haven't tried to do it is because of

3  what was revealed in February, which was flaws in the

4  Four Box Model.  They can't plead facts and they haven't

5  clearly pled facts at all in the complaint demonstrating how

6  that new information corrected any of the alleged misstatements

7  about the Pull Model and discounting and the like.  It just --

8  it doesn't make sense from a commonsense perspective, and it

9  certainly doesn't -- they haven't pled it under a corrective

10  disclosure theory consistent with the case law of the

11  Ninth Circuit.

12      I'll pause there.  But thank you, Your Honor, for taking

13  the time.

14      **THE COURT:**  All right.  Thank you.

15      Mr. Rizio-Hamilton?

16      **MR. RIZIO-HAMILTON:**  Thank you so much, Your Honor.

17      And, by the way, thank you so much for all the time that

18  you've given us today and on the prior motion.  I really

19  appreciate your consideration.

20      I would like to just touch briefly on loss causation

21  because it was just mentioned.  We do actually plead proximate

22  causation at paragraphs 525 and 526 of the complaint.

23      But setting that aside, we also plead facts that reveal

24  facts on the corrective disclosure dates that are the relevant

25  truth for our purposes.

1          For the February disclosure, for instance, it's not only

2     the lack of statistically significant telemetry data for the

3     Four Box Model, but it's also the fact that they had oversold

4     the channel by what they then estimated was $100 million and

5     that they lacked visibility into Tier 2 and beyond.

6          For August, for example, it's that they had actually

7     oversold the channel by more than $100 million, but they

8     weren't saying how much more.

9          And so those are new facts revealed to the market that

10    represented materializations of the concealed risks and

11    contradicted the prior statements that they had made.  And so

12    that would suffice to plead loss causation, even if we hadn't

13    pled proximate cause, which, as I mentioned, we do.

14         And the only thing I'll say about *Uber* very briefly is

15    that *Uber* has nothing to do with this case.  *Uber* is not even a

16    10(d) case.  It's a state law cause of action.  It involved

17    privately traded securities, not publicly traded securities.

18    It didn't even involve stock prices declines.  It just involved

19    a series of markdowns on these privately held securities that

20    were taken by banks, not a market.

21         And finally, the reason the loss causation theory failed

22    in *Uber* is because the plaintiff failed to adequately allege

23    that the disclosures actually precipitated the markdowns.

24         Here, by contrast, we connect the disclosures on the three

25    corrective disclosure dates with the stock price declines that

1  they directly triggered.  That was completely absent in *Uber*,

2  and that's why the case failed on that ground and it has no

3  bearing here.

4      Again, thank you very much for your time and

5  consideration.  It's greatly appreciated.

6      **THE COURT:**  You're most welcome.

7      Thank you, all.  This has been very helpful.  And we will

8  get a response to you shortly.

9      So the matter will be submitted at this time.  Thank you.

10      **MR. RIZIO-HAMILTON:**  Thank you.

11      **MR. LUTZ:**  Your Honor, may I ask one question, not about

12  this?

13      **THE COURT:**  Sure.

14      **MR. LUTZ:**  We have on the calendar right now, I believe, a

15  case management conference next Friday, I believe.  And

16  I believe if that's going to stick, we're going to have to

17  submit a submission tomorrow.

18      **THE COURT:**  Tomorrow.

19      Esther, can we kick that out a little bit?

20      **THE CLERK:**  How far out would you like to kick it?

21      **THE COURT:**  Well, I'd say maybe a month.

22      **THE CLERK:**  October 29th?

23      **THE COURT:**  Is that date convenient for folks?

24      **MR. LUTZ:**  That's fine for me.

25      **MR. RIZIO-HAMILTON:**  Just checking, Your Honor.  I'm sure

1    it's fine.

2          Yes, that would be wonderful.  Thank you.

3          **THE COURT:**  Okay.  Thank you.

4          We'll move that out to the 29th; so your statement won't

5    be due until the 22nd.  I should definitely have you an order

6    by then.  If for some reason I don't, contact Esther, and we'll

7    move this again.  But I don't think we'll need to do that.

8          All right.  Thank you, all.

9          **MR. LUTZ:**  Thank you, Your Honor.

10          **MR. RIZIO-HAMILTON:**  Thank you, Your Honor.

11          **MR. SCHATZ:**  Thank you.

12          **THE CLERK:**  That concludes our civil law and motion

13    calendar for today.

14                    (Proceedings adjourned at 12:12 p.m.)

15                              ---o0o---

16

17

18

19

20

21

22

23

24

25

1

2                    **CERTIFICATE OF REPORTER**

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Friday, September 17, 2021

7                     _Ana Dub_
     _____
8

9        Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
                 Official United States Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25