**KESSLER TOPAZ MELTZER**
    **& CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
(jjoost@ktmc.com)
Stacey M. Kaplan (Bar No. 241989)
(skaplan@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA  94104
Telephone: (415) 400-3000

**BERNSTEIN LITOWITZ BERGER**
    **& GROSSMANN LLP**
John J. Rizio-Hamilton (admitted *pro hac vice*)
(johnr@blbglaw.com)
Jeremy P. Robinson (admitted *pro hac vice*)
(jeremy@blbglaw.com)
1251 Avenue of the Americas
New York, NY  10020
Telephone: (215) 554-1400

*Lead Counsel for Lead Plaintiffs and
the Settlement Class*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE HP INC. SECURITIES LITIGATION | Case No. 3:20-cv-01260-SI |
| | <u>CLASS ACTION</u> |
| | **JOINT DECLARATION OF JENNIFER L. JOOST AND JEREMY P. ROBINSON IN SUPPORT OF (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES** |
| | Judge:   Hon. Susan Illston |
| | Date:    July 28, 2023 |
| | Time:    10:00 a.m. |

JOINT DECL. ISO MOTIONS FOR FINAL
APPROVAL OF SETTLEMENT AND
ATTORNEYS' FEES AND EXPENSES

Case No. 3:20-cv-01260-SI

# TABLE OF CONTENTS

                                                                                                    **Page**

TABLE OF EXHIBITS .................................................................................................................. iii

I.      INTRODUCTION ................................................................................................................1

II.     HISTORY OF THE ACTION .............................................................................................4

        A.      The Commencement of the Action and the Appointment of Lead Plaintiffs
                and Lead Counsel.....................................................................................................4

        B.      The Investigation and Filing of the Complaint .......................................................4

        C.      Defendants' First Motion to Dismiss ......................................................................6

        D.      The Investigation and Filing of the Amended Complaint .......................................9

        E.      Defendants' Second Motion to Dismiss ................................................................11

        F.      Lead Plaintiffs' Appeal to the Ninth Circuit.........................................................14

        G.      The Parties' Mediation Efforts and the Settlement of the Action..........................14

        H.      The Court Grants Preliminary Approval of the Settlement ...................................16

III.    RISKS OF CONTINUED LITIGATION............................................................................16

        A.      Risks of the Pending Appeal..................................................................................16

        B.      Risks Concerning Liability ....................................................................................18

                1.      Falsity..........................................................................................................18

                2.      Scienter .......................................................................................................20

        C.      Risks Related to Loss Causation and Damages .....................................................21

        D.      The Settlement Amount Compared to the Likely Maximum Damages that
                Could Be Proved at Trial .......................................................................................23

IV.     LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY
        APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE.......................................24

V.      ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ....................................26

VI.     THE FEE AND EXPENSE APPLICATION ....................................................................29

        A.      The Fee Application...............................................................................................29

                1.      Lead Plaintiffs Have Authorized and Support the Fee Application .........30

                2.      The Work Performed by Lead Counsel .......................................................31

3.      The Experience and Standing of Lead Counsel ........................................ 32

4.      The Standing and Caliber of Defendants' Counsel .................................. 33

5.      The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases ................................. 33

6.      The Reaction of the Settlement Class to the Fee Application .................. 34

B.      The Expense Application ......................................................................................... 34

VII.    CONCLUSION .................................................................................................................. 36

**TABLE OF EXHIBITS**

| | |
|---|---|
| **Exhibit 1** | Declaration of Jed D. Melnick in Support of Final Approval of Settlement |
| **Exhibit 2** | Declaration of Eileen Cheng, General Counsel for the State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses |
| **Exhibit 3** | Declaration of Brendan Tormey, Fund Director of Iron Workers Local 580 Joint Funds, in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses |
| **Exhibit 4** | Declaration of Jack Ewashko Regarding (A) Dissemination of Postcard Notice and Notice Packet; (B) Publication of Summary Notice; (C) Establishment of Telephone Helpline and Settlement Website; and (D) Report on Requests for Exclusion Received to Date |
| **Exhibit 5** | Summary of Lead Counsel's Lodestar and Expenses |
| **Exhibit 5A** | Declaration of Jennifer L. Joost on Behalf of Kessler Topaz Meltzer & Check, LLP in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses |
| **Exhibit 5B** | Declaration of Jeremy P. Robinson on Behalf of Bernstein Litowitz Berger & Grossmann LLP in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses |
| **Exhibit 6** | Breakdown of Lead Counsel's Hours by Task Category |
| **Exhibit 7** | Breakdown of Lead Counsel's Expenses by Category |

JENNIFER L. JOOST and JEREMY P. ROBINSON, declare as follows:

1.    I, Jennifer L. Joost, am a partner in the law firm Kessler Topaz Meltzer & Check, LLP ("KTMC"), counsel for Lead Plaintiff the State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island ("Rhode Island"), and co-Lead Counsel for the proposed Settlement Class in the above-captioned action ("Action").

2.    I, Jeremy P. Robinson, am a partner in the law firm Bernstein Litowitz Berger & Grossmann LLP ("BLB&G" and, together with KTMC, "Lead Counsel"), counsel for Lead Plaintiff Iron Workers Local 580 Joint Funds ("Iron Workers" and, together with Rhode Island, "Lead Plaintiffs"), and co-Lead Counsel for the proposed Settlement Class in the Action.

3.    We submit this Joint Declaration in support of Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation ("Settlement Motion") and Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Fee and Expense Motion"). The following statements are based on our personal knowledge based on our direct involvement in this litigation and information provided by other Lead Counsel attorneys working under our supervision, and if called on to do so, we could and would testify competently thereto.[1]

## I.    INTRODUCTION

4.    The proposed Settlement before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $10,500,000 for the benefit of the Settlement Class. As detailed herein, the Settlement provides a significant benefit to the Settlement Class by conferring a substantial, certain, and near-term recovery, while avoiding the significant risks of continued litigation, including the risk that the Settlement Class could recover nothing or less than the Settlement Amount. This risk was particularly acute here, where this Action was dismissed

---

[1] All capitalized terms that are not otherwise defined herein shall have the meanings provided in the Stipulation and Agreement of Settlement dated March 2, 2023 (ECF No. 118-1) ("Stipulation"), which was entered into by and among (i) Lead Plaintiffs, on behalf of themselves and the Settlement Class, and (ii) HP Inc. ("HP" or the "Company") and Dion J. Weisler, Catherine A. Lesjak, Steven J. Fieler, and Enrique Lores (collectively, "Individual Defendants" and, together with HP, "Defendants").

JOINT DECL. ISO MOTIONS FOR FINAL                                    Case No. 3:20-cv-01260-SI
APPROVAL OF SETTLEMENT AND
ATTORNEYS' FEES AND EXPENSES

twice at the pleading stage and was on appeal before the Ninth Circuit at the time the Settlement was reached.

5.    The proposed Settlement is the result of extensive efforts by Lead Plaintiffs and Lead Counsel, which included, among other things: (i) conducting an extensive investigation into the alleged fraud, including interviews with dozens of former employees of HP and a thorough review of public information such as filings with the U.S. Securities and Exchange Commission ("SEC"), analyst reports, conference call transcripts, news articles, and price and volume data for HP common stock; (ii) drafting an initial complaint and the detailed Complaint based on Lead Counsel's extensive investigation, and—following the dismissal of the Complaint—the detailed Amended Complaint, based on additional investigation and the receipt of seven deposition transcripts from the SEC in response to a successful Freedom of Information Act ("FOIA") request; (iii) opposing two rounds of Defendants' extensive motion to dismiss through briefing and oral argument; (iv) fully briefing an appeal from the Court's dismissal of Lead Plaintiffs' Amended Complaint in the Ninth Circuit; and (v) engaging in extended arm's-length settlement negotiations with the assistance of Jed D. Melnick of JAMS, an experienced mediator. Due to these efforts (and others), Lead Plaintiffs and Lead Counsel were well-informed of the strengths and weaknesses of the claims against Defendants at the time they achieved the proposed Settlement, and believe that the Settlement is in the best interests of the Settlement Class.

6.    The $10.5 million Settlement is based on a mediator's recommendation made by Mr. Melnick following extensive arm's-length negotiations between the Parties, which he facilitated and supervised. Mr. Melnick has submitted a declaration describing the Parties' mediation process (attached hereto as Exhibit 1). Mr. Melnick states in his declaration that he believes the Settlement "represents a recovery and outcome that is in [his] view fair, reasonable, and adequate to the members of the Settlement Class" based on his "involvement in the negotiations, review, and analysis of the Parties' mediation submissions, communications with the Parties, and assessment of the risks inherent in this litigation," and that the "mediation process involved significant disputed issues and featured involved arm's-length negotiations at all times." Melnick Decl., ¶ 10.

JOINT DECL. ISO MOTIONS FOR FINAL      2      Case No. 3:20-cv-01260-SI
APPROVAL OF SETTLEMENT AND
ATTORNEYS' FEES AND EXPENSES

7.    In addition, Lead Plaintiffs Rhode Island and Iron Workers are both sophisticated institutional investors that actively participated in the Action and closely supervised the work of Lead Counsel, and they strongly endorse approval of the Settlement. *See* Declaration of Eileen Cheng, General Counsel for Rhode Island, attached hereto as Exhibit 2 ("Cheng Decl."), ¶¶ 3-6; Declaration of Brendan Tormey, Fund Director of Iron Workers, attached hereto as Exhibit 3 ("Tormey Decl."), ¶¶ 3-6.

8.    As discussed in further detail below, the proposed Plan of Allocation, which was developed with the assistance of Lead Plaintiffs' damages expert, provides for the equitable distribution of the Net Settlement Fund to Settlement Class Members who submit Claims that are approved for payment by the Court on a *pro rata* basis fairly based on losses attributable to the alleged fraud.

9.    Lead Counsel worked diligently and efficiently to achieve the proposed Settlement in the face of significant risks. Lead Counsel prosecuted this Action on a fully contingent basis and advanced all litigation-related expenses, and thus exclusively bore the risk of an unfavorable result. For their efforts in achieving the Settlement, Lead Counsel, on behalf of Plaintiffs' Counsel, request attorneys' fees in the amount of 18% of the Settlement Fund, and payment of the litigation expenses that Lead Counsel incurred in connection with the institution, prosecution, and settlement of the Action. As discussed in the Fee and Expense Motion, the requested fee is well below the 25% benchmark for percentage fee awards in the Ninth Circuit and is below the range of percentage fees that courts within this Circuit typically award for similarly sized settlements. Moreover, the fee request—which is made pursuant to the more restrictive of two retention agreements entered into between Lead Plaintiffs and Lead Counsel at the outset of the Action—will result in a fee that is ***less than one half*** of Lead Counsel's total lodestar, resulting in a negative lodestar multiplier of approximately 0.35.  As such, the requested fee will result in an award of just 35% of the nearly 9,000 hours that Lead Counsel devoted to litigating this case—or a 65% discount on Lead Counsel's time at their current hourly rates. Lead Counsel respectfully submit that the requested fee of 18% of the Settlement Fund is fair and reasonable in light of the efforts of Lead Counsel, the result achieved in the Action, and the risks and complexity of the litigation. Lead Counsel also respectfully

submit that the expenses they incurred in litigating this Action for nearly three years—$135,598.87—were expended for the benefit of the Settlement Class and warrant approval.

## II.    HISTORY OF THE ACTION

### A.    The Commencement of the Action and the Appointment of Lead Plaintiffs and Lead Counsel

10.    On February 19, 2020, Lead Counsel filed a putative securities class action complaint in the Court, styled *Electrical Workers Pension Fund, Local 103, I.B.E.W. v. HP Inc., et al.*, Case No. 3:20-cv-01260-SI, on behalf of purchasers of HP common stock from February 23, 2017 through October 3, 2019, inclusive ("Class Period"). ECF No. 1.

11.    In accordance with the PSLRA, Lead Counsel caused a notice to be published in a national newswire service on February 19, 2020, advising potential class members of the pendency of the action, the claims asserted, and the deadline by which putative class members could move the Court for appointment as lead plaintiff.

12.    Rhode Island and Iron Workers moved for appointment as lead plaintiffs on April 20, 2020. ECF No. 8. No other class member filed a motion for appointment as lead plaintiff.

13.    On May 20, 2020, the Court entered an Order which appointed Rhode Island and Iron Workers as Lead Plaintiffs for the Action, and approved Lead Plaintiffs' selection of KTMC and BLB&G as Lead Counsel. ECF No. 33. By the same Order, the Court ordered that the Action be captioned "*In re HP Inc. Securities Litigation*" and the file maintained under No. 3:20-cv-01260-SI.

### B.    The Investigation and Filing of the Complaint

14.    Beginning prior to the Court's appointment of Lead Plaintiffs and continuing through the preparation of the Complaint for Violations of the Federal Securities Laws (ECF No. 35) ("Complaint") on behalf of Lead Plaintiffs, Lead Counsel undertook an extensive investigation into the alleged fraud and potential claims that could be asserted in the Action. This investigation included a detailed review and analysis of: (a) HP's public filings with the SEC; (b) research reports from securities and financial analysts; (c) transcripts of HP's conference calls with analysts and investors; (d) Company presentations, press releases, and reports; (e) news and

media reports concerning HP and other facts related to the Action; and (f) price and volume data for HP common stock. In preparing the Complaint, Lead Counsel also consulted with an expert in financial economics concerning issues of loss causation.

15. In addition, in connection with their investigation, Lead Counsel and their in-house investigators conducted an extensive public records search to locate former employees of HP and industry participants who might have relevant information pertaining to the claims asserted in the Action. These efforts included contacting or attempting to contact over 350 former HP employees or other potential witnesses who were believed to have potentially relevant information. Lead Counsel and/or their in-house investigators interviewed over 175 of these individuals and ultimately included detailed information received from one former HP employee in the Complaint.

16. On July 20, 2020, Lead Plaintiffs filed the Complaint based on this investigation. The detailed, 137-page Complaint asserted claims against all Defendants[2] under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder; against the Individual Defendants under Section 20(a) of the Exchange Act; and against Defendants Weisler and Lores under Section 20A of the Exchange Act. Lead Plaintiffs alleged that from February 23, 2017 through October 3, 2019, inclusive, Defendants made materially false and misleading statements and omissions to investors concerning HP's printing supplies business, the reliability of its "Four Box Model,"[3] and HP's purported stabilization of printing supplies revenue and growth in market share during the Class Period. The Complaint further alleged that the price of HP common stock was artificially inflated during the Class Period as a result of Defendants' alleged misrepresentations and omissions, and declined when the relevant truth concealed by Defendants'

---

[2] In addition to Defendants, the Complaint also asserted Section 10(b) and Section 20(a) claims against Christoph Schell, HP's former President of the Americas region and President of 3D Printing and Digital Manufacturing. Mr. Schell was not named as a defendant in the Amended Complaint.

[3] The "Four Box Model" was a method by which HP attempted to assess its printing supplies business revenue by analyzing four key drivers of that revenue: (i) the number of HP printers in use; (ii) the usage of HP's printers; (iii) HP's market share of the printing supplies aftermarket; and (iv) the price of HP's supplies. Complaint, ¶ 6. During the Class Period, HP claimed that the Four Box Model was able to accurately and reliably assess supplies revenues because HP's inputs for the model were based on real-time data that HP was receiving directly from its printers. *Id.*, ¶ 7.

misrepresentations and omissions was revealed through a series of partial disclosures beginning on February 27, 2019, and concluding on October 3, 2019.

### C.     Defendants' First Motion to Dismiss

17.     On October 2, 2020, Defendants filed a 39-page motion to dismiss the Complaint. ECF No. 49. Defendants argued that the Complaint should be dismissed because Lead Plaintiffs had not adequately alleged that Defendants had made any materially false and misleading statements; the majority of the challenged statements were non-actionable forward-looking statements; and the Complaint failed to allege facts giving rise to a strong inference of scienter. More specifically, Defendants argued, among other things, that:

(a)     the majority of the challenged statements, including those about revenue projections, future plans, and assumptions underlying revenue projections were forward-looking statements and (i) Lead Plaintiffs had failed to plead facts showing that Defendants made any of these statements with actual knowledge of their falsity, and (ii) the forward-looking statements were accompanied by meaningful cautionary language, and thus protected by the PSLRA safe harbor;

(b)     Defendants' statements about the reliability and predictive capability of the Four Box Model were inactionable opinion statements;

(c)     the Complaint failed to allege facts showing that Defendants knew that there were problems with the Four Box Model at the times they made the challenged statements and thus failed to plead a strong inference of scienter, particularly given that the model had previously produced accurate estimates for two years;

(d)     Lead Plaintiffs could not establish a strong inference of scienter based on the allegations of their confidential witness because that witness did not have any direct interaction or communication with the Individual Defendants; or based on Defendants' stock sales because the Defendants in question *increased* their holdings in HP common stock during the Class Period and nearly all of their shares were sold via 10b5-1 plans;

(e)    Lead Plaintiffs failed to plead a claim under Section 20(a) because they had not adequately pled a primary violation of Section 10(b); and

(f)    Lead Plaintiffs failed to plead a claim against Defendants Weisler or Lores for insider trading under Section 20A because (i) Lead Plaintiffs had not pled particularized facts demonstrating that any of the trades were suspicious in time or amount; and (ii) only one of their sales occurred "contemporaneously" with Lead Plaintiffs' purchases of HP common stock.

18.    On October 2, 2020, Defendants also filed a request that the Court consider documents incorporated by reference in the Complaint and take judicial notice of additional documents submitted to the Court, including the Company's SEC filings; earnings call transcripts; shareholder/analyst meeting transcripts and presentations; and conference presentation transcripts. ECF No. 50.

19.    On December 11, 2020, Lead Plaintiffs filed their oppositions to Defendants' motion to dismiss the Complaint and request for judicial notice. ECF Nos. 59, 61. In their 39-page opposition to the motion to dismiss, Lead Plaintiffs asserted that the Complaint adequately identified the false and misleading statements and omissions, detailed the reasons why each challenged statement was false or omitted material facts, and raised a strong inference of scienter. ECF No. 59. Among other things, Lead Plaintiffs argued that:

(a)    the Complaint pled actionable misstatements and omissions because it adequately alleged that Defendants had (i) misrepresented present fact in touting the Four Box Model's capabilities; (ii) misrepresented present or historical fact in stating that HP's market share in the printing supplies business had increased; (iii) misrepresented present fact in stating that inventory was aligned with "true demand;" and (iv) misrepresented present or historical fact in stating that HP's supplies business was on track to stabilize and had stabilized;

(b)    the PSLRA "safe harbor" did not apply because the challenged statements were statements of present fact, were not accompanied by adequate cautionary language,

and Defendants had no reasonable basis for their belief in the statements when they were made;

(c) Defendants' statements about the reliability and accuracy of the Four Box Model were actionable (rather than inactionable opinion statements) because Lead Plaintiffs had sufficiently alleged that Defendants had no reasonable basis for their belief;

(d) the allegations of the Complaint, taken collectively, adequately alleged a strong inference of scienter because (i) Defendants' own statements and conduct supported a strong inference that they knew or were deliberately reckless as to the fact that the Four Box Model lacked statistically relevant telemetry data for office-based printers and relied on "lagging and incomplete" third-party surveys to analyze market share; (ii) the former HP employee cited in the Complaint credibly alleged that it was well-known within HP that the Four Box Model was unreliable because it was not using real-time data to compute market share; (iii) the central importance of the supplies business to HP's profitability supported the inference of scienter; and (iv) the fact that two Individual Defendants sold substantial (and atypically large) amounts of their HP common stock during the Class Period supported the inference of scienter; and

(e) the Section 20A claims were adequately pled as to Defendants Weisler and Lores because Lead Plaintiffs adequately alleged an independent violation of Section 10(b), that Weisler and Lores sold stock while in possession of adverse, material, non-public information, and that Lead Plaintiffs purchased shares of HP common stock contemporaneously with at least one sale by each of those Defendants.

20. Lead Plaintiffs also objected to Defendants' request for judicial notice. ECF No. 61. Specifically, Lead Plaintiffs objected to Defendants' attempt to notice documents to improperly claim the truth of the matters asserted therein, or to defeat the well-pled allegations in the Complaint by drawing inferences in Defendants' favor that are improper at the pleading stage. Lead Plaintiffs also filed their own request that the Court take judicial notice of an SEC order. ECF No. 62.

JOINT DECL. ISO MOTIONS FOR FINAL                    8                    Case No. 3:20-cv-01260-SI
APPROVAL OF SETTLEMENT AND
ATTORNEYS' FEES AND EXPENSES

21. On January 20, 2021, Defendants filed their reply papers in support of their motion to dismiss. ECF No. 70.

22. The Court held oral argument on Defendants' motion to dismiss the Complaint by Zoom videoconference on February 5, 2021. ECF No. 74.

23. On March 19, 2021, the Court entered an Order granting Defendants' motion to dismiss the Complaint with leave for Lead Plaintiffs to file an amended complaint. ECF No. 83. In particular, the Court found that (a) the Complaint failed to adequately plead a materially false or misleading statement or omission, including because it failed to allege with particularity why Defendants' statements about the use of "big data" in connection with the Four Box Model were misleading; and (b) Lead Plaintiffs' allegations, both individually and holistically, did not establish a strong inference of scienter. By the same Order, the Court granted Defendants' and Lead Plaintiffs' requests for judicial notice.

24. The Court provided Lead Plaintiffs until April 9, 2021 to amend the Complaint (ECF No. 83, at 14), and that deadline was subsequently extended by agreement to May 3, 2021 (ECF No. 87).

**D.    The Investigation and Filing of the Amended Complaint**

25. On September 30, 2020—after Lead Plaintiffs had filed their Complaint in July 2020—the SEC filed an Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Cease-and-Desist Order"). The SEC's Cease-and-Desist Order concerned conduct that HP engaged in during the period leading up to the Class Period, including "HP's failure to disclose between November 2015 and June 2016 material information regarding its print supplies channel inventory management and sales practices." Specifically, the Cease-and-Desist Order explained that HP "used a variety of incentives to accelerate or 'pull-in' sales that they otherwise expected to materialize in later quarters" in order to meet sales targets. These practices, among others, "negatively impacted HP's operating profit in future quarters" and rendered the Company's "channel inventory disclosures" misleading because they provided investors "only an incomplete picture of HP's channel health."

Investors did not learn about the SEC's investigation until September 30, 2020, when the SEC publicly revealed the Cease-and-Desist Order and HP's agreement to pay a $6,000,000 monetary penalty. Lead Counsel submitted a request pursuant to FOIA to the SEC for documents related to the Cease-and-Desist Order on February 18, 2021.

26.    In response to the Court's March 19, 2021 order and in light of the now-public Cease-and-Desist Order, Lead Counsel and their in-house investigators redoubled their efforts to address the Court's Order dismissing the Complaint. Between the Court's dismissal of the Complaint and the filing of the Amended Complaint discussed below, Lead Counsel reached out to over 300 additional potential witnesses. Lead Counsel ultimately spoke to over 40 additional individuals from the U.S., South America, the United Kingdom and elsewhere, conducted follow-up interviews with several others, and added accounts from eight additional former employees to the Amended Complaint (in addition to the one former employee previously cited in the Complaint).

27.    Further, on or around April 16, 2021, following a series of negotiations, the SEC agreed to provide Lead Counsel with copies of certain deposition transcripts with redactions for confidential information. On Friday, April 30, 2021, the SEC produced three redacted transcripts. Lead Counsel reviewed these transcripts expeditiously over the weekend to ensure that this testimony was reflected in the Amended Complaint.

28.    On May 3, 2021, Lead Plaintiffs filed the Amended Complaint for Violations of the Federal Securities Laws ("Amended Complaint"). ECF No. 89. The 195-page Amended Complaint again asserted claims against all Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; against the Individual Defendants under Section 20(a) of the Exchange Act; and against Defendants Weisler and Lores under Section 20A of the Exchange Act. Lead Plaintiffs alleged that Defendants made materially false and misleading misstatements and omissions about HP's printing supplies business, including that Defendants had discovered and then covered-up the impact of unsustainable supplies sales practices; had mislead investors about HP's implementation of a "pull" rather than a "push" supplies sales model and operational changes; had misleadingly told investors that the "Four Box Model" was accurate and reliable because it was based on "big data;" and had made misstatements regarding HP's sales of printers and HP's market

share in the supplies business to convince investors that its supplies revenue had stabilized. Lead Plaintiffs further alleged that the price of HP's common stock was artificially inflated as a result of these alleged misrepresentations and omissions, and declined when the truth concealed by these misrepresentations and omissions was allegedly revealed through a series of partial disclosures beginning on February 27, 2019, and concluding on October 3, 2019.

29.     After the Amended Complaint was filed, on June 3, 2021, the SEC produced four additional redacted deposition transcripts. Lead Counsel extensively analyzed all seven transcripts in advance of opposing Defendants' motion to dismiss the Amended Complaint.

### E.    Defendants' Second Motion to Dismiss

30.     On June 4, 2021, Defendants filed their motion to dismiss the Amended Complaint. ECF No. 92. Defendants again filed a request that the Court take judicial notice of other documents submitted to the Court. ECF No. 93. Defendants argued that the Amended Complaint should be dismissed because Lead Plaintiffs failed to plead that any of the newly challenged statements in the Amended Complaint were false or misleading; that the Amended Complaint still failed to allege facts giving rise to a strong inference of scienter; and that the Amended Complaint did not adequately allege loss causation. Specifically, Defendants argued that:

(a)    Lead Plaintiffs' allegations that Defendants made misleading statements and omissions regarding HP's shift from a "push" to a "pull" model for printing supplies failed because Defendants never said that HP would eliminate all discounts; rather, under the pull model, HP would provide *lower* discounts, and thus these statements were not rendered false or misleading by the fact that HP continued to use discounts;

(b)    Lead Plaintiffs failed to plead facts showing that anything Defendants said about the pull model, the reasons for HP's shift to a pull model, or the health of HP's channel inventory was false or misleading;

(c)    Lead Plaintiffs still failed to adequately allege that Defendants' statements regarding the Four Box Model, the stabilization of the supplies business, or supplies market share were materially false or misleading;

(d)    Lead Plaintiffs' scienter allegations were defective because Lead Plaintiffs still did not plead any specific facts showing that the Individual Defendants knew their statements were false, and Lead Plaintiffs' additional allegations from former HP employees who said the Company continued to discount products to meet inventory targets did not show that HP had not made the switch to a pull model, and none of these low-level former employees were alleged to have had direct contact with any Individual Defendant;

(e)    Lead Plaintiffs' scienter allegations based on pre-Class Period conduct that was the subject of the Cease-and-Desist Order failed because the allegations in that case were untested and, in any event, related to a period before the Class Period began and before HP implemented its "pull" model; and

(f)    Lead Plaintiffs' allegations failed on loss causation grounds because the only corrective information alleged in the Amended Complaint was the revelation that HP's Four Box Model was flawed because HP lacked statistically significant telemetry data, but the Court had already determined that this revelation did not show that the Four Box Model statements were false or misleading, and Lead Plaintiffs did not allege that the gap in telemetry data "corrected" any of the alleged misstatements about HP's pull model.

31.    On June 25, 2021, Lead Plaintiffs filed their oppositions to Defendants' motion to dismiss the Amended Complaint and request for judicial notice. ECF Nos. 97, 98. Lead Plaintiffs argued that their additional investigation allowed them to add a number of important new allegations based on, among other things, the Cease-and-Desist Order, sworn testimony to the SEC, and the accounts of eight additional former HP employees. Lead Plaintiffs argued that these new facts:

(a)    allowed Lead Plaintiffs to identify and adequately plead several new categories of false and misleading statements, including allegations that, contrary to statements to investors, Defendants had not implemented a true "pull" sales model, and HP was not in fact selling inventory into the channel only when there was "true demand";

JOINT DECL. ISO MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND ATTORNEYS' FEES AND EXPENSES                    12                    Case No. 3:20-cv-01260-SI

and demonstrated that Defendants misled investors about the Four Box Model's accuracy and HP's stabilization of supplies revenue;

(b)    provided additional support for establishing an inference of scienter for both the new statements and those previously pled, including that the Cease-and-Desist Order demonstrated that the Individual Defendants were aware (before the Class Period) of HP's harmful, discount-reliant sales practices, and additional evidence from former employees established the Company's knowledge of flaws in the telemetry data for the Four Box Model; and

(c)    explained why HP's supplies business appeared to stabilize in 3Q17—because HP was engaging in unsustainable sales and inventory management practices that allowed HP to meet quarterly targets for a few quarters.

32.    Lead Plaintiffs further argued that the Amended Complaint adequately alleged loss causation, including because all of the alleged disclosures were causally connected to the alleged false and misleading statements and omissions. Lead Plaintiffs also objected again to Defendants' request for judicial notice. ECF No. 98. Specifically, Lead Plaintiffs objected to Defendants' attempt to reference external documents for the truth of the matter asserted therein.

33.    On July 9, 2021, Defendants filed a reply in support of their motion to dismiss the Amended Complaint and a response to their request for judicial notice. ECF Nos. 101, 102.

34.    The Court held oral argument on Defendants' motion to dismiss the Amended Complaint by Zoom videoconference on September 9, 2021. ECF No. 108.

35.    On September 15, 2021, the Court entered an Order which granted Defendants' motion to dismiss the Amended Complaint ("MTD Order"). ECF No. 112. The Court found that the Amended Complaint failed to adequately plead falsity for all categories of alleged misstatements—i.e., (a) telemetry data and the Four Box Model, (b) market share, (c) supplies revenue, (d) channel inventory management, (e) hardware placement, and (f) the sales model. The Court also found that Lead Plaintiffs' allegations did not plead a strong inference of scienter. This time, the Court dismissed Lead Plaintiffs' case with prejudice. On the same day, the Court issued its Judgment dismissing the Action finally and in its entirety. ECF No. 113.

36. After the second dismissal, Lead Plaintiffs and their counsel faced a choice: (1) stop pursuing the Action and cease spending time and resources on a case that had now been dismissed twice; or (2) continue their pursuit of the Action and devote more time and resources to seeking a recovery for the benefit of investors. They chose the latter.

**F.     Lead Plaintiffs' Appeal to the Ninth Circuit**

37. On October 14, 2021, Lead Plaintiffs filed a Notice of Appeal of the Court's MTD Order and Judgment. ECF No. 115; *see also State of Rhode Island, et al. v. HP, Inc., et al.*, No. 21-16718 (9th Cir.).

38. Lead Plaintiffs filed their opening appellate brief on February 23, 2022. Lead Plaintiffs argued that the Court erred in rejecting Lead Plaintiffs' falsity allegations. For example, Lead Plaintiffs argued that certain alleged misstatements—that HP had switched from a "push" to a demand-driven "pull" model and thus would be selling inventory into the channel only when there was true demand for it—were adequately alleged to be false or misleading because multiple former HP employees confirmed that HP continued to push excess inventory into its channel during the Class Period above demand. Lead Plaintiffs also argued that the Court had erred in finding Lead Plaintiffs' scienter allegations inadequate.

39. Defendants filed their answering brief on April 25, 2022. Defendants argued that the Court had correctly concluded that Lead Plaintiffs failed to plead a false or misleading statement and failed to plead particularized facts supporting a strong inference of scienter. Defendants also argued that the Court had erred in finding loss causation adequately alleged.

40. Lead Plaintiffs filed their reply appellate brief on June 15, 2022.

41. At the time the Parties reached their agreement to settle the Action in late November 2022 (as discussed below), Lead Plaintiffs' appeal had been fully briefed and oral argument on the appeal was scheduled for December 5, 2022.

**G.     The Parties' Mediation Efforts and the Settlement of the Action**

42. While Lead Plaintiffs' appeal from the dismissal of the Action was pending, the Parties agreed to explore the possibility of resolving the Action. To that end, the Parties engaged in discussions to explore a possible settlement. However, the Parties ultimately agreed that they would

JOINT DECL. ISO MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND ATTORNEYS' FEES AND EXPENSES                   14                   Case No. 3:20-cv-01260-SI

benefit from the involvement of an experienced mediator to facilitate their discussions. The Parties conferred and selected JAMS Mediator Jed D. Melnick to serve as the mediator for the Action in October 2022. Mr. Melnick is an experienced mediator of securities class actions and other complex litigation.

43. On October 21, 2022, the Parties provided Mr. Melnick with written submissions addressing their views on liability and damages. Mr. Melnick reviewed and analyzed these position statements, the Amended Complaint, the Parties' briefing on Defendants' motions to dismiss, the Court's decisions granting Defendants' motions to dismiss, and the appellate briefing to the Ninth Circuit. Armed with this information, Mr. Melnick then proceeded to assist the Parties in their continued settlement discussions, including by engaging in detailed discussions with both sides to further understand the strengths and weaknesses of their positions.

44. On November 17, 2022, after weeks of arm's length negotiations, Mr. Melnick issued a mediator's recommendation to the Parties that the Action be resolved in exchange for payment of $10,500,000 in cash for the benefit of the Settlement Class. The proposal was issued on a double-blind basis, meaning that if one side had rejected the proposal they would not find out whether the other side had accepted the proposal. On November 22, 2022, Mr. Melnick informed the Parties that both Lead Plaintiffs and Defendants had accepted the proposal.

45. After further negotiation of the non-monetary terms of the Settlement, the Parties executed a Term Sheet on December 20, 2022, which set forth their agreement in principle to settle the Action in return for HP's payment of $10,500,000 for the benefit of the Settlement Class. The Term Sheet was subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers.

46. In the ensuing weeks, the Parties negotiated the full terms of the Settlement and drafted the Stipulation and Agreement of Settlement and related papers, including the notices to be provided to the Settlement Class. On March 2, 2023, the Parties executed the Stipulation (ECF No.118-1), which sets forth the complete terms of the Parties' agreement to settle all claims asserted in the Action for $10,500,000, subject to the approval of the Court. The same day, Lead Plaintiffs

and HP also executed a confidential Supplemental Agreement providing that HP may terminate the Settlement if persons who request exclusion from the Settlement Class reach a certain threshold.

**H.      The Court Grants Preliminary Approval of the Settlement**

47.      On March 3, 2023, Lead Plaintiffs filed a motion for preliminary approval of the Settlement. ECF No. 118.

48.      Following a hearing on the motion on April 7, 2023, the Court entered the Order Preliminarily Approving Settlement and Providing for Notice (ECF No. 124) ("Preliminary Approval Order") which, among other things: (a) preliminarily approved the Settlement; (b) approved the forms of notice (i.e., Postcard Notice, Notice, and Summary Notice) and Claim Form, and authorized notice to be given to Settlement Class Members through mailing of the Postcard Notice, posting of the Notice and Claim Form on a website developed for the Settlement, and publishing the Summary Notice in *The Wall Street Journal* and over *PR Newswire*; (c) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, and/or Lead Counsel's request for attorneys' fees and expenses ("Fee and Expense Application"); and (d) set a schedule for the filing of opening papers and reply papers in support of the Settlement, Plan of Allocation, and the Fee and Expense Application. The Preliminary Approval Order also scheduled the Settlement Hearing for July 28, 2023 at 10:00 a.m. to determine, among other things, whether the Settlement should be finally approved.

**III.      RISKS OF CONTINUED LITIGATION**

49.      The Settlement provides a certain and near-term benefit to the Settlement Class in the form of a $10,500,000 cash payment. Lead Plaintiffs and Lead Counsel believe that the proposed Settlement is a favorable result for the Settlement Class in light of the substantial risks that Lead Plaintiffs and the Settlement Class would face in obtaining a litigated verdict in this case, and is in the best interests of the Settlement Class.

**A.      Risks of the Pending Appeal**

50.      Lead Plaintiffs and Lead Counsel believe that the claims asserted against Defendants have merit. However, the Court has dismissed this Action in its entirety *twice* because it determined

JOINT DECL. ISO MOTIONS FOR FINAL
APPROVAL OF SETTLEMENT AND
ATTORNEYS' FEES AND EXPENSES

16

Case No. 3:20-cv-01260-SI

that Lead Plaintiffs failed to adequately plead both (i) particularized facts demonstrating the falsity of Defendants' alleged misstatements; and (ii) a strong inference of scienter. *See* ECF Nos. 83, 112. If the Court's conclusion on *either* of these elements was upheld on appeal, investors would have received *nothing* in this Action.

51.    At the time of settlement, Lead Plaintiffs' appeal of the Court's order dismissing the Action had been fully briefed and was awaiting oral argument. While Lead Plaintiffs believe that they had meritorious arguments on appeal, they recognized that there was a significant risk that the Ninth Circuit would affirm the Court's decision. Specifically, Lead Plaintiffs understood that the Court's two detailed opinions dismissing the Complaint and Amended Complaint had carefully addressed Lead Plaintiffs' allegations, and that the issues on appeal were complex. Lead Plaintiffs also understood that, to succeed on their appeal, they would have to persuade the Ninth Circuit panel to reverse both the Court's holding that falsity had not been adequately alleged, as well as the Court's holding that Lead Plaintiffs had not pled a strong inference of scienter. Finally, Lead Plaintiffs understood that if the appeal was unsuccessful, the Settlement Class would recover nothing. Notably, the Ninth Circuit's overall reversal rate in private civil appeals is only 12.8%.[4]

52.    Moreover, even if the appeal had succeeded, Lead Plaintiffs would have faced additional substantial hurdles to establishing liability and damages on remand. To survive an expected motion for summary judgment and prevail at trial, Lead Plaintiffs would have been required to prove that Defendants' statements were materially false or misleading, and that Defendants knew or recklessly disregarded that their statements were materially false or misleading. Lead Plaintiffs also would have to establish that Defendants' alleged misrepresentations and omissions proximately caused the Settlement Class's losses. Finally, Lead Plaintiffs would have to prove, through expert testimony, that Settlement Class Members had suffered damages as well as

---

[4]    *See* U.S. Courts of Appeals—Decisions in Cases Terminated on the Merits, by Circuit and Nature of Proceeding, During the 12-Month Period Ending June 30, 2022, Table B-5, U.S. Courts of Appeal Statistical Tables for The Federal Judiciary (June 30, 2022), https://www.uscourts.gov/statistics/table/b-5/statistical-tables-federal-judiciary/2022/06/30.

JOINT DECL. ISO MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND ATTORNEYS' FEES AND EXPENSES    17    Case No. 3:20-cv-01260-SI

the amount of per share damages. If the Action continued following the appeal, Defendants would have asserted substantial arguments concerning each of these issues.

### B.    Risks Concerning Liability

53.    Lead Plaintiffs and Lead Counsel recognize that, even if they prevailed on appeal, they may still have been unable to muster sufficient admissible evidence to withstand a motion for summary judgment or convince a jury of Defendants' liability. Defendants would continue to vigorously challenge all elements of Lead Plaintiffs' securities fraud claims, including the key elements of falsity and scienter, as summarized below.

#### 1.    Falsity

54.    Lead Plaintiffs recognize the challenges in proving that Defendants' statements were materially false and misleading when made. Defendants would assert, as they did throughout the Action, that they made no misrepresentations about HP's supplies business, the reliability of HP's Four Box Model, or their shift to a pull business model. Defendants would further contend that they had assumed no duty to disclose certain facts that Lead Plaintiffs claimed were misleadingly omitted, and that any omissions did not render their statements materially misleading.

55.    With respect to falsity, the key alleged misrepresentations at issue in the Amended Complaint can be broadly categorized into two main groups: (1) misstatements concerning HP's purported change from a push to a pull sales model and the Company's inventory management practices, and (2) misstatements concerning Defendants' access to remote (telemetric) data about printing supplies for the purposes of estimating revenue, market share, and supplies business stabilization. Lead Plaintiffs faced significant risks with respect to establishing falsity for each of these categories of statements.

56.    For example, with respect to the model change statements, Lead Plaintiffs alleged that HP represented that it changed from a "push" to a demand-driven "pull" model during the Class Period and that this was misleading because HP continued to push printing supplies inventory into its sales channel materially beyond true demand using significant discounts. Defendants would contend that these statements were not misleading because HP did in fact change its sales model and, to the extent that inventory was still pushed into the channel through discounting, it was only

in immaterial amounts or because HP's model was incorrectly measuring the Company's market share. Further, Defendants would argue that, in any event, in describing its changed sales model, HP did not promise to eliminate all discounting, and thus the fact that HP continued to engage in some amount of discounting did not render Defendants' statements materially misleading.

57.    Relatedly, Lead Plaintiffs alleged that Defendants' representations concerning the health of HP's sales channel were misleading because they gave the misleading impression that they were discussing HP's entire inventory channel and, thus, that the entire inventory channel was healthy. Lead Plaintiffs alleged that, in reality, Defendants were only discussing a part of HP's sales channel but did not disclose this fact to investors, thus rendering their statements misleading. Defendants, however, would argue that they had fully disclosed that their channel inventory statements only referred to part of the channel, i.e., the "Tier 1" portion, and that as a result, investors knew the truth with respect to this issue—an argument that the Court had accepted in its dismissal of the Action.

58.    With regard to the second group of alleged misrepresentations, Lead Plaintiffs alleged that Defendants misled investors by touting HP's access to real-time "telemetry" data feeds regarding printing supplies (such as ink and toner) from its printers, without disclosing that a significant portion of HP's printers (specifically, commercial printers) were not sending any data, thus resulting in large holes in HP's data set. Lead Plaintiffs also alleged that many of HP's statements purportedly predicated on access to telemetry data—such as statements concerning HP's market share improving or its supplies business stabilizing—were misleading because HP never had sufficient telemetry data such to accurately compute its market share or assess the health of its supplies business. Moreover, Lead Plaintiffs alleged that the supplies business stabilization statements were misleading because Defendants failed to disclose that the stabilization had been achieved by pushing excess inventory into the channel. Defendants, on the other hand, would have continued to argue that these statements were not misleading because HP never represented that it exclusively relied on telemetry data to calculate its printing supplies sales and, in fact, disclosed to the market that its projections were based on several different sources of data, only one of which was the data purportedly being sent from its printers. Further, they would have argued that the

supply stabilization statements were not false statements because HP's supplies revenues had actually stabilized after years of decline, and Lead Plaintiffs did not allege that these revenue results were themselves misstated. In dismissing the Action, the Court had accepted these arguments as well and, even if these allegations were resurrected for pleading purposes following the appeal, they might still fail at the summary judgment stage or at trial.

59.    Additionally, Defendants would have continued to argue that many of the statements at issue were shielded by the PSLRA's safe harbor provision for forward-looking statements or were opinion statements that were not actionable.

### 2.    Scienter

60.    Lead Plaintiffs also faced risks in establishing that they had adequately pled scienter. And, even if successful on this issue in the appeal, Lead Plaintiffs would still need to prove to a jury that Defendants made the alleged false statements with the intent to mislead investors or with deliberate recklessness. Throughout the Action, Defendants vigorously contended that they believed their statements to be true and that they had no motive to commit fraud. Defendants would have continued to argue that they did not know or have any reason to believe that the assumptions that fed into the Four Box Model were flawed or that the Company's projections based on such model were unreliable, and thus—even if such statements were materially false—Defendants had no intent to mislead investors.

61.    Similarly, with respect to the model change statements, Defendants would argue that—as far as HP executives were aware—HP had changed its sales model to a pull model prior to the Class Period and they had no knowledge of any significant discounting during the Class Period. Indeed, Defendants would argue that the existence of a related SEC investigation regarding the period *prior* to the Class Period militates against a finding of scienter, because, knowing that HP was being scrutinized by regulators, Defendants could not credibly be expected to continue the same misleading practices while those agencies were investigating.

62.    On the data-related statements, Defendants would argue that they believed HP had sufficient access to telemetry data and that, in all events, they fully disclosed to investors that they were relying on sources other than telemetry data and thus had no intent to mislead the market.

Further, Defendants would argue that it is more credible to conclude that HP had sufficient data because, for two years during the Class Period, the Four Box Model had accurately predicted supplies sales and stabilization. Indeed, Defendants would claim that as soon as they discovered data deficiencies for the first time, they disclosed these deficiencies to investors, which undermines any claim of fraudulent intent or knowledge.

63.    In further support, Defendants would contend that they had no motive to commit fraud because they did not personally benefit from the alleged fraud. For instance, Defendants would have pointed to the absence of suspicious stock sales as evidence of a lack of fraudulent intent, a finding the Court has already twice affirmed in its rulings on Defendants' motions to dismiss. Defendants would also point to the absence of any "whistleblowers" or SEC enforcement action as further evidence of an absence of wrongdoing or scienter. Throughout the Action, Defendants asserted—and would continue to assert to a jury—that they had no motive to commit fraud and that there was no logical reason for Defendants to engage in the alleged fraud. Lead Plaintiffs and Lead Counsel recognized a risk that a trier-of-fact may accept Defendants' scienter arguments.

### C.    Risks Related to Loss Causation and Damages

64.    Even assuming that Lead Plaintiffs and Lead Counsel overcame the arguments set forth above and established liability, Lead Plaintiffs would have still confronted additional challenges in proving that the revelation of the relevant truth concealed by Defendants' alleged misrepresentations and omissions proximately caused the declines in the price of HP's common stock, and in establishing the amount of class-wide damages. More specifically, Lead Plaintiffs bore the burden of proving that each decline in HP's stock price was causally connected to a disclosure of the relevant truth concealed by Defendants' false or misleading statements or omissions. *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1121 (9th Cir. 2013).

65.    Defendants would have argued that the price declines in HP's common stock were not caused by revelation of the relevant truth concealed by the alleged misstatements, but rather, by lower-than-expected revenues for HP's supplies business. For example, Defendants had substantial

arguments as to whether the price declines following the second and third alleged corrective disclosures in August 2019 and October 2019 were causally connected to the alleged misstatements and omissions. In particular, they would have continued to argue, as they did at the pleading stage, that the issues with HP's Four Box Model, the excess inventory in the channel, declining market share, and continued declines in HP's supplies business were all revealed in the first alleged corrective disclosure in February 2019 and that the later disclosures revealed only supplies revenue misses or that HP was changing its supplies business model, none of which was causally connected to the alleged misrepresentations. Had any of these arguments been accepted, any potential recovery would be drastically limited, at a minimum, or eliminated altogether.

66.     Defendants also would have likely argued that Lead Plaintiffs could not "disaggregate" the declines caused by disclosure of the relevant truth concealed by Defendants' false or misleading statements from the declines caused by other news released on the same day. Here, on each of the three alleged corrective disclosures dates—the dates on which Lead Plaintiffs alleged the relevant truth concealed by Defendants' false or misleading statements or omissions was revealed—Defendants would have argued that there was non-fraudulent confounding information revealed in addition to the fraud-related corrective information. Defendants would have argued that it was this non-fraud related information, rather than any revelation of information concealed by the fraud, that caused the stock price declines, and that Lead Plaintiffs could not prove otherwise. Moreover, Defendants would contend that, even if Lead Plaintiffs could successfully disaggregate the fraud-related news, such disaggregation would substantially reduce damages.

67.     Under any circumstances, the issues of loss causation and damages would likely come down to a battle of the experts. Accordingly, Lead Plaintiffs and Lead Counsel recognized that the Court and a jury would be presented with very different opinions from highly qualified experts. If the Court or a jury found Defendants' expert's testimony to be more credible, it would be likely that Lead Plaintiffs and the Settlement Class would recover nothing at all.

68.     Accordingly, substantial risks of establishing loss causation and damages still remained in the case at the time the Settlement was reached.

69.     Moreover, in order to obtain any recovery for the Settlement Class, Lead Plaintiffs would have to prevail at numerous stages—on the pending appeal, on a litigated motion for class certification following remand, at summary judgment, at trial, and on the appeals that would inevitably be brought after any trial verdict for Lead Plaintiffs. In short, there were extremely serious risks attendant to the continued prosecution of the Action, and no guarantee that further litigation would have resulted in a higher recovery, or any recovery at all.

**D.     The Settlement Amount Compared to the Likely Maximum Damages that Could Be Proved at Trial**

70.     The Settlement Amount—$10.5 million in cash, plus interest—represents a significant recovery for the Settlement Class under the circumstances of the case, including the complete dismissal of the Action through the Court's two opinions granting Defendants' motions to dismiss. Lead Plaintiffs' damages expert estimates that the maximum theoretically possible damages that could be established in the Action if investors were to prevail on appeal and then survive ***all*** liability challenges noted above, and if damages were based on the ***entire*** abnormal price declines following ***all three*** alleged corrective disclosures (capped at Settlement Class Members' actual out-of-pocket losses, consistent with the proposed Plan of Allocation), would be approximately $1.9 billion. However, as noted above, Defendants had substantial arguments as to whether the price declines following the alleged corrective disclosures in August 2019 and October 2019 were causally connected to the alleged misstatements and omissions. If, for example, Defendants prevailed on these arguments and were able to eliminate the second and third corrective disclosures, maximum damages (connected with the first disclosure in February 2019) would have declined to approximately $1.3 billion. As noted above, the potential recoverable damages would be subject to further reductions based on Defendants' arguments as to the "disaggregation" of causes of the declines in the price of HP common stock following the alleged corrective disclosures.

71.     Additionally, given the Court's dismissal of the Action in its entirety (twice) and the fact that only Lead Plaintiffs' appellate rights remained at the time of settlement, any assessment of the realistic value of potential damages at this stage of the Action must take into account some measure of the likelihood of success on the dismissed claims. One such approach would be to

consider the Ninth Circuit's overall reversal rate in private civil appeals of 12.8%. Applying this reversal rate (as a rough proxy of the likelihood of reversal of the Court's MTD Order on appeal), produces a "risk-adjusted" potential recovery of approximately $166 to $243 million. Viewing the recovery obtained for the Settlement Class through this lens, the $10.5 million Settlement represents a recovery of 4% to 6% of these risk-adjusted figures. Given that the Action would face all the typical risks of a securities action on remand, even if the Amended Complaint was sustained on appeal, this level of recovery (which is comparable to recovery percentages seen in other securities class actions) is fair and reasonable. In sum, Lead Plaintiffs and Lead Counsel believe this certain, near-term recovery for the Settlement Class is fair, reasonable, and adequate under the circumstances, and in the Settlement Class's best interest.

## IV.    LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

72.    In its Preliminary Approval Order, the Court authorized Lead Counsel to retain A.B. Data, Ltd. ("A.B. Data") as the Claims Administrator to supervise and administer the notice procedure for the Settlement and the processing of Claims. *See* Preliminary Approval Order, ¶ 7. In accordance with the Preliminary Approval Order, A.B. Data, working in conjunction with Lead Counsel: (i) mailed the Postcard Notice to potential Settlement Class Members at the addresses set forth in the records provided by Defendants, and to potential Settlement Class Members who otherwise could be identified through further reasonable effort;[5] (ii) mailed a copy of the long-form Notice and Claim Form (together, "Notice Packet") to Nominees contained in A.B. Data's Nominee database and to potential Settlement Class Members upon request; (iii) published the Summary Notice in *The Wall Street Journal* and transmitted the same over *PR Newswire*; and (iv) developed a website for the Settlement, www.HPSecuritiesSettlement.com, ("Settlement Website") from which copies of the Notice and Claim Form can be downloaded.

---

[5]    The majority of the names and addresses of potential Settlement Class Members, as is the case in most securities class actions, were obtained from brokerage firms, banks, institutions, and other nominees ("Nominees") holding HP common stock in street name. *See* Declaration of Jack Ewashko ("Ewashko Decl.") (attached hereto as Exhibit 4), ¶ 4.

73. The Postcard Notice contains important information concerning the Settlement and, along with the Summary Notice, directs recipients to the Settlement Website for additional information regarding the Settlement (and the Action), including the long-form Notice, which includes, among other things, more details about the Settlement as well as the Plan of Allocation.

74. Collectively, the notices provide the definition of the Settlement Class, a description of the Settlement, information regarding the claims asserted in the Action and information to enable Settlement Class Members to determine whether to: (i) participate in the Settlement by completing and submitting a Claim; (ii) object to any aspect of the Settlement, the Plan of Allocation, and/or the Fee and Expense Application; or (iii) submit a request to be excluded from the Settlement Class. The notices also inform Settlement Class Members of Lead Counsel's intent to: (i) apply to the Court for an award of attorneys' fees in an amount not to exceed 18% of the Settlement Fund; and (ii) request payment of Litigation Expenses in an amount not to exceed $250,000, which amount may include requests for reimbursement of the reasonable costs incurred by Lead Plaintiffs directly related to their representation of the Settlement Class in an aggregate amount not to exceed $20,000.

75. In accordance with the Preliminary Approval Order, A.B. Data began mailing the Postcard Notice to potential Settlement Class Members and the Notice Packet to Nominees on April 28, 2023. Ewashko Decl., ¶¶ 3-5. As of June 22, 2023, A.B. Data has disseminated a total of 634,337 Postcard Notices and 4,172 Notice Packets to Settlement Class Members and Nominees. *Id.*, ¶ 8.

76. On May 19, 2023, in accordance with the Preliminary Approval Order, A.B. Data caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over *PR Newswire*. *Id.*, ¶ 10.

77. A.B. Data also developed and currently maintains the dedicated Settlement Website, www.HPSecuritiesSettlement.com, to provide potential Settlement Class Members with information concerning the Settlement and access to copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and other relevant documents. *See* Ewashko Decl., ¶ 12. The Settlement Website became operational on April 28, 2023. *Id.* Lead Counsel also made copies of the Notice and Claim Form available on their own websites,

www.ktmc.com and www.blbglaw.com. Lead Counsel and A.B. Data regularly monitor the Settlement Website to ensure that it is operating correctly. Lead Counsel and A.B. Data will continue to monitor and update the Settlement Website as the settlement process continues. For example, Lead Plaintiffs' papers in support of their motion for final approval of the Settlement and Lead Counsel's papers in support of the Fee and Expense Application will be made available on the Settlement Website after they are filed, and any orders entered by the Court in connection with these motions will also be posted.

78.     As noted above, the deadline for Settlement Class Members to file objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Settlement Class is July 7, 2023. To date, only seventeen (17) requests for exclusion have been received, *see* Ewashko Decl., ¶ 13, and there are no objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application. Lead Counsel will file reply papers on or before July 21, 2023 addressing all requests for exclusion and any objections that may be received.

**V.      ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT**

79.     Pursuant to the Preliminary Approval Order, and as set forth in the notices, Settlement Class Members who want to be eligible to receive a distribution from the Net Settlement Fund must submit a valid Claim with all required information postmarked (if mailed) or submitted online, via the Settlement Website, no later than August 14, 2023. As set forth in the notices, the Net Settlement Fund will be distributed among Settlement Class Members who submit eligible Claims according to the proposed Plan of Allocation, or other plan of allocation approved by the Court.

80.     Lead Counsel consulted with Lead Plaintiffs' damages expert in developing the proposed Plan of Allocation for the Net Settlement Fund ("Plan"). Lead Counsel believe that the Plan provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Action.

81.     The Plan is set forth at pages 15 to 19 of the long-form Notice. *See* Ewashko Decl., Ex. B, Notice at pp. 15-19. As described in the Notice, calculations under the Plan are intended as

a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *See* Notice, ¶ 65.

82.    In developing the Plan, Lead Plaintiffs' damages expert calculated the estimated amount of artificial inflation in the per-share closing price of HP common stock which allegedly was proximately caused by Defendants' alleged materially false and misleading statements and omissions during the Class Period. *See* Notice, ¶ 66. In calculating the estimated artificial inflation, Lead Plaintiffs' damages expert considered price changes in HP common stock in reaction to certain public announcements allegedly revealing the truth concealed by Defendants' alleged misrepresentations and omissions, adjusting for price changes that were attributable to market or industry forces on those days. *Id.*, ¶ 67. The estimated artificial inflation in HP common stock during the Class Period is set out in Table A of the Notice. *See* Notice at p. 18.

83.    Recognized Loss Amounts are calculated under the Plan for each purchase or acquisition of HP common stock that is listed on a Claimant's Claim and for which adequate documentation is provided. In general, Recognized Loss Amounts are calculated as the lesser of: (a) the difference between the amount of alleged artificial inflation in HP common stock at the time of purchase/acquisition and the time of sale, or (b) the difference between the purchase/acquisition price and the sale price for the shares. *See* Notice, ¶¶ 69, 71. Claimants who purchased/acquired and sold all of their HP common stock before the first alleged corrective disclosure, or who purchased/acquired and sold all of their HP common stock between two consecutive dates on which artificial inflation was allegedly removed from the price of the stock (that is, they did not hold the shares over a date where artificial inflation was allegedly removed from the stock price), will have no Recognized Loss Amount under the Plan with respect to those transactions because the level of artificial inflation is the same at the time of purchase/acquisition and sale, and thus any loss suffered on those sales would not be the result of the alleged misstatements in the Action. *See id.*[6]

---

[6]    Lead Plaintiffs alleged that corrective information was released to the market on: February 27, 2019 (after the close of trading), August 22, 2019 (after the close of trading), and October 3, 2019 (after the close of trading), which partially removed the artificial inflation from the price of HP common stock on: February 28, 2019, August 23, 2019, and October 4, 2019. Notice, ¶ 68.

JOINT DECL. ISO MOTIONS FOR FINAL
APPROVAL OF SETTLEMENT AND
ATTORNEYS' FEES AND EXPENSES                    27                    Case No. 3:20-cv-01260-SI

84.     As stated in the Notice, and in accordance with the PSLRA, Recognized Loss Amounts for shares of HP common stock sold during the 90-day period after the final alleged corrective disclosure are further limited to the difference between the purchase price and the average closing price of the stock from the end of the Class Period to the date of sale. Notice, ¶ 71.C.(ii). Recognized Loss Amounts for HP common stock still held as of the close of trading on December 31, 2019, the end of the 90-day period, will be the lesser of: (a) the amount of artificial inflation on the date of purchase or (b) the difference between the purchase price and $18.97, the average closing price for HP common stock during that 90-day period. *Id*., ¶ 71.D.

85.     The sum of a Claimant's Recognized Loss Amounts for all of his, her, or its purchases/acquisitions of HP common stock during the Class Period is the Claimant's "Recognized Claim." Notice, ¶ 72. The Plan limits Claimants' Recognized Claims based on whether they had an overall market loss in their transactions in HP common stock during the Class Period.  A Claimant's Recognized Claim will be limited to the amount of his, her, or its market loss in HP common stock transactions during the Class Period, and Claimants who have an overall market gain will not be eligible for a recovery. *Id*., ¶¶ 79-80.

86.     The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. Notice, ¶¶ 81-82. If an Authorized Claimant's *pro rata* distribution amount calculates to less than $10.00, no payment will be made to that Authorized Claimant. *Id*., ¶ 83.

87.     One-hundred percent of the Net Settlement Fund will be distributed to Authorized Claimants. If any funds remain after the initial *pro rata* distribution, as a result of uncashed or returned checks or other reasons, subsequent cost-effective distributions to Authorized Claimants will be conducted. Notice, ¶ 84. Only when the residual amount left for re-distribution to Settlement Class Members is so small that a further re-distribution would not be cost effective (for example, where the administrative costs of conducting the additional distribution would largely subsume the funds available), will those funds be donated to a *cy pres* recipient. *Id*.

88.     The Plan identifies the Investor Protection Trust as the proposed *cy pres* recipient for any residual funds remaining after the completion of all cost-effective distributions to Settlement

Class Members. Notice, ¶ 84. The Investor Protection Trust ("IPT") is a 501(c)(3) nonprofit organization devoted to investor education. Information about IPT's activities, including investor education and protection programs and research on the subject of investor education, can be found on IPT's website, www.investorprotection.org.[7]

89.    In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on damages they suffered as a result of purchases of HP common stock attributable to the misconduct alleged in the Action. To date, no objections to the proposed Plan of Allocation have been received.

## VI.    THE FEE AND EXPENSE APPLICATION

90.    In addition to seeking final approval of the Settlement and approval of the Plan of Allocation, Lead Counsel, on behalf of Plaintiffs' Counsel,[8] are applying for an award of attorneys' fees and payment of Litigation Expenses incurred during the course of the Action. Specifically, Lead Counsel are applying to the Court for an award of attorneys' fees of 18% of the Settlement Fund ("Fee Application") and payment of litigation expenses from the Settlement Fund in the amount of $135,598.87 ("Expense Application"). In accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4), Lead Counsel further request $10,000 for the value of the time that Lead Plaintiff Iron Workers' employees and fund counsel dedicated to the Action. The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's Fee and Expense Motion. The primary factual bases for the requested fee and expenses are summarized below.

### A.    The Fee Application

91.    For their efforts on behalf of the Settlement Class, Lead Counsel are applying for a fee award to be paid from the Settlement Fund on a percentage basis. The percentage method is the standard and appropriate method of fee recovery in a common-fund case like this one, because it aligns the lawyers' interest in being paid a fair fee with the interests of Lead Plaintiffs and the Settlement Class in achieving the maximum recovery in the shortest amount of time required under

---

[7]    The Parties do not have any relationship to the proposed *cy pres* recipient.
[8]    Plaintiffs' Counsel are Lead Counsel BLB&G and KTMC and additional counsel for Lead Plaintiff Rhode Island, Lynch & Pine.

JOINT DECL. ISO MOTIONS FOR FINAL            29            Case No. 3:20-cv-01260-SI
APPROVAL OF SETTLEMENT AND
ATTORNEYS' FEES AND EXPENSES

the circumstances. Use of the percentage method has been recognized as appropriate by the Supreme Court and Ninth Circuit for cases of this nature where an all-cash common fund has been recovered.

92.    Based on the result achieved, the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is reasonable and should be approved. As discussed in the Fee and Expense Motion, an 18% fee award is substantially below the 25% benchmark for percentage fee awards in the Ninth Circuit, is below the range of percentage fees typically awarded in securities class actions in this Circuit, and is fair and reasonable in light of all the circumstances in this case.

93.    Importantly, the requested fee represents a substantial discount on Lead Counsel's time devoted to the Action based on their current hourly rates. Indeed, the fee request will result in a fee that is *less than one half* of Lead Counsel's total lodestar, resulting in a negative lodestar multiplier of approximately 0.35. As such, the requested fee will result in an award of just 35% of the lodestar resulting from the nearly 9,000 hours that Lead Counsel devoted to litigating this case— or a 65% discount on Lead Counsel's time at their currently hourly rates.

### 1.    Lead Plaintiffs Have Authorized and Support the Fee Application

94.    Lead Plaintiffs Rhode Island and Iron Workers are sophisticated institutional investors that closely supervised and monitored the prosecution and settlement of this Action. *See* Cheng Decl., ¶¶ 3-5; Tormey Decl., ¶¶ 3-5. Lead Plaintiffs have evaluated the Fee Application and support the fee requested. *See* Cheng Decl., ¶¶ 7-8; Tormey Decl., ¶ 7.

95.    Moreover, Lead Counsel's 18% fee request is consistent with the more restrictive of the two separate retainer agreements entered into between Lead Counsel and Lead Plaintiffs at the outset of the litigation. Following the agreement to settle the Action, Lead Plaintiffs evaluated the requested fee again and believe it is fair and reasonable in light of the result obtained for the Settlement Class, the quality of the work performed by Lead Counsel, and the risks undertaken by counsel in this Action. *See* Cheng Decl., ¶ 7; Tormey Decl., ¶ 7.

## 2.      The Work Performed by Lead Counsel

96.      Lead Counsel devoted substantial time to the prosecution of the Action. As described above in greater detail, the work that Lead Counsel performed in this Action included, among other things: (i) conducting an extensive investigation into the claims asserted, which included a detailed review of public documents, interviews with dozens of former HP employees, review and extensive analysis of seven deposition transcripts obtained from the SEC through a FOIA request, and consultation with experts; (ii) drafting the initial complaint and the detailed Complaint and Amended Complaint; (iii) researching, briefing, and arguing two rounds of opposition to Defendants' motions to dismiss; (iv) fully briefing an appeal of the Court's MTD Order; and (v) engaging in arm's-length settlement negotiations to achieve the Settlement with the assistance of an experienced mediator.

97.      Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of the Action. As the lead partners on the case, we personally monitored and maintained control of the work performed by other lawyers at BLB&G and KTMC throughout the litigation. Other experienced Lead Counsel attorneys were also involved in the drafting of pleadings and motion papers, and in the settlement negotiations. More junior attorneys and paralegals worked on matters appropriate to their skill and experience level.

98.      Attached hereto as Exhibits 5A and 5B are declarations on behalf of KTMC and BLB&G in support of Lead Counsel's Fee and Expense Application ("Fee and Expense Declarations"). Each of the Fee and Expense Declarations includes a schedule summarizing the lodestar of the firm and the litigation expenses it incurred. The first page of Exhibit 5 is a chart that summarizes the information set forth in the Fee and Expense Declarations, listing the total hours expended, lodestar amounts, and litigation expenses for each Lead Counsel firm. The Fee and Expense Declarations further indicate the amount of time spent on the Action by the attorneys and professional support staff of each firm and the lodestar calculations based on their current hourly

JOINT DECL. ISO MOTIONS FOR FINAL           31           Case No. 3:20-cv-01260-SI
APPROVAL OF SETTLEMENT AND
ATTORNEYS' FEES AND EXPENSES

rates.[9] The Fee and Expense Declarations also provide a breakdown of Lead Counsel's time by task category (by timekeeper). A summary of Lead Counsel's lodestar by task category is attached hereto as Exhibit 6. The Fee and Expense Declarations were prepared from contemporaneous daily time records regularly maintained and prepared by the respective firms, which are available at the request of the Court.

99.    As set forth in Exhibit 5 attached hereto, Lead Counsel collectively expended a total of 8,955.35 hours in the investigation, prosecution, and resolution of the Action from its inception through March 2, 2023 (the date the Stipulation was signed). The resulting total lodestar for Lead Counsel is $5,462,506.75.[10]

100.    The requested fee of 18% of the Settlement Fund (or $1,890,000, plus interest) therefore represents a fractional amount (referred to as a "negative" multiplier) of approximately 0.35 of Lead Counsel's lodestar. Such a request is well below the positive fee multipliers typically awarded in comparable securities class actions and in other class actions involving contingency fee risk, in this Circuit and elsewhere. *See* Fee and Expense Motion, § II.C.2.

**3.    The Experience and Standing of Lead Counsel**

101.    As demonstrated by the firm resumes included as Exhibits 5A-5 and 5B-5 hereto, KTMC and BLB&G are among the most experienced and skilled law firms in the securities litigation field, with long and successful track records representing investors in such cases, and are consistently ranked among the top plaintiffs' firms in the country. Lead Counsel's extensive

---

[9] The hourly rates of Lead Counsel range from $795 to $1,250 per hour for partners, $440 to $825 per hour for other attorneys, $275 to $600 per hour for paralegals and other support staff, and $300 to $600 per hour for in-house investigators. *See* Fee and Expense Declarations, Exs. 5A-1 and 5B-1. These hourly rates are reasonable for this type of complex litigation. *See* Fee and Expense Motion, § II.C.2.

[10] Since the execution of the Stipulation on March 2, 2023, Lead Counsel has devoted roughly 195 additional hours to the Action (i.e., preparing for the hearing on preliminary approval, drafting the Settlement Motion and related papers, and assisting with the notice campaign). Lead Counsel will continue to perform legal work on behalf of the Settlement Class should the Court approve the Settlement. Additional resources will be expended assisting Settlement Class Members with their Claims and related inquiries and working with the Claims Administrator, A.B. Data, to ensure the smooth progression of claims processing. No additional legal fees will be sought for this work.

JOINT DECL. ISO MOTIONS FOR FINAL
APPROVAL OF SETTLEMENT AND
ATTORNEYS' FEES AND EXPENSES

32

Case No. 3:20-cv-01260-SI

experience in the field and the ability of their attorneys added valuable leverage during the settlement negotiations.

### 4. The Standing and Caliber of Defendants' Counsel

102. The quality of work performed by Lead Counsel in obtaining the Settlement should also be evaluated in light of the quality of opposing counsel. Defendants were represented in the Action by a team of extremely able counsel from Gibson, Dunn & Crutcher LLP, Sidley Austin LLP, and Wilson Sonsini Goodrich & Rosati who vigorously litigated the Action.

### 5. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases

103. The prosecution of Lead Plaintiffs' claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Lead Counsel in bringing this Action to a successful conclusion are described above. The risks assumed by Lead Counsel here, and the time and expenses incurred by Lead Counsel without any payment, were extensive. The risk of nonpayment was substantially heightened here with the Court's dismissal of the Action.

104. From the outset, Lead Counsel understood that they would be engaging in complex, expensive, lengthy, and hard-fought litigation with no guarantee of ever being compensated for the substantial investment of time and the outlay of money that the prosecution of the case would require. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation. Lead Counsel also advanced all of the costs necessary to pursue the case vigorously on a fully contingent basis, including funds to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case such as this typically demands. Because complex shareholder litigation often proceeds for several years before reaching a conclusion, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel have received no compensation during the course of this Action and no reimbursement of out-of-pocket expenses, yet they have incurred substantial time and expenses in prosecuting this Action for the benefit of HP investors.

105. Lead Counsel also bore the risk that no recovery would be achieved in the Action. As discussed above, this case presented a number of significant risks and uncertainties from the outset, including challenges in pleading and ultimately proving the falsity of Defendants' statements, establishing scienter, and establishing loss causation and damages.

106. Lead Counsel's persistent efforts in the face of substantial risks and uncertainties have resulted in a recovery for the benefit of the Settlement Class. In circumstances such as these, we believe the requested fee is reasonable and should be approved.

### 6. The Reaction of the Settlement Class to the Fee Application

107. As noted above, as of June 22, 2023, a total of 634,337 Postcard Notices and 4,172 Notices have been mailed to potential Settlement Class Members and Nominees advising them that Lead Counsel would apply for attorneys' fees in an amount not to exceed 18% of the Settlement Fund. *See* Ewashko Decl., ¶ 8 and Ex. A (Postcard Notice) and Ex. B (Notice at p. 1 and ¶ 39). In addition, the Court-approved Summary Notice—which also provided information on Lead Counsel's fee request—was published in *The Wall Street Journal* and transmitted over *PR Newswire* on May 19, 2023. *See* Ewashko Decl., ¶ 10. To date, no objections to the request for attorneys' fees have been received. Any objections received will be addressed in Lead Counsel's reply papers to be filed on or before July 21, 2023, after the deadline for submitting objections has passed.

### B. The Expense Application

108. Lead Counsel also respectfully seek $135,598.87 in litigation expenses from the Settlement Fund that they reasonably and necessarily incurred in connection with the prosecution of the Action. The notices informed the Settlement Class that Lead Counsel would seek payment of Litigation Expenses in an amount not to exceed $250,000.

109. From the outset of the Action, Lead Counsel were aware that they might not recover any of their expenses and, even in the event of a recovery, would not recover any of their out-of-pocket expenditures until such time as the Action might be successfully resolved. Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the

Action. Consequently, Lead Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

110.    As set forth in Exhibit 5, Lead Counsel have paid or incurred a total of $135,598.87 in unreimbursed litigation expenses in connection with the prosecution of the Action. These expenses are summarized in Exhibit 7, which identifies each category of expense (e.g., expert, online legal and factual research, court fees, telephone charges, and printing and copying) and the amount incurred for each category. These expenses are reflected in the books and records maintained by Lead Counsel, which are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred. These expenses are submitted separately by Lead Counsel and are not duplicated by the firms' hourly rates.

111.    One of Lead Counsel's largest expenses, $41,655.00, or approximately 31% of Lead Counsel's total expenses, was expended for the retention of an expert. More specifically, Lead Counsel consulted with Chad Coffman, C.F.A. ("Mr. Coffman") of Global Economics Group, LLC regarding loss causation during the preparation of the Complaint and Amended Complaint and damages in preparation for settlement negotiations. Mr. Coffman and his associates also assisted Lead Counsel in developing the proposed Plan of Allocation. This expert was essential to the prosecution of the Action.

112.    Another large component of Lead Counsel's expenses was for online legal and factual research, which was necessary to conduct the factual investigation and identify potential witnesses, prepare the complaints, research the law pertaining to the claims asserted in the Action, oppose Defendants' motions to dismiss, and prepare Lead Plaintiffs' appellate briefs. It is standard practice for attorneys to use online services to assist them in researching legal and factual issues, and indeed, courts recognize that these tools create efficiencies in litigation and ultimately save money for clients and the class. The charges for online legal research amounted to $60,501.72, or approximately 45% of Lead Counsel's total expenses.

113.    Lead Counsel also incurred $9,797.50, or approximately 7% of their total expenses, for their share of the cost of the mediator, Mr. Melnick.

JOINT DECL. ISO MOTIONS FOR FINAL                    35                    Case No. 3:20-cv-01260-SI
APPROVAL OF SETTLEMENT AND
ATTORNEYS' FEES AND EXPENSES

114.    The other expenses for which Lead Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court fees, telephone costs, copying, appellate printing costs, and postage and delivery expenses.

115.    In addition, Lead Plaintiff Iron Workers seeks reimbursement for reasonable costs incurred directly in connection with its representation of the Settlement Class in the Action. Such request is expressly authorized and anticipated by the PSLRA, as more fully discussed in Section IV of the Fee and Expense Motion. More specifically, in accordance with the PSLRA, Lead Plaintiff Iron Workers seeks reimbursement of $10,000 for the time expended in connection with the Action by its employees, including its former Fund Director Sean Boyle, who dedicated a conservative estimate of 14 hours to the Action, and Iron Workers' fund counsel who spent several dozen hours on this litigation advising the Fund concerning litigation strategy and settlement. *See* Tormey Decl., ¶¶ 5, 9-10.[11]

116.    The total amount requested by Lead Plaintiffs and Lead Counsel for expenses, $145,598.87 (including $135,598.87 for Lead Counsel's expenses and $10,000 for Lead Plaintiff Iron Workers' costs), is well below the $250,000 that Settlement Class Members were advised could be sought. To date, there have been no objections to the maximum expense amount set forth in the notices.

## VII.    CONCLUSION

117.    For all the reasons set forth above, Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submit that the requested fee in the amount of 18% of the Settlement Fund should be approved as fair and reasonable, and the request for Lead Counsel's Litigation Expenses in the amount of $135,598.87 and Lead Plaintiff Iron Workers' costs, in the amount of $10,000, should also be approved.

We declare under penalty of perjury that the foregoing is true and correct.

---

[11] Lead Plaintiff Rhode Island is not seeking a PSLRA award.

Executed this 23rd day of June, 2023.


_____
        */s/ Jennifer L. Joost*
         Jennifer L. Joost[12]

_____
        */s/ Jeremy P. Robinson*
         Jeremy P. Robinson

_____

[12]     In compliance with Civil Local Rule 5-1(h)(3), I hereby attest that concurrence in the filing of this document has been obtained from the signatories.